1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**      )
                                        )
6              **Plaintiff,**          )
                                        )
7         **vs.**                      )     **CASE NO. CR 15-255-PA**
                                        )
8   **PAUL TANAKA,**                   )
                                        )
9              **Defendant.**          )
    _____)

10

11

12

13                 **REPORTER'S TRANSCRIPT OF**

14            **JURY TRIAL PROCEEDINGS - DAY 3**

15               **FRIDAY, MARCH 25, 2016**

16                    **8:07 A.M.**

17              **LOS ANGELES, CALIFORNIA**

18

19

20

21

22   _____

23          **SHAYNA MONTGOMERY, CSR, RPR, CRR**
          FORMER FEDERAL OFFICIAL COURT REPORTER
24         312 NORTH SPRING STREET, ROOM 410
            LOS ANGELES, CALIFORNIA 90012
25            SHAYNAMONTGOMERY@YAHOO.COM

**UNITED STATES DISTRICT COURT**

1                        **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4         EILEEN DECKER
          United States Attorney
5         BY:  BRANDON D. FOX
               LIZABETH A. RHODES
6              EDDIE A. JAUREGUI
               Assistant United States Attorneys
7         United States Courthouse
          312 North Spring Street
8         Los Angeles, California 90012

9

10    **FOR THE DEFENDANT PAUL TANAKA:**

11        H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
          BY:  H. DEAN STEWARD
12             Attorney at Law
          107 Avenida Miramar, Suite C
13        San Clemente, California 92672
          (949) 481-4900
14

15    **FOR THE DEFENDANT PAUL TANAKA:**

16        LAW OFFICE OF JEROME J. HAIG
17        BY:  JEROME HAIG
               Attorney at Law
18        21143 Hawthorne Boulevard, Suite 454
          Torrance, California 90503
19        (424) 488-0686

20

21    **ALSO PRESENT:**

22        Leah Tanner, FBI Special Agent

23

24

25

1    **INDEX OF WITNESSES**

2    **PLAINTIFF'S**
     **WITNESSES**                                              **PAGE**

3

     ALFRED GONZALES

4

5            Direct Examination by Mr. Fox                9
             Cross-Examination by Mr. Haig               21

6

     JOHN CLARK

7

8            Direct Examination by Mr. Fox                35
             Cross-Examination by Mr. Haig               44

9

     STEVEN ROLLER

10

11           Direct Examination by Mr. Fox                47
             Cross-Examination by Mr. Haig               63
             Redirect Examination by Mr. Fox             76

12

13   PATRICK EDWARD MAXWELL

14           Direct Examination by Mr. Jauregui           83
             Cross-Examination by Mr. Steward            93
15           Redirect Examination by Mr. Jauregui        103
             Recross-Examination by Mr. Steward          105

16

17   ROBERT OLMSTED

18           Direct Examination by Mr. Fox                106
             Cross-Examination by Mr. Steward            125

19

20   PETER ELIASBERG

21           Direct Examination by Ms. Rhodes            139
             Cross-Examination by Mr. Steward            162

22

23   ROBERT BAYES

24           Direct Examination by Mr. Jauregui           172
             Cross-Examination by Mr. Haig               187

25

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|---|---|---|---|
| 1 | Clark 2006 Memo | 39 | 39 |
| 4 | Roller 2007 Memo | 58 | 60 |
| 5 | Johnson 2010 Memo | 94 | 95 |
| 6 | McCorkle 2010 Memo | 119 | 119 |
| 9 | E-mail Dated 5/5/11 | 160 | 160 |
| 12 | E-mail Dated 8/18/11 | 180 | 180 |
| 13 | E-mail Dated 8/18/11 | 178 | 179 |
| 112 | ACLU Letter to Baca, October 28, 2009 | 141 | 142 |
| 113 | ACLU Annual Report, May 5, 2010 | 144 | 147 |
| 114 | Rutherford v. Baca, Notice of Filing of Report, September 9, 2010 | 150 | 151 |
| 115 | Rutherford v. Baca, Plaintiff's Supplemental Filing, February 7, 2011 | 152 | 154 |
| 311 | 2010 Maxwell POE Complaint | 94 | 95 |

**UNITED STATES DISTRICT COURT**

1          **LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 25, 2016**

2                          **8:07 A.M.**

3                          --oOo--

4          THE DEPUTY CLERK:  Calling item number one,

5   CR 15-255, U.S.A. vs. Paul Tanaka.

6       Counsel, state your appearances, please.

7          MR. FOX:  Good morning, Your Honor.  Brandon Fox,

8   Lizabeth Rhodes and Eddie Jauregui on behalf of the United

9   States.  Also sitting at counsel table is FBI Special Agent

10  Leah Tanner.

11         THE COURT:  Good morning.

12         MS. RHODES:  Morning.

13         MR. STEWARD:  And, Your Honor, Dean Steward and

14  Jerome Haig for Mr. Tanaka.  He's present.

15         THE COURT:  Good morning.

16         MR. HAIG:  Good morning.

17         THE COURT:  Let me see counsel at sidebar.

18      (Discussion held at sidebar.)

19         THE COURT:  Okay.  I have three notes from the

20  jurors.

21      The first one is from Juror Number 9.  "It occurred to me

22  as I drove home last night that I have a childhood friend that

23  still hangs out with my younger brother that may be a sheriff.

24  His son is presently trying to become a sheriff.  Years ago,

25  over 25 or 30, I sold this childhood friend his first house.

1    Although this childhood friend still has a friendship with my

2    brother and family, I don't hang out with him and only see him

3    on occasion when my brother has a gathering."

4          MR. FOX:  Your Honor, the government's position with

5    Number 9 is that it's pretty clear that Juror Number 9 did not

6    lie to us during the voir dire process; that this does not show

7    any bias that Juror Number 9 might have, and that there's no

8    reason to strike Number 9 for cause.

9          MR. STEWARD:  We agree.

10         THE COURT:  Okay.  This is from Juror 7.  "I

11   remembered something on my way home.  My wife on my dad's side

12   used to be the warden at the Vacaville State Prison.  It was

13   when I was a child.  Not sure how long, never spoke to him

14   about it."

15         MR. FOX:  Your Honor, same issues.  We don't think

16   that the juror was lying.  We don't think this shows bias.

17       Can I have one quick moment.

18       (Plaintiff's counsel conferred off the record.)

19         MR. FOX:  Okay.  So again, the government doesn't

20   think this is a reason to strike the juror.

21         MR. STEWARD:  We agree.

22         THE COURT:  All right.  And the last one is

23   Alternate Number 1.  "I was an officer and shareholder in the

24   mid-80s for a small construction company building residential

25   properties, apartments and houses.  In 1985 a resident from the

1    area at one of our job sites filed a complaint alleging he had

2    been injured while in front of our property.  The corporation

3    was named but, to the best of my recollection, no one was named

4    individually.  I appeared as an officer of the corp in Compton

5    Superior Court.  We paid a settlement after one court session

6    of less than $10,000.  I don't recall the exact amount."

7               MR. FOX:  Same thing, Your Honor.  It looks like

8    they're just being conscientious in raising issues, but they

9    don't go to lying or bias.

10              MR. STEWARD:  We agree.

11              THE COURT:  Okay.

12              MR. FOX:  Thank you.

13              THE COURT:  Oh, one other thing.  Old age.  I got a

14   brief look at the filing last night.  It looks like most of

15   these objections involve a confrontation clause.  Again, once

16   the government has established that a coconspirator exception

17   applies, the confrontation clause is really inapplicable,

18   doesn't apply, and both the Supreme Court and Ninth Circuit

19   have held that.

20        You can state your objection on the record.

21              MR. STEWARD:  I believe we've adequately stated in

22   our papers what we've said before, we understand the Court's

23   ruling.  We disagree, but we understand.

24              THE COURT:  Okay.

25              MR. FOX:  Thank you, Your Honor.

1        (End of sidebar discussions.)

2              MR. FOX:  Do you want our witness on the stand, Your

3   Honor?

4              THE COURT:  No, that's all right.  If you could just

5   have him here in the courtroom.

6              MR. FOX:  I will do that.

7              THE COURT:  All right.  Let's bring the jurors in.

8        (Pause in proceedings.)

9        (The jury entered the courtroom.)

10             THE COURT:  Good morning, ladies and gentlemen.

11             THE JURY PANEL:  Good morning.

12             THE COURT:  Several of you gave us some notes.  We

13  have reviewed those notes, or I've reviewed them with counsel.

14  Thank you very much for being so conscientious, and none of

15  these are issues.  In addition, I want to thank you all for

16  being on time this morning so that we can get started.

17       All right.  Is the government prepared to call its first

18  witness?

19             MR. FOX:  We are, Your Honor.  The United States

20  calls Al Gonzales.

21             THE COURT:  Ladies and gentlemen, you've been given

22  notebooks.  Again, you're free to take notes, but rely on your

23  own memory of what was said by witnesses.

24             THE DEPUTY CLERK:  Could you please raise your right

25  hand.

```
 1              (The witness, ALFRED GONZALES, was sworn.)
 2                   THE DEPUTY CLERK:  Please be seated.
 3         When you're ready, will you state your full name for the
 4    record.
 5                   THE WITNESS:  Alfred Gonzales.
 6                   THE DEPUTY CLERK:  Thank you.
 7                   THE COURT:  Would you spell your last name, please.
 8                   THE WITNESS:  G-O-N-Z-A-L-E-S.
 9                   THE COURT:  Thank you.
10                   MR. FOX:  May I proceed, Your Honor?
11                   THE COURT:  Yes, please.
12                              DIRECT EXAMINATION
13    Q    (BY MR. FOX)  Mr. Gonzales, are you currently working?
14    A    Part-time.
15    Q    When were you last working full-time?
16    A    2007.
17    Q    Where were you working at the time?
18    A    I was working for the Los Angeles Sheriff's Department.
19    Q    How long did you work for the Los Angeles Sheriff's
20    Department?
21    A    26 years.
22    Q    What was the highest rank that you received?
23    A    Lieutenant.
24    Q    And in 2007 what was your job?
25    A    I was the day and p.m. watch commander; four days on days,
```

```
 1    one day on the evening, p.m. shift.

 2    Q     Where were you watch commander?

 3    A     At Men's Central Jail.

 4    Q     What is Men's Central Jail?

 5    A     The largest jail facility -- men's jail facility in the

 6    county of Los Angeles.

 7    Q     Who runs Men's Central Jail?

 8    A     I don't understand the question.

 9    Q     Who operates it?  Is it run by the Sheriff's Department?

10    A     Oh, yes, Los Angeles Sheriff's Department.

11    Q     And at the time that you were watch commander, what was

12    your rank?

13    A     I was a lieutenant.

14    Q     How long had you been a lieutenant with Men's Central

15    Jail?

16    A     I promoted from internal affairs in 2003 until the day I

17    retired in March of 2007.

18    Q     What were your duties in internal affairs?

19    A     I investigated alleged misconducts by anyone on the

20    Sheriff's Department, policy violations.

21    Q     When you promoted to become a lieutenant at Men's Central

22    Jail, was that your first experience with Men's Central Jail?

23    A     No, sir.

24    Q     Could you please describe your previous experience at

25    Men's Central Jail.
```

A     I began my employment with the County of Los Angeles in
1975.  I was a journeyman, sheet metal worker.  I worked there
from 1975 until 1981 when I went to the academy.  I was then
reassigned to the county jail.  Those six years were totally
county jail as a sheet metal worker.  Then I was reassigned to
Central Jail in -- after completing the academy for two more
years.  I returned for an additional two years as a sergeant in
the late 1990s working Inmate Reception Center, and then I
returned for the fourth time as a lieutenant in 2003.

Q     Can you please describe what the Inmate Reception Center
is.

A     That's where, when an inmate is arrested and he's going to
be booked into the jail system, they come into the Inmate
Reception Center, and it's adjacent to the county jail.

Q     What about when an inmate is released?  Do you know if the
Inmate Reception Center has a duty with respect to that inmate
and its records?

A     Yes.  They also release him from the same facility, the
Inmate Reception Center.

Q     Are you familiar with the layout of Men's Central Jail
from, let's say, the mid-2000s to when you left Men's Central
Jail?

A     Very much so.

Q     Can you please describe how it's laid out in terms of the
types of inmates that are assigned to various floors.

1  A    The majority of the jail is housed in -- the first floor

2  is your hospital and your administration.  Your second floor is

3  totally jail inmates, and they're your gang, high volatile

4  inmates.  The third, 3000 floor is also as equally high level

5  inmates, highly volatile.  Your new side, which is your 4,000,

6  houses single-man cells, multi-man cells.  They also have

7  highly but not quite as volatile as your second and third --

8  2,000 and 3,000.

9     Then you have 4,000.  You have large dorms on 4,000, and

10 you have 9,000, which is the third floor on the new side.  Then

11 you have a hospital area as well.  It's a little convoluted,

12 but you have a hospital area in the back, 6,000, 7,000 and

13 8,000.

14 Q    Mr. Gonzales, you mentioned when you graduated from the

15 academy you went to go work at Men's Central Jail.  Is that the

16 natural progression of deputies graduating from the academy?

17 A    Yes.

18 Q    I want to now take you to 2003 when you began working as a

19 lieutenant at Men's Central Jail.  Did you have a chance to

20 evaluate any issues that might be occurring at the jail at that

21 time?

22 A    I was initially assigned to the graveyard shift, typically

23 your slowest shift of the day.  So I had a lot of time to

24 review, and I would review the day logs from the previous --

25 the operations logs from the previous day.  And I had a lot of

1  time to just review reports coming through my desk -- or across

2  my desk.

3  Q    Did that cause you any concerns when you went through

4  those day logs?

5  A    Concerns -- I don't know if concerns, but I did notice a

6  pattern.

7  Q    What was that pattern?

8  A    I noted a high level of force being used on specific

9  floors in the jail.

10  Q    Which floors were those?

11  A    2,000 and 3,000.

12  Q    Those are the second and third floor?

13  A    Yes.

14  Q    Did you also have a chance to look at the reports that

15  were generated about those use of force reports -- or excuse

16  me, about those uses of force?

17  A    Some reports, yes.

18  Q    Did you notice any patterns with respect to them?

19  A    I noted a -- if this is the correct word -- a

20  cookie-cutter approach to some of the reports.  They seemed to

21  have the same sameness, no originality, same MO, operis --

22  operandi -- modis operandi.

23  Q    Did that cause you any concerns?

24  A    Yes, a little bit.

25  Q    Why is that?

1    A    Well, I couldn't see the force being used the same way all

2    the time, and it was repetitive.  The reports were being

3    read -- were being written repetitive, and I thought there

4    should be a variety of different incidents.

5    Q    Outside of the paper you were looking at, did you notice

6    anything with respect to deputy behavior?

7    A    Initially, yes.

8    Q    And what was that?

9    A    Well, having spent so much time in the jails -- in custody

10   division in my career, I noted a chronic -- immediate chronic

11   tardiness and deputies leaving the facility before the end of

12   their shifts.

13   Q    Are you familiar with the term "cliques"?

14   A    Yes.

15   Q    What, if anything, did you determine with respect to

16   whether there were any deputy cliques at Men's Central Jail

17   during that time?

18   A    I began my shift on graveyard shift at 2100 hours, which

19   is nine o'clock in the evening.  The p.m. shift doesn't get off

20   duty until 2200 hours, which is ten o'clock, so there's an hour

21   overlap.  And so I would go up on the floors and try to

22   interact with the men -- men and women.  But I also had a habit

23   of being near the exits as the p.m. shift would exit, and I

24   noted that 2,000 and 3,000 floors only would exit those floors

25   and would only exit those floors when everyone on that floor

```
 1   was present at the exit on that particular floor, for example,

 2   2,000.  And not until every member of that shift was present at

 3   that door, they would in unison come down the escalators, march

 4   down the escalators very stone-faced, expressionless and walk

 5   out the gates.  And at times, I would be standing outside the

 6   gates in uniform with my rank showing, and they would walk

 7   right by me and never acknowledge me, would never talk and

 8   would not even commingle with anyone else in the jail.

 9   Q    Are you familiar with John Clark?

10   A    Yes, sir.

11   Q    Who is John Clark?

12   A    One of my captains assigned to Men's Central Jail.

13   Q    Do you recall when he was captain of Men's Central Jail?

14   A    Approximately -- I believe he came in in 2004, and he

15   transferred out, I believe, latter part of 2006.

16   Q    Did you have a chance to bring any of your concerns to the

17   attention of Captain Clark?

18   A    Yes.

19   Q    Did the two of you come up with any sort of plan or a way

20   of dealing with these problems?

21   A    Could you be more specific.

22   Q    Well, in terms of the deputy cliques and -- sorry, should

23   have been more specific.  Thank you.

24        In terms of the deputy cliques and the use of force and

25   the cookie-cutter reports, did you discuss any plans with
```

1    Captain Clark?

2    A    Well, I had another concern that I also took to him, yes,

3    I did.

4    Q    And what type of plan did you discuss with Captain Clark?

5    A    I went to him, and I expressed my concerns as to my

6    observations in custody as well as their off-duty conduct.  And

7    I suggested that we had these two major cliques, only on --

8                MR. HAIG:  Objection, Your Honor, hearsay.

9                THE COURT:  No.  Overruled.  Go ahead.

10   Q    (BY MR. FOX)  You may proceed.

11               THE COURT:  You may proceed.

12               MR. FOX:  Thank you, Your Honor.

13               THE WITNESS:  I told him that we had these two

14   cliques, in my opinion, cliques on the p.m. shift on 2,000 and

15   3,000 floors, and I told him about my concerns with the force

16   being used up there.  I told him about my concerns with their

17   off-duty conduct, and then I explained to him how they would

18   exit the jails and that I felt, in my opinion, the best way to

19   deal with this is to break the floors up.

20   Q    (BY MR. FOX)  What do you mean by break the floors up?

21   A    I suggested that we would transfer everyone on those

22   shifts within the shift, keep them on the shift but move them

23   to different job assignments within the shifts so that everyone

24   just rotated assignments.

25   Q    So their hours would not change?

**UNITED STATES DISTRICT COURT**

1   A     Their hours would not change.

2   Q     Did there come a point in time in which you attended a

3   meeting at Men's Central Jail that was being held by Paul

4   Tanaka?

5   A     Yes.

6   Q     Do you recall when this was?

7   A     To the best of my recollection, it was June of 2006.

8   Q     Do you recall how the meeting was set up?

9   A     Could you be more specific.

10  Q     Sure.  Did you have advance notice of the meeting?  Was

11  it -- do you recall whether it was an all-staff meeting that

12  was announced?

13  A     To the best of my recollection, we were given about a

14  day's notice.  It was mandatory.  Every supervisor assigned to

15  Men's Central Jail had to be present; that included every

16  sergeant, every lieutenant and the captain.  There were no line

17  personnel in the meeting.

18  Q     Do you recall where within Men's Central Jail this meeting

19  was held?

20  A     It was on the second floor briefing room.

21  Q     Had you ever met Mr. Tanaka before that?

22  A     No.

23  Q     Did you ever encounter him after that date?

24  A     No.

25  Q     Do you think you would recognize him again if you saw him?

```
 1   A     Yes.

 2   Q     I'd like you to please look around the courtroom and tell

 3   me whether you recognize Mr. Tanaka in the courtroom.

 4   A     Yes.  Yes, I do.

 5   Q     Can you please identify a piece of clothing that he's

 6   wearing or where he's sitting.

 7   A     Mr. Tanaka's the first gentleman sitting at the bench at

 8   the table.

 9         MR. FOX:  Your Honor, I'd like the record to reflect

10   an in-court identification of Mr. Tanaka, please.

11         THE COURT:  The record will so reflect.

12   Q     (BY MR. FOX)  I want to talk about some of the specifics

13   of this meeting.  Do you recall where you sat at the meeting?

14   A     I was on the front row.

15   Q     Do you recall whether anybody was near you?

16   A     I was in the front row.  Captain Clark was three seats to

17   my right.  I had one of my sergeant friends next to me to my

18   left.  The podium was to my left, and Mr. Tanaka was at the

19   podium.

20   Q     Do you recall what Mr. Tanaka said at this meeting?

21   A     I can only paraphrase.  I don't remember it verbatim.

22   Q     Do you recall how he began the meeting?

23   A     I believe he stated that he was having this meeting due to

24   the supervision assigned to Men's Central Jail.  He described

25   it as being antiquated, and at one point he called us a bunch
```

1   of old dinosaurs.

2   Q    Do you recall whether Mr. Tanaka made any statements about

3   lieutenants referring to deputies as gang members?

4            MR. HAIG:  Objection, Your Honor, leading.

5            THE COURT:  Sustained.

6   Q    (BY MR. FOX)  After Mr. Tanaka referred to the supervisors

7   as a bunch of dinosaurs, what, if anything, did he say?

8   A    He stated that he had started to rectify the problem --

9   I'm only paraphrasing this -- and he said, "I have

10  hand-selected three new lieutenants assigned to Central Jail."

11  And then he continued, and he made reference to "How dare a

12  lieutenant on the Los Angeles Sheriff's Department refer to

13  deputy sheriffs as gang members, how dare him."

14  Q    Do you know who had referred to deputy sheriffs as gang

15  members out of the lieutenants?

16  A    I believe he was referring to me.

17  Q    And why is that?

18  A    In 2000 -- I believe it was 2004, I was still working the

19  graveyard shift, and my deputies -- the deputies on the p.m.

20  shift, 2,000 and 3,000, were getting involved in off-duty

21  conduct -- misconduct.  And one of the deputies happened to be

22  walking by my office at one point, and I brought him into my

23  office, and I decided I was going to give him some mentoring,

24  counseling.  And I spoke to him, and I said to him -- I brought

25  these incidents up to him and their conduct, walking out of the

 1  jail facility and the high level of force, and I said, "You

 2  guys" -- I said, "This is reminiscent of gang members.  You

 3  guys remind me of gang members."  I didn't call them gang

 4  members.  I said, "You remind me of gang members," and I was

 5  trying to explain to him how this type of conduct could have

 6  ramifications on their careers.

 7  Q    You mentioned Mr. Tanaka said he was bringing in three new

 8  lieutenants to work at Men's Central Jail.  Do you recall the

 9  names of the lieutenants that he mentioned at that meeting?

10  A    Yes.

11  Q    Who were they?

12  A    Kevin Hebert, Wes Sutton and Christopher Nee.

13  Q    Do you recall if Mr. Tanaka said anything else about how

14  you should be supervising deputies?

15  A    He was still at the podium, and he was describing the new

16  generation of deputies, and he referred to them as the XYZ

17  generation.  "These are the XYZ generation."  And he stepped

18  away from the podium, and he cradled his arms in this fashion,

19  and he said, "These are the Y generation.  You will coddle

20  them," and just as he said that, he looked in my direction.  He

21  looked directly at me, and he yelled, "Yes, you, Lieutenant,

22  will coddle them."

23  Q    What, if anything, did Mr. Tanaka say about whether

24  supervisors should be on the floors with the deputies?

25  A    At the conclusion of his -- it was near the conclusion of

1    his speech to us, he said, "You supervisors" -- I believe he

2    said, "You" -- he didn't say the word supervisor.  He said,

3    "You will stay off those floors and let the deputies do what

4    they have to do."

5    Q    Based on your experience, did you notice whether there was

6    a correlation between supervisors being on the floor and force

7    going up or down?

8    A    It was my experience that if you have supervision on those

9    floors, the deputies are going to do their jobs.  That's why

10   we're there.  We're there to supervise the deputies, and there

11   was a correlation.  We have supervisors on the floor, there's

12   no force.  My supervisors are not on those floors, and force

13   began to escalate.

14        I had force from time to time while I was on duty, and my

15   first question was always where was my sergeant, where is my

16   sergeant because I found that the sergeant wasn't on the floor,

17   force went up.

18             MR. FOX:  May I have one moment, Your Honor?

19             THE COURT:  Yes.

20             MR. FOX:  No further questions, Your Honor.

21             THE COURT:  All right.  Cross-examination.

22                         CROSS-EXAMINATION

23   Q    (BY MR. HAIG)  Good morning, sir.

24   A    Morning, sir.

25   Q    In 2007, that's when you left the Sheriff's Department as

```
 1  lieutenant.  Would that be correct?
 2  A    Yes, sir.
 3  Q    All right.  About what month?
 4  A    March 19.
 5  Q    And you retired as lieutenant from Central Jail?
 6  A    Yes.
 7  Q    That was your last assignment?
 8  A    Yes.
 9  Q    When you first got to Central Jail in 2003 -- well, when
10  your last assignment was at Central Jail in 2003, that was
11  after you promoted to lieutenant.  Would that be correct?
12  A    When I arrived at Central Jail?
13  Q    In 2003.
14  A    April 2003, yes, as a lieutenant --
15  Q    You had -- you had --
16  A    Newly-promoted lieutenant, yes.
17  Q    All right.  And after you promoted to lieutenant, you went
18  from internal affairs to Central Jail?
19  A    No, no.  I was a sergeant at internal affairs.  I promoted
20  to lieutenant, and my first day as a lieutenant was at Men's
21  Central Jail.
22  Q    That's what I was asking.  Okay.  Thank you.
23       And who was your direct supervisor in 2003 when you got to
24  Men's Central Jail?
25  A    Sergeant -- Captain Rick Adams.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    At some point in time, Captain Rick Adams was replaced by
 2   Captain John Clark?
 3   A    No, Captain Ray Leyva.
 4   Q    Okay.  And then after Ray Leyva, then came John Clark?
 5   A    Yes.
 6   Q    All right.  And in 2003, do you know the rank of Paul
 7   Tanaka?
 8   A    No.
 9   Q    You don't know whether he was a chief, assistant sheriff
10   or anything like that; is that correct?
11   A    He might have been a chief.
12   Q    All right.
13   A    I would be guessing.  I knew he was a manager.  I knew he
14   had rank, but I was concerned about my job.
15   Q    Of course.  Right.  I'm not asking what you were concerned
16   about, but in 2003, had you ever heard the name Paul Tanaka
17   before?
18   A    Oh, yes.
19   Q    Okay.  And obviously, in 2007 before the meeting was
20   called, you had heard the name Paul Tanaka?
21   A    Yes.
22   Q    And do you know what Paul Tanaka's rank was in 2007?
23   A    I believe he was an assistant sheriff.
24   Q    And when Mr. Tanaka came to Men's Central Jail as the
25   assistant sheriff, was that a rarity for somebody of that rank
```

**UNITED STATES DISTRICT COURT**

24

```
1   to actually come to the Men's Central Jail and hold a meeting?
2   A     I believe so.
3   Q     During your time as lieutenant at Men's Central Jail, do
4   you ever recall the predecessor to Paul Tanaka coming to the
5   jail and holding a meeting?
6   A     With supervisors?
7   Q     Yes.
8   A     No.
9   Q     This would be the only time that you recall the assistant
10  sheriff ever coming to county jail when you were working there.
11  Would that be correct?
12  A     I believe so.
13  Q     Did Mr. Tanaka show up there in a suit like he's wearing
14  today, or was he in uniform?
15  A     I believe he was in a uniform.
16  Q     Can you describe the uniform that he was wearing?
17  A     A sheriff's uniform.
18  Q     A typical sheriff's uniform with a --
19  A     I don't recall, to be honest with you.  I don't recall
20  whether he was wearing the uniform or not.
21  Q     If I were to show you a photograph of Mr. Tanaka in a
22  uniform in 2007, would that refresh your recollection as to
23  whether he was actually dressed that way at that time?
24            MR. FOX:  Objection to the form of the question.
25            THE COURT:  Sustained.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    (BY MR. HAIG)  During the meeting in 2007, were you in
 2   uniform?
 3   A    Yes.
 4   Q    And your captain, Captain Clark, was he in uniform?
 5   A    I don't recall.
 6   Q    Was it typical for the captain to wear a uniform to work
 7   every day?
 8   A    He wore a suit at times.
 9   Q    But you wore a uniform every day?
10   A    I wore a uniform every day.
11   Q    You were asked questions on direct examination about
12   cliques; right?  You said the 2,000 floor and the 3,000 floor
13   had what you call cliques when you were there; correct?
14   A    Yes.
15   Q    You also talked about how the 2,000 floor and the 3,000
16   floor were floors where inmates that were housed there could be
17   problems for having violent propensities; correct?
18   A    That's correct.
19   Q    Those were the most difficult floors to manage as a line
20   deputy on that floor.  Would that be correct?
21   A    Yes.
22   Q    And why is that?
23   A    You had your most volatile inmates, your high-level
24   inmates on those -- your gang members on those two floors.
25   Q    And as a supervisor there, you would expect more use of
```

1   force incidents in managing that type of volatile inmate

2   population than a less volatile inmate population.  Would that

3   be correct?

4   A     No doubt.

5   Q     The cliques that you talked about, they were basically --

6   the people that worked on 2,000 floor liked to associate with

7   each other and were friends with each other.  Would that be a

8   correct statement?

9   A     I guess.

10  Q     Well, did you know some of the deputies that worked on the

11  2,000 floor from 2003 to 2007?

12  A     Did I know them?  I supervised them.

13  Q     So you knew who they were?

14  A     Yes.

15  Q     All right.  On one shift, let's say the p.m. shift, how

16  many deputies would be working on the 2,000 floor?

17  A     20 maybe.

18  Q     Same thing on the 3,000 floor?

19  A     I believe so.

20  Q     And when that shift was over, there would be an overlap

21  from p.m. to graveyard, as you stated; right?

