1              UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,     )
                                   )
6                   Plaintiff,     )
                                   )
7         vs.                      )    CASE NO. CR 15-255-PA
                                   )
8    PAUL TANAKA,                  )
                                   )
9                   Defendant.     )
     ─────────────────────────────)

10

11

12

13                    REPORTER'S TRANSCRIPT OF

14              JURY TRIAL PROCEEDINGS - DAY 6

15                 THURSDAY, MARCH 31, 2016

16                        8:04 A.M.

17                 LOS ANGELES, CALIFORNIA

18

19

20

21

22   ─────────────────────────────────────────────────

23           SHAYNA MONTGOMERY, CSR, RPR, CRR
          FORMER FEDERAL OFFICIAL COURT REPORTER
24          312 NORTH SPRING STREET, ROOM 410
             LOS ANGELES, CALIFORNIA 90012
25            SHAYNAMONTGOMERY@YAHOO.COM

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    EILEEN DECKER
    United States Attorney
    BY:  BRANDON D. FOX
        EDDIE A. JAUREGUI
        Assistant United States Attorneys
    United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012

**FOR THE DEFENDANT PAUL TANAKA:**

    H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
    BY:  H. DEAN STEWARD
        Attorney at Law
    107 Avenida Miramar, Suite C
    San Clemente, California 92672
    (949) 481-4900

**FOR THE DEFENDANT PAUL TANAKA:**

    LAW OFFICE OF JEROME J. HAIG
    BY:  JEROME HAIG
        Attorney at Law
    21143 Hawthorne Boulevard, Suite 454
    Torrance, California 90503
    (424) 488-0686

**ALSO PRESENT:**

    Leah Tanner, FBI Special Agent

1          **INDEX OF WITNESSES**

2  **PLAINTIFF'S**
   **WITNESSES**                                              **PAGE**
3
   WILLIAM DAVID COURSON
4
           Direct Examination by Mr. Jauregui              8
5          Cross-Examination by Mr. Steward                21

6
   GILBERT EMANUEL MICHEL
7
           Direct Examination by Mr. Fox                   25
8          Cross-Examination by Mr. Steward                63
           Redirect Examination by Mr. Fox                 72
9
   JOHN A. TORRIBIO
10
           Direct Examination by Mr. Fox                   74
11         Cross-Examination by Mr. Haig                   80

12
   DAVID BETKEY
13
           Direct Examination by Mr. Fox                   85
14         Cross-Examination by Mr. Steward                89

15
   LEAH TANNER
16
           Direct Examination by Mr. Fox                   89
17         Cross-Examination by Mr. Haig                   157

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

## INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|---|---|---|---|
| 14 | E-mail Dated 8/18/11 | 150 | 150 |
| 52 | E-mail Chain Ending 9/7/11 | 118 | 134 |
| 57 | E-mail Dated 9/9/11 | 116 | 120 |
| 59 | E-mail Chain Ending 9/12/11 | 135 | 135 |
| 60 | E-mail Chain Ending 9/12/11 | 123 | 123 |
| 61 | E-mail Chain Ending 9/12/11 | 123 | 123 |
| 62 | E-mail Dated 9/12/11 | 121 | 121 |
| 63 | E-mail Chain Ending 9/12/11 | 123 | 123 |
| 65 | E-mail Dated 9/13/11 | 62 | 61 |
| 66 | E-mail Dated 9/13/11 | 62 | 61 |
| 67 | E-mail Dated 9/13/11 | 61 | 61 |
| 68 | E-mail Dated 9/14/11 | 137 | 137 |
| 70 | E-mail Dated 9/25/11 | 138 | 138 |
| 71 | E-mail Chain Ending 9/25/11 | 138 | 138 |
| 72 | E-mail Dated 9/26/11 | 156 | 156 |
| 94 | Recording of Anthony Brown Interview 8/26/11 Excerpts | 110 | 110 |
| 96 | Recording of Anthony Brown Interview 9/2/11 | 113 | 113 |
| 102 | Recording of Gilbert Michel Interview 8/30/11 Excerpts | 45 | 45 |
| 104 | Recording of Phone Message from Scott Craig to Leah Marx 9/9/11 | 134 | 134 |
| 106 | Video Recording of Approach of Leah Marx 9/26/11 | 140 | 140 |

UNITED STATES DISTRICT COURT

**INDEX OF EXHIBITS (CONTINUED)**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|--------|-------------|--------------------|----------|
| 107 | Audio Recording of Approach of Leah Marx 9/26/11 | 140 | 140 |
| 109 | Synched Audio, Video and Transcript of Approach of Leah Marx 9/26/11 | 140 | 140 |
| 110 | Recording of Phone Call from Carlos Narro to Maricela Long 9/26/11 | 143 | 143 |
| 111 | Transcript of Phone Call from Carlos Narro to Maricela Long 9/26/11 | 143 | 143 |
| 130 | Inmate Total Movement History Record | 127 | |
| 132 | Inmate Information Center Record | 107 | 109 |
| 140 | Statement of Probable Cause of Affiant Sergeant Scott A. Craig | 76 | 77 |
| 141 | Proposed Order for Investigative Records Dated 9/7/11 | 76 | 77 |
| 164 | AT&T Records of 909-815-8064 (Gerard Smith) | 147 | 147 |
| 165 | AT&T Records of 323-683-7618 (Maricela Long) | 147 | 147 |
| 166 | Verizon Records of 714-803-1197 (Scott Craig) | 147 | 147 |
| 167 | Verizon Records of Scott Craig, Greg Thompson and Maricela Long | 147 | 147 |
| 168 | Verizon Records of 323-243-4099 (Stephen Leavins) | 147 | 147 |
| 169 | Verizon Records of 562-318-4637 (Mickey Manzo) | 147 | 147 |

1

**INDEX OF EXHIBITS (CONTINUED)**

2

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|--------|-------------|-------------------|----------|
| 170 | Tanaka Summary Chart of Phone Records | 147 | 147 |
| 171 | Tanaka Verizon Records | 147 | 147 |
| 172 | Phone Summary Chart | 149 | 149 |
| 181 | Summary Chart with Phone Numbers Associated with LASD | 147 | 148 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 31, 2016**

2                          **8:04 A.M.**

3                          **--oOo--**

4          THE DEPUTY CLERK:  Calling item number one,

5   CR 15-255, U.S.A. vs. Paul Tanaka.

6      Counsel, state your appearances, please.

7          MR. FOX:  Good morning, Your Honor.  Brandon Fox,

8   Eddie Jauregui and Special Agent Leah Marx here on behalf of

9   the United States.

10         THE COURT:  Good morning.

11         MR. STEWARD:  Good morning, Your Honor.  Dean

12  Steward and Jerome Haig for Mr. Tanaka.  He's present.

13         THE COURT:  Are we ready to proceed?

14         MR. FOX:  We are, Your Honor.

15         THE COURT:  All right.  Let's bring the jury in.

16         MR. JAUREGUI:  Your Honor, should we bring the

17  witness in now, the first witness?

18         THE COURT:  That's fine.

19      (The jury entered the courtroom.)

20         THE DEPUTY CLERK:  Please be seated and come to

21  order.

22         THE COURT:  Good morning, ladies and gentlemen.

23         THE JURY PANEL:  Good morning.

24         THE COURT:  All right.  Call your next witness,

25  please.

 1          MR. JAUREGUI:  Your Honor, the government calls

 2  William David Courson.

 3          THE DEPUTY CLERK:  Stand here for me, please.  Raise

 4  your right hand.

 5      (The witness, WILLIAM DAVID COURSON, was sworn.)

 6          THE DEPUTY CLERK:  Please be seated.

 7      Will you please state your full name and spell your last

 8  name for the record.

 9          THE WITNESS:  William David Courson, C-O-U-R-S-O-N.

10          THE DEPUTY CLERK:  Thank you.

11                     DIRECT EXAMINATION

12  Q    (BY MR. JAUREGUI)  Are you presently employed?

13  A    Yes, sir.

14  Q    How are you employed?

15  A    With the Los Angeles County Sheriff's Department.

16  Q    And what rank do you hold -- are you a sworn employee or

17  civilian?

18  A    Sworn.

19  Q    What rank do you hold?

20  A    Deputy.

21  Q    How long have you been a deputy with the Sheriff's

22  Department?

23  A    Around eight years.

24  Q    And what is your current assignment?  Do you have a

25  certain unit you belong to, subdivision?

```
 1   A      Men's Central Jail.

 2   Q      And within Men's Central Jail, do you work on a particular

 3   floor or section?

 4   A      Right now I work 6,000.

 5   Q      What is 6,000?

 6   A      The main clinic area.

 7   Q      In 2010, sir, where within MCJ did you work?

 8   A      6,000 again.

 9   Q      Did there come a time, Deputy Courson, when you came to

10   know an FBI special agent named Leah Marx?

11   A      Yes, sir.

12   Q      And approximately when was that?

13   A      Sometime in 2010, I believe.

14   Q      And how did you meet her?

15   A      She would come in to interview inmates.

16   Q      And where did you meet her?

17   A      At 6,000, my work location.

18   Q      And did you have an understanding of what Special Agent

19   Marx was doing on your floor?

20   A      Interviewing inmates.

21   Q      Do you know why she was interviewing inmates?

22   A      Human trafficking cases.

23   Q      Did you see Special Agent Marx again after your first

24   meeting in 2010?

25   A      Yes.
```

1   Q      In what capacity?

2   A      Went out for drinks, breakfast.

3   Q      Approximately how many times did you see her?

4   A      Three or four.

5   Q      And how did it come to be that you saw Special Agent Marx

6   outside of MCJ?

7   A      I asked her out.

8   Q      And when you say you asked her out, what did you -- why

9   did you ask her out?

10  A      Because I thought she was cute.

11  Q      And what, if anything, did you discuss with Special Agent

12  Marx, Deputy Courson?

13         Let me ask you a different question.

14         In your career with the Sheriff's Department, have you

15  ever witnessed any uses of force?

16  A      Yes.

17  Q      And did you witness such an incident shortly after

18  beginning with the Sheriff's Department?

19  A      Yes.

20  Q      And what was that incident?

21  A      I was -- I don't remember where I was working, but I was

22  working and I was -- I saw a use of force or at least a

23  takedown, and I was told that I was upstairs racking gates.

24  Q      Okay.  Let me try to unpack that a little bit.

25         When you say you saw a takedown, what does that mean?

```
 1   Could you explain to the jury what you saw.
 2   A    Yes.  Okay.  While working, we were doing pill call for --
 3   the inmates went out into the hallway for pill call.
 4   Q    And what is a pill call?
 5   A    Inmates getting pills.
 6   Q    Okay.
 7   A    Or medicine or whatever you want to call it.
 8   Q    Okay.
 9   A    On the way back in at least one, maybe two deputies
10   followed an inmate in, and then they took him down to the
11   ground.  I don't -- then when asked what did I see, I asked
12   what do you want to hear and --
13   Q    Okay, well, let me stop you there.  Who asked you what did
14   you see?
15   A    I think it was a senior deputy.  It was at least a senior
16   or bonus.
17   Q    Okay.  And when you say a senior bonus, what does that
18   mean?
19   A    He's a senior line deputy, he took a test saying he can
20   supervise.
21   Q    Okay.  So he was someone above you in the chain of
22   command?
23   A    Yes, sir.
24   Q    Okay.  And he asked you what did you see?
25   A    Correct.
```

```
 1   Q     And what did you say to him?

 2   A     What do you want to hear.

 3   Q     And what did he respond?

 4   A     You were upstairs racking gates or running showers, or I

 5   wasn't down there basically is what he was saying.

 6               MR. STEWARD:  Move to strike.  Hearsay.

 7               THE COURT:  Overruled.

 8   Q     (BY MR. JAUREGUI)  And did you tell Special Agent Marx

 9   about that incident?

10   A     Yes.

11   Q     And during the course of your career in the Sheriff's

12   Department, Deputy Courson, did you learn about any rules,

13   official or otherwise, that you told Special Agent Marx about?

14   A     Yes.

15   Q     Okay.  What rules did you tell her about?

16   A     The unwritten rule was if an inmate fights with a

17   deputy --

18               MR. STEWARD:  Objection, foundation.

19               THE COURT:  Sustained.

20   Q     (BY MR. JAUREGUI)  Deputy Courson, you mentioned the

21   unwritten rule.  What is the unwritten rule?

22               MR. STEWARD:  Same objection.

23               MR. JAUREGUI:  I'll ask a different question, Your

24   Honor.

25               THE COURT:  All right.
```

```
 1   Q    (BY MR. JAUREGUI)  In the course of your career, did you
 2   attend any training sessions in the Sheriff's Department?
 3   A    Yes.
 4   Q    And when did you attend trainings in the Sheriff's
 5   Department?  Was it at the start of your career?
 6   A    Sir, we're always going through training, so --
 7   Q    Did you attend any trainings -- any jail operations
 8   trainings?
 9   A    Yes.
10   Q    And in those trainings, did you learn about any rules?
11   A    Yes.
12   Q    Did you learn about unofficial rules within the Sheriff's
13   Department?
14   A    Yes.
15   Q    And what were those rules?
16   A    That was the unwritten rule, the one that was just...
17   Q    Okay.  And what is the unwritten rule?
18        MR. STEWARD:  Same objection, Your Honor.
19   Foundation, hearsay.
20        THE COURT:  Overruled.  You can answer.
21        THE WITNESS:  If an inmate fights with a deputy, the
22   inmate goes to the hospital.
23   Q    (BY MR. JAUREGUI)  And do you have an understanding of
24   what that means?  Why would the inmate go to the hospital?
25   A    Because he --
```

1           MR. STEWARD:  Objection, calls for speculation.

2    Q    (BY MR. JAUREGUI)  Do you have an understanding of why the

3    inmate would go to the hospital?

4    A    Yes.

5    Q    And what is that understanding?

6    A    Was because he would be injured.

7    Q    And why would he be injured?

8           MR. STEWARD:  Objection, vague.

9           THE COURT:  Overruled.  You can answer.

10          THE WITNESS:  Because he would be beaten up.

11   Q    (BY MR. JAUREGUI)  Did you tell -- Deputy Courson, did you

12   tell Special Agent Marx about the unwritten rule?

13   A    Yes.

14   Q    And, Deputy Courson, are you today familiar with the name

15   Anthony Brown?

16   A    Yes.

17   Q    And how are you familiar with the name Anthony Brown?

18   A    Newspapers and hearing about it at work.

19   Q    And do you know whether there's a connection between

20   Anthony Brown and a cell phone brought into MCJ?

21   A    Yes.

22   Q    And are you aware, Deputy Courson, of a connection between

23   Special Agent Marx and that cell phone incident?

24   A    Yes.

25   Q    And what did you -- what do you understand that connection

1  to be?

2  A    That she got someone to bring it in.

3  Q    At any point, Deputy Courson, did you tell anyone within

4  the Department that you had been in social contact with Special

5  Agent Marx?

6  A    Yes.

7  Q    And approximately when was that?

8  A    I don't remember the year.  I think it was '14.

9  Q    Well, let me ask you this:  Did you report to anyone up

10  your chain of command that you had been in social contact with

11  Special Agent Marx?

12  A    Yes.

13  Q    And do you recall whom that was?

14  A    Yes.

15  Q    And who was it?

16  A    Captain Ornelas.

17  Q    And what happened when you informed Captain Ornelas that

18  you had been in social contact with Special Agent Marx?

19  A    I told him what had transpired, and then I spoke to ICIB.

20  Q    And what is ICIB?

21  A    Internal -- Internal Criminal Investigation Bureau.

22  Q    And when you spoke with ICIB, was that an interview that

23  you sat for?

24  A    Yes.

25  Q    Was that recorded?

1    A    Yes.

2          MR. JAUREGUI:  Your Honor, at this time the

3    government would move for the admission of Exhibit Number 98.

4    It's an audio recording.

5          MR. STEWARD:  On that representation, no objection.

6          THE COURT:  All right.

7          MR. JAUREGUI:  And with the Court' permission, I'd

8    like to play some excerpts from that recording.

9          THE COURT:  All right.

10         MR. JAUREGUI:  And could we play 98-1, please.

11         (Exhibit 98-1 played in open court.)

12    Q    (BY MR. JAUREGUI)  Now, Deputy Courson, I asked you

13    whether you had spoken to -- I asked you when you had reported

14    that you'd been in contact with Special Agent Marx.  Having

15    heard so far this excerpt, do you recall when that was?

16    A    Yes.

17    Q    And when was that?

18    A    2011.

19    Q    Okay.

20         (Exhibit 98-1 continued to play in open court.)

21         MR. JAUREGUI:  Okay.  And if we can now play 98-2.

22         (Exhibit 98-2 played in open court.)

23    Q    (BY MR. JAUREGUI)  Now, Deputy Courson, you just mentioned

24    "if we had any 415s"; is that right?

25    A    Yes, sir.

```
 1  Q     And could you explain to the jury what a 415 is.

 2  A     Disturbance.

 3  Q     And when you say "disturbance," could that include

 4  violence within the jail system?

 5  A     Yes.

 6  Q     And would that include also a deputy-on-inmate violence?

 7  A     Yes.

 8  Q     Or inmate-on-deputy violence?

 9  A     Yes.

10  Q     And, Deputy Courson, at the time that you were meeting

11  with Special Agent Marx, were you aware that she was covertly

12  recording you as part of an FBI investigation?

13  A     No, sir.

14  Q     Did you come to learn that eventually?

15  A     Yes, sir.

16  Q     Okay.

17             MR. JAUREGUI:  Continue, please.

18         (Exhibit 98-2 continued to play in open court.)

19             MR. JAUREGUI:  Your Honor, may we have a moment,

20  please?  I think we're having another technical issue here.

21             THE COURT:  Yes.  Why don't you make sure that that

22  is turned on.

23             MR. FOX:  It is, Your Honor.  I see the green light,

24  so I'm not sure if it's our power cord.  But we can -- if we

25  could take a five-minute break, Your Honor, I will get this
```

```
 1   fixed.
 2              THE COURT:  All right.  Ladies and gentlemen, you
 3   can sit here or you can return to the jury room if you'd like.
 4        (Off the record at 8:27 a.m.)
 5        (On the record at 8:30 a.m.)
 6              THE COURT:  All right.  The record should reflect
 7   that all the jurors are in place.
 8        Are we ready to resume?
 9              MR. FOX:  Your Honor, the computer now has to
10   reboot, so it'll take a couple of minutes as this happens.
11              THE COURT:  All right.
12        (Pause in proceedings.)
13              MR. JAUREGUI:  I think we're ready to resume, Your
14   Honor.
15              THE COURT:  All right.
16              MR. JAUREGUI:  Our apologies for that.
17        May we proceed?
18              THE COURT:  Yes.
19              MR. JAUREGUI:  If AUSA Fox could just continue with
20   the exhibit.
21        (Exhibit 98-2 continued to play in open court.)
22   Q    (BY MR. JAUREGUI)  Now, Deputy Courson, in the course of
23   your career -- you said you started in the 6,000 floor.  Is
24   that right?  Or in 2010, rather, you were working on the 6,000
25   floor?
```

19

```
1   A    Yes, sir.

2   Q    And today you work in the 6,000 floor?

3   A    Yes, sir.

4   Q    Okay.  And I'm not sure that I asked you this, but who are

5   the individuals that are interviewing you?

6   A    ICIB.

7   Q    And were there sergeants involved in that interview?

8   A    Oh, yes, sir.

9   Q    And who were the sergeants interviewing you?

10  A    Long, I think was her last name.

11  Q    Sergeant Long?

12  A    I had to read it on here.  I wouldn't remember.

13  Q    Was there a lieutenant also involved in that interview?

14  A    Yes, sir.

15  Q    And do you remember the lieutenant's name?

16  A    Leavins.

17  Q    Okay.  And if we could go to -- oh, and let me ask you --

18            MR. JAUREGUI:  No, if we could play 98-3, please.

19       (Exhibit 98-3 played in open court.)

20  Q    (BY MR. JAUREGUI)  Now, Deputy Courson, had you sent

21  information to Special Agent Marx about your department via

22  e-mail?

23  A    Yes.

24            MR. STEWARD:  Objection, vague, information.

25            THE COURT:  Overruled.  The answer will stand.
```

```
1    Q    (BY MR. JAUREGUI)  And she had e-mailed you, you told the

2    investigators; correct?

3    A    Yes.

4    Q    And did they tell you that they were going to go into your

5    e-mail to look for communications between the two of you?

6    A    Yes.

7         MR. JAUREGUI:  And if we could just play 98-4,

8    please.

9         (Exhibit 98-4 played in open court.)

10   Q    (BY MR. JAUREGUI)  Now, Deputy Courson, had anyone from

11   the FBI or the federal government threatened you at this point?

12   A    No, sir.

13   Q    Had anyone from the FBI or the federal government

14   threatened you in connection with this case?

15   A    No, sir.

16   Q    Had anyone from the federal government or the FBI tried to

17   intimidate you?

18   A    No, sir.

19   Q    Did they try to bully you?

20   A    No, sir.

21   Q    Did they try to blackmail you?

22   A    No, sir.

23   Q    Did they try to coerce you?

24   A    No, sir.

25         MR. JAUREGUI:  No further questions, Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  All right.  Cross-examination.
 2              MR. STEWARD:  Thank you, Your Honor.
 3                      CROSS-EXAMINATION
 4   Q    (BY MR. STEWARD)  The incident that you described a few
 5   minutes ago, I believe you said that you saw a takedown of an
 6   inmate; is that right?
 7   A    Yes, sir.
 8   Q    And when was that, to the best of your recollection?
 9   A    Late '08, maybe early '09.
10   Q    And where did it take place?
11   A    I do not recall, sir.
12   Q    Well, took place at the Men's Central Jail; right?
13   A    Well, yes, sir.  I thought you wanted a specific location.
14   Q    Do you remember what floor?
15   A    No, sir.
16   Q    And tell us again exactly what you saw.
17   A    An inmate coming from the hallway came back into the
18   module and two deputies followed him, and then they ended up on
19   the ground.  The deputies came up behind him and grabbed him.
20   Q    Was he handcuffed?
21   A    No, sir.
22   Q    And who were the two deputies?
23   A    I do not know, sir.
24   Q    You were working on that floor at the time; right?
25   A    Yes, sir.
```

```
 1   Q     And you were working with those two deputies?

 2   A     Yes, sir.

 3   Q     And you don't remember their names?

 4   A     That is correct, sir.

 5   Q     Now, I believe you testified that one of them asked you to

 6   lie about the incident, say that you were upstairs or something

 7   like that?

 8   A     Correct, yes, sir.

 9   Q     Which one -- well, describe the deputy that asked you to

10   do that.

11   A     I don't recall, sir.

12   Q     Is he white, black, Asian?

13   A     Sir, I do not remember.

14   Q     Tall, short?

15   A     Again, I do not remember.

16   Q     Well, you remember the incident; right?  It was pretty

17   remarkable to you; right?

18   A     Correct.

19   Q     Did you feel that the use of force on that inmate was

20   reasonable or unreasonable?

21   A     I have no idea why it even happened.

22   Q     Did you feel that the use of force on that inmate was

23   reasonable or unreasonable?

24   A     I guess I don't understand how I can make that call when I

25   don't know what started.
```

```
1   Q     Have you ever seen an unreasonable use of force in your
2   seven years as a deputy at the Men's Central Jail?
3   A     No, sir.
4   Q     Have you ever witnessed an incident where an inmate went
5   to the hospital because of force?
6   A     No, sir.
7   Q     Is it fair to say that you exaggerated a lot of the things
8   that you told Agent Marx?
9   A     Probably, yes, sir.
10  Q     Well, in fact, you flat-out lied to her, didn't you?
11  A     Yes, sir.
12  Q     Did you know at the time that it is a federal felony to
13  lie to an FBI agent?
14  A     In what course of action, sir?
15  Q     In the performance of her duties of investigating whatever
16  she's investigating.
17  A     I wasn't aware she was investigating the Department
18  though.
19  Q     Okay.  But she was asking you questions about the
20  Department; right?
21  A     Yes, sir.
22  Q     And you met her in connection with her asking questions of
23  inmates at the jail; right?
24  A     Yes, sir.
25  Q     So at a minimum, you knew she was investigating, I believe
```

```
 1    you described it as human trafficking; right?
 2    A    Correct.
 3    Q    And so when you're providing her with information about
 4    the jail, did you lie to her about some of those things?
 5    A    Yes, sir.
 6    Q    Do you have some sort of a deal or an arrangement with the
 7    U.S. Attorney's Office that you won't be prosecuted for lying
 8    to a federal agent?
 9    A    No, sir.
10    Q    Has that topic ever come up?
11    A    No, sir.
12    Q    I believe you testified this morning about having
13    information about a murder at the jail?
14    A    Yes, sir.
15    Q    Did you report that to anybody?
16    A    It was at the jail, so yes, they know about it.
17    Q    The question was, when you heard about that, did you go to
18    anybody else to provide them with the information?  Your
19    sergeant, anybody higher up, Internal Affairs, anybody?
20    A    No, sir.
21    Q    And in terms of your, I think you said four meetings with
22    Agent Marx, your goal was a personal relationship with her; is
23    that true?
24    A    Correct.
25    Q    And as you sit there today, do you agree with the
```

```
 1   assessment in the tape that we just saw that you got played?
 2   A     Yes, sir.
 3              MR. STEWARD:  Thank you, Your Honor.  Nothing
 4   further.
 5              MR. JAUREGUI:  May I have a moment, Your Honor?
 6              THE COURT:  Yes.
 7        (Plaintiff's counsel conferred off the record.)
 8              MR. JAUREGUI:  No further questions, Your Honor.
 9              THE COURT:  All right.  Sir, you may step down.
10        Call your next witness.
11              MR. FOX:  The United States calls Gilbert Michel.
12              THE DEPUTY CLERK:  Please raise your right hand.
13         (The witness, GILBERT EMANUEL MICHEL, was sworn.)
14              THE DEPUTY CLERK:  Please have a seat.
15        Will you please state your full name and spell your last
16   name for the record.
17              THE WITNESS:  It's Gilbert Emanuel Michel,
18   M-I-C-H-E-L.
19              THE DEPUTY CLERK:  Thank you.
20              MR. FOX:  May I proceed, Your Honor?
21              THE COURT:  Yes, please.
22                         DIRECT EXAMINATION
23   Q     (BY MR. FOX)  Mr. Michel, what do you do for a living?
24   A     I'm a property manager.
25   Q     Where is the property that you manage?
```

```
1    A     In Chandler, Arizona.

2    Q     Did you work for the Sheriff's Department at some point?

3    A     Yes.

4    Q     When was that?

5    A     In April of 2009 until September of 2011.

6    Q     What happened in September of 2011 that caused you to

7    leave the Department?

8    A     I was -- I took a bribe in for giving someone a cell phone

9    inside the facility that I worked at.

10   Q     Did you resign, or were you fired?

11   A     I resigned in lieu of being fired.

12   Q     I want to take you back to before April of 2009.

13         What type of training did you receive before you became a

14   deputy?

15   A     I went through an 18-week academy at the Sheriff's

16   Department, and the academy was located in Whittier,

17   California.

18   Q     When you started with the Department in April of 2009,

19   where were you assigned?

20   A     I was assigned to Men's Central Jail.

21   Q     And when a deputy arrives at Men's Central Jail after

22   training, is the deputy assigned to a specific floor or area of

23   Men's Central Jail?

24   A     Yes.  You go through a training program, and I was

25   assigned to the 2,000 floor.
```

1  Q    How long were you assigned to the 2,000 floor as part of

2  your training program?