22  A     Yes.

23  Q     And so there would be another 20 deputies that would come

24  in for graveyard shift, and an hour later the 20 deputies that

25  were on the p.m. shift would then leave?

```
1   A     The -- yeah, they would be relieved staggerdly [sic], yes.
2   Q     And as they were leaving and going home, going into their
3   cars and going to the personal vehicles, doing whatever they
4   were doing, the people -- the deputy sheriffs that were on the
5   2,000 floor, they would wait for each other and all leave
6   together as a unit.  Is that what you noticed?
7   A     Yeah, I noticed they were being relieved individually, but
8   they wouldn't leave the floor.  They would stay on that floor.
9   Even if the one member was late 15, 20 minutes, they would stay
10  on that floor 15, 20 minutes until every member was present,
11  and then they would leave together.
12  Q     You noticed -- you actually saw this happen face to face;
13  right?
14  A     I had an incident where I had to order them off the floor.
15  Q     You had to order one of the persons that was basically off
16  his shift off the floor; correct?
17  A     I had to order the entire shift off the floor.
18  Q     Because they wanted to wait around for all of the people
19  to leave; right?
20  A     They were waiting around for an individual that I was
21  counseling in the sergeant's office.
22  Q     Was this the same time that you were referring to this
23  individual as acting like a gang member, that person?
24  A     No, it was a separate incident.
25  Q     And did the level of unity of the people on the 2,000
```

1  floor, for instance, did that bother you?

2  A    I understood cohesiveness.  I understood the comradery.  I

3  did it as a deputy, but these deputies would not socialize with

4  any other deputy in the facility other than their floor, and it

5  was more a loyalty to their floor than to the Sheriff's

6  Department.  And that gave me concern.

7  Q    The loyalty didn't give you a concern?

8  A    No, it was -- it was not so much the loyalty because they

9  were -- coming off the way they came off those shifts and then

10  their conduct off duty, because they were getting involved in

11  bar fights and being arrested for DUIs, the same only two

12  floors, 2,000 and 3,000, coupled together, that was giving me

13  concerns.

14  Q    The comradery on those floors, was that a problem for you?

15  A    No.

16  Q    The fact that these deputy sheriffs that were all fairly

17  young deputy sheriffs, all around the same age, probably early

18  20s; correct?

19  A    20s and 30s, yes.

20  Q    That they got along with each other, they trusted each

21  other, they wanted to associate with each other, did that pose

22  a problem for you?

23  A    No, no.  It was more than that, Counselor.  It wasn't just

24  comradery.  They were taking it, in my opinion, a step further.

25  They were not socializing with anyone in the jail other than

**UNITED STATES DISTRICT COURT**

1    themselves, and as they walked off the floors in mass, very

2    stone-faced, they would even walk by me and not even

3    acknowledge the presence of their supervisor.  That bothered

4    me.

5    Q    You said that you had to intercede a few times when some

6    of the people that were working on the 2,000 floor, the 3,000

7    floor got into off-duty issues; correct?

8    A    Yes.

9    Q    How many times did that happen during your time from 2003

10   to 2007 as a lieutenant?

11   A    The incidents that I'm referring to happened in a short

12   period of time in 2003.

13   Q    From 2004 to 2007, none of these incidents happened?

14   A    While I was assigned to day shift, and since I'm assigned

15   to day shift, I wasn't privy to what was happening as they were

16   getting off on p.m. shift.  It could have happened.  I wasn't

17   aware of it.

18   Q    All right.  So the cliques you're talking about on the

19   2,000 floor and the 3,000 floor that you noticed, this was in

20   2003.  Would that be correct?

21   A    Yes.

22   Q    And you have no personal knowledge of cliques that were

23   going on after 2003 because you weren't monitoring that type of

24   activity.  Would that be a correct statement too?

25   A    I wasn't on duty at that time.

**UNITED STATES DISTRICT COURT**

```
 1   Q     Therefore --

 2   A     It could have happened, but I wasn't on duty.

 3   Q     You didn't notice the cliques after 2003 when you changed

 4   your shift.  Would that be correct?

 5   A     I didn't see the clique mentality on day shift.  I was not

 6   working p.m. shift as the deputies were getting off, so I

 7   wasn't -- I couldn't monitor them.

 8   Q     I understand that.

 9   A     I don't know whether it was or not.

10   Q     But when you're talking about these cliques, just so I can

11   be -- ask you a precise question, are we talking about just one

12   year of your observation, 2003?

13   A     The one year that I had the ability to observe them is

14   when I saw it happen.  The one year that I worked graveyard

15   shift in 2003 and 2004 is when I saw the cliques, yes.

16   Q     And that's when, in your belief, Mr. Tanaka was not yet

17   assistant sheriff, he was a chief.  Would that be correct?

18   A     I don't know what rank Mr. Tanaka was at the time.

19   Q     Like you said, the only time you ever saw Mr. Tanaka face

20   to face before coming into court today was that time at the

21   meeting at the Central Jail in 2007?

22   A     The meeting was in 2006.

23   Q     2006; is that correct?

24   A     Yes.

25   Q     All right.  Was it in 2003 that you had the counseling
```

1    meeting with the deputy sheriff that was working at Men's

2    Central Jail where you referred to him as acting like a gang

3    member?

4    A    It could have been 2003, 2004, because I transferred to

5    day shift in 2004, so it was 2003, 2004.

6    Q    Do you recall the name of this deputy sheriff that you

7    were counseling as acting like a gang member?

8    A    I believe his name was Corales, I believe.

9    Q    Was Deputy Corales the only person you had ever referred

10   to as acting like a gang member?

11   A    Yes.

12   Q    You'd never said that to any other deputy sheriff during

13   the time that you were at Men's Central Jail from 2003 to 2007.

14   Would that be a correct statement?

15   A    Yes.

16   Q    Did Deputy Corales take your advice to heart, or did he

17   rebuff you?

18   A    In my opinion, I don't believe he was receptive to my

19   advice.

20   Q    As a matter of fact, he was upset that you would refer to

21   him as a gang member.  Would that be a correct statement?

22   A    I don't recall that.  I know that -- I don't believe he

23   was receptive to it.

24   Q    As far as you know, the deputy sheriffs you supervised at

25   Men's Central Jail are not members of a criminal street gang.

1    Would that be correct?

2    A      I wasn't calling them gang members.

3    Q      That's not the question I asked you.

4           Do you know whether the deputy sheriffs that work at Men's

5    Central Jail are members of a criminal street gang?  Yes or no.

6                THE COURT:  Sir, you don't direct witnesses how to

7    answer questions.  Just ask your questions.

8    Q      (BY MR. HAIG)  Do you know whether people -- deputy

9    sheriffs that were working at Men's Central Jail when you were

10   working there from 2003 to 2007 were members of a criminal

11   street gang?

12   A      I didn't know that.

13   Q      Do you know whether the Sheriff's Department would hire

14   somebody that is an active member of a criminal street gang?

15   A      I don't believe so.

16   Q      You talked about the three people after the June 2006

17   meeting where Assistant Sheriff Tanaka was there, the three

18   people that were going to be coming to the jail to be

19   supervisors that we said -- Mr. Sutton, Mr. Hebert and Mr. Nee;

20   is that correct?

21   A      They were already assigned to the jail.

22   Q      And what were their ranks?  Did they all have the same

23   rank or different ranks?

24   A      They were newly-promoted lieutenants.

25   Q      When Mr. Tanaka said that these people were going to be

**UNITED STATES DISTRICT COURT**

33

1    working at the jail, you said they were already there?

2    A    To the best of my recollection, they were already there.

3    They had just arrived.  They had been there a couple of months.

4    Q    And these three, were they all men?

5    A    Yes.

6    Q    And these three gentlemen all had the same rank as you?

7    A    Yes.

8    Q    And did they perform essentially the same function that

9    you performed?

10   A    Yes.

11   Q    Just on different shifts?

12   A    Yes.

13   Q    How many lieutenants would be working at the same time at

14   Men's Central Jail?  It's a big jail, as you said.

15   A    At any one time?

16   Q    Yes.

17   A    Within the jail proper, two.

18   Q    Did either Mr. Sutton -- Lieutenant Sutton, Lieutenant

19   Hebert or Lieutenant Nee have the same assignment that you had,

20   just on a different shift while working at Men's Central Jail?

21   A    Yes.

22   Q    And after the June 2006 meeting, did any of your work

23   duties change?

24   A    No.

25   Q    You said that Mr. Tanaka yelled and said that "How dare

**UNITED STATES DISTRICT COURT**

1   you" -- looking at you, "How dare you, Lieutenant, refer to a

2   deputy sheriff as a gang member."  He yelled at you.

3   A    No.

4   Q    What did he say?

5   A    He said that, but he didn't yell at me.

6   Q    Well, he was yelling.

7   A    He yelled it, but he wasn't looking at me.

8   Q    You thought he was referring to you when he said that?

9   A    I thought only because I'd had this one incident, and I --

10  to the best of my recollection, I didn't know anyone else that

11  had counselled a deputy and referred to him as -- reminded him

12  of gang members.  So I believed, in my opinion, that he was

13  probably referring to me.

14  Q    And as you think back upon this incident in 2003, do you

15  probably think it was a mistake to refer to a Hispanic deputy

16  sheriff as a gang member?

17  A    No.

18           MR. HAIG:  I have nothing further.

19           THE COURT:  All right.  Redirect?

20           MR. FOX:  Nothing, Your Honor.

21           THE COURT:  All right.  You may step down.  Thank

22  you very much.

23       Call your next witness.

24           MR. FOX:  The United States calls John Clark.

25           MR. STEWARD:  And, Your Honor, I neglected to move

```
 1    to exclude witnesses before the first witnesses.  My apologies.
 2    I would make that motion now.
 3              THE COURT:  I think we've already gone over that,
 4    that all witnesses are going to be excluded.
 5              THE DEPUTY CLERK:  Please raise your right hand.
 6          (The witness, JOHN CLARK, was sworn.)
 7              THE DEPUTY CLERK:  Please be seated.
 8          Will you please state your full name and spell your last
 9    name for the record.
10              THE WITNESS:  John Clark, last name C-L-A-R-K.
11              THE DEPUTY CLERK:  John with a J-O-H-N?
12              THE WITNESS:  Yes.
13              THE DEPUTY CLERK:  Thank you.
14              MR. FOX:  May I proceed, Your Honor?
15              THE COURT:  Yes.
16                       DIRECT EXAMINATION
17    Q    (BY MR. FOX)  Are you currently employed, Mr. Clark?
18    A    Yes, I am.
19    Q    What do you do?
20    A    I'm a consultant with the Center for Public Safety
21    Management.
22    Q    What do you do for that center?
23    A    This company does assessments of police departments around
24    the country, and I participate in those assessments.
25    Q    How long have you been doing that?
```

```
1    A      About four months.

2    Q      Were you previously employed full-time?

3    A      Yes, I was.

4    Q      When was that?

5    A      I was with the Los Angeles County Sheriff's Department

6    from April of 1979 until September of 2012.

7    Q      What was the highest rank that you achieved at the

8    Sheriff's Department?

9    A      Captain.

10   Q      Where did you work as a captain?

11   A      I worked Transportation Bureau, Central Jail, Commercial

12   Crimes Bureau, Transportation Bureau again and Internal

13   Affairs.

14   Q      Let's go through just a couple of those.  When did you

15   work for Men's Central Jail as captain?

16   A      August 2004 to December 2006.

17   Q      And what about Internal Affairs?

18   A      I was there February 2012 to September 2012.

19   Q      Let's focus on your time as captain of Men's Central Jail.

20          At that time, did -- were deputies assigned to certain

21   floors at the jail to work?

22   A      Yes.

23   Q      Could you please describe how they were assigned.

24   A      Well, generally, scheduling would assign them to certain

25   floors to work for a particular job cycle, which is normally
```

1   the 28 days.

2   Q    Did this raise any concerns in your mind at the time?

3   A    Relative to the method of scheduling, no.

4   Q    Did it raise any concerns with respect to anything else?

5   A    Well, with the force issues that we were working to

6   reduce, the deputies had worked these floors for a long period

7   of time, and so I used as an option to try to address the force

8   issues.

9   Q    So what did you do?

10  A    Well, throughout the period of time that I was there,

11  we're managing the force and trying to address ways to reduce

12  the force through administrative methods, through training,

13  counseling, discipline.  And we weren't having the reduction in

14  force that I had hoped for, so I instituted a rotation policy.

15  Q    What was this rotation policy that you introduced?

16  A    I was going to have the deputies transferred from job to

17  job every two months, meaning different floors.

18  Q    Why did you think this would work?

19  A    Well, we weren't having the success I'd hoped for with the

20  other methods that myself and other captains before me had

21  tried, so I'd hoped that if there was something -- some group

22  dynamics, group think, anything else that was going on on the

23  floors by the long period of times they worked together, maybe

24  this change would affect that and have some change in the

25  number of force we were having.

```
 1   Q    I imagine that the Sheriff's Department is a bureaucracy
 2   like many government entities; is that right?
 3   A    Yes.
 4   Q    So did you have to do anything particularly if you were
 5   going to implement this rotation plan, to clear it with anyone?
 6   A    Yes.
 7   Q    What did you have to do?
 8   A    I had to run the policy by my commander.
 9   Q    Did your commander approve of this policy?
10   A    He did.
11   Q    What was your commander's name?
12   A    Dennis Conte.
13   Q    Did you do anything else to implement this policy to get
14   anybody to sign off on it?
15   A    I went through our employee relations and ran it by them.
16   Q    After running this by employee relations, were you still
17   going forward with the plan?
18   A    I had announced it -- with the approval of my commander, I
19   had announced it to the staff that it was going to be
20   implemented at the next cycle change, which was going to be a
21   few weeks down the road.
22   Q    When you say you had announced it to your staff, does that
23   include the deputies?
24   A    Yes.
25   Q    What did you do to communicate the plan to the deputies?
```

```
 1   A    I wrote a memo out to the deputies and put it out to them
 2   in an e-mail on a Friday and told them I would come to
 3   briefings and discuss it the following week.
 4   Q    Mr. Clark, I'd like you to open up your binder if you
 5   could to Exhibit Number 1, and please take a look at it.
 6        Do you recognize that?
 7   A    I do.
 8   Q    What is it?
 9   A    It's the copy of the memo that I sent out to the deputies.
10   Q    Do you know if that's the final copy of that memo?
11   A    That I'm not sure.  I see the date, but I'm not sure
12   exactly the date I sent it out.
13   Q    Is this in substantially the same form, however, as the
14   final version of the one you sent out?
15   A    I believe so.
16            MR. FOX:  Your Honor, I move for the introduction of
17   Government Exhibit 1.
18            THE COURT:  Any objection?
19            MR. HAIG:  No, Your Honor.
20            THE COURT:  It will be received.
21        (Exhibit No. 1 received into evidence.)
22            MR. FOX:  May I publish it to the jury, Your Honor?
23            THE COURT:  Yes.
24   Q    (BY MR. FOX)  Mr. Clark, if you could, please, just read
25   for the jury the third paragraph of this rotation plan.
```

A     "In addition, although familiarity with the position usually makes the job easier, it can also create complacency which lends to officer safety issues."

(Reporter admonition.)

THE WITNESS:  Oh, okay.

"In addition, although familiarity with the position usually makes the job easier, it can also create complacency which lends to officer safety issues.  Personnel leaving the unit for other agencies have indicated they became bored or felt stagnated.  They point out moving around the jail and experiencing other aspects of the facility may have been beneficial to their morale.  I have also discussed with you the use of force and how change can be beneficial, whether the causal factors are systemic, operational or personal.  I want each one of you to have a lengthy career with the Sheriff's Department and succeed with your career goals."

Q     (BY MR. FOX)  You mentioned that you communicated the plan to deputies.  Is this the rotation plan, in substance, that you sent out to the deputies?

A     Yes.

Q     Were you able to implement this policy after meeting with the deputies and communicating this plan to the deputies?

A     No.

Q     Why not?  What happened?

A     I was told after that Mr. Tanaka did not approve of the

1   plan.

2   Q    After you were told that Mr. Tanaka did not approve of the

3   plan, did you attend a meeting held at Men's Central Jail

4   regarding this and other issues?

5   A    Yes.

6   Q    When was that?

7   A    I don't know the particular date, but I -- when I put this

8   memo out on Friday, it was the Wednesday after that.

9   Q    Now, this memo has a date on it, doesn't it?

10  A    It does.

11  Q    What is that date?

12  A    February 8th.

13  Q    Do you know if that's the date that you sent out the memo?

14  A    I don't know for sure.

15  Q    Was it around that date that you would have sent out the

16  memo?

17  A    It was sometime in February, I remember that.

18  Q    Where did this meeting take place with Mr. Tanaka?

19  A    It was in the second floor of Central Jail's briefing

20  room.

21  Q    Who was in attendance?

22  A    Mr. Tanaka, myself, some of my lieutenants and some of my

23  sergeants assigned to Central Jail.

24  Q    What occurred at this meeting?

25  A    Mr. Tanaka started talking to us about this planned

1    rotation, that it was not something he agreed with, and

2    basically questioned why we would want to do something like

3    that.

4    Q    What, if anything, occurred after he made that statement?

5    A    Well, shortly into his discussion, I stopped him and said

6    that it was -- because he was talking to us as a group, and I

7    made it clear to him it was my decision to do this rotation and

8    not the sergeants and lieutenants that were in the room.

9    Q    What, if anything, did Mr. Tanaka say in response to that?

10   A    I don't recall a specific response, but the discussion

11   continued with the group.

12   Q    At the conclusion of this meeting, was it your

13   understanding that this plan would be rolled out or would not

14   be rolled out?

15   A    It would not.

16   Q    Did you have an additional discussion with Mr. Tanaka that

17   day?

18   A    Yes, I did.

19   Q    Where was that?

20   A    At Central Jail, there's the security side, which is

21   inside the bars, and outside security, there's what we call

22   admin hallway.

23   Q    When did this occur?

24   A    Shortly after the meeting finished.

25   Q    Who was present?

**UNITED STATES DISTRICT COURT**

```
 1   A     Mr. Tanaka, myself.
 2   Q     What, if anything, did Mr. Tanaka say to you at this
 3   point?
 4         Well, let me actually ask you first.
 5         What, if anything, did you say to Mr. Tanaka at this
 6   point?
 7   A     I told him that I thought this was the best thing for the
 8   unit and the future of the Department to implement this
 9   rotation.
10   Q     And what, if anything, did Mr. Tanaka say in response?
11   A     He told me to make it go away before it ended up in the
12   Sheriff's office.
13   Q     What was your understanding as to what that meant?
14   A     I took it as I would be transferred.
15   Q     What happened after Mr. Tanaka held this meeting in the
16   ensuing days?
17   A     Relative to this?
18   Q     Relative to you.
19   A     Okay.  Well, that was Wednesday.  On Thursday evening, I
20   received a call from Chief Jones, who was the division chief at
21   the time, and he told me I was being transferred effective that
22   following Sunday.
23   Q     How many times during the course of your career did you
24   encounter Mr. Tanaka?
25   A     I think we first met when we were lieutenants at Inmate
```

**UNITED STATES DISTRICT COURT**

1    Reception Center, but I mean, I couldn't tell you how many

2    times after that.

3    Q    Do you think you'd recognize him again if you saw him?

4    A    Yes.

5    Q    Could you please look around the courtroom and tell me if

6    you recognize him.

7    A    He's sitting at the table to your left.

8    Q    Okay.  Where at that table?

9    A    Closest to me of the three gentlemen.

10            MR. FOX:  Your Honor, may the Court reflect the

11    in-court identification of Mr. Tanaka.

12            THE COURT:  The record will so reflect.

13            MR. FOX:  Thank you.

14       One moment, Your Honor.

15       Nothing further, Your Honor.

16            THE COURT:  All right.  Cross-examination.

17                      CROSS-EXAMINATION

18    Q    (BY MR. HAIG)  Good morning, Mr. Clark.

19    A    Morning.

20    Q    The assignments -- the assignment rotation plan that you

21    had just been talking about --

22    A    Yes.

23    Q    -- was in response to what you viewed to be too much

24    violence on the 2,000 and 3,000 floors.  Would that be correct?

25    A    I wouldn't use the term "violence," but use of force that

1    occurred on those floors.

2    Q    "Use of force" means a deputy using force on one of more

3    inmates or one or more deputies using force on one or more

4    inmates.  Would that be correct?

5    A    Correct.

6    Q    And were there certain floors that you saw more use of

7    force than other floors?

8    A    Yes.

9    Q    And what floors would those be?

10   A    Generally, it was 2,000 and 3,000.

11   Q    Did you make any attempts before trying to implement this

12   rotation plan to identify some of the problem deputies on

13   either the 2,000 floor or the 3,000 floor?

14   A    Yes.  As part of my administrative responsibilities, I

15   reviewed force frequently with the force reports, the

16   statistics on force, discussed it with the watch commanders,

17   and we addressed individuals that had higher uses of force or

18   problematic force.

19   Q    Before announcing this group transfer policy for the

20   deputies working at county jail, did you attempt to look at the

21   actual deputies that you viewed to be a problem regarding use

22   of force?

23   A    Yes, I did, and the issue of the problem is there's also

24   the number of force that was appropriate use of force also, but

25   the number of force can be problematic for a deputy also, even

```
 1   though they're all appropriate.  So it wasn't just always

 2   improper force, it was the number of force was an issue also.

 3   Q    Mr. Tanaka, at that time, was the assistant sheriff in

 4   2006?

 5   A    Yes.

 6   Q    And do you recall whether his job assignment had any kind

 7   of role supervising Men's Central Jail?

 8   A    He was in the chain of command.

 9   Q    And had you asked at that time Assistant Sheriff Tanaka

10   before coming out with this memo, and he had told you, "I don't

11   want you to do it," then the memo wouldn't have come out;

12   correct?

13   A    Correct.

14   Q    As being part of your chain of command, he had the right

15   to veto this rotation plan.  Would that be correct also?

16   A    Yes.

17   Q    And that's, in fact, what he did.  Would that be correct?

18   A    Yes.

19              MR. HAIG:  Thank you.  I have nothing further.

20              THE COURT:  Redirect?

21              MR. FOX:  Nothing, Your Honor.

22              THE COURT:  All right.  Thank you.  You may step

23   down.

24              THE WITNESS:  Thank you.

25              THE COURT:  Call your next witness.
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. FOX:  Your Honor, the government calls Steve
 2   Roller.
 3        (Pause in proceedings.)
 4              MR. FOX:  Your Honor, the witness is taking a
 5   restroom break.  He'll be in in a minute.
 6        (Pause in proceedings.)
 7              THE DEPUTY CLERK:  Just stand here for me, please.
 8   Raise your right hand.
 9        (The witness, STEVEN ROLLER, was sworn.)
10              THE DEPUTY CLERK:  Please be seated.
11        Will you please state your full name and spell your last
12   name for the record.
13              THE WITNESS:  Steven M. Roller, R-O-L-L-E-R.
14              THE DEPUTY CLERK:  Do you spell Steven with a P-H?
15              THE WITNESS:  With a V.
16              THE DEPUTY CLERK:  With a V.  Thank you.
17              MR. FOX:  May I proceed, Your Honor?
18              THE COURT:  Yes.
19                       DIRECT EXAMINATION
20   Q   (BY MR. FOX)  Mr. Roller, are you currently retired?
21   A   Yes, I am.
22   Q   How long have you been retired?
23   A   2012, October.
24   Q   What did you do before that?
25   A   I was a captain with the Los Angeles County Sheriff's
```

**UNITED STATES DISTRICT COURT**

1    Department.

2    Q    How long had you been with the Los Angeles County

3    Sheriff's Department?

4    A    Since September 17th, 2000.

5    Q    Was that the first law enforcement agency that you worked

6    for?

7    A    No, it wasn't.

8    Q    How many law enforcement agencies have you worked for?

9    A    Counting the Sheriff's Department, four.

10   Q    What was the previous law enforcement agency that you'd

11   worked for right before the Sheriff's Department?

12   A    Compton Police Department.

13   Q    What was your rank there?

14   A    I was a captain.

15   Q    And when you came over to the Sheriff's Department, what

16   rank did you start at?

17   A    Lieutenant.

18   Q    At some point in time, did you work for an undersheriff at

19   the Sheriff's Department?

20   A    I worked for two undersheriffs, Bill Stonich and Larry

21   Walde.

22   Q    What is the role of the undersheriff in the Sheriff's

23   Department?

24   A    He is the second in command of the Sheriff's Department,

25   responsible for basically overseeing the day-to-day operations

1    of the Department.

2    Q    What do aides to undersheriffs do?

3    A    The aide to the undersheriff, when I was there, dealt with

4    correspondence with going to meetings, dealing with various

5    commands within the Sheriff's Department and carrying out the

6    directives of the undersheriff.

7    Q    When did you stop being an aide to an undersheriff?

8    A    In 2005 when I promoted to captain.

9    Q    When you were promoting from an aide to another position

10   within the Sheriff's Department, how do you select where you're

11   going to go?

12   A    In my case, I was sent as a group of three candidates to

13   an interview because there was a contract city involved in the

14   command that I commanded.  So I went for an interview process

15   involving city leaders and government officials from that

16   particular city and also the county representative.

17   Q    You mentioned your promotion from a lieutenant to a

18   captain; is that correct?

19   A    That's correct.

20   Q    And where did you eventually work as a captain?

21   A    My first unit of assignment was commanding Century

22   Station.

23   Q    What is Century Station?

24   A    Century Station is a sheriff's station, which actually

25   physically is in the city of Lynwood, which is responsible for

```
 1   patrolling five county areas and a contract city of Lynwood.
 2   Q    Do you recall the exact location of Century Station?
 3   A    It's at Alameda, just south of Imperial Highway.
 4   Q    When you decided to go to Century Station, did you have
 5   any communications with anyone in your chain of command about
 6   whether that was the appropriate assignment?
 7   A    Well, Mr. Walde, who was the undersheriff before I went
 8   for the interview, basically told me that I didn't really need
 9   to go to that location because I would get a choice assignment
10   being the executive aide to the undersheriff.  But I expressed
11   my desire to participate in that because I had a municipal law
12   enforcement background, and I wanted to command a sheriff's
13   station.
14   Q    When did you become the captain of Century Station?
15   A    It was, I believe, in April of 2005.
16   Q    Did you notice any issues that demanded your attention
17   when you became captain of Century Station involving the
18   deputies?
19   A    Yes.  There was a group of deputies who had pretty much
20   taken over the scheduling, the overtime, the car assignments;
21   basically running ramshod on the other deputies that were
22   there, kind of a rogue organization who were in charge of the
23   station.
24   Q    Was there a name that they identified themselves with?
25   A    Yes, they called themselves the Regulators.
```

```
 1   Q     Along with the Regulators, did you see some other problems
 2   involving deputies at the Century Station?
 3   A     Yes.  When I took command of the station, they had the
 4   highest amount of significant force incidents in the county.
 5   They also had the highest number of officer-involved shootings
 6   in the county.  In fact, they had more officer-involved
 7   shootings than the entire rest of the Sheriff's Department
 8   combined.
 9   Q     What about citizen complaints, were there any issues with
10   respect to citizen's complaints?
11   A     Yes, they were at the very top of the citizen complaints
12   also.
13   Q     And what is a citizen's complaint?
14   A     When a citizen would either come into the station or call
15   and file a complaint about the conduct of the deputies during a
16   contact that they might have.
17   Q     Did you do anything to confront these issues?
18   A     Yes.  The first thing that I did was have conversations
19   with supervisors to -- causing them to be supervisors, do their
20   job as supervisors.  We then had several meetings with the
21   deputies where we stressed the importance of doing good police
22   work, honest police work.  And what it did was it resulted in a
23   lowering of force issues considerably, shootings -- I rolled on
24   every officer-involved shooting that we had which lowered the
25   shooting incidents.  The citizen complaints were significantly
```

1  lower.  I took a strong disciplinary posture towards any

2  misconduct that was done there, and it seemed to have a very

3  significant effect.

4  Q    I want to ask you about a couple of things you just

5  mentioned.  You said you rolled at every shooting.  What does

6  it mean that you rolled?

7  A    I would respond to the actual scene of the shooting.  I

8  would then be walked through with the shooting team from

9  homicide and Internal Affairs, and then I would go back and

10  talk to the deputies involved.  And then when the reports came

11  through, I would have a firsthand knowledge of what had

12  transpired and also what the scene looked like.

13       With every involved shooting, there's a force review,

14  executive force review that's done by the executives of the

15  Department, and the captain would attend those and participate

16  in a discussion of the shooting and give his opinion as to

17  whether the shooting was within policy, out of policy, and if

18  there was a recommendation for discipline.

19  Q    You mentioned also in your previous answer something about

20  strong discipline of the deputies.  Do you recall that?

21  A    Yes.

22  Q    What did you mean by strong discipline of the deputies?

23  A    There were several cases where internal investigations, or

24  unit level investigations which is an internal investigation

25  into conduct which is done by a supervisor at the unit of

1    assignment.  There were several that I initiated for

2    disciplinary reasons for policy violations.  In addition, I

3    inherited several investigations that were started by the

4    previous captain at that station that were not completed, so I

5    was able to adjudicate those.  A couple of those resulted in

6    terminations of deputies.

7    Q    You had spoken previously about the Regulators, the group

8    that was within Century Station.  Did you do anything with

9    respect to the Regulators?

10   A    Yes.  There was a funeral for an officer who was killed in

11   the line of duty who previously had worked Century and had

12   transferred to another station.  During that funeral, one of

13   the Century deputies got up and made a speech at the funeral

14   and made a comment that we were not sure of actually what it

15   meant.