3  A    About a year.

4  Q    What types of inmates are housed on the 2,000 floor?

5  A    At the time that I was working there, there was regular

6  GP, general population inmates.  There was green light inmates.

7  Those are the inmates that are -- need to be protected.  There

8  was a gang module with green lighters, and there was also like

9  a high power segregated area on 2,000 floor.

10  Q    What does "high power" mean?

11  A    High power is the highest risk inmate.  They're either

12  very violent or they're -- they're like a celebrity, so they

13  need extra protection.

14  Q    You mentioned that you had the training on the 2,000 floor

15  for about a year.  What happened to your assignment after a

16  year?

17  A    Well, after I got off training, I went to vac relief.

18  Q    What does that mean?

19  A    That's vacation relief for -- anyone who has a permanent

20  spot in the jail, if they go on vacation or take a day off or a

21  leave, then I would cover their spot.

22  Q    And while you were assigned to vacation relief, did you

23  ever work at the 3,000 floor?

24  A    Yes.

25  Q    I want to ask you about some of your experience on the

1    3,000 floor.

2         While you were there, did you ever encounter a deputy by

3    the name of Justin Bravo?

4    A    Yes.

5    Q    Did you ever see Mr. Bravo engaged in what appeared to you

6    to be unprovoked force?

7              MR. STEWARD:  Objection, calls for conclusion,

8    hearsay, and irrelevant to this matter.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.

11   Q    (BY MR. FOX)  Could you please describe that incident.

12   A    Well, I had done a trade actually at that time with one of

13   my classmates, and when I was working in the module an inmate

14   had come back from a pass; I don't know where he came from, but

15   when the inmates would come back, return from passes, they

16   would go inside the laundry room.  And this inmate was doing

17   pull-ups in the laundry room on the pipes, and there was a CA

18   that was working with me at the time, CA Wendlant.  He told the

19   inmate to not do the pull-ups on the pipes because he would

20   possibly break the pipe.

21        So the inmate kind of gave like -- kind of gave him

22   attitude.  So Wendlant went out to the hallway and returned

23   with Deputy Bravo, and at that time, Deputy Bravo had got the

24   inmate and had him up against the wall and was talking to him.

25   And then right after that, he -- Deputy Bravo slapped the

1   inmate in the back of the -- side of the head and punched him

2   in his right rib area.  And after -- and I --

3   Q    Let me stop you there and ask a couple questions, then

4   we'll move on.

5        When you saw Mr. Bravo slap the inmate and punch the

6   inmate, did you see the inmate before that do anything to

7   Mr. Bravo?

8   A    No.

9   Q    And you mentioned that Mr. Bravo punched him.  Where did

10  Mr. Bravo punch the inmate?

11  A    In the right rib -- like back of his rib area.

12  Q    After you observed this, what happened?

13  A    Well, we let the inmate go back into his cell.  Deputy

14  Bravo left, and maybe -- some time had passed, and Deputy Bravo

15  and another deputy came into the module and wanted to talk to

16  me, so they pulled me into the recreational room.

17  Q    What happened when you and Mr. Bravo and the other deputy

18  were in the recreation room?

19  A    Well, as soon as we got in there, they started asking me

20  questions like -- they asked me where did I come from, where

21  did I previously work at, if I knew anyone on the Department.

22  And then he asked me a really strange question.  He asked me if

23  I had seen anything previous to our conversation.

24  Q    Okay.  Let me ask you a little bit about what you just

25  said.  You said that they asked you if you knew anyone on the

1   Department?

2   A     Yes.

3   Q     What did you tell them?

4   A     I told them that I had a cousin who worked on the 2,000

5   floor.

6   Q     And you said that they asked you if you had seen anything

7   previous to that discussion?

8   A     Correct.

9   Q     What did you understand that to mean?

10          MR. STEWARD:  Objection, calls for a conclusion,

11   opinion of the witness.

12          THE COURT:  Overruled.

13          THE WITNESS:  At the time, I knew that they were

14   testing me to see how I would respond to their questions, so I

15   told them that I didn't see anything and I didn't even know

16   what they were talking about.

17   Q     (BY MR. FOX)  What did they say in response to that?

18   A     They were -- they were fine with the answer.  They didn't

19   question me anything about any other incidents or anything.

20   Q     Mr. Michel, at some point in time after that, were you

21   assigned to a floor permanently?

22   A     Yes.

23   Q     Approximately when did this occur?

24   A     About six months after I was on vac relief.

25   Q     And where were you assigned?

```
 1    A     I was assigned on the 3,000 floor.
 2    Q     Based on your experience on the 3,000 floor and at Men's
 3    Central Jail generally, are you familiar with the term "shot
 4    callers" as it relates to deputies?
 5    A     Yes.
 6    Q     What are shot callers?
 7    A     Shot callers are the line deputies that basically run the
 8    floor.  They're the ones who like control the floor, who works
 9    in what area on the 3,000 floor.
10    Q     I want to ask you some questions about -- about your
11    experience in this case.
12          When did you first come in contact with Anthony Brown?
13    A     As soon as I started my training, I worked in 22 and 24
14    module on 2,000 floor.  He was actually housed there when I got
15    there.
16    Q     And is that on the 2,000 floor?
17    A     Yes, it is the 2,000 floor.
18    Q     Anything unusual about your interaction with Mr. Brown
19    when you were on the 2,000 floor?
20    A     Not really.  He seemed pretty friendly and tried to talk
21    to me a lot.
22    Q     And you said you were later assigned to the 3,000 floor.
23          Did you encounter him again when you were assigned to the
24    3,000 floor?
25    A     Yes.
```

```
 1   Q     What happened when you encountered him again?
 2   A     When I first encountered him on the 3,000 floor, he was
 3   being transferred from the 2,000 floor, and when he came up he
 4   had a property bag that was like a trash bag that was filled
 5   with legal material.  And in that also he had a stack of photos
 6   probably about two inches thick with photos of his case that he
 7   was supposedly being tried for.
 8   Q     In the summer of 2011, did you reach an agreement with
 9   Anthony Brown?
10   A     Yes.
11   Q     What was that agreement?
12   A     The agreement was I was going to bring him in cigarettes,
13   food and a cell phone.
14   Q     In exchange for what?
15   A     Money.
16   Q     Was there someone on the outside that Mr. Brown put you in
17   contact with to obtain this contraband and the money?
18   A     Yes.
19   Q     And who specifically was that?
20   A     All I knew is that his name was CJ and that he was an
21   associate of Mr. Brown's.
22   Q     How were you put in contact with CJ?
23   A     Initially, I had brought in my personal cell phone and
24   allowed Anthony Brown to make a phone call to CJ, but CJ did
25   not answer that phone call.  So I got the number from Anthony
```

1    Brown and later contacted CJ on the outside.

2    Q     At the time, did you know CJ was an undercover FBI agent?

3    A     No, I didn't.

4    Q     Did you later learn that?

5    A     Yes.

6    Q     How much later?

7    A     When the FBI actually came to visit me at my residence.

8    Q     Okay.  We'll get to that, but now backing up again to when

9    you first came in contact with CJ, did you eventually meet with

10   him?

11   A     Yes.

12   Q     And we talked about contraband that Mr. Brown had asked

13   you to bring into the jail.

14         Did CJ give you any of this contraband?

15   A     Yes.

16   Q     What did he give you specifically?

17   A     The cell phone.

18   Q     Did he give you cigarettes and a lighter?

19   A     No.

20   Q     Did you bring Mr. Brown that contraband?

21   A     Yes.

22   Q     And the cell phone that CJ gave you to give to Mr. Brown,

23   when did you obtain it from CJ?

24   A     It was, I believe, July or August of 2011 sometime.

25   Q     Can you explain the circumstances of how you obtained that

**UNITED STATES DISTRICT COURT**

1   phone from CJ that day.

2   A      Yes.  What happened when I got off of work that afternoon

3   around two o'clock, I contacted CJ and we figured out a

4   location where we could meet, and the location was in South

5   L.A., right around the area of the 105 and Vermont Street.  And

6   when I got to the location, he had told -- well, previously in

7   our conversation he had told me what kind of vehicle he was in.

8   So he was already there when I pulled into the parking lot.

9   Q      And what happened when you saw him when you pulled into

10  the parking lot?

11  A      Well, I pulled in and we were driver's side to driver's

12  side, and I rolled down my window and asked if he was CJ, and

13  yes, he was.  And so --

14              MR. STEWARD:  Move to strike.  Hearsay.

15              THE COURT:  Overruled.

16              THE WITNESS:  And so he verified that he was, in

17  fact, CJ and just made small talk, and he handed me the cell

18  phone in a plastic bag.  So I received the cell phone, and then

19  he gave me money that was inside of a sunglasses case, like a

20  cloth case, but he threw that in to me.  He didn't hand that to

21  me.  He just threw it in the window.  And after he threw it in

22  the window, he said, "Hey, man, I want my case back."  So I

23  took the money out of the case, put it in my console and then

24  threw the case back to him in his vehicle.

25  Q      (BY MR. FOX)  Did you later determine how much money CJ

```
1   had given you?
2   A    Yes, he...
3   Q    How much was it?
4   A    He gave me $700.
5   Q    Was that part of an agreement you had previously with CJ,
6   that he'd give you $700?
7   A    No.
8   Q    Had Mr. Brown told you that you would be paid if you gave
9   him a phone?
10  A    Yes.
11  Q    What had Mr. Brown told you about the amount of money
12  you'd be paid?
13  A    He said it was going to be $2,000.
14  Q    Whose car were you driving to meet CJ?
15  A    An ex-girlfriend's.
16  Q    What is her name?
17  A    Angela Caruso.
18  Q    Did she have a job at the time?
19  A    Yes.
20  Q    What was that job?
21  A    She was an L.A. County Sheriff's deputy.
22  Q    What did you do after leaving your meeting with CJ?
23  A    I drove home, but I didn't drive on the freeway.  I
24  actually drove on side streets because I had no idea who CJ
25  was, so I didn't want to be followed home.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    After you arrived home, what happened?
 2   A    When I arrived at home, I had the cell phone with me.  I
 3   took the cell phone apart to see if there was anything inside
 4   the cell phone and to see if the cell phone actually worked.
 5   Q    Why did you do both of those things?
 6   A    Because I didn't want there to be any drugs or weapons
 7   inside the cell phone, and I wanted to make sure it actually
 8   worked.
 9   Q    At any point in time, did you provide Anthony Brown with
10   drugs or weapons?
11   A    No.
12   Q    When you checked the cell phone to see if it worked, did
13   you determine whether it did work?
14   A    Yes, it did.
15   Q    So what did you do with it?
16   A    Then I charged it, and after I charged it I put it inside
17   a rubber glove that we used at the jails, and I put it inside
18   my backpack.
19   Q    When was the next time you went to Men's Central Jail?
20   A    It was about a week later.
21   Q    And what did you do once you got there?
22   A    I got dressed and started at my assignment, but at that
23   time, I gave Anthony Brown the cell phone.
24   Q    Would you leave the cell phone -- well, let me ask,
25   actually.
```

**UNITED STATES DISTRICT COURT**

1        When you said you gave it to Mr. Brown, how did you give

2   it to him?

3   A     It was inside the glove.  I woke him up, and I placed it

4   on top of his bunk.

5   Q     Did you have an agreement with Mr. Brown about how much

6   you would get paid every time you gave him that cell phone?

7   A     Yes.

8   Q     What was that?

9   A     The first time it was 2,000, and the second time it was

10  supposed to be like $2,100.

11  Q     When you were done with your shift, what would you do with

12  that phone?

13  A     I would -- if -- when I had passed him the phone, I would

14  recover the phone at the end of my shift.

15  Q     Why did you do that?

16  A     Because the phone needed to be charged, and Anthony Brown

17  said that I could look at the phone to see -- to see who he was

18  talking to and communicating with.

19  Q     Did you ever meet with CJ again?

20  A     Yes.

21  Q     When?

22  A     It was a couple weeks after I initially gave Anthony Brown

23  the phone.

24  Q     Where did you meet him?

25  A     It was in a parking lot in the Los Feliz area.

```
1   Q    And what happened at this meeting?

2   A    I was supposed to -- we were supposed to exchange notes

3   because Anthony Brown was upset at what was supposedly going on

4   outside with his money.  So I was supposed to give him a note,

5   but the note never got exchanged, but CJ did give me more

6   money.

7   Q    Did CJ also give you a note?

8   A    No.  I don't remember -- there were supposed to be notes

9   passed, but I don't remember if I ever did pass the notes.

10  Q    Is there another name for notes, such as these that are

11  supposed to be passed to inmates?

12  A    Yes.

13  Q    What are they called?

14  A    They're called kites.

15  Q    What was the total amount you received from CJ during

16  these meetings?

17  A    $1,500.

18  Q    Did you have a plan to obtain more than $1,500 from CJ?

19  A    I didn't, but Anthony Brown had offered me $20,000 for

20  bringing him in the phone.

21  Q    And how was -- how did you believe he was going to try to

22  get you the additional money?

23  A    Because -- well, Anthony Brown stated that he would pay me

24  in a cashier's check and all I had to do was give him an

25  address to mail that check.
```

1  Q     Whose address did you give him?

2  A     I gave him my father's address.

3  Q     Mr. Michel, you're aware that at some point that phone was

4  found by the Sheriff's Department on Anthony Brown; correct?

5  A     Yes.

6  Q     How long did Anthony Brown have the phone in terms of

7  number of days, weeks, months before the phone was found?

8  A     A couple of weeks.

9  Q     How did you find out the phone had been found by the

10 Sheriff's Department?

11 A     I was working in my module, and a deputy came into the

12 module and said, "We just found a phone."  So as soon as that

13 deputy said that, I knew that it was the phone that I had given

14 Anthony Brown.

15 Q     So what did you do when you found that information out?

16 A     I went out to the -- I told them that -- my partners that

17 I had to go to my locker.  So I went out to my locker and got

18 my keys from my vehicle and went out to my vehicle to use my

19 personal cell phone to call CJ to let him know that the phone

20 was found.

21 Q     Why did you call CJ to let him know the phone was found?

22 A     Because I didn't want them to trace back -- if the number

23 was still on the phone that they found, I did not want them to

24 trace the phone to CJ and then back to me.

25 Q     At that time, did you know that CJ was an undercover FBI

1  agent?

2  A     Yes.

3  Q     By the time you called CJ?

4  A     Oh, wait.  No, I did not.

5  Q     Did you do anything with your own phone, the one that you

6  were using, your personal phone?

7  A     I lost it.

8  Q     Could you explain the circumstances that caused you to

9  lose your phone.

10 A     Yes.  After I made that phone call, I knew that they could

11 possibly trace it back -- the phone calls to me.  So I took my

12 phone apart and I hid it inside of my vehicle, and when I tried

13 to find it, I could not find it.

14 Q     What happened next after you found out that they had

15 seized the phone and after you hide your -- after you hid your

16 phone?  Excuse me.

17 A     That's when -- I believe it was a couple weeks after that

18 when the FBI actually came to visit me at my home.

19 Q     Who specifically came to visit you at your home?

20 A     Initially, there was three agents that contacted me in my

21 parking lot.  It was Agent Dahle, Agent Wayne and Agent Marx.

22 Q     Could you please explain how it was that they came in

23 contact with you that day.

24 A     Yes.  When I pulled into the parking lot at the complex

25 that I lived in, Agent Wayne and Marx approached me from the

1    front of my vehicle, and from behind, Agent Dahle was behind

2    me.

3    Q     And what did they say to you?

4    A     As soon as I got out of my vehicle, they asked me what my

5    name was -- well, they said, "Are you Gilbert?"  And I said,

6    "Yes."

7               MR. STEWARD:  Move to strike.  Hearsay on the first

8    part of that.

9               THE COURT:  Overruled.

10              THE WITNESS:  I said, "Yes," and at that time, then

11   they flashed their identification at me and said that they were

12   FBI agents and they wanted to talk to me about things that were

13   going on at Men's Central Jail.

14   Q     (BY MR. FOX)  Did you agree to talk with them right there?

15   A     No.  I -- they asked me if we could go into my apartment,

16   and at that time I said no because my girlfriend at the time

17   was in the apartment and she had no idea what was going on, so

18   I did not want them to talk to me in my apartment.

19   Q     That was Ms. Caruso?

20   A     Yes.

21   Q     Where did you go then?

22   A     They asked if there was a Starbucks or any location nearby

23   that we could talk, and I said yes, there was actually a

24   Starbucks up the street.  And that's when I got into the

25   vehicle with Agent Dahle and Agent Wayne, and we went to the

```
 1   Starbucks down the street.

 2   Q     What happened when you went to the Starbucks?

 3   A     When we got to the Starbucks, we were -- the inside of the

 4   Starbucks was super packed.  So there was a location behind the

 5   Starbucks where they had tables and chairs set up.  So we went

 6   there and sat down.  And Agent Marx was sitting across from me

 7   and the Agent Wayne was sitting to the right of me, and they

 8   opened up a laptop computer, and they had a binder that was

 9   about two, three inches thick with my photo and information

10   about me.  And as soon as the -- then they -- as soon as the

11   laptop came up, they showed me a video of me driving and

12   meeting CJ.

13   Q     Did the agents explain to you what they wanted to talk to

14   you about?

15   A     Yes.

16   Q     What did they say?

17   A     Well, one of the things was me accepting a bribe, and the

18   other thing was if I knew of anything that was going on at the

19   jail.

20   Q     Did you agree to speak with the FBI about these issues at

21   that time?

22   A     Yes, but I didn't -- I talked to them, but I told them

23   that I did not have any information.

24   Q     Why did you tell them that you did not have any

25   information?
```

```
1   A    Because at the time, I didn't know what was going to
2   happen to me or what was going on, so I didn't want to just
3   tell -- give any information to them.
4   Q    So what happened?
5   A    So it was like a really hot day, and we -- they wanted to
6   continue our conversation, so I suggested that we go back to
7   our -- my residence because then by that time they had notified
8   my girlfriend at the time, and so we went back to my residence
9   and had another conversation.
10  Q    Did you agree to provide the information the FBI had asked
11  you about when you went back to your place?
12  A    No.
13  Q    What happened next?
14  A    Well, we were sitting down at my kitchen table, and
15  several agents were asking me questions.  And when I was trying
16  to answer one agent, another agent would ask me a question, and
17  I was frustrated and got upset with them because they were
18  saying that I was a liar, but I wasn't lying to them and giving
19  them false information.  I just was not giving them information
20  at the time.
21  Q    When was the next time you -- well, I'm sorry, let me ask
22  you one more question about that.
23       Did the agents give you anything before they left?
24  A    Yes, they basically -- we were parting ways, and Agent
25  Wayne handed me his business card and said, "If you want to
```

1  talk to me, give me a call," and so I took his business card.

2  And the next day I tried to get a lawyer, but there was some --

3  a lot of crazy things going on at the time, and I didn't

4  contact a lawyer.  So it was like a day or two after that I did

5  finally contact my lawyer and gave him the information on the

6  card.

7  Q    Do you remember the next time you were working in Men's

8  Central Jail after the FBI had contacted you?

9  A    Yes.

10  Q    When was that?

11  A    It was about a week after the initial contact with the FBI

12  agents.

13  Q    What happened that morning?

14  A    I went to work, and when I got there I had got dressed and

15  went to the -- to my assignment, and when I got there someone

16  called me up on the phone and told me to 1019 the captain's

17  office.

18  Q    What does that mean, 1019 the captain's office?

19  A    It just -- it means that -- it's a radio code to give you

20  a location to where to go to.

21  Q    Did you respond to the captain's office?

22  A    Yes, I did.

23  Q    What happened when you got there?

24  A    When I got downstairs to the captain's hallway, before

25  getting to his office Sergeant Craig and Sergeant Long met me

1   in the hallway.

2   Q    And what did they do when they met you in the hallway?

3   A    Well, they asked if I was Deputy Michel and, obviously,

4   yes, it's written on my uniform.  And they asked if they could

5   ask me some questions, so they pulled me off to another office

6   in that hallway and asked me some questions.

7   Q    You mentioned a Deputy Craig and Long.  Was there another

8   person in the room besides the three of you?

9   A    Yes, Lieutenant Leavins actually came in as well.

10            MR. FOX:  Your Honor, I move for the admission now

11   of Government Exhibit 102, which is part of the stipulation.

12   It's the audio recording of Gilbert Michel on August 30th of

13   2011.

14            MR. STEWARD:  No objection.

15            THE COURT:  It will be received.

16       (Exhibit No. 102 received into evidence.)

17            MR. FOX:  And, Your Honor, I'm going to play now the

18   first clip from that exhibit.

19       (Exhibit 102, Excerpt 1, played in open court.)

20            MR. FOX:  Just stop the recording.

21   Q    (BY MR. FOX)  After Mr. Craig said, "Does this guy look

22   familiar to you," what was happening at the time?

23   A    We were sitting in the office, and he actually showed me a

24   picture of inmate Brown.

25   Q    Did you know what the interview was about at that point?

1    A      Yes.

2           (Exhibit 102, Excerpt 1, continued to play in open court.)