16        My chief at the time turned to me and said, "What's going

17   on?  What does that mean?"  I said I would find out.  There was

18   also a floral arrangement that was delivered and was on display

19   at the funeral which was done in black and white and had a

20   number on the center of the funeral arrangement, and we didn't

21   know what that signified.  So I was instructed to find out

22   through my sources at Century what that meant.

23   Q    Did you learn through your sources what that meant?

24   A    Yes.  Several days later, I did learn that what it meant

25   was it was a Regulator symbol, that was his Regulator number,

1    and that the saying basically was "Regulators for life, life

2    for Regulators."

3    Q    Did the existence of the Regulators cause you any

4    concerns?

5    A    Yes, they did.

6    Q    Why is that?

7    A    When I was executive aide to the undersheriff, the

8    undersheriff had received an anonymous correspondence while I

9    was there that I opened and read which alluded to extortion of

10   not only deputies but other people in the community done by the

11   Regulators, the fact that they were extorting probationary

12   deputies to contribute financially to various events.  There

13   was also a charitable alleged fundraiser to make up salary for

14   a deputy that had been suspended by the Department, to make up

15   his loss salary and cover his loss of wages for his misconduct.

16   Q    Mr. Roller, I want to focus now on any efforts you tried

17   to either disband or break up the Regulators.  Did you take any

18   efforts to do those things?

19   A    Yes.  I was in constant contact with my boss, a chief and

20   also my area commander.  I was then notified that there had

21   been, due to my efforts, a private meeting set up with three

22   members of the Regulators who purported to be the leaders of

23   the organization.  They met in a park and disclosed the

24   organization to the chief.  Chief then came back, informed me

25   of the conversation.

1        He then had a meeting in my conference room that was

2   attended by six or seven of the Regulator leaders, my chief,

3   two commanders and my operations staff.  We told them at the

4   time that it was okay to be a social organization, but there

5   were activities that the station needed to decrease and stop

6   happening and that their influence on the station would end.

7   Q    Did you find that it did end at that point in time?

8   A    It reduced.  It did not totally end.

9   Q    Did you do anything else to try to break up this group?

10  A    Yes.  I had several meetings with the entire staff of

11  Century Station, pointing out the fact that, number one, at

12  previous meetings they had denied the existence or knowledge of

13  the organization but now we knew what they were and that they

14  were operating.

15       I then made changes in various staffing positions to

16  remove those people who were Regulators from positions where

17  they could control certain activities within the station, the

18  watch deputies, the scheduling people, and that seemed to have

19  a definite impact on the activity.

20  Q    I want to direct your attention to June of 2007.  At some

21  point in time around that time frame, did a meeting occur with

22  Mr. Tanaka at Century Station?

23  A    Yes.

24  Q    Okay.  Do you remember the date that that occurred?

25  A    The meeting was June 28th, 2007.

56

1   Q    And what -- first of all, who was present at that meeting?

2   A    I was told to have the entire staff of Century Station

3   that was available to be at the meeting.

4   Q    Where was this meeting held?

5   A    It was held in the Kenny Hahn Auditorium at Century

6   Station, which is a large meeting area.

7   Q    In terms of those present, you're familiar with people

8   that are sworn and people that are not sworn; is that right?

9   A    Yes.

10  Q    What is the difference between people who are sworn and

11  not sworn?

12  A    Sworn personnel are certified police officers, peace

13  officers.  The nonsworn are the support staff, the clerical

14  staff.

15  Q    And did both sworn and nonsworn attend that meeting?

16  A    Yes.

17  Q    When Mr. Tanaka arrived, what occurred at this meeting?

18  A    Well, the meeting had already been in progress.  The

19  meeting was originally called for two o'clock.  So I started

20  the meeting by talking about the activities that had been

21  occurring at Century Station, the fact we had made a big

22  improvement in our force, our shootings were down, the citizen

23  complaints were down, the citizen accommodations were up.

24       Mr. Tanaka then arrived at about 2:30 in the afternoon.  I

25  turned over the floor to Mr. Tanaka so that he could address

1    the people at the station.

2    Q    At some point in time, did Mr. Tanaka make a statement

3    about Internal Affairs?

4    A    Yes, he did.

5    Q    What, if anything, did he say about Internal Affairs?

6    A    He stated he hated Internal Affairs; they had no place in

7    the Department; and that investigations ruin the deputy's

8    lives; and that it's not fair to them to have investigations

9    since it impacts them, impacts their family, leaves them

10   uncertain; and that he didn't like the fact that captains were

11   putting investigations on deputies or personnel; and that he

12   would see to it that any captain that put excessive or

13   unnecessary investigations on a deputy would be investigated

14   themselves.

15   Q    Are you familiar -- are you familiar with the term "blue

16   line"?

17   A    Yes.

18   Q    What is that term?

19   A    The blue line is a term that's referred to the law

20   enforcement conduct that a law enforcement officer takes.  We

21   "tow the blue line," which means we're supposed to be honest

22   and above board and do everything according to the book and

23   policy, and that's that blue line that separates us from the

24   criminal element.

25   Q    What, if anything, did Mr. Tanaka say about the blue line

1    at that meeting?

2    A    Mr. Tanaka said that he understood that Century was a

3    rough area full of gang members, and that in dealing with gang

4    members sometimes you ought to tow the blue line and even cross

5    it at times.

6    Q    Are you familiar with the term "gray area"?

7    A    Yes.

8    Q    What, if anything, did Mr. Tanaka say about the gray area?

9    A    Well, at that time he didn't say anything about the gray

10   area.  He just said that you had to cross that blue line in

11   dealing with the gang members and be very aggressive against

12   them.

13   Q    I want to direct your attention to your binder, Exhibit 4

14   in your binder, please.

15        Can you open it up and look at Exhibit 4.

16   A    Yes.

17   Q    Do you recognize that?

18   A    Yes.

19   Q    What is it?

20   A    This is a copy of a memorandum that I drafted to Willie J.

21   Miller who was my district commander.  This copy has a name of

22   a deputy redacted, and it is not the original.  It is a copy

23   that was taken out of my computer.  The reason I know that is

24   the copy that I sent to Commander Miller was signed above my

25   printed name.

```
 1   Q      You don't know who took that out of your computer?

 2   A      No, I don't.

 3   Q      And you said the name is redacted.  What do you mean by

 4   redacted?

 5   A      There's a black thick line drawn through the deputy's last

 6   name at the bottom of the page.

 7   Q      Why did you create this memo?

 8   A      After Mr. Tanaka had addressed the deputies, I went back

 9   in my office, and I was just in shock that here the

10   undersheriff of the Department had made statements to deputies

11   that basically contradicted everything that I was trying to do

12   at Century and had accomplished.  I was trying to get them to

13   tow the blue line, and I just had somebody tell them, a

14   high-ranking person, that they had to be very aggressive and

15   sometimes cross that blue line.

16          So the first thing I did was bring my operations staff

17   into the office and say, "Did you guys take that the same way I

18   did?"  And they said, "Oh, yeah, definitely."

19              MR. HAIG:  Objection, Your Honor, hearsay as to the

20   last part of the statement.

21              THE COURT:  Overruled.

22              THE WITNESS:  So once that was done, I made a phone

23   call to my chief, and I was instructed to prepare a memo

24   through the chain of command to document what he had said.

25   Q      (BY MR. FOX)  And is that what that memo is?
```

1   A     That's what this memo is.

2   Q     Is Exhibit 4 -- I know you mentioned it's a copy, but is

3   it in substantially the same condition -- the text in it as the

4   memo that you prepared?

5   A     Yes, the text is complete with the exception of the

6   redaction.

7            MR. FOX:  Your Honor, I move for the admission of

8   Government Exhibit 4.

9            THE COURT:  Any objection?

10           MR. HAIG:  No, Your Honor.

11           THE COURT:  It will be received.

12       (Exhibit No. 4 received into evidence.)

13           MR. FOX:  May I publish it, Your Honor?

14           THE COURT:  Yes.

15  Q     (BY MR. FOX)  I'm not sure if it's easier, Mr. Roller, for

16  you to read -- for you to read the copy that's in front of you

17  or to read what's on this computer screen in front of you, but

18  what I'd like you to do, first of all, is read the second

19  paragraph of your memo.

20  A     Okay, just a second.  I closed the book, so I've got to

21  find it again.

22           THE COURT:  There should be a copy on the screen

23  just to your right.

24           THE WITNESS:  My eyes aren't that good, Your Honor.

25           THE COURT:  Okay.

1          THE WITNESS:  Second paragraph, you said?

2     Q    (BY MR. FOX)  Yes, please.  It starts with "This

3     assembly."

4     A    "This assembly took place in the Kenneth Hahn Auditorium.

5     Originally scheduled for 1400 hours, it began with me giving an

6     overview of activities within Century's area as it relates to

7     crime reduction, personnel, expectations and a request for

8     future suggestions on impeaching crime and improving

9     community -- improvement.  At 1430 hours, Mr. Tanaka arrived

10    and addressed the group.  He covered various general topics and

11    stated his purpose for the visit."

12    Q    Now if can you continue with the next paragraph, please.

13    A    "He went on to field various questions from the group

14    including plans for 2008 personnel shortages and other general

15    questions.  In concluding his remarks, he stated that he did

16    not like the lengthy new pursuit policy and solicited input

17    through the unit commander to shorten the policy.

18         "He also stated that he believed that deputies and

19    officers should function right on the edge of the line in that

20    deputies needed to be very aggressive in their approach to

21    dealing with gang members.  He also said that the captain and

22    supervisors should not be so hasty in putting on cases on

23    deputies and that they should think about what they are doing

24    and see if there is another way to address the issue.

25         "He said that a lot of supervisors are quick to just put

1   cases on people, and that when they become supervisors, they

2   forget what it is like to be a deputy.  He said that he would

3   be checking to see which captains were putting the most cases

4   on deputies, and he would be putting a case on them.  He said

5   that when a deputy has a case on him, he cannot function

6   properly in the field and it has a negative impact on his

7   performance and his personal life.  He said that he didn't like

8   the Internal Affairs Bureau and the way they worked."

9   Q    Mr. Roller, how long did you remain captain of Century

10  Station?

11  A    Three weeks after I wrote this memo, I was on vacation and

12  I received a phone call in the Gulf of Alaska telling me that

13  I'd been transferred effective immediately.

14  Q    Who did you receive phone call from?

15  A    First it was my chief's aide.  He transferred me to the

16  undersheriff who then transferred me to the Sheriff.

17  Q    And who was the Sheriff at the time?

18  A    Leroy Baca.

19  Q    What was Mr. Tanaka's role in the organization at this

20  time?

21  A    He was an assistant sheriff.

22  Q    Do you recall what responsibilities he had as assistant

23  sheriff?

24  A    Part of his responsibility was over the patrol stations

25  Region 2, which Century was in, he was the assistant sheriff.

 1   Q    Was this a transfer that you were seeking?

 2   A    No.

 3   Q    Do you think that you would recognize Mr. Tanaka again if

 4   you saw him?

 5   A    Oh, definitely.

 6   Q    Could you please look around the courtroom and let me know

 7   if you see him.

 8   A    He's the person sitting at the table wearing the red,

 9   white and gray tie, blue shirt and gray suit.

10        MR. FOX:  Your Honor, may the record reflect the

11   in-court identification of Mr. Tanaka?

12        THE COURT:  The record will so reflect.

13        MR. FOX:  One moment, Your Honor.

14        No further questions, Your Honor.

15        THE COURT:  Cross-examination.

16                    CROSS-EXAMINATION

17   Q    (BY MR. HAIG)  Good morning, Mr. Roller.

18   A    Good, thank you.

19   Q    I want to go to the time when you first got to Century

20   Station.  What was -- was that in -- I'm just trying to look at

21   my notes here.  What date was that that you got to Century

22   Station?  2005?

23   A    2005.

24   Q    Okay.  When you were the aide to Undersheriff Walde, I'm

25   assuming that was after you were the aide to Undersheriff

1    Stonich?

2    A    That's correct.  Undersheriff Stonich retired.

3    Q    And Undersheriff Walde worked in Sheriff's Headquarters?

4    A    Yes.

5    Q    And that would be in what city?

6    A    Monterey Park.

7    Q    And so that's where you worked too?

8    A    Yes.

9    Q    Did you have day-to-day contact with Paul Tanaka while you

10   were Undersheriff Walde's aide?

11   A    I wouldn't say it was every single day, but I did have

12   contact with him and his staff probably on a daily basis.

13   Q    Where was he working at that time?

14   A    The other side of the fourth floor.  On the same floor as

15   I was, just in a different office.

16   Q    What was Mr. Tanaka's rank at that time?

17   A    Assistant sheriff.

18   Q    Okay.  What was he in charge of in 2005?

19   A    2005, I don't know whether he was on the administrative

20   end -- I believe he was in 2005.

21   Q    When you elected and chose to become the captain -- after

22   promoting to captain, excuse me, you chose to go to Century

23   Station?

24   A    Well, I was selected to go to Century Station.

25   Q    You've talked about how as promoting from an aide to the

```
 1    undersheriff, you have a privilege to pick a good spot;
 2    correct?
 3    A      That's correct.
 4    Q      And people tried to talk you out of going to Century
 5    Station?
 6    A      Well, some of them thought I was going to one of the most
 7    difficult commands in the Sheriff's Department.
 8    Q      A difficult command because -- because Century Station
 9    patrols a high crime area.  Would that be correct?
10    A      Yes.
11    Q      And what cities does Century Station patrol?
12    A      Walnut Park, Florence, Firestone, Watts, Willowbrook and
13    Lynwood.
14    Q      Those areas have a lot of different gangs; correct?
15    A      Yes.
16    Q      And a higher rate of crime than many other -- probably
17    most other stations?
18    A      Yes.
19    Q      Because of your work in the Compton Police Department and
20    your job as captain in the Compton Police Department, which is
21    not too far from Century Station, was that one of the reasons
22    why you wanted to work there?
23    A      Yes, and I wanted a patrol station because my background
24    was municipal.
25    Q      You go to Century Station in 2005; right?
```

```
 1   A     Yes.
 2   Q     And from 2005 to June of 2007, had you had any visits from
 3   any assistant sheriff between -- before Assistant Sheriff
 4   Tanaka actually came and saw you?
 5   A     No.
 6   Q     You state in the memo that you wrote --
 7               MR. HAIG:  Exhibit 2, I believe?  Is that correct?
 8               MR. FOX:  4.
 9               MR. HAIG:  4, I'm sorry.
10   Q     (BY MR. HAIG)  -- in Government's Exhibit 4 that this was
11   a part of Mr. Tanaka's visits to all patrol commands going to
12   Century Station.
13   A     That was the way it was stated to me when the visit was
14   requested.
15   Q     How long did this visit or this meeting take?
16   A     Well, the total time of the meeting was about two hours.
17   Mr. Tanaka was there for probably 45 minutes.
18   Q     And you prepared this memo only two days after?
19   A     This memo was prepared on a Saturday.  The phone call
20   directing me to do it was done on a Friday.
21   Q     Would you say that your memory was pretty fresh at the
22   time you prepared this memo?
23   A     Yes.
24   Q     Certainly better than it is today, which is several years
25   later?
```

**UNITED STATES DISTRICT COURT**

1    A     Yes.

2    Q     You stated when you testified a moment ago -- and correct

3    me if I'm wrong -- that at the time, Assistant Sheriff Tanaka

4    said that he hated Internal Affairs?

5    A     That's correct.

6    Q     Do you see anything in your memo to which you can

7    attribute Mr. Tanaka using the words "I hate Internal Affairs"?

8    A     There's nothing in my memo, it's from my recollection and

9    my recollection the day that I wrote this.  This memo, it was

10   quite honestly toned down because I knew it wouldn't just stop

11   at our division.  I knew it was going to be passed on.

12   Mr. Tanaka being an assistant sheriff, quite honestly, I didn't

13   know what would be done with this memo by the Sheriff, if it

14   ever would make it to the Sheriff.

15   Q     You intentionally, as you state today, toned down the

16   memo?

17   A     That's correct.

18   Q     And put things in the memo that were not an accurate

19   depiction of what Mr. Tanaka told you it would be?

20   A     No, that's not what I said.  What I said was I toned down

21   things.  The content of the memo is accurate in what it

22   depicts, it just is not in the strongest language that I could

23   have used.

24   Q     In your testimony today, would it be accurate that

25   Mr. Tanaka on June 28th, 2007 said that he hated Internal

1    Affairs?

2    A     Yes.

3    Q     Did you use the word "hate" in your memo?

4    A     No, I did not.

5    Q     In your testimony on direct examination, did you talk

6    about this blue line?

7    A     Yes.

8    Q     And that Mr. Tanaka used the words "the blue line"?

9    A     Yes.

10   Q     Is the blue line anywhere in your memo that you wrote two

11   days later?

12   A     No, I said that they should function right on the edge of

13   the line.  I did not say the color.  I said the line.

14   Q     Do you say -- is there anywhere in your memo that they

15   should cross over the line?

16   A     No, what it says is they should function right on the edge

17   and be aggressive.

18   Q     Do you think it's improper police work to be aggressive in

19   patrolling a high gang and crime area?

20   A     Not if you're obeying the law yourself and doing it within

21   policy.

22   Q     Did Mr. Tanaka ever tell you that day that you should not

23   obey the law, that deputies should not obey the law and do

24   things out of policy?

25   A     No, what he said was sometimes deputies had to cross the

```
 1   line.  To me, that meant violating law or policy.
 2   Q    Is there anything in the memo that you wrote two days
 3   later that shows that Mr. Tanaka said that deputies should
 4   cross the line?
 5   A    No, but it was said to my chief when I reported the
 6   conversation that night.
 7   Q    Did you put it in your memo?
 8   A    No.
 9   Q    As a matter of fact, in your memo, you put in that they
10   should go to the edge of the line.
11   A    What I said was that, to quote the memo, they should
12   function right on the edge of the line.  And once again, that
13   was because I knew this memo would get sent up to the chain,
14   and obviously, I must have been right, I was transferred two
15   weeks later without warning.
16   Q    Do you think deputies should be aggressive in their
17   approach to dealing with gang members?
18   A    Sometimes that works.
19   Q    That's what Mr. Tanaka told you that day and told the
20   group of people that day, they should be aggressive?
21   A    Yes, but in the context that he said it, he said to be
22   aggressive and sometimes cross that line, which is different
23   than just being aggressive when you deal with gang members.
24   Q    I'm looking at the middle paragraph.
25              MR. HAIG:  And if we could publish that again.
```

1    Q    (BY MR. HAIG)  Do you see that -- the middle paragraph

2    that starts with "He also stated"?

3    A    Where in the middle paragraph are you looking at?

4    Beginning of the paragraph or end of the paragraph?

5    Q    Actually, if you look at the monitor right there, sir,

6    right in front of you.

7    A    It's not on --

8    Q    Do you see the highlighted portion?

9    A    Yes.

10   Q    Could you read that, please.

11   A    "He also stated that he believed that deputies and

12   officers should function right on the edge of the line in that

13   deputies need to be very aggressive in their approach to

14   dealing with gang members."

15   Q    That statement that you just read, do you have any quarrel

16   with that statement?

17   A    Other than the fact that it is not 100 percent or in the

18   context of what he said, it is toned down because this document

19   was going to travel up through the chain and was a overview.

20   But his exact comments were made to my boss and my boss's boss

21   at the time that I reported what he had said, and like I said

22   earlier, I was in shock because that had contradicted

23   everything that I had tried to do at Century.

24   Q    The statement that's highlighted that you just read, just

25   that statement that's in your memo, do you have a problem with

1  that statement?

2  A     No, I wrote it.

3  Q     Do you have a problem with that statement being something

4  that you disagree with?  Just that statement that's written in

5  your memo, not the other things that you had just spoken about.

6  A     Well, I think you have to take the two sentences in

7  context.  If you're referring to just -- just those two

8  sentences taken out of context, there's nothing in that out of

9  context that is erroneous.

10 Q     You stated during this time that Mr. Tanaka was touring

11 the station and making the statements that he said that

12 captains that put unnecessary or excessive investigations on

13 the deputies would get cases put on them as well?

14 A     Yes.

15 Q     You think it's a good thing to put unnecessary and

16 excessive investigations and cases on deputies?

17 A     Unnecessary ones, no, but you don't know whether they're

18 necessary until you complete the investigation.  Excessive, if

19 you're in a position or command that has a lot of cases that

20 you want to investigated, what's excessive?  A captain who puts

21 on necessary investigations or begins the necessary

22 investigations is doing his job.  A captain who ignores

23 investigations or deals with them when they are not being

24 investigated and doesn't investigate the conduct -- the

25 negative conduct is not doing his job.  You don't know whether

1    the investigation is totally necessary until it's adjudicated.

2    If it's adjudicated and the complaint is sustained, then it was

3    necessary.

4    Q    As a captain, you can't make any kind of preliminary

5    determination whether an investigation looks to you to be

6    necessary or excessive or not?

7    A    Captain is basing his initial decision whether to create

8    an investigation usually on either a crime report or a citizen

9    complaint.  Sometimes those are glossaries.  Sometimes a deputy

10   will say things and not include things or a citizen may

11   overreact or report something that is erroneous.  So the

12   purpose of the investigation is to not only get to the truth of

13   the matter, but it's to adjudicate the complaint, whether that

14   be to clear the officer or to find that the officer did

15   something that was egregious and needs to be handled through

16   discipline.

17   Q    In your --

18   A    The purpose of an investigation is a fact-finding mission.

19   Q    In your experience, did you see captains putting -- I'm

20   not talking specifically at Century Station, but in your

21   experience as a deputy and as a supervisor, did you see times

22   when supervisors would unnecessarily put cases on deputies as a

23   way of management style?

24   A    No.

25   Q    Now, you didn't have the view that Assistant Sheriff

```
 1   Tanaka had at that time being the assistant sheriff over patrol
 2   of the entire Sheriff's Department; correct?
 3   A    No, I didn't have his view, but I sat in through enough
 4   case reviews as the executive aide to the undersheriff.  Also,
 5   my previous experience at the City of Compton doing
 6   investigations, work in Internal Affairs to know I'm sure
 7   Mr. Tanaka saw not only Century Station, but he saw the rest of
 8   the stations within the command.
 9   Q    Of course.  So he had, obviously, more perspective than
10   you would have just being the station commander for one
11   station?
12   A    Certainly.
13   Q    You said three weeks later after you published this memo
14   to your supervisor, that you were instructed that you were
15   being transferred?
16   A    That's correct.
17   Q    Isn't it true that Sheriff Baca is the only person that
18   could transfer captains?
19   A    Well, officially his name comes out on the memo involving
20   the transfers, but knowing what I know about the inner workings
21   of the Sheriff's Department, that's not true.
22   Q    So you're just guessing when you're saying that?
23   A    No, I'm not guessing.
24            MR. FOX:  Objection, Your Honor, argumentative.
25            THE COURT:  Sustained.
```

74

1          MR. HAIG:  I'll rephrase, Your Honor.  Thank you.

2    Q    (BY MR. HAIG)  You said knowing what you know about the

3    inner workings, you feel that that's not true.

4    A    That's correct.

5    Q    That's your opinion?

6    A    It's my opinion through my experience and what I observed

7    as being the executive aide to the undersheriff -- or two

8    undersheriffs and seeing a total of about three years of

9    transfers go through the office.

10   Q    Did you talk to the Sheriff about this opinion that you

11   have?

12   A    Yes, I did.

13   Q    Did he confirm that opinion to you?

14   A    No, what the Sheriff did was tell me that I was

15   transferred for an investigation that occurred before I ever

16   got to Century Station.

17   Q    You have no idea whether the Sheriff transferred you after

18   reading this memo based upon his own best judgment, do you?

19   A    No, what I was told was later that Mr. Tanaka and the

20   Sheriff met with a group of Regulators on the parking lot of

21   Century Station --

22          MR. HAIG:  I'd object, Your Honor.  This is beyond

23   the scope.

24          THE COURT:  You stepped on this yourself.

25   Overruled.  Finish your answer.

**UNITED STATES DISTRICT COURT**

```
 1              THE WITNESS:  I was told while I was on vacation --
 2    and I left a week after this memo was written for a two-week
 3    Alaska vacation.  I was told by my aide that Mr. Tanaka and the
 4    Sheriff showed up at Century Station.  They met with three of
 5    the leaders of the Regulators, and later on that afternoon I
 6    received a call.
 7          And what was unusual about the transfer is every other
 8    transfer on the Sheriff's Department usually comes out in a jay
 9    dick form and it's dated two or three weeks in the future, when
10    I was told my transfer was effective immediately that afternoon
11    and my replacement had already been put in place when I got the
12    phone call.
13    Q    (BY MR. HAIG)  Who was your replacement?
14    A    Jim Hellmold.
15    Q    And where did you go after being transferred?
16    A    I went to captain of Internal Criminal Investigations
17    Bureau.
18    Q    Also known as ICIB; correct?
19    A    That's correct.
20    Q    You knew after you got transferred that the new captain,
21    Captain Hellmold, was successful in reducing the amount of
22    citizen's complaints, shootings through Century Station?
23    A    I don't know whether he was successful in reducing them
24    substantially.  I wasn't privy to a lot of that data.
25    Q    You do know that the incidents of citizen complaints and
```

```
 1   officer-involved shootings reduced at Century Station after you

 2   left, do you not?

 3   A     I hope so.

 4   Q     Do you know that to be true?

 5   A     No.

 6   Q     Do you know Captain Hellmold?

 7   A     Do I know him, yes.

 8              MR. HAIG:  Thank you.  I have nothing further.

 9              THE COURT:  Redirect?

10              MR. FOX:  Thank you, Your Honor.

11                        REDIRECT EXAMINATION

12   Q    (BY MR. FOX)  Mr. Roller, Mr. Haig asked you questions

13   about whether you were aware of whether Mr. Tanaka was

14   referring to other captains putting cases on other captains who

15   might be unnecessarily putting cases on deputies.

16         Do you recall that?

17   A     Yes.

18   Q     Who was Mr. Tanaka speaking to at the time he made the

19   statement?

20   A     He was speaking to the group of Century Station.

21   Q     Were there deputies --

22   A     I was the only captain there.

23   Q     Were there any other deputies there other than those that

24   worked at Century Station?

25   A     No.
```

1   Q    You said that you made the statement that Mr. Tanaka --
2   I'm sorry, you said that a statement was made to your chief
3   that Mr. Tanaka said crossed the line.  Who was it that made
4   the statement to your chief that Mr. Tanaka had made this
5   statement?
6   A    I did.
7   Q    And you said that the statement was also made to your
8   boss's boss?
9   A    Yes.
10  Q    Was that -- who is that?
11  A    That was my division chief, Ronnie Williams.
12  Q    You also mentioned your boss as well, that the statement
13  was made to your boss.  Who was that?
14  A    That was Commander Willie Miller, and also in the room was
15  Commander Ralph Martin.
16  Q    And who made the statement reflecting Mr. Tanaka's
17  statement at that meeting that you had with your boss and your
18  boss's boss?
19  A    I made the statement.
20  Q    And approximately when was this that you told them about
21  Mr. Tanaka's statements?
22  A    First thing day after the meeting; I tried to get in touch
23  with him that night and couldn't do it.
24  Q    I want to pull up one last thing on your memo.  I would
25  just like you to read this last line if you could in the

1   context of something that Mr. Haig asked you.

2        Let me ask the question first, and unfortunately, I'm

3   going to need some technical assistance once again.

4        Mr. Haig asked you a question about whether your memo

5   reflected that Mr. Tanaka had said that he hated Internal

6   Affairs.  Do you recall that?

7   A     Yes.

8   Q     It might be easier for you to read the hard copy of the

9   memo in front of you, the very last -- there we go -- the very

10  last sentence there on that third paragraph.  Do you see it

11  there?

12  A     Yes.  "He said he didn't like the Internal Affairs Bureau

13  and the way they worked."

14             MR. FOX:  I have no more questions, Your Honor.

15             THE COURT:  Recross?

16             MR. HAIG:  No, thank you.

17             THE COURT:  All right.  You may step down.  Thank

18  you very much.

19        Ladies and gentlemen, we're going to take our first break

20  of the morning.  Again, I want to remind you until this trial's

21  over you're not to discuss this case with anyone, including

22  your fellow jurors, members of your family, people involved in

23  the trial or anyone else, and do not allow others to discuss

24  the case with you.  This includes discussing the case on

25  Internet chat rooms, through Internet blogs, bulletin boards,

1    e-mails or by text messages.  If anyone tries to communicate

2    with you about this case, please let me know about it

3    immediately.

4         Do not read or watch any news reports or other accounts

5    about the trial or anyone associated with it, including looking

6    online.  Do not do any research such as consulting

7    dictionaries, searching the Internet or using other reference

8    materials, and do not make any investigation about the case on

9    your own.  Please keep an open mind until all of the evidence

10   has been received, you've heard the arguments of counsel, the

11   instructions of the Court and the views of your fellow jurors.

12        All right.  We'll come back at 10:15.  Please leave your

13   notebooks on your chairs.

14        (The jury exited the courtroom.)

15             THE COURT:  Anything we need to take up?

16             MR. STEWARD:  Very briefly, Your Honor.  I think

17   Mr. Maxwell is our next witness, and if so, we have a defense

18   exhibit I wanted to run by the Court before I jumped into it.