3    Q      (BY MR. FOX)  Mr. Michel, you mentioned earlier that

4    Mr. Leavins was in the room with Mr. Craig, Ms. Long and you.

5    Did he stay in the room the entire time?

6    A      No.

7    Q      What was he doing?

8    A      As soon as I had told Sergeant Craig that the FBI was

9    involved, he -- a little bit after that, he left the room.

10   Q      Did he come back in at any point in time?

11   A      Yes, later on.

12          MR. FOX:  I'm now going to play the second clip.

13          (Exhibit 102, Excerpt 2, played in open court.)

14          MR. FOX:  Now playing the third clip.

15          (Exhibit 102, Excerpt 3, played in open court.)

16          MR. FOX:  Now the next clip.

17          (Exhibit 102, Excerpt 4, played in open court.)

18          MR. FOX:  And the next clip.

19          (Exhibit 102, Excerpt 5, played in open court.)

20          MR. FOX:  Playing the next clip.

21          (Exhibit 102, Excerpt 6, played in open court.)

22          MR. FOX:  Playing the next clip.

23          (Exhibit 102, Excerpt 7, played in open court.)

24          MR. FOX:  Playing the next clip.

25          (Exhibit 102, Excerpt 8, played in open court.)

1  Q    (BY MR. FOX)  Mr. Michel, what was the Christmas party

2  fight?

3  A    There was a few deputies that were at an unsanctioned

4  Christmas party that got into an altercation --

5            MR. STEWARD:  Objection, foundation.

6            THE COURT:  Sustained.

7  Q    (BY MR. FOX)  He sustained the objection, let me ask you a

8  different question.

9       In that statement you made right there, you reference a

10  Christmas party fight.  Without getting into the details of

11  what -- what you know that they did or what you suspected they

12  did, what were the general allegations about that Christmas

13  party?

14  A    That deputies were fighting amongst each other.

15            MR. FOX:  Now I'm going to play the next clip.

16       (Exhibit 102, Excerpt 9, played in open court.)

17            MR. FOX:  Playing the next clip.

18       (Exhibit 102, Excerpt 10, played in open court.)

19            MR. FOX:  Playing the next clip.

20       (Exhibit 102, Excerpt 11, played in open court.)

21            MR. FOX:  Your Honor, for planning purposes, I have

22  about 17 minutes left of recordings to play.  So you could

23  break at any time, and it would be fine.  I can continue to go

24  if you'd like me to.

25       Thank you, Your Honor.

```
 1            (Exhibit 102, Excerpt 12, played in open court.)

 2                 MR. FOX:  Playing the next clip.

 3            (Exhibit 102, Excerpt 13, played in open court.)

 4                 MR. FOX:  Playing the next clip.

 5            (Exhibit 102, Excerpt 14, played in open court.)

 6                 MR. FOX:  Playing the next clip.

 7            (Exhibit 102, Excerpt 15, played in open court.)

 8                 MR. FOX:  And the next clip.

 9            (Exhibit 102, Excerpt 16, played in open court.)

10                 MR. FOX:  Playing the next clip.

11            (Exhibit 102, Excerpt 17, played in open court.)

12                 MR. FOX:  Playing the next clip.

13            (Exhibit 102, Excerpt 18, played in open court.)

14                 THE COURT:  Is this a good time to break?

15                 MR. FOX:  Yes, Your Honor.

16                 THE COURT:  Ladies and gentlemen, again I want to

17       remind you until this trial is over, you're not to discuss this

18       case with anyone, including your fellow jurors, members of your

19       family, people involved in the trial or anyone else, and do not

20       allow others to discuss the case with you.  This includes

21       discussing the case on the Internet, in chat rooms, blogs,

22       bulletin boards, e-mails or text messages.  If anyone tries to

23       communicate with you about this case, please let me know about

24       it immediately.

25            Do not read, watch or listen to any news reports or other
```

1    accounts about the trial or anyone associated with it.  That

2    includes going online.  Do not do any research such as

3    consulting dictionaries, searching the Internet or using other

4    reference materials, and do not make any investigation about

5    the case on your own.

6         Finally, you're reminded to keep an open mind until all of

7    the evidence has been received, you've heard the arguments of

8    counsel, the instructions of the Court and the views of your

9    fellow jurors.  If you need to speak with me, simply give a

10   note to the clerk.

11        We'll come back at five after the hour.

12        (The jury exited the courtroom.)

13             THE DEPUTY CLERK:  Please be seated.

14             THE COURT:  All right.  I noticed, I think as part

15   of this stipulation, that there were transcripts that were

16   received in addition to the recordings.  The transcripts, I

17   assume, should only be marked for identification since they're

18   not going to actually go back.

19             MR. FOX:  Your Honor, unless there was a typo, I --

20   and there could have been a typo, but I don't recall seeing a

21   transcript that was going to be admitted, and I have not sought

22   to admit any transcript so far.

23             THE COURT:  Okay.  Well, I'll look at the

24   stipulation again, and I would also assume that the recordings,

25   if the -- they're not going to go back to the jury room, but if

1    somebody needs to hear them, we'll do that probably here in

2    open court.

3                THE. FOX:  Yes, Your Honor.

4                THE COURT:  Okay.

5                MR. STEWARD:  We agree, Your Honor.

6                MR. FOX:  And, Your Honor, just so you're aware,

7    there is one recording that's not synched that we'll get to

8    later today probably, so we will have to pass out the

9    transcript books at that point.

10               THE COURT:  That's fine.

11               MR. FOX:  Okay, thank you.

12               THE COURT:  All right.  Thank you.

13          (Off the record at 9:50 a.m.)

14          (On the record at 10:08 a.m.)

15               THE COURT:  Okay.  I think the confusion is that

16   Exhibit -- for example, Exhibit 102, 102 itself, I believe, is

17   actually a transcript, and I think the record at this point

18   says the government offered 102 and 103.

19               MR. FOX:  Your Honor, I think the problem is with

20   the electronic file we gave you.  Upstairs we noticed on our

21   shared folder that contains all the exhibits that at one point

22   102 was a transcript, and we tried to delete it and it wouldn't

23   delete.  You may have a 102 that's actually the audio

24   recording, which is what it's intended to be.  I'm not sure, it

25   may be a copying error on our part, but 102 is intended to be

1  the recording, and 103 is intended to be the transcript.  You

2  may have a 103 that is the transcript on there as well.  I'll

3  be happy to work with your CRD after to work out this issue.

4          THE COURT:  Well, I just want to make sure the

5  record's clear that it's clear the excerpts that are being

6  played, if they're separate exhibits, that we get it so that

7  when people look at this they can -- it's clear exactly what

8  was being displayed, what was being played.

9          MR. FOX:  So -- and for that purpose, 102 is the

10  recording excerpts.  103 is the transcript, and that's the way

11  it is in our hard copy as well that we have here.  I think,

12  again, the error was just in the electronic form that we gave

13  you when we gave it to you at the start of the trial.  We'll

14  work this issue out.

15          THE COURT:  All right.

16          MR. FOX:  Thank you, Your Honor.

17          THE COURT:  All right.  Are we ready to proceed?

18          MR. FOX:  We are.

19          THE COURT:  All right.  Let's bring the jury out.

20          MR. FOX:  Would you like the witness to take the

21  stand?

22          THE COURT:  Yes, please.

23      (The jury entered the courtroom.)

24          THE DEPUTY CLERK:  Please be seated.

25          MR. FOX:  May I continue, Your Honor?

1          THE COURT:  Yes, please.

2     Q     (BY MR. FOX)  Mr. Michel, I'm now going to play Excerpt 28

3     from 102.

4          (Exhibit 102, Excerpt 28, played in open court.)

5              MR. FOX:  Now playing the next clip.

6          (Exhibit 102, Excerpt 29, played in open court.)

7     Q     (BY MR. FOX)  Mr. Michel, in the beginning of that excerpt

8     they said, "We're going to take a break and discuss some

9     things."  Was there a break at that point?

10    A     Yes.

11    Q     Where did you go?

12    A     I stayed inside that room that we were having the

13    interview in.

14    Q     Was anybody with you during that time?

15    A     No.

16    Q     Do you know where the others went?

17    A     No, I don't.  They went into the hallway, I know that.

18    Q     Approximately how long was it before things resumed?

19    A     I don't recall.

20             MR. FOX:  I'm now going to play the next clip.

21         (Exhibit 102, Excerpt 30 played in open court.)

22    Q     (BY MR. FOX)  Based on the time that Mr. Craig said in the

23    last clip, 8:10 when you broke and 9:55, approximately how long

24    was it between these two sessions?

25    A     About 45 minutes.

1   Q    And I can point you to -- well, I'll just move on, thank

2   you.

3        (Exhibit 102, Excerpt 31 played in open court.)

4            MR. FOX:  I'm now going to play the last clip.

5        (Exhibit 102, Excerpt 32 played in open court.)

6   Q    (BY MR. FOX)  Mr. Michel, were you relieved of duty that

7   day?

8   A    No.

9   Q    Were you later approached by ICIB Sergeants Craig and Long

10  for a follow-up interview?

11  A    Yes.

12  Q    Do you recall when that was?

13  A    Actually, I had several.

14  Q    And in one of those follow-up interviews, did you admit to

15  committing assaults on inmates?

16  A    Yes.

17  Q    Do you remember approximately when that was?

18  A    It was September of 2011.

19  Q    Was that the same day that you agreed to resign?

20  A    Yes.

21  Q    You mentioned before that when the FBI initially

22  approached you before you had an attorney, you had not yet

23  agreed to cooperate with the investigation; correct?

24  A    Yes.

25  Q    Did you later change your mind?

```
 1  A     Yes.
 2  Q     What happened, without getting into your communications
 3  with your attorney?
 4  A     Well, when I went to the Sheriff's Department first and
 5  gave them all the information that I did have, they basically
 6  turned it around on me and said that I was a disgrace to the
 7  Department and that was the reason why the FBI was
 8  investigating the Department.  So at that point, I -- I
 9  realized that I was just going to tell all the truth and just
10  let everything out on the table instead of hold anything back.
11  Q     After you agreed to cooperate with the federal government,
12  were you charged in this matter?
13  A     Yes.
14  Q     What were you charged with?
15  A     Bribery.
16  Q     Have you pled guilty to that charge?
17  A     Yes, I did.
18  Q     What kind of plea agreement did you reach?  Is it a
19  cooperation agreement?
20  A     Yes, I believe so.
21  Q     And what is your understanding as to what your obligations
22  are in order to receive any benefits for your cooperation?
23  A     Well, I'm not really benefitting anything, really.
24  It's --  there's a point system that is set to my guilty plea
25  and there's a point system that will be deducted from that,
```

1  but, I mean, other than that there's not really a set -- like

2  I'm going to get off or I, you know, don't have to say

3  anything, anything like that.

4  Q    Do you understand that you may receive leniency from the

5  government in its recommendations to the Court if you cooperate

6  in this investigation?

7  A    Yes.

8  Q    Now, Mr. Michel, I want to go into some of the items that

9  you told Sergeants Craig and Long about and other instances

10  potentially in which you committed abuse of inmates.

11       Are you familiar with the Brag incident?

12  A    Yes.

13  Q    Please explain what happened in that incident.  First of

14  all, when did it occur?

15  A    In -- around October of 2010.

16  Q    And what happened?

17  A    I had a neighbor that had a teenage daughter that had been

18  kidnapped and taken away and was being prostituted out, and how

19  I found out is my children and I were --

20            MR. STEWARD:  Objection, Your Honor, relevance at

21  this point.

22            THE COURT:  Overruled.  Go ahead.

23            THE WITNESS:  My children and I were

24  trick-or-treating, and when we went to that neighbor's house,

25  the neighbor explained to me that -- what had happened with her

1  daughter.  So she gave me the name of inmate Brag and --

2  Q    (BY MR. FOX)  What did you do with that name?

3  A    Well, when I went back to work I looked him up to see

4  where he was located at, and it just so happened that he was in

5  the module that I was working in.

6  Q    So what did you do with that information?

7  A    Well, at that time, I told my partners and --

8  Q    Which floor was this?

9  A    On the 3,000 floor.

10  Q    Do you recall who your partners were?

11  A    Deputy Aguirre, Deputy Ibarra, Deputy Carbajal.

12  Q    And what happened after you informed them of the

13  situation?

14  A    At that moment, Deputy Aguirre said that we wouldn't do

15  anything at that time because they were -- we were busy doing

16  other things, but he said that he would get back to me and we

17  would do something about coming in contact with that inmate

18  Brag.  And then eventually, later on we pulled that inmate out

19  and started talking to him.  And when Deputy Aguirre was

20  talking to him, he was saying -- he was totally denying that he

21  even knew the girl -- the teenage girl, and at that time we

22  basically assaulted inmate Brag.

23  Q    What do you mean you assaulted him?

24  A    Well, he was slapped, punched, kicked.

25  Q    Who did that?

1    A    Deputy Aguirre had slapped him, punched him.  I slapped

2    him.  I punched him in the rib area and kicked him in his right

3    inner thigh.

4    Q    Was the inmate doing anything to pose a physical threat to

5    the deputies at that point?

6    A    No, not a physical threat.

7    Q    What happened next?

8    A    After we had continued to talk with him and he denied

9    everything, we just threw him back in his cell and didn't

10   report any of the force that was used.

11   Q    Did you report -- you said you did not report any of the

12   force that was used.  Is that something that's mandated by the

13   Department, that you report force?

14   A    Yes, we were supposed to report any force used.

15   Q    Was there another use-of-force incident out of policy that

16   you were engaged in?

17   A    Yes.

18   Q    And did this involve a pill call?

19   A    Yes.

20   Q    Okay.  Can you please describe this incident.  First of

21   all, when approximately did it occur, if you can recall?

22   A    I don't remember the exact date or when it occurred.

23   Q    What floor were you working?

24   A    I was also working on the 3,000 floor at the time, day

25   shift.

1   Q      Who were your partners at the time?

2   A      At the time, I was working with CA and --

3   Q      What is a CA?

4   A      CA is a custody assistant.  They help out with the daily

5   activities in the -- in the modules, but they're not deputies.

6   They're like deputy helpers or assistants, I guess.

7   Q      Okay.  And what occurred in this incident?

8   A      An inmate had come out for pill call, and I was doing

9   searches of inmates.  And when I pulled -- when I started

10  searching the inmate, I started asking him questions, and he

11  would not answer any of the questions that I asked him.  And

12  so -- and quite honestly, he was like laughing at me.  So I

13  just pushed him back into the wall and told him to put back his

14  shoes, because I had taken off his shoes while I was searching

15  him, and he went and got his pills.  But when he went to walk

16  back into the module, he kind of like looked back and snickered

17  at me.  And at that time, Deputy -- I'm sorry, I'm drawing a

18  blank with --

19  Q      You cannot recall the deputy's name; is that correct?

20  A      Yes.

21  Q      Okay.  If you think of it, please let us know, but what

22  happened at that point?

23  A      Well, then the -- that deputy says, "He -- he's laughing

24  at you," and he basically -- then he started like teasing me.

25  The deputy started teasing me saying, "Oh, you look like a

1  joke."  So I went back into the module, and the deputy followed

2  me in there.  And we pulled the inmate -- because he had not

3  gone into his cell yet, and we pulled the inmate out back into

4  the lobby of the module.  And I started to search him out

5  again, but it was not -- it was to pick a fight, not to just

6  ask him questions again.

7  Q    Did you use force on the inmate?

8  A    Yes, I did.

9  Q    What did you do?

10  A    I punched him several times and took him down to the

11  ground and just used my knees to hit him.

12  Q    Did the Sheriff's Department's employees that were with

13  you use force as well on this inmate?

14  A    Yes, they did.

15  Q    What did they do?

16  A    They punched him, and they also used pepper spray.

17  Q    You mentioned in the other incident involving Brag and the

18  handcuffed inmate that you did not write a use of force.  What

19  about in this instance, did you write a use of force with

20  respect to this pill call inmate?

21  A    Yes, I did.

22  Q    Why did you do it in this instance but not in the Brag

23  incident?

24  A    Because there was -- there was actual witnesses and other

25  inmates around at the time.

1   Q      Did you write an accurate report?

2   A      No, I didn't.

3   Q      Why not?  What was inaccurate about it?

4   A      The way that I encountered the inmate, it was not -- it

5   was not per policy.

6   Q      Did you say anything about what had provoked you in that

7   report to commit force on this inmate?

8   A      Yes, I did.

9   Q      Do you recall what you reported?

10  A      I said that the -- yes, I did.  I do recall.

11  Q      What did he say -- what did you say in the report that the

12  inmate did?

13  A      I said as I was doing the search, the inmate made --

14  referred to me as a faggot.  So that is when I -- and also that

15  he -- as he referred to me as that name he swung at me, but he

16  did not swing at me.

17  Q      Did any of the Sheriff's Department's employees that were

18  with you using this force on the inmate participate in drafting

19  the report --

20  A      Yes.

21  Q      -- the false report with you?

22         Who was that?

23  A      I'm sorry, I can't recall his name right now.

24  Q      Is it the same deputy you couldn't recall the name of

25  before?

1   A     Yes.

2   Q     Did you describe this beating of the handcuffed inmate to

3   Sergeants Craig and Long when they interviewed you in September

4   of 2011?

5   A     Yes.

6          MR. FOX:  Your Honor, I move for the admission of

7   Government's Exhibit 65, 66 and 67.  One second.

8          (Counsel conferred off the record.)

9          MR. STEWARD:  Yes, Your Honor.  These are e-mails,

10  and the objection we previously made we'd make again and

11  submit.

12         THE COURT:  All right.  The objection's overruled.

13  They'll be received.

14         (Exhibit Nos. 65, 66 and 67 received into evidence.)

15         MR. FOX:  Thank you, Your Honor.

16  Q     (BY MR. FOX)  I'm going to show you now, Mr. Michel,

17  Government Exhibit 65.

18  A     Sir, I remember his name, the deputy.

19  Q     Oh, okay.  Well, before I show you this exhibit then,

20  you're talking about the deputy who engaged in the improper

21  force of the pill-call inmate and helped you create that false

22  report; is that right?

23  A     Yes, sir.

24  Q     What is the name of that deputy?

25  A     Deputy Castillo.

1   Q    Okay.  I'm going to show you now Government Exhibit 65.

2   This is an e-mail from Steve Leavins to William T. Carey on

3   September 13th at 3:47 p.m.

4       Can you please read the text of this e-mail?

5   A    Yes, sir.  "That idiot Michel is confessing to beating

6   handcuffed inmates with other deputies.  Not looking good.

7   They all still -- they are still interviewing him.  Will

8   advise."

9   Q    And now this e-mail at 3:48 p.m. between Mr. Carey and

10  Mr. Leavins, what is stated?

11  A    "Wow."

12  Q    And the top e-mail, also at 3:48, what does Mr. Leavins

13  write?

14  A    "Tell me about it."

15  Q    I'm going to show you Exhibit 66, e-mail from William T.

16  Carey to Christopher Nee, September 13th, 2011 at 4:25 p.m.

17      Could you please read this?

18  A    "The boss in?"

19  Q    Do you have any idea who Chris Nee is?

20  A    I have no idea, sir.

21  Q    And now final e-mail, September 13th, 2011 at 4:34 p.m.

22  from Mr. Carey to Mr. Nee.  What does this e-mail state?

23  A    It says "Made contact.  Thank you."

24       MR. FOX:  One moment.

25       (Plaintiff's counsel conferred off the record.)

```
 1              MR. FOX:  Nothing further, Your Honor.

 2              THE COURT:  All right.  Cross-examination?

 3              MR. STEWARD:  Thank you, Your Honor.

 4                       CROSS-EXAMINATION

 5    Q    (BY MR. STEWARD)  Sir, the e-mails you were just shown,

 6    one we just looked at was dated September 13th, 2011; correct?

 7    A    Yes, sir.

 8    Q    And the day that you were interviewed was August 30th,

 9    2011?

10    A    I don't know -- what interview are you referring to?

11    Q    The one we just watched the excerpts of the tape.

12    A    I believe those are two different interviews.

13    Q    Okay.  Let's go to the one, the statement that you made to

14    them on August 30th, 2011.

15         Okay?  You have that in mind?

16    A    Yes.

17    Q    Okay.  You remember being interviewed on that day;

18    correct?

19    A    Yes.

20    Q    And then the e-mail that you just read, two or three

21    little ones, short ones, those were all dated September 13th,

22    2011; correct?

23    A    Well, I was interviewed on both days.  I don't understand

24    what you're trying to get at.

25    Q    Well, on the -- I'm sorry.  On the e-mails that we just
```

```
 1   looked at, the little short ones with Carey and Leavins and
 2   people like that, you were not included on those e-mails;
 3   correct?
 4   A    Correct.
 5   Q    When was the first time you ever saw those?
 6   A    Last time I testified.
 7   Q    A year ago?
 8   A    I think it's -- yeah, about a year ago.
 9   Q    Okay.  At the time, contemporaneously, you were not part
10   of that e-mail trail at all; correct?
11   A    Correct.
12   Q    You were not part of that electronic conversation;
13   correct?
14   A    Correct.
15   Q    Now, Mr. Fox asked you about your current legal situation.
16   You have been charged with federal bribery; correct?
17   A    Yes.
18   Q    You have come to court and pled guilty; correct?
19   A    Yes.
20   Q    And you have not yet been sentenced; correct?
21   A    Yes.
22   Q    Now, you face up to ten years in federal prison under
23   those charges; correct?
24   A    Possibly, yes.
25   Q    In other words, the court could impose ten years on you
```

1    pursuant to your guilty plea at the time of sentencing; right?

2    A     Possibly, yes.

3    Q     Okay.  And you mentioned something about some numbers and

4    all of that.  That has to do with the federal sentencing

5    guidelines; right?

6    A     Correct.

7    Q     And you have at least a basic understanding of how those

8    work?

9    A     Yes.

10   Q     And generally what it is, is your crime that you've

11   committed is part of a chart.  On the left-hand side, it's an

12   axis, and on the top it has to do with criminal history.  You

13   put them together, and you come up with a guideline range.

14   That's a simplified version of the way it works; right?

15   A     Yes.

16   Q     And you understand that; right?

17   A     Yes.

18   Q     And so under the deal that you have -- well, first, it's a

19   written plea agreement; right?

20   A     Yes.

21   Q     It's like a contract with the prosecution; correct?

22   A     Yes.

23   Q     And in that you agree to cooperate with them, among other

24   things, by testifying here at trial; right?

25   A     Yes.

1    Q    And part of your plea bargain, your plea agreement is that

2    you have made yourself available to them to discuss what

3    happened in this case; right?

4    A    Yes.

5    Q    And how many times have you done that?

6    A    Approximately four times.

7    Q    In the last three years?

8    A    Almost five years -- or no, four years.

9    Q    So that's four times face-to-face meetings; correct?

10   A    About this particular case, approximately four.

11   Q    Okay.  How about total, how many times you ever met with

12   them in the last five years?

13   A    I couldn't tell you.  It's a lot.

14   Q    More than ten?

15   A    I couldn't tell you.  It's a lot.

16   Q    Okay.  In the last 60 days, how many times you met with

17   them?

18   A    Approximately three to four times.

19   Q    Okay.  And when I say "them," I mean the prosecution team,

20   the three folks sitting at the prosecution table, perhaps

21   Ms. Rhodes, perhaps other FBI agents.  And that's who we're

22   talking about here, right, the people you've met with from the

23   government?

24   A    I've met with the FBI, yes, and --

25   Q    Okay.  And also the prosecutors; right?

1  A    Yes.

2  Q    Okay.  And ultimately -- and I think you described this on

3  your direct testimony, ultimately you're hoping for a

4  recommendation from the prosecution team about lowering your

5  federal sentencing guideline range; correct?

6  A    No.

7  Q    What are you hoping for?

8  A    I'm hoping that the court gives me a fair sentence.

9  Q    Okay.  Well, and a fair sentence for you would be not to

10 go to jail; right?

11 A    Yes.  I don't know anyone who wants to go to jail.

12 Q    And you understand that your sentence could be anywhere

13 from straight probation all the way up to 120 months in federal

14 prison; right?

15 A    Possibly, yes.

16 Q    Okay.  And I think you told us that part of your agreement

17 is that they will make a recommendation about what they think

18 your sentence should be; right?