19   It's a page out of this gentleman's personnel file indicating

20   that back in 1980 he was fired from a police organization, the

21   Le Claire Police Department, for being unable to get along with

22   one or more others in the Department and he blames it on the

23   police chief.  The date of it is February 1980.  I'd like to go

24   into it as a pattern of this gentleman not being able to get

25   along.  I believe he'll testify and blame Mr. Tanaka for the

```
 1    ills of his career, and we think it's very similar, and we'd

 2    like to go into it.

 3              THE COURT:  What's the exhibit number?

 4              MR. STEWARD:  It's Defense 356.

 5              THE COURT:  356?

 6              MR. STEWARD:  Correct, Your Honor.

 7              THE COURT:  What's the government's view?

 8              MR. JAUREGUI:  Your Honor, we would object on

 9    multiple grounds.  First of all, this is a 36-year-old event.

10    Secondly, I believe it will be completely irrelevant.

11    Obviously, we'll have to wait to see, but it has no bearing on

12    his truthfulness or credibility.

13        I do believe it's improper impeachment.  Like I said, it's

14    36 years old, and it's also the witness's own statement.  So I

15    just don't think -- I think it's -- we would object to it on

16    multiple, multiple grounds.

17              THE COURT:  Okay.  Let's see where we are once he

18    testifies.

19              MR. STEWARD:  Thank you, Your Honor.

20        (Off the record at 10:03 a.m.)

21        (On the record at 10:16 a.m.)

22              THE COURT:  Let me see counsel at sidebar.

23        (Discussion held at sidebar.)

24              THE COURT:  Okay.  Let's avoid saying good morning

25    to the witness.  That's sort of state court deal, but I'll tell
```

1  him good morning.  You want to cut their hearts out anyways, so

2  let's avoid doing that.

3          MR. HAIG:  I was trying to be polite.

4          THE COURT:  I know.

5          MR. HAIG:  I won't do it anymore.

6          THE COURT:  That's all right.

7      I've looked at this.  I think it -- is this the only

8  incident that you've got?

9          MR. STEWARD:  Well, no, there are other things not

10 like that.

11         THE COURT:  Okay.  Well, based on what I know right

12 now, which is not a whole lot, it's probably too old, and under

13 403 I think it sort of wastes a lot of time.  But let's see how

14 it goes.  But if you're going to try to get into this, why

15 don't you give me a heads-up before you do.

16         Certainly.

17         MR. JAUREGUI:  Your Honor, I would just say, I also

18 don't -- this is Eddie Jauregui speaking for the government.  I

19 also don't think it's proper under Rule 608(b).  I think it's a

20 specific instance.  It doesn't go to his character for

21 truthfulness -- his character or truthfulness.  I just don't

22 think it's proper impeachment material.

23         THE COURT:  Well, at this point I sort of agree with

24 you.

25         MR. FOX:  One minor housekeeping issue, Your Honor.

**UNITED STATES DISTRICT COURT**

1    The defense has no objection to witnesses who've already

2    testified being in the courtroom after they're done testifying.

3    Is that okay with Your Honor?

4              THE COURT:  That's fine.

5              MR. FOX:  Thank you.

6              MR. JAUREGUI:  Thank you, Your Honor.

7         (End of sidebar discussions.)

8              THE COURT:  All right.  Let's bring our jury in.

9         (The jury entered the courtroom.)

10             THE DEPUTY CLERK:  Please be seated.

11             THE COURT:  All right.  Call your next witness.

12             MR. JAUREGUI:  Your Honor, the government calls

13   Commander Pat Maxwell.

14             THE DEPUTY CLERK:  If you'll raise your right hand

15   for me.

16        (The witness, PATRICK EDWARD MAXWELL, was sworn.)

17             THE DEPUTY CLERK:  Please be seated.

18        Will you please state your full name and spell your last

19   name for the record.

20             THE WITNESS:  Patrick Edward Maxwell, M-A-X-W-E-L-L.

21             THE DEPUTY CLERK:  Thank you.

22             THE COURT:  All right.  Counsel.

23             MR. JAUREGUI:  Thank you, Your Honor.

24   //

25                       DIRECT EXAMINATION

```
1   Q     (BY MR. JAUREGUI)  Sir, how are you employed?

2   A     I'm employed by the Los Angeles County Sheriff's

3   Department.

4   Q     And how long have you been employed with the Los Angeles

5   County Sheriff's Department?

6   A     Approximately 30 and a half years.

7   Q     And what is your current rank in the Department?

8   A     Commander.

9   Q     How long have you been a commander?

10  A     Since July of 2013.

11  Q     And prior to becoming a commander, what did you do within

12  the Sheriff's Department?

13  A     I was a captain at Norwalk Sheriff's Station.

14  Q     And how long did you hold that position?

15  A     A little bit over six years.

16  Q     And what were your responsibilities as the captain of the

17  Norwalk station?

18  A     I was the unit commander of Norwalk Station, and on our

19  Department is a captain.  I basically served as the chief of

20  police for the City of Norwalk and the City of La Mirada and

21  the unincorporated areas of Whittier County.

22  Q     And did you oversee other staff members when you were the

23  captain of the Norwalk station?

24  A     Yes.

25  Q     And how many staff members did you oversee?
```

1    A    I had approximately 190 sworn officers and approximately

2    50 professional staff.

3    Q    And those sworn officers, what ranks were they?

4    A    They were lieutenants, sergeants and deputy sheriffs.

5    Q    Prior to becoming the captain, did you hold any other

6    position at the Norwalk station?

7    A    Yes, I did.

8    Q    And what was that position?

9    A    Operations lieutenant.

10   Q    And how long did you serve as the operations lieutenant of

11   the Norwalk station?

12   A    Approximately three and a half years.

13   Q    Sir, when you were the captain, was Paul Tanaka in your

14   chain of command?

15   A    Yes.

16   Q    And how was he in your chain of command?  Where did he

17   fall within the chain of command?

18   A    I was the captain of Norwalk station, and above me would

19   be the area commander, and then you have a division chief of my

20   division, and then you would have the assistant sheriff of

21   patrol, which was Paul Tanaka.

22   Q    Okay.  In 2007 when you were the captain, were you

23   familiar with an entity called the Internal Affairs Bureau?

24   A    Yes.

25   Q    And how were you familiar with the Internal Affairs

1    Bureau?

2    A     Well, it's a unit in itself in our Department.  It's

3    headed up by a captain and investigators.

4    Q     Okay.  And what does the Internal Affairs Bureau do?

5    A     The Internal Affairs Bureau, they investigate allegations

6    of misconduct that aren't criminal in nature.  They only do

7    administrative investigations.  We have another unit that

8    investigates any type of criminal allegations.

9    Q     And when you say they investigate misconduct, whom are --

10   who are they investigating?

11   A     Any member of the Los Angeles County Sheriff's Department,

12   either sworn or professional staff.

13   Q     Commander Maxwell, are you familiar with the phrase

14   "putting a case on someone"?

15   A     Yes.

16   Q     And what do you understand that phrase to mean?

17   A     It's kind of a term that -- you know, putting a case on

18   somebody in terms of administrative investigations is basically

19   you open up an administrative investigation on an employee.

20   Q     In 2007 had you ever discussed the Internal Affairs Bureau

21   with Paul Tanaka?

22   A     Yes.

23   Q     And where did that discussion take place?

24   A     It was at Headquarters bureau.  It was just a casual

25   conversation.

UNITED STATES DISTRICT COURT

```
 1   Q    Okay.  And who was involved in that conversation?
 2   A    Myself and Paul Tanaka.
 3   Q    And where were you at Sheriff's Headquarters?
 4   A    I don't exactly recall what floor I was on.
 5   Q    Were you in a conference room, a meeting room?
 6   A    I don't recall.
 7   Q    Okay.  What was -- you discussed Internal Affairs;
 8   correct?
 9   A    Yes.
10   Q    And what was the discussion?
11   A    Paul was upset because he told me at Century Station that
12   there were a lot of internal investigations that were opened on
13   deputies, and he was upset -- the number -- about them.  And I
14   recall there was like 20 open cases, and he said he was
15   personally going to go down there and look into it and he might
16   have to put a case on the captain.
17   Q    And, Commander Maxwell, did you know who the captain of
18   Century Station was at that time?
19   A    Captain Roller.
20   Q    Now focusing on your time as captain of the Norwalk
21   station, did you hold staff meetings, Commander Maxwell?
22   A    Yes, I did.
23   Q    And who attended your staff meetings?
24   A    My managers and supervisors.
25   Q    And when you say "my managers and supervisors," who do you
```

1  mean?

2  A    The lieutenants I would refer to as managers.  At the

3  time, I believe I had seven or eight lieutenants and

4  approximately 30 sergeants who are supervisors.

5  Q    And were those people under you in the command structure?

6  A    Yes.

7  Q    Okay.  Did you ever invite any Sheriff's Department

8  executives, any individuals above you in the chain of command

9  to attend your staff meetings?

10  A    Yes, I have.

11  Q    And had you ever invited Paul Tanaka to attend any of your

12  staff meetings?

13  A    Yes, I did.

14  Q    And approximately when was that?

15  A    It was approximately 2009.

16  Q    And what was Mr. Tanaka's position within the Department

17  at that time?

18  A    He was the assistant sheriff in charge of patrol

19  operations and detective bureau and, I believe, Homeland

20  Security.

21  Q    And why did you invite then Assistant Sheriff Tanaka to

22  visit your station?

23  A    One of the main reasons is Paul's very knowledgeable in

24  the budget and how the money flows through the Department, and

25  I wanted him to share his knowledge with my supervisors to

 1  better understand of how the Department operates.

 2  Q    And did he, in fact, make remarks or comments to your --

 3  and just to be clear, when you say your supervisors, are you --

 4  excuse me, are you again speaking about the sergeants and

 5  lieutenants who work under you?

 6  A    Yes.

 7  Q    And did Mr. Tanaka, in fact, make comments or remarks to

 8  those sergeants and lieutenants?

 9  A    Yes, he did.

10  Q    And approximately how many people were present, Commander

11  Maxwell?

12  A    Normal staff meeting, there's usually 30 to 35 people

13  present.  It fluctuates because people are on vacation or have

14  another obligation or they're excused for it.

15  Q    And where did this meeting take place?

16  A    At Norwalk Sheriff's Station in the downstairs assembly

17  room.

18  Q    And what did Mr. Tanaka say in his remarks to your

19  sergeants and lieutenants?

20  A    He talked about the budget, other things going on in the

21  Department, and then at some point, he started to -- started

22  telling the staff what a difficult job deputy sheriffs have to

23  do and we need to support them and, you know, what they do day

24  in and day out is very tough.  And then he moved to the right a

25  couple steps, and he said, "And you guys need to allow them to

1    work in the gray area."

2    Q     And, Commander Maxwell, did you have a reaction to this

3    comment about allowing the deputies to work in the gray area?

4    A     Did I have a reaction?

5    Q     Yes.

6    A     Not a verbal one, no.

7    Q     Did you have any reaction to it?

8    A     I mean, within myself I was, you know, surprised that that

9    was said.

10   Q     And why were you surprised, Commander Maxwell, about this

11   gray area comment?

12   A     Well, the gray area is very -- it has -- in law

13   enforcement it has a very negative position.  I mean, the gray

14   area's unknown, and in police work you don't have unknown.

15   Q     And what did you -- did you personally have an

16   understanding of what gray area meant?

17   A     Yeah, my definition, my understanding of gray area is to

18   work, you know, outside policy or outside the law.

19   Q     Commander Maxwell, did you say anything to your staff at

20   Norwalk station about Paul Tanaka's comments?

21   A     Yeah.  After Paul left I addressed my staff, and I said,

22   you know, "I don't know what Mr. Tanaka was talking about, the

23   gray area, but I want to be very clear here.  There is no gray

24   area.  You know, our deputy sheriffs, we have a responsibility

25   that they don't get themselves in trouble, and, you know,

1  they're either in policy or out of policy.  They're either

2  operating within the Constitution or outside of the

3  Constitution.  There is no gray area.  Do you understand me?"

4  Q    Now switching topics, Commander Maxwell, as a captain at

5  Norwalk station, were you familiar with something called a gang

6  meeting?

7  A    Yes.

8  Q    And how were you familiar with the term "gang meeting"?

9  A    Well, the -- they start -- when Paul took over as

10 assistant sheriff, he started these meetings on Monday, and

11 they were originally called a gang meeting.  And it was where

12 different station captains would come down to Headquarters, and

13 there would be a lot of crime strategies discussed and go over

14 last week's crime or the weekend's crime and, you know, what

15 are you guys doing about this?

16      And in those meetings would be all different ranks.  It

17 would be the station captains, but you may have a division

18 chief or two in there from patrol.  You'd have lieutenants.

19 You'd have sergeants.  You'd have some professional staff from

20 the crime analysts.  You would have maybe the narcotics unit in

21 there.  The gang unit would also be in there.  And, you know,

22 they fluctuated, but the amount of people fluctuated between 30

23 and 50 people during these meetings.

24 Q    And, Commander Maxwell, I'm sorry if I misspoke, where

25 would these meetings take place?

```
 1   A     At the time they were taking place at our old headquarters
 2   in Monterey Park down in the basement conference room.
 3   Q     Oh, I apologize.  Go ahead.
 4   A     No, I'm sorry.
 5   Q     And as the captain of the Norwalk station, did you attend
 6   any of these meetings?
 7   A     Yes.
 8   Q     Now, Commander Maxwell, do you recall anything unusual
 9   happening at any of these gang meetings with -- where
10   Mr. Tanaka was present?
11   A     Yes.
12   Q     And approximately when was that?
13   A     This was also in approximately 2009.
14   Q     And what was unusual about that meeting in 2009?
15   A     Well, during one of the meetings -- usually Paul would
16   chair these meetings, and he would go around the room calling
17   each station captains, and he was very good at calling captains
18   at task that weren't doing their job.  And as he was going
19   around the room -- and he always had a red file in front of
20   him, a stack of papers.  And I don't know if he was reading
21   from something, but just out of the blue he made a comment, and
22   he goes, "Do you believe" -- he goes, "L.A.P.D.," he goes, "Do
23   you believe that they have" -- and I don't remember the exact
24   number, but he said, "Do you believe L.A.P.D. has
25   approximately, you know, a couple hundred Internal Affairs
```

```
 1   investigators?"
 2         And all of us in the room -- I mean, I know myself, I was
 3   kind of surprised it was that high.  And he goes, "You know,
 4   and" -- "You know, we have" -- "and like I said, the numbers
 5   aren't right" -- or "I don't recall the exact numbers, but the
 6   sum is what I'm going to get at here," is he said that, "You
 7   know, we have 45."  He goes, "In my opinion, that's 44 fucking
 8   too many."
 9   Q     And, Commander Maxwell, did you have a reaction to that
10   statement?
11   A     Yeah, I mean, I was surprised.  I looked at one of my
12   fellow captains in the room, and we just kind of looked at each
13   other in kind of a startled look.
14   Q     And why were you -- why did you have a startled look on
15   your face?
16   A     Well, Internal Affairs is a tough job to begin with.  The
17   investigators that work there are usually sergeants, and they
18   have a very tough job to do.  You know, they're the policemen
19   of the policemen, and, you know, when you have an assistant
20   sheriff basically just almost disregarding them or what they do
21   on the Department, and, you know, that spread like wildfire.
22         That was back to Internal Affairs within 30 minutes, and,
23   you know, you got a room full of managers and you have one of
24   your top people in the Department discounting basically the
25   Internal Affairs Bureau.
```

```
 1   Q     Commander Maxwell, you've had personal interactions with
 2   Paul Tanaka before; correct?
 3   A     Yeah.
 4   Q     And if you saw him today, would you recognize him?
 5   A     Yes.
 6   Q     Do you recognize him in the room today?
 7   A     Yes, he's at the defendant's table in the middle wearing a
 8   dark suit, striped tie.
 9            MR. JAUREGUI:  Your Honor, the government requests
10   that the Court take notice of the witness's identification of
11   the defendant.
12            THE COURT:  The record will so reflect.
13            MR. JAUREGUI:  Your Honor, may I have a moment?
14            THE COURT:  Yes.
15            MR. JAUREGUI:  No further questions for this
16   witness, Your Honor.
17            THE COURT:  All right.  Cross-examination.
18            MR. STEWARD:  Thank you, Your Honor.
19                         CROSS-EXAMINATION
20   Q    (BY MR. STEWARD)  You filed a POE complaint against
21   Mr. Tanaka; correct?
22   A     Yes.
23   Q     When was that?
24   A     May of 2010.
25   Q     Can you tell the jury what a POE complaint is.
```

```
1   A     POE complaint is called -- it's short -- excuse me, short

2   for Policy of Equality that came out of a federal consent

3   decree, a 30-year federal consent decree for a process where

4   you can file complaints in the Department.

5   Q     And at the time you filed this, was Mr. Tanaka a superior

6   officer to you?  Was he higher in rank?

7   A     Yes, he was assistant sheriff.

8   Q     And in your experience over the many years you've been in

9   the Sheriff's Department, are these complaints common?

10  A     Can you define "common"?

11  Q     Well, are you aware of -- at the time in 2010, are you

12  aware of anyone else filing a POE complaint against a superior

13  officer in the L.A. County Sheriff's Department?

14  A     It happens all the time.

15  Q     Did it happen in 2010?

16  A     You know, those records are confidential.  I don't have

17  access to them, but I would say yes.

18  Q     So you don't know for sure?

19  A     In 2010 I do.

20  Q     Take a look if you would at a white binder.  It may be at

21  your feet.  Looks like this, and I'd ask you to be careful when

22  you open it, it's kind of overstuffed.

23  A     I have it, sir.

24  Q     Take a look if you would at Exhibit 311, 3-1-1.

25  A     Okay.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     You have it?

 2   A     Yes, sir.

 3   Q     Do you recognize this?

 4   A     Yes.

 5   Q     And is this a document that you created?

 6   A     Yes.  Yes.

 7   Q     And is this the POE complaint you and I have been talking

 8   about?

 9   A     This was a narrative, yes.

10   Q     Two-page document, and you recognize this as that

11   complaint; correct?

12   A     Yes, sir.

13              MR. STEWARD:  Your Honor, I'd offer 311 at this

14   time.

15              THE COURT:  Any objection?

16              MR. JAUREGUI:  No, Your Honor.

17              THE COURT:  It will be received.

18         (Exhibit No. 311 received into evidence.)

19              MR. STEWARD:  And if I can switch over to the Elmo.

20         May I publish it, Your Honor?

21              THE COURT:  Yes.

22   Q     (BY MR. STEWARD)  And, Mr. Maxwell, this is the document

23   we've been talking about; correct?

24   A     Yes.

25   Q     And it's a two-pager; right?
```

**UNITED STATES DISTRICT COURT**

```
1    A     Yes.

2    Q     And if we can take a look at the first paragraph, you

3    describe an e-mail that you received from -- looks like

4    Lieutenant Joe Gooden, aide to Assistant Sheriff Paul Tanaka.

5          See that?

6    A     Yes.

7    Q     And the e-mail was directed at station captains; correct?

8    A     Yes.

9    Q     And it's your understanding that would be station captains

10   throughout the Los Angeles Sheriff's Department; correct?

11   A     Yes, sir.

12   Q     Okay.  So all captains, including you, received this memo;

13   right -- or e-mail -- I'm sorry, e-mail?

14   A     I would assume so, yes.

15   Q     And in this e-mail, you were asked -- you and all of the

16   other captains were asked to create certain reports.  Is that

17   accurate?

18   A     Yes.

19   Q     And could you tell us what kind of reports was the e-mail

20   requiring you to prepare?

21   A     I don't recall.

22   Q     Well, let's take a look at your POE complaint, Number 311,

23   and it talks about preparing a lengthy written report about

24   their station's target gang, target tagger gang, nonrevocable

25   parole operations, Section 8 housing and a host of other issues
```

1   related to crime within the station's jurisdiction; right?

2   A      Yes.

3   Q      And you wrote that; correct?

4   A      Yes.

5   Q      And your objection in this POE complaint was to have to

6   prepare these various documents and take the time to do that;

7   right?

8   A      No, I believe you're misstating.  My complaint was not

9   about doing the report.  That was just the background leading

10  up to the event that happened.

11  Q      Okay.  Tell us what the event was that happened.

12  A      Well, there was three captains that were called in Chief

13  Laing's office, and it was myself, Captain Mike Claus,

14  C-L-A-U-S, and Captain Dave Halm, H-A-L-M.  And when we got

15  there, inside that meeting was Chief Tom Laing, L-A-I-N-G,

16  Commander Mike Rothans and Commander Bill Ryan.

17         And Chief Laing was visibly upset.  He was really red in

18  the face, and he said he'd just been to Mr. Tanaka's office and

19  got his ass ripped.  And he said that, you know, Tanaka said,

20  "You guys are fucking dead to him, you don't get anymore

21  fucking resources" and on and on.  And Tom Laing is a very

22  religious man.  First time I ever heard him cuss, but he was,

23  you know, really upset, and we're no longer allowed to come to

24  the gang meetings -- and I'd have to read this to refresh my

25  memory, but that was along the lines.

Q    Do you recall that all of this discussion centered around
the fact that you had complained about preparing these reports?

A    Say that again, sir.  I'm sorry.

Q    Sure.  The discussion you just described was caused by a
meeting with Mr. Tanaka and that particular captain wherein he
and you and the other captain, L-A-I-N-G or whatever it was,
complained about having to do what you thought was busywork and
you don't have time "as my staff and I are constantly carping
and working to save time and save the Department from incurring
paid overtime."  That was the heart of your complaint, isn't
that true?

A    Well, the key to that, it was -- it was my complaint, but
the threats were delivered to three captains; the other two had
nothing to do with it.

Q    So your complaint was that you had to do more work under
this demand by Mr. Tanaka; right?

A    I would describe it as busywork.

Q    And you didn't want to do it; right?

A    No, I didn't have the resources or the time.

Q    Okay.  And yet, at that time as captain at Norwalk, you
were being paid around 180,000 a year; right?

          MR. JAUREGUI:  Your Honor, I'm not sure how this is
relevant.  I would object.

          THE COURT:  Overruled.  You can answer.

          THE WITNESS:  You know, sir, in 2010 I don't really

```
 1    know my salary, but I'm not going to say you're incorrect.
 2    It's in the ballpark.
 3    Q     (BY MR. STEWARD)  How many hours a week were you working
 4    in 2010?
 5    A     You know, a station captain probably works -- or at least
 6    I did anywhere from 60 to 80 hours a week.
 7    Q     And you did not want to spend any more time on what you
 8    call busywork; right?
 9    A     Yeah, I guess.
10    Q     And this POE complaint was found to be unfounded; right?
11    A     You know, I don't know because no one was ever
12    interviewed.
13    Q     Did you receive any benefit from making this complaint?
14    A     What do you mean "benefit"?
15    Q     Well, were you relieved of the obligation to file these
16    extra busywork reports?
17    A     Yes.  The three captains had received an e-mail that we
18    were excused from doing the report, and then my Chief Laing
19    told me I was no longer allowed to attend the gang meetings.
20    Q     Now, you've sued civilly the Los Angeles Sheriff's
21    Department; right?
22    A     At the end of 2012.
23    Q     Any other lawsuits?
24    A     I'm sorry?
25    Q     Any other lawsuits against the Los Angeles County
```

1    Sheriff's Department?

2    A    No.

3    Q    Just that one.

4         You sued Paul Tanaka personally in that lawsuit; right?

5    A    I believe he was listed as a defendant along with the

6    County and Lee Baca.

7    Q    And you have a personal bias against Paul Tanaka; isn't

8    that true?

9    A    Professional, yes.

10   Q    Personally as well; right?

11   A    Professionally.

12   Q    Now, in this lawsuit in 2012, you were seeking monetary

13   compensation; right?

14   A    Yes.

15   Q    You were seeking large -- a great deal of money; right?

16   A    I don't know if it actually listed any amount.

17   Q    But the lawsuit itself is Patrick Maxwell vs. the

18   Sheriff's Department, Paul Tanaka and perhaps others; right?

19   A    And Lee Baca.

20   Q    And because of this lawsuit, your intention was to gain a

21   great deal of money; right?

22   A    What's your definition of "a great deal of money"?

23   Q    Couple hundred thousand bucks at least; right?

24   A    Well, I was looking to recover the money that I was denied

25   in a promotion to commander, that's correct.

1    Q     And who denied you that promotion, in your view?

2    A     Sheriff Baca and with input from Paul Tanaka.

3    Q     And it's your understanding that only Sheriff Baca could

4    promote at captain and above; right?

5    A     He's the only one that had the authority, but Paul Tanaka

6    had a lot of power.

7    Q     When was the first time you spoke with the FBI about this

8    case?

9    A     They called me last week.

10   Q     I'm sorry, the first time you spoke with the FBI.  Last

11   week?

12   A     Yes, sir.

13   Q     You never did an interview with Agent Tanner or any other

14   FBI agent before last week?

15   A     No, sir.

16   Q     Now, you talked about the gray area.  Isn't it true that

17   the phrase "the gray area" is subject to a number of

18   interpretations?

19   A     Yes, it could be.

20   Q     And at the time you heard Paul Tanaka talk about the gray

21   area, you don't know what he meant, do you?

22   A     No, of course not.

23   Q     And so what you were talking about earlier on direct is

24   your personal opinion about what he was talking about; right?

25   A     Mine and about every other seasoned law enforcement

1   officer.

2               MR. STEWARD:  Move to strike.  Hearsay, Your Honor.

3               THE COURT:  Sustained.  The answer is stricken, and

4   the jury should disregard it.

5   Q    (BY MR. STEWARD)  Do you recall, when he made the

6   statements about the gray area, Mr. Tanaka using his hands?

7   A    Yes.

8   Q    And did he talk about or analogize a football field?  Do

9   you remember that?

10  A    I don't know what he was thinking.

11  Q    No, I'm not asking that.  I'm asking what he said that

12  time when he discussed the gray area and you were present.  You

13  remember him using his hands, but do you also remember him

14  talking about the hands being a football field?

15  A    No.

16  Q    Do you remember him discussing a football field in

17  connection with the gray area at all?

18  A    No, sir.

19  Q    Did you settle that lawsuit?

20  A    Yes.

21  Q    How much did you get?

22  A    The County settled for 140,000, and after costs I

23  received, I believe, 67,000.

24              MR. STEWARD:  I have nothing further, Your Honor.

25  Thank you.

```
 1              THE COURT:  All right.
 2              MR. JAUREGUI:  Your Honor, permission to do a brief
 3   redirect?
 4              THE COURT:  That's fine.  You don't need my
 5   permission.
 6                      REDIRECT EXAMINATION
 7   Q    (BY MR. JAUREGUI)  Commander Maxwell, you -- in
 8   cross-examination you talked about POE.  What does POE stand
 9   for?
10   A    Policy of Equality.
11   Q    And the nature of -- and it's a complaint; correct?
12   A    Yes.
13   Q    The nature of your complaint, was it that you had to do
14   busywork, the nature of your POE complaint?
15   A    No.  As I stated earlier, my complaint was not about the
16   busywork.  My complaint was about the threats of losing
17   resources and the threats to my career and the hostile work
18   environment that was created by those threats.
19   Q    And who did you understand to be making threats to your
20   career?
21   A    Well, I was told by Commander Rothans and Chief Laing that
22   these threats were made by Paul Tanaka.
23              MR. STEWARD:  Move to strike.  Hearsay, Your Honor.
24              THE COURT:  Sustained.  The answer is stricken, and
25   the jury should disregard it.
```

**UNITED STATES DISTRICT COURT**

```
1   Q     (BY MR. JAUREGUI)  And, Commander Maxwell, at the time
2   that you filed this POE complaint, how long had you been in the
3   Sheriff's Department?
4   A     20 -- approximately 25 years.
5   Q     And had you ever filed a POE complaint before that?
6   A     No, sir.
7   Q     And have you ever filed a POE complaint since then?
8   A     You know, let me back up for a second.  I'm sorry, I have
9   filed POE complaints as a mandated reporter, and what I mean by
10  that is as a manager on the Department, if anyone reports any
11  type of sexual harassment, any type of inappropriate -- cartoon
12  hanging on a wall, I mandate the call and file a POE.  That is
13  the first time that I filed a POE as a victim, not as a
14  mandated reporter but as a victim, and I've not since filed one
15  as a victim since then.
16  Q     Okay.  And the lawsuit that Mr. Steward asked you about,
17  it was settled out of court?
18  A     Yes.
19  Q     And who -- do you know who paid the settlement cost to
20  you?
21  A     County of Los Angeles.
22            MR. JAUREGUI:  No further questions, Your Honor.
23            THE COURT:  All right.
24            MR. STEWARD:  I just have one follow up, Your Honor,
25  if I may.
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  All right.

2                    RECROSS-EXAMINATION

3    Q    (BY MR. STEWARD)  Mr. Maxwell, counsel just asked you

4    about the essence of what you were complaining about, and it's

5    on page 2 of your POE, your complaint was "This has instantly

6    caused me stress.  Last night, May 19th, 2010, I vomited

7    several times and could not sleep.  The actions and statements

8    made by Assistant Sheriff Paul Tanaka is typical of his

9    demeanor, and he must be held accountable.  How an executive

10   could make these threats and affect my 220,000 citizens I serve

11   along with staff of 250 personnel is beyond my comprehension."

12        That's what you were complaining about; right?  You'd been

13   caused stress?

14   A    I think I testified what I was complaining about.

15   Q    But you'll agree with me the paragraph that I just read,

16   you wrote that; right?

17   A    Yes.

18   Q    And that was part of your POE complaint; right?

19   A    Sure.

20   Q    And that was given to the -- who did you give it to?

21   Where did this complaint go?

22   A    It goes to the -- eventually, the Equity Panel, Internal

23   Affairs Bureau.

24   Q    Okay.

25             MR. STEWARD:  No further questions, Your Honor.


                    UNITED STATES DISTRICT COURT

```
1                    THE COURT:  Anything else?