19 A    Yes.

20 Q    Okay.  But the court has the ultimate decision; right?

21 A    Correct.

22 Q    In your mind, it is advantageous to get a favorable

23 recommendation from the government; right?

24 A    No.

25 Q    Well, you want them to recommend probation, don't you?

```
1   A     No.

2   Q     You want them to recommend five years?

3   A     No.

4   Q     What are you looking for from the prosecution?

5   A     I want them to be fair.

6   Q     Okay.  And fair is no jail time for you; correct?

7   A     Not necessarily.

8   Q     Now, you described an incident earlier this morning having

9   to do with an inmate and pull-ups and Mr. Bravo; right?

10  A     Correct.

11  Q     Did you say that there was a second deputy present for

12  that?

13  A     Not a deputy.  He was a CA.

14  Q     Okay.  What is a CA?

15  A     A custody assistant is someone who works inside the module

16  but is not a deputy.

17  Q     And he was a witness to this incident; right?

18  A     Yes.

19  Q     Okay.  What was his name?

20  A     CA Wendlant.

21  Q     Whitley?

22  A     Wendlant.

23  Q     Wendlant.

24        Was Bravo disciplined for that incident, if you know?

25  A     I have no idea.
```

```
 1   Q     The inmate who was doing the pull-ups, any idea what he
 2   was there for, what his charge was?
 3   A     No.
 4   Q     Murder, robbery, anything?  You don't know?
 5   A     I have no idea.
 6   Q     Okay.  But that was on the 3,000 floor; right?
 7   A     Correct.
 8   Q     So he's probably not there for shoplifting?
 9   A     I believe at the time it was a medium security, like 7s
10   and 8s.  So I don't know exactly -- I didn't know his name, and
11   I didn't know where he was actually housed.
12   Q     Did you report that incident?
13   A     No.
14   Q     Do you know whether or not the CA reported that incident?
15   A     I have no idea.
16   Q     Do you know whether or not Mr. Bravo reported the
17   incident?
18   A     No, I don't.
19   Q     Now, you mentioned the cell phone in both your testimony
20   and I believe it was also in the snippets that we looked at,
21   and I believe your words were "It's just a cell phone."  Is
22   that about what you said in the interview that we saw, the
23   excerpts?
24   A     Yes.
25   Q     And at the time, was that truly your feeling, that a cell
```

**UNITED STATES DISTRICT COURT**

1  phone was no big deal?

2  A    Yes.

3  Q    Okay.  Is it still your opinion today?

4  A    No.

5  Q    Okay.  And you understand that a cell phone can be more

6  dangerous than a gun in a jail facility; right?

7              MR. FOX:  Objection, Your Honor, argumentative.

8              THE COURT:  Sustained.

9  Q    (BY MR. STEWARD)  It could be used to facilitate a drug

10 deal; right?

11 A    Correct.

12 Q    It could have been used to help with an escape; correct?

13 A    Yes.

14 Q    It could have been used to order a hit on a witness;

15 right?

16 A    Yes.

17 Q    And all of these are very dangerous things; right?

18 A    Yes.

19 Q    And as you sit there today, you understand that; right?

20 A    Yes.

21 Q    And there was a -- in our snippets, we also saw a passage

22 that talked about security being paramount.  Would you agree

23 that security in the jail is paramount?

24 A    Yes.

25 Q    Now, at one point you indicated that your first contact

1    with the FBI -- I think they meet you at the apartment, you go

2    to Starbucks, and at Starbucks you said you didn't have any

3    information.  Do I have that right?

4    A    Yes.

5    Q    Okay.  And you understand that at that point, the

6    statement "I don't have any information" is itself a lie;

7    right?

8    A    Yes.

9    Q    And you knew that at the time; right?

10   A    Yes.

11   Q    And did you know that lying to an FBI agent is a federal

12   felony?

13   A    At the time, no.

14   Q    Okay.  As you sit here today, were you charged, as part of

15   the charges against you, lying to an FBI agent?

16   A    No.

17   Q    Do you have some sort of a deal with the prosecution that

18   you won't be charged for that?

19   A    No.

20   Q    Is there any sort of a free pass involved in your

21   agreement with them on that particular criminal charge?

22   A    No.

23   Q    Were you disciplined for the Brag incident?

24   A    No.

25   Q    Now, you've told us that you actually received $1,500 for

1   the cell phone; correct?

2   A     Yes.

3   Q     And for the receipt of that money and your conduct here,

4   your law enforcement career was destroyed; right?

5   A     Yes.

6   Q     You may be going to federal prison; right?

7   A     Yes.

8   Q     And for the cell phone and the $1,500, the bribe you

9   actually took, the unreported violence on Brag, the lies to the

10  FBI, no information, and the pill-call incident where you lied

11  in the report, you're still hoping for help from the

12  prosecution at the time of your sentencing; isn't that true?

13  A     No.

14          MR. STEWARD:  No further questions, Your Honor.

15                    REDIRECT EXAMINATION

16  Q    (BY MR. FOX)  Mr. Michel, Mr. Steward asked you questions

17  about how many times you've met with the federal government as

18  part of your cooperation over the years; is that correct?  Do

19  you remember that line of questioning?

20  A     Yes.

21  Q     As part of your cooperation, have you testified at other

22  trials?

23  A     Yes.

24  Q     As part of your cooperation, were you prepared to testify

25  in January of this year in a trial involving one of the

1   deputies that you were involved in a beating incident with?

2   A     Yes.

3   Q     And that was a Deputy Aguirre; is that correct?

4   A     Yes.

5   Q     And is it your understanding that any benefits you receive

6   will be a result of your overall cooperation and not just in

7   this trial?

8   A     Yes.

9   Q     Now, Mr. Steward also asked you questions about how many

10  times you'd met with the prosecutors.

11        How many times have you and I personally met to go over

12  your testimony in this case?

13  A     Once.

14              MR. FOX:  No further questions, Your Honor.

15              MR. STEWARD:  No recross, Your Honor.

16              THE COURT:  All right.  You may step down.

17              THE WITNESS:  Thank you, sir.

18              THE COURT:  Call your next witness.

19              MR. FOX:  The United States calls John Torribio.

20              THE DEPUTY CLERK:  Stand here for me, please.

21        Raise your right hand.

22     (The witness, JOHN A. TORRIBIO, was sworn.)

23              THE DEPUTY CLERK:  Please be seated.

24        Will you please state your full name and spell your last

25  name for the record.

```
 1                    THE WITNESS:  John A. Torribio, T, as in Tom,
 2      O-R-R-I-B, as in boy, I-O.
 3                    THE DEPUTY CLERK:  Thank you.
 4                    MR. FOX:  May I proceed, Your Honor?
 5                    THE COURT:  Yes.
 6                            DIRECT EXAMINATION
 7      Q     (BY MR. FOX)  Please tell us what you do for a living.
 8      A     I'm a judge with the Los Angeles Superior Court.
 9      Q     What is the Los Angeles Superior Court?
10      A     It's the -- it's the court of law for the County of Los
11      Angeles from all environs.
12      Q     How long have you been a superior court judge?
13      A     27 years.
14      Q     What did you do before that?
15      A     Private practice and then public defender.
16      Q     What types of cases as a judge do you handle?
17      A     I've handled over the years all phases of criminal law
18      from simple possession to death penalty.  I've done civil, some
19      moderate civil -- state civil rights cases very infrequently,
20      torts, some family law.
21      Q     In addition to the cases that you just described, do you
22      handle any requests from law enforcement agencies that are not
23      part of a charged case?
24      A     Yes.  I handle voluminous requests for warrants,
25      destruction of evidence, trap and trace orders, all types of
```

```
 1    investigative documents or requests.
 2    Q     Are you familiar with search warrants?
 3    A     Yes.
 4    Q     What are search warrants?
 5    A     A search warrant is an authorization for a law enforcement
 6    agency to search someone's business or residence.  It requires
 7    approval from the court because of all the various rights we
 8    have under the Constitution.
 9    Q     Can you give us an indication about how many search
10    warrants you might handle on a given week.
11    A     40 to 90.
12    Q     I want to now direct your attention to 2011.
13          At that time, did you know a Sheriff's Department sergeant
14    by the name of Scott Craig?
15    A     Yes.
16    Q     How did you know him?
17    A     He'd come to me numerous times for warrants.
18    Q     Again going back to 2011, do you recall him ever bringing
19    you an unusual request?
20    A     Yes.
21    Q     What was that?
22    A     It was a request to search the FBI offices in Los Angeles.
23    Q     Can you please describe how he made this request of you,
24    how did he come up to you?
25    A     Just the normal process is they come into the court; in
```

```
 1    this instance, I was in chambers.  The bailiff comes and
 2    escorts them back.  I say, "Hi, Scott.  What do you have?"  And
 3    he says, "I have a search warrant."  He hands it to me.  And
 4    this is almost in every single case.  I read it.  Sometimes
 5    they'll give me a brief overview and then I'll read it.
 6    Q    Did Mr. Craig make any statements to you in this
 7    particular occasion when he brought you the order?
 8    A    I don't remember anything other than, "Here, Judge, I'm
 9    here for a warrant."
10    Q    And in your book -- I'm not sure if it's that book or a
11    book at your feet, Exhibits 140 and 141 I ask you to take a
12    look at, please.
13    A    I have 141.
14    Q    And can you look at 140 as well, please.
15    A    It's the affidavit of Sergeant Craig.
16    Q    Is that 140 the affidavit that he gave to you on the date
17    we're talking about?
18    A    Let me just check it.  Yes.
19    Q    Does it appear to be a true and accurate copy of that
20    affidavit that he gave to you?
21    A    Yes.
22    Q    And what about 141, what is that?
23    A    That is the order for the investigative records.
24    Q    Is that a proposed order?
25    A    Yes.
```

1    Q     And did -- is that a true and accurate copy of the

2    proposed order that Mr. Craig gave you that date?

3    A     Yes.

4           MR. FOX:  Your Honor, I move for the admission of

5    Exhibits 140 and 141.

6           THE COURT:  Any objection?

7           MR. HAIG:  No, Your Honor.

8           THE COURT:  All right.  They'll be received.

9        (Exhibit Nos. 140 and 141 received into evidence.)

10          MR. FOX:  And I'm just going to publish 141.

11   Q     (BY MR. FOX)  What is the date on this proposed order?

12   A     September 7th, 2011.

13   Q     And can you describe who comes up with the language

14   initially in the proposed order?

15   A     The investigative agency.

16   Q     What did you -- well, first of all, let's talk about what

17   they were asking for in this proposed order.

18       Can you please read for the jury the text that I've

19   highlighted.

20   A     "Good cause having been shown, so order that the Federal

21   Bureau of Investigation provide, one, any and all investigative

22   records, reports, office correspondence, and/or notes; second,

23   investigating agents true identities and current assignments;

24   third, locations of additional cellular telephones currently in

25   use and/or deployed within the confines of the Los Angeles

1    County jail system and the identities of those persons

2    possessing said cellular phones; four, disclose -- disclosure

3    of any and all contraband items given to any Los Angeles County

4    jail inmates through any means at the direction, consent or

5    knowledge of the FBI to include a description of the item, the

6    identity of the inmate and the date, time and location of

7    occurrence relative to any and all investigations, past or

8    present, occurring within the confines of the Los Angeles

9    County jail system from August 5th, 2009 to present."

10   Q    When Mr. Craig gave you Exhibits 140 and 141, what did you

11   do with them?

12   A    Well, I read 140, if I remember.

13   Q    That's his affidavit?

14   A    That's his affidavit, and then I said, "I can't sign this

15   order."

16   Q    Did you explain to Mr. Craig why you could not sign the

17   order?

18   A    Los Angeles County does not have jurisdiction over the

19   federal government.

20   Q    What, if anything, did he say in response to that?

21   A    I don't recollect any specific comments.

22   Q    Do you recall any other comments that you made to

23   Mr. Craig?

24   A    I just went through and explained that as a county or a

25   state, we do not have jurisdiction over the federal government.

1    I didn't use the preemption clause, but it's just that they're

2    superior jurisdiction, I think is the words I used.

3    Q    I'm going to now show you another portion of Exhibit 141.

4         Do you see what I've highlighted there?

5    A    Yes.

6    Q    Let me try to do a better job.  I cut off --

7    A    I'll read it right off of here.

8    Q    Okay, thank you.  Could you please read -- well, first of

9    all, whose handwriting is that?

10   A    That's my handwriting.

11   Q    Could you please read what you wrote.

12   A    "Denied.  Court has no jurisdiction over any federal

13   agency."  Then my signature and date.

14   Q    What date is there?

15   A    September 8th, 2011.

16   Q    Why did you write this on this document?

17   A    Well, I wanted the -- these are all -- based on my

18   experience, investigations are always supervised by someone, a

19   lieutenant or above.  And I just wanted management to know that

20   this warrant would not be valid no matter where you took it,

21   that it was -- we had no jurisdiction.  We had no right to

22   issue it.

23   Q    Did you give Mr. Craig any indication that the court would

24   have jurisdiction over a criminal case of an FBI agent that was

25   operating within the scope of her authorized duties?

```
 1   A    I didn't put it that way.  I just said we have no -- you

 2   know, absent special circumstances, for example, drunk driving,

 3   we would -- we would have jurisdiction over an agent who was

 4   driving while under the influence of alcohol.  We handle a

 5   divorce of an agent, but if it's anything involving the duties

 6   of the agency in any aspect, I explained that we have -- we

 7   have no right to any of their information.

 8   Q    Did Mr. Craig indicate to you in any way that he was going

 9   to be seeking an arrest warrant for an FBI agent based on what

10   was in his affidavit?

11   A    No.

12              MR. FOX:  One moment, Your Honor.

13        No further questions.

14              THE COURT:  All right.  Cross-examination.

15                    CROSS-EXAMINATION

16   Q    (BY MR. HAIG)  Judge Torribio, you are a superior court

17   judge for the State of California.  Would that be correct?

18   A    Correct.

19   Q    And as such, when you're given warrants to sign, search

20   warrants -- and you stated, am I right, 40 to 90 a week?

21   A    Yes.

22   Q    A month?

23   A    Yes, I average five to eight a day.

24   Q    Would you say --

25   A    Sometimes more.
```

1   Q     And you're assigned to the Norwalk courthouse?

2   A     Yes.

3   Q     That's in southeast Los Angeles?

4   A     Yes.

5   Q     And how long have you been assigned there?

6   A     All 27 years.

7   Q     Would you say that you're a judge of choice in that

8   courthouse for search warrants?

9   A     I make myself readily available.

10  Q     And that would be even outside of normal work hours?

11  A     That's correct.

12  Q     And Sergeant Craig was a person that you had signed search

13  warrants for in the past?

14  A     Yes.  Also his -- the officers that came with him.

15  Q     And who was that?

16  A     It's a lady.  It's Marley or Maddie -- they call her

17  Maddie.

18  Q     Last name Long?

19  A     M-A-D-D-I-E.

20  Q     Last name Long?

21  A     I think so, yes.  Sergeant Long, yes.

22  Q     Did you have a conversation with Sergeant Long about any

23  of this?

24  A     When I spoke, I spoke to whoever was there.  I didn't --

25  whoever came in with Sergeant Craig was present when I

```
 1   addressed him.  I didn't address them as -- individually, I
 2   just addressed them as a group, but I was looking at Scott
 3   because he's the one that brought the warrant in.
 4   Q    And you call him Scott because that's what you -- you were
 5   on a first-name basis?
 6   A    He'd been in front of me I would say at least ten times
 7   for warrants.
 8   Q    Were you working that day?
 9   A    Yes.
10   Q    And you were in your chambers?
11   A    In chambers.
12   Q    And so Sergeant Craig and Sergeant Long would have
13   approached your clerk; correct?
14   A    That's correct.
15   Q    And your clerk would have notified you that they're
16   outside with the warrant?
17   A    That's right.
18   Q    And you would have said, "I'm ready to see them," and they
19   walk into the back and walk into your chambers?
20   A    That's right.
21   Q    And you greeted them and they sat down right in front of
22   you?
23   A    Yes.
24   Q    And as they sat down right in front of you, you would
25   review the warrant?
```

1   A      That's correct.

2   Q      That's your typical procedure?

3   A      That's done almost every time.  In fact, it is done every

4   time.

5   Q      And you said sometimes you'll ask one of the officers for

6   some background before reading it?

7   A      Well, sometimes they'll get -- a lot of them are very

8   simple.  They're just warrants to search somebody's house for

9   narcotics or child porn and the facts are very simple and

10  straightforward.  When I looked at this, it was a little -- it

11  was not a little different, it was completely different.  I'd

12  never seen anything like it before.

13         So I just asked for a brief -- very brief overview.  He

14  gave me a brief synopsis.  There was a phone in the jail.  They

15  were trying to find out what was going on.  I said -- and that

16  helps me look at things in context then as opposed to reading

17  it two or three times.  Since they've given you a context, when

18  you read it it makes more sense to you.

19  Q      Do you recall either Sergeant Long or Sergeant Craig

20  telling you during this meeting in your chambers on that date

21  that this was a very important investigation by the Sheriff's

22  Department?

23  A      No, I don't.

24  Q      Do you recall him ever employing any of the names of the

25  upper management in the Sheriff's Department on that date?

```
 1   A      No.
 2   Q      Now, being a superior court judge for the State of
 3   California, you are a State of California constitutional
 4   employee.  Would that be correct?
 5   A      That's correct.
 6   Q      And as opposed to a federal court judge, who you're
 7   sitting right next to today, you do not have jurisdiction over
 8   a separate governmental entity like the federal government; is
 9   that correct?
10   A      Well, I have jurisdiction over a number of governmental
11   entities, not the United States of America though.
12   Q      Of course.
13   A      Like I could order the Attorney General for California to
14   do something or the Los Angeles County Sheriff's Office to do
15   something or the CH -- the California Highway Patrol to do
16   something, but I couldn't order any agency of the federal
17   government to do anything.
18   Q      Because you do not have jurisdiction over the federal
19   government?
20   A      I have no power or authority over them at all.
21   Q      Thank you.
22          MR. HAIG:  I have nothing further.
23          MR. FOX:  Nothing, Your Honor.
24          THE COURT:  All right.  Thank you.
25          THE WITNESS:  Thank you.
```

**UNITED STATES DISTRICT COURT**

```
 1                THE COURT:  You may step down.
 2         Call your next witness.
 3                MR. FOX:  The United States calls David Betkey.
 4                THE DEPUTY CLERK:  Please raise your right hand for
 5    me.
 6         (The witness, DAVID BETKEY, was sworn.)
 7                THE DEPUTY CLERK:  Please be seated.
 8         Will you please state your full name and spell your last
 9    name for the record.
10                THE WITNESS:  David Ray Betkey, B-E-T-K-E-Y.
11                THE DEPUTY CLERK:  Thank you.
12                MR. FOX:  One moment, Your Honor.
13         May I proceed, Your Honor?
14                THE COURT:  Yes.
15                        DIRECT EXAMINATION
16    Q    (BY MR. FOX)  Mr. Betkey, are you currently employed?
17    A    Yes.
18    Q    What do you do for a living?
19    A    I work for the Los Angeles County Sheriff's Department.
20    Q    How long have you worked for the Los Angeles County
21    Sheriff's Department?
22    A    42 years.
23    Q    What is your current position with the Sheriff's
24    Department?
25    A    Commander, north patrol division.
```

```
1    Q    I want to go back to 2011.  What was your position with
2    the Sheriff's Department at the time?
3    A    Chief technical services division.
4    Q    What is the technical services division?
5    A    It has Data Systems Bureau, anything to do with computers,
6    communication and fleet; Scientific Services Bureau, which is
7    the crime lab; and the Records Bureau.
8    Q    In the summer of 2011, can you please describe your
9    relationship with Mr. Tanaka.
10   A    Well, we ran together.  We smoked cigars together.  He was
11   my boss at the assistant sheriff level, I believe for a short
12   time, and of course as the undersheriff.
13   Q    Did you share a mutual friend as well?
14   A    Yes.
15   Q    Who was that?
16   A    Cecil Rhambo.
17   Q    And would Mr. Rhambo also smoke cigars with you?
18   A    Yes.
19   Q    Where would the three of you smoke cigars?
20   A    Usually on the back patio that was built for employees at
21   the Monterey Park Headquarters.
22   Q    Approximately how many people would join you when you
23   would smoke cigars?
24   A    Oh, there could be as many as 25 or 30.
25   Q    And sometimes it would be fewer?
```

1    A    Yes.

2    Q    Where was your office located in 2011?

3    A    Norwalk.

4    Q    Did you at some point move to Monterey Park?

5    A    No.

6    Q    The cigar patio, though, that was in Monterey Park?

7    A    Yes.

8    Q    Can you describe the cigar patio.

9    A    Yes.  It was built for all Sheriff's Department employees

10   to take their breaks, their lunch hours and after hours to

11   smoke cigars, pipes, whatever.  It had a barbecue.  It had a

12   refrigerator.  It was covered.  It was quite nice for

13   somebody's backyard patio basically.

14   Q    How often would you go to Monterey Park when you were in

15   2011, when you were at Norwalk in order to smoke cigars on the

16   patio?

17   A    Well, I probably went two or three times a week.

18   Q    And what time of day was it generally when you went?

19   A    Usually after 5:00.

20   Q    Who would generally smoke cigars with you after five

21   o'clock those days?

22   A    Well, there was quite a few people.  A lot of them were

23   detectives from Homicide.  They were actually from all over the

24   Department.  There were executives.  There were deputies,

25   sergeants, lieutenants that would come down to relax, to smoke

1    cigars and enjoy the fellowship, if you will.

2    Q    Are you familiar with a person who is a lieutenant at the

3    time named Steve Leavins?

4    A    Yes.

5    Q    Would he smoke cigars with you on the patio?

6    A    I remember seeing Steve, but I don't know if he was a

7    cigar smoker.  Some of them smoked pipes, some didn't smoke at

8    all.

9    Q    Did you ever see him on the cigar patio?

10   A    Yes.

11   Q    Did you ever see him interacting with Mr. Tanaka?

12   A    Yes.

13   Q    Okay.  What -- could you please describe those

14   interactions.

15   A    Well, like everyone else, we'd be on the patio, 25 people

16   talking.  And we would -- once in a while, he would talk to

17   Steve, Steve would talk to him.  There was an occasion maybe

18   that they'd move off to the side on the grass.  I couldn't hear

19   what they were saying, but they discussed things.  Next to the

20   patio was a nice little grass area.

21   Q    How often in 2011 do you recall Mr. Leavins and Mr. Tanaka

22   walking away from the group on to the grass area to have

23   discussions?

24   A    Oh, maybe once or twice, maybe more.

25            MR. FOX:  One moment.

1      Nothing further, Your Honor.

2              THE COURT:  All right.  Cross-examination.

3              MR. STEWARD:  Thank you, Your Honor.

4                          CROSS-EXAMINATION

5  Q    (BY MR. STEWARD)  Mr. Betkey, were you aware that in the

6  summer of 2011 Mr. Leavins's office was right next to the patio

7  that you just described?

8  A     Yes.

9  Q     Thank you.

10             MR. HAIG:  Nothing further.

11             MR. FOX:  Nothing, Your Honor.

12             THE COURT:  All right.  You may step down.  Thank

13 you.

14      Call your next witness.

15             MR. FOX:  The United States calls Leah Tanner.

16      (The witness, LEAH TANNER, was sworn.)

17             THE DEPUTY CLERK:  Please be seated.

18      Will you please state your full name and spell your last

19 name for the record.

20             THE WITNESS:  Leah Tanner, T-A-N-N-E-R.

21             THE DEPUTY CLERK:  Thank you.

22             MR. FOX:  May I proceed, Your Honor?

23             THE COURT:  Yes, please.

24                          DIRECT EXAMINATION

25 Q    (BY MR. FOX)  What do you do for a living?

1   A     I'm a special agent with the FBI.

2   Q     How long have you been a special agent with the FBI?

3   A     Approximately seven years.

4   Q     Are you currently assigned to a particular squad?

5   A     Yes.

6   Q     What squad is that?

7   A     Public corruption squad.

8   Q     What are your current duties?

9   A     I'm tasked with investigating a wide range of violations

10  that fall under what you would consider a public corruption

11  code; so bribery, money laundering, things like that.  But

12  it typically we investigate public officials or police

13  officers.