2                    MR. JAUREGUI:  No, Your Honor.

3                    THE COURT:  All right.  You may step down.

4                    THE WITNESS:  Thank you, Your Honor.

5                    THE COURT:  Call your next witness.

6                    MR. FOX:  The government calls Robert Olmsted.

7                    THE DEPUTY CLERK:  Stand here, please.  Please raise

8       your right hand.

9            (The witness, ROBERT OLMSTED, was sworn.)

10                   THE DEPUTY CLERK:  Please have a seat.

11           Will you please state your full name and spell your last

12      name for the record.

13                   THE WITNESS:  Robert Olmsted, O-L-M-S-T-E-D.

14                   THE DEPUTY CLERK:  Thank you.

15                   MR. FOX:  May I proceed, Your Honor?

16                   THE COURT:  Yes, please.

17                           DIRECT EXAMINATION

18      Q    (BY MR. FOX)  Mr. Olmsted, what do you do for a living?

19      A    I retired from the Los Angeles County Sheriff's

20      Department.

21      Q    How long have you been retired?

22      A    Probably about five and a half years now.

23      Q    What are the years that you worked for the Sheriff's

24      Department?

25      A    January of '78 until November of '10.
```

1   Q    Why did you become a member of the Los Angeles County

2   Sheriff's Department?

3   A    My dad was on the Department.  I saw the comradery.  He

4   encouraged me to do it and, through my personality, thought I'd

5   do well.

6   Q    What rank did you achieve with the Sheriff's Department

7   before you retired?

8   A    I retired as a commander.

9   Q    During the time that you were employed by the Sheriff's

10  Department, generally what roles did you serve?

11  A    I worked at the jail as a deputy.  I worked patrol.  I

12  went to the training bureau, back to patrol and various

13  assignments as sergeant, lieutenant.  My last assignment was

14  the commander that oversaw the three jails:  Men's Central

15  Jail, Twin Towers and Century Regional Detention Facility.

16  Q    How long were you a commander over those jails?

17  A    About two years.

18  Q    So what years were that -- were they?

19  A    I was promoted in April of '8 and retired November of '10.

20  Q    Had you previously served an executive function within

21  Men's Central Jail?

22  A    Yes.

23  Q    What was that?

24  A    I was the captain at Men's Central Jail.

25  Q    When was that?

1   A    That would have been the very end of '06 until April of

2   '08.

3   Q    How did you find out that you were going to become the

4   captain of Men's Central Jail?

5   A    I was -- at the time I was a captain of our Commercial

6   Crimes Bureau Fraud Units, and I received a phone call from

7   Paul Tanaka asking me to go to Men's Central Jail as the

8   captain on a body swap.

9   Q    Who was the captain that you were going to replace?

10  A    John Clark.

11  Q    Do you recall what Mr. Tanaka's position was at the time

12  when he called you?

13  A    I believe he was the assistant sheriff over custody.

14  Q    And you said this was over the phone.  Was it just the two

15  of you on the phone?

16  A    Yeah.  I assumed it was just the two of us, yes.

17  Q    Do you recall whether Mr. Tanaka explained why he wanted

18  you to become captain of Men's Central Jail?

19  A    Yes.  He said that there's morale issues and grumblings of

20  heavy-handedness by the deputies.  I assumed that to mean

21  force.

22  Q    What did you understand the grumblings of heavy-handedness

23  to mean?

24  A    That there was -- gave the impression of excessive force

25  or a lot of force cases that were occurring at Men's Central

**UNITED STATES DISTRICT COURT**

1    Jail.  Just because there's force doesn't mean it's all bad,

2    but there was an excessive amount of force being played out.

3    Q    Did Mr. Tanaka say anything to you about a rotation plan?

4    A    Yes.

5    Q    What did he say about that?

6    A    He said that John Clark tried to initiate a rotation plan

7    of the 3,000 -- actually, of all of the jail -- the entire

8    Men's Central Jail, specifically the 3,000 floor, and he nixed

9    it and said that he wants another direction.  There's morale

10   issues and wants me to go and do a body swap and take his

11   place.

12   Q    When you were captain of Men's Central Jail, what were

13   your duties?

14   A    Oversaw the safety and security of the jail, basically.

15   It's both the safety and security of the jail, the inmates and

16   the deputies that work there.

17   Q    Where was your office?

18   A    Inside the building but outside the jail.

19   Q    Was there anyone higher ranking than you within that

20   facility?

21   A    No.

22   Q    When you were commander, where were your offices?

23   A    Across the street at Twin Towers.

24   Q    When you began as captain of Men's Central Jail, did you

25   learn about any pressing issues that you needed to deal with?

1    A      Oh, yes.  Yes.

2    Q      What were they?

3    A      A variety of issues.  I saw that -- gave the appearance of

4    force -- excessive force or force that was occurring at the

5    jails.  I had deputies with broken right hands.  I saw that the

6    uniforms were rather shoddy.  The deputies did not carry mace.

7    Those that did were ostracized.  There were no tasers deployed

8    at all.  So any type of less lethal processes in handling

9    inmates were not -- not being utilized.  I mean, I can go on

10   and on with some of the stuff that I needed to address.

11   Q      Did you recognize anything about the behavior of the

12   deputies themselves?

13   A      Oh, yeah, absolutely.  There's -- it's standard that when

14   the captain walks among the facility they put out what's --

15   it's a 10-code that's basically law talk that says the

16   captain's walking and lets everybody to know to be on your

17   toes, which is fine, I'm glad they're on their toes.

18          I walk up to the 3,000 floor, and I'm immediately

19   surrounded by about nine, ten deputies, and it was like they're

20   all standing in a circle around me.  And I'm looking at them,

21   and the first response out of the ringleader was, "What are you

22   doing up on our floor?"  And I -- right then and there, I

23   said --

24              MR. STEWARD:  Move to strike, Your Honor, as

25   hearsay.

1    THE COURT:  Overruled.  The answer will stand.

2    THE WITNESS:  Right then and there, I realized I had

3  a significant problem in terms that -- shall I say I very

4  forcibly told the deputies to get back to their jobs.  At the

5  most, there should have only been two deputies on that floor

6  that would handle the freeway traffic.  So I'm looking at

7  probably seven that were not doing their jobs within that jail

8  at that particular time.  The fact that I was challenged, the

9  captain of the facility, was, in my opinion, atrocious.  So

10  I -- right then and there --

11    MR. STEWARD:  Objection to the narrative at this

12  point, Your Honor.

13    THE COURT:  Why don't you just finish your answer,

14  then he'll ask you another question.

15    THE WITNESS:  Right then and there, I knew I had a

16  problem.

17  Q    (BY MR. FOX)  Are you familiar with the term "force

18  packages"?

19  A    Yes.

20  Q    What are force packages?

21  A    Any time there's a force that's applied, there's an

22  investigation that must -- must occur.  That force package is

23  written -- it consists of written documentation by the deputies

24  that apply the force.  There's an oversight of both the

25  sergeant, captain -- sergeant, lieutenants and captain that get

1    applied to that package.  The inmate gets interviewed.  Any

2    witnesses that views force will be interviewed, should be

3    applied to it, any doctor's notes or medical attention.  So

4    it's a complete synopsis of the entire incident up to and

5    including the application of the force and the review of the

6    package of the force itself.

7    Q    Are there different types of investigations that can come

8    out of these force packages?

9    A    Sure.  Like I -- I think I might have said earlier is that

10   sometimes force must be applied and it becomes legitimate use

11   of force.  When it looks like there's training issues or

12   violations of policies on the Department, there needs to be an

13   investigation.  The unit can do the investigation.  Internal

14   Affairs can do the investigation, and internal criminal can

15   take a look at it from criminal perspective as well.

16   Q    When you said "internal criminal," do you mean ICIB?

17   A    Yes.

18   Q    And how do the force packages come into play with any of

19   these investigations?  Are they used in any way for the

20   investigations?

21   A    I'm sorry, I don't understand the question.

22   Q    You mentioned the force packages.

23   A    Yes.

24   Q    And are they used in any way in order to evaluate the

25   deputies with any of these investigations?

**UNITED STATES DISTRICT COURT**

1   A     Oh, absolutely.  Once force is applied, the sergeant who

2   does most of the work and takes a look at the inmate,

3   interviews the inmate, interviews the doctors, he does a

4   synopsis of the force itself and puts a recommendation down.

5   It's in policy or out of policy, and then that gets reviewed by

6   a lieutenant, and that gets reviewed by a captain.

7   Q     Did you play any role in reviewing the force packages

8   while you were captain at Men's Central Jail?

9   A     Yes.

10  Q     What role did you play?

11  A     Those force packages that were complete and given to me by

12  my operations lieutenant were then given to me, and I would

13  review them at my desk.

14  Q     Did you notice any pattern with respect to these force

15  packages when you were reviewing them as captain of Men's

16  Central Jail?

17  A     Yes.  I noticed that there's what we call a

18  boilerplate-type protocol that was occurring.  In other words,

19  I would see the same verbiage over and over and over again that

20  the deputy would strike or use his flashlight to subdue the

21  inmate.  It would glance off the shoulders and hit the inmate

22  in the head.

23        After seeing these type of -- this is just one, but after

24  seeing these type of protocols being used in force packages or

25  being -- being applied, I saw that as a red flag, that any time

1    you have to hit -- or you hit an inmate in the head, that's

2    significant force.  It really needs to be looked into.

3    Q    Did you do anything to try to fix those issues?

4    A    Sure.

5    Q    What did you do?

6    A    Training.  You go to the floors, talk to the inmates.  I

7    talked to the deputies.  I would do investigations to determine

8    whether or not they're in policy or out of -- out of policies.

9    Q    Did you see anything with respect to the amount of force

10   that was being used by deputies in Men's Central Jail at the

11   time you were captain?

12   A    I saw that it needed to be addressed, and during my

13   tenure, my stats, we were able to lower force by 30 percent

14   when I got promoted and moved across the street as commander.

15   Q    And when did that occur?

16   A    I moved over in April of '08, so the 16 months I was there

17   force literally had gone down by 30 percent.

18   Q    You mentioned that you were commander over three different

19   jails.  What were your duties, though, in overseeing those

20   three different jails?

21   A    To ensure that the captains that were in -- that are in

22   charge of the jails would follow custody protocols,

23   administrative policies, investigations were done timely, and

24   just administrative oversight in general, budget issues.

25   Q    Who took over for you as captain of Men's Central Jail

1    when you were promoted to commander?

2    A    My operations lieutenant at the time, Dan Cruz.

3    Q    And how many captains were reporting to you when you were

4    commander?

5    A    Three.

6    Q    One for each jail?

7    A    Yes.

8    Q    What, if anything, was brought to your attention while you

9    were commander regarding Men's Central Jail?

10   A    There was a report that was done in May of -- I believe it

11   was May of '9.  It's the chief of custodies.  We call it SCIF,

12   the Sheriff's Critical Information Form.  It's a semiannual

13   review of protocols within the jails, all the jails, not just

14   the southern but the northern jails as well.

15        And it was -- they looked at the indices of number of

16   escapes, number of forces used, this type of stuff.  It was

17   used as a best-practice/worst-practice protocols.  At Men's

18   Central Jail it was glaring that significant force was off the

19   scale at Men's Central Jail at that particular time.

20   Q    Did you observe anything troubling to you while Captain

21   Cruz was reporting to you?

22   A    Yeah.  I determined that he wasn't being truthful with me.

23   He was hiding quite a bit of the force that was being used.  I

24   found out about this because I had other people who would call

25   me up and tell me to look into other uses of force that

1    occurred that I was not notified about that were significant.

2    Q    Did you also see issues with force packages while you were

3    commander with respect to Men's Central Jail?

4    A    Yes, I did.

5    Q    What was that?

6    A    Hearing others tell me there was significant force that

7    was going on in the jail --

8              MR. STEWARD:  Move to strike.  Hearsay.

9              THE COURT:  Excuse me.  Without going into what

10   others told you, if you can just describe what it was that you

11   did.

12             THE WITNESS:  I asked the operations lieutenant,

13   which was the Number 2 person at Men's Central Jail, to do a

14   random review of force packages for me.  I said just grab 30 at

15   will, review them for me, do them in detail and bring me the

16   results.

17   Q    (BY MR. FOX)  Did you later look at a report that was

18   generated with respect to these 30 force packages?

19   A    Are we talking about a report on the assessment of those

20   30?

21   Q    Let's go to that, yes, please.

22   A    Yes.

23   Q    Okay.  And what did you find out?

24   A    Out of those 30, that 18 of them were out of Department

25   policy.  18 had -- all 18 had been approved by -- at one layer

1   of supervisory position up to and including the captain and

2   gave the impression that all those 18 were then appropriate

3   uses of force and were later determined to be unlawful uses of

4   force.

5   Q    I want to break that down a little bit.  You're saying

6   that there were some approvals of these force packages.  Of

7   these 30 force packages, how many of those had been approved by

8   at least one level of supervisor?

9   A    All of them, all 30 had been approved by one level or not.

10  Q    And based on the outside audit that you had commissioned

11  by the lieutenant, how many of those did you find to be out of

12  policy actually and should not have been approved?

13  A    18.

14  Q    You mentioned also that there were issues with the amount

15  of force.  Did you try to deal with these issues with the

16  captain of Men's Central Jail?

17  A    Yes, I did.

18  Q    Were the issues solved after trying to deal with the

19  issues of the captain at Men's Central Jail?

20  A    No.

21  Q    So what did you do?

22  A    I went to my chief, and I said, "I think to fix this, I

23  think we need to move the captain."

24  Q    When was this?

25  A    I'm thinking that's probably January of '10.  That's a

1    guess.

2    Q    You mentioned the audit that you had done where it was

3    found that 18 out of the 30 were out of policy, and did you

4    also commission a study regarding the amount of force --

5         (Reporter admonition.)

6         MR. FOX:  Sorry.

7    Q    (BY MR. FOX)  Did you also have a report prepared

8    regarding the amount of force that was being used in Men's

9    Central Jail?

10   A    Yes.  I had -- including those 30 packets, I had them take

11   a look at the number of Internal Affairs investigations that we

12   had, those deputies that had used, if I remember right, ten or

13   more uses of force in the last two years, and I think there was

14   one other report I don't recall off the top of my head.  And I

15   had that all evaluated by my peers and myself.

16   Q    Can you take a look in that binder in front of you at

17   Exhibit 5, please.

18   A    Okay.

19   Q    What is it?

20   A    This is a review from Captain Greg Johnson to Steve

21   Johnson, the commander, regarding the use of force packets from

22   Men's Central Jail, an audit.

23   Q    Is that the audit that you've been referring to?

24   A    That's one of them, yes.

25   Q    Can you please take a look at Exhibit 6 as well.

1    A      Okay.

2    Q      What is Exhibit 6?

3    A      It's a memorandum from Mark McCorkle, lieutenant, to Steve

4    Johnson and myself, both commanders of custody division,

5    confidential use of force at Men's Central Jail; i.e.,

6    rollouts, Internal Affairs rollouts.

7    Q      Are those true and accurate copies of the reports that you

8    received that you've been referring to in your testimony?

9    A      They appear to be, yes.

10            MR. FOX:  Your Honor, I move for the admission of

11   Governments Exhibits 5 and 6.

12            MR. STEWARD:  No objection.

13            THE COURT:  They'll be received.

14       (Exhibit Nos. 5 and 6 received into evidence.)

15   Q     (BY MR. FOX)  Mr. Olmsted, you said that you went to your

16   chief regarding these issues.  Did you -- was the problem

17   solved after you went to your chief?

18   A      No.

19   Q      What did you do?

20   A      Told my chief, I said, "If you can't solve the problem, I

21   have to go over your head."

22   Q      So what did you do?

23   A      I went to Assistant Sheriff Cavanaugh.

24   Q      Approximately when did you go to Assistant Sheriff

25   Cavanaugh?

```
 1   A     Within a few days after talking to the chief, so January
 2   sometime in 2010.
 3   Q     Why did you go to Assistant Sheriff Cavanaugh versus
 4   another assistant sheriff?
 5   A     Cavanaugh is the direct supervisor of my chief, which
 6   would be the second in command above me, and that's the
 7   standard protocol for chain of command.
 8   Q     Did you bring these issues to Assistant Sheriff
 9   Cavanaugh's attention?
10   A     Yes, I did.
11   Q     How long of a meeting did you have with him, if you
12   recall?
13   A     An hour at least.  Hour, hour 15 minutes.
14   Q     Did Mr. Cavanaugh provide you with an acceptable answer to
15   you?
16   A     No.
17   Q     What, if anything, did he say?
18             MR. STEWARD:  Objection, hearsay.
19             MR. FOX:  Your Honor, I can reask a different
20   question.
21             THE COURT:  All right.
22             MR. FOX:  Thank you.
23   Q     (BY MR. FOX)  Was it your understanding after your meeting
24   with Assistant Sheriff Cavanaugh that Captain Cruz would be
25   replaced?
```

```
 1   A     No.
 2   Q     Was it your understanding that there might be a follow-up
 3   conversation that you could have with somebody?
 4   A     He said he was going to try --
 5              MR. STEWARD:  Objection, move to strike.  Hearsay.
 6              THE COURT:  Sustained.
 7   Q     (BY MR. FOX)  After your meeting with Assistant Sheriff
 8   Cavanaugh, did you receive a phone call from another executive
 9   at some point?
10   A     Yes, I did.
11   Q     When was that?
12   A     Probably a week later.
13   Q     Who did you hear from?
14   A     Paul Tanaka.
15   Q     What was his title at that point?
16   A     Assistant sheriff.
17   Q     Over what?
18   A     Patrol detectives.
19   Q     Who was on the phone besides you and him?
20   A     Two of us, I think.
21   Q     When did that conversation occur?
22   A     The week after Cavanaugh's meeting, so probably the middle
23   of January.
24   Q     What, if anything, did Mr. Tanaka say to you in that phone
25   conversation?
```

```
 1   A     I'm sorry, that was an in-person conversation.

 2   Q     Was there a conversation to set up the in-person

 3   conversation?

 4   A     Yes.

 5   Q     And who was that with?

 6   A     I don't know who set it up, but I ended up going to his

 7   office about a week later.

 8   Q     Let's talk about that meeting in his office about a week

 9   later.  Was anyone else present besides you and Mr. Tanaka?

10   A     The first meeting, no.

11   Q     Where was his office at the time?

12   A     Monterey Park.

13   Q     Is there a specific area of Monterey Park in terms of --

14   this was at Sheriff's Headquarters; correct?

15   A     Sheriff's Headquarters on the fourth floor.

16   Q     And what, if anything, did you talk to Mr. Tanaka about in

17   this meeting?

18   A     I expressed my concerns, as I did with Mr. Cavanaugh, the

19   use of force issues that were going on, the fact that, in my

20   opinion, they were out of control.  I brought with me a stack

21   of paper two, three inches thick.  You don't go to an executive

22   on the Department without having all your ducks lined up, and

23   told him that -- I said, "The way to solve this problem is

24   truly a leadership issue, and we need to move to Dan Cruz."

25   Q     You mentioned you brought a stack of documents with you.
```

1    Did you bring Government's Exhibits 5 and 6 with you?

2    A    The -- yes.

3    Q    And you said that you mentioned that Dan Cruz -- you

4    needed a change in leadership.  You were referring to Dan Cruz;

5    is that right?

6    A    Correct.

7    Q    What, if anything, happened after you explained this to

8    Mr. Tanaka?

9    A    He says, "We're not moving Dan Cruz.  We're going to

10   promote him and" --

11   Q    Was it at that conversation or a future --

12   A    No, I'm sorry.  At that particular point, no.  He said in

13   the first meeting, it was "Let me look into it."

14   Q    Did Mr. Tanaka explain to you on that date how he would

15   look into it?

16   A    Yes, he did.

17   Q    What did he say?

18   A    He said he's going to send his aide, which is Duane

19   Harris, down to Men's Central Jail to do an investigation to

20   find out what the problems are.

21   Q    Did you provide the stack of documents that you brought to

22   the meeting to Mr. Tanaka?

23   A    No.

24   Q    Why not?

25   A    He didn't ask for them.

```
 1   Q    Did you describe the information that was in those reports
 2   to Mr. Tanaka?
 3   A    Yes.
 4   Q    Did you have a follow-up meeting with Mr. Tanaka?
 5   A    Yes.
 6   Q    When was that?
 7   A    I think it was about a week later.
 8   Q    And who was present for that meeting?
 9   A    The latter half of the meeting was Duane Harris, his aide.
10   Q    And the first half of the meeting?
11   A    Just he and myself.
12   Q    Where did it occur?
13   A    In his office, same location.
14   Q    What, if anything, did Mr. Tanaka mention to you when it
15   was just you and Mr. Tanaka in the meeting?
16   A    He said it was -- he was apologetic.  He said he found out
17   that the problems were Dan Cruz.  At that point, he says,
18   "We're not going to move Dan Cruz, we're going to promote him.
19   I'm going to send Duane Harris down there to be his operations
20   aide, and between Duane Harris and you, his commander, you will
21   make Dan Cruz successful."
22   Q    What, if anything, did Mr. Tanaka say about Mr. Tanaka's
23   own future with the Department?
24   A    He says, "I make all the decisions on the Department.  I
25   make all the promotions on the Department."  And then he told
```

```
 1    me three people he was not going to promote and said that, "I'm
 2    going to be the Sheriff for the next 15 years, and these people
 3    are going to work for me, so I need to know who the people are
 4    that I promote."
 5              MR. FOX:  One moment, Your Honor.
 6          No more questions, Your Honor.
 7              THE COURT:  All right.  Cross-examination.
 8              MR. STEWARD:  Thank you, Your Honor.
 9                        CROSS-EXAMINATION
10    Q    (BY MR. STEWARD)  Dan Cruz did get transferred; right?
11    A    I believe about three months later, yes.  I think it was
12    about three months.
13    Q    And Cruz was the problem, or at least part of the problem
14    at the jail; right?
15    A    In my opinion, yes.
16    Q    And you didn't get along with Cruz?
17    A    I didn't like the way he hid stuff from me.  That's not
18    how we operate on the Department.
19    Q    Okay.  And the two of you ended up frequently arguing;
20    isn't that true?
21    A    Yes.
22    Q    Loudly?
23    A    I would assume there's probably one or two heated
24    discussions we had behind closed doors, yes.
25    Q    Now, you were originally asked by Mr. Tanaka to become a
```

1    captain at the jail; correct?

2    A    I already was a captain.

3    Q    Okay.  No, no, I'm talking originally.  Let's go back to

4    when you first came to MCJ.  It's my understanding from direct

5    that you were called by Mr. Tanaka and asked to become a

6    captain at the jail; correct?

7    A    Yeah, asked to take the command of Men's Central Jail,

8    yes.

9    Q    Okay.  And did you have some sort of a relationship with

10   Mr. Tanaka prior to that?

11   A    No.

12   Q    Any idea why he called you?

13   A    Nope.

14   Q    But he told you there were problems at the jail; right?

15   A    Yes.

16   Q    And he felt that you were going to be part of the

17   solution; right?

18   A    Yes.

19   Q    He sent you to the jail to have an impact; right?

20   A    Yes.

21   Q    And you found that was difficult to do; right?

22   A    No.

23   Q    The jail -- well, let's talk about this.  You supervised,

24   as captain only, the Men's Central Jail or other facilities?

25   A    As captain, it was Men's Central Jail only.

1    Q     And then you became commander?

2    A     Correct.

3    Q     And as commander, it was everything except the two

4    farthest north facilities in the County.  Does that sound

5    right?

6    A     I was in charge of Men's Central Jail, Twin Towers and

7    Century Regional Detention Facility.

8    Q     Okay.  And just generally, the job of maintaining,

9    supervising and holding people in a jail setting is a difficult

10   job; right?

11   A     Sure.

12   Q     And the Men's Central Jail is one of the largest, if not

13   the largest, jail facility in the country; right?

14   A     It's large, yes.  I'm not sure if it's largest in the

15   country.

16   Q     When did you first talk to the FBI about the things that

17   you've testified here today?

18   A     It had to have been, I'm guessing -- I retired in '10, so

19   I'm thinking in February, March, April of '11.

20   Q     So for the last four, five years, you've talked with the

21   FBI periodically about the things that you've testified about

22   today; right?

23   A     Yes.

24   Q     Okay.  And in your contact with the FBI, did you tell

25   anyone at the Sheriff's Department that you were having these

1   conversations with the FBI?

2   A    I might have mentioned it to a cohort, but no one on the

3   Department, I don't think.

4   Q    And have you had an opportunity to look at the written

5   statements that you've made over the last couple years produced

6   by the FBI?

7   A    Recently?

8   Q    At any time.

9   A    No, not the statements I made to the FBI, no.

10   Q    Okay.  Are you aware that, in their view, you were a CHS,

11   a confidential human source?

12   A    I believe it was called a source, yes.

13   Q    Okay.  So that term is somewhat familiar to you?

14   A    No.  That's the first time -- I heard "source" only.

15   That's the first time I heard the other acronym.

16   Q    Okay.  So you were, in terms of the -- let's talk about

17   the confidential side.  Did you share with anyone else the fact

18   that you were talking to the FBI on occasion?

19   A    I might have mentioned it months later to a peer.  That's

20   about it.  Nobody active on the Department, no.

21   Q    It was your intention to be sure that no one active on the

22   Department found out that you were talking to the FBI; right?

23   A    I didn't want them to know, no.

24   Q    Now, for the information you were providing the FBI, were

25   you paid for that?

1    A      No.

2    Q      Did you receive any type of nonmonetary benefit?

3    A      No.

4    Q      Were you asked periodically every 90 days to fill out a

5    form which discussed what you could and could not do as a

6    source?

7    A      Yes, but I don't know if it was 90 days.  But yes, I was

8    admonished several times.

9    Q      Okay.  And the admonishment was both orally and on a

10   written form; correct?

11   A      I know it was orally, and I might have done one initially

12   on written form, I don't recall.

13   Q      Okay.  In terms of timing, as I understand it, you became

14   a captain in 2006 at the jail; right?

15   A      No, I was a captain before that.  I went to Men's Central

16   Jail at the end of 2006.

17   Q      Okay.  So you're at Men's Central Jail as a captain 2006

18   until you became -- you were promoted as a commander; right?

19   A      Correct.

20   Q      And when was the promotion to commander?

21   A      April of '8.

22   Q      Okay.  And then you left in 2010?

23   A      Correct.

24   Q      Now, your efforts to pass along the problems you were

25   encountering, I think you told us that you went to -- who was

```
 1    your immediate supervisor in --
 2    A     Dennis Burns, the chief of custody.
 3    Q     And that would be when you were commander; right?
 4    A     Correct.
 5    Q     You're commander for approximately two years?
 6    A     Correct.
 7    Q     And you went to Burns and got no satisfaction, for want of
 8    a better phrase?
 9    A     Correct.
10    Q     Okay.  Same thing with Marv Cavanaugh, you went to him;
11    right?
12    A     Correct.
13    Q     And you got no satisfaction there either; right?
14    A     Correct.
15    Q     So then you went to Mr. Tanaka?
16    A     Yes.
17    Q     Okay.  Was he directly above Cavanaugh at that point?
18    A     No.
19    Q     He was above that.
20    A     No.
21    Q     Explain it to me, will you?  Where was he here?
22    A     They were peer assistant sheriffs, two sets of
23    responsibilities on the Department.
24    Q     Okay.  Cavanaugh was over custody; right?
25    A     Correct.
```

1    Q    And Mr. Tanaka was not at that point; right?

2    A    Correct.

3    Q    He was over patrol?

4    A    Correct.

5    Q    Okay.  But you went to him anyway, Mr. Tanaka?

6    A    I was asked to go to his office, yes.

7    Q    Now, did you ever approach Leroy Baca?

8    A    Yes.

9    Q    How many times?

10   A    Twice.

11   Q    How did -- let's start with the first one.  When was that?

12   A    I want to say that was September of '10.

13   Q    Okay.  And what were the circumstances?  How did you try

14   to chat with him?

15   A    I was -- I came back to the Department.  At that time, I

16   was off for a personal reason.  I came back to the Department

17   for an event that I knew he was going to be at.  I was a senior

18   command staff, so I greeted him when he walked up.  And I told

19   him at that point, I said, "Lee, I'm retiring.  I'm done and --

20   but I've got to tell you what's going on at Men's Central Jail,

21   some issues there."  And that was the first time.

22   Q    Okay.  And was the event a barbecue for the dedication of

23   a building in the jail system?

24   A    Yeah, a dedication of the barbecue at Twin Towers, yes.

25   Q    Okay.  So very informal; correct?