14  Q     Back in 2011 were you assigned to a different squad?

15  A     Yes.

16  Q     What squad was that?

17  A     A civil rights squad.

18  Q     When did your squads change?

19  A     In approximately August of 2011.

20  Q     When you were on the civil rights squad, what were your

21  duties?

22  A     The civil rights squad investigates various federal civil

23  rights violations, which includes human trafficking, hate

24  crimes and color of law violations.

25  Q     Did there come a time on the civil rights squad in which

```
1   you opened an investigation into deputy misconduct within the
2   Sheriff's Department?
3   A    Yes.
4   Q    When was that approximately?
5   A    Approximately June of 2010.
6   Q    What caused you to open that investigation?
7   A    In June of 2010 my supervisor brought me an inmate letter
8   that was sent to the U.S. Attorney's Office and passed along to
9   the FBI, and the letter was basically alleging conduct within
10  the jails that included deputies assaulting inmates and then
11  trying to cover up the assaults by writing false reports.
12  Q    Did you take any steps to determine whether this was an
13  investigation you should open?
14  A    Yes.
15  Q    What steps did you take?
16  A    Just like in any investigation, the first thing we do is
17  determine the validity of any type of complaint we get in.  So
18  I went ahead with another agent and went to the jail to
19  interview the inmate who wrote the letter.
20  Q    How long had you been an FBI agent at that point?
21  A    Approximately a year.
22  Q    And in speaking with the inmate and reading his letter,
23  approximately how many incidents was he describing?
24  A    He just himself, he described one or two incidents, but in
25  addition to his, he provided the names and booking numbers of
```

```
1    at least five to seven, maybe more, other inmates that he said
2    also had incidents that they would be willing to talk about.
3    Q    What did you do with that information?
4    A    I did go and interview additional inmates that the
5    information was provided.
6    Q    Was there any sort of pattern to some of these allegations
7    by the inmates?
8    A    Yes.
9    Q    What were those patterns?
10   A    Even though the incidents were different in some ways, the
11   overall theme that we were starting to hear from the inmates
12   was very very similar, and it involved an inmate claiming there
13   was no provocation, the deputies would assault them and then
14   the inmates would be charged with a crime for assaulting a
15   deputy, despite the inmate not being the aggressor.
16   Q    During your investigation, did you at some point encounter
17   an inmate named Anthony Brown?
18   A    Yes.
19   Q    Do you recall how you got in touch with Anthony Brown?
20   A    Within the first couple months from opening the
21   investigation, we'd interviewed a significant amount of inmates
22   at that time, and one of the inmates that I'd interviewed had
23   told me that there was an inmate named Anthony Brown who he
24   believed had seen some incidents and would be able to provide
25   some additional information.
```

```
1   Q    So what did you do?

2   A    One of the times I was at the jail, I'd asked to have

3   inmate Anthony Brown brought down to the interview room.

4   Q    When you met with Mr. Brown, what were the general

5   allegations that he was making?

6   A    He was making the same types of allegations the other

7   inmates had, which is seeing frequent assaults on the inmates

8   without provocation, and he also brought up things that other

9   inmates had touched on, which was that deputies were willing to

10  bring in contraband in exchange for cash bribes.

11  Q    At some point, did you sign Anthony Brown up as an

12  informant?

13  A    Yes.

14  Q    Why did you do that?

15  A    In the types of cases we work, it's helpful to have

16  individuals who have access to information that we can't get

17  ourselves.  And after talking to him for a while, he was out of

18  his cell quite a bit because of medical issues, and he had

19  access to information more regularly than some other inmates.

20  And so we had asked him if he would be willing to work as an

21  informant in the jails.

22  Q    What were you hoping to accomplish by having Mr. Brown

23  provide information to you?

24  A    Like I said, since we're not in the jails every day,

25  having somebody on the inside who has access to information to
```

1    provide us more up-to-date information on things that were

2    going on every day, so providing us if there was an incident

3    that occurred information on who the inmate may have been, who

4    the deputies were that were involved and just other daily

5    operations going on that we wouldn't be able to get without

6    him.

7    Q    You mentioned that Mr. Brown made allegations that

8    deputies were bringing in contraband.

9         In July of 2011, did you conduct an undercover operation

10   with respect to Deputy Gilbert Michel?

11   A    Yes.

12   Q    Why did you conduct that operation?

13   A    So again, and part of our investigations is that in

14   addition to obtaining the information from individuals, one of

15   the things that we have to do is verify that information.  So

16   being told that deputies are accepting bribes, that alone is

17   not going to allow us to charge individuals if that is going

18   on.  So the undercover operation was both, one, to verify

19   whether or not what the inmates were saying was actually true,

20   and if it was, it was to weed out corrupt deputies.

21   Q    And what happened as result of that -- well, let's

22   describe that operation first.

23        What occurred at the first meeting?

24   A    At the first meeting, we had an undercover FBI agent who

25   was posing as an associate of Anthony Brown.  He met with

1    Gilbert Michel and they exchanged the phone and cash and
2    Gilbert Michel took both of those at that meeting.
3    Q    In order to conduct an undercover operation, does the FBI
4    require any paperwork or approvals to be done?
5    A    A significant amount.
6    Q    Can you please generally describe the approvals and the
7    paperwork.
8    A    It's kind of a two-prong approval process.  So in the
9    local FBI office in L.A., we went through our chain of
10   command -- so our supervisor, his supervisor, and I believe
11   even a supervisor above that -- and just explained what our
12   plan was and asked for the approval.
13        In addition to that, we also had to contact our office in
14   Washington, D.C. because any time we're paying a bribe, we have
15   to get approval from Washington, D.C. to pay a cash bribe.  And
16   so we obtained approvals on both sides, both locally in L.A.
17   and in D.C. in order to move forward with the operation.
18   Q    Do you recall approximately when the first undercover
19   meeting was held between the undercover agent and Mr. Michel?
20   A    It was late July of 2011.
21   Q    And who was present for this undercover meeting?
22   A    There was Gilbert Michel and the undercover agent that
23   met, but then we also had a surveillance team that was close by
24   that watched the interaction as well as an airplane that was
25   videotaping the interaction from above.

```
 1   Q     This undercover agent, do you know the name he was going
 2   by in the undercover operation?
 3   A     Yes.
 4   Q     What is that name?
 5   A     CJ.
 6   Q     You mentioned that you were conducting surveillance of the
 7   meeting between CJ and Mr. Michel.
 8         Was this meeting in any way recorded?
 9   A     Yes.
10   Q     In what way?
11   A     Like I'd said, we had the plane that was recording from
12   above, but it was able to actually see the hand-to-hand
13   exchange.  In addition, the undercover agent was wired up with
14   a recording device so that any conversations would have been
15   recorded, as well as I believe there's a camera in his hat so
16   that it would catch what was going on directly in front of him.
17   Q     What happened at the first undercover operation?
18   A     CJ, the undercover agent, provided Michel the -- a half of
19   the amount of cash that we agreed upon and the cell phone.
20   Q     Was there a second meeting between CJ and Mr. Michel?
21   A     Yes.
22   Q     Approximately when was that?
23   A     The first week of August of 2011.
24   Q     At that point in time, were you aware whether Mr. Michel
25   had passed the phone on to Anthony Brown?
```

UNITED STATES DISTRICT COURT

1    A    Yes.

2    Q    How did you become aware of that?

3    A    Once the phone was inside, Mr. Brown was advised to reach

4    out to the undercover agent from the cell phone that was

5    brought in, and he did that.

6    Q    What was the purpose of the second meeting between

7    Mr. Michel and CJ?

8    A    It was to give Gilbert Michel the remainder of the money

9    of the cash bribe that we had agreed upon for bringing the

10    phone in, as well as to take in what we drafted up to look like

11    a kite which was kind of a ruse between the undercover agent

12    and Anthony Brown.

13    Q    Did you do anything to record this meeting?

14    A    Yes.

15    Q    What did you do to record it?

16    A    It was the same type of thing with the undercover agent

17    being wired up and having recording devices to record the

18    interaction.

19    Q    During your meetings with Anthony Brown -- or let me

20    scratch that.

21        Was there a plan for what Anthony Brown was supposed to be

22    doing with the phone that he received from Mr. Michel?

23    A    Yes.

24    Q    What was that plan?

25    A    It was kind of twofold.  Like I said, since Anthony Brown

```
 1   was actually out of his cell quite a bit for medical reasons,

 2   he was constantly going down to the clinic, since he was out of

 3   his cell more, he had more ability to see things that were

 4   going on.  So the first one was for him to provide realtime

 5   updates to the undercover agent about what was going on.  So if

 6   he had seen something, if there was a deputy that we hadn't

 7   previously identified that he could see the name, he could send

 8   the name, but then it was also if there was a chance when he

 9   was in his cell or there was something going on and, you know,

10   if he would be able to take a photo with the phone.  Even

11   though it was unlikely, it was still an option.

12   Q    As part of the approval process, is the FBI supposed to

13   evaluate the risks of the operation?

14   A    Yes.

15   Q    And did you do so in this case?

16   A    Yes.

17   Q    Did people above you do so in this case?

18   A    Yes.

19   Q    Were you aware of any risks with respect to the cell phone

20   and introducing it to Anthony Brown?

21   A    Yes.

22   Q    So why did you take the risks?

23   A    In public corruption, especially police corruption

24   investigations, the allegations are very, very difficult to

25   corroborate.  Many times, especially when inmates are not
```

1  considered to always be the most credible source of

2  information, but police corruption is something we take

3  incredibly serious, and so we weighed the risks and determined

4  that we needed to take some risks in order to determine whether

5  or not these allegations were true and whether or not this was

6  going on.

7  Q    Did you do anything to try to mitigate the risks with

8  respect to that cell phone?

9  A    Yes.

10  Q    What did you do?

11  A    The undercover agent admonished Anthony Brown multiple

12  times about the use of the cell phone.  In addition, I was -- I

13  set up the cell phone online when we first got the cell phone,

14  and the system was set up so that I could view -- after a phone

15  call was made, I could see online who was called or who reached

16  out on the cell phone, as well as I had the ability to

17  terminate the service immediately if something had happened.

18  Q    Did you do anything to track to see -- as you described,

19  did you do anything to track it?

20  A    Yes.

21  Q    What did you do?

22  A    I would log on regularly any time I was at my desk to see

23  what phone calls had been made or what had gone through.

24  Q    How often did you do that?

25  A    Sometimes multiple times a day.

1  Q    Did you learn at some point that the phone was used in a

2  way that you had not intended for it to be used when the phone

3  was first introduced?

4  A    Yes.

5  Q    What did you learn?

6  A    It was actually before that had even occurred, because

7  Anthony Brown contacted the undercover agent and told him that

8  his cellmate had seen Deputy Michel give Anthony Brown the

9  phone at that moment.  And so the cellmate knew that Anthony

10  Brown had a phone, and he had asked if he could call his

11  girlfriend -- if the cellmate could call his girlfriend.  And

12  Anthony Brown asked the undercover agent if it was okay because

13  he knew he wasn't supposed to allow anyone to use it.

14      I spoke with the undercover agent, and we both agreed that

15  in any other situation and not to blow Anthony Brown's cover,

16  it wouldn't make sense to tell him, "No, you can't use my cell

17  phone."  And so we just told him he had to monitor the

18  conversation about what was being said and not to let his

19  cellmate use the phone.

20  Q    Did you learn at some point that the Sheriff's Department

21  found the phone on Anthony Brown?

22  A    Yes.

23  Q    Approximately when did you learn that?

24  A    August 8th of 2011.

25  Q    How did you learn that that date?

1   A     I received a phone call from the undercover agent who told

2   me he just got a frantic call from Gilbert Michel saying that

3   the Sheriff's Department just found the phone and that he

4   needed to drop his -- "his" meaning the undercover agent,

5   needed to drop his number.

6   Q     Approximately how long did Anthony Brown have the phone in

7   the jail at that point?

8   A     It was less than two weeks, but during that time he didn't

9   have the phone nearly every day.

10  Q     Did you tell the Sheriff's Department on August 8th that

11  this was an FBI phone?

12  A     No.

13  Q     Why not?

14  A     At that point, we had no reason to believe that our

15  investigation was compromised because the phone was not set up

16  as an FBI phone.  It was a dropped cell phone, what we call it,

17  that was paid for in cash.

18  Q     Did you take any steps after August 8th to figure out what

19  happened to the phone and Anthony Brown?

20  A     At that time, the biggest thing we wanted to do was to get

21  in to talk to Anthony Brown and -- but in order to maintain the

22  covert nature of our investigation, I had gone to a gang agent

23  that I'm friends with and asked if he would be willing to go to

24  the jail to see Anthony Brown.

25  Q     Did he agree to do so?

```
 1   A     Yes.

 2   Q     What did he report back to you?

 3   A     He attempted to see Anthony Brown but was turned away,

 4   told that he could not see him.

 5           MR. HAIG:  Objection, Your Honor, hearsay, and move

 6   to strike the answer.

 7           THE COURT:  Overruled.  The answer will stand.

 8   Q     (BY MR. FOX)  Was there a time that you yourself went to

 9   Men's Central Jail?

10   A     Yes.

11   Q     Was it as a result of hearing that the other agents

12   couldn't get in?

13   A     That was part of it, yes.

14   Q     And when did you go back to Men's Central Jail?

15   A     August 23rd, 2011.

16   Q     Why did you go there that day?

17   A     At that point, we knew that the Sheriff's Department had

18   become aware that the phone was linked to us, and so the

19   purpose of the meeting was, one, to talk to Anthony Brown and

20   get his side of the story and everything that had occurred, but

21   also to make sure he knew that we were aware that they're on to

22   us and I -- you know, our investigation and that everything was

23   going to be okay and that we're still here for him.

24   Q     Who did you go there with?

25   A     Special Agent David Dahle and Special Agent Wayne
```

1    Plympton.

2    Q    Can you describe the steps you took when you got to Men's

3    Central Jail to try to meet with Anthony Brown.

4    A    We did the same thing we always do.  We went into the

5    jail, showed our credentials at the front lobby desk, went into

6    the sally port which is where -- the secured area.  We provided

7    our driver's license which they keep in the sally port, showed

8    our FBI credentials, filled out a form with our names,

9    telephone numbers and the inmate that we were going to see.

10   Q    And what happened?

11   A    After we did that, we checked in with the watch commander

12   like we always do, and then we went to the 6,000 floor

13   interview rooms to wait for Anthony Brown.

14   Q    What happened while you were waiting for Anthony Brown?

15   Was he eventually brought to you?

16   A    He was.

17   Q    Okay.  And what happened after he was brought to you?

18   A    He was brought into the interview room.  He was

19   handcuffed, which is not usual because he was usually a general

20   population inmate which they're not handcuffed.  We had

21   asked -- I believe Agent Dahle actually had asked for Anthony

22   Brown to be unhandcuffed.  We were informed that he can't be

23   unhandcuffed and if he is, a deputy has to sit in the room,

24   which obviously was not an option for us.  So we kept him

25   handcuffed.

1    Q    Approximately what time on August 23rd did you begin

2    meeting with Anthony Brown?

3    A    It was approximately 10:40 in the morning.

4    Q    Did anything unusual happen during your visit with Anthony

5    Brown?

6    A    Yes.

7    Q    Okay.  And before we get into that, let's talk about the

8    general subject matters that you covered with Anthony Brown.

9         Not getting into the specifics, but generally what did you

10   speak about with Anthony Brown on August 23rd?

11   A    Generally, just the interaction between him and Gilbert

12   Michel leading up to the phone being found, the phone being

13   found, what had happened after that, things like that.

14   Q    You mentioned that something unusual happened.

15        Approximately how long into your interview did that

16   happen?

17   A    A little over an hour into the interview.

18   Q    And what happened?

19   A    I can't recall if someone was pounding on the door or if

20   the door flung open, but a very large sergeant in the Sheriff's

21   Department was standing at the door and yelled at us, "This

22   interview is over," and had deputies yank Anthony Brown out of

23   the room.

24   Q    You said he was very large.  Did you learn his name at

25   some point?

1   A     Yes.

2   Q     What was his name?

3   A     Sergeant Wayne Waterman.

4   Q     Could you please describe his size.

5   A     At least six-four, six-five, 280.

6   Q     And you said that he came in the room and they began to

7   pull Mr. Brown out.  How many people were with Mr. Waterman?

8   A     I would say at least three or four deputies.

9   Q     Did you say anything as they were pulling Mr. Brown away?

10  A     Yes.

11  Q     What did you say?

12  A     I said, "Don't worry, we'll be back to get you."

13  Q     Who were you talking to?

14  A     Anthony Brown.

15  Q     Did you try to get Anthony Brown?

16  A     Yes.

17  Q     What did you do?

18  A     After we left the jail that day, it was obvious that we

19  would not be going back into the jail.  So I contacted

20  Assistant United States Attorney Lawrence Middleton and

21  explained to him what had occurred, and we discussed getting a

22  writ for him to be brought over for his testimony.

23  Q     What was Lawrence Middleton's title at that point?

24  A     He was the chief of the public corruption civil rights

25  section.

1    Q     Did Mr. Middleton ask you for any information in order to

2    obtain the writ?

3    A     Yes.

4    Q     What did he ask you for?

5    A     Just the basic identifying information for Anthony Brown;

6    so his booking number, date of birth, things like that that he

7    would need to fill out for the writ.

8    Q     Why did you want a writ for Anthony Brown?

9    A     At that time, we were very concerned with how the

10   interview was terminated, and we wanted to be able to bring him

11   over to federal custody to lock in his statement in the grand

12   jury, and we were also concerned for his safety at that point.

13   Q     You say lock in his statement to the grand jury.  What do

14   you mean by that?

15   A     Given the fact that we didn't feel we had access to

16   Anthony Brown at that point, our concern becomes making sure

17   that we can get him on the record with what occurred with the

18   cell phone because we had planned to charge Gilbert Michel for

19   accepting a bribe.

20   Q     After you left Men's Central Jail that day, did you

21   personally do anything to see where he was located after you

22   left Men's Central Jail?

23   A     Yes.

24   Q     What did you do?

25   A     I went online to -- the Sheriff's Department has a

1    publicly available inmate locater, and you just go to the

2    website, enter in the inmate's name and date of birth and it'll

3    show you generally where the inmate is.  Not their cell

4    location, but the facility they're located at.

5    Q    Is this a system that you had used before searching for

6    Mr. Brown?

7    A    Yes, I've used it hundreds of times.

8    Q    Have you found it to be accurate?

9    A    For the most part, yes.

10   Q    I want to direct your attention to Government Exhibit 132.

11   Again, I'm not sure if it's that binder or one on the ground.

12        132, please.

13   A    Okay.

14   Q    Do you recognize that?

15   A    Yes.

16   Q    What is it?

17   A    It is a printout from the inmate locater.  So when you go

18   on to the system and type in the name, it pulls up a page, and

19   this is a printout from that page.

20   Q    Do you know who conducted that search?

21   A    Yes.

22   Q    Who?

23   A    I did.

24   Q    Of which inmate?

25   A    Anthony Brown.

```
 1   Q     What is the date on that document?

 2   A     I did the search on August 26th, 2011.

 3   Q     Why did you search for Anthony Brown that day?

 4   A     At that time, that was a day after we requested the writ.

     The writ was signed, and we had -- I believe it was Lawrence

 6   Middleton that reached out to me saying that we're not getting

 7   a positive response on where Anthony Brown is and --

 8                 MR. HAIG:  Objection, Your Honor, hearsay.  Move to

 9   strike the answer.

10                 THE COURT:  Sustained.  The answer is stricken.  The

11   jurors should disregard it.

12   Q     (BY MR. FOX)  Is that a true and accurate copy of the

13   printout of the inmate information locater that you were just

14   discussing?

15   A     Yes.

16   Q     Is there anything different about it than compared to when

17   you printed it out?

18   A     Just the fact that I wrote over the word "release" with a

19   pen.

20                 MR. FOX:  Your Honor, I move for the admission of

21   Government Exhibit 132.

22                 THE COURT:  Any objection?

23                 MR. HAIG:  Yes, Your Honor.  It's a hearsay

24   document, and foundation.

25                 THE COURT:  Foundation's overruled.  Let me take a
```

```
1    look at it.  Can you bring that up?
2              MR. FOX:  Sure.  Okay, good.
3              THE COURT:  Okay.  The objection's overruled.
4              MR. FOX:  Thank you, Your Honor.
5         May I publish this now to the jury?
6              THE COURT:  Yes.
7              MR. FOX:  And this is admitted as Government Exhibit
8    132.
9         (Exhibit No. 132 received into evidence.)
10   Q    (BY MR. FOX)  Special Agent Tanner, I'm highlighting the
11   first approximate third of the page.
12        On this page, who is the inmate that's listed?
13   A    Anthony Brown.
14   Q    Is that the booking number that you knew Anthony Brown to
15   have in 2011?
16   A    Yes.
17   Q    I'm highlighting now the middle of the page.
18        What does this indicate under housing location?
19   A    It has the permanent housing date listed, but usually when
20   someone is in Sheriff's custody there's initials for a facility
21   address and city.  And it's a Sheriff's custody facility, and
22   there's nothing there.
23   Q    I'm highlighting the area that you doodled in right there
24   under "release."
25   A    Yes.
```

UNITED STATES DISTRICT COURT

1    Q    And what does this show for any release of this -- of

2    Mr. Brown?

3    A    It shows that he was released at 1:58 p.m. on August 25th,

4    2011.

5    Q    And, Special Agent Tanner, I'm highlighting the bottom

6    right of the page.

7         It says 8/26/2011.  Is that -- did that come on the

8    document when you printed it?

9    A    Yes.  So when I went to the website, that's what prints

10   off on the bottom with the date that I ran the search.

11            MR. FOX:  Now, Your Honor, I would like to move to

12   admit Government Exhibit 94 which is a recording that's part of

13   the stipulation that we read earlier.

14            THE COURT:  Any objection?

15            MR. HAIG:  No, Your Honor.

16            THE COURT:  All right.  It'll be received.

17       (Exhibit No. 94 received into evidence.)

18   Q    (BY MR. FOX)  Special Agent Tanner, can you just generally

19   describe what this recording is between Maricela Long, Scott

20   Craig and Anthony Brown on August 26.  Is this around the time

21   that you'd been searching for Anthony Brown?

22   A    Yes.

23            MR. FOX:  I'm going to play the first clip.

24       (Exhibit 94, Excerpt 1, played in open court.)

25   Q    (BY MR. FOX)  We're going to hear from someone named Weber

```
 1   on this portion of the recording.  Did you know who Weber was?
 2   A    Sergeant Weber was an ICIB investigator.
 3        (Exhibit 94, Excerpt 2, played in open court.)
 4   Q    (BY MR. FOX)  As of August 26, Special Agent Tanner, had
 5   you done anything to try to obtain Anthony Brown?
 6   A    Yes.
 7   Q    What had you done?
 8   A    We issued a federal writ.
 9   Q    In this clip that we just played, there is a mention of
10   two different Davids and a new David had been there that day.
11        Had there been two different Davids working on the
12   investigation?
13   A    Yes.
14   Q    Who was working on the investigation before August of
15   2011?
16   A    David Lam.
17   Q    Who had been working on the investigation after this date?
18   A    David Dahle.
19        MR. FOX:  I'm now going to play the third part of
20   this exhibit.
21        (Exhibit 94, Excerpt 3, played in open court.)
22   Q    (BY MR. FOX)  Special Agent Tanner, I want to go back to
23   Gilbert Michel.
24        After you found out that the Sheriff's Department was
25   aware that this was an FBI phone and that Anthony Brown was
```

1    cooperating with the FBI, did you do anything with respect to

2    Gilbert Michel?

3    A      After the 23rd?

4    Q      Correct.

5    A      After the 23rd, once we were kicked out from the

6    interview, we kind of had to speed up our plans with Gilbert

7    Michel.  We usually like to have a plan in place, usually an

8    arrest warrant, things like that when we go and approach

9    someone that we plan on charging with a crime, but in this

10   instance, given what had happened on the 23rd, we knew we

11   didn't have time to do that.  So on the evening of the 23rd, we

12   drafted up an operations plan and the following day went to

13   Gilbert Michel's house.

14   Q      What was your role in the approach of Gilbert Michel?

15   A      I was with Special Agent Tanner, Agent David Dahle and

16   Special Agent Wayne Plympton, and we waited for him at his

17   apartment.  When he pulled up, we asked if he would be willing

18   to speak to us.