```
 1   A      Yes.
 2   Q      At any point, did you attempt to visit Leroy Baca at his
 3   office?
 4   A      I was asked to go to his office prior to my retirement,
 5   and I want to say that was probably October, maybe.
 6   Q      Did you go?
 7   A      Yeah.
 8   Q      Get any satisfaction from him?
 9   A      No.
10   Q      Now, you said there was another instance where you
11   attempted to approach him?
12   A      Yes.
13   Q      Just generally, what happened there?
14   A      It was the last Sunday before Christmas in '10 at an event
15   that -- a charity that I do that I coordinate that I knew he
16   was going to attend.  At that particular time, I again
17   approached Baca, and I said, "We need to do something about
18   this."  He said, "Talk to me after the event," and then he
19   left.
20   Q      Did you get any satisfaction from him, any follow-up after
21   that?
22   A      No.
23   Q      And during the times that you're talking about that we've
24   been discussing, he was the Sheriff; right?
25   A      Correct.
```

1    Q    The buck stopped with him?

2    A    Correct.

3    Q    Okay.  Were you frustrated that you couldn't get things

4    done?

5    A    Yes.

6    Q    And yet, while you were commander, you had a great deal of

7    power to make changes in the jail system; right?

8    A    Not a great deal of power.  I mean, to make any changes

9    I'd have to go to Dennis Burns because he's the chief of

10   custody who would have to approve the changes, yes.

11   Q    Well, let's talk for a moment -- you mentioned John Clark

12   and the rotation plan.  That was not a plan that you supported;

13   correct?

14   A    No, I would have supported it.

15   Q    Okay.  Do you recall testifying back in Washington,

16   D.C. --

17   A    No.

18   Q    -- in --

19   A    No.

20   Q    Okay.  Do you recall at any point indicating that you

21   can't just transfer everybody as that plan anticipated?

22   A    No, I would have approved the plan.

23   Q    Okay.  But you were gone by the time the plan was

24   discussed; correct?

25   A    I wasn't even -- I was still the captain at the fraud

1    detail at, as I understand, the time the plan was discussed.

2    Q    Okay.  But that was one of the problems that you

3    encountered when you came in first as a captain and then as a

4    commander; right?

5    A    It wasn't a problem because I knew it couldn't have been

6    facilitated.  So therefore, since it was not inputted, I didn't

7    even attempt to try.

8    Q    My fault.  What I was getting at was the deputies on the

9    2,000 floor and 3,000 floor and their tight-knit groups, was

10   that a problem when you came in?

11   A    Oh, yes.  Yes.

12   Q    Okay.  And what, if anything, did you do about that?

13   A    I learned from a very good executive on the Department

14   that handled Men's Central Jail, and I talked to him before I

15   went there, that you need to manage by walking around.  So I

16   literally spent probably eight hours a day inside the jail

17   facility, and I would spend the other four -- three or four

18   hours outside in my administrative office.  So I managed by

19   walking around and seeing, having my thumb on the pulse to see

20   what was going on and made changes that way.

21   Q    Okay.  Did that work?

22   A    Yes.

23   Q    Do you know if anybody else had tried that before?

24   A    Yes.

25   Q    Apparently, it didn't work with them?

```
 1   A      No, it did because this is the advice I got from this
 2   particular -- I think he was assistant sheriff when he retired.
 3   Q      Okay.  And who was that?
 4   A      Dahlman, Dennis Dahlman.
 5   Q      So it was that simple to cure the problem of the cliques
 6   on 2,000 and 3,000 by just walking around?
 7   A      It didn't cure it.  It kept them on their toes.  Again,
 8   part of the problem was the 10-code, letting everybody know
 9   when the captain was walking.
10   Q      Now, you had little contact with Paul Tanaka personally;
11   isn't that true?
12   A      Correct.
13   Q      And how many times did you have personal meetings with him
14   to discuss problems at the jail?
15   A      Just those two meetings we discussed earlier.
16   Q      And you indicated to Mr. Tanaka that everything was fine
17   at the jail; isn't that true?
18   A      No.
19   Q      You did blame Daniel Cruz for a lot of the problems at the
20   jail to Mr. Tanaka; right?
21   A      Yes, I believe and still do that it was a supervisory
22   leadership issue.
23   Q      And that's why you were put in charge, or at least put in
24   initially as captain at the Men's Central Jail; right?
25   A      I don't know the reason for it but --
```

```
 1   Q    Okay.  And yet, when you left, many of these same problems
 2   still existed; right?
 3   A    No.
 4   Q    Well, isn't that why you went to the FBI?
 5   A    Well, when you say "left," you mean when I left and
 6   retired or when I left for captain?
 7   Q    When you retired.
 8   A    Okay.  Can you ask the question again then, please.
 9   Q    Sure.  Sure.  Weren't many of the same problems -- the
10   cliques, use of force, all of these things -- still in
11   existence at the time you retired?
12   A    Yes.
13   Q    Okay.  And that was why you went to the FBI; right?
14   A    Yeah, there was an incident that caused me to go to the
15   FBI, yes.
16   Q    Okay.  And you went to them rather than them coming to
17   you; correct?
18   A    Correct.
19   Q    Okay.  And you would have these periodic meetings at
20   Starbucks and places like that; right?
21   A    We met several times, yes.
22   Q    And you were providing them as much inside information as
23   you could; right?
24   A    Correct.
25   Q    Why?
```

```
 1   A      Felt it was the right thing to do.
 2   Q      You did the same thing for the Los Angeles Times; isn't
 3   that true?
 4   A      Correct.
 5   Q      You went to them quietly and supplied them with
 6   information on a number of occasions; right?
 7   A      Correct.
 8   Q      You've described yourself before as a whistleblower;
 9   right?
10   A      Correct.
11   Q      Have you ever sought monetary compensation from the County
12   for the things that you've talked about today?
13   A      No.
14   Q      Never sued them?
15   A      Nope.
16          MR. STEWARD:  Thank you, Your Honor.  I have nothing
17   further.
18          THE COURT:  All right.  Redirect?
19          MR. FOX:  One moment, Your Honor.
20      Nothing further, Your Honor.
21          THE COURT:  Sir, you may step down.
22          THE WITNESS:  Thank you.
23          THE COURT:  Thank you.
24      Call your next witness.
25          MS. RHODES:  Thank you, Your Honor.  The government
```

1    will call Peter Eliasberg to the stand, but before that we'd

2    like to read two stipulations that have been filed.

3            THE COURT:  That's fine.

4            MS. RHODES:  The first stipulation we'd like to read

5    is a stipulation regarding e-mails, and it reads "Plaintiff,

6    United States of America, by and through its counsel of record,

7    the United States Attorney for the Central District of

8    California and Assistant United States Attorneys Brandon Fox,

9    Lizabeth Rhodes and Eddie Jauregui, and defendant Paul Tanaka,

10   by and through his counsel of record, Dean Steward and Jerome

11   Haig, hereby stipulate as follows:  Government's Exhibits 9

12   through 78 are true and correct copies of e-mails transmitted

13   over the Los Angeles County Sheriff's Department's e-mail

14   server on or about the dates listed in the exhibits."  And it's

15   signed March 13th and 14th by the parties.

16       Your Honor, that's Exhibit Number 190.

17       Also, we'd like to read Exhibit 191 a stipulation

18   regarding ACLU filings and correspondence with the LASD, and it

19   reads as follows:  "Plaintiff, United States of America, by and

20   through its counsel of record, the United States Attorney for

21   the Central District of California and Assistant United States

22   Attorneys Brandon Fox, Lizabeth Rhodes, Eddie Jauregui, and

23   defendant Paul Tanaka, by and through his counsel of record,

24   Dean Steward and Jerome Haig, hereby stipulate as follows:

25   Government's Exhibits 112 and 116 are letters sent from the

1    American Civil Liberties Union to Sheriff Baca at the

2    Los Angeles County Sheriff's Department on or about the dates

3    listed in the exhibits.  Government's Exhibits 113 and 115 --

4    through 115 are court filings made by the American Civil

5    Liberties Union in litigation against the Los Angeles County

6    Sheriff's Department.  The filings were made on or about the

7    dates listed in the exhibits," and it's signed by all parties.

8              THE COURT:  Ladies and gentlemen, the parties have

9    agreed to certain facts that have been stated to you.  You

10   should therefore treat these facts as having been proved.

11             MS. RHODES:  And now the government would call Peter

12   Eliasberg to the stand.

13             THE DEPUTY CLERK:  Please stand here for me, please.

14   Raise your right hand.

15        (The witness, PETER ELIASBERG, was sworn.)

16             THE DEPUTY CLERK:  Please be seated.

17        Will you please state your full name and spell your last

18   name for the record.

19             THE WITNESS:  My name is Peter Eliasberg.  My last

20   name is spelled E-L-I-A-S-B-E-R-G.

21             THE DEPUTY CLERK:  Thank you.

22                        DIRECT EXAMINATION

23   Q    (BY MS. RHODES)  What do you do for a living?

24   A    I'm a civil rights lawyer.  I'm the legal director at the

25   ACLU of Southern California.

**UNITED STATES DISTRICT COURT**

1    Q    And ACLU is an acronym?

2    A    It is.  It stands for American Civil Liberties Union.

3    Q    And what is the American Civil Liberties Union?

4    A    It's a nonprofit organization that's devoted to protecting

5    the civil rights and civil liberties, primarily those protected

6    in the Bill of Rights in the United States Constitution but

7    others also.

8    Q    How long have you been an attorney for the ACLU?

9    A    A little over 20 years.

10   Q    And as part of your job at the ACLU, did you come into

11   contact with the Los Angeles County Sheriff's Department?

12   A    Yes, I did.

13   Q    How?

14   A    Primarily through work that -- the ACLU has been

15   monitoring conditions in the Los Angeles County jails for a

16   very long time, more than three decades as a result of having

17   prevailed in a case on behalf of inmates in the county jails

18   called Rutherford, and then there were subsequent court orders

19   in Rutherford that gave us access to walk the -- walk the

20   housing units, talk to inmates in the jails.  We also receive

21   many, many complaints from inmates and their family members

22   about conditions in the jail, and that's how I -- that's my --

23   has been my principal interaction with the Sheriff's

24   Department.

25   Q    And you said the ACLU has access.  Is that access unique

1    to the ACLU?

2    A    Pretty much.  I mean, there's other people -- jail

3    chaplains have special access and so on, but yes, it's

4    not typical --

5         (Reporter admonition.)

6              THE WITNESS:  Sure.  It is not typical for lawyers

7    to be able to walk in the housing units and talk to inmates in

8    the jails.

9    Q    (BY MS. RHODES)  Now, you mentioned that the litigation

10   that allows the ACLU access is quite old.  How long have you

11   been working monitoring the jails for the ACLU?

12   A    I started working in late 2009 and early 2010.  There were

13   times before that when I would get involved with a particular

14   issue, but in terms of doing it on a regular basis, like 2009,

15   early 2010.

16   Q    I'd like you to turn if you would -- it should be in front

17   of you near the end -- Exhibit 112.

18              MS. RHODES:  May I have one moment, Your Honor?

19              THE COURT:  Yes.

20         (Counsel conferred off the record.)

21              THE WITNESS:  I see it.

22   Q    (BY MS. RHODES)  And what is this?

23   A    It's a letter that colleagues of mine sent dated October

24   28th, 2009 to Sheriff Baca -- or at the time, Sheriff Baca.

25   Q    And you didn't sign this.  Were you aware of it?

1   A     Yes, I was.

2   Q     And were you aware of the complaints that caused the

3   letter?

4   A     Yes, I was.  I talked to my colleagues about the

5   complaints that prompted them to write this letter and send it.

6              MS. RHODES:  Your Honor, at this time I'd move to

7   admit Exhibit 112.

8              THE COURT:  Any objection?

9              MR. STEWARD:  No objection.

10             THE COURT:  It will be received.

11        (Exhibit No. 112 received into evidence.)

12  Q     (BY MS. RHODES)  Now, Mr. Eliasberg, what was the purpose

13  of this letter?

14  A     Well, the purpose of the letter was to try to get

15  changes -- inmates had complained to us on a regular basis that

16  when they talked to us about conditions in the jails that they

17  would be retaliated against, that deputies would warn them,

18  threaten them, tell them not to do things -- tell them not to

19  talk to the ACLU.  And it made our job very hard.  Not only we

20  felt wrong for the inmates themselves, but it also made it very

21  hard for us to do our job monitoring jail conditions if inmates

22  felt that they were in danger if they talked to us.  So we

23  wrote a letter to Sheriff Baca basically saying this is a big

24  problem, and we'd like you to meet with us to address and

25  figure out ways to get this to stop.

1          MS. RHODES:  And if I could have that published.

2    Q    (BY MS. RHODES)  I'd like you --

3          MS. RHODES:  If I could just have the second

4    sentence of the first paragraph blown up.

5    Q    (BY MS. RHODES)  And I'd like you to read it.  It starts

6    "We have documented."

7    A    "We have documented a persistent and increasing number of

8    retaliation incidents when inmates have complained about

9    conditions in the jail."

10   Q    Okay.  And then the third paragraph, please, that starts

11   "However."

12   A    "However, our joint efforts have not been adequate to

13   address the problem of retaliation and excessive force, which

14   has continued to worsen despite the creation of the reporting

15   process."

16   Q    And what happened as a result of this letter?

17   A    Well, we continued to hear about these problems.  We saw

18   no lessening in the complaints about retaliation.  So, in

19   effect, nothing happened, or nothing good happened.

20   Q    Did you get any response that you recall from the

21   Sheriff's Department as a result of this letter?

22   A    I do not remember a response to this specific letter.  I

23   do remember that about a year after this or maybe even a little

24   bit more than a year --

25          MR. STEWARD:  Objection, nonresponsive.

```
 1              THE COURT:  Sustained.
 2   Q    (BY MS. RHODES)  And did you later, through the Rutherford
 3   litigation, file reports with the court regarding the
 4   conditions in jail and the excessive force?
 5   A    Yes, we did.
 6   Q    I'd like to turn your attention to 213 -- I'm sorry, 113,
 7   and, Mr. Eliasberg, I think Exhibit 113 spans both that binder
 8   and the next one which is at your feet to your right.
 9   A    Okay.  I have both binders.
10   Q    Do you recognize Exhibit 113?
11   A    Yes, I do.
12   Q    And what is it?
13   A    It is a report that we filed with the court in the
14   Rutherford case about conditions in the Los Angeles County
15   jails that we thought were very problematic, including
16   information that we received from numerous inmates about
17   excessive unnecessary force, beatings being administered by
18   deputies against inmates in the jails.
19   Q    And as part of the filing, did you attach a lengthy report
20   at -- I think it's page 4 of that filing.  It's A134764.
21   A    Yes, we did.
22   Q    And what was that?
23   A    Well, the report was a documentation of the conditions
24   that we were particularly troubled by, which included what we
25   believed was a pattern of excessive force in the jails by
```

```
 1    deputies.  There were other things discussed in the report too,
 2    other conditions, crowding conditions and so on, but it was
 3    about the main issues that we thought were going on in the
 4    jails that were improper.
 5    Q    And the main issues were?
 6    A    Well, they included excessive force, overcrowding, inmates
 7    not getting out-of-cell time that they were entitled to.  Those
 8    were the principal -- and mistreat treatment of inmates with
 9    mental illness.
10    Q    And when you file these reports, was the other side the
11    Sheriff's Department?
12    A    Yes.
13    Q    Is it your understanding that this report, this filing got
14    served on the Sheriff's Department?
15    A    Yes, I know it did.
16    Q    Did you also do anything to give the Sheriff's Department
17    these reports?
18    A    I don't know with every one of the reports we did whether
19    we did things beyond actually serving them in the litigation.
20    Q    Did you issue press releases with regard to these reports?
21             MR. STEWARD:  Objection, relevance.
22             THE COURT:  Overruled.  You can answer.
23             THE WITNESS:  Yes, we did.
24    Q    (BY MS. RHODES)  And why?
25    A    Because we wanted -- it's my belief that sometimes when
```

 1    there's serious problems and what we believe to be a legal

 2    action going on, that public knowledge of that can have a

 3    beneficial affect in pressuring people who we believe are

 4    behaving improperly, to change that behavior.

 5    Q    At the beginning of the report, is there an executive

 6    summary?

 7    A    Yes, there is.

 8    Q    How long is that?

 9    A    My memory was about two pages -- yeah, page and three

10    quarters.

11    Q    And did you assist in writing that executive summary?

12    A    I did.

13              MS. RHODES:  I'd like to have that published.

14              THE COURT:  Has it been offered?

15              MS. RHODES:  No, it has not.  I'm sorry, Your Honor.

16         Before I do that, let me perfect it, Your Honor.  I

17    apologize.

18    Q    (BY MS. RHODES)  Does the filing also include

19    declarations?

20    A    Yes, it does.

21    Q    Of whom?

22    A    Either only inmates or former inmates who are almost --

23    the declarations were either all inmates or former inmates,

24    that was a very large percentage of the declarations.

25    Q    What's a declaration?

1    A    A declaration is a sworn statement.

2    Q    And approximately how many declarations does Exhibit 113

3    contain?

4    A    My recollection is about 45, but we put in a table of the

5    declarations.  If I look at that, I could tell you exactly how

6    many.

7    Q    Would that help refresh your recollection?

8    A    It would.  We list 40 -- 40, but I think in two cases

9    there was not an actual declaration, so I think it was 38

10   declarations.

11           MS. RHODES:  Your Honor, at this time I move to

12   admit Exhibit 113.

13           THE COURT:  Any objection?

14           MR. STEWARD:  No, Your Honor.

15           THE COURT:  It will be received.

16       (Exhibit No. 113 received into evidence.)

17   Q    (BY MS. RHODES)  I'd like to go back to the executive

18   summary, and this is the executive summary that you assisted in

19   writing, Mr. Eliasberg?

20   A    That's correct.

21   Q    Can you read -- and we'll blow up -- the second sentence

22   of the first paragraph that starts "Today."

23   A    "Today, many of the awful conditions targeted by the

24   original lawsuit persist, together with an apparent culture of

25   violence and fear, including prisoner-on-prisoner assaults and

1    the use of excessive force by deputies.  This violence fuelled

2    in significant part by the overarching problem of chronic

3    overcrowding in the cell blocks of Men's Central Jail is one of

4    the most compelling reasons why this ageing, decrepit facility

5    must have its population dramatically reduced or be closed."

6    Q    And can you read the first sentence of the fourth

7    paragraph as well.

8    A    Is it okay if I just do it from the --

9    Q    Yeah, if you'd just wait one second, I think we can also

10   get it on the screen so that everyone can read it along with

11   you.  First paragraph -- first sentence of the fourth

12   paragraph.

13   A    That begins "The widely reported"?

14   Q    Yes.

15   A    "The widely reported violence at Men's Central Jail is

16   particularly disturbing because the vast majority of people

17   being held at the jail are simply awaiting trial.  In other

18   words, they are presumed innocent and have yet to get their day

19   in court.  In addition, a high percentage of these prisoners

20   suffer from mental disabilities, and many are unable to control

21   their own disturbed behaviors.  A national expert found that

22   abuse of prisoners by deputies at Men's Central Jail is not

23   only very likely but is disproportionately directed at

24   prisoners with serious mental illness.  The taxing" --

25              THE COURT:  I believe this was only supposed to be

```
 1    the first sentence.
 2              MS. RHODES:  Thank you, Your Honor.
 3              THE WITNESS:  My apologies.
 4              THE COURT:  That's all right.
 5    Q    (BY MS. RHODES)  Now I'd like to turn to the exhibits --
 6    I'm sorry, to the declarations that you referenced previously.
 7    And if you could go to the first declaration, and at the bottom
 8    it's A134837.
 9         Do you have that in front of you?
10    A    Yes, I do.
11    Q    And is this one of the declarations that you filed along
12    with your report?
13    A    Yes.
14    Q    Can you please read paragraph 6 of that declaration.
15    A    "It seems like the guards are their own gang in here.
16    They put their hands on inmates to show off their authority.
17    The whole jail is overwhelming, and I fear for my safety.  I
18    never know when someone will come and beat me and then accuse
19    me of assault."
20    Q    What happened as a result of this filing with these
21    declarations?
22    A    Well, the problems persisted.  We didn't see any
23    improvement.  In fact, I think, if anything, things got worse.
24    Q    Did anyone at the level of assistant sheriff or above call
25    you?
```

```
 1   A     No.
 2   Q     Did the Sheriff's Department respond to this in any forum?
 3   A     Yes.
 4   Q     What?
 5   A     The chief spokesperson for the Sheriff's Department made
 6   comments in the media about how the ACLU --
 7              MR. STEWARD:  Objection, hearsay, Your Honor.
 8   Hearsay.
 9              THE COURT:  Sustained.
10   Q     (BY MS. RHODES)  Based on the comments -- based on
11   comments in the media, did you do anything?  Let me rephrase.
12        Based on the Sheriff's Department's responses in the
13   media, did that cause you to have confidence that things would
14   change?
15   A     No.
16   Q     Did you continue to file reports?
17   A     Yes.
18   Q     What was the next one you filed?
19   A     I believe it was about six to eight months later.
20   Q     And can you look at Exhibit 114.
21   A     I have it.
22   Q     And what is that?
23   A     It's the notice of filing with the court of a second
24   report about conditions in the jails.
25   Q     What's the date of that?
```

1   A      September 9th, 2010.

2   Q      And was this also publicly filed?

3   A      Yes, it was.

4   Q      Was a copy served on the Sheriff's Department?

5   A      Yes.

6   Q      Does it -- what -- what does it talk about as well?

7   A      It talks about -- in one sentence, the theme was "The

8   problems that we identified in our previous report continue; if

9   anything, are getting worse.  We've seen no progress or change

10  in the things that we identified in the report from earlier in

11  the year."

12  Q      And that includes the excessive force that you were

13  hearing about?

14  A      Yeah, I believe that was the first topic we addressed in

15  the second report.

16          MS. RHODES:  Your Honor, I'd move to admit

17  Exhibit 114.

18          MR. STEWARD:  No objection.

19          THE COURT:  It will be received.

20      (Exhibit No. 114 received into evidence.)

21  Q      (BY MS. RHODES)  Did you do anything else to bring to

22  light what was happening in the jails besides filing this

23  report?

24  A      We held a press conference with the issuance of the

25  report, and I believe I did a number of media interview -- I'm

1    sure I did a number of media interviews after the report was

2    issued.

3    Q    What, if anything, happened as a result of this report?

4    A    We noticed no change or improvements in the conditions and

5    problems with excessive force that we identified.

6    Q    Based on that, did you move for a protective order?

7    A    Yes, we did.

8    Q    What is that?

9    A    Well, in this case, the protective order that we moved for

10   in that particular case was basically saying that the people

11   who are our clients, the inmates in the jails, are afraid to

12   talk to us because they're being retaliated against for talking

13   to us, and we asked the court for an order that basically

14   barred the Sheriff's Department from taking any adverse action

15   against inmates for talking to us.

16   Q    And do you recall approximately when that protective order

17   was filed?

18   A    I don't remember the exact date, no.  It was around this

19   time, but I don't remember exactly when.

20   Q    And can you turn to Exhibit 115.

21   A    I have it.

22   Q    During the course of -- during the course of applying for

23   a protective order, did something happen?

24   A    Yes.  We had moved for a protective order, and the court

25   hadn't ruled on the motion.  And then in January of 2011,

1   something happened that we brought to the court's attention in

2   a supplemental filing for the protective order.

3   Q    What was that?

4   A    One of my colleagues who had the title then of jail

5   project monitor -- I believe she's now the jail project

6   director -- was in the jails talking to an inmate.  She was in

7   an attorney room.  She heard scuffling.  She went and looked

8   through a glass window that looked out into the housing unit

9   and saw two deputies beating an inmate --

10          MR. STEWARD:  Objection, Your Honor.  This is all

11   hearsay.

12          THE COURT:  Sustained.  The answer --

13          MR. STEWARD:  Move to strike the balance of -- the

14   beginning of that sentence.

15          THE COURT:  The answer is stricken.  The jury should

16   disregard it.

17   Q    (BY MS. RHODES)  Did you get a report which caused you to

18   file something in the protective order?

19   A    Yes.

20   Q    Why did you file -- did it cause you to file a

21   declaration?

22   A    Yes.

23   Q    Whose declaration was that?

24   A    The declaration of Esther Lim.

25   Q    Why did you file her declaration?

```
 1   A     Because we believed it was relevant to the relief we were

 2   asking for, the protective order we were asking for.

 3   Q     How -- how was it relevant?

 4   A     We had alleged that -- and supported those allegations

 5   with sworn statements that one of the ways that inmates were

 6   punished for talking to the ACLU was by being beaten up by

 7   deputies.

 8   Q     I'd like you to turn your attention to Exhibit 115.

 9         Do you recognize that?

10   A     Yes.

11   Q     What is it?

12   A     It's a supplemental filing in support of the motion for

13   protective order.

14   Q     And does it contain the declaration of Esther Lim that

15   we've just spoken about?

16   A     Yes.

17              MS. RHODES:  Your Honor, I'd move to admit 115.

18              MR. STEWARD:  No objection.

19              THE COURT:  It will be received.

20         (Exhibit No. 115 received into evidence.)

21   Q     (BY MS. RHODES)  Why did you think that the contents --

22   that what Esther Lim had seen and declared in her declaration

23   were significant?

24   A     Well, as I said, I thought it was significant because we

25   had previously submitted to the court statements from inmates
```

1    saying that one of the ways they got retaliated against was by

2    being beaten up.  The Sheriff's Department's response almost

3    uniformly was inmates make stuff up and the ACLU exaggerates.

4    This was the first time I was aware of that anybody --

5            (Reporter admonition.)

6            THE WITNESS:  This was the first time I was aware of

7    that anyone who was not an inmate or former inmate had actually

8    observed deputies beating an inmate in the jails.

9    Q    (BY MS. RHODES)  And with the filing and with Esther Lim,

10   did you also issue a press release?

11   A    Yes, we did.

12   Q    Why?

13   A    Because we continued to hope that public pressure and

14   public knowledge of what was happening in the jails might force

15   the Sheriff's Department to change its practices and behavior.

16   Q    And when you say "its practices and behavior," did that

17   include the way it was conducting investigations?

18   A    Yes.

19   Q    After you issued a press release, did you learn anything

20   about the way they were conducting the internal investigation

21   with regard to Esther Lim?

22   A    Yes.

23   Q    What did you learn?

24   A    Two things:  Particularly they -- a sheriffs official made

25   public statements about her and her credibility --

```
 1              MR. STEWARD:  Move to strike, Your Honor.  Hearsay.
 2              THE COURT:  Ladies and gentlemen, we're going to
 3    take our final break of the day.  Again, I want to remind you
 4    until this trial is over, you're not to discuss this case with
 5    anyone, including your fellow jurors, members of your family,
 6    people involved in the trial or anyone else, and do not allow
 7    others to discuss the case with you.  This includes discussing
 8    the case on the Internet, through blogs or chat rooms or
 9    bulletin boards, by e-mails or text messages.  If anyone tries
10    to communicate with you about this case, please let me know
11    about it immediately.
12         Do not read, watch or listen to any news reports or other
13    accounts about the trial or anyone associated with it,
14    including anything online.  Do not do any research such as
15    consulting dictionaries, searching the Internet or using other
16    reference materials, and do not make any investigation about
17    the case on your own.
18         Finally, you're reminded to keep an open mind until all of
19    the evidence has been presented, you've heard the arguments of
20    counsel, the instructions of the Court and the views of your
21    fellow jurors.
22         We'll come back at quarter after.
23         (The jury exited the courtroom.)
24              THE DEPUTY CLERK:  Please be seated.
25              THE COURT:  Sir, you may step down.
```

1          All right.  We'll address the objection as soon as we get

2     back.

3          (Off the record at 12:01 p.m.)

4          (On the record at 12:15 p.m.)

5               MR. FOX:  Your Honor, do you want the witness out of

6     the room?

7               THE COURT:  Yes, please.

8          Okay.  Do you wish to be heard?

9               MS. RHODES:  Yes, Your Honor.  The -- this is not

10    hearsay because it's not offered for the truth.  In fact, what

11    the Sheriff's Department did was call into question the

12    credibility of Esther Lim.  We're certainly not saying there is

13    any truth that the person who witnessed this would or would not

14    do certain things.  The Sheriff's Department said this is not a

15    credible witness, and the affect on the hearer, a second reason

16    that it's not hearsay is that the affect was that the ACLU had

17    no faith, certainly no renewed faith in any kind of

18    investigation that would first challenge the credibility of a

19    witness to a crime before opening any investigation.  So it's

20    not hearsay, and it has an affect on the hearer.

21              MR. STEWARD:  That's actually a pretty decent

22    argument, Your Honor, and I'll withdraw my objection on the

23    not-for-the-truth portion of it.

24              THE COURT:  That's a first.

25              MS. RHODES:  May I bring up one other thing, Your

```
1    Honor, while the jury is not here?
2                THE COURT:  Yes.
3                MS. RHODES:  Not our next witness, but the witness
4    after that, we submitted a compulsion order to Your Honor, and
5    he would only testify with that compulsion.  I haven't been at
6    my computer, I don't know if that came through ECF, and also
7    you may need to instruct him orally.  So I just bring that to
8    the Court's attention.
9                THE COURT:  Well, couple things.  One, the order has
10   been signed.
11               MS. RHODES:  Okay.
12               THE COURT:  And if he's going to need -- if he's
13   going to need to be instructed, we're going to do that outside
14   the presence of the jury.
15               MS. RHODES:  It's Mickey Manzo.  We'll take a break
16   then before that.
17               THE COURT:  All right.
18        Yeah, let's bring the jury in, and if you could have the
19   witness...
20               MR. JAUREGUI:  The next witness, Your Honor?
21               MR. FOX:  Eliasberg.
22               THE COURT:  Mr. Eliasberg.
23        (The jury entered the courtroom.)
24               THE DEPUTY CLERK:  Please be seated.
25               THE COURT:  All right.  If we could have the witness
```

1   come forward, please.

2              MS. RHODES:  Your Honor, may I proceed?

3              THE COURT:  Yes, please.

4   Q    (BY MS. RHODES)  Mr. Eliasberg, when we broke, we were

5   talking about the press that covered Ms. Lim and the

6   declaration you filed.  Do you remember that?

7   A    Yes, I do.

8   Q    Did the Sheriff's Department respond publicly?

9   A    Yes.

10  Q    How?

11  A    I remember particularly quotations from the Sheriff's

12  spokesperson Steve Whitmore and the L.A. Times basically

13  attacking Ms. Lim's credibility saying that if things had

14  really happened the say she said they did, she would have done

15  things differently.

16  Q    And was that troubling to you?

17  A    Extremely.

18  Q    Why?

19  A    Because I didn't think -- I thought that Ms. Lim was a

20  witness to potential criminal activity, and I couldn't believe

21  that the law enforcement agency that would have responsibility

22  for investigating that potential criminal activity would

23  criticize a principal witness in public.

24  Q    Now, we've spoken a bit about press coverage that the ACLU

25  engaged in.  I'd like you to turn back to Binder 1, Exhibit 9

```
 1   if you could.