19   Q      What was the goal of this?

20   A      The goal was, one, to notify him that we had evidence of

21   him on tape accepting a bribe in exchange for bringing the cell

22   phone in, and then also to see if he'd be willing to cooperate

23   with us and tell us what he knew about what was going on in the

24   jails.

25   Q      On that date, did he agree to cooperate?

```
1   A     No.

2   Q     Did he, at a later time, agree to cooperate?

3   A     Yes.

4   Q     Approximately when was that?

5   A     It was a few weeks later that we had received information

6   from his attorney that he would at least be willing to sit down

7   and talk with us.

8   Q     Now, going back to Anthony Brown, had you been able to

9   locate him by September 2nd of 2011?

10  A     No.

11        MR. FOX:  Your Honor, I'd like to admit again a

12  recording that has been stipulated to as being authentic.  This

13  is Exhibit 96.

14        THE COURT:  Any objection?

15        MR. HAIG:  No.

16        THE COURT:  It will be received.

17     (Exhibit No. 96 received into evidence.)

18        MR. FOX:  And I'm going to play the recording that

19  is September 2nd between Gerard Smith and Anthony Brown.

20  Q     (BY MR. FOX)  Do you recall, Special Agent Tanner, who

21  Gerard Smith was?

22  A     Yes.

23  Q     Who was he at the time?

24  A     He was an OSJ deputy.

25        MR. FOX:  Now playing it.
```

**UNITED STATES DISTRICT COURT**

1          (Exhibit 96, Excerpt 1, played in open court.)

2    Q    (BY MR. FOX)  Special Agent Tanner, I'm going to show you

3    now what's in evidence as Government Exhibit 155.  We heard

4    Anthony Brown in that recording and Gerard Smith mention legal

5    pads.

6          When this originally -- well, I'll ask you this:  Do you

7    recognize Anthony Brown's handwriting?

8    A    Yes.

9    Q    Whose handwriting is this?

10   A    It's Anthony Brown's.

11   Q    How is it that you recognize this handwriting?

12   A    Because he's written me long letters before too.

13   Q    And you see the date on the upper right.  Can you tell

14   looking at this what the date is?

15   A    This one looks like a 3 or an 8, but on the last couple

16   pages it's very clearly September 3rd that he signs the letter.

17   Q    Looking at the fifth page of this exhibit, can you please

18   read the portion that I've highlighted.

19   A    "Lieutenant and Captain, I have cooperated to the fullest

20   and I will continue to cooperate since I've been left for dead

21   by the feds after gathering evidence for two years.  However, I

22   feel like no one is looking at this matter the way that they

23   should be viewing this matter.  Let me explain, sir."

24   Q    Now I'm moving on to page 14, and the paragraph that's in

25   the middle of the page, can you read this, please.

```
 1   A      "As a person who knows a little something about the law, I
 2   know the evidence that I provided to the FBI means nothing
 3   without my testimony, and without my testimony being that I am
 4   the one who shot the videos, took the pictures, gave them the
 5   notes, names of inmates and deputies involved means nothing if
 6   I don't testify.  And after being put in this position by the
 7   feds and then hung out to dry, I have no desire to testify for
 8   the FBI.  However, I will cooperate with the following people
 9   of LASD:  Lieutenant Steve, Captain Tom, Sergeant Long,
10   Sergeant Gray, Sergeant Weber and Sergeant Lopez, and I can't
11   forget Lieutenant Thompson.  And I will testify for LASD only
12   if needed."
13   Q    Showing the 22nd page of this exhibit, the very bottom of
14   it, can you please read that.
15   A      "I am not a hostile witness, and I will cooperate to the
16   fullest in my opinion.  I believe LASD should handle their own
17   problems, not FBI or any other agency, and so no one has to
18   bully me or take my stuff and legal work to make me cooperate
19   with this investigation.  But that has happened.  I am not
20   hostile.  There is no reason to be hostile with LASD,
21   especially when the FBI" --
22   Q    Now I'm going to move on to the top of the next page.
23   A      -- "has left me for dead.  However, I am concerned about
24   my safety."
25   Q     Well, I don't know if that was big enough, so let me
```

1   highlight now the top of page 25.  Can you read that portion,

2   please.

3   A    "Get me from prison.  I will not testify for the FBI, and

4   I don't" -- I'm not sure what that says -- "the FBI ever again.

5   I just want to help with this investigation and with the

6   requested documents, fight my case, end of story."

7   Q    Can you read the rest of what I've highlighted now.

8   A    "It is up to LASD, not me, how they handle this

9   investigation.  Again, it is not my problem, and that is my

10  position."

11  Q    Was Anthony Brown turned over to the federal government

12  pursuant to the writ?

13  A    No.

14  Q    What was the date that his testimony was scheduled for

15  according to the writ?

16  A    September 7th of 2011.

17          MR. FOX:  Now I want to move for the admission of

18  Government Exhibit 57, which is an e-mail from Mr. Carey to

19  Mr. Leavins.

20          THE COURT:  Is this a good time for a break, or do

21  you want to --

22          MR. FOX:  Now is fine, Your Honor.

23          THE COURT:  All right.  Ladies and gentlemen, we're

24  going to take our final break of the day.  Again, I want to

25  remind you until this trial is over, you're not to discuss this

1  case with anyone, including your fellow jurors, members of your

2  family, people involved in the trial or anyone else, and do not

3  allow others to discuss the case with you.  This includes

4  discussing the case online, in Internet chat rooms, blogs,

5  bulletin boards, e-mails or by text messaging.  If anyone tries

6  to communicate with you about this case, please let me know

7  about it immediately.

8       Do not read, watch or listen to any news reports or other

9  accounts about the trial or anyone associated with it,

10  including looking up anything online.  Do not do any research

11  such as consulting dictionaries, searching the Internet or

12  using other reference materials, and do not make any

13  investigation about the case on your own.

14       Finally, you're reminded to keep an open mind until all of

15  the evidence has been received, you've heard the arguments of

16  counsel, the instructions of the Court and the views of your

17  fellow jurors.

18       We'll come back at five after the hour.

19       (The jury exited the courtroom.)

20            THE DEPUTY CLERK:  Please be seated.

21            THE COURT:  Is there any objection to Exhibit 57?

22            MR. HAIG:  Yes, on the same grounds as before, Your

23  Honor, the hearsay and confrontation clause.

24            MR. FOX:  And, Your Honor, so we don't have to do

25  this before the jury as well, we're going to be seeking a few

```
 1   other e-mails admissions if it's okay with you.  It's under the
 2   same grounds.  60, 61, 63, and I believe 52 and 62 with this
 3   witness.  I believe they have the same objections.
 4            MR. HAIG:  60, 61 and 63, did you say?
 5            MR. FOX:  I'll go over the list again.  57, which is
 6   what we're doing now, 52, 60, 61, 62, and 63.  It's not going
 7   to be in that order, but all those exhibits is what we're going
 8   to be seeking the admission of, and they're all those e-mails.
 9   Looks like, Your Honor, we will have a few more as I go through
10   it, but it's all going to be the same objection.
11            MR. HAIG:  That is correct, Your Honor, yes.
12            MR. FOX:  And just looking at my notes, Your Honor,
13   59, 68, 70 and 71, although a few of these Mr. Tanaka's on, and
14   it's my understanding that their objection is not to exhibits
15   that Mr. Tanaka's name is on.
16            MR. HAIG:  That would be correct, Your Honor.
17            THE COURT:  All right.  Why don't I take a look at
18   these, and then when we come back from the break I'll be
19   prepared to rule on them.
20            MR. FOX:  Thank you, Your Honor.
21            MR. HAIG:  Your Honor, could I also ask the Court a
22   question?
23            THE COURT:  Yes.
24            MR. HAIG:  Just on scheduling, I think we're --
25   sounds like we're getting close to the end of the government's
```

1    case.  I'm just wondering if the Court, for our scheduling

2    purposes, whether we're going to be in session on Monday or

3    not.

4              THE COURT:  I'll ask the jury and see what they want

5    to do.

6              MR. FOX:  And, Your Honor, we're still on track.

7    It's going to be close whether we're able to rest today.  It

8    may be tomorrow morning.  We're close though.

9              THE COURT:  Okay.  All right.  Thank you.

10        (Off the record at 11:53 a.m.)

11        (On the record at 12:07 p.m.)

12             THE COURT:  Let me just say that I feel Tom Brady's

13   pain.

14             MR. HAIG:  I don't get it.

15             MR. JAUREGUI:  I'll tell you later.

16             THE COURT:  My mother has a bone to pick with --

17   anyway.

18        All right.  I've taken a look at Exhibits 52, 59, 60, 61,

19   63, 62, 68, 70 and 71.  70 and 71, I believe were authored by

20   the defendant, and as to the rest, these e-mails are not

21   testimony within the meaning of the confrontation clause.  They

22   weren't produced for the primary purpose of creating an

23   out-of-court substitute for trial testimony, and moreover, the

24   requirements for admission of coconspirator statements under

25   the Federal Rules of Evidence are identical to the requirements

1    of the confrontation clause.  And therefore, if a statement is

2    admissible under the Federal Rules as an admission of the

3    coconspirator, the defendant's right of confrontation is not

4    violated and these e-mails are coconspirator statements made in

5    furtherance of the conspiracy.

6        All right.  So the objection is overruled.

7            MR. FOX:  Thank you, Your Honor.

8        May we bring the witness back in?

9            THE COURT:  Yes, let's bring the jury in.

10   (The jury entered the courtroom.)

11           THE DEPUTY CLERK:  Please be seated.

12           MR. FOX:  May I proceed, Your Honor?

13           THE COURT:  Yes.

14   Q    (BY MR. FOX)  Special Agent Tanner, when we broke we were

15   discussing Mr. Brown not being produced on September 7th, 2011

16   pursuant to the writ.

17       I want to direct your attention now --

18           MR. FOX:  And actually, Your Honor, I don't think I

19   formally did this.  I'd like to move for the admission of

20   Government Exhibit 57, which is one of the ones we just talked

21   about.

22           THE COURT:  Okay.  The objection's overruled for the

23   reasons previously stated by the Court.

24   (Exhibit No. 57 received into evidence.)

25   Q    (BY MR. FOX)  Special Agent Tanner, I'd like you to read

1    this e-mail dated September 9th, 2011 at 4:41 p.m. between

2    William "Tom" Carey and Steven Leavins, please.

3    A    "Steve, official request from feds for interview with

4    Brown was made."

5    Q    Do you know who made that request?

6    A    Generally, the FBI management.

7    Q    And we discussed again the writ.

8         I now want to turn your attention to Government Exhibit

9    62.

10            MR. FOX:  And, Your Honor, I move for the admission

11   of this exhibit as well.

12            THE COURT:  I'm sorry, the exhibit number?

13            MR. FOX:  62.

14            THE COURT:  It'll be received.

15        Excuse me.  I assume you have an objection to 62?

16            MR. HAIG:  Yes, same objection I lodged before the

17   break, Your Honor.

18            THE COURT:  The objection's overruled.  It will be

19   received.

20        (Exhibit No. 62 received into evidence.)

21            MR. FOX:  Thank you, Your Honor.

22   Q    (BY MR. FOX)  Looking at the bottom e-mail in Government

23   Exhibit 62, it's dated September 12th, 2011 at 2:45 p.m. from

24   Steve Leavins.

25        Can you please read what's written.

```
 1   A     "Sir, I spoke with Mr. Tanaka regarding the court order.

 2   If you could please provide me a copy of the order, I will take

 3   care of it.  Thank you."

 4   Q     Special Agent Tanner, are you familiar with a deputy by

 5   the name of James Sexton?

 6   A     Yes.

 7   Q     Do you know what role he played in the Sheriff's

 8   Department in August and September of 2011?

 9   A     Yes, he was an OSJ deputy.

10   Q     And based on your investigation, do you know what role he

11   performed with respect to Anthony Brown?

12   A     Yes.

13   Q     What role did he perform?

14   A     He had two roles.  One of them was he was one of the

15   deputies that was standing guard outside Anthony Brown's cell,

16   and he was also the deputy who did some of the maneuvering in

17   the computer system with Anthony Brown's aliases and things

18   like that.

19         MR. HAIG:  Objection, Your Honor.  Move to strike

20   the answer.  Foundation.

21         THE COURT:  Sustained.  The answer is stricken.  The

22   jury should disregard it.

23   Q    (BY MR. FOX)  Special Agent Tanner, have you had a chance

24   to review e-mails by James Sexton in your investigation?

25   A     Yes.
```

```
 1   Q    And are Government's Exhibits 60, 61 and 63 some of the
 2   e-mails that you reviewed as part of your investigation?
 3   A    Yes.
 4            MR. FOX:  Your Honor, I move for the admission of
 5   Government's Exhibits 60, 61 and 63.
 6            THE COURT:  They'll be received.
 7        (Exhibit Nos. 60, 61 and 63 received into evidence.)
 8            MR. FOX:  I'm publishing now Government Exhibit 60.
 9   Q    (BY MR. FOX)  It's an e-mail from James Sexton to Gerard
10   Smith with a copy to Mickey Manzo, Gregory Thompson and William
11   Gilbert.
12        Do you know who William Gilbert was at the time, what role
13   he played in the Sheriff's Department?
14   A    Yes.
15   Q    What was his role?
16   A    He was assigned to jail liaison.
17   Q    And who was the lieutenant at jail liaison?
18   A    Greg Thompson.
19   Q    This e-mail is dated September 12th, 2011 at 11:04 a.m.
20        What is the subject of this e-mail?
21   A    "Operation Pandora's Box."
22   Q    Could you please read what's written in this e-mail.
23   A    "Gents, I am going to handle booking our friend back under
24   his true alias.  Can you please shoot me the URC/case
25   information he was originally charged under.  I am going to try
```

1   to reinstate his old booking number as we speak.  I am 9-7 at

2   the nurse's station until further notice."

3   Q    I'm now highlighting the top e-mail from that string of

4   e-mails with the subject "Operation Pandora's Box."

5       Can you read the top e-mail, please.

6   A    "Sir, Sergeant Geske is the WC and is assisting us with

7   our inmate.  Captain Antuna wanted to be notified when there

8   was movement of this inmate out of custody.  Sergeant will

9   advise when what [sic] need to prep him for movement to state."

10   Q    We saw in the previous e-mail from September 9th that

11   there was a federal request that Mr. Carey and Leavins were

12   discussing with respect to Anthony Brown -- federal request to

13   interview Anthony Brown.

14       Did the Sheriff's Department ever turn Anthony Brown over

15   to the federal government?

16   A    No.

17   Q    And after August 23rd, did the Sheriff's Department ever

18   allow the federal government to interview Anthony Brown?

19   A    No.

20   Q    Now going to --

21       MR. HAIG:  Objection, Your Honor.  Move to strike

22   the last answer.  Lack of foundation as to her knowledge --

23       MR. FOX:  Your Honor, I'll be happy --

24       MR. HAIG:  -- based upon the form of the question.

25       MR. FOX:  I'll be happy to lay a larger foundation.

1          THE COURT:  All right.

2    Q    (BY MR. FOX)  Special Agent Tanner, have you been the case

3    agent involved in the Anthony Brown related investigations

4    since 2010?

5    A    Yes.

6    Q    And are you familiar with all of the interviews that have

7    been conducted of Anthony Brown since that time?

8    A    Yes.

9    Q    Does the FBI keep records of every single interview they

10   conduct of every single witness?

11   A    Yes.

12   Q    And when somebody goes before the grand jury, are there

13   records kept of that person's grand jury testimony?

14   A    Yes.

15   Q    As a result of your experience on this investigation, are

16   you familiar with the number of times that Anthony Brown has

17   spoken with the federal government?

18   A    Yes.

19   Q    And are you familiar with the number of times that Anthony

20   Brown has testified in the grand jury?

21   A    Yes.

22   Q    Are you also familiar generally with when those things

23   happened?

24   A    Yes.

25   Q    With respect to Anthony Brown after August 23rd of 2011,

```
 1   did the Sheriff's Department -- any member of the Sheriff's

 2   Department allow you to interview Anthony Brown?

 3   A     No.

 4   Q     After August 23rd of 2011 -- actually, make it broader.

 5         At any time that Anthony Brown was in the custody of the

 6   Sheriff's Department, did the Sheriff's Department allow

 7   Anthony Brown to testify before the grand jury?

 8   A     No.

 9              MR. FOX:  One moment.

10         Your Honor, I'd like to publish now Government Exhibit 61.

11   Q     (BY MR. FOX)  Special Agent Tanner, who is this an e-mail

12   from?

13   A     It's from James Sexton.

14   Q     And what is the subject?

15   A     "Operation Pandora's Box."

16   Q     Who is it sent to and what date, please?

17   A     Gerard Smith on September 12th, 2011.

18   Q     What time?

19   A     11:51 a.m.

20   Q     Can you please read what's stated in the e-mail.

21   A     "Boss, on the phone with the head clerk and document

22   control.  They are on board, but they need the jacket

23   regardless for court case and his judgment in order to get him

24   released out of the system properly.  I am going to book him

25   under his old booking number as a court returnee and
```

```
 1   re-Live Scan him at IRC ASAP.  By the time you return downtown
 2   with the jacket, we should be ready for the next phase.  In
 3   route to IRC shortly."
 4   Q    Highlighting now the top e-mail from the string, who is
 5   this from?
 6   A    Eliel Telxeira.
 7   Q    At some point in your investigation, did you determine
 8   what position Mr. Telxeira held within the Sheriff's
 9   Department?
10   A    I believe he was a deputy at IRC.
11   Q    What was IRC?
12   A    The Inmate Reception Center.
13   Q    And who is this an e-mail from?
14   A    James Sexton.
15   Q    What is written in this e-mail?
16   A    "James, no need to pull a new booking number.  Please use
17   2863148.  We are changing the info on this booking number to
18   Anthony Brown."
19   Q    I'm now going to publish for you, Special Agent Tanner,
20   130, and I'd like you to keep that -- oh, let me ask you this:
21   This number, 2863148, do you recognize that as being something
22   that is used on inmates?
23   A    Yes.
24   Q    What is it?
25   A    It's a booking number.
```

```
1   Q    I'll show you now 130, which is already in evidence.

2        What is the booking number on this document that I'm

3   showing you, the inmate total movement history for Chris

4   Johnson?

5   A    2863148.

6   Q    Is that the same number that we saw in the previous

7   e-mail?

8   A    Yes.

9   Q    And what does this document show happened to Anthony Brown

10  at 1:29 p.m. on -- I'm sorry, I said Anthony Brown -- Chris

11  Johnson at 1:29 p.m. on September 12th, 2011?

12  A    That the inmate was released.

13  Q    I'm now going to publish Government Exhibit 131.  I'm

14  highlighting the top part of this e-mail.

15       Generally, what is this document?

16  A    This is the same thing we saw earlier, which is a printout

17  from the inmate information website where you can enter in the

18  inmate's name.

19  Q    Did you obtain this from the Sheriff's Department via a

20  request for subpoena?

21  A    I can't tell based on this document whether it was a

22  subpoena or -- yes, it was.

23  Q    How can you tell?

24  A    In the bottom right corner where it says LASD underscore

25  and then numbers that's Bates numbered, and it was from the
```

1    Sheriff's Department.

2    Q    Let me -- in other words, the Sheriff's Department would

3    put that number and those letters on the documents they'd

4    produce?

5    A    Yes.

6    Q    And who is this a record for?

7    A    Anthony Brown.

8    Q    That booking number, is that the same booking number that

9    Anthony Brown had on your August 26th printout?

10   A    No.

11   Q    Can you generally describe what information is contained

12   in the box that I just highlighted.

13   A    This is typically where the regular arrest information is

14   input.  For this one, it shows that Anthony Brown was arrested

15   on September 12th, 2011 at 12:56 p.m. at IRC.

16   Q    Looking at the second page of this exhibit, highlighting

17   the box that says "release" at the top, what does this say?

18   A    It says that he was released to Lancaster State Prison on

19   September 12th, 2011 at 3:42 in the afternoon.

20   Q    At some point, did you learn that Anthony Brown had been

21   transferred to state custody?

22   A    Yes.

23   Q    We saw in this document September 12th was the date that,

24   according to those documents, he was transferred.

25        When did you learn that he was transferred?

| | |
|---|---|
| 1 | A     I believe it was the next day or the day after. |
| 2 | Q     What did you do after you learned he was in state custody? |
| 3 | A     I immediately contacted Lancaster State Prison and |
| 4 | requested to set up an interview to meet with Anthony Brown. |
| 5 | Q     Did the state prison allow you to interview Anthony Brown? |
| 6 | A     Yes. |
| 7 | Q     Does the Sheriff's Department run the state prison? |
| 8 | A     It does not. |
| 9 | Q     Did you meet with Anthony Brown? |
| 10 | A     I did. |
| 11 | Q     Do you remember when? |
| 12 | A     September 15th of 2011. |
| 13 | Q     And when you went to interview him, do you recall his |
| 14 | demeanor when you first met with him? |
| 15 | A     Yes, I do. |
| 16 | Q     What was his demeanor? |
| 17 | A     He was incredibly angry at me. |
| 18 | Q     Why was that? |
| 19 | A     Because he informed us that he had been left for dead by |
| 20 | the feds, and he believed that after we were kicked off of the |
| 21 | interview that we made no attempts to find him. |
| 22 | Q     At some point, were you able to calm him down? |
| 23 | A     Yes. |
| 24 | Q     And did you discuss certain subject matters in that |
| 25 | interview of him? |

```
 1   A     I did.

 2   Q     Without getting into the specific comments that he made,

 3   what generally did the two of you discuss?

 4   A     Just generally things that happened from the time that the

 5   interview was terminated at the Sheriff's Department on the

 6   23rd up to anything that had occurred up to the point that we

 7   were interviewing him.

 8   Q     Was that the only time that you interviewed Mr. Brown

 9   between then and December of 2012?

10   A     No.

11   Q     When, if ever, did Anthony Brown testify before the grand

12   jury?

13   A     December of 2012.

14   Q     And how did you obtain his testimony at that point?

15   A     We obtained a federal writ and had him brought over to

16   federal custody.

17   Q     Whose custody was he in before he was brought over to

18   federal custody?

19   A     The State of California.

20   Q     We talked earlier about your undercover efforts with

21   respect to Gilbert Michel.

22         Did you engage in any other covert work in order to try to

23   obtain information from deputies before August of 2011?

24   A     Yes.

25   Q     Who did you attempt to obtain information from in a covert
```

1   fashion before then?

2   A    Deputy William David Courson.

3   Q    Why did you choose Mr. Courson?

4   A    I wouldn't say I chose him.  He was a deputy that worked

5   on 6,000 floor, so I'd had some communication with him very

6   early on in the investigation.  He had made some statements to

7   me in the hallway when I first met him that he had used a

8   flashlight on an inmate and he probably didn't need to.  And

9   that was similar to some of the things we were looking into,

10  and so it was determined that this might be somebody that we

11  may want to investigate.

12  Q    So what did you decide to do?

13  A    After discussing it with my supervisor and other agents,

14  we decided that since he had asked if I wanted to meet up that

15  I would wear a recording device and I would go meet out with

16  him and see if I could get information to determine if he was

17  engaging in criminal activity.

18  Q    Did he -- without getting into the exact statements, did

19  he provide you with information over time that was helpful in

20  your investigation?

21  A    Yes.

22  Q    And did it involve misconduct that might have been going

23  on in the jail?

24  A    Yes.

25  Q    Why not just approach Mr. Courson and ask him to cooperate

1    with you without going through this covert work?

2    A     Initially, the fact that I thought he may be engaging in

3    the very behavior that we were investigating, it would not be

4    smart to tell an individual that you're investigating either

5    them or the actions of individuals in the Department.  But it

6    also ran the risk that if he said no that he didn't want to

7    cooperate or talk to me, that he could out our entire

8    investigation.  And at that point, we were still covert and

9    wanted it to stay that way.

10   Q     Special Agent Tanner, have you seen the documents of the

11   proposed court order and the affidavit relating to the proposed

12   court order that on their face would require the FBI to turn

13   over documents to the Sheriff's Department?

14   A     Yes.

15   Q     Had you seen those documents before they were produced

16   pursuant to a subpoena?