 2   A     I have the exhibit.

 3   Q     Okay.

 4         MS. RHODES:  And, Your Honor, based on the

 5   stipulation, I would like to move Exhibit 9 into evidence.

 6         THE COURT:  Any objection?

 7         MR. STEWARD:  The stipulation, Your Honor, was as to

 8   foundation.

 9         MS. RHODES:  May I have one moment, Your Honor?

10         THE COURT:  Yes.

11      (Counsel conferred off the record.)

12         MR. STEWARD:  No objection, Your Honor.

13         THE COURT:  All right.  It will be received.

14      (Exhibit No. 9 received into evidence.)

15   Q    (BY MS. RHODES)  Now, Mr. Eliasberg, could you --

16         MS. RHODES:  If we could publish this.

17   Q    (BY MS. RHODES)  Mr. Eliasberg, if you could read who this

18   is from.

19   A     It's from James R. Lopez.

20   Q     And can you read the second person who is CC'd there.

21   A     Yes, it says Tanaka, Paul K.

22   Q     Now can you read the date sent.

23   A     5/5/2011, so May 5th, 2011.

24   Q     And then can you read the first full paragraph after the

25   dash.
```

1    A    "Assistant Sheriff Tanaka hosted your weekly staff

2    meeting.  All chiefs were in attendance.  Issues relating to

3    the recent media coverage of the Department were discussed."

4    Q    And then the fourth dash and what appears immediately

5    below it, just the opening line.

6    A    "Below is a copy of an article in today's Los Angeles

7    Times (Fatarichi/Blankstein [phonetic]) reporting on a lawsuit

8    filed yesterday by the deputies assaulted during the MCJ

9    Christmas party."

10    Q    Okay.  And the article is entitled?

11    A    "L.A. County Sheriff's Department fosters 'gang-like

12    activity' among jail deputies, suit alleges."

13    Q    Okay.  If you could turn to the second page of that

14    e-mail, the third paragraph, second sentence that starts "The

15    allegations," could you read that.

16    A    "The allegations come amid other recent accusations of

17    brutality inside county jails.  Last February, an ACLU

18    representative spurred an internal criminal investigation after

19    she said she saw two deputies, unaware of her presence, beating

20    an unconscious inmate for at least two minutes."

21    Q    And then the last paragraph that starts "Sheriff's

22    spokesperson," could you just read that first sentence.

23    A    "Sheriff's spokesman Steve Whitmore denied the allegations

24    that the Sheriff's Department fosters 'lawlessness' among jail

25    employees, saying the Department has taken swift action in

**UNITED STATES DISTRICT COURT**

 1  response to the incident.  'The whole story will be told, and

 2  we look forward to the opportunity to tell it.'"

 3  Q    I'd like you to turn to Exhibit 10.

 4           MS. RHODES:  May I have one moment, Your Honor?

 5           THE COURT:  Yes.

 6       (Counsel conferred off the record.)

 7           MS. RHODES:  Your Honor, I have no further

 8  questions.

 9           THE COURT:  All right.  Cross-examination.

10           MR. STEWARD:  Thank you, Your Honor.

11                      CROSS-EXAMINATION

12  Q    (BY MR. STEWARD)  Mr. Eliasberg, Exhibit -- I think it's 9

13  that we were just looking at -- you have that in front of you?

14  A    I do now.

15  Q    And are you named anywhere in this?

16  A    I don't see my name, no.

17  Q    Okay.  It appears to be from a James R. Lopez.  Do you

18  know who that is?

19  A    I don't.

20  Q    To bcenter11@gmail -- do you know who that is?

21  A    I'm guessing it's a list, sir, if not a person, but no, I

22  don't know if it's a person or who it is.

23  Q    And then there's a number of cc's after that; correct?

24  A    Yes.

25  Q    And one of them appears to be Mr. Tanaka?

1    A    Yes.

2    Q    And then there are a number of -- appears to be bullet

3    points after "Good morning.  Yesterday was busy was

4    uneventful."  Do you see that?

5    A    Yes.

6    Q    And it's just in the last one at the bottom that a --

7    appears to be a copy of an L.A. Times article is pasted on

8    there.  You see that?

9    A    Yes.

10   Q    Okay.  And in order to review this and believe anything it

11   says in here, one has to believe the L.A. Times; right?

12            MS. RHODES:  Objection, calls for speculation.

13            MR. STEWARD:  I'll withdraw it.

14            THE COURT:  Sustained.

15   Q    (BY MR. STEWARD)  But you don't know anything about this

16   e-mail above the L.A. Times being pasted; correct?

17            MS. RHODES:  Objection, foundation.

18            THE COURT:  Overruled.  You can answer.

19            THE WITNESS:  No, it's not correct.  I know about

20   the news broadcast, "The Gang Behind the Badge."

21   Q    (BY MR. STEWARD)  I'm sorry, I wasn't clear.

22        This is not your e-mail; right?

23   A    No, it's not.

24   Q    Okay.  And the first time you saw this was when it was

25   produced to you by the prosecution; right?

1    A    Yes.

2    Q    Okay.  How long ago was that?

3    A    About a week ago.

4    Q    Now, you understand that -- let me back up.

5         You've been looking at and monitoring the Los Angeles

6    County jail system for a number of years; right?

7    A    That's correct.

8    Q    Your agency, your organization has been doing it even

9    longer; right?

10   A    Yes.

11   Q    And you understand that the Sheriff's Department has no

12   control over how many criminal cases the D.A.'s office files;

13   right?

14   A    I don't know that to be true.

15   Q    Okay.  You do understand that the budget for the Sheriff's

16   Department in this county is controlled by the County Board of

17   Supervisors; right?

18             MS. RHODES:  Objection, calls for speculation.

19             THE COURT:  Sustained.

20   Q    (BY MR. STEWARD)  Well, the Sheriff's Department doesn't

21   have a source of funding other than from the County Board of

22   Supervisors; right?

23             MS. RHODES:  Same objection.

24             THE COURT:  Sustained.

25   Q    (BY MR. STEWARD)  The Sheriff's Department does not

**UNITED STATES DISTRICT COURT**

```
 1   control the number of inmates under its care and security;
 2   right?
 3              MS. RHODES:  Objection, calls for speculation, Your
 4   Honor.
 5              THE COURT:  Sustained.
 6   Q    (BY MR. STEWARD)  The Sheriff's Department must work
 7   within a given budget, you know that to be true; right?
 8   A    I don't really understand the question.
 9   Q    Okay.  Well, for example, jail overcrowding, that's one of
10   the things that your organization has been complaining about
11   for years; right?
12   A    That's correct.
13   Q    Do you believe that the Sheriff's Department has the
14   ability to just build another jail?
15              MS. RHODES:  Objection, beyond the scope, calls for
16   speculation.
17              THE COURT:  Overruled.  You can answer.
18              THE WITNESS:  Not by themselves, no.
19   Q    (BY MR. STEWARD)  So when you're talking jail
20   overcrowding, in your many years of experience of monitoring
21   the jail, you know that they have only X number of beds; right?
22   A    I guess, yes.
23   Q    Now, have you ever had a conversation with Paul Tanaka?
24   A    Yes.
25   Q    When?
```

A     Well, I was at a meeting he attended in 2011, and I had a

conversation with him at a debate for sheriff in, I believe --

I don't know what exact year when the sheriff's election took

place.

Q     Do you recall talking to the FBI on March 12th, 2015, just

about a year ago?

A     I've talked to the FBI.  I don't know if the date was

March 12th, 2015, no.

Q     Okay.  In attendance was Ms. Tanner, used to be Ms. Marx,

Assistant U.S. Attorney Mr. Fox, and they spoke to you on that

date.  You recall that?

A     I recall meeting with those people.  I don't remember the

date, no.

Q     Okay.  Do you recall telling them at any point that you

don't recall any specific meeting with Mr. Tanaka?

A     I don't recall saying that because I've had -- I've been

at a meeting with him.

Q     So if that's in some sort of report, that would be

inaccurate; is that right?

A     I'm sorry, what would be inaccurate?  That I said that?

Q     That you never had a meeting with him.

A     If it said I'd never been in a meeting with him, that

would be inaccurate.

Q     Now, the letter to Sheriff Baca in October of 2009 that we

looked at, I don't recall the exhibit number, but the one we

1  looked at first this morning, do you have that in mind?

2  A    Yes.

3  Q    It was not addressed to Paul Tanaka; right?

4  A    That's correct.

5  Q    There was no CC or carbon copy indication that it went to

6  Mr. Tanaka; right?

7  A    I don't believe so, no.

8  Q    And, in fact, in October of 2009, Mr. Tanaka was not the

9  undersheriff; is that correct?

10           MS. RHODES:  Objection, calls for speculation.

11           THE COURT:  Sustained.

12  Q    (BY MR. STEWARD)  Do you know whether or not Mr. Tanaka

13  was even in the chain of command for the jail in October of

14  2009?

15  A    No, I don't.

16  Q    Now, you -- holding defendants in a pretrial facility, a

17  jail, is a difficult job right?

18           MS. RHODES:  Objection, calls for speculation,

19  beyond the scope.

20           THE COURT:  Sustained.

21  Q    (BY MR. STEWARD)  There was a discussion about inmates who

22  are mentally ill and the issues surrounding them and holding

23  them in custody.  Wasn't that what you discussed with

24  government counsel?

25  A    I'm not sure what are you talking about.  The conversation

```
 1   in 2015?
 2   Q    No, I'm now talking about this morning, March 20, whatever
 3   it is today.  Didn't you discuss this morning with government
 4   counsel, and I believe you read from something --
 5   A    Oh.
 6   Q    -- talking about the difficulty of keeping mentally ill
 7   prisoners in custody?
 8   A    Yeah, there was reference to that in the report I read
 9   from, yes.
10   Q    Okay.  Well, and you know based on your years of
11   experience -- and you have a lot of years of experience with
12   L.A. county jail system; right?
13   A    Yes.
14   Q    Okay.  You know from that experience that it is difficult
15   to control, maintain and keep safe mentally ill inmates; right?
16              MS. RHODES:  Objection, misstates testimony, Your
17   Honor.
18              THE COURT:  I think it does, actually, but -- you
19   understand the question?
20              THE WITNESS:  I think so, Your Honor.
21              THE COURT:  All right.  You can answer.
22              THE WITNESS:  Yes, I think that can be difficult.
23   Q    (BY MR. STEWARD)  Okay.  And the complaints that the ACLU
24   has had for the last 30 years about the jail system in
25   Los Angeles County are not unique to Los Angeles County; right?
```

1    A    I would not agree with that.

2    Q    Okay.  Overcrowding -- other states, other counties have

3    those issues; right?

4    A    Yes.

5    Q    Okay.  Force complaints -- other jails, other counties

6    have those complaints; right?

7    A    Yes, but I've said that the violence in the L.A. county

8    jails I believe is worse than anywhere in the country.  So I

9    don't agree the fact there were forced complaints in other

10   countries means that was the same as went on with the L.A.

11   county jails, no, I don't agree with that.

12   Q    So you're familiar with these issues in the Los Angeles

13   County jail system; right?

14   A    Yes.

15   Q    But you don't know about Fulton County in Georgia, you

16   don't know about the degree to which these issues have arisen;

17   right?

18   A    No, I don't agree with that.

19   Q    You are aware of the jail problems in Fulton County?

20        I'm sorry, that's a question.

21   A    I have talked to people about conditions in jails and

22   prisons in the south including Fulton County, yes.

23   Q    Now, for example, in some of the things you talked about

24   this morning, the ACLU has had major issues with jail

25   overcrowding; right?

1   A     You referring to our national office?

2   Q     No, I'm referring to you, this office, this county.

3   Overcrowding has been an issue that the ACLU has complained

4   about again and again and again; right?

5   A     Yes.

6   Q     Okay.  And in terms of overcrowding, what does the ACLU

7   suggest that the L.A. County Sheriff's Department do about it?

8             MS. RHODES:  Objection, beyond the scope.

9             THE COURT:  Let's go to sidebar for a moment.

10        (Discussion held at sidebar.)

11             THE COURT:  Okay.  I have her objection.  Want to be

12   heard?

13             MR. STEWARD:  Certainly.  I think this is a general

14   area that's of importance having to do with their position --

15   ACLU's position in the jail and the years -- the litigation

16   that they've been talking about on direct.  If the Court feels

17   that it's beyond the scope, then we'll just call Mr. Eliasberg

18   back in our case.  It's that easy.

19             MS. RHODES:  I do think it's beyond the scope.  I'm

20   not sure what relevance the overcrowding has to this case,

21   either the defense of -- or not, and so --

22             MR. STEWARD:  Our position is -- I'm sorry, I didn't

23   meant to cut you off.

24             MS. RHODES:  And so I think it may be a 403 issue,

25   which would be a waste of time.

```
 1            MR. STEWARD:  Okay.  Our position is the ACLU has a
 2   significant bias here, and that's where we're going with all of
 3   this; that these are issues that the Sheriff's Department can't
 4   solve because they don't have the money to do it, and these
 5   guys have been pushing it and pushing it.
 6        Now, I've tried to go there a couple of different ways
 7   but...
 8            THE COURT:  Okay.  Well, if you want to do this in
 9   your own case, we'll then address it.  Let's move this along.
10            MR. STEWARD:  Okay.
11        (End of sidebar discussions.)
12            MR. STEWARD:  And nothing further, Your Honor.
13            THE COURT:  All right.  Any redirect?
14            MS. RHODES:  No, Your Honor.  Thank you.
15            THE COURT:  All right.  You may step down.  Thank
16   you.
17        And the name of your next witness?
18            MR. JAUREGUI:  Robert Bayes, Your Honor.
19            THE COURT:  All right.
20            THE DEPUTY CLERK:  Please stand here for me and
21   raise your right hand.
22        (The witness, ROBERT BAYES, was sworn.)
23            THE DEPUTY CLERK:  Please be seated.
24        Will you please state your full name and spell your last
25   name for the record.
```

1          THE WITNESS:  Robert Bayes, B, as in boy, A-Y-E-S.

2          THE DEPUTY CLERK:  Thank you.

3          THE COURT:  Before we start, let me see counsel at

4     sidebar.

5       (Discussion held at sidebar.)

6          THE COURT:  I know the parties had a stipulation

7     that the witnesses who have testified can stay in here, but if

8     you recall him, do you have any objection to him staying in the

9     audience?

10          MR. STEWARD:  Not really, no.

11          THE COURT:  Okay, that's fine.

12       (End of sidebar discussions.)

13          MR. JAUREGUI:  Your Honor, may I proceed?

14          THE COURT:  Yes, please.

15                    DIRECT EXAMINATION

16    Q    (BY MR. JAUREGUI)  Mr. Bayes, how are you presently

17    employed?

18    A    I'm with the L.A. County Sheriff's Department, and I'm a

19    sergeant.

20    Q    And how long have you worked for the Los Angeles County

21    Sheriff's Department?

22    A    25 years.

23    Q    And how long have you been a sergeant?

24    A    Since December 2013.

25    Q    Going back to August 2011, Mr. Bayes, what was your rank

**UNITED STATES DISTRICT COURT**

1    then?

2    A    I was a detective with the Jail Investigation Unit.

3    Q    And could you please explain to the jury what the Jail

4    Investigation Unit is.

5    A    Jail Investigation Unit is one of four units in the

6    Custody Investigative Services Unit, and we are the detectives

7    that handled all the cases or reports that are written inside

8    of the jails, court services and Transportation Bureau, and the

9    reports would be anything from a simple vandalism to attempted

10   murder.

11   Q    And, sir, where physically were you located at that time?

12   A    At the Men's Central Jail, 3,000 floor.

13   Q    And you said that JIU -- I'm sorry, is JIU another term

14   for the Jail Investigation Unit?

15   A    Yes.

16   Q    And you said that JIU was one of four divisions within a

17   larger group; correct?

18   A    Correct.

19   Q    And what were the other divisions?

20   A    OSC, Operation Safe Jail, K-9 and Jail Liaison.

21   Q    And did your responsibilities include writing reports?

22   A    Yes.

23   Q    Did there come a time, Sergeant Bayes, that you came to be

24   involved -- that you came to know of an inmate named Anthony

25   Brown?

1    A     Yes.

2    Q     And when was that?

3    A     August 8th, 2011.

4    Q     And how did you get to know that name?

5    A     I received a call from Sergeant Orpe, O-R-P-E, who is a

6    Men's Central Jail sergeant, and he notified me that his

7    deputies had found a cell phone in Anthony Brown's property.

8    Q     And what were you asked to do, if anything, about that?

9    A     Since I answered the phone in our unit, I assumed the

10   handle or took the handle on the case.  The deputies brought

11   the cell phone down to my office, and I took off the numbers

12   off the back of the cell phone.  They then took the cell phone

13   down to Homicide Bureau and ran it on a cellebrex [phonetic].

14   Q     And, sir, just so everyone's clear, when you said you took

15   the handle, what does that mean?

16   A     I assumed -- I assume control of the investigation.

17   Q     Okay.  And what was the investigation -- what were you

18   doing, or what were you tasked with doing?

19   A     Possession of a cell phone in the jail.

20   Q     Okay.  And did you interview the inmate Anthony Brown?

21   A     Yes.

22   Q     Did you interview him on August 8th, 2011?

23   A     No.

24   Q     When did you first interview Anthony Brown?

25   A     August 16th, 2011.

```
 1  Q     And how did that interview come to be?
 2  A     Deputy Jason Colon, C-O-L-O-N, had sent me an e-mail, and
 3  I received that e-mail on August 16th in the morning when I got
 4  to work.  And he said that he had interviewed Anthony Brown the
 5  night prior on August 15th.
 6  Q     Okay.  And who is Deputy Colon?
 7  A     Deputy Colon works for Operation Safe Jail.
 8  Q     And what did he tell you about an interview on August
 9  16th, if anything?
10  A     On August 16th, he mentioned that he had interviewed
11  Anthony Brown the night prior and that he was going back for a
12  second interview.
13         MR. HAIG:  Objection, Your Honor.  Hearsay.
14         THE COURT:  If you could just avoid telling us at
15  the moment what he said.
16  Q     (BY MR. JAUREGUI)  Sir, did you end up participating in an
17  interview on August 16th?
18  A     Yes.
19  Q     Of Anthony Brown?
20  A     Yes.
21  Q     And who participated in that interview?
22  A     Myself, Detective Armand, A-R-M-A-N-D, Villagomez,
23  V-I-L-L-A-G-O-M-E-Z, and Deputy Jason Colon.
24  Q     And what, if anything, did you learn about the cell phone
25  after that interview -- or in that interview?
```

1  A    I learned from Anthony Brown, after talking to him

2  approximately an hour, that he had a contact on the outside

3  named CJ, and CJ was helping to bring the cell phone into the

4  jail through a deputy, and possibly narcotics also.

5  Q    And what did you do with that information, if anything?

6  A    Took that information back to my sergeant, Chris

7  Reddington, R-E-D-D-I-N-G-T-O-N, and briefed him on the

8  interview that we had with Anthony Brown.  And during that

9  interview, he said that we should notify ICIB or Internal

10  Criminal Investigation Bureau.

11  Q    And, Sergeant Bayes, did you then notify the Internal

12  Criminal Investigation Bureau?

13  A    Yes, I did.

14  Q    And whom -- with whom did you speak?

15  A    Lieutenant Rob Peacock, P-E-A-C-O-C-K.

16  Q    And did there come a time, sir, after speaking to

17  Lieutenant Peacock, that you spoke with an individual named

18  Greg Thompson?

19  A    Yes.

20  Q    And who is Greg Thompson?

21  A    Greg Thompson was my lieutenant and CISU.

22  Q    And when did you speak with him?

23  A    Approximately four o'clock that afternoon.

24  Q    And what did you speak to him about?

25  A    He called me.  I was already at home, and he called me.

**UNITED STATES DISTRICT COURT**

1    And he was very irate and cussing, and he asked me why I

2    notified ICIB.

3    Q     And what did you tell him?

4    A     I told him that in the conversation with Sergeant

5    Reddington, that Sergeant Reddington advised that we should

6    notify ICIB, so I made that call.

7    Q     And what did he say to you, if anything?

8    A     He just was asking -- I guess he -- in my interpretation,

9    he had talked to Detective Villagomez and/or Sergeant

10   Reddington before he called me, and he asked me if that -- he

11   wanted to find out if I would tell him the truth.

12   Q     And just to be clear, what was Greg Thompson's role within

13   the jail, if any, at that time?

14   A     He was my lieutenant in Custody Investigative Services

15   Unit.

16   Q     And what, if anything, did you do next?

17   A     I hung up the phone.  Got tired of his cussing at me and

18   belittling me, so I hung up on the phone on him.

19   Q     Did you have an understanding, sir, of why -- why he was

20   so angry with you or why he was cussing at you?

21   A     My impression was that I guess I shouldn't have called

22   ICIB, that was something that he should have done as a

23   lieutenant in our group.

24   Q     Okay.  Sergeant Bayes, I'd like to now have you look at

25   Exhibit Number 12 in the big black binder in front of you,

```
1   please.

2   A    Yes.

3   Q    And do you recognize that exhibit?

4   A    Yes, I do.

5   Q    And what is it?

6   A    It is an e-mail from my lieutenant, Greg Thompson, to

7   Chris Reddington, myself, Gerard Smith, G-E-R-A-R-D, Jason

8   Colon and regarding a briefing on the Brown case.

9   Q    I'm sorry, Sergeant Bayes, I meant to direct your

10  attention to Exhibit Number 13.  Could you please look at

11  Exhibit Number 13.  We'll come back to Exhibit Number 12.

12  A    Okay.

13  Q    And do you recognize that exhibit?

14  A    Yes, I do.

15  Q    And what is it?

16  A    It is an e-mail from Greg Thompson to myself.

17  Q    And do you recall receiving this e-mail from Lieutenant

18  Thompson?

19  A    Yes.

20        MR. JAUREGUI:  Your Honor, the government moves to

21  admit Exhibit Number 13.

22        THE COURT:  Any objection?

23        MR. HAIG:  No, Your Honor.

24        THE COURT:  It will be received.

25        (Exhibit No. 13 received into evidence.)
```

```
 1              MR. JAUREGUI:  And if I could ask Mr. Fox to publish
 2    that exhibit.
 3    Q    (BY MR. JAUREGUI)  Okay.  Sergeant Bayes, could you -- do
 4    you see the "To" line in this e-mail?
 5    A    Yes.
 6    Q    It says Roberto E. Bayes; correct?
 7    A    Correct.
 8    Q    Is that you?
 9    A    Yes.
10    Q    And if you wouldn't mind, could you please read this
11    e-mail to the jury.
12    A    "Bob, I had to change plans.  Anthony Brown will be
13    shipped to CDC on the next available bus.  Until then he will
14    be in 1750 and no phones, no visits, especially from outside LE
15    without my approval."
16    Q    Okay.  And, Sergeant Bayes, do you understand what 1750
17    means in this e-mail?
18    A    Yes.
19    Q    And what does it mean?
20    A    1750 is a jail area that's in Men's Central Jail.  It is
21    our highest classified area where the most notorious inmates
22    that we house, our most violent or people that have high --
23    like celebrities or those type of -- high type of
24    notoriety-type cases could be housed on there.
25    Q    And the end of that e-mail that says "no phones, no
```

1    visits, especially from outside LE without my approval," do you

2    see that?

3    A    Yes.

4    Q    Do you have an understanding, sir, of what "LE" means?

5    A    "LE" means law enforcement.

6    Q    Okay.  Now if we can go back to Exhibit Number 12.

7         And do you recognize this exhibit?

8    A    Yes.

9    Q    And what is it?

10   A    This is an e-mail from Greg Thompson to Sergeant

11   Reddington, myself, Gerard Smith and Jason Colon, briefing on

12   Brown case.

13   Q    Okay.  And if you wouldn't mind reading this e-mail to the

14   jury as well.

15              THE COURT:  Has it been offered?

16              MR. JAUREGUI:  Your Honor, the government offers

17   Exhibit Number 12 into evidence.

18              MR. HAIG:  No objection.

19              THE COURT:  It will be received.

20         (Exhibit No. 12 received into evidence.)

21              MR. JAUREGUI:  And, AUSA Fox, if you could please

22   publish that exhibit.

23              THE WITNESS:  "I would like to meet Tuesday 8/23/11,

24   2011, afternoon to discuss your progress on this case.  I know

25   JIU has an SW that morning, so at this time let's plan on 1300

1    in JIU."

2    Q    (BY MR. JAUREGUI)   Okay.   And at this point in time,

3    Sergeant Bayes, had you written any reports about your

4    interview of Anthony Brown?

5    A    Yes.

6    Q    And what had you written at that point in time?

7    A    I had written a memorandum on August 17th, 2011.

8    Q    Okay.   And had you shared that memorandum yet with anyone?

9    A    Yes.

10   Q    And who did you share it with?

11   A    Lieutenant Thompson.

12   Q    Okay.   Did you speak to Lieutenant Thompson at any point

13   after receiving this e-mail discussing the progress of your

14   case?

15   A    Yes.

16   Q    And when was that?

17   A    On the 26th.

18   Q    Prior to the 26th, sir, had you spoken to -- did you speak

19   to him at any point right after this August 18th e-mail?  Did

20   you speak with Lieutenant Thompson on August 19th?

21   A    Oh, I'm sorry, I'm reading the 23rd.   Yes, I did.

22   Q    And what did you speak with Lieutenant Thompson about?

23   A    He'd sent me an e-mail -- actually that e-mail was sent to

24   me on August 18th after I left work.   So on the 19th, I was

25   working overtime, and I got off overtime at six o'clock p.m.   I

```
1   looked at my e-mails, and Lieutenant Thompson had sent me an
2   e-mail in regards to a meeting he had with the undersheriff.
3   Q    And what did he say?
4   A    I sent him an e-mail just saying "Hey, how'd your meeting
5   go," and he said "Call me."
6   Q    And did you end up calling him?
7   A    Yes, I did.
8   Q    And what did -- what did you discuss?
9   A    He said that the undersheriff knows who Gerard Smith and
10  Mickey Manzo is, but he doesn't know who the fuck Robert Bayes
11  is because he didn't go to the meeting.
12  Q    And what did you understand that to mean?
13  A    That apparently I should have gone to the meeting.
14  Q    At that point in time, had you written a report -- a full
15  report on the cell phone incident involving Anthony Brown?
16  A    No.
17  Q    And did you then -- after the discussion with Lieutenant
18  Thompson on the 19th, did you speak with him again about your
19  report?
20  A    Not on the 19th, no.
21  Q    At any point after the 19th, sir?
22  A    The 23rd, he had called me and asked me to make the report
23  a conspiracy and that it would be a conspiracy with one unknown
24  female, one unknown male voice.
25  Q    Okay.  And at that point, by August 23rd, were you writing
```

1    a report -- had you been writing the report up as a conspiracy?

2    A      No.

3    Q      And did he tell you why he wanted you to write the report

4    up as a conspiracy?

5    A      No.

6    Q      Did he tell you who the male voice was?

7    A      No.

8    Q      Did he tell you who the female voice was?

9    A      No.

10   Q      Did you follow Lieutenant Thompson's commands?

11   A      I did on the 26th.

12   Q      What happened on August 26th?

13   A      Lieutenant Thompson called me at my office, and he

14   requested that I write the conspiracy report and deliver it to

15   him expeditiously because he was going to a meeting at

16   Sheriff's Headquarters to meet with the undersheriff and others

17   in regards to this Anthony Brown cell phone matter.

18   Q      And I believe I asked you -- if I haven't asked you this

19   question, I apologize.  How did you plan to write the report if

20   not as a conspiracy?

21   A      As a simple possession of a cell phone in jail.

22   Q      And would that be a misdemeanor or a felony offense?

23   A      Misdemeanor.

24   Q      Okay.  And on August 26th, did you proceed to write the

25   report?

1   A     Yes, I did.

2   Q     And what did you do?

3   A     I wrote the report with what knowledge I had, and I took

4   it to Lieutenant Thompson, who was across the street at the

5   Twin Towers Correctional Facility.  He read the report and told

6   me that it was a piece of shit and that he was going to dictate

7   or direct me how to write the report he wanted to present.

8   Q     And what happened next?

9   A     I went to an adjacent office, which was Sergeant

10  Gutierrez's office, and Lieutenant Thompson told me that he was

11  going to send me e-mails and to cut and paste these e-mails and

12  put it into a report form.

13  Q     And did you do that?

14  A     Yes, I did at his direction.

15  Q     And what did you write in the report?

16  A     Everything that he sent to me in e-mail form.  It was like

17  a timeline, and I had never seen that before.

18  Q     And did you write that it was a conspiracy?

19  A     Yes.

20  Q     And did you include certain names in that report?

21  A     Yes.

22  Q     And, sir, what names did you include in that report?

23  A     He gave me three names -- David Dahle, D-A-H-L-E, Leah

24  Marx, M-A-R-X, and Mr. Plympton -- I think it's Wayne Plympton.

25  Q     Okay.  And did you know who those individuals were?

1    A     No, I did not.

2    Q     Do you know if they were affiliated with law enforcement

3    at that time?

4    A     Affiliated with the FBI?

5    Q     At that time, did you know that, sir?

6    A     May I refresh my recollection?

7    Q     Sure.  Would looking at --

8              MR. JAUREGUI:  Can I have a moment, sir, Your Honor?

9              THE COURT:  Yes.

10         (Plaintiff's counsel conferred off the record.)

11   Q     (BY MR. JAUREGUI)  Sergeant Bayes, I'm just going to move

12   on from that point.

13         What happened after you finished writing the report?

14   A     Lieutenant Thompson -- I gave him the completed report,

15   and he signed it.  And he said that he was going over to

16   Sheriff's Headquarters, and he asked me to follow him in a

17   separate car, which I did.

18   Q     And did you go to Sheriff's Headquarters?

19   A     Yes, I did.

20   Q     And what happened when you got there?

21   A     I sat outside in the sheriff's -- sheriff's area greeting

22   area outside his office.  Sat there approximately two to two

23   and a half hours.  To my right there was a white type of office

24   with a closed door.  To my left was a sheriff's office, and

25   he -- during that time, he came out, he greeted me and then

1    continued from my left to his right.

2    Q    And then what happened?

3    A    During the time, say toward the end of the two and a half

4    hours, the door burst open from the office to my right, and the

5    undersheriff, Paul Tanaka, came out screaming, "Motherfuck,

6    fuck, fuck," and he was completely irate and pissed off.

7    Q    Sir, do you recognize Paul Tanaka in the room today?

8    A    Yes.

9    Q    Could you please identify him.

10   A    He's the gentleman on the defense table in the middle.

11          MR. JAUREGUI:  Your Honor, if the record would

12   reflect that the witness has identified the defendant?

13          THE COURT:  The record will so reflect.

14   Q    (BY MR. JAUREGUI)  Sergeant Bayes, at this point in time,

15   did you have any idea that the cell phone found on Anthony

16   Brown was connected to the FBI?

17   A    No.

18   Q    At this point in time, had you interviewed Anthony Brown

19   any other time than the one time you interviewed him?

20   A    No.

21   Q    And did you continue investigating the Anthony Brown

22   incident after August 26th?

23   A    Yes.

24   Q    Was the investigation ultimately taken away from you, sir?

25   A    Yes.