17   A     No.

18   Q     Do you recall the date of the proposed court order?

19   A     I believe the date on the order was September 7th, 2011.

20   Q     And do you recall what date Judge Torribio's signature

21   was?

22   A     It was September 8th, 2011.

23             MR. FOX:  Your Honor, I move for the admission of

24   Government Exhibit 52.

25             MR. HAIG:  We would object, Your Honor.

1        THE COURT:  Want to give me a clue as to the

2   grounds?

3        MR. HAIG:  Hearsay, Your Honor, and confrontation.

4        THE COURT:  Overruled.

5        MR. FOX:  Thank you.  Your Honor.

6        THE COURT:  It will be received.

7        (Exhibit No. 52 received into evidence.)

8        MR. FOX:  Now publishing Government Exhibit 52.

9   Q    (BY MR. FOX)  This is an e-mail from Chris Nee to Steve

10  Leavins dated September 7th, 2011 at 459 p.m. with no subject

11  line.

12       Could you please read this e-mail.

13  A    "Good afternoon.  After the document gets signed tomorrow,

14  would you please make a copy for Mr. Tanaka.  Thank you."

15       MR. FOX:  Your Honor, I now move for the admission

16  of Government Exhibit 104, which is an audio recording of a

17  voicemail that was subject to a stipulation.

18       MR. HAIG:  No objection, Your Honor.

19       THE COURT:  It will be received.

20       (Exhibit No. 104 received into evidence.)

21  Q    (BY MR. FOX)  Special Agent Tanner, are you familiar with

22  Government Exhibit 104, a voicemail by Scott Craig?

23  A    Yes.

24  Q    Okay.  Did you receive this voicemail from Scott Craig

25  that we're about to listen to?

1   A      Not at the time.

2   Q      How did you obtain it?

3   A      It was responsive to a federal grand jury subpoena that we

4   served on the Sheriff's Department.

5           MR. FOX:  Now I'm going to play this for the jury.

6   Again, this is Government Exhibit 104.

7           (Exhibit 104 played in open court.)

8   Q      (BY MR. FOX)  Special Agent Tanner, based on the dates

9   stated on the recording, when did this occur in relation to the

10  denied court order?

11  A      It was the day after the denied court order.

12  Q      Did you call Mr. Craig back?

13  A      I did not.

14  Q      Why not?

15  A      He did not call the right number.

16  Q      What was your number at the time?

17  A      He called extension 4147 and my number was 4174, so nobody

18  got the message.

19  Q      Special Agent Tanner, there's been testimony about a task

20  force that began in September of 2011.  I want to direct your

21  attention to Exhibit 59.

22          MR. FOX:  And, Your Honor, I move for the admission

23  of this exhibit.

24          THE COURT:  It will be received.

25          (Exhibit No. 59 received into evidence.)

**UNITED STATES DISTRICT COURT**

```
 1   Q    (BY MR. FOX)  This is an e-mail from William "Tom" Carey
 2   to Scott Craig, Maricela Long, with a copy to Steve Leavins.
 3        What is the date of this e-mail?
 4   A    September 12th, 2011.
 5   Q    What time?
 6   A    9:43 a.m.
 7   Q    What is the subject?
 8   A    "Retaliation allegations list."
 9   Q    And do you see what it says for attachments?
10   A    Yes.
11   Q    Without -- we won't get into them, but are the attachments
12   connected to this document on this exhibit?  Can you see the
13   back end of the exhibit?  Do you recall?
14   A    Sorry, I don't understand your question.
15   Q    Okay.  If we were to scroll down, is what I'm trying to
16   say --
17   A    Yes, there are attachments to this e-mail.
18   Q    And those are retaliation complaints from the ACLU; is
19   that correct?
20   A    Correct.
21   Q    Okay.  Can you please read what's stated in this e-mail.
22   A    "List of ACLU complaints out of CJ probably lead us, in
23   part, to where/what the feds are looking at.  Tom Carey."
24   Q    Is CJ another name for Men's Central Jail?
25   A    Yes.
```

1          MR. FOX:  Your Honor, I also move for the admission

2    of Government Exhibit 68.

3          THE COURT:  It will be received.

4      (Exhibit No. 68 received into evidence.)

5    Q    (BY MR. FOX)  Special Agent Tanner, this is an e-mail from

6    William Carey to Christopher Nee.

7          What is the date on this?

8    A    September 14th, 2011.

9    Q    And in the -- do you recall in the e-mails below this what

10   is generally discussed in these e-mails?

11   A    Yes.

12   Q    What is it?

13   A    It's generally that the Department of Justice was going to

14   be at Men's Central Jail during that time.

15   Q    And what is it that Mr. Carey writes to Mr. Nee?

16   A    "Not sure if the boss is aware of this FYI."

17   Q    Special Agent Tanner, you mentioned earlier that the

18   investigation became overt at some point; is that correct?

19   A    Yes.

20   Q    Were there any media reports about the investigation in

21   September of 2011?

22   A    Yes.

23   Q    As part of your grand jury investigation, did you receive

24   documents indicating that Mr. Tanaka exchanged e-mails about

25   those media reports?

1    A    Yes.

2         MR. FOX:  Your Honor, I move for the admission of

3    Government Exhibits 70 and 71.

4         THE COURT:  They'll be received.

5         (Exhibit Nos. 70 and 71 received into evidence.)

6    Q    (BY MR. FOX)  Special Agent Tanner, is this one of the

7    exhibits -- the documents you were referring to?

8    A    Yes.

9    Q    And who is this from?

10   A    Paul Tanaka.

11   Q    To whom?

12   A    Steve Leavins and William "Tom" Carey.

13   Q    What is the date of this?

14   A    September 25th, 2011.

15   Q    What time?

16   A    9:20 a.m.

17   Q    And what is the subject line?

18   A    "FBI investigating reports of beatings in Los Angeles

19   County jails, LATimes.com."

20   Q    At this time -- were you aware by September 25th that the

21   LASD had been conducting surveillance of you?

22   A    No.

23   Q    Now publishing Government Exhibit 71, highlighting an

24   e-mail.  Can you read this e-mail, who's it from and to on this

25   exhibit.

```
 1   A    It's from Paul Tanaka to Steve Leavins and William "Tom"
 2   Carey.
 3   Q    What is the date and time of this e-mail?
 4   A    September 25th, 2011 at 9:26 a.m.
 5   Q    What is the subject?
 6   A    "Justice Department boosts activity to police the police."
 7   Q    And can you tell based on the e-mail whether there's an
 8   article attached to it?
 9   A    Yes.
10   Q    Where is it from, what publication?
11   A    The Washington Post.
12   Q    Now highlighting the e-mail above this.
13        Who's it an e-mail from?
14   A    It's from Steve Leavins.
15   Q    To who?
16   A    To Paul Tanaka.
17   Q    And what is the date and time of this e-mail?
18   A    September 25th, 2011 at 9:34 a.m.
19   Q    Can you please read the text of the e-mail.
20   A    "I figured that was the motivation, especially when Holder
21   had to approve the L.A. Times grand jury subpoena."
22   Q    Do you know who the Attorney General was at the time?
23   A    Yes.
24   Q    Who was the United States Attorney General at the time?
25   A    Eric Holder.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Highlighting the top e-mail in this chain.
 2         Who's this from and to?
 3   A     It's from Paul Tanaka to Steve Leavins.
 4   Q     What is the time and date?
 5   A     It's at September 25th, 2011 at 10:33 a.m.
 6   Q     What is written in this e-mail?
 7   A     "This certainly clarifies where the orders into
 8   investigating local law enforcement agencies are coming from,
 9   the top."
10   Q     Special Agent Tanner, anything unusual happen to you the
11   next day on September 26?
12   A     Yes.
13   Q     What happened?
14   A     I arrived home from work, and there were two individuals
15   standing in front of my apartment building, one female and one
16   male.  The male was not wearing a jacket, and his weapon and
17   Sheriff's badge was exposed, and so I knew it was sheriff's
18   deputies.
19         MR. FOX:  Your Honor, I move for the admission of
20   Government Exhibits 106 and 107 and 109.
21         THE COURT:  Any objections?
22         MR. HAIG:  We do not, Your Honor.
23         THE COURT:  All right.  They'll be received.
24     (Exhibit Nos. 106, 107 and 109 received into evidence.)
25         MR. FOX:  And I'm going to publish for the jury
```

Government Exhibit 109.

Q    (BY MR. FOX)  Before I do so, Special Agent Tanner, are you familiar with what Government Exhibit 109 is?

A    I would have to look but --

Q    Let me -- actually, I'll show you the first part of it, and you can tell me if you're familiar with it.

     Do you recognize this first frame?

A    Yes.

Q    What is this?

A    This is a video in front of my apartment building.

     (Exhibit 109 played in open court.)

Q    (BY MR. FOX)  Special Agent Tanner, how did you learn that that encounter was video and audio taped?

A    It was a significant amount of time later when we had requested any and all recordings of FBI agents from the Sheriff's Department in a federal grand jury subpoena.

Q    We saw in that recording and heard Mr. Craig say, "We could do this," and raise his -- "We could either do this," and raise his arms.  What did you understand him to mean when he said that?

A    That they could arrest me right in front of my house.

Q    Did Mr. Craig indicate to you during that encounter what it was that they might arrest you for?

A    No.

Q    Or what they were looking at?

1    A    No.

2    Q    What did you do after this encounter?

3    A    I immediately went inside my apartment and called my

4    supervisor at the time, Carlos Narro.

5    Q    Why did you do that?

6    A    Well, I had just been told that I was going to be

7    arrested, and I obviously had absolutely no reason or

8    understanding as to what the reason was.  And so I called my

9    supervisor to find out what I should do.

10   Q    And what did he tell you to do?

11   A    He told me to immediately come back to the office.

12   Q    Did you do that?

13   A    Yes.

14   Q    What happened when you went back to the office?

15   A    Anyone on any squad that was still at the office came down

16   to meet me in the parking lot and escorted me up to the

17   executive management floor at the FBI.

18   Q    Did you give your supervisor anything at the time?

19   A    Yes.

20   Q    What did you give him?

21   A    The business cards that Sergeant Craig and Sergeant Long

22   had given to me at the apartment.  I gave them to Carlos Narro,

23   and he took them into his office with another agent to call the

24   sergeants.

25             MR. FOX:  Your Honor, I move for the admission of

1  Government Exhibit 110, which is the -- subject to the

2  stipulation is the audio recording of a phone call, and I'd

3  like to pass out the transcript books to the jury so they can

4  follow along with Exhibit 111.

5           THE COURT:  All right.  Any objection to 111?

6           MR. HAIG:  No, Your Honor.

7           THE COURT:  All right.  It will be received.

8       (Exhibit No. 111 received into evidence.)

9           THE COURT:  Let's pass out the notebooks.

10           MR. FOX:  And, Your Honor, just for clarification,

11  110 is the audio recording and 111 is the transcript.  So we're

12  asking, obviously, for 110 to be received.

13       (Exhibit No. 110 received into evidence.)

14       (Pause in proceedings.)

15           THE COURT:  All right.  Ladies and gentlemen, would

16  you just keep your books -- keep the books closed for just a

17  moment.

18       You're about to hear a recording that's been received into

19  evidence.  A transcript of the recording is being provided to

20  help you identify speakers and to help you decide what the

21  speakers say.  Remember that the recording is the evidence, not

22  the transcript.  If you hear something different from what

23  appears in the transcript, what you heard is controlling.

24  Listen carefully, the transcript will not be available during

25  your deliberations.

1          MR. FOX:  And, Your Honor, there are several tabs,

2   but the one that it's going to relate to is tab 111 in the jury

3   binder.

4          THE COURT:  All right.  If everybody would open tab

5   111.

6          MR. FOX:  May I proceed, Your Honor?

7          THE COURT:  Yes, please.

8       Everybody's got a notebook?

9          THE JUROR:  What exhibit number?

10         THE COURT:  111, tab 111.

11         THE JUROR:  101?

12         THE COURT:  111.

13         THE JUROR:  Ready.

14         THE COURT:  All right.

15         MR. FOX:  Thank you.

16      (Exhibit 110 played in open court.)

17         MR. FOX:  Your Honor, we can collect the jury

18   binders.

19         THE COURT:  All right.

20      (Pause in proceedings.)

21   Q   (BY MR. FOX)  Special Agent Tanner, we heard a reference

22   to the undersheriff in that recording, that Mr. Narro would

23   have to contact the undersheriff.

24      Do you know who the undersheriff was at the time?

25   A   Yes.

```
 1   Q     Who was that?

 2   A     Paul Tanaka.

 3   Q     Were you ever arrested, Special Agent?

 4   A     No.

 5   Q     Going back to the meetings that you attended with your

 6   management on September 26th after you had that encounter with

 7   Mr. Craig and Ms. Long, did you have a conversation with your

 8   assistant director in charge?

 9   A     Yes.

10   Q     And who was that?

11   A     It was Steve Martinez at the time.

12   Q     What was the subject matter that the two of you discussed?

13   A     It was just a discussion on whether or not I wanted to

14   stay on the case after what had just occurred.

15   Q     What did you say?

16   A     I said yes.

17   Q     Was that the only discussion you had with your

18   supervisors, about whether you'd remain on the case?

19   A     No.

20   Q     Approximately how many others did you have?

21   A     There were at least a few more discussions between

22   supervisors and even the U.S. Attorney's Office.

23   Q     Did this encounter with Mr. Craig and Ms. Long and what

24   was said on that recording with Mr. Narro affect your

25   investigation at all?
```

```
1    A    Yes.

2    Q    In what ways?

3    A    One of the biggest things was that I was incredibly

4    uncomfortable returning to the jails, which was so crucial in

5    the case at that point, was talking to witnesses and gathering

6    information and continuing to build trust with the inmates that

7    were providing information, and I did not feel comfortable

8    going back after what had occurred.

9    Q    Were there any other reasons why agents that you were

10   working with could not go back?

11   A    In general, we had -- other agents that were working the

12   case, we had all learned from other agents in the office that

13   they were being turned away at the jails and told they couldn't

14   go in and interview inmates.

15            MR. HAIG:  Objection, Your Honor, hearsay.  Move to

16   strike the answer.

17            THE COURT:  Overruled.

18   Q    (BY MR. FOX)  Special Agent Tanner, did you ever go back

19   to the jail?

20   A    Yes.

21   Q    Approximately when was this?

22   A    Had to be at least four, six months plus later.

23   Q    What about the others that you were investigating the case

24   with, do you remember when they began to go back?

25   A    I think it was four months later in December of 2011 that
```

1    the first individuals from our team went back.

2              MR. FOX:  Your Honor, I'd like to now move to admit

3    business records under 902(11), Government's Exhibits 164

4    through 171.

5              MR. HAIG:  No objection, Your Honor.

6              THE COURT:  All right.  They'll be received.

7         (Exhibit Nos. 164, 165, 166, 167, 168, 169, 170 and 171

8    received into evidence.)

9    Q    (BY MR. FOX)  And, Special Agent Tanner, are you generally

10   familiar with what was just introduced?

11   A    Yes.

12   Q    What are those exhibits?

13   A    They're phone records for county-issued cell phones for

14   Department members.

15   Q    Do you have the binder that has Exhibit 181 in front of

16   you?

17   A    Yes.

18   Q    What is 181?

19   A    It's a spreadsheet that I created that includes all of the

20   numbers that I used in my phone summary charts and including

21   the location that I was able to obtain that number from.  So

22   whether it was a Sheriff's Department roster or directly from

23   the phone company, it's basically just a compilation of all of

24   the numbers, who they belong to and where I found that

25   information out.

1          MR. FOX:  Your Honor, I move --

2    Q    (BY MR. FOX)  I'll ask you first, was this -- does it

3    basically compile information from a number of voluminous

4    records?

5    A    Yes.

6    Q    And does this contain information obtained from both the

7    LASD and the phone companies?

8    A    Yes.

9          MR. FOX:  I move for the admission, Your Honor, of

10   Government Exhibit 181.

11         THE COURT:  Any objection?

12         MR. HAIG:  No.

13         THE COURT:  It will be received.

14   (Exhibit No. 181 received into evidence.)

15   Q    (BY MR. FOX)  Special Agent Tanner, can you now turn to

16   Government Exhibit 170.

17   A    Okay.

18   Q    What is it?

19   A    It is Paul Tanaka's county-issued cell phone.  I did a

20   summary chart of the pertinent calls from August of 2011 to the

21   end of September 2011.

22   Q    Is this a product of you summarizing voluminous cell

23   phone -- or I'm sorry, phone records over this time?

24   A    Yes.

25         MR. FOX:  Your Honor, I move for the admission of

```
 1   Government Exhibit 170.
 2              MR. HAIG:  No objection.
 3              THE COURT:  I think it's already in but --
 4              MR. FOX:  170 is in?
 5              THE COURT:  I think you moved 164 through 171.
 6              MR. FOX:  You are right, Your Honor.  Thank you very
 7   much.
 8   Q    (BY MR. FOX)  And then 172, Special Agent Tanner, do you
 9   know what 172 is?
10   A    This is a couple of dates that I broke down and did a
11   phone summary chart for multiple individuals and their phone
12   numbers and calls back and forth, and so it's specific dates
13   between August of 2011 and September of 2011.
14   Q    And again, is this the product of you summarizing
15   voluminous phone records?
16   A    Yes.
17              MR. FOX:  Your Honor, I move for the admission of
18   Government Exhibit 172.
19              THE COURT:  Any objection?
20              MR. HAIG:  No.
21              THE COURT:  It will be received.
22         (Exhibit No. 172 received into evidence.)
23   Q    (BY MR. FOX)  Special Agent Tanner, can you just generally
24   describe for the jury what this chart contains in looking at
25   it.
```

1    A     Generally or for this specific date?

2    Q     I guess maybe we'll back up.

3          How did you pick the dates that are listed in this

4    exhibit?

5    A     The dates in this exhibit are days that were significant

6    in terms of what was going on.  So if there was an event that

7    occurred or something that happened that was significant, I

8    made a separate chart for those days that outlined the phone

9    calls between the pertinent individuals.

10              MR. FOX:  And I want to --

11         (Plaintiff's counsel conferred off the record.)

12              MR. FOX:  Your Honor, I move for the admission of

13   Government Exhibit 14.

14              THE COURT:  Any objection?

15              MR. HAIG:  No.

16              THE COURT:  It will be received.

17         (Exhibit No. 14 received into evidence.)

18   Q     (BY MR. FOX)  Special Agent Tanner, I'd like you to read

19   this e-mail from Steve Martinez to Leroy Baca on August 18th of

20   2011.

21   A     Subject is "Please call."

22         "Lee, I have an important and sensitive matter I need to

23   discuss with you.  If you have an opportunity this evening,

24   please call me at (310) 883-8539.  Regards, Steve."

25   Q     Is this August 18th, is that the date that the Sheriff's

1  Department was apprised by the FBI that this was an FBI phone?

2  A    Yes.

3  Q    Now going back to Exhibit 172, I'm going to highlight

4  calls between 5:40 and 6:13 p.m.

5       Can you please tell me what happens about a half hour

6  after that e-mail from Mr. Martinez to Mr. Baca according to

7  your chart.

8  A    Then Sheriff Baca contacted Steve Martinez, two phone

9  calls that each lasted five minutes.

10  Q    And then turning your attention to 5:57 p.m., what

11  happens?

12  A    Paul Tanaka and Sheriff Baca have a nine-minute phone

13  call.

14  Q    What do we see occur at 6:06 p.m.?

15  A    Paul Tanaka calls his voicemail.

16  Q    And what about one minute later at 6:07 p.m.?

17  A    Paul Tanaka called Chris Nee, his aide at the time, calls

18  his personal cell phone.

19  Q    And, Special Agent Tanner, I'm just highlighting some

20  calls between 6:21 p.m. and 6:50 p.m.

21       Generally, what do you see on this chart here?

22  A    There's just quite a few calls going back and forth

23  between Paul Tanaka, Chris Nee's personal phone, Chris Nee's

24  work phone and Tom Carey.

25  Q    And you don't know, obviously, the substance of these

1    calls because you weren't a participant in them; is that

2    correct?

3    A    Correct.

4    Q    I'm now going to highlight Paul's at 10:09 and 10:15 p.m.

5    on August 18th.  What happens then?

6    A    Paul Tanaka and Cecil Rhambo have -- at first, it looks

7    like it's a call that wasn't connected because it's only one

8    minute, but then soon after there's a 30-minute call between

9    Paul Tanaka and Cecil Rhambo.

10   Q    Who did you know Cecil Rhambo to be at the time?

11   A    He was the assistant sheriff.

12   Q    I'm now going to turn to your chart from August 23rd.  We

13   see some information in bold here.  Why did you bold that

14   information?

15   A    It was a way to look at all of the phone calls while also

16   understanding the things that were occurring at specific times,

17   so it was easier to determine things that were going on and the

18   phone calls subsequent to some of those things.  So I took, you

19   know, things such as the interview and other things that had

20   occurred throughout that time period and I put them in the time

21   periods that were corresponding, and I just bolded them.

22   Q    And about how many calls were there in the approximate

23   one-hour period of time that you were interviewing Anthony

24   Brown?

25   A    There was about five calls.

```
 1   Q    And when you're preparing this chart, how did you decide

 2   which individuals to include on this chart in terms of their

 3   phones?

 4   A    I included individuals that were -- that we had become

 5   [sic] to learn were part of this overall scheme, and so

 6   their -- any other --

 7              MR. HAIG:  Objection, Your Honor, argumentative

 8   answer by the witness.  Move to strike the word "scheme."

 9              THE COURT:  Sustained.  Scheme will be stricken.

10              MR. FOX:  Thank you, Your Honor.

11   Q    (BY MR. FOX)  You said that there were approximately five

12   calls over that hour.

13   A    Correct.

14   Q    I want to now focus on the, say, 45 minutes approximately

15   after your interview was terminated.

16        Approximately how many calls am I highlighting here over

17   the next 45 minutes?

18   A    I believe there's almost 20 calls just on this page.

19   Q    Now highlighting on the next page calls between 12:22 and

20   12:35 p.m.

21        Were there any calls between Mr. Tanaka and any member of

22   OSJ during that period?

23   A    Yes.

24   Q    Where?

25   A    At 12:23 Paul Tanaka speaks to Greg Thompson, and then
```

1   just a few minutes later Greg Thompson and Paul Tanaka have

2   another phone call, followed by another phone call between

3   Captain Carey, and it's a call that goes to Tanaka's desk line.

4   Q     Now I want to look at August 25th.

5         What information did you put in bold on this exhibit?

6   A     I added the times that a fax was transmitted between the

7   U.S. Marshals Service and the Los Angeles Sheriff's Department

8   Warrant and Detainers fax number that I obtained from the phone

9   records, and I added those times into the phone records.

10  Q     Approximately how many calls are between 8:35 p.m. and

11  9:40 a.m.?

12  A     There's five calls.

13  Q     And at least on this page, approximately how many calls

14  occur over the next hour and a half starting at 10:37?

15  A     There's well over 15 calls.

16  Q     On this next page, August 25th at 1:58 p.m., what did you

17  bold there?

18  A     That was the time that I obtained from one of the

19  Sheriff's Department documents that shows when Anthony Brown,

20  at least as that name, was released from custody.

21  Q     And what is the first call on the chart after 1:58?

22  A     Greg Thompson calls Chris Nee's desk line.

23  Q     I'm going to move now to August 26th, and starting at

24  11:13 a.m., do we see any calls between Mr. Tanaka and anybody

25  from ICIB during this time?

1    A     Yes.

2    Q     Who's that?

3    A     Tom Carey.

4    Q     And any calls between Mr. Tanaka and the Sheriff during

5    this time?

6    A     Yes, in between the calls with Tom Carey.

7    Q     You have something bolded on this page.

8          Can you please explain what this is.

9    A     This is one of the Anthony Brown aliases that was used,

10   and it was from the documents from the Sheriff's Department

11   that claimed Kevin King was arrested at 3:30 p.m.

12   Q     And generally, what do we see from 5:45 to 7:35 p.m. that

13   evening?

14   A     It's generally just a lot of phone calls between Paul

15   Tanaka and Greg Thompson, Steve Leavins and Tom Carey just back

16   and forth.