```
1    Q     And do you know where the investigation went?

2    A     Went to the Internal Criminal Investigation Bureau, or

3    ICIB.

4              MR. JAUREGUI:  Your Honor, if I could have a moment?

5              THE COURT:  Yes.

6              MR. JAUREGUI:  No further questions for this

7    witness, Your Honor.

8              THE COURT:  All right.  Cross-examination.

9                        CROSS-EXAMINATION

10   Q     (BY MR. HAIG)  Sergeant, what is your current assignment?

11   A     I am a sergeant at the Inmate Reception Center.

12   Q     At Men's Central Jail; right?

13   A     At Inmate Reception Center.

14   Q     At MCJ?

15   A     No, across the street.

16   Q     Across the street.  Okay.

17         When did you leave JIU?

18   A     December 2013.

19   Q     Does that coincide with when you were promoted?

20   A     Yes.

21   Q     The investigation of an inmate having contraband is

22   something that JIU would take charge of at the time that you

23   worked there; correct?

24   A     Yes.

25   Q     And the inmate having a cell phone, was that a rare or not
```

1    a rare occurrence?

2    A      Somewhat rare.

3    Q      Because you answered the phone on August 8th, 2011, the

4    case just became assigned to you by you assigning it to

5    yourself.  Would that be correct?

6    A      Correct.  I answered the phone, yes.

7    Q      And how long after answering the phone did you actually

8    get the phone delivered to you?

9    A      Maybe an hour or two.

10   Q      That was on August 8th; right?

11   A      August 8th, yes.

12   Q      And I think you stated that the first time you actually

13   had a face-to-face with Mr. Anthony Brown was August 16th?

14   A      Yes.

15   Q      What did you do between August 8th and August 16th to

16   investigate how Anthony Brown actually got the phone into his

17   possession?

18   A      Anthony Brown, at the time on August 8th, did not want to

19   talk, and so I didn't talk to him.

20   Q      How do you know that?

21   A      He said that he -- he told the deputies he did not want to

22   talk about the cell phone.

23   Q      Do you know another deputy sheriff named Mickey Manzo?

24   A      Yes.

25   Q      What was his job in August of 2011?

1   A     Operation Safe Jail.

2   Q     And how is that different than JIU?

3   A     Operation Safe Jail is like the gang unit, and inside our

4   jails they go out and gather intelligence, talk to gang

5   members, try to elicit information on narcotics or weapons that

6   are inside the jail, try to quell riots.  In talking to gang

7   members, they try to elicit information to try to solve

8   homicides out in the streets and talk to -- you know, homicides

9   or any crimes of other various agencies.

10  Q     In August of 2011, would JIU and OSJ work together from

11  time to time on cases?

12  A     Time to time.  Not on cases, just if there might be

13  gang-related, but very rarely on cases.

14  Q     Sharing intelligence sometimes?

15  A     Sometimes.

16  Q     Okay.  When you interviewed Mr. Brown on August 18th, did

17  you have any information at that time that he had spoken to any

18  other deputies?

19  A     Just Deputy Colon.

20  Q     Did you have any detailed interviews from Mr. Brown of any

21  conversations he'd had?

22  A     No.

23  Q     Did you have any idea that Mickey Manzo was doing any work

24  on the Anthony Brown matter --

25  A     No.

```
 1   Q      -- at that time?
 2          Did you ever learn that there was a order signed by a
 3   Los Angeles County Superior Court judge regarding some
 4   restrictions to Anthony Brown?
 5   A      I have learned that, yes.
 6   Q      Did you know it at the time in mid-August of 2011?
 7   A      No.
 8   Q      When did you learn that?
 9   A      I believe at the -- at the trial.
10   Q      At one of the trials of somebody that's not seated in the
11   court; correct?
12   A      Correct.
13   Q      All right.  So you didn't do anything to try to get any
14   kind of court order regarding Anthony Brown; correct?
15   A      The only court order I did was a court order to get the
16   information from Sprint on the cell phone.
17   Q      This was -- go back to the cell phone.  This was a Boost
18   Mobile cell phone and Boost is owned by Sprint Corporation; is
19   that right?
20   A      Yes.
21              MR. JAUREGUI:  Your Honor, calls for speculation.
22              THE COURT:  That's all right.  The answer will
23   stand.
24          Next question.
25   Q      (BY MR. HAIG)  Why did you seek an order for the cell
```

**UNITED STATES DISTRICT COURT**

```
 1   phone records from Sprint?

 2   A     That's what I've always done on a cell phone.  If I've had

 3   a cell phone in custody, I tried to get what information is --

 4   has been used on a cell phone.

 5   Q     During the time that you were investigating the cell

 6   phone, how it got into Anthony Brown's hands between August 8th

 7   and August 16th, did you have any conversations with Lieutenant

 8   Thompson about your investigation?

 9   A     Yes.

10   Q     And when do you think that first conversation was that you

11   had with Lieutenant Thompson?

12   A     Actually, I think that was on the 17th.

13   Q     The 17th was the first time you ever spoke to him?

14   A     In regards to giving him information on the cell phone,

15   yes.

16   Q     And that would be the first time that he ever made any

17   inquiry to you regarding the Anthony Brown matter and

18   specifically the cell phone that he had in his possession?

19   A     Yes.  He just told me to keep him apprised after I did the

20   court order, and that's what I did.

21   Q     What court order are you talking about?  The order --

22   A     The cell --

23   Q     -- the cell phone court order?

24   A     Yes.

25   Q     All right.  Not the order that I spoke about a moment
```

**UNITED STATES DISTRICT COURT**

```
 1   ago --
 2   A     The cell phone court order.
 3   Q     Right.  Which is not the same as the one that you saw in
 4   that other trial you talked about.  Would that be correct?
 5   A     No.
 6   Q     That's not correct?
 7   A     I'm sorry?
 8   Q     Is it the same order, or is it not the same order?
 9   A     It is not the same order.
10   Q     All right.  Thank you.
11         Did Lieutenant Thompson tell you why he had some interest
12   on August 17th about this incident and specifically the Anthony
13   Brown phone incident?
14   A     We had a meeting that he, excuse me, invited me, Sergeant
15   Reddington, Jason Colon and Gerard Smith to attend a meeting
16   with the captain -- Captain Ornelas of Men's Central Jail
17   regarding information that the captain had in regarding Anthony
18   Brown.
19   Q     That would be Captain Ralph Ornelas?
20   A     Yes.
21   Q     O-R-N-E-L-A-S?
22   A     Yes.
23   Q     Before you went into the interview on August -- let's
24   see -- August 16th with Anthony Brown?
25   A     Yes.
```

1   Q    Before that interview, did you have any independent

2   information that the cell phone that was found on him on August

3   8th was actually brought to him or assisted being brought to

4   him through a deputy sheriff?

5   A    No.

6   Q    It was only during that interview with him on the 16th

7   that he finally told you that there was a deputy sheriff

8   involved.  Would that be correct?

9   A    Yes.

10  Q    Did he give you the name of the deputy sheriff?

11  A    No.

12  Q    Did you -- you obviously asked him the name?

13  A    Yes.

14  Q    You asked where this person worked?

15  A    Yes.

16  Q    Asked for a physical description?

17  A    No.  He was very vague in his description, if any.  He

18  just mentioned the name CJ and that they would contact the

19  deputy on the outside.

20  Q    And based upon that, you said you reported your findings

21  and were advised to turn this over to ICIB?

22  A    I reported it to ICIB due to they handle crimes involving

23  personnel -- sworn personnel.

24  Q    You were actually ordered to turn it over to ICIB.  Would

25  that be correct?

1   A    I'm not sure what you're -- what date you're talking about

2   or --

3   Q    On August 16th.

4   A    Turning over what, sir?  I'm not clear on --

5   Q    Well, turning over the investigation or at least alerting

6   ICIB that there was a potential criminal violation by a sworn

7   deputy.

8   A    I alerted them, yes.

9   Q    Why did you do that?

10  A    I had talked with my sergeant, Chris Reddington, and he

11  worked Internal Affairs Bureau, and him being my sergeant, we

12  talked about it.  He hemmed and hawed back and forth, and he

13  stated, "Yeah, we need to contact ICIB because, you know, a

14  deputy may be involved in this."

15  Q    And later on, when Lieutenant Thompson found out about

16  this, he was not happy?

17  A    Correct.

18  Q    And it appeared to you that he was not happy because you

19  didn't go to him first?

20  A    Correct.

21  Q    Not necessarily because of the referral to ICIB?

22  A    I'm sorry?

23  Q    Was he unhappy about the referral, or was he unhappy that

24  you referred to it without talking to him first?

25  A    I believe I -- without me talking to him, I overstepped my

1    bounds and went out of the chain of command.

2    Q    Turn, if you will, to Exhibit 13.

3         (Counsel conferred off the record.)

4    Q    (BY MR. HAIG)   Sergeant Bayes, you already testified a

5    little bit about this, but August 13th at 1:30, Lieutenant

6    Thompson wants to have a follow-up meeting with you -- I'm

7    sorry, that's the wrong one.  Go to 12, please.  I made the

8    same mistake that counsel made.

9         You have that now, Sergeant?

10   A    Yes.

11   Q    Okay.  So just to keep the chronology correct, the

12   matter's been referred to ICIB.  Thompson chewed you out.

13   Couple days later, you then get this e-mail from Lieutenant

14   Thompson saying that he wants a follow-up meeting a few days

15   away, August 23rd.

16   A    Yes.

17   Q    So you calendared that, and you were ready to go; right?

18   A    We never had the meeting.

19   Q    Never had the meeting, right.

20        The JIU, we know what that is.  SW, that would be a search

21   warrant that was being executed?

22   A    Yes, correct.

23   Q    All right.  Later that day, Exhibit 13, this is again

24   addressed to you from Lieutenant Thompson.  Obviously, your

25   name is Bob, so meaning that Anthony Brown is being sent to

1    state prison; right?

2    A     Correct.

3    Q     You knew at this time that Anthony Brown was a -- already

4    a sentenced inmate awaiting transfer to state prison at the

5    time you started your investigation on August 8th.  Would that

6    be correct?

7    A     No, I did not know.

8    Q     You found out eventually; right?

9    A     I knew that he was looking at an extensive amount of

10   years, 25 years to life or 400-plus years.

11   Q     Didn't you learn that pretty early on in your

12   investigation?

13   A     I would say, yes.

14   Q     Because one of the things that you do in JIU is you make a

15   referral as to whether criminal charges should be filed.  Would

16   that be correct?

17   A     Once the investigation is done, yes.

18   Q     And you said that the possession of a cell phone in county

19   jail is a misdemeanor; right?

20   A     Correct.

21   Q     A misdemeanor's punishable by a maximum of six months'

22   confinement; correct?

23   A     Correct, or 30 days.

24   Q     But a maximum of six months is the maximum for a

25   misdemeanor?

1    A    Correct.

2    Q    And this misdemeanor specifically has a maximum of six

3    months?  Do you know that to be true?

4    A    I don't recall.

5    Q    Your advice would have been to just not refer the case to

6    prosecution if you aren't looking at a six-month max on top of

7    423 years.  Wouldn't that be correct?

8    A    Correct.

9    Q    Whereas if somebody was serving five days for a traffic

10   warrant, there might be a different recommendation; right?

11   A    Yes.

12   Q    When you received this e-mail on August 18th, you weren't

13   surprised at all, were you?

14   A    I received the information, and that was just from

15   Lieutenant Thompson.  I had -- no, it didn't really correlate

16   with me with the cell phone of the investigation.

17   Q    Did you respond in any way to Lieutenant Thompson when you

18   received the e-mail at 1:31 p.m. on August 18th that Mr. Brown

19   was going to be sent to state prison?  Did you correspond with

20   him in any way about how you felt about that?

21   A    No.

22   Q    And based upon that, the meeting was clearly going to be

23   canceled that had already been set for August 23rd?

24   A    Well, it got canceled because of the search warrant on the

25   23rd.

1   Q     Well, if we go back to Exhibit 12, sir, in the chronology

2   on August 18th, you have a meeting set up regarding the Anthony

3   Brown cell phone incident; right?

4   A     Yes.

5   Q     And this is before you know or are even advised about any

6   federal government involvement in the cell phone.  Would that

7   be correct?

8   A     Correct.

9   Q     The e-mail that came a few hours later, a little over

10  three hours later at 1:30, which is the following exhibit,

11  Exhibit 13, that for all intents and purposes canceled your

12  meeting on the 23rd because Anthony Brown wasn't going to be in

13  county jail anymore and there really wasn't going to be any

14  more investigation for you to do.  Would that be correct?

15  A     Well, my understanding that -- you know, even if Anthony

16  Brown is sent away to state prison doesn't mean I stop my

17  investigation.

18  Q     Of course not.  But did you take this e-mail to mean that

19  the meeting would be canceled or not canceled?

20  A     No, it had no affect at all about the meeting being

21  canceled.

22  Q     On August 18th, when did you finish your workday, if you

23  recall?

24  A     Approximately 3:30.

25  Q     And when did you work next after August 18th?

**UNITED STATES DISTRICT COURT**

```
1   A    I worked overtime on August 19th.  Or do you mean back at
2   my normal position at JIU?
3   Q    Well, that's -- I'm going to ask the next question.  So
4   you worked overtime, not a JIU assignment, some other
5   assignment?
6   A    Correct.
7   Q    Where did you work?
8   A    At the County Services Parks Division at Mona Park Pool.
9   Q    Does that mean you didn't have access to your normal
10  e-mail because you weren't at your desk?
11  A    Correct.
12  Q    An e-mail came that you never saw?
13  A    Yes.
14  Q    And that e-mail asked you to go to Sheriff's Headquarters
15  for a meeting regarding the Anthony Brown matter?
16  A    Yes.
17  Q    And what time was that meeting supposed to be?
18  A    I believe 1:00 or 1:30.
19  Q    On what date?
20  A    August 19th.
21  Q    And clearly, had you received that e-mail, you would have
22  gone?
23  A    Yes.
24  Q    It was not only an order, but that's something you would
25  just do; right?
```

**UNITED STATES DISTRICT COURT**

1    A    Yes.

2    Q    Did anybody try to contact you in any way, specifically

3    Lieutenant Thompson, or anybody else to get you to go to that

4    meeting?

5    A    No, but Mickey Manzo contacted me about seven o'clock that

6    night to find out what information I had to pass on to him so

7    he could talk about it during the meeting, per Lieutenant

8    Thompson.

9    Q    Seven o'clock on the night of the 18th or the 19th?

10   A    18th.

11   Q    So you knew that a meeting was going to happen the next

12   day, you just didn't know that you had been invited because you

13   hadn't seen the e-mail.  Would that be correct?

14   A    Yes.

15   Q    Because Manzo had told you that he was going to go to

16   Headquarters for a meeting?

17   A    He said he was attending a meeting.  I didn't know what

18   meeting he was referring to or what time it was.

19   Q    Did you give Manzo the information he requested of you?

20   A    Yes.

21   Q    When did you find out that you had actually missed the

22   meeting?

23   A    On the 19th at 6:00 p.m.

24   Q    And how did you find out?

25   A    Excuse me.  I checked my e-mail after my overtime shift at

1    the County Parks.

2    Q    Are you -- do you know, is there a way you can check your

3    e-mail remotely of your desk?

4    A    Oh, I didn't have a desk.  I was standing at our -- posted

5    at a community pool.

6    Q    Well, how were you able to check your e-mail?

7    A    I responded back to the headquarters of the County Parks

8    to pick up my overtime slip, and they had computers there to

9    use.

10   Q    And Mr. Thompson -- or Lieutenant Thompson told you that

11   it did not appear that the undersheriff was happy that you had

12   missed that meeting.  Was that the impression that you had

13   gotten?

14   A    I just got the impression that because I didn't go to the

15   meeting, he knew who Gerard Smith was and Mickey Manzo and

16   didn't know who I was.

17   Q    August 23rd comes around, and you're asked to make a

18   report -- a conspiracy report, as you've testified to --

19   A    Yes.

20   Q    -- right?

21        Was that a phone call you got from Lieutenant Thompson or

22   an e-mail to do that?

23   A    I believe I received a phone call.

24   Q    Was anybody else on the line?

25   A    No.

1    Q    During that phone call, did Lieutenant Thompson ever

2    mention the undersheriff as wanting this to be done?

3    A    No.

4    Q    You then wrote the report, and you sent the report to

5    Lieutenant Thompson.  Would that be correct?

6    A    I wrote the report on the 26th.

7    Q    And you sent it to Lieutenant Thompson?

8    A    I walked it over personally.

9    Q    And he looked at it and said -- I'm using your words --

10   that it was a piece of shit?

11   A    Correct.

12   Q    How'd that make you feel?

13            MR. JAUREGUI:  Objection, Your Honor.

14            THE COURT:  Sustained.

15   Q    (BY MR. HAIG)  Did the things that you put in that first

16   report, the August 26th report that Lieutenant Thompson didn't

17   like and used those words, did that report have accurate

18   statements in there, as far as you knew?

19   A    It had a -- the only information that I -- I had acquired

20   up to that point.

21   Q    It was things that you knew of personally, and you could

22   attest that the things in that report were true and correct, to

23   the best of your knowledge.  Would that be correct?

24   A    Yes.

25   Q    But Lieutenant Thompson didn't like that report, and he

1    wanted three now-known FBI agents to be put as suspects or

2    coconspirators in a new report.  Would that be correct?

3    A    Yes.

4    Q    And the report that you initially gave him that he didn't

5    like, didn't have any of those three folks -- Dahle, Marx or

6    Plympton -- listed as suspects; is that correct?

7    A    Correct.

8    Q    Just listed as witnesses; right?

9    A    I don't believe I had them at all in the first report.  I

10   just had an unknown male voice and unknown female voice.

11   Q    What followed was Lieutenant Thompson sending you e-mails

12   for you to cut and paste into a report?

13   A    Yes.

14   Q    And you followed his orders; correct?

15   A    Correct.

16   Q    And you prepared a report that did not reflect your

17   personal knowledge of the facts in that report.  Would that be

18   correct too?

19   A    Yes.

20   Q    And you signed that report?

21   A    I did not sign it.  I put my name listed on the bottom as

22   the author.

23   Q    And by putting your name on that report, you know that

24   that report is to be relied upon by people who would look at

25   that report as having statements that were entered truthfully

1    and accurately and completely by the author of that report.

2    Would that be correct?

3    A    Yes.

4    Q    And you knew that to be incorrect to write a report that

5    was not accurate and to put your name on that report?

6    A    I did not know if the information he was giving me was

7    inaccurate, as I didn't know -- I wasn't privy to any of the

8    information he was giving me.  It was stuff that was handled or

9    done behind my back.

10   Q    As you weren't privy to that, did it ever occur to you to

11   ask Lieutenant Thompson to prepare a report that you could then

12   attach as a supplemental report to your actual report?

13   A    That was a report I gave him in the instant that he

14   thought was a piece of shit.

15   Q    Is there any -- did you ever ask Lieutenant Thompson then

16   to write his own report that he thought that -- based upon what

17   he knew about the case instead of telling you what to put in

18   your own report?

19   A    No, because he was in a -- appeared to be in a frenzy, in

20   a hurry, and was directing me to write this report at his

21   question.

22   Q    He directed you to write a report and to put your name at

23   the end of the report.  Would that be correct, sir?

24   A    Yes.

25   Q    All right.  And that report did not reflect what you knew

1    about the case; correct?

2    A    Correct.

3    Q    And you said that these were cut and pasted from various

4    e-mails from Lieutenant Thompson sent you successively on that

5    day?

6    A    Yes.

7    Q    In any part of these e-mails, did Lieutenant Thompson or

8    was there any notation about the undersheriff, Paul Tanaka,

9    wanting any of these things to go into the report?

10   A    Not that I'm aware of.

11   Q    When you were at Sheriff's Headquarters and you saw the

12   undersheriff, was that the first time you had ever seen him

13   face-to-face?

14   A    Probably that close.

15   Q    Had you ever had a conversation with him before that date?

16   A    Not that I'm aware of.

17   Q    Did you have any conversation with him on that date?

18   A    Not that I'm aware of, no.

19   Q    You said he exited --

20   A    Oh, on that day, no, I did not.

21   Q    All right.  You said you waited for about two and a half

22   hours at Sheriff's Department Headquarters?

23   A    Yes.

24   Q    In Monterey Park?

25   A    Yes.

1   Q      What floor, if you recall?

2   A      I believe it was the fourth floor.

3   Q      And were you in a waiting room, or can you just tell us

4   where you were seated and waiting.

5   A      I was outside of the Sheriff's office where the sergeants

6   or lieutenants sit at the desk, I guess it's like a lobby.

7   Q      When you say the Sheriff's office, actually Sheriff Baca's

8   office; correct?

9   A      Sheriff Baca, yes.

10  Q      When you saw the undersheriff, Paul Tanaka, walk out after

11  two and a half hours and he was cursing, and he appeared to be

12  not real happy; correct?

13  A      Correct.

14  Q      Whose office did you see him walk out of, if any?

15  A      He walked out of the meeting room to my right.

16  Q      Did he converse with you at all after he walked out?

17  A      No.

18  Q      Was any commentary made by him in any way about your

19  report or anything that you had done in this case?

20  A      No.

21  Q      And except for hearing him curse and looking upset, you

22  had no context at all to what he was cursing and was upset

23  about.  Would that be correct, sir?

24  A      Yeah, I had no idea what he was mad about.

25          MR. HAIG:  Thank you.  No more questions.

1          MR. JAUREGUI:  No further questions from the

2    government, Your Honor.

3          THE COURT:  All right.  Thank you, sir.  You may

4    step down.

5       Let me see counsel at sidebar.

6       (Discussion held at sidebar.)

7          THE COURT:  I have a note from the jury.  Maybe you

8    can give me some clue as to what I can say about this.

9       "Can you please remind the others not to use strong

10   perfume?"

11         MR. HAIG:  The other jurors?  Is that what you think

12   it means?  This is Jerome Haig.

13         THE COURT:  No, I think it means you.

14         MR. JAUREGUI:  You're clearly "the others."

15         MR. HAIG:  Because you all are right next to him.

16         THE COURT:  Could be that.  That's true.

17      Anyway, I'm going to let them go.

18         MR. FOX:  Your Honor, do you want to deal with the

19   Mickey Manzo issue now?  Because he is here.

20         THE COURT:  Yeah, I'll let them go, and then we can

21   take him on Tuesday.

22         MR. FOX:  Perfect.

23         THE COURT:  Okay.

24         MR. FOX:  Thank you.

25      (End of sidebar discussions.)

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Ladies and gentlemen, we're going to

2    break for the day.  Again, I want to remind you until this

3    trial is over, you're not to discuss this case with anyone,

4    including your fellow jurors, members of your family, people

5    involved in the trial or anyone else, and do not allow others

6    to discuss the case with you.  This includes discussing the

7    case on the Internet, through blogs, bulletin boards, e-mails

8    or text messages.  If anyone tries to communicate with you

9    about this case, please let me know about it immediately.

10         Do not read, watch or listen to any news reports or other

11    accounts about the trial or anyone associated with it.  That

12    includes anything online.  Do not do any research such as

13    consulting dictionaries, searching the Internet or using other

14    reference materials, and do not make any investigation about

15    the case on your own.

16         Finally, you're reminded to keep an open mind until all of

17    the evidence has been received, you've heard the arguments of

18    counsel, the instructions of the Court and the views of your

19    fellow jurors.

20         We're going to resume on Tuesday, so you'll have Monday

21    off.  We're going to start at eight o'clock, and we will go

22    again until 1:30.  Please have a nice weekend.  Thank you all

23    for showing up and have a nice weekend.  We'll see everybody on

24    Tuesday.

25         (The jury exited the courtroom.)

**UNITED STATES DISTRICT COURT**

```
 1              THE DEPUTY CLERK:  Please be seated.

 2              THE COURT:  All right.  We have one other issue we

 3   want to take up.

 4              MR. FOX:  Would you like me to bring Mr. Manzo in?

 5              MS. RHODES:  Is that the issue?

 6              THE COURT:  Let's go to sidebar for a moment.

 7         (Discussion held at sidebar.)

 8              THE COURT:  Does he have a lawyer?

 9              MR. FOX:  He does, who's here.  It's Mr. Lombard

10   still.

11              THE COURT:  Mr. Lombard hasn't told him that he's

12   got to --

13              MR. FOX:  We haven't -- we haven't had a chance to

14   give him the order, so we don't know what they've

15   communicated --

16              THE COURT:  Okay.

17              MR. FOX:  -- to each other.

18              THE COURT:  Well, to avoid --

19              MR. FOX:  Do you want me to bring Mr. Lombard in?

20         (End of sidebar discussions.)

21              THE COURT:  Mr. Lombard, could you join us, please?

22         (Discussion held at sidebar.)

23              MR. LOMBARD:  Good afternoon, Your Honor.

24              THE COURT:  How are you?

25              MR. LOMBARD:  Having some flashbacks, but I'm okay.
```

```
 1              THE COURT:  There's been an order that has been
 2    submitted to me granting Mr. Manzo immunity from any testimony
 3    he might offer during this trial.  Have you had a chance to
 4    discuss that with him?
 5              MR. LOMBARD:  I have, Your Honor.  Well, I knew that
 6    issue was pending.
 7              THE COURT:  Okay.  Is this going to be -- does he
 8    need to be -- well, do I need to talk with him?
 9              MR. LOMBARD:  No, Your Honor.
10              THE COURT:  Okay.  Okay.  You got a copy of the
11    order?
12              MR. LOMBARD:  I do not have a copy.
13              MS. RHODES:  We will have a copy, and we will get it
14    to him.  It's electronically filed, and we'll be able to get it
15    to him.
16              THE COURT:  Is it on the docket now?
17              THE DEPUTY CLERK:  I'm assuming it is, but I don't
18    know.  I was given it last night.
19              MS. RHODES:  If you'll give me a copy, I --
20              THE DEPUTY CLERK:  I can make copies.
21              MS. RHODES:  That would be great, thank you.
22              THE COURT:  Okay.  All right.
23              MR. FOX:  Do you want to know the order of witnesses
24    here, or do you want -- I've got my notes over there, actually.
25    It would be better for me to --
```

1          THE COURT:  Okay.

2       (End of sidebar discussions.)

3          MR. FOX:  Your Honor, I believe on Tuesday we will

4   start with Mickey Manzo.  Then we will hear from Special Agent

5   David Dahle.  Michelle Miller will be the next witness, and

6   then if we have time, potentially Bobby Lyons and potentially

7   Judy Gerhardt.  I think that probably will be enough, but if we

8   even have more time than that, Linda -- her last name looks

9   like Farrar but is pronounced Farrar -- will be the next

10  witness.

11         THE COURT:  All right.

12      All right.  Anything else?

13         MR. FOX:  Nothing from the government, Your Honor.

14         THE COURT:  All right.  Have a nice weekend.  We'll

15  see you on Tuesday at 8:00.

16         MR. FOX:  Thank you, Your Honor.

17         MS. RHODES:  Thank you, Your Honor.

18      (The proceedings adjourned at 1:34 p.m.)

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1            **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6            I, SHAYNA MONTGOMERY, Former Federal Official

7    Realtime Court Reporter, in and for the United States District

8    Court for the Central District of California, do hereby certify

9    that pursuant to Section 753, Title 28, United States Code that

10   the foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  *August 24, 2016*

17

18

19                    /s/ SHAYNA MONTGOMERY
                    _____
20                    SHAYNA MONTGOMERY, CSR, RPR, CRR
                    Former Federal Official Court Reporter
21

22

23

24

25

**UNITED STATES DISTRICT COURT**