17   Q     Now looking at August 30th, what is bolded here?

18   A     This is the time, per the tapes that we received from a

19   federal grand jury subpoena from the Sheriff's Department, the

20   time that the interview with Gilbert Michel on August 30th was

21   stopped and the phone calls that happened after that.

22   Q     And what do we see at 8:08 a.m.?

23   A     Steve Leavins calls Captain Tom Carey's cell.

24   Q     What happens at 8:47 a.m.?

25   A     Captain Tom Carey calls Paul Tanaka's cell phone, and they

1    have a five-minute phone call.

2    Q    Now I'm going to move on to another date, September 8th.

3         What happened on September 8th?

4    A    This was the day that Scott Craig attempted to get the

5    court order from the superior court.

6    Q    And what do we see from 4:40 p.m. to 6:15 p.m.?

7    A    Again, it's a lot of calls going between Paul Tanaka, Tom

8    Carey, Chris Nee, Steve Leavins back and forth throughout the

9    next hour and a half.

10        MR. FOX:  Your Honor, I'm now going to move for the

11   admission of Government Exhibit 72.

12        MR. HAIG:  Could I just have a moment to look at it,

13   please, Your Honor?

14        THE COURT:  Yes.

15   (Pause in proceedings.)

16        MR. HAIG:  We have no objection, Your Honor.

17        THE COURT:  It will be received.

18   (Exhibit No. 72 received into evidence.)

19   Q    (BY MR. FOX)  Special Agent Tanner, this is an e-mail from

20   Scott Craig to Steve Leavins, September 26, 2011 at 6:39 p.m.

21        Approximately how long after Mr. Craig approached you and

22   threatened your arrest did this e-mail occur?

23   A    A little less than an hour afterward.

24   Q    Do you know if this e-mail had an attachment?

25   A    Yes.

```
 1   Q     What was the attachment?

 2   A     It was an audio file.

 3   Q     I want you to keep that 6:39 p.m. in your head for a

 4   second.

 5         What happens two minutes after Mr. Craig forwards that

 6   e-mail to Mr. Leavins?

 7   A     Paul Tanaka and Steve Leavins have a two-minute telephone

 8   call.

 9   Q     And what happens at 7:33 that evening?

10   A     Paul Tanaka calls Tom Carey's cell, and they talk for four

11   minutes.

12             MR. FOX:  Your Honor, may I have a minute, please?

13             THE COURT:  Yes.

14         (Pause in proceedings.)

15             MR. FOX:  No further questions, Your Honor.

16             THE COURT:  All right.  Cross-examination.

17                     CROSS-EXAMINATION

18   Q     (BY MR. HAIG)  Ms. Tanner -- Agent Tanner, when you left

19   the FBI academy, was this your first assignment working in

20   Los Angeles in the civil rights division?

21   A     Yes.

22   Q     And your partner when you got to Los Angeles, was that

23   David Lam?

24   A     Yes.

25   Q     Did you have a supervisor at that time?
```

1    A    On the civil rights squad?

2    Q    Yes.

3    A    Yes.

4    Q    And who was that?

5    A    Victor Cockrell.

6    Q    And at some point in time, did you have a supervisor named

7    Mr. or Agent Delaney?

8    A    He was the special agent in charge, so he would have been

9    my boss's boss's boss.

10   Q    So as far as the chain when you first started, it was

11   Victor Cockrell, and above Victor Cockrell would have been who?

12   A    I believe it was Peter Angelini for a while and Doug Price

13   at the time back in 2009 or 2010, if that's what you're asking.

14   I think those were the two people that were right above Victor

15   Cockrell.

16   Q    And were you on a team of special agents at that time?

17   A    We call it a squad.

18   Q    A squad?

19   A    Uh-huh.

20   Q    And how many people on squad?

21   A    It depends, but I believe our squad -- the civil rights

22   squad at the time had maybe seven to nine agents.

23   Q    Besides looking into abuses in the Los Angeles County

24   jail, your squad was tasked with other types of civil rights

25   violations.  Would that be correct?

```
1    A      Yes.

2    Q      What kind of violations?

3    A      Human trafficking, hate crimes and then color of law.

4    Q      And color of law would be the things that you were looking

5    into; right?

6    A      Correct.

7    Q      And were there other people in your squad that were

8    looking into color of law at other types of facilities?

9    A      I'm sure there were other investigations, if you mean in

10   general at any facility at all, or do you mean Sheriff's

11   Department?

12   Q      Any custodial facility.

13   A      I'm sure there were at least some preliminary

14   investigations going on, but I don't know of any specific at

15   that time.

16   Q      And by color of law, you mean somebody who is a

17   governmental employee that's using their power as a government

18   employee to deny somebody civil rights?

19   A      Yes.  I mean, for our squad it was pretty rare to have

20   anything of a color of law violation to be anything other than

21   law enforcement, but yes, technically the statute does cover

22   broader than that.

23   Q      And it certainly doesn't necessarily have to be in a

24   custodial facility?

25   A      No.
```

```
 1   Q     Were you tasked with looking into matters inside
 2   Los Angeles County jail?
 3   A     I was just given the inmate letter, and my supervisor told
 4   me to look into the letter and determine if there was anything
 5   relevant there and whether or not something should be opened up
 6   as an investigation.
 7   Q     All right.  The inmate letter did not come actually from
 8   Anthony Brown.  Would that be correct?
 9   A     Correct.
10   Q     Who did it come from?
11   A     An inmate named Aaron Amy.
12   Q     Did you ever speak to Mr. Amy?
13   A     I did.
14   Q     At Los Angeles County jail?
15   A     Yes.
16   Q     When you spoke to Mr. Amy, was that the fist time that you
17   had actually gone to Los Angeles County jail to interview
18   somebody?
19   A     Yes.
20   Q     And you knew that there was a procedure that you would go
21   through to interview somebody; correct?
22   A     I found out when I got there the procedure.
23   Q     All right.  You went there as an FBI agent, not as
24   somebody covert; correct?
25   A     Correct.
```

```
1   Q    And you went there by yourself or with somebody else?

2   A    No, we always went to the jails with at least one other

3   agent.

4   Q    When you went and saw Mr. Amy, do you remember who you

5   went with?

6   A    I believe it was Agent David Lam.

7   Q    And that would be normal that you would go with your

8   partner?

9   A    Yeah.  I mean, on our squad if somebody wasn't available

10  that was working the case, we would just take another agent on

11  the squad just so there was always two agents present for the

12  interview.

13  Q    When you got to county jail, you went to a desk where

14  there was probably a uniformed deputy sheriff?

15  A    Yes.

16  Q    You showed him your ID?

17  A    Yes.

18  Q    And you said you wanted to interview somebody?

19  A    When you first walk in, all you do is show your ID and

20  then they open a separate secured door for you to walk through

21  to get to the sally port, and that's where you actually request

22  and write down who you're there to interview.

23  Q    You write down the name and the booking number; right?

24  A    As well as give them your driver's license, which they

25  keep, and you write your name, telephone number, things like
```

```
 1   that.
 2   Q    So you tell them who you are, you verify who you are, and
 3   do you go back to a secure facility or secure part of the
 4   facility, rather?
 5   A    Yes.  That's in the sally port, you do that.  They open
 6   the sally port gate once you've completed all the necessary
 7   paperwork, and then you walk down the hallway to the watch
 8   commander's office to check in.
 9   Q    And that would be 6,000?
10   A    The watch commander's office is before 6,000.
11   Q    The interview area is called 6,000; right?
12   A    Correct.
13   Q    And that is typically the place where law enforcement
14   would interview in-custody people at Los Angeles County jail?
15   A    Yes.
16   Q    There's also an attorney interview room, you know where
17   that is; right?
18   A    Yes.
19        (Reporter admonition.)
20            MR. HAIG:  I'm sorry.
21   Q    (BY MR. HAIG)  There's also an attorney interview room.
22   Do you know where that is?
23   A    Yes.
24   Q    All right.  Did you ever interview suspects in the
25   attorney interview room?
```

**UNITED STATES DISTRICT COURT**

```
1   A    I wouldn't call them suspects.  I wasn't there to

2   interview individuals as suspects.

3   Q    All right.  Did you ever interview incarcerated folks at

4   the attorney interview room?

5   A    I believe I did one interview in an attorney interview

6   room, and that was because the individual had an attorney and

7   the attorney wanted to be present.  And so I believe I did one

8   interview that way, but otherwise I typically went to the 6,000

9   floor.

10  Q    There's also a social visiting area there too; right?

11  A    Correct.

12  Q    But you never would interview anybody there?

13  A    No.

14  Q    Describe, if you will, how the typical interview process

15  goes, at least when it went the first time you went there once

16  you get to the interview room itself.

17  A    The process to interview somebody?

18  Q    No.  Do you get a table?  Do you have a chair?  Do you

19  stand up?

20  A    You just walk into the room, and there's a table and

21  chairs there.

22  Q    And is the inmate usually there when you get there?

23  A    No.

24  Q    Is the inmate brought there by a deputy?

25  A    Sometimes they just come down, especially if they're
```

1    general population they're not escorted, they just walk down to

2    the interview room and come in.

3    Q    They basically have a slip of paper that's an escort piece

4    of paper; right?

5    A    It's not an escort piece of paper.  It's giving them

6    permission to leave their cell and come down to the interview

7    room, and it shows that they have an interview so they're

8    allowed to be there.

9    Q    It's a pass, for lack of a better word; right?

10   A    Correct.

11   Q    Okay.  All right.  And for people that have different

12   security protocols, they would be taken perhaps by an escort;

13   right?

14   A    It's very, very few that are escorted, but yes, there is a

15   security level that they're always escorted.  They're

16   handcuffed and escorted by a deputy or sergeant at all times.

17   I don't remember many times when we would interview someone

18   that was high security and that needed that.

19   Q    After this first interview, you were then made aware of a

20   gentleman named Anthony Brown; correct?

21   A    It was not during that first interview.

22   Q    When were you made aware of Anthony Brown?

23   A    I want to say maybe it was a month, maybe two months after

24   that.

25   Q    Did you then go to county jail and speak to Anthony Brown?

```
 1   A     Yes.
 2   Q     And was that the first time you'd ever had any interaction
 3   with him in any way?
 4   A     Yes.
 5   Q     And how long did that first interview last, if you recall?
 6   A     I have no idea.
 7   Q     During that interview is when you got information from him
 8   that he may be helpful to you.  Would that be correct?
 9   A     Yes.
10   Q     Was it right after that first interview that you had
11   decided that maybe this gentleman might be a good informant?
12   A     It wasn't after the first.  I believe we spoke to him
13   maybe two or three times before -- as a team, we discussed
14   whether or not we should open him up as a source.
15   Q     And do you remember when the first interview with Anthony
16   Brown was?
17   A     I believe it was August of 2010, but I'm not positive of
18   the exact date.
19   Q     And at the time of that first interview, Mr. Brown was
20   fighting a court case in Los Angeles County Superior Court.
21   Would that be correct?
22   A     Correct.
23   Q     And was he representing himself at the time?
24   A     Yes.
25   Q     He was what's called a pro per?
```

1   A    Yes.

2   Q    Did he -- when he came to you, did he come with a lot of

3   things in tow, lot of documents and things like that?

4   A    Every once in a while he would come with some of those

5   court documents, but not every time.

6   Q    And Mr. Brown was interested, was he not, in enlisting

7   your help or Agent Lam's help in some of the things that were

8   going on with his criminal case?

9   A    He would briefly talk to us about it and ask for, not

10  help, but ask for maybe transcripts, and we always told him

11  from the very beginning that we do not get involved in state

12  court cases and we would not get involved in his case.

13  Q    Did you make any attempts to contact any of the

14  investigating officers that were involved in the prosecution of

15  that state court case?

16  A    We would never contact someone and out a source.  The

17  whole point of having a source is that they're anonymous.  So

18  you would never call someone and tell them and ask them for

19  information on your confidential source.

20  Q    And you explained that to him, right, to Anthony Brown?

21  A    We explained to him that we would be keeping his identity

22  for as long as possible anonymous, and that was the whole point

23  of him agreeing to be a source is that we weren't going to

24  constantly be telling people that he was our source.

25  Q    As part of validating a source and making sure that

1    they're going to be somebody who's valuable for you, you want

2    to make sure that that source is reliable; correct?

3    A    That's part of it.

4    Q    And is giving you worthwhile information?

5    A    Correct.

6    Q    You also want to look at that person's background;

7    correct?

8    A    Sometimes.

9    Q    Did you investigate or look at Anthony Brown's background?

10   A    Yes.  Part of the requirements when we open up any source

11   is to run a full criminal history on the individual as well as

12   look through Bureau documents to determine if they've ever

13   either provided information before or have been a source

14   before.

15   Q    Not just looking at the criminal history, but actually

16   looking at -- in Anthony Brown's case, the actual charges that

17   were pending against him; right?

18   A    Not necessarily.  That's what shows up on a criminal

19   history, so...

20   Q    He was actually being prosecuted at the time; right?

21   A    Correct.

22   Q    So there was -- instead of a criminal history, it was

23   actually a criminal present, wasn't it?

24   A    No.  The criminal history shows his arrest, so it is on

25   the criminal history.

1  Q    All right.  So did you make -- did you do anything --

2  because he had not been convicted at the time that you were --

3  and I assume he had not been convicted at the time that you

4  were first speaking to him.  Would that be correct?

5  A    Correct.

6  Q    All right.  Because he had not been convicted of any

7  crime, he was fighting his case; right?

8  A    Correct.

9  Q    And he was representing himself when you first met him?

10  A    Yes.

11  Q    All right.  At some point in time later in the future, he

12  ended up having an attorney that represented him in his trial?

13  A    I believe it was about a year after we met him, yes.

14  Q    All right.  Did you and Anthony Brown discuss the charges

15  that he was facing in his pending criminal case?

16  A    Just briefly.  Because we, again, reiterated to him that,

17  one, we don't want him to tell us significant amounts of info,

18  nor would we get involved in his case; that was a totally

19  separate matter and that was not something the FBI would

20  involve themselves in.

21  Q    As part of validating one of your sources, you want to

22  make sure that this person not only provides reliable

23  information but might necessarily be used for you in supporting

24  an affidavit or even testifying in court; right?

25  A    They could be, but we would never use solely an

1    informant's information as the only source of information in an

2    affidavit or anything of that nature.

3    Q    I understand that, but you do -- would like -- you would

4    like to have, in a perfect world, a reliable informant who is

5    also trustworthy, yes?

6    A    In a perfect world, yes.

7    Q    And part of determining whether an informant is

8    trustworthy is looking at his criminal history?

9    A    Could be one way.

10   Q    Did you look at any of the publicly-available documents in

11   Anthony Brown's pending criminal case?  And when I say

12   available documents, I mean a criminal complaint, an

13   information or a preliminary hearing.

14   A    No.

15   Q    Do you know what a preliminary hearing is?

16   A    Yes.

17   Q    All right.  It's a -- it's a preliminary hearing

18   transcript is something that might have been available in

19   Mr. Brown's case; correct?

20   A    It probably was.

21   Q    Did you seek to make a copy of that transcript from the

22   court file?

23   A    No.

24   Q    Did you look at any of the police reports underlying the

25   charges against Mr. Brown?

```
 1   A      No.

 2   Q      But you knew that he was charged with robbery?

 3   A      Yes.

 4   Q      Multiple counts of robbery; correct?

 5   A      Yes.

 6   Q      And you knew that he was charged with discharging a

 7   firearm during one of these robberies; correct?

 8   A      Yes.

 9   Q      You knew that he had several criminal convictions in the

10   past; right?

11   A      Yes.

12   Q      For violent felonies?

13   A      I don't know if they were violent felonies, but they were

14   felonies.

15   Q      Do you know what those felonies were?

16   A      I believe there was some mail fraud, some wire fraud, and

17   maybe some forgery charges that I remember looking at when we

18   first ran his criminal history.

19   Q      Do you know whether he was being prosecuted under the

20   California Three Strikes law based upon his current offense?

21   A      I don't recall if I knew at the time whether it was a

22   Three Strikes law or not.

23   Q      Now, eventually Anthony Brown went to trial; right?  Is

24   that right?

25   A      Yes.
```

1  Q    Did you monitor his trial while it was going on?

2  A    No.

3  Q    By the time he was actually in trial, did -- was he

4  actually an informant that was working for the FBI?

5  A    Yes.

6  Q    All right.  How long did that take from the time that you

7  first met with him in, you say right around August of 2010,

8  before he was actually signed on as an informant?

9  A    I believe in September of 2010 is when he was officially

10 opened up as a source.

11 Q    About a month then it took from your first meeting with

12 Anthony Brown before he was actually made a source?

13 A    Yes.

14 Q    And as you just explained when Mr. Fox was asking you some

15 questions, it's a fairly complicated process; right?

16 A    No.

17 Q    To get somebody to be a source?

18 A    No.

19 Q    No, all right.

20      Well, it takes a lot of approvals; right?

21 A    There's approvals, but it's not complicated.  It's filling

22 out forms and discussing whether or not the person has the

23 right access to the information you're trying to obtain, and

24 there's not -- as long as those things are met, for the most

25 part the approvals will be obtained fairly easily.

1   Q    Mr. Brown told you about certain things on that first

2   meeting in August of 2010 about things that he had witnessed

3   that would be within your jurisdiction as a civil rights FBI

4   special agent; right?

5   A    Yes.

6   Q    Did you do anything after that first meeting to

7   corroborate any of the things that he was telling you?

8   A    We did that for nearly every inmate that we'd interviewed,

9   including Anthony Brown, which was, to the best we could at

10  that time, while it's still being covert is take the

11  information that they were giving us and try and match it up

12  with other information we were obtaining.  But at that time,

13  without first names, last names sometimes, inmate names, we

14  couldn't do a whole lot with the information at that time.

15  Q    It's true then that Anthony Brown gave you information

16  about what he saw, and he claimed that he saw deputies engaging

17  in violent conduct against inmates; right?

18  A    Yes.

19  Q    And -- but he wasn't able to give you names of any of the

20  inmates?

21  A    It -- I believe sometimes he was able to give monikers or

22  maybe the first part of their last name.  Usually it was

23  piecemeal just because a lot of the inmates don't go by their

24  real names in jail.  So it was hard to get the specifics, but

25  he was trying to give us at least information on dates of when

1    things occurred or maybe a deputy that was involved, which

2    would in the future allow us to go back and look at incident

3    reports and things like that to match it up.

4    Q    Before making him an actual official source, did you do

5    anything to investigate on your own some of the deputies that

6    he had mentioned during that first interview in August of 2010?

7    A    Just as much as we could at that point from what the other

8    inmates had been telling us.

9    Q    Did Anthony Brown give you any names of any deputies?

10   A    Yes.

11   Q    And did you attempt to determine whether those deputies

12   were actually people that worked at the Los Angeles County

13   jail?

14   A    Yes.  Again, it was very difficult because the very most

15   that an inmate would have on a deputies is their last name is

16   on a patch on their uniform.  So at the very most, we were

17   given last names, and there's really no way with just that

18   information to determine much more about that individual or to

19   even determine which individual might be a deputy just using a

20   last name.

21   Q    And, in fact, Anthony Brown had difficulty seeing.  Would

22   that be correct?

23   A    Yes.

24   Q    And he -- and the first time you met him, he did not have

25   eyeglasses; right?

1    A      Correct.

2    Q      And he -- at one point in time after he started working

3    for the FBI, you were able to get him some eyeglasses; right?

4    A      Yes.

5    Q      And one of the purposes for getting him eyeglasses was so

6    that he could see names?

7    A      Correct.

8    Q      And see things better; right?

9    A      Yes.

10   Q      Okay.

11          THE COURT:  All right.  Ladies and gentlemen, we're

12   going to call it a day.  Again, I want to remind you until this

13   trial is over, you're not to discuss this case with anyone,

14   including your fellow jurors, members of your family, people

15   involved in the trial or anyone else, and do not allow others

16   to discuss the case with you.  This includes discussing the

17   case on the Internet, in blogs, chat rooms, bulletin boards,

18   e-mails, text messages.  If anyone tries to communicate with

19   you about this case, please let me know about it immediately.

20          Do not read, watch or listen to any news reports or other

21   accounts about the trial or anyone associated with it.  Do not

22   do any research such as consulting dictionaries, searching the

23   Internet or using other reference materials, and do not make

24   any investigation about the case on your own.

25          Finally, you're reminded to keep an open mind until all

the evidence has been received, you've heard the arguments of

counsel, the instructions of the Court and the views of your

fellow jurors.  If you need to speak with me, simply give a

note to the clerk.

We're going to resume tomorrow morning at eight o'clock.

I'd like the jury to consider whether or not you want to meet

this coming Monday.  If any one of you has made plans so that

you aren't available, just let me know, and we'll take that day

off.  But Monday is a day that is now available to the Court.

So if you're available, we could meet Monday, and if not we'll

just resume on Tuesday.  All right.  Maybe you can discuss that

in the morning and just let me know.

Thank you very much.

(The jury exited the courtroom.)

THE DEPUTY CLERK:  Please be seated.

THE COURT:  You know who your next witnesses will

be?

MR. FOX:  Yes, there are two more witnesses left.

One is FBI Special Agent Joe Rock who will be reading in grand

jury and trial testimony that Mr. Tanaka has made, and then

Ruben Martinez who is with the Sheriff's Department, and that's

it.  That's all we're planning on putting on.

Before we -- or at the time we call Special Agent Rock, we

will be asking you to take judicial notice, and I forgot to ask

you yesterday, do you want me to refile that, a corrected

```
 1   version of that?
 2           THE COURT:  I don't think it's necessary.  I think I
 3   can probably figure out what you were getting at.
 4           MR. FOX:  Thank you, Your Honor.
 5           THE COURT:  Okay.  And you're going to start your
 6   case tomorrow?
 7           MR. STEWARD:  We're planning on that, yes, Your
 8   Honor.
 9           THE COURT:  Okay.  And do you know who you're
10   calling?
11           MR. STEWARD:  We do.  Would you like that list?
12           THE COURT:  Sure.
13           MR. STEWARD:  Certainly, Your Honor.  Depending on
14   timing, Judge Birotte is maybe our first witness.  I've
15   notified his chambers that it may be as soon as tomorrow, and I
16   haven't been able to turn my cell phone back on to find out
17   whether he's available tomorrow.  There's a sheriff's deputy
18   employee by the name of Hebert, H-E-B-E-R-T; another one by the
19   name of Antuna; the name we've heard a number of times, Cecil
20   Rhambo.  We have Paul Yoshinaga.
21           As character witnesses, we have Rod Lyons; a gentleman
22   whose name I can't pronounce nor remember at the moment, I have
23   him down as the car dealer; a gentleman by the name of David
24   Real or Real who is a current Sheriff's Department employee;
25   another character witness by the name of Charlotte Lynch; and a
```

1    character witness by the name of Janice -- oh, I'm sorry, Ed

2    Medrano -- Ed Medrano is another character witness, and as of

3    right now, it's our intention that our client will testify.

4    That's subject to confirmation this evening, but that's our

5    plan at the moment.

6              THE COURT:  Okay.  And it's roughly in this order?

7              MR. STEWARD:  I hope so.  Depends on scheduling.

8    We're -- obviously, we're going much quicker than we

9    anticipated.

10             THE COURT:  Okay.  Well, what I'd like you to do is

11   to let the government know so that we don't have any delays.

12   If you can let them know this afternoon, say, by three o'clock

13   who your first four or so witnesses are going to be --

14             MR. STEWARD:  Will do, Your Honor.

15             THE COURT:  -- or four witnesses for tomorrow.

16             MR. STEWARD:  We can do that easily.

17             THE COURT:  Okay.

18             MR. FOX:  Thank you, Your Honor.

19             THE COURT:  All right.  We'll see everybody

20   tomorrow.

21        (The proceedings adjourned at 1:36 p.m.)

22

23

24

25

1              **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6              I, SHAYNA MONTGOMERY, Former Federal Official

7    Realtime Court Reporter, in and for the United States District

8    Court for the Central District of California, do hereby certify

9    that pursuant to Section 753, Title 28, United States Code that

10   the foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  *August 24, 2016*

17

18

19                  /s/ SHAYNA MONTGOMERY
                    _____
20                  SHAYNA MONTGOMERY, CSR, RPR, CRR
                    Former Federal Official Court Reporter
21

22

23

24

25


**UNITED STATES DISTRICT COURT**