1     **UNITED STATES DISTRICT COURT**

2   **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3    **HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE**

4

5 **UNITED STATES OF AMERICA,**  )
             )
6      **Plaintiff,**  )
             )
7   **vs.**       )  **CASE NO. CR 15-255-PA**
             )
8 **PAUL TANAKA,**      )
             )
9     **Defendant.**  )
             )

10

11

12

13      **REPORTER'S TRANSCRIPT OF**

14    **JURY TRIAL PROCEEDINGS - DAY 7**

15     **FRIDAY, APRIL 1, 2016**

16       **8:00 A.M.**

17     **LOS ANGELES, CALIFORNIA**

18

19

20

21

22

23    **SHAYNA MONTGOMERY, CSR, RPR, CRR**
   FORMER FEDERAL OFFICIAL COURT REPORTER
24   312 NORTH SPRING STREET, ROOM 410
    LOS ANGELES, CALIFORNIA 90012
25    SHAYNAMONTGOMERY@YAHOO.COM

```
1                      APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4        EILEEN DECKER
         United States Attorney
5        BY:  BRANDON D. FOX
             EDDIE A. JAUREGUI
6            Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California 90012
8

9
     FOR THE DEFENDANT PAUL TANAKA:
10
         H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
11       BY:  H. DEAN STEWARD
             Attorney at Law
12       107 Avenida Miramar, Suite C
         San Clemente, California 92672
13       (949) 481-4900

14

15   FOR THE DEFENDANT PAUL TANAKA:

16       LAW OFFICE OF JEROME J. HAIG
         BY:  JEROME HAIG
17           Attorney at Law
         21143 Hawthorne Boulevard, Suite 454
18       Torrance, California 90503
         (424) 488-0686
19

20
     ALSO PRESENT:
21
         Leah Tanner, FBI Special Agent
22

23

24

25
```

UNITED STATES DISTRICT COURT

1              **INDEX OF WITNESSES**

2  **PLAINTIFF'S**
   **WITNESSES**                                      **PAGE**
3
   LEAH TANNER
4
           Cross-Examination (Continued) by Mr. Haig      11
5          Redirect Examination by Mr. Fox               71
           Recross-Examination by Mr. Haig               72
6

7  JOE ROCK

8          Direct Examination by Mr. Fox                 77

9
   RUBEN MARTINEZ
10
           Direct Examination by Mr. Jauregui            83
11         Cross-Examination by Mr. Steward             103
           Redirect Examination by Mr. Jauregui         105
12

13

14


15 **DEFENDANT'S**
   **WITNESSES**                                      **PAGE**
16
   PAUL K. TANAKA
17
           Direct Examination by Mr. Haig               108
18         Cross-Examination by Mr. Fox                 198

19

20

21

22

23

24

25


**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|--------|-------------|--------------------|----------|
| 2 | Sheriff's Headquarters Bureau Diagram | 174 | |
| 30 | E-mail Chain Ending 8/24/11 | 79 | |
| 142 | Special Operations Group Surveillance Log 9/13/11 | 88 | 89 |
| 143 | Special Operations Group Surveillance Log 9/14/11 | 88 | 89 |
| 144 | Special Operations Group Surveillance Log 9/26/11 | 88 | 89 |
| 145 | Special Operations Group Surveillance Log 9/28/11 | 88 | 89 |
| 146 | SOG Weekly Report 8/29/11 | 97 | 98 |
| 147 | SOG Weekly Report 9/5/11 | 97 | 98 |
| 148 | SOG Weekly Report 9/12/11 | 97 | 98 |
| 149 | SOG Weekly Report 9/19/11 | 97 | 98 |
| 150 | SOG Weekly Report 9/25/11 | 97 | 98 |
| 151 | LASD Surveillance Request | 100 | 100 |
| 152 | Special Operations Group Surveillance Log 9/28/11 and 9/29/11 | 100 | 100 |
| 182 | Tanaka GJ Transcript 12/19/12 | 76 | 80 |
| 183 | Tanaka Trial Transcript - Sexton 1 | 78 | 80 |
| 193 | Stipulation Re Tanaka Previous Testimony | 75 | |
| 205 | Tanaka Trial Transcript - Thompson | 79 | 80 |

**UNITED STATES DISTRICT COURT**

1        **INDEX OF EXHIBITS (CONTINUED)**

2                                              **FOR**
         **NUMBER   DESCRIPTION              IDENTIFICATION   RECEIVED**
3
         305       Business Card Back (Our Core      126           127
4                  Values)

5        310       LASD ORG Chart                    109           109

6        346       FBI - Cell Phones as Prison        42
                   Contraband
7
         360       E-mails - Tanaka and Leavins      185           185
8
         361       E-mails                           189           189
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1            LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 1, 2016

 2                            8:00 A.M.

 3                            --oOo--

 4            THE DEPUTY CLERK:  Calling item number one,

 5   CR 15-255, U.S.A. vs. Paul Tanaka.

 6       Counsel, state your appearances, please.

 7            MR. FOX:  Good morning, Your Honor.  Brandon Fox and

 8   Eddie Jauregui on behalf of the United States.

 9            THE COURT:  Good morning.

10            MR. JAUREGUI:  Good morning.

11            MR. STEWARD:  And, Your Honor, Dean Steward and

12   Jerome Haig on behalf of Mr. Tanaka who's present.

13            THE COURT:  Good morning.

14            MR. HAIG:  Good morning.

15            THE COURT:  I think we're missing one of the jurors,

16   and we'll get started.

17       What I'd like to do this morning is to give the jury a

18   sense of where we are in the case, and as I understand it,

19   there's a cross-examination of the current witness and the

20   government intends to call two additional witnesses.

21            MR. FOX:  Yes, including -- that two includes the

22   person who's just going to read back the testimony.

23            THE COURT:  Okay.  And your rough estimate of...

24            MR. FOX:  Once the special agent's off the stand,

25   the read back should take about 30 minutes and about a
```

```
 1   15-minute direct of our next witness.  So I can't imagine the
 2   cross of the next witness is -- the last witness is very
 3   extensive.  So I think that once Special Agent Tanner's off the
 4   stand, we're probably talking about an hour longer.
 5              THE COURT:  Okay.
 6              MR. STEWARD:  And, Your Honor, Mr. Tanaka would be
 7   our first witness.  Our best estimate is the direct is going to
 8   run at least two hours.  I'm sure counsel's cross will be
 9   somewhat lengthy as well, so the expectation is he would be on
10   the stand the rest of the day.  We have a brief character
11   witness that will be available at the end of the day if we need
12   that witness, but I think that's what'll happen the rest of
13   today.  Then on either Monday or Tuesday, we have approximately
14   eight or nine witnesses, which will probably take up most of
15   the day.
16              THE COURT:  Okay.  And how many of those are
17   character witnesses?
18              MR. STEWARD:  Half.  Four, I believe of the eight or
19   nine.
20              THE COURT:  Okay.  I believe Mr. Yoshinaga is also a
21   potential witness.  I have a recollection that he either was or
22   currently is employed by county counsel.
23              MR. STEWARD:  Correct, Your Honor.
24              THE COURT:  Okay.  I'm going to send out an order
25   today requiring a proffer for certain of the defense's disputed
```

1  jury instructions.  You can -- that'll be ready within the

2  hour, and you can take a look at that.  I'd like to, if

3  possible, get that Sunday sometime or at the latest early --

4  well, we're going to go on Monday.  If we don't go on Monday,

5  then you can probably file it Monday.  If we're going to go on

6  Monday, I'll probably need it sometime Sunday.

7          MR. FOX:  And, Your Honor, I assume we'll have a

8  jury instruction conference sometime after that proffer, of

9  course, but are you thinking that we will do it Monday -- if we

10 hold court Monday, Monday after the defense case is finished?

11          THE COURT:  As to the?

12          MR. FOX:  As to the jury instructions.

13          THE COURT:  Yes.

14          MR. FOX:  Okay.  Thank you.

15      So in other words, for us to anticipate the closing, if

16 they're going to call eight or nine witnesses on Monday, we'll

17 then have a jury instruction conference so we could plan on

18 closing the next day.  Is that what your preference is?

19          THE COURT:  That just kind of depends.  My usual --

20 my experience has been that sometimes all those witnesses don't

21 get called.  If we're done Monday early enough, it's

22 conceivable that we'll try to squeeze those closings in.

23          MR. FOX:  We'll be ready.  Thank you, Your Honor.

24          THE COURT:  Okay.

25          MR. FOX:  Your Honor, if we have no other

1  housekeeping issues, would you like the witness on the stand

2  for when the jury comes in?

3          THE COURT:  Well, let's find out what the status of

4  them is.

5          MR. FOX:  Okay.

6     Your Honor, there's one thing I've cleared with the

7  defense but wanted to clear with you.  When we're reading back

8  Mr. Tanaka's testimony, at one point there's a reference to an

9  exhibit that is being discussed in his testimony.  It is an

10  exhibit at this trial as well.  It's Exhibit 30, and my plan is

11  to publish it at the same time that we are reading back that

12  portion of the testimony.  It's fine with the defense.

13          THE COURT:  All right.  Now, one other thing, when

14  you're reading back his testimony, is that being read from an

15  exhibit?

16          MR. FOX:  Yes, Your Honor.

17          THE COURT:  Okay.  And I guess my question is

18  whether we want to have the reporter record that or we can use

19  the exhibit.

20          MR. FOX:  My preference, based on what we saw in a

21  trial in 2014 in the court, of course with a different

22  reporter, but the read back -- when the jury asked to have it

23  read back later, it was not exact with the exhibit.  And I

24  think if we read it back accurately according to the exhibit --

25  and I'm happy to provide your court reporter with copies of

1    those -- I think it would be better to base it on that exhibit

2    rather than on what the court reporter puts down in case

3    there's a typo or something like that.

4            MR. STEWARD:  Agreed, Your Honor.

5            MR. FOX:  Thank you, Your Honor.

6            THE COURT:  So she won't have to record it?

7            MR. STEWARD:  Correct.

8            MR. FOX:  Yes.  And, Your Honor, if we could,

9    though, just put on the record that both parties agree that it

10   was read back the right way when we're done, I think that would

11   be great.

12           THE COURT:  That's fine.

13           MR. FOX:  Thank you.

14           THE COURT:  Let's bring the jury in.

15           MR. FOX:  Would you like the witness?

16           THE COURT:  Yes, please.

17        (The jury entered the courtroom.)

18           THE DEPUTY CLERK:  Please be seated.

19           THE COURT:  Good morning, ladies and gentlemen.

20           THE JURY PANEL:  Good morning.

21           THE COURT:  Let me give you a little idea of where

22   we are in the case.  I expect that the government will conclude

23   its case today, probably sometime this morning.  The defense

24   will then begin its case, and that will -- it'll take probably

25   most of today, and then I think they will probably have maybe

1   another day putting on evidence.  I'd like you to know that

2   when you think in terms of whether or not you want to meet on

3   Monday or whether you want to go on Tuesday.  So maybe at the

4   first break, maybe you can decide what you want to do.

5             THE JUROR:  We took a vote yesterday.

6             THE COURT:  Okay.

7             THE JUROR:  And we would like to be on Monday.

8             THE COURT:  All right.

9        All right.  So we will go forward on Monday.

10       All right.  Cross-examination of the witness.

11       Ms. Tanner, you're reminded that you're still under oath.

12            THE WITNESS:  Yes, Your Honor.

13            MR. HAIG:  Thank you, Your Honor.

14                CROSS-EXAMINATION (CONTINUED)

15  Q   (BY MR. HAIG)  Ms. Tanner, I want to go back to August of

16  2010 and specifically after you met with Anthony Brown on

17  6,000.

18  A    Okay.

19  Q    All right.  That was your first meeting; right?

20  A    Yes.

21  Q    All right.  After that first meeting, had you and your

22  partner, Special Agent Lam, decided that you would want to vet

23  him as an informant?

24  A    The discussion started around that time after we met with

25  him the first time.  We didn't -- we had, I think, maybe one or

```
 1   two more meetings before we made the ultimate decision to
 2   officially ask him if he would be willing to be a source.
 3   Q    One or two more meetings with Mr. Brown or with your
 4   partner?
 5   A    With Mr. Brown.
 6   Q    Okay.  And again, at 6,000?
 7   A    Yes.
 8   Q    All right.  Now, the 6,000 interview room, it's a -- as
 9   far as you know, a secure room, nobody's listening in as far as
10   you know; right?
11   A    As far as I know.
12   Q    Right.  Okay.
13        And there's no signs posted about conversations being
14   recorded or anything like that?
15   A    No.
16   Q    All right.  In between the time that you met with him the
17   first time, did you give him your phone number?
18   A    I don't know if it was the first time, but in one of the
19   first few meetings I did provide him with my desk line.
20   Q    Your desk line, and where would that be?  In what physical
21   building would that desk line be?
22   A    It's the FBI office in Westwood.
23   Q    The civil rights division; right?
24   A    It's not really a division.  The whole FBI office is in
25   Westwood.
```

```
 1  Q    I see.  And the number that you gave him was actually
 2  the number that would ring on your --
 3       (Reporter admonition.)
 4          MR. HAIG:  Sorry.
 5  Q    (BY MR. HAIG)  The number that you gave him was the number
 6  that would ring at your desk?
 7  A    Correct.
 8  Q    Did he ever call you at that number?
 9  A    Yes.
10  Q    And were you ever at your desk when the call came through?
11  A    Sometimes.
12  Q    And when the call came through, you would have some sort
13  of -- for lack of a better word, some prerecorded message that
14  it was a call coming from an inmate at Men's Central Jail?
15  A    I would recognize the number on the caller ID as the
16  number of what it looked like when a jail call was coming in.
17  Q    And you would pick up; right?
18  A    For the first nine months, no.
19  Q    You never answered any of his calls?
20  A    I don't believe in the first nine months I answered any
21  phone calls that came from the jail.
22  Q    How were you able to communicate with Mr. Brown?  Was it
23  always face-to-face during those first nine months?
24  A    It was usually face-to-face.  Sometimes what would happen
25  is we kind of had a code where if he would call, in the
```

```
 1    recordings it would say "You have a telephone call from county
 2    jail from," and then it would give him a short time period to
 3    say their name, and then he would hang up.  And that was kind
 4    of code for "Come down and see me at the jail."
 5    Q     All right.
 6    A     "I have information."
 7    Q     Okay.  And that was a code that the two of you had
 8    discussed during personal meetings?
 9    A     Yes.
10    Q     So for those first nine months, would the interviews and
11    talks with Mr. Brown always be on 6,000?
12    A     Yes.
13    Q     Was there a point in time when that changed?
14    A     At some point, we decided that it would be too obvious if
15    we were meeting with him so often.  So we actually had -- in
16    order to build the undercover, actually, we had the undercover
17    agent CJ go and pose as his friend and go through the visitors
18    section and meet with Anthony Brown as just a regular visitor
19    through the glass so that it -- he could still get the
20    information, but we didn't actually have to go to the jail to
21    meet with him.
22    Q     CJ would be in civilian clothes; correct?
23    A     Yes.
24    Q     And he would just be posing as a normal civilian?
25    A     Correct.
```

1  Q    And he was at the social visiting window we spoke about

2  yesterday?

3  A    The visiting area, yes.

4  Q    And there's a glass with a phone on each side?

5  A    Yes.

6  Q    And have you been in that room before?

7  A    I have.

8  Q    So you know there's signs all over about the conversations

9  being recorded?

10 A    Yes.

11 Q    Were any safeguards taken by CJ, as far as you know, to

12 preserve the confidentiality of the source?

13 A    Well, they would speak as though they were friends.  They

14 wouldn't -- CJ would not go in and speak to him as an FBI

15 agent.  He would go in and speak to him as if they were

16 friends, and they would speak in kind of a code to each other

17 so that both of them kind of knew in general what the other one

18 was trying to talk about without actually saying things, you

19 know, that were completely obvious about who each other was.

20 Q    Did this begin after Mr. Brown was already signed as an

21 informant?

22 A    Yes.

23 Q    The talking in code at the social window; right?

24 A    Yes.

25 Q    You do know that there are certain safeguards an informant

```
1    has to know about before he agrees to be an informant for the

2    federal government; correct?

3    A     I'm not sure what you mean by "safeguards."

4    Q     Well, he has to know what the rules of the game are;

5    right?

6    A     Yes.

7    Q     And that's set forth in a -- for lack of a better word, a

8    contract between the government and him; right?

9    A     It's not a contract.

10   Q     Well, he has to sign something, doesn't he?

11   A     He does not.

12   Q     Did he sign anything in this case?

13   A     I don't believe so.

14   Q     Did you present him with any documentation for him to read

15   about the things he needs to do and things he needs to abide

16   to?

17   A     We do it verbally.

18   Q     When you say you did it verbally, you did it verbally in

19   this situation?

20   A     When we first signed him up as a source, yes.

21   Q     And when you first signed him up as a source, did you do

22   it verbally because you didn't want to tip off the L.A. County

23   Sheriff's Department to the fact he was a confidential source

24   inside the jail?

25   A     We do it verbally with every source, so I'm not sure what
```

1   would tip us off if we were having a conversation with him in

2   person.

3   Q    Did you have him sign any documentation?

4   A    Not when we first signed him up, no.

5   Q    You say you do it verbally with every source?

6   A    Yes.

7   Q    That's your practice?

8   A    Yes.

9   Q    And as far as every source, what source number was this

10  gentleman in how many sources you had used in your career as an

11  FBI agent?

12  A    I'm sorry, I do not understand your question.

13  Q    Was this the first person you had ever used as a

14  confidential informant?

15  A    No.

16  Q    How many people had you used before this time?

17  A    I had one source prior to that.

18  Q    Was this the first source you would use as a confidential

19  informant who was actually an inmate in a custodial facility?

20  A    Yes.

21  Q    Did you tell Mr. Brown that he was not allowed to commit

22  any outside offenses other than what you authorized him to do?

23  A    Yes.

24  Q    Did you tell him that he couldn't sell drugs inside the

25  jail, for instance?

1   A    We don't get specific.  We have four very general

2   admonishments that is given to every single source when we open

3   them up.  It doesn't matter who they are.  If they're an

4   inmate, if they're the CEO of a company, it's always the same

5   at least four admonishments that everyone is given.

6   Q    And do you recall when that admonishment was given to him?

7   A    It would have been whatever day we officially opened him

8   as a source, so I believe sometime in September of 2010.

9   Q    And you said that the opening him of a source was approved

10  through your chain of command.  Would that be correct?

11  A    Correct.

12  Q    And who would those people be that approved him as a

13  source?

14  A    My supervisor Victor Cockrell, and then, like I said, I

15  believe at the time it would have been his boss who was, I

16  think Doug Price or Pete Angelini at the time.  I can't

17  remember who was the boss at the time.

18  Q    Was the intent at the time that he was approved as a

19  source to introduce any kind of device to him that would allow

20  him to record or listen to activity inside the jail?

21  A    Not initially.

22  Q    Initially, the -- you just wanted to talk to him about the

23  things he had seen; right?

24  A    In general, it was to continue gathering information on

25  the allegations that we had been hearing from multiple people

1    at that time, and so we don't necessarily sign up a source with

2    one specific purpose.  It's to continue to gather information,

3    and then from there we move forward with our investigation.

4    Q    Did Mr. Brown provide you with information after he was

5    signed up in September of 2010?

6    A    Yes.

7    Q    Did that information result in him being able to testify

8    in front of a grand jury?

9    A    Yes.

10   Q    And did he testify in front of a grand jury in 2010?

11   A    No.

12   Q    He didn't testify in a grand jury until late 2011 the way

13   you testified; is that right?

14   A    Late 2012.

15   Q    2012, thank you.

16        In September of 2010, do you know where Anthony Brown was

17   housed within Men's Central Jail?

18   A    I believe he was still on the 2,000 floor.

19   Q    The name of Gilbert Michel, when did that name come up in

20   your conversation with Anthony Brown?

21   A    I don't believe we actually knew the name Gilbert Michel

22   until after we had actually had the undercover meet with him.

23   We had had a different name that he gave Anthony Brown and that

24   he gave CJ, so we didn't actually know it was Anthony Brown

25   until the meet-up.

1  Q    You didn't know it was Gilbert Michel --

2  A    Correct.

3  Q    -- until the meet-up.

4       You mean the meet-up that was videotaped with CJ giving

5  the phone to Gilbert Michel?

6  A    I believe it was either just immediately before based on a

7  phone number or it was right after when we had followed him to

8  his apartment after the exchange.

9  Q    Was it -- did you not know Deputy Michel's name because

10 Mr. Brown didn't give you his name?

11 A    I believe what it was is that when Deputy Michel called CJ

12 to set up the meeting, he called himself Rich.  And so at that

13 point, we didn't necessarily know the full name because again,

14 Anthony Brown only sees the last name.  And so at that point,

15 we weren't able to definitively say who exactly it was at that

16 point.

17 Q    But you had known -- before the arranged meeting with CJ

18 and Deputy Michel, you had known before from Anthony Brown that

19 Deputy Michel was somebody that Anthony Brown was trying to get

20 in good favor with; right?

21 A    I don't believe -- I mean, I'd have to look back at my

22 notes.  I do not know that it was right before that that we

23 actually knew his real name.

24 Q    I'm not asking about the real name.  I'm just asking about

25 the actual person.  You knew that there was some -- that some

```
1   guard -- some deputy sheriff at Men's Central Jail that Anthony
2   Brown was trying to get into good graces with to have him
3   accept a bribe or have him -- give assistance to him; right?
4   A     Well, I don't know that's a fair characterization that he
5   was trying to get a deputy to get in his good graces.  We were
6   aware that there was a deputy that was willing to take a bribe
7   and bring in contraband.  And so yes, we did know that.
8   Q     And that was through what Anthony Brown had told you;
9   right?
10  A     Not me.  The undercover agent.
11  Q     CJ?
12  A     Yes.
13  Q     During a social visit?
14  A     I believe it was during one of those meetings.
15  Q     When was it that Anthony Brown first asked you for a cell
16  phone?
17  A     He never asked for a cell phone.
18  Q     Whose idea was it to bring in the cell phone?
19  A     We had heard from multiple inmates about the willingness
20  of deputies to smuggle in contraband, and we'd heard that it
21  was anything from food, pornography, and so in jail contraband
22  can be anything that they're just not allowed to have.  So it
23  may not be illegal on the outside, but in jail it's considered
24  contraband.  So it was a whole host of things that we were
25  learning, including phones, outside food, things like that.
```

1    And so we -- we discussed as a team that a phone would actually

2    be a dual purpose way for us to determine if this deputy was

3    going to accept a bribe.

4    Q    You knew at the time that possession of a unregulated

5    phone by an inmate in county jail was a violation of California

6    criminal law, did you not?

7              MR. FOX:  Objection, misstates the law.

8              THE COURT:  Let's come back to that question.

9    Q    (BY MR. HAIG)  You stated that the cell phone was a dual

10   purpose entity?

11   A    Yes.

12   Q    A dual purpose in that you could corrupt -- or Anthony

13   Brown could corrupt this guard by getting a bribe; right?

14   A    I would absolutely not characterize it as somebody

15   corrupting a deputy.

16   Q    So you would testify it as deputy already being corrupt

17   and accepting something that proves his corruptness; right?

18   A    I would absolutely say if a deputy is taking a bribe they

19   are corrupt and they are not being corrupted, yes.

20   Q    Okay.  Fair enough.  I'm not going to disagree with you on

21   that, but the taking of a bribe for bringing an item into the

22   jail could be any item from pornography to food to something

23   illegal like drugs; right?

24   A    It could be, yes.

25   Q    And Deputy Michel's conviction for taking a bribe was not

1   conditioned upon the bribe for a phone, it was conditioned upon

2   the bribe, period; correct?

3   A      Correct.

4   Q      What use did the phone have in the aspect of Deputy Michel

5   accepting this bribe?

6   A      As I previously testified, it was dual purpose.  One, to

7   corroborate whether or not deputies were, in fact, accepting

8   bribes in exchange for bringing contraband, but it also

9   provided our source the opportunity to have more up-to-date

10  contact with the undercover agent to relay information on what

11  was going on in the jail.

12  Q      When you say up-to-date contact, do you mean Anthony Brown

13  actually using the phone and calling the source CJ?

14  A      Or texting, yes.

15  Q      Or texting.  Or what, calling you perhaps too?

16  A      He was ordered to only call CJ.

17  Q      He didn't follow those orders, did he?

18  A      I believe once or twice he tried contacting me, yes.

19  Q      At your line at the FBI office; right?

20  A      Correct.

21  Q      There was a time before Anthony Brown got the phone that

22  was smuggled into him that he'd asked you for a phone; right?

23  A      Again, he never asked us for a phone.  That's not an

24  accurate characterization.

25  Q      The two of you had discussed or it had been discussed

1    either with you and him or with CJ and him about him getting a

2    phone; right?

3    A    It was about the fact that a deputy was willing to bring

4    in a phone, not that he was saying "Give me a phone."

5    Q    He was anxious to get the phone, was he not?

6    A    He -- I would not characterize it that way.

7    Q    Wasn't there a phone call that you had with him on the

8    recorded line at county jail where he was asking about the

9    phone?

10   A    Yes.

11   Q    And didn't you respond that he would get the phone soon

12   enough?

13   A    Yes.

14   Q    All right.  So he was asking about the phone, he wanted

15   the phone?

16   A    He knew that the meet was taking place because Gilbert

17   Michel had told him that he was meeting with CJ, and at that

18   point he still hadn't received the phone.  So he didn't know

19   what was going on, and nobody had had contact with him.

20   Q    This was all the way in the summer of 2011; right?

21   A    Correct.

22   Q    This conversation that you had with him on the recorded

23   line was maybe a week or two before he actually got the phone?

24   A    I believe it was, yeah, within a week or something close

25   to that.

```
1    Q    So let's call it approximately mid-July of 2011?

2    A    I think it was something like that, yes.

3    Q    By that time, you had known that Mr. Brown had already

4    been sentenced to state prison?

5    A    I believe, yes, we knew at that time.

6    Q    And had been sentenced to 423 years to life in state

7    prison?

8    A    I don't know if we knew the sentence at that point, but we

9    knew that he had been sentenced, I believe.

10   Q    You knew it was a lengthy sentence?

11   A    I believe so, yes.

12   Q    And you knew the protocols in county jail were that he

13   would soon be sent -- if he had no other holds, would soon be

14   sent to state prison from county jail; right?

15   A    That's what is supposed to happen, yes.

16   Q    Right.  And that's what typically happens because you knew

17   that; right?

18   A    Correct.

19   Q    So at the time that the phone was smuggled in by Deputy

20   Michel and given to Anthony Brown, this sentenced inmate was

21   imminently going to depart county jail and go to state prison;

22   right?

23   A    At some point, yes.

24   Q    And was it your intent for him to take that phone with him

25   to state prison?
```

```
 1  A    We hadn't really discussed how it would occur, but our
 2  intention was not necessarily that it would go with him, and if
 3  it did then we would obviously take the appropriate steps since
 4  we had no reason to believe or had any intention of having it
 5  in a state facility at that point because the purpose was for
 6  county jail and issues going on in county jail.
 7  Q    The cell phone that he had was to -- you say a dual
 8  purpose, communicating with CJ, memorializing by a photo or a
 9  video something that was going on in county jail.  Would that
10  be correct?
11  A    And then also to determine whether or not deputies were
12  bringing in contraband in exchange for bribes.
13  Q    Other deputies besides Deputy Michel?
14  A    In general, if we were able to determine that what we were
15  being told by multiple inmates about multiple deputies was
16  confirmed with one deputy, then it would absolutely allow us to
17  continue looking to determine if it was happening with other
18  deputies as well.
19  Q    So explain this to me.  Was it something that CJ had
20  instructed Anthony Brown to text him if he saw a deputy taking
21  a bribe from another inmate?
22  A    No.  When you do an investigation, what you're doing is if
23  you corroborate the initial allegation, then what you do is you
24  continue to build on that investigation.  So if we knew that
25  Deputy Michel had, in fact, accepted a bribe, we then begin to
```

1    look at him.  Who are his associates in the jails?  What

2    deputies does he call a lot on the phone?  And determine

3    whether or not they may be people that are also engaged in this

4    behavior.

5    Q    The cell phone wasn't a tool to help you in that in any

6    way.  In other words, how was -- how was Anthony Brown able to

7    memorialize with the item that he had in his hand, the cell

8    phone, anything regarding bribes being taken?

9    A    It's actually a direct correlation because if at this

10   point Deputy Michel is now aware that this inmate -- to his

11   belief, he's receiving cash bribes from an individual on the

12   street that's associated with Anthony Brown.  If he has a

13   friend who he wants to cut in on the action, he can easily tell

14   him, "Okay, hey, you can do this too" and set him up with

15   Anthony Brown.  We had no idea where this was going to go,

16   which was the whole point of the investigation, to determine

17   how far-reaching this really was.

18   Q    That's great, but I'm asking about the cell phone itself.

19        Was the cell phone something that you had instructed or CJ

20   had instructed Anthony Brown to use as a recording device to

21   record bribes being given to any other deputy sheriff?

22   A    I don't know how you would bribe a deputy in the jails.

23   It's more the contact and various things.  So if another deputy

24   came to the cell and said, "Hey, Deputy Michel told me that you

25   got some cash on the outside, I want in," the source could then

```
 1   text the undercover and give him the information and it could
 2   go from there.
 3   Q    The source could also remember, like Anthony Brown could
 4   remember, what happened and then just tell CJ at the next time
 5   he meets with him too; right?
 6   A    He could.
 7   Q    Right.  Without the danger of having the cell phone in the
 8   jail; right?
 9   A    The idea was to have realtime contact, not wait for a
10   couple weeks until CJ went back to the jail for another visit.
11   Q    Well, realtime contact could be Anthony Brown going and
12   making a phone call to you and using your code so that CJ can
13   come and talk to him; right?
14   A    Could be.  Visits do not occur every day, so...
15   Q    They don't occur every day, but you're allowed to go when
16   you want to go; right?
17   A    I was staying out of the jails at that point to not reveal
18   the fact that we were continuing to meet with Anthony Brown.
19   So no, it was not logical that I would immediately go to the
20   jails.
21   Q    There are social visits quite frequently?
22   A    Yes.
23   Q    At least three or four days a week you can have social
24   visits at Men's County Jail [sic]?
25   A    Yes.
```

```
1   Q    At the most, it would have been two days from the time
2   that CJ said something; correct?
3   A    Yes.
4   Q    During the time that Anthony Brown had the phone, were
5   there any texts that you talk about between Anthony Brown and
6   CJ about another deputy talking about corrupt activity?
7   A    No.  He had the phone for a little over a week and a half,
8   so there was really not much time.
9   Q    A week and a half?  That's a long time to have a phone,
10  isn't it?
11  A    I personally don't think so, no.
12  Q    You don't think so?
13  A    No.
14  Q    In that week and a half, there was really nothing that you
15  gained from Anthony Brown's possession of the phone.  Would
16  that be correct?
17  A    I think the fact that it was brought in and a deputy
18  accepted a bribe is a very big thing, actually.
19  Q    I'm talking about from the phone itself.  Not from the
20  bribe, but actually from the actual item, the phone itself.
21       Was there any actual intelligence gained from that phone
22  itself?
23  A    The fact that Anthony Brown had the ability to regularly
24  contact our source, I think is incredibly important.  The fact
25  that he had it for such a short amount of time to me does not
```

1   show there was no relevance to bringing it in.  I don't think

2   there's any correlation between the two.

3   Q    You're basically saying that the importance of the phone

4   is that he was able to text CJ on a regular basis?

5   A    That he had the ability to reach out to the undercover

6   agent and have contact with him on a regular basis, absolutely.

7   Q    The ability to do so; right?

8   A    Yes.

9   Q    But that ability did not result in any actual intelligence

10  that you got from any of those texts.  Would that be correct?

11  A    Correct.

12  Q    You've already said that Anthony Brown was vetted as an

13  informant.  Part of working as an informant is getting paid;

14  right?

15  A    Not always.

16  Q    Well, in this case, Anthony Brown was paid; correct?

17  A    He was.

18  Q    When was the first time that you gave him money?

19  A    We never gave him money.  Everything is a -- in the jails

20  there's a system that they call putting money on the books.

21  It's not cash.  It's just something they can use to purchase

22  items like food and phone cards, and so the initial money that

23  we requested for him was actually not for him.  It looks as

24  though it's being paid to him through our source system, but it

25  was actually for him to purchase phone cards to be able to call

1    initially instead of calling collect.  That was very early on.

2    Q    In the county jail, the system is inmates are not allowed

3    to have cash on their person; correct?

4    A    Correct.

5    Q    And there's a system where you can go online and you can

6    enter your credit card and give them money that they have on

7    their books; right?

8    A    Correct.

9    Q    And that's what the FBI did?

10   A    Yes.

11   Q    And that money is then used to purchase things inside the

12   jail?

13   A    Correct.

14   Q    Commissary items, food, phone cards, things like that;

15   right?

16   A    Yes.

17   Q    Okay.  And you're saying that he bought some phone cards;

18   correct?

19   A    We told him to buy phone cards, yes.

20   Q    And did you tell him to buy phone cards and give them to

21   other people?

22   A    Some of the times, he was using phone cards to give to

23   inmate trustees who are inmates that had a lot more privileges

24   of being able to walk around the jails.  And in giving them to

25   the other inmates, the other inmates would let the -- or tell

1    the deputies, "Go ahead and let this guy out to help me out,"

2    and it allowed Anthony Brown to walk around the jails more so

3    that he would have more access to information.

4    Q    He also gave some phone cards to what you would term would

5    be "shot callers," gang members; right?

6    A    They were gang members.  The shot callers was specific to

7    them kind of being in charge of the floor of inmates.

8    Q    So people that were housed at the Men's Central Jail that

9    had some authority in their general area amongst the inmates

10   there.  Would that be correct?

11   A    Yes.

12   Q    Were any of these shot callers vetted?

13   A    No.

14   Q    Did you know specifically who they were?

15   A    No.

16   Q    At some point in time, Anthony Brown also told you that he

17   had some drugs that he had sold to other inmates in Men's

18   Central Jail while he was your informant; correct?

19   A    I believe he told us that after he was transferred to

20   state custody.

21   Q    He gave you the names of the people that he allegedly sold

22   drugs to; correct?

23   A    Yes.

24   Q    Names of inmates?

25   A    I believe they were monikers.  They weren't names.

1    Q    Did you do anything to investigate the truthfulness of

2    what Anthony Brown told you?

3    A    At that time, I believe we had information that it --

4    because his claim of selling drugs came from the fact that he

5    was saying that Michel -- Deputy Michel had brought him in

6    drugs that he, in turn, sold.  At that time, we had no reason

7    to believe that that was actually true, that Gilbert Michel had

8    brought in drugs.

9    Q    You feel that Anthony Brown was lying to you about that?

10   A    Yes.

11   Q    Lying about committing another crime?

12   A    Yes.

13   Q    All right.  That wasn't the first time he had lied to you,

14   though?

15   A    I believe there were a couple other things that we

16   couldn't verify.  I don't know that I would call it lies, but

17   that we couldn't determine whether it was true or not.

18   Q    At the time that -- let me back up.

19         The recommendation to bring the cell phone into the jail

20   and be put into Anthony Brown's hands, was that something that

21   you supported?

22   A    Yes.

23   Q    And was that something that your partner supported?

24   A    Yes.

25   Q    Was that something that you could approve on your own?

1    A    Absolutely not.

2    Q    So how did this approval happen?  Did you have to go to

3    another level?

4    A    Absolutely.

5    Q    How many levels above you did it have to go?

6    A    Like I said yesterday, we have almost a dual track

7    approvals for anything involving a bribe.  And so not just the

8    bribe payment, but the overall operation, which included

9    bringing the cell phone in, was approved both in Washington,

10   D.C. as well as the executives in the FBI office in L.A.

11   Q    As far as you know -- as far as you know, when you were in

12   the FBI a few years ago in 2011, had the FBI ever been involved

13   in bringing a cell phone into county jail and be placed in the

14   hands of an inmate?

15   A    I didn't know of any.  It doesn't mean it didn't happen,

16   but I didn't know of any.

17   Q    Did you -- were you aware of the dangers of a cell

18   phone -- an unregulated cell phone being in somebody's hands?

19   A    I wouldn't necessarily call it unregulated.  We had some,

20   you know, safeguards in place, but yes, we knew that there were

21   some risks.

22   Q    This cell phone was as regulated as me going to Radio

23   Shack and buying a cell phone.  Would that be correct?

24   A    I mean, if you were checking online every day to see what

25   calls were being made by someone else, then I guess yes.

1  Q    You didn't have a special website -- a special FBI website

2  to get anymore information on this phone than a normal consumer

3  would be able to get on the phone; right?

4  A    Correct.

5  Q    All you would get would be the texts; right?  The text

6  numbers, but not the texts actually what they said; correct?

7  A    Correct.

8  Q    And you would get the numbers that were called or the

9  numbers that called that number; right?

10  A    Yes.

11  Q    And you would be able to see what those numbers were;

12  right?

13  A    Yes.

14  Q    This phone also had Internet access, didn't it?

15  A    I believe so.  It was a flip-phone, though, so I think

16  back then the ability to get on the Internet with a flip-phone

17  was nearly nonexistent.

18  Q    In 2011 the ability to get on the Internet with a

19  flip-phone was nonexistent, is that what you're saying?

20  A    I'm not saying it isn't possible.  I'm saying if you've

21  ever had a flip-phone and tried to get onto the Internet with a

22  flip-phone, most websites didn't work on it because it

23  wasn't -- it's not a smart phone.  It wasn't, you know, like

24  that, so I don't even know if it would have been possible.

25  Q    Did you use the cell phone before it was ever given to CJ

```
 1  to give to Deputy Michel to give to Anthony Brown?
 2  A    Yes, just turning it on, making sure everything was
 3  working properly, entering in CJ's number in the, you know,
 4  address book, making sure there was nothing on the phone,
 5  clearing it, making sure everything was good to go.
 6  Q    Did the phone come with a user's manual?
 7  A    Yes.
 8  Q    Did you read it?
 9  A    No.
10  Q    Did you attempt to go on the Internet with this phone?
11  A    I think I did.  I think I tried to check just a general
12  website, and I couldn't get it to load.  It just kept doing
13  that scrolling thing.  So I mean, again, I'm not saying that
14  the Internet didn't work.  I just don't think it was
15  necessarily built for searching the Internet.
16  Q    But the phone did have the ability to go onto the
17  Internet.  Was that correct?
18  A    Yes, technically.
19  Q    Did the phone have the ability to download any apps?
20  A    I would say it's highly unlikely that any apps would have
21  been available in 2011 for a flip-phone.
22  Q    Do you know that to be the case?
23  A    With reasonable certainty, but no, I can't say for sure.
24  Q    You never tried to download an app with that phone, did
25  you?
```

1    A    No.

2    Q    You never looked at the user manual to determine whether

3    there were any proprietary apps for that model of cell phone?

4    A    No.

5    Q    And this phone was bought at a retail establishment?

6    A    Yes.

7    Q    A Radio Shack, someplace like that?

8    A    I think like a Best Buy.

9    Q    Did you buy it?

10   A    Yes.

11   Q    All right.  And it was a Boost Mobile phone?

12   A    Yes.

13   Q    Now Boost Mobile is a subsidiary of Sprint?

14   A    I believe so, yes.

15   Q    All right.  And it's a prepaid cell phone?

16   A    Yes.

17   Q    All right.  And does it also have a -- or did it have a

18   Direct Connect feature?  Do you know what that is?

19   A    I don't think it did.

20   Q    You know what that is; right?

21   A    I do.

22   Q    Okay.  Kind of the Nextel Direct Connect thing?

23   A    I think about 20 years ago I had a phone with that, so

24   yes.

25   Q    Okay.  All right.  And Boost Mobile was also part of the

1   Sprint/Nextel network; correct?

2   A    I believe so, yes.

3   Q    And do you know whether there was any Direct Connect

4   capability on that phone?

5   A    I don't.

6   Q    Did you look into the possibility of getting a phone that

7   would be able to be monitored on a contemporaneous basis -- and

8   I'll explain contemporaneous to you -- where you're actually

9   able to know what number's being called at that time -- at the

10  exact time it's being called, being able to see the text as

11  they're being sent, being able to listen to phone calls that

12  are being made and received, being able to listen to voicemails

13  at the time that they're being listened to, basically being

14  able to get a key stroke and audio realtime of this phone?

15  A    Well, it sounds like you're describing a wiretap, and no,

16  we would not have had the authority to wiretap that phone.

17  Q    Well, you're a federal agent; right?

18  A    Yes.

19  Q    And this was a consensual encounter with Anthony Brown;

20  correct?

21  A    Correct.

22  Q    So you didn't need a wiretap, a court order to have this

23  phone listened to, did you?  It was a consensual monitoring by

24  Anthony Brown; correct?

25  A    The Bureau does not do consensual monitored T3s, so --

1  wiretaps, so no, we did not.

2  Q    I'm not asking about a wiretap.  I'm asking about -- are

3  you saying that your office did not have the ability -- the

4  technical ability to listen to this phone call and listen to

5  this phone in realtime?

6  A    We did.  The program we had would have required Anthony

7  Brown to enter in a code -- call a specific number, enter in a

8  code, and that would record any, you know, incoming, outgoing

9  calls.  And we determined that would not be safe to have a cell

10 phone set up that way because if anyone saw it or tried to use

11 it, it would be obvious that the phone was set up in a way that

12 it was almost too obvious that it was a -- you know, I don't

13 even know how to describe it -- a phone that wouldn't have been

14 set up by anyone other than probably someone like us.

15 Q    In 2011 the only way that you could have had a monitored

16 cell phone would be to enter a code.  Is that -- is that what

17 you're saying?

18 A    That's the system we use, yes.

19 Q    You stated when you talked to Anthony Brown he had a bunch

20 of items with him back in August of 2010 and maybe other times

21 too because he was representing himself; right?

22 A    He wouldn't bring them down to meet with us all the time,

23 but he would sometimes have questions or have, you know, some

24 documents that he would show us.

25 Q    Did you ever ask to look at any of his documents?

```
 1    A      Nope.

 2    Q      Did you ever ask to look at any of his police reports?

 3    A      No.

 4    Q      Did you take any safeguards to write down the victims of

 5    the multiple crimes he was eventually convicted of?

 6    A      No.

 7    Q      You know that he was on tape using a handgun and shooting

 8    at somebody; right?

 9              MR. FOX:  Objection, Your Honor, 403.

10              THE COURT:  Sustained.

11    Q      (BY MR. HAIG)  You know that there were allegations that

12    he used a gun.  You've talked about this yesterday; right?

13    A      One of his charges was discharge of a weapon.

14    Q      And you know -- I'm assuming you followed the case closely

15    enough to know that he was convicted of multiple serious

16    felonies that resulted in a long prison sentence; right?

17    A      I receive -- when you have someone opened up as a source,

18    when any type of court action or if they're arrested, if

19    they're not in custody, I get automatic notifications from the

20    Bureau, and it sends it -- sends me an e-mail saying there was

21    court action, or something like that, linked to your source.

22    And so I believe I received a notification that he had been

23    convicted, and I received that e-mail.

24    Q      Did you ever go and sit in any of his trial proceedings to

25    see what was going on?
```

```
1    A     No.  You would never -- again, you would never associate

2    yourself in a way that other people would know that you're

3    linked to that person if they're a source.  That's the whole

4    point of someone being a source.

5    Q     The answer's no; right?

6    A     No.

7    Q     Okay.  Did you ever ask CJ to go in there and sit in the

8    audience like a friend, just like on that normal visit that he

9    would have in the social visiting room?

10   A     No.

11   Q     Did anybody, as far as you know, ever monitor anything

12   that was going on in court with your source?

13   A     No.

14   Q     All right.  Except for just knowing generally that he had

15   been convicted?

16   A     Correct.

17   Q     You didn't know, like you said, none of the victims in

18   this at all; right?

19            MR. FOX:  Objection, asked and answered, irrelevant.

20            THE COURT:  Sustained.

21   Q     (BY MR. HAIG)  Did you take any safeguards to make sure

22   that when Anthony Brown got this phone that he did not contact

23   any victims besides telling him about the phone numbers that he

24   could call?

25   A     It was that as well as monitoring to determine what
```

1    numbers are being called.

2    Q    Did you discuss with your partner or with any of your

3    supervisors the dangers of having a cell phone in county jail

4    in the hands of an inmate?

5    A    Yes.

6    Q    And did you discuss that those -- that a cell phone can be

7    an actual very dangerous item?

8    A    It can be.

9    Q    That it can be used to assist in somebody breaking out of

10   jail?

11   A    It could be.

12   Q    Intimidating or calling a witness?

13   A    Could be.

14   Q    Giving the phone to somebody else where they can do the

15   same types of things?

16   A    Could be.

17   Q    All right.  Did you think that those were dangerous things

18   that were potentially possible of happening?

19   A    I think anything is possible when you have a source, but

20   again, you also look at your interactions with the individual

21   and determine the risks and balance that out and determine

22   whether or not you think that is actually something that would

23   occur in this case, and we didn't have reason to believe that

24   would be the case.

25   Q    Could you open your exhibit binder to Exhibit 346, the

43

1   white binder, I think, in front of you.

2   A    Okay.

3   Q    Have you seen this document before?

4   A    I have, but not at the time that it came out.

5   Q    And what is the date of this document, do you know?

6   A    July of 2010.

7   Q    And this document is produced by the Federal Bureau of

8   Investigation?

9   A    Yes.

10  Q    Your employer?

11  A    Yes.

12  Q    So in July of 2010, about a month before you met with

13  Anthony Brown for the first time, there was a publication in an

14  official journal of yours, the FBI Law Enforcement Bulletin,

15  about cell phones and prison contraband; correct?

16  A    Yes.

17  Q    And have you read this since then?

18  A    Since then, yes.

19  Q    And you did not read it at the time?

20  A    No.

21  Q    Did anybody in your chain of command refer you to this

22  document as something that you might want to look at before

23  agreeing that a cell phone should be put in the hands of an

24  inmate?

25  A    No.  I don't know that anyone knew about it at the time,

44

1    but no, nobody directed me to this or gave it to me.

2    Q    And how were you directed to this afterwards?

3    A    In a different situation it was presented to me.

4    Q    After looking at this document, do you reassess your view

5    about the seriousness of having a cell phone in the hands of an

6    inmate?

7              MR. FOX:  Objection, relevance.

8              THE COURT:  Sustained.

9    Q    (BY MR. HAIG)  Did you have any idea that this cell phone

10   could be detected by people in the L.A. county jail,

11   specifically people that worked there and are in charge of

12   security?

13   A    I'm not sure what you mean by "detected."

14   Q    Found.

15   A    Of course.

16   Q    All right.  And that was a concern of yours; right?

17   A    I don't know that it was necessarily a concern.  At that

18   time, again it wasn't linked to us, and so if it was found, it

19   wasn't an immediate concern knowing that it's just a

20   misdemeanor to have a cell phone in custody.  It wasn't a major

21   concern of ours.

22   Q    It's just a misdemeanor to have a cell phone in custody.

23   You knew it was a crime; right?

24   A    If it's not authorized by a law enforcement agency, it's a

25   crime.  But this one was authorized, so it was not a crime.

```
 1   Q    It was a crime for Anthony Brown to have it on his person?

 2   A    No.

 3   Q    You're saying that he was authorized by you so it's not a

 4   crime?

 5   A    He is acting as an agent of the federal government when we

 6   authorized him to receive the cell phone, which it falls under

 7   the law as being authorized by the law.

 8   Q    Generally speaking, possession of a cell phone by an

 9   inmate in another situation would be a misdemeanor, as you

10   described?

11   A    If it was not authorized by us, correct.

12   Q    We've already heard testimony about that; right?

13              MR. FOX:  Objection, Your Honor.

14              THE COURT:  Sustained.

15   Q    (BY MR. HAIG)  Were there any contingency plans that you

16   had for the cell phone being discovered by law enforcement

17   inside the jail?

18   A    No.

19   Q    Did you know about Deputy Michel's violent propensities at

20   the time that the cell phone was smuggled in to Anthony Brown?

21   A    No.

22   Q    You knew that he worked on the 2,000 or 3,000 floor;

23   correct?

24   A    On the 3,000 floor, I believe, yes.

25   Q    And you knew that there were reports of deputy abuse of
```

```
 1    inmates on the 3,000 floor; right?
 2    A     Yes.
 3    Q     And you heard about a lot of these things; correct?
 4    A     Yes.
 5    Q     And you also knew that Deputy Michel, at that point in
 6    time, had smuggled a cell phone in to Anthony Brown; right?
 7    A     Yes.
 8    Q     And at the time that the cell phone was discovered, you
 9    knew about that almost right away because CJ was notified;
10    right?
11    A     Correct.
12    Q     And you would have been able to go onto the website -- the
13    Boost Mobile website and determine that that cell phone had a
14    couple calls on it to the FBI; right?
15    A     To the FBI office?
16    Q     Yes.
17    A     Yes.
18    Q     Because those calls would still be in the memory of that
19    cell phone?
20    A     I don't know what you mean by the calls.  Like the phone
21    numbers?
22    Q     Yes.
23    A     Yes.
24    Q     Because Anthony Brown was ordered to erase things off the
25    phone after he sent texts or made phone calls; right?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes, because we didn't -- if for some reason it was found,
 2   we didn't want there to be any numbers or content of text
 3   messages with the undercover agent to be on the phone.
 4   Q     And certainly, you don't have any problem with the
 5   Sheriff's Department finding this contraband.  You don't think
 6   there was a problem legally with them searching somebody for
 7   contraband and finding it; right?
 8   A     I don't know how that would be a problem.
 9   Q     Right.  They're in charge of the security of the jail;
10   right?
11   A     Yes.
12   Q     And they're in charge of investigating somebody who's in
13   possession of contraband; correct?
14   A     Yes.
15   Q     So you would had to have assumed that Anthony Brown would
16   be interviewed by somebody regarding how he got the cell phone?
17              MR. FOX:  Objection to the form of the question.
18              THE COURT:  Sustained.
19   Q     (BY MR. HAIG)  Did you think that Anthony Brown would be
20   questioned after the cell phone was detected?
21   A     I thought he might be.
22   Q     And if he was being truthful, did that concern you that he
23   would have spilled the beans as to not only the fact that he
24   was an FBI informant, but the fact that a deputy sheriff had
25   smuggled a phone in to him?
```

```
 1   A    I was not worried about that.  I -- there was absolutely
 2   nothing that I was concerned about with the truth, but at the
 3   same time, I had no reason to believe that he would
 4   automatically say that "I'm an FBI informant."
 5   Q    I guess -- I think you misunderstood me when I said
 6   worried.
 7        Were you worried that he would actually tell the truth to
 8   the FBI, not because of anything that you had done, but just
 9   because that would basically expose him as an informant and
10   potentially expose him to harm from deputies who he was
11   informing on?
12   A    I think you just said that he would tell the truth to the
13   FBI.  I'm not sure --
14   Q    No, that he would tell the truth to the Sheriff's
15   Department --
16   A    Okay.
17   Q    -- that was investigating the crime that they thought he
18   had committed, which was possession, right, possession of the
19   phone?
20   A    I'm sorry, I do not understand your question.
21   Q    You've stated that possession of a phone is a misdemeanor;
22   right?
23   A    If it's not authorized, correct.
24             MR. FOX:  Objection.
25   Q    (BY MR. HAIG)  If not authorized, right.  Okay.
```

**UNITED STATES DISTRICT COURT**

1        Because he was a confidential informant, there was nobody

2    in the Sheriff's Department that should have known that the

3    phone was authorized; correct?

4    A    Correct.

5    Q    So they would have had to operate on the presumption that

6    he was possessing that phone illegally; right?

7                MR. FOX:  Objection, speculation.

8                THE COURT:  Sustained.

9    Q    (BY MR. HAIG)  Did you tell anybody in the Sheriff's

10   Department that Anthony Brown was an informant?

11   A    No.

12   Q    Did you tell anybody in the Sheriff's Department that you

13   had authorized him to receive a cell phone from an undercover

14   FBI agent?

15   A    If you mean at that time, the answer is no.

16   Q    At that time, right, the answer's no.

17        So Anthony Brown's cover was not compromised at the time

18   that the cell phone was recovered on August 8th; right?

19   A    Correct.

20   Q    The Sheriff's Department, you knew, would probably do an

21   investigation as to how he got that cell phone?

22   A    Actually, I -- at that time, I did not know, and I

23   actually had more information after a year of investigating

24   that when someone has been sentenced to a very significant

25   amount of time, when there is a small jail violation, that

1  would be considered a misdemeanor.  Just, you know, if they

2  didn't know that he was authorized to do it, the chances that

3  they were going to do anything about it was slim, and that was

4  just based on a year of investigating and gathering documents.

5  Q    At the time that the cell phone was smuggled into the

6  jail, you didn't know that, though, did you?

7  A    That's what I just said.  I did know that, that -- did I

8  know for sure they wouldn't investigate it, no.  But did I know

9  that over the course of the year and investigating that the --

10  it is highly unlikely that they would bring a case to the

11  district attorney's office about a very small violation for

12  someone that's been sentenced to 400 years, they -- I've been

13  told they would not do that.

14  Q    Having a cell phone is -- an unauthorized cell phone in

15  county jail, we've talked about that as being a violation.  You

16  now know that there was an investigation that was done between

17  August 8th and August 18th about Anthony Brown possessing the

18  cell phone and how he got it; right?

19  A    I guess it depends on what you call investigation.  Did

20  they do some things and try and talk to him between the 8th and

21  the 18th, yes.

22  Q    They asked him how he got the phone?

23  A    Yes.

24  Q    Who he got the phone from?

25  A    Yes.

1   Q     Who he contacted with that phone?

2   A     Yes.

3   Q     All those things?

4   A     Yes.

5   Q     And it appeared that they were as interested in a security

6   breach as they were about the actual crime of possessing the

7   cell phone?

8             MR. FOX:  Objection, argumentative.

9             THE COURT:  Sustained.

10  Q     (BY MR. HAIG)  Did the people that spoke to Anthony Brown

11  question him about a security breach on how that phone got

12  smuggled in?

13  A     I don't know what you're referencing, just --

14  Q     Well, the county jail is a secure facility; correct?

15  A     Yes.

16  Q     Inmates aren't allowed to have cell phones; correct?

17  A     Correct.

18  Q     That cell phone has to get there somehow?

19  A     Correct.

20  Q     All right.  Did the people that interviewed Anthony Brown

21  talk to him about how that cell phone got in his hands?

22  A     Again, you're just saying generally people that talked to

23  him.  Many people talked to him, so I don't know which one

24  you're specifically referencing with that.

25  Q     You've heard stories before August of 2011 about deputy

1  sheriffs in an unprovoked way assaulting inmates on 3,000 and

2  2,000, things like that; right?

3  A    Yes.

4  Q    Okay.  And you know that at the time in August of 2011,

5  Gilbert Michel did not know that CJ was an FBI agent; right?

6  A    Right.

7  Q    He thought CJ was a friend of Anthony Brown?

8  A    Correct.

9  Q    All right.  And he thought that Anthony Brown was going to

10 pay him for that phone and maybe pay him for other things;

11 correct?

12 A    He did pay him for that phone.

13 Q    Right.  And for other things as well?

14 A    Yes.

15 Q    And for the continued bringing him that phone?

16 A    Yes.

17 Q    Because Gilbert Michel would take that phone out at the

18 end of his shift, would recharge the phone, and then when he

19 came back to county would give it to Anthony Brown?

20 A    Yes.

21 Q    So each time he brought that phone in was another

22 violation of the law, as far as Gilbert Michel was concerned?

23 A    I don't believe that that's the case.

24 Q    He smuggled the phone in multiple times to county jail;

25 right?

1    A     If bringing -- just bringing a cell phone into the jail

2    was a crime, there would be a big problem with the amount of

3    cell phones I saw in the jails on deputies.

4              MR. HAIG:  Move to strike, Your Honor.  It's

5    nonresponsive.

6              THE COURT:  The answer is stricken, and the jury

7    should disregard it.

8    Q     (BY MR. HAIG)  When --

9              MR. HAIG:  Just one moment, please, Your Honor.

10   Q     (BY MR. HAIG)  On August 8th, once the phone was known to

11   be discovered by the Sheriff's Department, you shut the phone

12   off; right?

13   A     Immediately, yes.

14   Q     The service was canceled?

15   A     Correct.

16   Q     But the phone could still be powered on?

17   A     The phone could be, yes, but the service itself was shut

18   off, yes.

19   Q     Understood.  All right.

20         Did you make any attempts at that time to get Anthony

21   Brown out of Men's Central Jail?

22   A     No.

23   Q     Did you make any attempts to go see Anthony Brown on or

24   about August 8th?

25   A     Not that day.  It was a few days later that we tried to

1    have agents go and see him.

2    Q    When you say we tried, what agent went to go see him?

3    A    It was Glenn Hotema who worked on a gang squad.

4    Q    And again, was this person going in his official capacity

5    as an agent, or was he going in the -- just the regular

6    visiting room?

7    A    He was going to go as an agent but under the guise that he

8    was investigating a bank robbery since that's what Anthony

9    Brown had been convicted of so that it wasn't obvious why they

10   were going to talk to him, and that was -- that was the plan

11   when we had asked him to go.

12   Q    And at that time, was there any medical procedure that

13   stopped him from being able to see Anthony Brown?

14   A    I'm not sure the date of the medical procedure, but I know

15   that when the agent went to see him, he was turned away.

16   Q    And this was sometime between August 8th and August 18th?

17   A    I believe it was the 10th or 11th, if I'm not mistaken.

18   Q    Did you have any communication on August 9th with Anthony

19   Brown, you or Special Agent Lam?

20   A    No.

21   Q    August 10th?

22   A    No.

23   Q    August 11th?

24   A    No.

25   Q    The next time that you went and saw him was August 23rd.

1    Would that be correct?

2    A    Correct.

3    Q    And that was in your official capacity as an agent; right?

4    A    Yes.

5    Q    And that's the meeting that we spoke about that Sergeant

6    Waterman came in and interrupted; right?

7    A    Yes.

8    Q    Okay.  Between August 8th and August 23rd, you never made

9    any attempts to go and see him.  Would that be correct?

10   A    Well, aside from trying to have another agent go, no.

11   Q    Right.  And between August 8th and August 23rd, you never

12   made any attempts to try to get him out of Men's Central Jail?

13   A    Again, at that point, from the 8th to the 18th our

14   investigation was still covert and we had no reason to get him

15   out of the jail.  We don't have the ability to just move

16   someone from a county jail, and so at that point, again we had

17   no reason to move him from county jail.

18   Q    Well, you could have asked somebody in the U.S. Attorney's

19   Office to issue a writ, couldn't you have?

20   A    Writs are for testimony.  They're not to just move

21   somebody from one facility to another.

22   Q    Did you alert anybody at Men's Central Jail in between

23   August 8th and August 18th that Anthony Brown needed to be

24   protected?

25   A    No.

```
1   Q    Did you feel that Anthony Brown needed to be protected
2   from deputy sheriffs between August 8th and August 18th?
3   A    No.
4   Q    Did you feel that he needed to be protected from Gilbert
5   Michel?
6   A    No.
7   Q    You had no fear that Gilbert Michel would take any action
8   against Anthony Brown to silence a potential witness against
9   him?
10  A    No.
11  Q    Did you alert your superiors at any point in time that the
12  phone had been seized by the Sheriff's Department?
13  A    Immediately after I got the call from the undercover agent
14  about him receiving the call from Gilbert Michel, I terminated
15  the service and immediately told my supervisor who then passed
16  word up the chain of command.
17  Q    Up the chain of command to where?
18  A    Once he -- I met with him, he immediately said, "I'm going
19  to brief management," and he walked out.  And so...
20  Q    That was on August 8th?
21  A    Yes.
22  Q    From August 8th to August 23rd, did you have any more
23  discussions with anybody in your chain of command about Anthony
24  Brown?
25  A    Many conversations, yes.
```

1   Q     About the cell phone?

2   A     In general about what the plan was going to be going

3   forward.

4   Q     When you went to the Men's Central Jail on August 23rd,

5   did you know at that time that Anthony Brown's cover had been

6   exposed to the Sheriff's Department?

7   A     Yes, that was the purpose of us going.

8   Q     When did you first learn that?

9   A     I believe it was around the time that the Special Agent in

10  Charge Steve Martinez had reached out to the Sheriff's

11  Department.  It had been passed down to me through my

12  supervisor that they were going to notify the Sheriff's

13  Department, and so at that point, I was aware that we had been

14  outed.

15  Q     You knew on August 18th that you had been, to use your

16  word, outed; correct?

17  A     It was either the 18th or the 19th.  At some point after

18  those phone calls were made, it was passed down to me that that

19  was the case.

20  Q     And did you know on August 18th that the Sheriff's

21  Department had been tasked with protecting Anthony Brown?

22  A     I think any time an inmate's in custody they're tasked

23  with protecting an inmate, so I don't -- other than that, no, I

24  knew nothing else.

25  Q     And protecting him in a more heightened fashion than just

1    normally housing him?

2    A    I knew that they were tasked with protecting him as an

3    inmate.  That's all I knew.

4    Q    Nothing more than just general protection then; correct?

5    A    Yes.

6    Q    And from August 18th to August 23rd, did you have any

7    contact with Anthony Brown?

8    A    No.

9    Q    On August 23rd, you spoke to Anthony Brown; correct?

10   A    Yes.

11   Q    And you got information from him at that time that he had

12   told the people in the jail that he had bribed -- or he had

13   somebody, one of his friends bribe Gilbert Michel to get him a

14   cell phone; right?

15   A    Yes.

16   Q    And that was the first time that you knew that Anthony

17   Brown had actually told people in the county jail that Gilbert

18   Michel was the person involved.  Would that be correct?

19   A    I believe so, yes.

20   Q    And that's when you started with the -- you said you kind

21   of amped up the -- getting to Gilbert Michel, trying to talk to

22   him, try to figure out what was going on, see if you could turn

23   him into a source; right?

24   A    Yeah, we had to speed it up significantly at that point.

25   Q    When Sergeant Waterman came in there and stopped the

```
 1   interview that you were having with Anthony Brown, he alerted
 2   you to talk to Tom Carey; right?
 3   A    I don't believe he said to talk to Tom Carey.  I think he
 4   told us we needed to report to the watch commander's office.
 5   Q    And were you given some sort of instruction on August 23rd
 6   about Tom Carey coming to Men's Central Jail to meet with you?
 7   A    At some point when we were in the watch commander's
 8   office, we had asked to use one of the phones in there to call
 9   our management and let them know what had happened.  And I
10   believe it was at that point -- and I can't remember if it was
11   Lieutenant LaFave, I think it might have been -- had told us
12   that -- I believe he just said a captain was on his way and
13   that we should wait.  And we waited for a while and then
14   decided we needed to get out to the car and call our management
15   again because nobody had answered.
16   Q    Understood.
17        By the time -- if Captain Carey got there that day, you
18   weren't there when he got there; right?
19   A    Correct.
20   Q    And you never had any conversations with Captain Carey
21   that day; right?
22   A    Right.
23   Q    And after that day, you never tried to call Captain Carey
24   and talk to him about Anthony Brown in any way, did you?
25   A    We -- Special Agent Wayne Plympton had left a business
```

**UNITED STATES DISTRICT COURT**

```
 1   card with the lieutenant as we were walking out and said that
 2   Captain Carey could call him if he wanted, and we never
 3   received a call.
 4   Q    You were the special agent in charge of this -- the whole
 5   Anthony Brown matter; right?
 6   A    I was not in charge.  It was -- there were multiple agents
 7   working the case.
 8   Q    Well, this was your case; right?
 9   A    I opened the case, yes.
10   Q    Okay.  Did you ever contact Tom Carey?
11   A    No.
12   Q    On August 23rd of 2011, did you know who Tom Carey was?
13   A    No.
14   Q    Did you know what ICIB was at that time?
15   A    No.
16   Q    All right.  You now know what it is; correct?
17   A    I do.
18   Q    All right.  And you now know that ICIB is an investigative
19   arm of the Sheriff's Department that investigates crimes by
20   deputies?
21   A    Yes.
22   Q    All right.  Okay.
23        At that time, you had no idea who Tom Carey was or what he
24   did; correct?
25   A    Correct.
```

1   Q    Did you have any contacts in the Sheriff's Department that

2   you regularly worked with on any task forces or anything like

3   that?

4   A    I knew a couple task force officers.

5   Q    Did you talk to any task force officers after that meeting

6   on August 23rd to help coordinate any activity regarding

7   Anthony Brown?

8   A    No, we do not coordinate public corruption cases with any

9   task force officers, especially for an agency that we're

10  investigating.

11  Q    Did you reach out to any of these task force officers to

12  seek advice or guidance?

13  A    Again, we don't consult with task force officers on public

14  corruption cases because they're sensitive matters, so no.

15  Q    Did you do any research to find out who Tom Carey was

16  after August 23rd?

17  A    No.

18  Q    Did you do any research to find out what ICIB was after

19  that day?

20  A    Nothing was brought up about ICIB, so I would have had no

21  reason to research it.

22  Q    After August 23rd, you stated that you tried to run

23  Anthony Brown on the computer a couple days later, and you

24  found that he had been released according to his name and

25  booking number; correct?

1  A     Yes.

2  Q     Have you ever worked in a custodial facility?

3  A     No.

4  Q     Unlike somebody who's a deputy sheriff, you don't start

5  off working at any kind of custodial facility in the FBI;

6  right?

7  A     No.

8  Q     Okay.  Do you know or have you ever been trained in the

9  protocols of protecting an inmate whose identity needs to be

10 protected in a custodial facility?

11 A     No.

12 Q     All right.  It was surprising to you, was it not, that

13 when you looked for Anthony Brown you couldn't find him;

14 correct?

15 A     Incredibly surprising.

16 Q     Did you reach out to anybody in the Sheriff's Department

17 at that time to ask about his whereabouts and simply demand

18 that you were able to see him?

19 A     Again, at that point on the 26th, the writ was issued the

20 day before so we had no reason to be contacting the Sheriff's

21 Department.  We were going through formal procedures to bring

22 Anthony Brown over for his testimony.

23 Q     You say to bring Anthony Brown over for his testimony;

24 right?

25 A     Yes.

1   Q    Okay.  And Anthony Brown was going to be brought over for

2   his testimony, he would be transported from the county jail to

3   the courthouse or to MDC; correct?

4   A    I believe when someone is writ over for testimony, they

5   bring them over before their testimony and house them sometimes

6   for weeks, if not more, in federal custody before they actually

7   testify so that they're not just being brought directly from a

8   county jail the day of.

9   Q    And there's a federal custodial facility in Los Angeles;

10  right?

11  A    Yes.

12  Q    And it's just a couple blocks away from this courthouse?

13  A    Yes.

14  Q    It's called the Metropolitan Detention Center?

15  A    Yes.

16  Q    And you would expect on a writ of an inmate for testimony

17  in front of the grand jury that he would probably be housed

18  there; right?

19  A    At that point, I wouldn't have known -- they have multiple

20  facilities, but he could have been housed there, I guess.

21  Q    And you've been there before?

22  A    Yes.

23  Q    Okay.  All right.

24       And it's certainly a convenient location to have an inmate

25  transported to federal court for him; right?

```
 1   A     Yes.

 2   Q     Okay.  And who runs the Metropolitan Detention Center?

 3   A     The U.S. Marshals Service.

 4   Q     To your knowledge, did the U.S. Marshals Service ever go

 5   over to Men's Central Jail and request Anthony Brown?

 6   A     I don't know.

 7   Q     Okay.  You don't work for the Marshals; right?

 8   A     I do not.

 9   Q     You have no information, do you, as to whether this writ

10   that has been entered into evidence was actually sent to the

11   Sheriff's Department, do you?

12   A     Through the investigation and interviewing individuals,

13   yes.

14   Q     So you know that the Sheriff's Department has received

15   this writ?

16   A     Between piecing together all the information, yes.

17   Q     That's your guess; right?

18   A     That is based on my investigation, yes.

19   Q     Have you talked to one person that said yes, I received

20   this writ?

21   A     From the Sheriff's Department?

22   Q     Yes.

23   A     No.

24   Q     Okay.  All you have is a fax from the Marshals Service to

25   the Sheriff's Department fax number; correct?
```

```
1    A    And also Sheriff's Department employees who have said
2    they've seen the writ.
3    Q    Isn't it true that that writ was withdrawn by the federal
4    government?
5    A    No.
6    Q    Isn't it true that the U.S. Marshals took no action to
7    execute on that writ and get the body?
8    A    What happened is the Marshals were unable to locate him,
9    and so that's not necessarily inaction on their part, is if
10   they can't find the individual who the writ is listed for
11   there's not a whole lot they can do.
12   Q    Did you make any inquiry of anybody in county jail to try
13   to find Anthony Brown between August 26th and September 12th?
14   A    Did I ask someone working in county jail?
15   Q    Yes.
16   A    No.
17   Q    Did you call anybody in county jail to look for this
18   person?
19   A    No.
20   Q    Did you make any request by e-mail, by text, by phone of
21   Captain Tom Carey?
22   A    No.
23   Q    Of Steve Leavins?
24   A    I didn't know Steve Leavins.
25   Q    Of Greg Thompson?
```

1    A    I didn't know Greg Thompson.

2    Q    Of Undersheriff Tanaka?

3         MR. FOX:  Objection, Your Honor, this was asked and

4    answered in his broader question.

5         MR. HAIG:  Your Honor, I'm trying to ask about

6    specific --

7         THE COURT:  Let's go to sidebar.

8       (Discussion held at sidebar.)

9         THE COURT:  How much longer do you have with this

10   witness?

11        MR. HAIG:  Very little, Your Honor.

12        THE COURT:  Okay.  The objection is sustained.

13        MR. FOX:  Thank you, Your Honor.

14      (End of sidebar discussions.)

15   Q    (BY MR. HAIG)  Ms. Tanner, did you have any contact at all

16   with Paul Tanaka between August 18th and September 26th?

17   A    No.

18   Q    You talk about, and I think the phone call was played,

19   when Special Agent Narro spoke to Sergeant Maricela Long and

20   Sergeant Scott Craig.  You remember that phone call I'm talking

21   about?

22   A    Yes.

23   Q    All right.  And they mentioned the undersheriff as

24   somebody that you could contact if you had any questions about

25   the nature of the interaction that you had earlier that day and

```
 1   any other questions; correct?
 2   A     It was to contact him regarding what they were going to be
 3   charging me with.
 4   Q     There you go.
 5         And they gave you a number of (323) 526-5000?
 6   A     Yes.
 7   Q     And they told you that that was the number for the
 8   undersheriff; correct?
 9   A     They said that was the number for Sheriff's Headquarters
10   Bureau.
11   Q     Didn't they tell you that that was the number for
12   Undersheriff Tanaka?
13   A     They said it was the number for Sheriff's Headquarters
14   Bureau and you can ask for Mr. Paul Tanaka.
15   Q     That number is actually the number that rings to Sheriff
16   Lee Baca's personal desk, is it not?
17   A     No.
18   Q     That is not his office number?
19   A     I do not believe that is his direct office line, no.
20   Q     But you do know that the number (323) 526-5000 is not and
21   was not at that time Undersheriff Paul Tanaka's number?
22   A     My understanding is that number was a general number, and
23   that's why they gave them the Sheriff's Headquarters Bureau
24   number so they could call that and request to speak to
25   Undersheriff Paul Tanaka.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Did Special Agent Carlos Narro ever call and speak to
 2   Undersheriff Tanaka in your presence?
 3   A    In my presence, no.
 4   Q    Did you?
 5   A    Did I call Undersheriff Tanaka?
 6   Q    Yes.
 7   A    No.
 8   Q    And this was on September 26th; correct?
 9   A    Yes.
10   Q    On September 26th, was that the first time that you had
11   ever heard the name Undersheriff Paul Tanaka in relation to the
12   Anthony Brown matter?
13              MR. FOX:  Objection, vague.
14              THE COURT:  Sustained.
15   Q    (BY MR. HAIG)  Had you ever heard of the Undersheriff Paul
16   Tanaka at that time?
17   A    In the investigation?
18   Q    Yes.
19   A    Absolutely.
20   Q    On September 26th?
21   A    On that day did --
22   Q    On that date.  When you heard Undersheriff Paul Tanaka on
23   that date, had you heard him on prior dates?  I know you've
24   heard of him since then because you're doing your part of this
25   investigation.  I'm talking about on September 26th of 2011,
```

```
1    had you heard that name in relation to your work on the Anthony
2    Brown matter?
3    A    Again, I guess I'm confused what you mean.  If you mean in
4    the investigation since I opened it, absolutely, I'd heard his
5    name by that point.  If you mean specific to Anthony Brown in
6    those few days --
7    Q    Yes.
8    A    I don't know what you mean by if I heard him -- or heard
9    his name.
10   Q    Did you hear his name in relation to anything involving
11   Anthony Brown before that date, before September 26?
12   A    No.
13   Q    All right.  Did you also review documents from Sheriff
14   Leroy Baca?
15            MR. FOX:  Objection, vague.
16            THE COURT:  Sustained.
17            MR. HAIG:  Your Honor, I could approach and explain
18   if you'd like.
19            THE COURT:  Sustained.  Next question.
20   Q    (BY MR. HAIG)  Did you know that Sheriff Leroy Baca was on
21   vacation for two weeks in the early part of September?
22            MR. FOX:  Objection, foundation.
23            THE COURT:  Sustained.
24   Q    (BY MR. HAIG)  There was an e-mail from Mr. Sexton --
25   Deputy Sexton -- you know who that is; right?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Yes.
 2   Q     And there was a reference to Operation Pandora's Box.  You
 3   know the e-mail that I'm talking about?
 4   A     Yes.
 5   Q     All right.  And that was an e-mail that originated, at
 6   least on the subject line, with Deputy Sexton; correct?
 7   A     Yes.
 8   Q     All right.  Did you, in your investigation of this case,
 9   see any other e-mails that originated with any other deputy
10   sheriff with the moniker or name or subject line of Operation
11   Pandora's Box that did not -- that were not forwarded e-mails
12   or e-mails in a chain originating with Deputy Sexton?
13   A     That I reviewed, no.
14   Q     Were you at any high-level meetings between the Sheriff's
15   Department and the U.S. Attorney's Office involved in this case
16   either in August or September of 2011?  Were you present at
17   either one of those meetings?
18   A     There were a lot of meetings.  I don't know specifically
19   if you're referencing ones that involved the Sheriff's
20   Department or if you just mean in general, because there were a
21   lot of meetings.
22   Q     Well, a joint meeting between management of the Sheriff's
23   Department and management in the U.S. Attorney's Office,
24   specifically on August 30th, were you at that meeting?
25   A     There wasn't a meeting on the 30th.
```

```
 1    Q     Were you at a meeting in late August of 2011?

 2    A     No.

 3    Q     Were you at a meeting in late September of 2011 involving

 4    management of the Sheriff's Department and management of the

 5    U.S. Attorney's Office?

 6    A     No.

 7    Q     You stated that you went to Lancaster State Prison to

 8    speak to Anthony Brown shortly after he was transported there

 9    from the Men's Central Jail; right?

10    A     Yes.

11    Q     And he was angry at you?

12    A     Very.

13    Q     Thank you.

14              MR. HAIG:  I have nothing further.

15              THE COURT:  Redirect.

16                        REDIRECT EXAMINATION

17    Q     (BY MR. FOX)  Special Agent Tanner, Mr. Haig asked you on

18    cross-examination whether you talked to one person who

19    indicated that they had seen the writ.

20          Do you recall that line of questioning?

21    A     Yes.

22    Q     Who had you spoken to within the Sheriff's Department who

23    indicated that they saw the writ?

24    A     During an interview, Paul Tanaka told us that he had seen

25    the writ.
```

```
 1   Q    Was there anybody else who had told you that within the
 2   Sheriff's Department?
 3   A    Yes.
 4   Q    Who else?
 5   A    There were, I believe, at least one or two OSJ deputies
 6   who had told us that they saw the writ at the time.
 7   Q    And where were those OSJ deputies -- where were they
 8   performing their functions within OSJ?
 9   A    At the Inmate Reception Center, or IRC.
10   Q    Was one of these deputies that indicated they had heard
11   about the writ Deputy Sexton?
12   A    Yes.
13   Q    And was another one Deputy Jason Pearson?
14   A    Yes.
15            MR. FOX:  One moment, Your Honor.
16       (Plaintiff's counsel conferred off the record.)
17            MR. FOX:  Nothing, Your Honor.
18            MR. HAIG:  Just a couple questions on that -- on
19   just what -- two minutes, I promise, Your Honor.
20                     RECROSS EXAMINATION
21   Q    (BY MR. HAIG)  Regarding the interview with Paul Tanaka at
22   the time he was interviewed, that was not testimonial but it
23   was with the FBI; right?
24   A    Yes, and I actually -- now that I just said that, I
25   realized it was in grand jury that he made that statement, not
```

1    the interview.  I apologize.

2    Q    You've interviewed him; right?

3    A    Yes.

4    Q    And he's testified in front of the grand jury?

5    A    Yes.

6    Q    And he's testified in trial?

7    A    Yes.

8    Q    Right.

9         Regarding that writ, he talked about seeing lots of writs;

10   right?

11   A    No.

12   Q    All right.  Okay.

13        And did you ask Mr. Tanaka whether he had taken any action

14   to prevent that writ from being executed by the Marshals?

15   A    I wasn't in the grand jury, so I wouldn't have been able

16   to ask him that question.

17   Q    Were you listening to what he was saying?

18   A    I'm not allowed in the grand jury unless I'm testifying.

19   Q    So you're just basically saying something about something

20   you read in a transcript; right?

21   A    I read his transcript, and he said it, yes.

22   Q    Okay.  In that transcript, was he asked any questions

23   about blocking the Marshals Service from executing that writ?

24             MR. FOX:  Objection, Your Honor, foundation and also

25   hearsay.

```
 1                THE COURT:  Sustained.

 2                MR. HAIG:  No more questions.

 3                MR. FOX:  Your Honor, I have nothing.

 4                THE COURT:  All right.  You may step down.  Thank

 5   you.

 6         Call your next witness.

 7                MR. FOX:  Your Honor, the government calls Special

 8   Agent Joe Rock.

 9                THE COURT:  May I see counsel at sidebar.

10         (Discussion held at sidebar.)

11                THE COURT:  Is this the testimony that's going to be

12   read?

13                MR. FOX:  Yes, Your Honor.

14                THE COURT:  And this is...

15                MR. FOX:  About half an hour.

16                THE COURT:  Okay.  This is for court proceedings,

17   grand jury?

18                MR. FOX:  First one will be grand jury.  The next

19   two will be trial.  My plan is -- we have a stipulation.  My

20   plan is -- there are three paragraphs in the stipulation.  The

21   first one's regarding grand jury, so I will read in that

22   stip -- the first paragraph of the stipulation, ask you to take

23   judicial notice of what a grand jury is, and then we can read

24   in that transcript with the special agent.

25         When we're done with that, my plan is to read in the
```

**UNITED STATES DISTRICT COURT**

 1    second paragraph of the stipulation, and then we'll have the

 2    trial testimony and then read in that portion of grand jury

 3    testimony.

 4              THE COURT:  Okay.  When you're asking about -- you

 5    asking for judicial notice of the grand jury?  You want the

 6    Court to read the blurb concerning that?

 7              MR. FOX:  Yes, Your Honor.

 8              THE COURT:  Okay.

 9              MR. FOX:  And my plan -- if it's what you prefer, my

10    plan is to ask you to take judicial notice of the grand jury

11    and then have you read in that, if that's okay.

12              THE COURT:  That's fine.

13              MR. FOX:  Thank you.

14          (End of sidebar discussions.)

15              THE DEPUTY CLERK:  Stand here for me, please.

16          Raise your right hand.

17          (The witness, JOE ROCK, was sworn.)

18              THE DEPUTY CLERK:  Please be seated.

19          Will you please state your full name and spell your last

20    name for the record.

21              THE WITNESS:  My name is Joe Rock.  Last name

22    spelled R-O-C-K.

23              THE DEPUTY CLERK:  Thank you.

24              MR. FOX:  Your Honor, I'd like to read a portion of

25    a stipulation.  This is Exhibit 193.  I'm going to read the

1    first paragraph of that stipulation.

2         The parties agree that Government Exhibit 182 is a true

3    and correct copy of excerpts of testimony defendant Paul Tanaka

4    provided to a grand jury on December 19th of 2012.

5         And, Your Honor, I ask you to take judicial notice of

6    grand juries, please.

7              THE COURT:  All right.  Ladies and gentlemen, the

8    Court has decided it is not necessary to receive evidence of

9    the fact that in the federal criminal justice system grand

10   juries investigate crimes, and absent a stipulation or

11   agreement, all felony crimes must be prosecuted by a grand jury

12   indictment.

13        A grand jury investigation is the same thing as a grand

14   jury proceeding.  Grand juries do not have the same function as

15   trial juries.  For example, grand juries are not required to

16   presume defendant's innocence and may return an indictment

17   without considering the same burden of proof as a trial jury.

18   Grand juries do not hear arguments from defense attorneys and

19   do not necessarily receive the same evidence that is later

20   introduced at trial.

21        Grand jury indictments are not evidence against any

22   defendant.  Grand juries are ordered by the District Court and

23   are summoned, selected and impanelled pursuant to federal law.

24   A grand jury must consist of no less than 16, no more than 23

25   members.  The only people permitted inside the grand jury room

```
 1   are the witnesses under examination, grand jurors, the attorney
 2   for the government and an interpreter, if needed, and a court
 3   reporter.
 4       The attorney for the government assists the grand jury in
 5   deciding which witnesses to hear from and which subpoenas to
 6   issue.  Counsel for the witnesses or defendants are not
 7   permitted inside the grand jury room.  Witnesses desiring to
 8   confer with counsel may be excused from the grand jury room,
 9   have an opportunity to confer with their counsel and return to
10   continue their testimony.
11       By law, all participants other than witnesses are bound to
12   strict secrecy regarding proceedings before the grand jury.
13   The term of a normal grand jury is not to exceed 18 months.
14   All proceedings before the grand jury must be recorded.
15       You may but are not required to accept these facts as
16   true.
17   Q    (BY MR. FOX)  Special Agent --
18           MR. FOX:  I'm sorry, Your Honor.  May I proceed?
19           THE COURT:  Yes.
20                       DIRECT EXAMINATION
21   Q    (BY MR. FOX)  Special Agent Rock, could you please turn to
22   Government Exhibit 182.
23   A    Okay.
24   Q    And I ask, Special Agent, that you read the role of Paul
25   Tanaka in this exhibit.  Do you understand?
```

1   A     I do.

2   Q     Starting from the first page of that exhibit, "Proceedings

3   had before the grand jury of the United States of America in

4   and for the Central District of California at the United States

5   District Courthouse, 312 North Spring Street, 13th Floor,

6   Los Angeles, California commencing at 11:41 a.m. on Wednesday,

7   December 19th, 2012."

8          (Exhibit 182 was read in open court by Mr. Fox and the

9   witness.)

10          MR. FOX:  Your Honor, we're now done with Government

11  Exhibit 182, the portions of his grand jury testimony.  I'd

12  like to read in now Government Exhibit -- I'm sorry,

13  stipulation -- same stipulation, paragraph 2.

14          The parties have agreed that Government Exhibit 183 is a

15  true and correct copy of excerpts of testimony defendant Paul

16  Tanaka provided in United States vs. James Sexton on or about

17  May 19th of 2014.

18  Q     (BY MR. FOX)  Special Agent, I'd like you to turn to

19  Government Exhibit 183.

20          Is that before you?

21  A     It is.

22  Q     And I'm going to read starting at page 901.

23          Do you see that?

24  A     I do.

25  Q     I'd like you to read the part of Mr. Tanaka.  Okay?

1    A    Okay.

2         (Exhibit 183 was read in open court by Mr. Fox and the

3    witness.)

4         MR. FOX:  And, Your Honor, at this time I'm going to

5    publish Exhibit 30.

6         (Exhibit 183 continued to be read in open court by Mr. Fox

7    and the witness.)

8         MR. FOX:  Your Honor, we're done discussing

9    Government Exhibit 183.  I now want to read the stipulation in

10   the third paragraph of Exhibit 193, and that reads:  The

11   parties agree that Government Exhibit 205 is a true and correct

12   copy of excerpts of testimony defendant Paul Tanaka provided in

13   United States vs. Stephen Leavins, Greg Thompson, Scott Craig,

14   Maricela Long, Gerard Smith and Mickey Manzo on or about June

15   6th and June 10th of 2014.

16   Q    (BY MR. FOX)  And, Special Agent, I'm going to begin

17   reading from page 2097, line 3.

18        (Exhibit 205 was read in open court by Mr. Fox and the

19   witness.)

20   Q    (BY MR. FOX)  Now I ask you to turn to page 2240.

21        Do you see that in your binder?

22   A    I do.

23   Q    Starting on line 13.

24        (Exhibit 205 continued to be read in open court by Mr. Fox

25   and the witness.)

1          MR. FOX:  Your Honor, we're done reading that.  I do

2     move for the admission of Government Exhibit 182, 183 and 205.

3          MR. STEWARD:  No objection, Your Honor.

4          THE COURT:  All right.  They'll be received.

5          (Exhibit Nos. 182, 183 and 205 received into evidence.)

6          THE COURT:  All right.  You may step down.

7          THE WITNESS:  Thank you.

8          MR. JAUREGUI:  Your Honor, should we call our next

9     witness?

10          THE COURT:  No, I think we're going to take our

11     break.

12          Ladies and gentlemen, we're going to take our first break

13     of the day.  Again, I want to remind you until this trial is

14     over, you're not to discuss this case with anyone, including

15     your fellow jurors, members of your family, people involved in

16     the trial or anyone else, and do not allow others to discuss

17     the case with you.  This includes discussing the case on the

18     Internet, by e-mails or text messages.  If anyone tries to

19     communicate with you about this case, please let me know about

20     it immediately.

21          Do not read, watch or listen to any news reports or other

22     accounts about the trial or anyone associated with it,

23     including looking online.  Do not do any research such as

24     consulting dictionaries, searching the Internet or using other

25     reference materials, and do not make any investigation about

```
 1    the case on your own.
 2         Finally, you're reminded to keep an open mind until all of
 3    the evidence has been received, you've heard the arguments of
 4    counsel, the instructions of the Court and the views of your
 5    fellow jurors.
 6         We'll come back at -- let's make it ten after the hour.
 7         (The jury exited the courtroom.)
 8              THE DEPUTY CLERK:  Please be seated.
 9              THE COURT:  I'm sorry, do you have another witness?
10              MR. FOX:  We have one more witness.  His name is
11    Ruben Martinez.
12         Your Honor, if it's okay, could we just get on the record
13    that the -- by the defense that Government's Exhibits 182, 183
14    and 205 were accurately read to the jury?
15              MR. STEWARD:  Yes, Your Honor, we agree.
16              MR. FOX:  Thank you.
17              THE COURT:  All right.  Anything else?
18              MR. FOX:  We have nothing else.
19              THE COURT:  All right.  Thank you.
20         (Off the record at 9:55 a.m.)
21         (On the record at 10:12 a.m.)
22              THE COURT:  All right.  Are we ready to proceed?
23              MR. FOX:  Yes, Your Honor.
24              MR. JAUREGUI:  Yes, Your Honor.
25              MR. FOX:  We were just talking, though.  They're
```

```
 1    obviously going to have a motion after our next witness, so how
 2    would you like to handle that?
 3              THE COURT:  I think we'll just -- I'll ask you if
 4    you have any more witnesses.  You'll say no.  I'll ask us to go
 5    over to sidebar, and we'll --
 6              MR. FOX:  Do you want -- so we will say no, we'll
 7    actually just rest at that point, and then we'll go to sidebar.
 8    Is that what you'd like us to do?  That's perfectly --
 9              THE COURT:  Yes.
10              MR. FOX:  Yes, that's what we will plan on doing.
11              THE COURT:  Let's bring the jury in.
12         (The jury entered the courtroom.)
13              THE DEPUTY CLERK:  Please be seated.
14              THE COURT:  All right.  If you'd call your next
15    witness, please.
16              MR. JAUREGUI:  Yes, Your Honor.  The government
17    calls Ruben Martinez.
18              THE DEPUTY CLERK:  If you'll raise your right hand
19    for me.
20         (The witness, RUBEN MARTINEZ, was sworn.)
21              THE DEPUTY CLERK:  Please be seated.
22         Will you please state your full name and spell your last
23    name for the record.
24              THE WITNESS:  Yes, Ruben Martinez, M-A-R-T-I-N-E-Z.
25              THE DEPUTY CLERK:  Thank you.
```

|  |  |
|--|--|
| 1 | DIRECT EXAMINATION |
| 2 | Q    (BY MR. JAUREGUI)  Mr. Martinez, were you formerly |
| 3 | employed by the Los Angeles County Sheriff's Department? |
| 4 | A    I was. |
| 5 | Q    How long did you work for the Department? |
| 6 | A    A little over 31 years. |
| 7 | Q    And when did you leave? |
| 8 | A    January of 2012. |
| 9 | Q    Why did you leave the Department? |
| 10 | A    I retired. |
| 11 | Q    What was your rank when you retired from the Department in |
| 12 | 2012? |
| 13 | A    I was a sergeant. |
| 14 | Q    And did you work in a specific section or bureau? |
| 15 | A    I did. |
| 16 | Q    And what was that? |
| 17 | A    Internal Criminal Investigations Bureau. |
| 18 | Q    And did you have a specific assignment within the Internal |
| 19 | Criminal Investigations Bureau? |
| 20 | A    I did. |
| 21 | Q    What was that? |
| 22 | A    I was in charge of the surveillance team known as SOG, |
| 23 | Special Operations Group. |
| 24 | Q    And could you explain briefly for the jury what the SOG |
| 25 | does. |

1    A     Yeah, we were a surveillance team.  We conducted

2    surveillances of targets, for lack of a better term, that were

3    designated by investigators at the unit.

4    Q     And seeing as you were within ICIB, is that another name

5    for the Internal Criminal Investigations Bureau?

6    A     Correct.

7    Q     Seeing as you were within ICIB, were most of your targets

8    internal or external to the Sheriff's Department?

9    A     Internal.

10   Q     Generally speaking, Mr. Martinez, how did you determine

11   who to conduct surveillance on?

12   A     I was directed by investigators.

13   Q     I want to ask you about the September 2011 time period.

14         Did there come a time, sir, when you were asked to conduct

15   surveillance on a deputy named Gilbert Michel?

16   A     Yes.

17   Q     Who asked you to conduct that surveillance?

18   A     Sergeant Scott Craig.

19   Q     What, if anything, did sergeant Craig tell you about this

20   assignment?

21   A     He indicated that this was part of a case wherein a

22   telephone had been introduced or brought into the Men's Central

23   Jail.

24   Q     And what did he say Gilbert Michel had to do with that?

25   A     He was suspected of actually bringing the phone into the

```
 1  unit.
 2  Q    And in or around this same time, were you asked to conduct
 3  surveillance on a special agent of the FBI?
 4  A    I was.
 5  Q    And was that Special Agent Leah Marx?
 6  A    It was.
 7  Q    What -- and who gave you that assignment, sir?
 8  A    Sergeant Scott Craig.
 9  Q    What, if anything, did he say to you about why you were
10  being asked to conduct surveillance on an FBI special agent?
11  A    It was relating to same case, and it was his brief that
12  she had contacted Gilbert Michel to bring the phone into the
13  jail.
14  Q    And did you ultimately conduct surveillance on Gilbert
15  Michel and Special Agent Marx?
16  A    I did.
17  Q    Approximately when was that?
18  A    September of 2011.
19  Q    During the course of this work, did you participate in any
20  briefings about the surveillance that you were conducting?
21  A    Several.
22  Q    And just so the jury's clear, when I use the term
23  "briefing," does that have a particular meaning to you?
24  A    Yeah, briefing is conducted when a supervisor of a given
25  unit will, in my case, contact any team.  It lasts maybe 20
```

```
 1    minutes at a time.  You explain to them what the focus or what
 2    the target of that surveillance is for that day.
 3    Q    And approximately how many briefings did you participate
 4    in pertaining to this case?
 5    A    Dozens.
 6    Q    And what about meetings other than briefings, did you have
 7    meetings about this case with other members of ICIB?
 8    A    I did.
 9    Q    And where were those meetings held?
10    A    They were held at the ICIB office in down -- in city of
11    Commerce and also at Sheriff's Headquarters in Monterey Park.
12    Q    And who was present generally at these meetings?
13    A    Members of the unit, the captain, lieutenant, sergeants,
14    deputy personnel.
15    Q    Are you familiar with somebody named -- well, you
16    mentioned Scott Craig.  Was he in attendance?
17    A    Yes.
18    Q    Are you familiar with someone named Maricela Long?
19    A    Yes.
20    Q    Was she in attendance at these meetings?
21    A    She was.
22    Q    What about a Lieutenant Thompson, are you familiar with
23    him?
24    A    Yes.
25    Q    Was he in attendance at these meetings?
```

```
 1   A     On one or two of them, yes.

 2   Q     And what about Lieutenant Leavins, was he --

 3   A     Yes.

 4   Q     Okay.  And the meetings at Sheriff's Headquarters,

 5   approximately how many of those meetings were you invited to?

 6   A     Maybe three or four.

 7   Q     And did you attend any of those meetings, sir?

 8   A     Yes.

 9   Q     And would this have been approximately around the same

10   time, September 2011?

11   A     It would have.

12   Q     Do you recall who was in attendance at that meeting?

13   A     Again, Sheriff's personnel, on occasion my captain,

14   Lieutenant Leavins, Scott Craig, Maricela Marx and

15   deputy -- other deputy personnel.

16   Q     And, Mr. Martinez, you said Maricela Marx.  Is that --

17   A     I'm sorry, Maricela Long.

18   Q     Okay.  Where specifically was this meeting held?

19   A     At Sheriff's Headquarters.

20   Q     And do you know who Paul Tanaka is, sir?

21   A     I do.

22   Q     Was Paul Tanaka in attendance at that meeting?

23   A     No.

24   Q     Did you ever attend any meetings at Sheriff's Headquarters

25   about this surveillance in which Mr. Tanaka was present?
```

1    A     One.

2    Q     And did it have to do with the surveillance of Special

3    Agent Marx?

4    A     It did.

5    Q     Okay.  Mr. Martinez, I'm going to ask you to please take a

6    look at Exhibits 142 through 145.

7          There's a binder at your feet, I believe, sir.

8    A     Okay.  I'm looking at 142 now.

9    Q     Okay.  If you could just take a moment and look at 142

10   through 145, and then I'll ask you some questions about them.

11   A     Okay.

12   Q     Okay.  Do you recognize these exhibits, sir?

13   A     I do.

14   Q     And what are they?

15   A     Those are daily operations logs, logs that we kept during

16   the course of our surveillance.

17   Q     And did you put together these logs?

18   A     My team did.

19   Q     And did you supervise the team members that put together

20   these logs?

21   A     I did.

22   Q     And do these appear to be true and accurate copies of

23   those surveillance logs?

24   A     Yes.

25              MR. JAUREGUI:  Your Honor, I would move for the

1  admission of Exhibits 142, 143, 144 and 145.

2          MR. STEWARD:  No objection.

3          THE COURT:  They'll be received.

4      (Exhibit Nos. 142, 143, 144 and 145 received into

5  evidence.)

6          MR. JAUREGUI:  If Mr. Fox could please publish

7  Exhibit 142.

8  Q    (BY MR. JAUREGUI)  Okay.  Mr. Martinez, I want you to look

9  at the top of this page.

10     Could you please tell the jury -- well, first of all, this

11 is the log that we were -- one of the logs we were just talking

12 about?

13 A    That's correct.

14 Q    Who is the target named in this exhibit?

15 A    Leah Marx.

16 Q    And the date is 9/13/2011; correct?

17 A    That's correct.

18 Q    Is this approximately when you began conducting

19 surveillance of Leah Marx?

20 A    It is.

21 Q    There's a section there that says "Units involved."

22     Do you see that?

23 A    I do.

24 Q    Could you just explain to the jury what that means.

25 A    Yeah, every member of my team was given a number, a

1    designated number.  In this particular case, I was 7 and the

2    numbers 9, 11, 17, 23 and 24 would indicate various members of

3    my team.

4    Q    So there were approximately -- well, there were six

5    individuals from your team participating in this surveillance

6    of Leah Marx on this day?

7    A    Yes.

8    Q    Okay.

9              MR. JAUREGUI:  And if we could just come out.

10   Q    (BY MR. JAUREGUI)  Okay.  And I want to walk you through

11   some of the entries on this exhibit.

12        At the top there, you see where it says 1330?

13   A    I do.

14   Q    Would that be 1:30 in the afternoon?

15   A    It would.

16   Q    And it says "Briefing in office conducted by 7."

17        Could you explain to the jury what that means.

18   A    Yeah, again, every -- prior to every surveillance we

19   would -- I would conduct a meeting.  Those meetings are called

20   briefings.  In this case, I gave the briefing telling my team,

21   explaining to my team what we were doing and why we were doing

22   it.

23   Q    And taking a look at this exhibit, do you recall what you

24   told your team that your task was for that day?

25   A    Well, I could speculate.

**UNITED STATES DISTRICT COURT**

```
 1   Q    Well, I'm not going to ask you to speculate, sir.
 2        Maybe I'll just direct your attention to the line that
 3   says 1440.  Do you see that?
 4   A    I do.
 5   Q    And could you just -- it's redacted; correct?
 6   A    It is.
 7   Q    Okay.  Could you just read what's there for the jury.
 8   A    Yes.  It says "Surveillance operation begins at" -- I
 9   would assume that's an address and possible residence of the
10   target.
11   Q    And then the next line or the next entry.
12   A    Yes.  "1445, target's personal vehicle '08," and the CA
13   obviously resembles -- represents a California license number
14   "found in parked carport underneath target's apartment
15   complex."
16   Q    And then I'm just going to go down to the bottom of that.
17        You see where it says 1700?
18   A    I do.
19   Q    And it says "Surveillance operation ended," and then it
20   says 7 next to it.
21        Do you see that?
22   A    I do.
23   Q    So you conducted your surveillance from approximately
24   1:45 -- I'm sorry, 2:45 p.m. to about five o'clock; right?
25   A    That's correct.
```

1    Q    And you personally participated in this?

2    A    I did.

3    Q    And have -- taking a look at this exhibit, but you and

4    other members of your team were tracking Special Agent Marx at

5    her residence; correct?

6    A    That's correct.

7    Q    And if I could go to 143.

8         And this is a surveillance log for the next day; correct?

9    A    That's correct.

10   Q    And same thing, units involved, it has six numbers listed

11   there?

12   A    Yes.

13   Q    So six members of your group were tracking Leah Marx

14   beginning at five o'clock in the morning on 9/14/2011; correct?

15   A    Correct.

16   Q    Okay.

17        MR. JAUREGUI:  And if you could just -- AUSA Fox, if

18   I can get you to highlight the narrative sections.  Yeah, all

19   the way down.

20   Q    (BY MR. JAUREGUI)  We're going to break it up so the jury

21   can see it better.

22        Okay.  Could you just -- I'm not going to ask you to read

23   every line here, but if you could just explain to the jury what

24   you were doing beginning at five o'clock in the morning and the

25   purpose of tracking of Leah Marx.

**UNITED STATES DISTRICT COURT**

1   A     Sure.  As I recall the purpose of this, this operation was

2   to determine -- to follow or to determine where she worked.  So

3   we set up surveillance at five o'clock in the morning.  We were

4   unsure what time she left for work.  Could have been at 5:00 or

5   6:00 or 7:00, we didn't know.

6        So we set up at 5:00 with the intention of following her

7   to her place of employment.  At this particular time, she came

8   out at about 8:20 in the morning.  She took her dog down the

9   street to relieve himself, then returned the dog back to her

10  apartment.

11  Q     And then if I could just -- and why were you making note

12  of details like that, Mr. Martinez?

13  A     In case it came up later on.  What did she do when she

14  left, Sergeant Martinez?  Well, what function did you observe

15  her -- what operations or what things did you observe her

16  doing?

17  Q     Okay.  And when you said you wanted to know where she

18  worked, did you just want to know physically where she worked,

19  where her office was?

20  A     That was my directive, yes.

21  Q     Okay.

22            MR. JAUREGUI:  Now if we could go to the bottom

23  part.

24  Q     (BY MR. JAUREGUI)  And if I could just ask you to read

25  8:47 -- the time entry for 8:47.

```
 1  A    8:47 in the morning, she arrived at the federal building,

 2  11000 Wilshire Boulevard, Westwood.  She parked in the east end

 3  of the parking lot, exited the vehicle and walked toward the

 4  main entrance to the federal building and out of our view at

 5  about 8:50 in the morning.

 6  Q    And, Mr. Martinez, you had been in law enforcement for

 7  25-plus years at this point; right?

 8  A    Correct.

 9  Q    Did you know that the federal building located at 11000

10  Wilshire Boulevard was the FBI?

11  A    I did.

12  Q    Okay.

13         MR. JAUREGUI:  If we could go to the next exhibit.

14  Q    (BY MR. JAUREGUI)  What are we looking at here,

15  Mr. Martinez?

16  A    It's a surveillance log of September 26, 2011.

17  Q    And did you have an understanding of what was going to

18  happen on this day, September 20 -- did anything unusual happen

19  on this day, September 26, 2011?

20  A    Yes.

21  Q    And what was that, Mr. Martinez?

22  A    Let me just refer to my notes for a minute, please.

23  Q    Sure.

24         MR. STEWARD:  I'm sorry, may I inquire is the

25  witness reviewing some sort of notes?
```

1          THE WITNESS:  I'm sorry, the notes that are provided

2   to me, this log.

3          MR. STEWARD:  Thank you.

4          THE COURT:  He's reviewing the exhibits.

5          MR. STEWARD:  Thank you for the clarification.

6   Q    (BY MR. JAUREGUI)  Mr. Martinez, why don't I just direct

7   your attention to page 2 of this exhibit.

8          MR. JAUREGUI:  And if I can ask Special Agent -- I'm

9   sorry, AUSA Fox to please take me to that page.

10          THE WITNESS:  Okay.

11   Q    (BY MR. JAUREGUI)  Okay.  Could you just read this

12   entry -- the time and the entry, please, to the jury.

13   A    Yeah.  It's about 5:31 in the afternoon.  Target got out

14   of her vehicle, walked toward the front of her apartment

15   complex where she was met by two detectives from my unit,

16   Sergeant Scott Craig and Sergeant Maricela Long, in front of

17   her building.

18   Q    And then towards the right there, it says "Video by 9."

19          Do you see that?

20   A    Correct, I do.

21   Q    At the start of this day, Mr. Martinez, was there a

22   briefing conducted?

23   A    Yes.

24   Q    And was the purpose -- what was the purpose of that

25   briefing on that day?

1   A    The purpose of that briefing that day was to tell my team

2   that Sergeants Craig and Long intended to come out and

3   contact -- make contact with our target.

4   Q    And the Special Operations Group, your group, did you know

5   what Sergeants Craig and Long were going to do that day?

6   A    They made an attempt to interview her.

7   Q    Did you know what they were going to say to Special Agent

8   Marx?

9   A    Not specifically, no, but they were going to interview her

10  regarding this case.

11  Q    Okay.  And did you do anything different other than --

12  well, it says "Video by 9."

13       Let me ask you, was there a video recording conducted on

14  that day?

15  A    There was.

16  Q    And is your team in charge of videotaping that approach of

17  Leah Marx?

18  A    Yeah, I directed one of my deputies to videotape it, and I

19  directed another deputy to take still photographs.

20  Q    How about audio, was there any audio of that day?

21  A    No, sir.

22  Q    Was there any audio that your team took?

23  A    No, we were too far away.

24  Q    Do you know whether there was other audio of that day's

25  events?

```
 1   A     I'm assuming that Sergeants Craig and Long had tape
 2   recorders on their bodies.
 3              MR. STEWARD:  Move to strike, Your Honor,
 4   speculation, assumption.
 5              THE COURT:  Sustained.  The answer is stricken.  The
 6   jury should disregard it.
 7   Q     (BY MR. JAUREGUI)  Mr. Martinez, did you have an
 8   understanding on this day that Special Agent Marx would be told
 9   that she was the target of a felony complaint?
10   A     No.
11   Q     Did you continue conducting surveillance of Special Agent
12   Marx after this day, September 26, 2011?
13   A     No.
14   Q     Well, let me show you Exhibit Number 145, please.
15         Seeing this exhibit, Mr. Martinez, do you -- is it your
16   understanding that you conducted surveillance of Leah Marx
17   after September 26, 2011?
18   A     Yes.
19   Q     At any time that you conducted surveillance of Special
20   Agent Marx, did you determine or observe any criminal conduct
21   by Special Agent Marx?
22   A     No.
23   Q     Now I want to direct your attention to Exhibits 146
24   through 150, please.
25   A     Okay.
```

**UNITED STATES DISTRICT COURT**

1   Q     And do you recognize those exhibits, Mr. Martinez?

2   A     I do.

3   Q     And what are they?

4   A     Those are weekly logs.  Those are logs that I -- for lack

5   of a better term, those with weekly reports that I wrote and

6   passed on to my supervisor, Lieutenant Leavins.

7              MR. JAUREGUI:  Your Honor, I move for the admission

8   of 146 through 150.

9              MR. STEWARD:  No objection, Your Honor.

10             THE COURT:  They'll be received.

11         (Exhibit Nos. 146, 147, 148, 149 and 150 received into

12   evidence.)

13             MR. JAUREGUI:  Okay.  AUSA Fox, if you could please

14   pull up 146, and if you could zoom in on that middle part,

15   please.

16   Q     (BY MR. JAUREGUI)  Mr. Martinez, could you please read the

17   entry for September 1st, 2011 to the jury.

18   A     Yes, sir.  "SOG team completed workup on the Gilbert

19   Michel case for Sergeant Long.  Team responded to Star Center

20   and transported target's personal vehicle to the tech crew for

21   scanning to verify that no tracking devices were installed on

22   the vehicle.  SOG team then installed a tracking device on the

23   vehicle."

24   Q     Okay.  Mr. Martinez, you wrote this; right?

25   A     I did.

1    Q    Okay.  Can you explain why you were inspecting

2    Mr. Michel's vehicle to verify that no tracking devices were

3    installed on it?

4    A    Yeah, Sergeant Long asked me to take the vehicle down to

5    our technical crew to determine whether or not, in essence, the

6    FBI had put a tracking device on his car.

7    Q    Could you read the next entry, September 2nd, 2011.

8    A    Sure.  SOG team responded to Santa Clarita at five o'clock

9    in the morning -- I'm going to paraphrase here -- to begin

10   surveillance of Men's Central Jail Deputy Gilbert Michel for

11   Sergeant Long.  Objective was to determine if FBI was possibly

12   following the target.  Target observed leaving his residence at

13   about eight o'clock with no one following him.

14   Q    Now, Mr. Martinez, was there anything unusual about doing

15   this -- determining whether the FBI was following a deputy from

16   the Los Angeles Sheriff's Department, in your mind?

17   A    Yes.

18   Q    And what was unusual about that?

19   A    Well, in the sense that I've never done it before, I had

20   never done it before.

21   Q    And are you familiar with the term "countersurveillance"?

22   A    I am.

23   Q    Is this what you would call countersurveillance?

24   A    It is.

25   Q    And had you ever -- well, I think you just answered that

1   you had never conducted countersurveillance on the FBI before;

2   correct?

3   A    Not before or after.

4   Q    And you were being asked to do this by Sergeant Long?

5   A    Yes.

6   Q    Now if I can have you look at Exhibits Number 151 and 152,

7   please.

8   A    Okay.

9   Q    Okay.  Mr. Martinez, do you recognize those exhibits?

10  A    I do.

11  Q    And briefly, what are they?

12  A    These are worksheets -- workup sheets.  When we begin a

13  surveillance operation, my unit does a workup sheet, and that's

14  what this represents.

15       MR. JAUREGUI:  And, Your Honor, I would move for the

16  admission of 151 and 152, please.

17       MR. STEWARD:  No objection, Your Honor.

18       THE COURT:  They'll be received.

19  (Exhibit Nos. 151 and 152 received into evidence.)

20       MR. JAUREGUI:  And if I could ask AUSA Fox to please

21  publish 151.

22  Q    (BY MR. JAUREGUI)  Now, Mr. Martinez, other than Special

23  Agent Marx, were you asked to track any other FBI agent?

24  A    Yes.

25  Q    Okay.  And if I could direct your attention to the top

1    part of this exhibit, Exhibit Number 151.

2    A     Yes.

3    Q     And if you look at the right column, it says "David C.

4    Lam."

5          Do you see that?

6    A     I do.

7    Q     Who's that?

8    A     He's an FBI agent.

9    Q     Is that the other agent you were asked to surveil?

10   A     It is.

11   Q     And on the left side, it says "Investigator: Sergeant

12   Craig."

13         Do you see that?

14   A     I do.

15   Q     And what does it mean that it says "Investigator: Sergeant

16   Craig"?

17   A     He's the one that requested the surveillance.

18   Q     And directing your attention, same side of the page, if

19   you could just tell the jury what it says down at the bottom

20   there, "Reason for surveillance."

21   A     "Locate target and establish lifestyle.  Document context

22   made."

23              MR. JAUREGUI:  And if we could pull out from there

24   and then highlight the middle part, additional -- yeah.

25   Q     (BY MR. JAUREGUI)  And could you tell the jury what it

1  says -- do you see the sentence that says "Additional LOCS,"

2  period?

3  A    Yes.

4  Q    And, well, first of all, what is LOCS?

5  A    Locations.

6  Q    Okay.  Could you read that sentence, please.

7  A    Yeah, "Additional locations and individuals subject

8  associates with."  In this case, it was Leah Marx.

9  Q    So at this time, you knew that -- did you know that

10 Special Agent Lam was -- was -- involved is the wrong word, but

11 associated with Special Agent Marx?

12 A    Yes.

13 Q    And, Mr. Martinez, did you also track Special Agent Lam at

14 his home?

15 A    I did.

16 Q    And did you track him to the 11000 Wilshire Boulevard

17 address at FBI?

18 A    Yes.

19 Q    At any point in your career, Mr. Martinez, before

20 September 2011, had you ever been -- we talked about

21 countersurveillance and the car, but had you ever been tasked

22 with conducting surveillance on an FBI special agent?

23 A    No.

24 Q    And at any point after this events -- or these events,

25 have you -- did you ever again conduct surveillance on an FBI

```
 1    special agent?
 2              MR. STEWARD:  Objection, relevance.
 3              THE COURT:  Sustained.
 4              MR. JAUREGUI:  No further questions, Your Honor.
 5         Excuse me one second.
 6         I'm sorry, Your Honor, one second, please.
 7              THE COURT:  Uh-huh.
 8         (Plaintiff's counsel conferred off the record.)
 9              MR. JAUREGUI:  No further questions, Your Honor.
10              THE COURT:  Cross-examination.
11              MR. STEWARD:  Thank you, Your Honor.
12                        CROSS-EXAMINATION
13    Q    (BY MR. STEWARD)  Did Paul Tanaka ever give you an order?
14    A    No, sir.
15    Q    Did he ever give your unit an order, that you're aware of?
16    A    No, sir.
17    Q    And I think you indicated he was at one of your
18    surveillance briefings; is that right?
19    A    It was a meeting.
20    Q    Okay.  At that meeting, do you have any workup sheets,
21    surveillance logs, personal notes, calendars that would
22    indicate he was at that meeting?
23    A    Absolutely nothing.
24    Q    Now, after you had determined where Ms. Marx lived and
25    worked, you continued to surveil her; right?
```

1    A    That's correct.

2    Q    And you did that because you were trying to determine if

3    she was in contact with any other members of your department;

4    right?

5    A    Well, I did that at the direction of Sergeant Craig.

6    Q    Okay.

7    A    I don't know what his ultimate goal was.

8    Q    He didn't share that with you?

9    A    He indicated it was part of this investigation.

10   Q    Okay.  The question that I just asked about whether or not

11   she was in contact with other members of the Department, you

12   were told that was one of the reasons you were doing this;

13   right?

14   A    Correct.

15   Q    Did you ever feel that the surveillance of Ms. Marx was

16   some sort of a closely-guarded secret?

17   A    No, sir.

18   Q    And was there anything in the surveillance activity that

19   you took place with regarding Lam and Marx from start to finish

20   that caused you any concern whatsoever about the legitimacy of

21   what you were doing?

22   A    No, sir.

23   Q    And if you'd had a concern like that, could you have gone

24   to Lieutenant Peacock?

25   A    Yes.

```
 1   Q     Thank you.
 2              MR. STEWARD:  Nothing further, Your Honor.
 3              THE COURT:  All right.
 4              MR. JAUREGUI:  Just very briefly, Your Honor.
 5                    REDIRECT EXAMINATION
 6   Q     (BY MR. JAUREGUI)  Mr. Martinez, you indicated you
 7   participated in a meeting at Sheriff's Headquarters with
 8   Mr. Tanaka.
 9   A     Yes.
10   Q     And was that meeting specifically -- was the surveillance
11   of Leah Marx discussed at that meeting?  Let me ask it a
12   different way.
13         Did it pertain to the surveillance of Leah Marx?
14   A     Yes.
15   Q     And is there a reason you remember that meeting, sir?
16   A     Well, as I recall, the meeting was more administrative.  I
17   think my captain was requesting additional resources, either
18   overtime or additional equipment or manpower.  What triggered
19   my memory was that Mr. Tanaka, during the course of the
20   meeting, had a Tupperware or plastic container of cantaloupe
21   that he was eating from.
22   Q     And had you ever attended any other meeting with
23   Mr. Tanaka at Sheriff's Headquarters?
24   A     No, sir.
25   Q     Who was your captain -- who was the captain of ICIB at the
```

```
 1   time?
 2   A      Captain Tom Carey.
 3              MR. JAUREGUI:  No further questions, Your Honor.
 4              MR. STEWARD:  And no recross, Your Honor.
 5              THE COURT:  All right.  You may step down.  Thank
 6   you very much.
 7         Does the government have any additional witnesses?
 8              MR. FOX:  The United States rests.
 9              THE COURT:  All right.  Let's go to sidebar.
10         (Discussion held at sidebar.)
11              MR. STEWARD:  At this time, Your Honor, the defense
12   would make a motion for judgment of acquittal on the pending
13   charges under Rule 29.  It's an intent crime, and our
14   suggestion is the government has failed to prove criminal
15   intent on behalf of our client, and we'd submit.
16              THE COURT:  Okay.
17              MR. JAUREGUI:  Your Honor, we think we've marshalled
18   more than -- we think we've marshalled more than enough
19   evidence on both -- all -- both counts and specifically going
20   to the intent.  We have the statements, the evidence saying
21   that Mr. Tanaka had said "Eff the FBI."  We have Mr. Tanaka --
22   the testimony from Mr. Bornman saying that he had met with
23   Mr. Leavins, and Mr. Leavins said, "No one's going to" -- "I'm
24   going to make sure no one gets to this inmate."
25         We have all the documents showing that Mr. Tanaka should
```

 1   be contacted, that should the FBI come to the jails, that they

 2   should -- somebody should call Mr. Tanaka's cell phone.  I

 3   mean, I think that's just some of the evidence, but I think we

 4   have more than enough to establish an intent, Your Honor.  And,

 5   of course, the standard is in the light most -- the evidence

 6   should be viewed in the light most favorable to the government.

 7              THE COURT:  All right.  The motion's denied.

 8              MR. JAUREGUI:  Thank you.

 9              THE COURT:  You ready to proceed?

10              MR. STEWARD:  We are.

11         (End of sidebar discussions.)

12              THE COURT:  All right.  Does the defense wish to

13   call a witness at this time?

14              MR. HAIG:  Yes, Your Honor.  We call Paul Tanaka to

15   the stand.

16              THE COURT:  All right.

17              THE DEPUTY CLERK:  If you'll raise your right hand

18   for me.

19         (The witness, PAUL K. TANAKA, was sworn.)

20              THE DEPUTY CLERK:  Please be seated.

21         Will you state your full name for the record, please.

22              THE WITNESS:  My name is Paul K. Tanaka,

23   T-A-N-A-K-A.

24              THE DEPUTY CLERK:  Thank you.

25              MR. HAIG:  May I proceed?

1          THE COURT:  Yes, please.

2                    DIRECT EXAMINATION

3    Q    (BY MR. HAIG)  Mr. Tanaka, what do you currently do for a

4    living?

5    A    I work as the mayor of the city of Gardena.

6    Q    Is that an elected position?

7    A    Yes.

8    Q    And how long have you served as mayor?

9    A    I'm in my 12th year as mayor.

10   Q    And when does this term expire, the term that you're

11   currently in?

12   A    In one year, March of 2017.

13   Q    Have you ever worked as a peace officer?

14   A    I did.

15   Q    And are you retired from the -- from that work?

16   A    I am.

17   Q    And when did that happen?

18   A    I retired on August 1st, 2013.

19   Q    And what was your rank when you retired?

20   A    I was the undersheriff of the Los Angeles County Sheriff's

21   Department.

22   Q    And in the chain of command of the Los Angeles County

23   Sheriff's Department, where does the undersheriff fit?

24   A    I was the person right below the Sheriff.

25   Q    Directing your attention to the exhibit book in front of

```
 1   you, in the white binder, Exhibit 310.
 2        Do you have it in front of you, sir?
 3   A    I do.
 4   Q    Does that reflect the organizational chart of the
 5   Sheriff's Department in 2011 when you were undersheriff?
 6   A    It does.
 7   Q    And do you see -- do you see your name and your photograph
 8   on there?
 9   A    Yes.
10   Q    Okay.  And do you see somebody above you?
11   A    I do.
12   Q    And who would that be?
13   A    Sheriff Leroy D. Baca.
14             MR. HAIG:  Your Honor, move to admit 310.
15             THE COURT:  Any objection?
16             MR. FOX:  No objection, Your Honor.
17             THE COURT:  It will be received.
18        (Exhibit No. 310 received into evidence.)
19             MR. HAIG:  May I publish, please, to the jury?
20             THE COURT:  Yes.
21             MR. HAIG:  Thank you.
22   Q    (BY MR. HAIG)  In 2011 when you were undersheriff, it
23   shows that there are two different sides to Exhibit 310.
24        Do you see that?
25   A    Yes.
```

1    Q     What do those two different sides signify?

2    A     It was what was -- a side that was more of the

3    administrative and custodial side of the Sheriff's Department,

4    and then there was the operational side, which referred to

5    generally what we -- our day-to-day activities in patrol and in

6    the field.

7    Q     As undersheriff, there are two assistant sheriffs below

8    you; is that correct?

9    A     Correct.

10   Q     Did either one of those undersheriffs report to you, as

11   far as your chain of command was concerned?

12   A     Assistant sheriffs, yes, they did.

13   Q     Okay.  I have used the word "chain of command."

14         What do you understand the word chain of command to mean?

15   A     A chain of command in our organization, which is referred

16   to often as a quasi-military organization, was your reporting

17   protocols.  So in other words, a deputy would report to a

18   sergeant; sergeant to a lieutenant; lieutenant to a captain;

19   captain to a commander; commander to a chief.  Then to an

20   assistant sheriff, undersheriff, and ultimately to the boss,

21   the Sheriff.

22   Q     Are there obligations to follow lawful orders of a

23   superior ranking deputy sheriff in the organization?

24   A     Yes.

25              MR. FOX:  Objection, leading.

```
1              THE COURT:  Sustained.

2    Q    (BY MR. HAIG)  What kind of obligations does a deputy

3    sheriff have in following orders?

4    A    Deputy sheriffs are expected to follow all lawful orders

5    of their superior officers.

6    Q    Are they expected to follow unlawful orders?

7    A    No.

8    Q    Now, you obviously didn't start off as a -- as the

9    undersheriff in the Sheriff's Department; correct?

10   A    That's correct.

11   Q    When did you start your career as a peace officer?

12   A    In 1979 I attended the Rio Hondo Police Academy in -- in

13   September of '79.  In February of '80 I became a reserve police

14   officer for the Montebello Police Department.  In June of that

15   same year, 1980, I was hired by the El Segundo Police

16   Department as a full-time police officer, went through the

17   sheriff's academy and worked for the El Segundo Police

18   Department until May of 1982.

19   Q    And where is El Segundo?

20   A    El Segundo is a small city located adjacent to the north

21   of Manhattan Beach, and it would be south of Venice, Marina del

22   Rey area.

23   Q    Before attending the -- you said you became -- you got

24   your training at the sheriff's academy.  Would that be correct?

25   A    To be a full-time peace officer, yes.
```

1   Q    Did the El Segundo Police Department have its own training

2   academy?

3   A    It did not.

4   Q    All right.  And like other departments, did it use the

5   sheriff's academy?

6   A    Yes.

7   Q    Before going to the sheriff's academy to get your peace

8   officer training, had you had any schooling before that, any

9   formal education?

10  A    Yes.

11  Q    And what was that?

12  A    After graduation from Gardena High School in 1976, I

13  attended Loyola Marymount University and I graduated in 1980

14  with a bachelor of science in accounting.

15  Q    And as you were working as a peace officer, did you do any

16  other type of employment in the accounting field?

17  A    I did.

18  Q    What did you do?

19  A    I worked for a small CPA firm in the city of Gardena.

20  Q    And how long did you work for that CPA firm?

21  A    Altogether?

22  Q    Yes.

23  A    Probably somewhere in the neighborhood of 20 years.

24  Q    At some point in time while you were a peace officer, did

25  you get any more training in the field of accounting?

```
1    A    I did.

2    Q    And how did that happen?

3    A    I believe it was in the late '80s that I decided to engage

4    in more studies, and I prepared myself to take the CPA exam,

5    the certified public accountant exam, and ultimately, I was

6    certified by the State of California in -- I believe it was

7    1993 as a CPA.

8    Q    And when you were certified as a CPA in 1993, were you

9    still employed with the Los Angeles County Sheriff's

10   Department?

11              MR. FOX:  Objection, Your Honor, relevance.

12              THE COURT:  Sustained.

13   Q    (BY MR. HAIG)  In 1993 were you employed as a Los Angeles

14   County sheriff's deputy?

15   A    In 1993 I was, yes.

16   Q    What was your rank at that time?

17   A    I was a lieutenant.

18   Q    And when had you become a lieutenant in the Sheriff's

19   Department?

20   A    I believe it was in July of 1991.

21   Q    Do you remember what your assignments were as a

22   lieutenant?

23   A    I do.

24   Q    What were they?

25   A    Initially, when I was promoted I was assigned to Mira Loma
```

1    facility, which was a men's and women's jail facility in

2    Lancaster in the north county.  I was assigned there for

3    approximately seven and a half months, and then I was

4    transferred to the Inmate Reception Center in Downtown

5    Los Angeles, where I believe I remained assigned there for the

6    next couple of years.

7    Q    When you were at the Inmate Reception Center, we call

8    it -- you've called it IRC; right?

9    A    It is known as IRC, yes.

10   Q    And you were a lieutenant there?

11   A    I was a watch commander there.

12   Q    All right.

13   A    A lieutenant.

14   Q    And as lieutenant at IRC, did you have a similar position

15   at that time as Al Gonzales, the gentleman who testified in

16   this trial earlier?

17   A    I believe he testified he was a watch commander at the

18   adjacent facility.

19   Q    What were your duties as a watch commander?

20   A    At Inmate Reception Center, the duties generally just

21   included overseeing all the activities.  It involved inmates

22   that were booked -- or people that were booked into the system;

23   then found appropriate housing; the movement, each and every

24   day, early in the morning and in the afternoons, of sending

25   inmates from our custody into the courts throughout the county

```
 1   and then bringing them back from court; and then also
 2   facilitating the release of individuals that were in the
 3   custody at L.A. County jails.
 4   Q    Did -- did your duties at Inmate Reception Center allow
 5   you to walk the floors, or did you have to stay in your office?
 6   A    Oh, no, walking the floors on the secure side of the
 7   facility.
 8   Q    As a watch commander, did you think, at that time when you
 9   were actually a watch commander, that it was important to walk
10   the floor?
11             MR. FOX:  Objection, Your Honor, leading.
12             THE COURT:  Sustained.
13   Q    (BY MR. HAIG)  Did you think there were important duties
14   of being a watch commander?
15             MR. FOX:  Objection, Your Honor, leading.
16             THE COURT:  Sustained.
17   Q    (BY MR. HAIG)  What were some of the duties of being a
18   watch commander at IRC?
19   A    Again, it was to oversee the activities involved in the
20   processing intake and releasing of inmates, and it was to --
21   the primary role of the watch commander is just to ensure that
22   the people that are assigned to your shift are doing the job
23   that they're supposed to do in the manner that they're supposed
24   to do it.
25   Q    And how, in your view, are you best able to do that as a
```

```
 1    watch commander?
 2    A    By making yourself visible at the various workstations
 3    throughout the facility.
 4    Q    When you were a watch commander as a lieutenant, did you
 5    feel like you had a good working relationship or a poor working
 6    relationship with the deputy sheriffs there?
 7    A    I believe that I had a very good professional working
 8    relationship with the people that I was responsible for
 9    supervising.
10    Q    Did you see when Al Gonzales came in and testified last
11    week?  Were you present when that happened?
12    A    Yes.
13    Q    All right.  Do you recall him attributing a statement to
14    you that you should stay off the floors and let the deputies do
15    their jobs?
16              MR. FOX:  Objection, Your Honor, improper.
17              THE COURT:  Sustained.
18    Q    (BY MR. HAIG)  Did you ever tell Mr. Gonzales that the
19    deputies should stay off the floors -- or, I'm sorry, that the
20    watch commander should stay off the floors and let them do
21    their jobs when you were supervising Al Gonzales?
22    A    No.
23    Q    Is that a statement that you've ever made to anybody
24    you're supervising at Men's Central Jail or at IRC?
25    A    Absolutely not.
```

1    Q    Why wouldn't you make a statement like that?

2    A    Because if you talk to any lieutenants that I was

3    responsible for supervising over the course of years, I always

4    told them to walk the floors.

5              MR. FOX:  Objection, Your Honor, move to strike the

6    answer.

7              THE COURT:  Sustained.  The answer is stricken.  The

8    jury should disregard it.

9    Q    (BY MR. HAIG)  As a lieutenant, did you have any other

10   assignments after working Inmate Reception Center?

11   A    From the Inmate Reception Center, I was assigned to Lennox

12   Station in the latter part of 1993.  I remained there until --

13   I believe it was August of 1996.

14   Q    Was there -- who was the Sheriff at that time in 1996?

15   A    Sheriff Sherman Block.

16   Q    Was there a time during your tenure at the Sheriff's

17   Department that Sherman Block no longer was Sheriff?

18   A    Yes.

19   Q    And when was that?

20   A    I believe it was November of 1998.

21   Q    And did you have any position as lieutenant with the

22   newly-elected Sheriff?

23   A    I did.

24   Q    And who was the newly-elected Sheriff?

25   A    Lee Baca.

**UNITED STATES DISTRICT COURT**

```
 1  Q     And what position did you have with the newly-elected

 2  Sheriff, Lee Baca?

 3  A     Initially, I was part of his transition team, and then he

 4  assigned me as a -- he wanted me to do some auditing of the

 5  budget unit.

 6  Q     As far as you know, was Sheriff Baca aware of your

 7  background in accounting?

 8  A     He was.

 9  Q     And were you led to believe that he valued that knowledge

10  in --

11              MR. FOX:  Objection, leading.

12              THE COURT:  Sustained.

13  Q     (BY MR. HAIG)  Did Mr. Baca ever communicate to you

14  anything regarding your knowledge of accounting?

15  A     He did.

16  Q     Did you ever get promoted after the rank of lieutenant?

17  A     I did.

18  Q     And when was that?

19  A     In August of 1999, the Sheriff promoted me to the rank of

20  captain.

21  Q     And how old were you at that time?

22  A     41 years old.

23  Q     If you know, how many captains were there in the Sheriff's

24  Department?

25  A     Probably somewhere in the neighborhood of about 57 or 58.
```

**UNITED STATES DISTRICT COURT**

```
1   Q    And as far as age, do you know where you fit in that range
2   of captains?
3   A    I believe I was the youngest at the time.
4   Q    Were you ever promoted to pass the rank of captain?
5   A    I was.
6   Q    And what were you promoted to?
7   A    I was promoted to the rank of commander by Sheriff Baca.
8   Q    And where did you work at that time?
9   A    I was assigned to the Office of the Undersheriff.
10  Q    And how long were you a captain before being promoted to
11  commander?
12  A    I was the captain from August of '99 until February of
13  2001, so it was about 18 months.
14  Q    Would you say that that was an unusually short amount of
15  time or a regular amount of time?
16            MR. FOX:  Objection, leading.
17            THE COURT:  Sustained.
18  Q    (BY MR. HAIG)  What was the typical amount of time
19  somebody would be a captain, in your understanding and
20  experience in the Sheriff's Department, before being promoted
21  to commander?
22  A    I think it varied, but I'd put the average at around five
23  years.
24  Q    How many commanders were there at the time that you were
25  promoted to commander in the Sheriff's Department?
```

UNITED STATES DISTRICT COURT

```
1    A    Somewhere in the neighborhood of 25 or 26.
2    Q    And as far as -- and your age was what at that time when
3    you were promoted?
4              MR. FOX:  Objection, asked and answered.
5              THE COURT:  Sustained.
6    Q    (BY MR. HAIG)  Were you among the youngest again?
7              MR. FOX:  Objection, leading.
8              THE COURT:  Sustained.
9    Q    (BY MR. HAIG)  In the range of commanders that you had in
10   the Sheriff's Department, where did you fit as far as your age
11   when you were first promoted?
12   A    I believe I was the youngest at the time that I was
13   promoted to commander.
14   Q    And what was your assignment when you were promoted to
15   commander?
16   A    Assigned to the Office of Undersheriff Bill Stonich.
17   Q    And did you have an office?
18   A    I did.
19   Q    Where was your office?
20   A    It was located on the second floor at Sheriff's
21   Headquarters building in Monterey Park.
22   Q    What's the next rank above commander?
23   A    Chief.
24   Q    Were you ever promoted to chief?
25   A    I was.
```

1    Q    And who promoted you?

2    A    Sheriff Lee Baca.

3    Q    And do you remember when you were promoted to chief?

4    A    August of 2003.

5    Q    And what age were you at that time?

6    A    I'm sorry, it was August of...  It was August of 2002, I'm

7    sorry.

8    Q    All right.  And do you remember how old you were at that

9    time?

10   A    I believe I was 44.

11   Q    And what were your responsibilities as chief?

12   A    I was assigned as a chief of the Administrative Services

13   division, primarily the -- I had responsibility for the budget

14   for the Sheriff's Department, personnel, facilities planning

15   and facilities maintenance for the Sheriff's facilities

16   throughout the county.

17   Q    You said you had primary responsibility for the budget, is

18   that what you said?

19   A    Yes, I did.

20   Q    And what does that mean?

21   A    Well, the Sheriff gets an annual budget from the Board of

22   Supervisors.  In 2002 and '3, I believe the budget was

23   approximately $1.7 billion annually, and my responsibility was

24   to make sure that we expended our -- the resources that were

25   given to us in appropriate manner without exceeding our

```
 1   budgeted funds.
 2   Q    And without going into details, were you successful in
 3   achieving your goals that you just set out?
 4   A    Yes.
 5   Q    How many chiefs were there in the Sheriff's Department?
 6   A    At the time that I was promoted to chief?
 7   Q    Yes.
 8   A    It may have been eight at the time, and I know,
 9   ultimately, that number grew to 11 by the time that I retired
10   from the Department.
11   Q    And Department-wide, how many employees does the Sheriff's
12   Department have?
13   A    When I retired in 2013, the Department was budgeted for
14   approximately 18,000 employees, and I believe that about little
15   over -- or somewhere near the neighborhood of 17,000 were
16   actually filled positions.
17   Q    And that includes peace officers that are called sworn?
18   A    Yes.
19   Q    And does it also include civilian employees?
20   A    It does.
21   Q    What's the difference?
22   A    Well, the sworn peace officers are the ones who go through
23   the academy and successfully complete the training that's
24   prescribed by the State of California in order to become a law
25   enforcement officer.  The civilians are the people who provide
```

```
 1    all the necessary support in order to make the organization
 2    work, such as your clerical staff and your budget folks, et
 3    cetera.
 4    Q    All right.  Before becoming undersheriff, were you also an
 5    assistant sheriff?
 6    A    I was.
 7    Q    And how long were you an assistant sheriff?
 8    A    I was an assistant sheriff for six and a half years.
 9    Q    All right.  And how many assistant sheriffs were in the
10    Sheriff's Department when you were first made assistant
11    sheriff?
12    A    Two.
13    Q    And who promoted you?
14    A    Sheriff Lee Baca.
15    Q    What were your duties when you were first promoted to
16    assistant sheriff?
17    A    I had responsibility for the custody side.  So I had
18    Custody division, Correctional Services division, Court
19    Services division, Technical Services division and
20    Administrative Services division.  Those were the five
21    divisions that were -- that I was charged with overseeing.
22    Q    And what were the dates that you were the assistant
23    sheriff over those divisions?
24    A    From January of 2005 until -- I believe it was June of
25    2007.
```

1    Q    And you mentioned one of the things that you oversaw was

2    custody?

3    A    Yes.

4    Q    And what is that?

5    A    It's the jail facilities throughout Los Angeles County.

6    Q    Could you tell us what jail facilities there are

7    throughout Los Angeles County.

8    A    Well, you have Men's Central Jail down here in Downtown

9    Los Angeles.  You have the Inmate Reception Center, Twin Towers

10   Correctional Facility.  There was Century Regional Detention

11   Facility, which is the female facility in Lynwood.  To the

12   north in Saugus we have the Wayside Honor Rancho, also known as

13   the Pitchess Detention facilities that include -- it varied

14   depending on the budget, but there are approximate four jail

15   facilities on that piece of property.  And then there was

16   another facility to the far north in Lancaster, Mira Loma.

17   Q    Approximately how many inmates on an average day would be

18   housed in all the jail facilities administered by the Sheriff's

19   Department?

20   A    Over the course of the years, I would say that it would be

21   fair to say that the average daily population in the jails

22   numbered approximately 20,000.

23   Q    When you became a deputy sheriff, was Men's Central

24   Jail -- the current Men's Central Jail, was that a jail

25   facility at that time?

```
 1   A     It was.
 2   Q     All right.  And what would you say the condition of Men's
 3   Central Jail was as far as the physical structure of Men's
 4   Central Jail was when you became assistant sheriff?
 5   A     It was old.
 6   Q     Were there any things that you thought it might need to
 7   make it better from a physical standpoint?
 8   A     Well, it was a -- it was a -- it was a facility that had
 9   been designed years ago, and it really was designed -- the
10   entire system was designed to be a county jail.  County jails
11   originally were designed to house people who had been arrested
12   and were serving -- and then ultimately convicted and were
13   serving time for, say, drunk driving, drunk in public, petty
14   thieves, just small crimes.  County jails were not designed --
15   certainly L.A. County Jail was never designed to hold the type
16   of inmates that now populate the jail, which is violent
17   individuals and violent gang members.  And so it's a very
18   difficult jail to manage with the way it's designed, especially
19   Men's Central Jail.
20   Q     Did the Sheriff's Department have any choice as to the
21   inmates that it accepted into the county jail system?
22   A     No.
23   Q     As far as you know, how did those inmates end up in the
24   county jail?  If you know.
25   A     Well, if individuals are arrested for crimes and then
```

1    ultimately booked into the system and either they're unable to

2    make bail or they have no bail or they've already been

3    sentenced and they're being housed awaiting either release or

4    transportation to another facility.

5    Q    Did Sheriff Lee Baca have any core beliefs or values that

6    he tried to instill in any of his subordinate officers?

7    A    Yes.

8    Q    I direct your attention to Exhibit 305.

9         Mr. Tanaka, do you recognize this document?

10   A    I do.

11   Q    And what do you recognize it to be?

12   A    The core values of the Los Angeles County Sheriff's

13   Department.

14   Q    And were these core values something that you ever saw

15   outside of court today?

16   A    Yes.

17   Q    Where would you see it?

18   A    They were all over the place.  They were hanging.  They

19   were blown up and put in framed poster-like -- yeah, framed

20   posters throughout every facility in the Sheriff's Department,

21   in addition to being in our manual of policy and procedures and

22   in many other places.

23   Q    Was this something that you saw when Sherman Block was

24   Sheriff or when Lee Baca was Sheriff or both?

25   A    Sheriff Lee Baca rewrote the core values that had existed,

1   and he personally wrote this particular set of core values.

2   Q    And what did you believe those core values to mean as far

3   as a policy in the Sheriff's Department?

4   A    It was the framework, or the guide, the foundation for how

5   we were to do our -- perform our duties.

6          MR. HAIG:  And I move to admit 305, Your Honor.

7          MR. FOX:  Your Honor, may I just have one minute?

8        (Counsel conferred off the record.)

9   Q    (BY MR. HAIG)  Mr. Tanaka, do you recall the approximate

10  date when the Sheriff, Lee Baca, started posting these core

11  values around and making it part of your policy?

12  A    I believe it was shortly -- sometime shortly after he

13  became the Sheriff of Los Angeles County in November of 1998.

14  Q    All right.

15         MR. HAIG:  I move to admit, Your Honor.

16         MR. FOX:  I have no objection to this exhibit,

17  Your Honor.

18         THE COURT:  All right.  It will be received.

19        (Exhibit No. 305 received into evidence.)

20         MR. HAIG:  Your Honor, may I publish, please?

21         THE COURT:  Yes.

22  Q    (BY MR. HAIG)  Mr. Tanaka, I'd like you to read from the

23  exhibit which has been put in front of you, Exhibit 305,

24  please.

25  A    Okay.  "Our Core Values.  As a leader in the Los Angeles

1    County Sheriff's Department, I commit myself to honorably

2    perform my duties with respect for the dignity of all people,

3    integrity to do right and fight wrongs, wisdom to apply common

4    sense and fairness in all I do and courage to stand against

5    racism, sexism, anti-Semitism, homophobia and bigotry in all

6    its forms."

7    Q    Did you consider this core value to be something that was

8    advisory or something that was compulsory?

9    A    Oh, it's absolutely something that was compulsory.

10   Q    And did you have any personal animus to anything that was

11   in the core values?

12   A    No.

13   Q    When those core values became something that became

14   compulsory from Sheriff Baca, did you agree with that?

15   A    Yes.

16   Q    Who was your predecessor -- your immediate predecessor as

17   assistant sheriff -- when you became assistant sheriff in 2005?

18   A    I believe -- Larry Waldie.

19   Q    And did Mr. Waldie then become the undersheriff?

20   A    Yes.

21   Q    All right.  Did you feel it was important or it was not

22   important to visit the specific commands under your

23   jurisdiction as assistant sheriff?

24   A    I thought it was absolutely vital that I visit the various

25   commands that I was responsible for overseeing.

1  Q    And did you -- while you were a chief, did you look at

2  what some of the undersheriffs did as far as leaving the

3  office, for instance?

4  A    I'm sorry, I'm not quite sure -- when I was chief?

5  Q    When you were chief, did you have an opportunity to view

6  the supervisory nature of the assistant sheriff and how they

7  conducted themselves in their job?

8  A    I did.

9  Q    And did you try to emulate them in any way?

10 A    I certainly tried to learn from those that had more

11 experience and were above me in rank whenever it was

12 appropriate.

13 Q    Did you do anything that you thought was different when

14 you became assistant sheriff than what your predecessors had

15 done?

16 A    I'm sure we all had our different styles.

17 Q    And did you think it was important to visit -- to get out

18 of the office?

19 A    Yes, to visit the units that I was responsible for

20 overseeing.

21 Q    Do you remember in 2003 visiting Men's Central Jail and

22 speaking to Al Gonzales?

23 A    I believe you're referencing 2006.

24 Q    2006, thank you.  Do you recall visiting Men's Central

25 Jail and seeing Lieutenant Gonzales there on that date?

1    A    I do not have a specific recollection of him being at the

2    supervisory meeting that I attended that included the captain

3    and the sergeants and lieutenants from Men's Central Jail.

4    Q    Do you recall why you went to that supervisory meeting?

5    A    I do.

6    Q    And why did you go?

7    A    I went in response to complaints from approximately 200

8    deputies that had been assigned to that facility.  Their

9    concern was that they had been told that they would be --

10            MR. FOX:  Objection, foundation and hearsay.

11            THE COURT:  Sustained.

12   Q    (BY MR. HAIG)  The reason you went was because you had

13   received some complaints?

14            MR. FOX:  Objection, leading.

15            THE COURT:  Sustained.

16   Q    (BY MR. HAIG)  Why did you go -- without telling us what

17   anybody told you, why did you go to that meeting in 2006?

18   A    In response to a couple hundred complaints from employees

19   who worked at Men's Central Jail.

20   Q    And how were you contacted by these employees?

21   A    By e-mail.

22   Q    Did you have reason to believe that Mr. Gonzales was

23   referring to employees in a way that you disapproved of?

24            MR. FOX:  Objection, leading.

25            THE COURT:  Sustained.

**UNITED STATES DISTRICT COURT**

```
 1   Q     (BY MR. HAIG)  Did you disapprove of the way Mr. Gonzales
 2   was referring to some of his employees?
 3                 MR. FOX:  Objection, leading.
 4                 THE COURT:  Sustained.
 5   Q     (BY MR. HAIG)  Did you learn how Mr. Gonzales was
 6   referring to some of his employees?
 7                 MR. FOX:  Objection, leading.
 8                 THE COURT:  Sustained.
 9   Q     (BY MR. HAIG)  When you went to that meeting, did you have
10   any understanding about Mr. Gonzales and how he supervised
11   deputies?
12   A     I may have known or heard about his management style prior
13   to that meeting.
14   Q     And how were you made aware of his management style?
15                 MR. FOX:  Objection, misstates the testimony.
16                 THE COURT:  Sustained.
17   Q     (BY MR. HAIG)  When you went to the meeting in 2006 at
18   Men's Central Jail, who did you meet with, if you recall?
19   A     The captain of the facility, most, if not all, of their
20   lieutenants and sergeants.
21   Q     Did you meet with anybody else?
22   A     On that particular day, I -- I don't believe so.
23   Q     Did you ever make a comment on that date about the need
24   for supervisors to coddle deputies?
25   A     No.
```

1    Q     Did you hear when Mr. Gonzales made those comments in his

2    testimony?

3                MR. FOX:  Objection, again, improper.

4                THE COURT:  Sustained.

5    Q     (BY MR. HAIG)  Have you ever made a comment like that

6    about supervisors having to coddle their deputies?

7    A     No.

8    Q     Did you ever tell Mr. Gonzales that he needed to get out

9    of the way of his deputies and let them do their job?

10   A     No.

11   Q     And why do you know that you didn't say that?

12   A     I would never tell a supervisor to get out of the way or

13   abdicate their responsibility to supervise the people they were

14   charged with supervising.

15   Q     Did you have any conversations with Mr. Gonzales about any

16   references that he made to deputy sheriffs being gang members?

17   A     I did not have the discussion with him.

18   Q     Did you talk to him about that at all in any way?

19   A     Not to him.

20   Q     Did you come to learn about that reference being made to

21   any deputy sheriffs?

22   A     I do.

23   Q     And how did you learn that?

24   A     I learned that from some deputies.

25   Q     And how did that make you feel?

```
 1            MR. FOX:  Objection, relevance.

 2            THE COURT:  Sustained.

 3   Q    (BY MR. HAIG)  What action did you take in your command of

 4   Men's Central Jail after you heard some of those complaints

 5   from deputies?

 6   A    I spoke to the chief of Custody division and asked him to

 7   seriously consider transferring or having Lieutenant Gonzales

 8   transferred because I thought he was failing in his role as a

 9   mentor and a supervisor at Men's Central Jail.

10   Q    Why did you think he was failing?

11   A    As he stated, he didn't walk the floors, and he made

12   references to gang -- deputies as being --

13            MR. FOX:  Objection, hearsay.  Move to strike.

14            THE COURT:  Sustained.  The answer is stricken.  The

15   jury should disregard it.

16   Q    (BY MR. HAIG)  Why did you think he was failing in his

17   command?

18   A    I didn't think he was doing his job appropriately.

19   Q    Did you hear any complaints from any -- strike that.

20        What happened after you recommended that he be

21   transferred, Mr. Gonzales?

22   A    The chief said that Lieutenant Gonzales would be retiring

23   within a couple of months, and so he asked if -- he

24   acknowledged that he was a problem, and he --

25            MR. FOX:  Objection, Your Honor, hearsay.  Move to
```

 1    strike.

 2              THE COURT:  Sustained.  The answer is stricken.  The

 3    jury should disregard it.

 4    Q    (BY MR. HAIG)  Mr. Tanaka, without saying what somebody

 5    else might have told you, what did you do after that regarding

 6    Mr. Gonzales and transferring him, if anything?

 7    A    Lieutenant Gonzales retired a couple months later.

 8    Q    And where did he retire from?

 9    A    Men's Central Jail.

10    Q    And do you know who took his place?

11    A    I'm not sure.

12    Q    When somebody -- when you were the assistant sheriff, were

13    you able to unilaterally transfer somebody?

14    A    No.

15    Q    Were you allowed to unilaterally promote somebody?

16    A    No.

17    Q    Who had the power to transfer and promote people in the

18    Sheriff's Department at certain ranks?  And maybe you can talk

19    about that, about the ranks.

20    A    Oh, in order to become a sergeant, you have to take a

21    multiple-part test.  It involves a written examination.  It

22    involves oral interview, and it involves an appraisal -- a

23    promotability score which is given to you by the unit you're

24    assigned to, the command staff.  You're then, dependent on your

25    scores, placed on a list, and if you score high enough on that

```
 1    list and there are openings or vacancies at the rank of
 2    sergeant, you would be promoted.
 3          The same process applied to the rank of lieutenant.
 4    However, from the point of captain and above, it was solely at
 5    the authority and discretion of Sheriff Lee Baca.  You filled
 6    out your application and you were put on a promotability list,
 7    and then the Sheriff would decide who he wanted to appoint as
 8    his command staff -- captain, commander, chief, assistant
 9    sheriff and undersheriff.
10    Q     Did you have input with the Sheriff?
11    A     I did.
12    Q     Would you ever give recommendations to the Sheriff
13    regarding promotions?
14    A     Yes, he expected that.
15    Q     Would you ever give recommendations to the Sheriff
16    regarding transfers?
17    A     Yes.
18    Q     If those things happened, do you know whether the Sheriff
19    always followed your recommendation?
20    A     He did not.
21    Q     Were there times that he didn't follow your
22    recommendation?
23              MR. FOX:  Objection, Your Honor, leading.
24              THE COURT:  Sustained.
25    Q     (BY MR. HAIG)  How often, would you say on average, he
```

1    would follow your recommendations for a promotion?

2    A    Well, if I was able to provide, you know, appropriate

3    level of information that supported the recommendation, then he

4    would accept it.  If he didn't agree, then he didn't agree.  I

5    couldn't give you a percentage, but it was maybe 50/50.

6    Q    Was there ever a time where you were displeased with

7    anything that he did regarding a promotion?

8              MR. FOX:  Objection, relevance.

9              THE COURT:  Sustained.

10   Q    (BY MR. HAIG)  Do you remember a rotation plan for deputy

11   sheriffs on the -- at Men's Central Jail that was proposed by

12   John Clark?

13   A    I do.

14   Q    And what was John Clark's rank at that time?

15   A    He was a captain.

16   Q    And what do you recall about the transfer plan proposed by

17   John Clark?

18   A    My recollection is that the deputy sheriffs that were

19   assigned to that facility -- and they numbered approximately

20   600 at the time -- that they would be rotated, not only in job

21   assignment, but on shifts.  So in other words, if I'm working

22   the day shift from 6:00 a.m. to 2:00 p.m. now, two months later

23   I would be working on the afternoon shift from 2:00 p.m. to

24   10:00 p.m., and then two months after that, I would be working

25   on the -- what we call the early morning or graveyard shift

1    from 10:00 p.m. to 6:00 a.m.  That was my understanding in my

2    discussion with him about the rotation plan.

3    Q    And based upon your understanding, did you approve or

4    disapprove of that plan?

5    A    I did not approve of that plan.

6    Q    Did you tell anybody about that?

7    A    Yes, I told him that I did not approve of that plan.

8    Q    Why did you not approve of that plan?

9    A    Well, not to mention the employee relations nightmare that

10   it would have caused, the impact on personal lives of having to

11   try to figure out how you're going to deal with your kids, your

12   childcare in having to have a shift change every two months

13   from days to p.m.s to graveyards and then all over again.  It

14   would just be impossible for one person to manage their

15   personal life with that kind of disruption in schedule, and I

16   told him that that would be completely unacceptable to impose

17   upon his personnel.

18   Q    And did you take any action on Mr. Clark's plan after

19   telling him that?

20   A    Yes.

21   Q    And what action did you take?

22   A    I told him that he had to come up with another plan to

23   address the problem that he said he had and that he was not

24   going to impose mass punishment on an entire facility.

25   Q    Did you have any view at that time about the punishment of

1  deputy sheriffs who acted against policy or acted against the

2  law?

3  A    I've always maintained the same view.

4  Q    And what is that view?

5  A    Those that violate the policy should be disciplined

6  accordingly, and those that violate the law should be treated

7  accordingly.

8  Q    Did you make any recommendations about John Clark

9  remaining as captain at Men's Central Jail after this

10  interaction you had with him regarding the transfers?

11  A    I believe I had discussions with the Sheriff.

12  Q    And what was the result of those discussions?

13  A    I told the Sheriff that I believe that the Men's Central

14  Jail was one of the most difficult commands in the organization

15  and that he needed --

16         MR. FOX:  Objection, Your Honor, foundation.

17         THE COURT:  Sustained.

18  Q    (BY MR. HAIG)  What was the result of that discussion you

19  had with the Sheriff?  Did anything happen with Mr. Clark?

20  A    I made a recommendation to the Sheriff that Captain

21  Clark --

22         MR. FOX:  Objection, Your Honor, hearsay and

23  foundation.

24         THE COURT:  Why don't you repeat the question.

25         MR. HAIG:  All right.  I'm just going to ask it a

1  different way, if that's all right, Your Honor.

2          THE COURT:  That's fine.

3          MR. HAIG:  All right.

4  Q    (BY MR. HAIG)  After the discussions with Mr. Clark

5  regarding the transfers and after your disapproval of those

6  transfers, did Mr. Clark remain at Men's Central Jail as a

7  captain?

8  A    For a period of time, short period of time.

9  Q    And did you have a desire that he remain there --

10 A    No.

11 Q    -- as captain?

12 A    No.

13 Q    And because you did not want him to remain there as

14 captain, what did you do?  Without saying what you said, what

15 did you do?

16 A    Made a recommendation to the Sheriff, who was the only one

17 who could approve transfers of command staff, that Captain

18 Clark be moved to another unit of assignment.

19 Q    Did the Sheriff end up following your recommendation?

20 A    He did.

21 Q    And how long did it take before Mr. Clark -- Captain Clark

22 at that time was moved out of his assignment at Men's Central

23 Jail?

24 A    I don't recall, but it was a relatively short period of

25 time.

```
 1    Q    Do you recall where he went?

 2    A    I do.

 3    Q    Where did he go?

 4    A    To Detective division, Commercial Crimes Bureau.

 5    Q    Did you have any input in the successor to Captain Clark

 6    at Men's Central Jail?

 7    A    I'm sorry?

 8    Q    Did you have any input into Captain Clark's successor as

 9    captain at Men's Central Jail?

10    A    Yes, I did.

11    Q    And who did you have input with regarding that?

12    A    Sheriff Lee Baca.

13    Q    Did you have anybody in mind, or did you make a

14    recommendation to Mr. Baca?

15    A    I did make a recommendation.

16    Q    And who was your recommendation?

17    A    I recommended Captain Robert Olmsted.

18    Q    If you know, did Sheriff Baca follow that recommendation?

19    A    After discussion, yes, he did.

20    Q    Do you recall how long Captain Olmsted was at Men's

21    Central Jail in his position as captain?

22    A    I believe he was a captain for approximately one year,

23    maybe a fraction longer.

24    Q    And what happened after that one year, a fraction longer?

25    A    He was promoted to commander.
```

1   Q    Was that something that you supported or did not support?

2   A    I fully supported it.

3   Q    And when he became -- when he became commander, did

4   somebody take his spot as captain at Men's Central Jail?

5   A    Yes.

6   Q    And who was that?

7   A    Captain Daniel Cruz.

8   Q    And you were still overseeing the jail at that time as

9   part of your direct command as assistant sheriff?

10  A    I don't believe so.

11  Q    Okay.  Who was?

12  A    That would have been Assistant Sheriff Marvin Cavanaugh.

13  Q    Even though you were assistant sheriff still, did you have

14  a different set of responsibilities at some point in time

15  during your tenure as assistant sheriff?

16  A    I did.  From June 2007 until June 2011 I was assigned as

17  the assistant sheriff to oversee the 23 patrol stations,

18  centralized detective division units and Homeland Security.

19  Q    All right.  When Robert Olmsted became commander, you were

20  then not overseeing Men's Central Jail?

21  A    That's correct.

22  Q    Were you ever made aware of any kind of dispute that was

23  going on between Commander Olmsted and Captain Cruz?

24  A    Yes.

25  Q    And how were you made aware of that?

1   A     I don't remember.  Somebody brought it to my attention.

2   Q     Did you do anything to try to intervene in that dispute?

3   A     I did.

4   Q     What did you do?

5   A     First, I spoke to -- I don't remember which one first,

6   either Commander Olmsted or Captain Cruz.  I wanted to hear

7   about the problems that I'd been hearing between the two, and

8   then I spoke to the other one, whichever one I didn't speak to

9   first.  And the bottom line is I just asked them to put aside

10  whatever personal differences they were having and work

11  together because it was -- I had been hearing it was very

12  uncomfortable for the subordinates around to see them, the two

13  high ranking officers, fighting all the time.

14  Q     Did you ever have a meeting with Commander Olmsted about

15  this?

16  A     I did.

17  Q     And what happened at that meeting?

18  A     I told him that I -- you know, I asked him if it was

19  possible for him to be able to work on a professional manner --

20  in a professional manner with the captain, and he said that he

21  would be able to make that work.

22  Q     Did Commander Olmsted at that meeting ever ask you to

23  transfer Dan Cruz out of his assignment as captain at Men's

24  Central Jail?

25  A     No.

```
1   Q    How well did you know Robert Olmsted at that time of that
2   meeting that we're just referring to right now?
3   A    I did not know a lot about Robert Olmsted.  He just had a
4   reputation for --
5             MR. FOX:  Objection, Your Honor.
6             THE COURT:  Sustained.
7   Q   (BY MR. HAIG)  Would you say that he was somebody that was
8   close to you as far as a friend?
9   A    No.
10  Q    Was he somebody that you socialized with outside of law
11  enforcement?
12  A    No.
13  Q    Was he somebody that you confided in inside the
14  Department?
15  A    No, I -- no.
16  Q    And you were, as you say, assistant sheriff over patrol
17  and other entities at the time of this meeting with
18  Mr. Olmsted; right?
19  A    Yes.
20  Q    Did you ever make any statement -- well, let me back up.
21       Did -- do you recall being asked at that meeting to
22  transfer Dan Cruz?
23             MR. FOX:  Objection, asked and answered.
24             THE COURT:  Sustained.
25  Q   (BY MR. HAIG)  Did you ever make a statement to
```

1    Mr. Olmsted at that meeting that you wanted to promote Dan

2    Cruz?

3    A    No.

4    Q    Did you ever make a statement at that meeting that you

5    were going to be the Sheriff someday for about 15 years and you

6    wanted your people in place?

7    A    No.

8    Q    As a result of that meeting that you had with Commander

9    Olmsted, did you recommend any action be taken?

10   A    As a result of the meeting between the two of them -- or

11   individually, they both assured me that they would be able to

12   put aside their differences and do their job.

13   Q    Did you take any other action at that time?

14   A    No, not at that time.

15   Q    Did you take any action later?

16   A    I did.

17   Q    And what action did you take?

18        MR. FOX:  Objection, vague as to time.

19        MR. HAIG:  I can clean it up, Your Honor.

20   Q    (BY MR. HAIG)  When I asked did you take any action later,

21   was there a point in time after this meeting with Commander

22   Olmsted and Captain -- Commander Olmsted about the situation at

23   Men's Central Jail where you recommended any action be taken?

24   A    Yes.

25   Q    And do you recall when that was?

```
 1   A     It was probably a few months later, and word got back to
 2   me that the feuding --
 3              MR. FOX:  Objection, Your Honor, nonresponsive.
 4              THE COURT:  Sustained.
 5   Q    (BY MR. HAIG)  You said a few months later.  What action
 6   did you recommend be taken?
 7              MR. FOX:  And, Your Honor, objection, again, vague
 8   as to time.
 9              MR. HAIG:  I just said a few months later, Your
10   Honor, so...
11              THE COURT:  Rephrase the question.
12              MR. HAIG:  I will.  All right.
13   Q    (BY MR. HAIG)  Did something happen after that meeting
14   with Commander Olmsted that caused you to recommend something?
15   A     Yes.
16   Q     And based upon that, did you recommend something?
17   A     Yes.
18   Q     What did you recommend?
19              MR. FOX:  Objection, vague as to time.
20              MR. HAIG:  I'll ask it again, Your Honor?
21              THE COURT:  Okay.
22              MR. HAIG:  Okay.
23   Q    (BY MR. HAIG)  After -- do you remember when you
24   recommended something at Men's Central Jail after that meeting
25   with Commander Olmsted?
```

```
 1  A    Yes.

 2  Q    How long after?

 3  A    It was a few months later.

 4  Q    And what did you recommend?

 5          MR. FOX:  Objection, Your Honor, vague as to time.

 6  If I may have a moment?

 7          THE COURT:  That's fine.

 8      (Counsel conferred off the record.)

 9  Q    (BY MR. HAIG)  Do you remember when you had this meeting

10  with Commander Olmsted?  What year?

11  A    Approximately 2008 or '9.

12  Q    All right.  And how many months, if you know, your best

13  guess how many months later did you recommend other action be

14  taken?

15  A    A few months after that meeting that took place in 2008 or

16  '9.

17  Q    And do you recall what you recommended at that time?

18  A    I do.

19  Q    What did you recommend?

20  A    Because the feuding was continued, I -- I spoke to both

21  Commander Olmsted and Captain Cruz to let them know exactly

22  what my plan would be, and that would be to send my aide who

23  was a lieutenant to be the operations -- or second in command

24  lieutenant at Men's Central Jail, serve as an aide to Captain

25  Cruz, and since he was a seasoned officer and he happened to
```

**UNITED STATES DISTRICT COURT**

1   personally know both of them, I sent him down there with a

2   simple mission to monitor what was going on between the two and

3   to see if he can't help resolve the conflict that they had

4   which was interfering with their performance of their duties.

5   Q    And who did you send there?

6   A    At the time, it was Lieutenant Duane Harris.

7   Q    Did you do this on your own, or did that -- did Mr. Harris

8   being sent there have to be done by somebody else?

9   A    I needed the approval of the Sheriff to have a lieutenant

10  transferred.

11  Q    Did the Sheriff give you that approval or --

12  A    He did.

13  Q    Did you ever consult with the assistant sheriff over

14  custody, Marv Cavanaugh, regarding this specific incident of

15  your request to move Duane Harris to Men's Central Jail?

16  A    I would say we had a discussion.

17  Q    Was there any opposition from anybody -- from

18  Mr. Cavanaugh about that?

19  A    I wouldn't say he was opposed to it.

20  Q    Who was the assistant sheriff over patrol before you

21  became the assistant sheriff over patrol?

22  A    Doyle Campbell.

23  Q    And did something happen to Doyle Campbell that caused you

24  to take over that position?

25  A    Yes.

```
 1   Q     What was that?
 2   A     He left the Department.
 3   Q     Did Doyle Campbell have a habit of visiting his different
 4   patrol locations?
 5            MR. FOX:  Objection, foundation.
 6            THE COURT:  Sustained.
 7   Q   (BY MR. HAIG)  Were you able to interact with Doyle
 8   Campbell on a daily basis when you were assistant sheriff and
 9   he was assistant sheriff?
10   A     Yes.
11   Q     And after interacting with Doyle Campbell, did you see him
12   out of the office frequently?
13            MR. FOX:  Objection, leading.
14            THE COURT:  Sustained.
15   Q   (BY MR. HAIG)  Did you ever see him out of the office?
16   A     I believe he was out of the office periodically.
17   Q     Did he ever let you know about whether he did anything
18   when he was out of the office?
19            MR. FOX:  Objection, foundation.
20            THE COURT:  Sustained.
21   Q   (BY MR. HAIG)  When you became assistant sheriff over
22   patrol, how many patrol facilities are there?
23   A     There were 23 stations when I became the assistant sheriff
24   on the patrol side.
25   Q     And what did you feel it was your job to do as assistant
```

```
 1    sheriff over patrol?

 2    A     Well, in addition to providing just general leadership --

 3    I hadn't been to patrol in a long time, so the first thing I

 4    did in the first few months was I made it a point to visit all

 5    of the sheriff's stations and as many of the commands -- I

 6    believe there were something like 37 commands that were

 7    assigned to the assistant sheriff position that I had just been

 8    appointed to.

 9    Q     What is the rank of somebody who is in command of a patrol

10    station?

11    A     Captain.

12    Q     Do you recall visiting a patrol station in Norwalk?

13    A     I do.

14    Q     And do you recall when that was?

15    A     Sometime in the either summer or fall of 2007.

16    Q     And do you recall who the captain of Norwalk Station was

17    when you paid that visit?

18    A     I do.

19    Q     And who was that?

20    A     Captain Patrick Maxwell.

21    Q     And did you know Captain Maxwell very well at that time?

22    A     I wouldn't say very well, but I knew him.

23    Q     Was there any animosity, as far as you know, between

24    yourself and Captain Maxwell when you visited the station in

25    2007?
```

1   A     No.

2   Q     When you visited the station in 2007, did you talk to more

3   than one person?

4   A     Yes.

5   Q     And how did you address that station, if you remember?

6   A     It was the captain.  It was his available supervisory

7   staff, lieutenants and sergeants.  If I recall, there were

8   anywhere from 40 to 60 members of that particular command,

9   which included deputy sheriffs and civilian support staff.

10  Q     Did you have any goals during that presentation at Norwalk

11  Station?

12  A     I did.

13  Q     What were your goals?

14  A     My goals were to learn about the operation at Norwalk

15  Station, what their primary functions were.  You know, they had

16  I think four or five contract cities that we reported to and

17  provided patrol services for.  I also wanted to not only find

18  out about their operation, but I wanted to provide them with my

19  philosophy on what I expected.

20  Q     And what was your philosophy?

21  A     My expectations were communicated at every command that I

22  went to.  It was very simple.  It was make sure that you're as

23  smart as you can be, know all the laws, know the lines of right

24  and wrong, and do your job -- not only do your job well, but do

25  it in the right way because that's our obligation as peace

1    officers.

2    Q    Do you recall at that meeting at Norwalk Station in 2007

3    addressing any of the people in attendance about something

4    regarding the gray area?

5    A    I don't have a specific recollection of every briefing

6    that I conducted throughout my career, but I certainly had that

7    discussion at every command I visited so that would -- it would

8    make sense that I would have it there.

9    Q    When you said "that discussion," what do you mean by that

10   discussion?

11   A    About the gray area.

12   Q    Is that a discussion that you had only done at that

13   station, or had you done it at other times?

14   A    Probably hundreds of times.

15   Q    And in what kind of venues when you say you've done it

16   hundreds of times?

17   A    In facilities, whether it be jail facilities or detective

18   division facilities or station commands.

19   Q    Was it a speech or delivery that you knew fairly well?

20   A    Yes.

21   Q    Can you tell us what you said in the 2007 speech regarding

22   the gray area at Norwalk Station.

23   A    Sure.

24   Q    What did you say?

25   A    I explained to the personnel that worked there, as I did

```
 1    at the other commands, that it was an obligation of a deputy
 2    sheriff to be extremely intelligent.  They had to be not only
 3    aware of all the laws, but the ever-changing laws.  Not only
 4    was it their duty, it was their responsibility because you
 5    can't enforce the laws if you don't know what they are.  I also
 6    told them you had to know all the policies and all the
 7    protocols of our organization, and then I said you had to have
 8    an unwavering sense of right or wrong.
 9         And I would hold my hands up the same way every single
10    time.  I said this hand represents the line of the law and the
11    policy, and this line represents right or wrong.  I said as
12    long as you stay inbounds, inside of these lines, that's where
13    you can do your job.  Step over the line and you're going to
14    either lose your job or go to jail, so don't do it.
15         And I referred to that area in between the lines as a gray
16    area because I used a black line and a white line, so I just
17    said everything in between is gray.  Sometimes I said it was
18    the green area.  Sometimes I referred to it as a football
19    field.  In the same manner, I said you play anywhere in the
20    field and do your job, but if you step on the line you're out
21    of bounds, so don't do it.
22    Q    After giving that speech at Norwalk Station in 2007 about
23    the gray area, did Captain Maxwell ever approach you and ask
24    you questions about what you meant?
25    A    No.
```

```
 1   Q     Did he appear to be upset in any way after that speech?

 2   A     No.

 3              THE COURT:  All right.  Ladies and gentlemen, we're

 4   going to take our final break of the day.  Again, I want to

 5   remind you until this trial is over you're not to discuss this

 6   case with anyone, including your fellow jurors, members of your

 7   family, people involved in the trial or anyone else, and do not

 8   allow others to discuss the case with you.  This includes

 9   discussing the case on the Internet, by e-mails or text

10   messages.  If anybody approaches you or tries to talk with you

11   about this case, please let me know about it immediately.

12         Do not read, watch or listen to any news reports or other

13   accounts about the trial or anyone associated with it.  Do not

14   do any research, such as consulting dictionaries, searching the

15   Internet or using other reference materials, and do not make

16   any investigation about the case on your own.

17         Finally, you're reminded to keep an open mind until all of

18   the evidence has been received, you've heard the arguments of

19   counsel, the instructions of the Court and the views of your

20   fellow jurors.

21         We'll come back at five after the hour.

22              THE DEPUTY CLERK:  All rise.

23         (The jury exited the courtroom.)

24              THE COURT:  All right.  Sir, you may step down.

25              THE WITNESS:  Thank you, sir.
```

1            THE DEPUTY CLERK:  Please be seated.

2            THE COURT:  All right.  Is there anything we need to

3    take up?

4            MR. FOX:  Not from the government, Your Honor.

5            MR. HAIG:  No, Your Honor.

6        (Off the record at 11:51 a.m.)

7        (On the record at 12:09 p.m.)

8            MR. HAIG:  Your Honor, would you like him up on the

9    stand?

10           THE COURT:  Yes, please.

11       All right.  Let's bring the jury in.

12       (The jury entered the courtroom.)

13           THE DEPUTY CLERK:  Please be seated.

14           THE COURT:  All right.  Counsel, let's resume.

15           MR. HAIG:  Thank you.

16   Q    (BY MR. HAIG)  Mr. Tanaka, when you were assistant sheriff

17   on the patrol side, how many captains were within your command?

18   A    I believe there was between 30 and 40.

19   Q    Would that be just patrol captains or all the captains

20   combined?

21   A    The captains that were on the side of the organization I

22   was responsible with.  There were six divisions, and I believe

23   there were somewhere in the neighborhood of 35 to 40 unique

24   commands within those six divisions.

25   Q    Now, are there salary positions and hourly positions of

**UNITED STATES DISTRICT COURT**

```
1    sworn officers in the Sheriff's Department?
2    A    Yes.
3    Q    All right.  Is captain a salary position or an hourly
4    position?
5    A    It's salaried.
6    Q    And in 2007 do you recall what the approximate salary was
7    for a captain?
8    A    Yes.
9    Q    And what was that?
10   A    It was in the range of around $180,000 or so per year, not
11   including health benefits.
12   Q    Were there any other benefits on top of that?
13   A    Well, the medical benefits for family and also a
14   county-issued vehicle.
15   Q    Were there any prescribed work hours in policy for a
16   captain?
17   A    No, the County had come up with this term called MegaFlex,
18   which allowed you to have flexible hours, I believe, if you
19   showed up to work for -- I think it was for one hour, that was
20   considered a full workday for management employees.
21   Q    Were you covered by MegaFlex?
22   A    I was a MegaFlex employee, yes.
23   Q    When you became assistant sheriff, if you showed up for
24   one hour, you'd be paid for the whole day?
25            MR. FOX:  Objection, relevance.
```

```
 1              THE COURT:  Sustained.
 2   Q    (BY MR. HAIG)  Did you take any -- any role of the work
 3   hours of the captains in your command?
 4   A    I did.
 5   Q    And what did you learn?
 6   A    When I was an assistant sheriff, I had difficulty on
 7   occasion finding sometimes a chief, a commander or a captain
 8   during a workweek.  So at some point, I ordered every captain,
 9   commander and chief under -- that I was responsible for, they
10   had to be at work Monday through Friday, 8:30 to 5:00 at a
11   minimum.
12   Q    And how did you relay that order to the people below you?
13   A    By e-mail.
14   Q    Do you remember approximately when that was done?
15   A    Sometime between 2005 and 2007 when I was the assistant
16   sheriff on the custody side.
17   Q    Do you recall the responses that you got from that e-mail?
18   Without saying specifically what they were --
19   A    I do.
20   Q    -- the types of responses?
21        And what were they?
22   A    Unhappy.
23   Q    Did that change your position?
24   A    No.
25   Q    Why not?
```

```
 1   A    Because I preached all the time, work eight hours' work
 2   for eight hours' pay.
 3   Q    Did you sometimes ask your captains to work more than
 4   eight hours?
 5            MR. FOX:  Objection, relevance, leading.
 6            THE COURT:  Sustained.
 7   Q    (BY MR. HAIG)  Patrick Maxwell testified in this case.
 8   You recall that; right?
 9   A    Yes.
10   Q    All right.  Do you recall him making a statement that --
11            MR. FOX:  Your Honor, I'm going to object to
12   anything that counsel says about testimony.
13            MR. HAIG:  Could we approach, please, Your Honor?
14            THE COURT:  Sure.
15            MR. HAIG:  Thank you.
16       (Discussion held at sidebar.)
17            MR. HAIG:  I don't want to just keep asking
18   questions and have them get sustained because it's a waste of
19   time, but at the same time, there are witnesses who have
20   testified about certain things that --
21            THE COURT:  Yeah, but so what?  It's -- well, does
22   it test for his hearing?
23            MR. HAIG:  Of course not, Your Honor.
24            THE COURT:  Then what is it?  Nothing good is going
25   to come of you asking him so and so was here, did you hear him
```

**UNITED STATES DISTRICT COURT**

1    testify to so and so.

2              MR. HAIG:  Well, okay.  Okay.  I don't have to ask

3    it that way then, Your Honor, but --

4              THE COURT:  Then he might stop objecting.

5              MR. HAIG:  But certainly, for instance, Commander

6    Maxwell made comments about Mr. Tanaka, and those comments have

7    to be -- to be put into a context, he has to be able to refute

8    those comments if they were untrue about him.

9              THE COURT:  Then ask a proper question.

10             MR. HAIG:  I'm trying to, Your Honor.

11             THE COURT:  Well, it's your -- he's your witness.

12   He'll keep objecting, and the objections have been sustained.

13   Believe me, when you preface that question with you were here

14   when so and so testified, do you recall him saying X, well,

15   what do you want to ask him next?  Was that the truth?  Do you

16   agree with it?  It's irrelevant.  Just ask the question.  You

17   don't need to put the preface on it.  Just ask it.

18             MR. HAIG:  Very well.

19        (End of sidebar discussions.)

20   Q    (BY MR. HAIG)  Mr. Tanaka, do you feel that you were --

21   that you would call captains to task for not doing their jobs?

22   A    Yes, I did.

23   Q    And how would you do that?

24   A    I'd have a discussion with them if I thought that they

25   weren't performing to the level that I fully expected them and

```
 1   that was expected of them by the organization.
 2   Q     Would you typically have discussions with people that you
 3   felt weren't doing their jobs in private or in front of other
 4   people?
 5   A     Private.
 6   Q     Would you ever use language that's not suitable for
 7   television?
 8   A     In admonishment sessions?
 9   Q     Yes.
10   A     No.
11   Q     Was it ever your goal to embarrass?
12             MR. FOX:  Objection, Your Honor, relevance and
13   leading.
14             THE COURT:  Sustained.
15   Q     (BY MR. HAIG)  Do you recall visiting Century Station when
16   Captain Roller was the captain?
17   A     I do.
18   Q     And do you recall addressing the entire staff of the
19   station?
20   A     I wouldn't say the entire staff, but a -- a certain
21   portion of whoever was available to be in attendance at the
22   meeting.
23   Q     And do you recall who was in attendance at that time?
24   A     It would be Captain Roller.  I believe there were some
25   lieutenants, sergeants and a number of the deputy and civilian
```

1    personnel.

2    Q    Did you say at that time that captains who initiate

3    unnecessary and excessive investigations would themselves be

4    subject to investigation?

5    A    I don't have a specific recollection of saying that at

6    that meeting, but that's something that I would say.

7    Q    Why would you say that?

8    A    I have said that before.

9    Q    Did you ever say that -- at that function at Century

10   Station that deputies should be aggressive in pursuing areas

11   with gang members?

12   A    In pursuing -- in doing their job.

13   Q    Did you ever talk about a "blue line" -- and I'm putting

14   that in quotes -- at that session at Century Station?

15   A    No.

16   Q    Did you ever advise any sworn personnel to cross over the

17   line between right and wrong at that session?

18   A    No.

19   Q    Did you ever -- did you say anything about Internal

20   Affairs when you went to Century Station in 2007?

21   A    I might have.

22   Q    And why do you say you might have?

23   A    I had discussed my feelings about Internal Affairs on

24   occasion.

25   Q    What are your feelings about Internal Affairs at that

1   time, or what were they?

2   A      I know that they had a function to do a necessary

3   function, but I did not like the process by which they

4   performed their duties.

5   Q      Why is that?

6   A      I believe that the process was excessively drawn out to

7   the entire statute of limitations of one year.  People who had

8   investigations put on them oftentimes didn't know what they

9   were being investigated for.  They were then ostracized and

10  felt as if there was a cloud hanging over their head.  They

11  became unproductive, and I felt the process needed to be

12  improved so that we did not lose productivity of employees

13  while they were under an investigation -- an administrative

14  investigation.

15  Q      When you say "administrative investigation," what does

16  that mean?

17  A      Policy violations -- maybe you didn't come to work on time

18  a few times, maybe called in sick when you weren't really sick.

19  You might have violated something that was an administrative

20  policy of the organization.  Those are the types of things that

21  were investigated by Internal Affairs.

22  Q      Do you think Internal Affairs serves a useful purpose in a

23  police agency?

24  A      Absolutely.

25  Q      Did you feel in 2007 that it wasn't serving its purpose or

1   it was serving its purpose?

2   A     I believe that it served its purpose, but I don't believe

3   it was doing the job in the appropriate manner.

4   Q     Did you ever make a statement about a comparison between

5   L.A.P.D. and how many Internal Affairs officers they have and

6   the Sheriff's Department and how many they have?

7   A     I know that's been attributed to me, but I have no

8   recollection of making any kind of comment like that.

9   Q     Did you ever say that "We have 45 internal officers and

10  that's 44 too many"?

11            MR. FOX:  Objection, asked and answered.

12            THE COURT:  Sustained.

13  Q     (BY MR. HAIG)  What were your views about deputy

14  discipline in 2007 when you were supervising patrol?

15  A     That discipline was necessary to ensure proper behavior of

16  deputy sheriffs.

17  Q     What was your view about deputy sheriffs that would

18  violate the law when you were supervising patrol?

19  A     I had no tolerance for deputies who wore a badge and

20  violated the law.

21  Q     When a deputy sheriff is accused of a violation of a law,

22  a criminal statute, is there an agency within the Sheriff's

23  Department that looks into that?

24  A     Yes.

25  Q     And what is that agency called?

```
 1   A     Allegations of criminal conduct by deputy sheriffs and

 2   sheriff civilian employees were investigated by the Internal

 3   Criminal Investigations Bureau, which has been referred to

 4   frequently here as ICIB.

 5   Q     And when did you -- have you ever had ICIB under any of

 6   your commands when you were employed in the Sheriff's

 7   Department?

 8   A     Yes.

 9   Q     And when was that?

10   A     During the period of time when I was the undersheriff.

11   Q     When you -- do you remember when you became undersheriff?

12   A     I believe it was June of 2011.

13   Q     In June of 2011, did you understand how many people were

14   in ICIB at that time?

15   A     Generally, yes.

16   Q     About how many?

17   A     I believe there were 12 full-time investigators and a

18   small surveillance unit that was comprised of deputies and, I

19   believe, a sergeant.

20   Q     When you say "investigator," what rank is an investigator?

21   A     In the Internal Criminal Investigations Bureau, the

22   investigators were at the rank of sergeant.

23   Q     And did ICIB have an office location?

24   A     Yes, they did.

25   Q     And did they have a commanding officer?
```

1    A    They did.

2    Q    And when you took over as undersheriff in June of 2011,

3    who was ICIB's commanding officer?

4    A    Tom Carey.

5    Q    And what was his rank at that time?

6    A    He was a captain.

7    Q    Were there any subordinate officers below him?

8    A    Yes.

9    Q    And who were they?

10   A    I'm not sure who the lieutenants were when he took over.

11   I just know that at some point in time, he had two lieutenants

12   that work for him, Robert Peacock and Stephen Leavins.

13   Q    And did you know Stephen Leavins --

14   A    I did.

15   Q    -- before he became lieutenant in ICIB?

16   A    Yes.

17   Q    How did you know him?

18   A    I'd worked with him periodic -- periodically from about

19   1993 on, so at that point, probably a period of almost 20 years

20   I had had some contact with him at various assignments.

21   Q    Did he ever work for you as an aide?

22   A    He did.

23   Q    And when was that?

24   A    While I was an assistant sheriff, and it probably would

25   have been sometime in the area of 2000 -- maybe '10 or '11, I'm

1    not really sure.  It was for a very brief period of maybe three

2    or four months.

3    Q    We've talked about chief, commander, assistant sheriff,

4    undersheriff.  At what rank do you get an aide?

5    A    Chief.

6    Q    And what's your view of the job that an aide does for a

7    chief or assistant sheriff or undersheriff?

8    A    Well, the aide's position is just kind of like your chief

9    assistant.  They're responsible for just making sure that

10   everything's in order when you come to work.  If you're going

11   to a meeting, that, you know, you're prepared for it.  Answers

12   telephone calls.  At least for me, my aides were responsible

13   for a lot of the walk-in traffic, the phone calls, e-mails, et

14   cetera, that I expected them to handle on my behalf.

15   Q    Are aides typically sworn or civilian?

16   A    Sworn.

17   Q    Did ICIB have any particular focus of concern when you

18   took over as undersheriff in 2011?

19   A    I believe initially the focus from Captain Carey was to

20   bring in more experienced investigators when he had openings.

21   That was initially I think in the summer of like June of 2011,

22   that was his main focus.

23   Q    Would he ask you for more investigators?

24          MR. FOX:  Objection, foundation.

25          THE COURT:  Sustained.

```
 1  Q    (BY MR. HAIG)  In 2011 did you receive any requests for
 2  more staffing?
 3             MR. FOX:  Objection, foundation.
 4             THE COURT:  Sustained.
 5  Q    (BY MR. HAIG)  How was staffing determined in ICIB?
 6  A    Every unit was provided with a budgeted amount of
 7  personnel, so ICIB would be budgeted for one captain, two
 8  lieutenants, and I believe initially they were budgeted for
 9  approximately 12 sergeant investigators in addition to that
10  surveillance team.
11  Q    And in June of 2011 when you took over as undersheriff,
12  how busy was ICIB?
13  A    They were -- I think they had a fairly -- a fair number of
14  active cases, but, see, ICIB handled not only internal
15  investigations on Sheriff's Department people but also --
16             MR. FOX:  Objection, narrative.
17             THE COURT:  Sustained.
18  Q    (BY MR. HAIG)  What did they handle besides internal
19  investigations of Sheriff's Department officials, ICIB?
20  A    Requests for internal criminal investigations of personnel
21  from other police departments within L.A. County who did not
22  have the means to be able to do their own investigations.
23  Q    As undersheriff in June of 2011, did you have other
24  responsibilities besides overseeing ICIB?
25  A    Yes.
```

```
 1   Q     What were those responsibilities?
 2   A     Well, the organization, I think I mentioned earlier,
 3   was -- budgeted for approximately 18,000 people at that time.
 4   I think we had probably close to 16-, 17,000 actual employees.
 5   Our budget was probably in the neighborhood of $2.7 billion at
 6   that time.  So 23 sheriff's stations, the largest county jail
 7   system in the country.  There were a number of responsibilities
 8   that, you know, we had I believe it was -- I can't remember the
 9   exact number now.  It's around 40 cities that contracted with
10   the Sheriff's Department, four law enforcement services, like
11   over 100 unincorporated unique communities within the
12   4,000-square-mile county.  And so there were -- there's quite a
13   few responsibilities to ensure that everything was being done
14   that needed to be done.
15   Q     Did the Sheriff have equal responsibilities in that way?
16   A     Well, you know, the Sheriff had a big task.  He was
17   responsible for the whole ship as a Sheriff.
18   Q     Did you have a county-issued or
19   Sheriff's-Department-issued cell phone when you were
20   undersheriff?
21   A     I did.
22   Q     Did you also have a desk phone?
23   A     I did.
24   Q     What was your desk phone number at that time?
25   A     When I was undersheriff?
```

1    Q     Yes, sir.

2    A     (323) 526-5115.

3    Q     And where would that ring to if somebody called that

4    number?

5    A     Into the undersheriff's office, and the -- it would ring,

6    I believe, at my secretary's desk and at my aide's desk.  There

7    was a bank of numbers, and I believe it rang on all of the

8    phones that were just in the cubicles outside of my office.

9    Q     And the phone number (323) 526-5000, do you recognize that

10   phone number?

11   A     Oh, yes.

12   Q     And whose phone number was that?

13   A     Sheriff Lee Baca's.

14   Q     And where would that ring?

15   A     That would ring in his office and the bank of cubicles of

16   the secretaries that worked in the Sheriff's office.

17   Q     Would Baca, when you were undersheriff, would he call you

18   on your cell phone from time to time?

19   A     Yes.

20   Q     How about the other assistant sheriffs or the assistant

21   sheriffs, would they call you on your cell phone from time to

22   time?

23   A     Yes.

24   Q     Would Captain Carey call you on your cell phone from time

25   to time?

1    A     Yes.

2    Q     Steve Leavins?

3    A     Yes.

4    Q     Lieutenant Peacock?

5    A     Yes.

6    Q     Do you know a gentleman named Greg Thompson?

7    A     I do.

8    Q     And who is he -- or who was he back in 2011?

9    A     He was a lieutenant that was in charge of the gang unit in

10   the jails.

11   Q     When you say "in charge of the gang unit," is it called a

12   gang unit?

13   A     It was called Operation Safe Jails, and it mirrored the

14   gang unit that was on -- worked in patrol side, which was

15   Operation Safe Streets.

16   Q     And what was the responsibility of Operation Safe Jail?

17   A     General responsibilities included ensuring that inmates

18   did not harm one another.  You have, at any given time,

19   thousands of gang members, all from different parts of L.A.

20   County, many of whom do not like each other on the street.  And

21   the role of Operation Safe Jails and the other unit that was

22   part of it, JIU, Jail Investigations Unit, was to ensure

23   that -- their primary responsibility was the safety and

24   security of each and every inmate in that jail, and they had to

25   keep this person separated from this person, this gang

1  separated from this gang, and from facility to facility of the

2  nine or ten facilities, they had to ensure that people who

3  weren't supposed to cross each other's paths didn't cross each

4  other's paths while they were in our custody.

5  Q    If an inmate was caught with contraband -- drugs or a cell

6  phone -- what did you understand to be the responsibility of

7  investigating that inmate for possessing those items in 2011?

8  A    Responsibility would be to find out how an inmate came to

9  be in possession of contraband that would not normally be found

10  on their possession in our jail facilities.

11  Q    And who would be tasked with doing that initial

12  investigation, if you know?

13  A    It would have been either the Jail Investigations Unit or

14  Operation Safe Jails.

15  Q    On August 8th of 2011, were you notified by anybody that

16  Anthony Brown or an inmate in Men's Central Jail had been

17  searched and a cell phone had been found on his person?

18  A    Was I notified on that date?

19  Q    Yes, sir.

20  A    No.

21  Q    Do you recall when you were first notified about a cell

22  phone being found on an inmate?

23  A    I do.

24  Q    And when was that?

25  A    August 18th, 2011.

1    Q     And how were you notified?

2    A     I received a phone call from Sheriff Lee Baca.

3    Q     Do you recall where you were at that time?

4    A     I was driving on the freeway, either the 60 or the 10, and

5    I was on my way to a community event.

6    Q     And based upon the Sheriff contacting you and advising you

7    about that, what did you do?

8    A     I made a phone call or phone calls to follow up to try to

9    find an answer to his question.

10   Q     What was the Sheriff's demeanor at that time during that

11   phone call?

12   A     He was -- I remember him being upset.

13   Q     And do you recall why he was upset?

14   A     He was just very short.  He was really annoyed.

15   Q     Did the Sheriff task you with anything to do after getting

16   that phone call?

17   A     Yes.

18   Q     And what were you asked to do?

19   A     To find out if a cell phone had been recovered from an

20   inmate in our jail system.

21   Q     And what did you do to answer the Sheriff's question?

22   A     I made a phone call or phone calls, and I -- because I

23   didn't know anything about it, and I probably called somebody

24   in Custody because that's where the phone was found to ask if

25   we had recovered a phone from an inmate.

1    Q    Were you able to get any information from those phone

2    calls?

3    A    Yes.

4    Q    And based upon that information, do you recall what you

5    did next?

6    A    Yes.

7    Q    What did you do?

8    A    I found out that a phone had been confiscated from an

9    inmate, and I called the Sheriff back to let him know that it

10   had occurred.

11   Q    Did you find out any more specific information about the

12   circumstances around how that phone was confiscated?

13   A    On August 18th, no.

14   Q    Do you recall a meeting a couple days later on August

15   20th?

16   A    I do.

17   Q    Was that a meeting that you attended?

18   A    I did attend it.

19   Q    And do you recall what day of the week that was?

20   A    Saturday.

21   Q    And where was that meeting?

22   A    At Sheriff's Headquarters.

23   Q    And do you recall who attended that meeting?

24   A    I'm not sure I can recall every single person, but the

25   Sheriff was there, Captain Tom Carey, Lieutenant Steve Leavins.

**UNITED STATES DISTRICT COURT**

1    There was a lieutenant from Internal Affairs, Liam Gallagher.

2    There was a captain from Major Crimes Bureau, Jim Ritenour,

3    Lieutenant Thompson, and I believe two of his OSJ deputies were

4    there at that meeting also.

5    Q    Who was in charge, if you know, of handling the attendance

6    list for that meeting?

7    A    I think I was tasked with putting that meeting together at

8    the request of the Sheriff.

9    Q    And who determined who was going to be going to that

10   meeting?  Was that you, or was that the Sheriff, or was it

11   somebody else?

12   A    The Sheriff specified who he wanted to be at that meeting.

13   If he didn't know the name, he pointed out the position or

14   their -- that he wanted.

15   Q    How was it that you contacted these people to come to the

16   meeting on Saturday?

17   A    I don't recall.  It might have been my aide that made the

18   contact, I don't know.

19   Q    Would that have been something usual or unusual to use

20   your aide to do that?

21   A    It would have been normal for my aide to make all of the

22   phone calls.

23   Q    Do you recall where this meeting took place in Sheriff's

24   Headquarters?

25   A    Yes.

**UNITED STATES DISTRICT COURT**

1   Q     Where was that?

2   A     It was in a room called the -- on the 4th floor called the

3   Executive Planning Counsel, or EPC Conference Room.

4              MR. HAIG:  One moment, please, Your Honor.

5         (Counsel conferred off the record.)

6   Q     (BY MR. HAIG)  Mr. Tanaka, Exhibit 2 is on the screen.

7   A     Okay.

8   Q     Do you recognize this?

9   A     I do.

10  Q     What do you recognize it to be?

11  A     It's a portion of the fourth floor at Sheriff's

12  Headquarters Bureau in Monterey Park that depicts the Office of

13  the Sheriff and his surrounding work areas, and the Office of

14  the Undersheriff and the surrounding work areas, and the

15  Executive Planning Counsel conference room.

16  Q     It appears to be accurate as far as the layout of the

17  fourth floor?

18  A     Yes.

19  Q     And the meeting that you just discussed on the 20th of

20  August, that happened in the Executive Planning Conference

21  Room?

22  A     Yes.

23  Q     All right.  Who was running that meeting?

24  A     The Sheriff.

25  Q     Do you remember how long that meeting lasted?

```
 1   A     I don't.  Maybe between one or two hours.
 2   Q     Was there information that you learned at that meeting
 3   about the cell phone that was recovered on an inmate?
 4   A     Yes.
 5   Q     Did that relate to the same cell phone and the same inmate
 6   in which Mr. Baca had called you two days earlier?
 7   A     Yes.
 8   Q     All right.  And what did you learn at that meeting about
 9   the status of that phone and the inmate?
10   A     I believe it was just a briefing that was given to the
11   Sheriff of the circumstances leading to the discovery of the
12   cell phone, and I don't know that there was a lot more offered
13   because I don't know that there was a lot more known at that
14   particular point.
15   Q     Did you know on the 20th about -- if you recall, about the
16   FBI's involvement in that cell phone?
17   A     I believe that whatever was known at that point, that was
18   part of the briefing.
19   Q     Did you also have reason to believe that a deputy
20   sheriff -- LASD deputy sheriff's employee was involved in any
21   way?
22   A     Possibly.
23   Q     Did you later learn during the time of this investigation
24   that a deputy sheriff was involved?
25   A     Yes.
```

1    Q     And who did you learn that to be?

2    A     Deputy Gilbert Michel.

3    Q     And what did you learn that he had done in relation to

4    that cell phone?

5    A     That he had accepted money in exchange for smuggling the

6    cell phone into Central Jail and put the cell phone into the

7    hands of an inmate at Men's Central Jail.

8    Q     What did you come to learn about the cell phone and its

9    origin as to how it got to Deputy Michel?

10   A     What I've learned?

11   Q     During -- during the time in August of 2011.

12   A     That the deputy had received the phone from someone he

13   believed to be an acquaintance of the inmate in the streets,

14   and then he brought the phone into the jail and gave it to the

15   inmate.

16   Q     At the time that you learned this, did you also learn that

17   or have any knowledge that the actions by the FBI were somehow

18   authorized by the FBI?  Did anybody tell you that at that time

19   in August?

20   A     No.

21   Q     Did anybody at any of the meetings in early August discuss

22   any possible criminal conduct by members of the FBI?

23            MR. FOX:  Objection, vague as to time in August.

24            THE COURT:  Sustained.

25   Q     (BY MR. HAIG)  At the August 20th meeting, do you recall

**UNITED STATES DISTRICT COURT**

1   Sheriff Baca discussing anything about the FBI's involvement in

2   the phone?

3   A     I don't -- I don't recall that.

4   Q     Do you recall at some point in time being advised by the

5   Sheriff that the FBI was involved in the phone being received

6   by Deputy Michel?

7   A     Yes.

8   Q     And do you recall when that happened approximately?

9   A     I'm sorry, I must have misunderstood your question.  I

10  believe that that issue was raised that the FBI might be

11  involved in the phone deal with Gilbert Michel, I believe that

12  was raised during the --

13  Q     The Saturday meeting?

14  A     -- the Saturday meeting.

15  Q     And when you heard that, what was your reaction?

16  A     I don't remember having any particular reaction that

17  particular day.  I don't think we knew enough.  I just don't

18  remember that there was really that much information that was

19  known on that particular day, other than the initial briefing

20  given by somebody to the Sheriff.

21  Q     What was your reaction to finding out that a deputy

22  sheriff had taken a bribe and brought the phone in to an

23  inmate?

24  A     Oh, I was very upset.

25  Q     Why?

1   A    Because it was another example of a deputy sheriff

2   violating their oath of office and, as I would say, just

3   bringing discredit to our badge.

4   Q    What organization within the Sheriff's Department would

5   have been tasked with investigating that aspect?

6   A    Criminal conduct by -- allegations of criminal conduct by

7   members of the organization of the Sheriff's Department were

8   investigated by ICIB investigators.

9   Q    At that meeting on February 20th, did you ever say "fuck

10  the FBI"?

11  A    I certainly don't have any recollection of making that

12  kind of comment.

13  Q    Did you -- were you -- as you recall from several years

14  ago, were you more upset at the FBI or more upset at the

15  deputy?

16  A    As it pertained to this particular matter, my irritation

17  was directed at the deputy for doing what he did, which was

18  accepting money to smuggle contraband into our jail system.

19  Q    How many years did you have in the Department at that time

20  in 2011?

21  A    29.

22  Q    Had you ever come into a situation where you had heard of

23  a phone being smuggled into the jail with the assistance of the

24  FBI at that time?

25  A    No.

```
 1   Q     Was there any concern raised at that August 20th meeting
 2   about the FBI's role in this?
 3   A     There may have been.  I don't remember.
 4   Q     Did you issue any orders to any of the people subordinate
 5   to you at that August 20th meeting?
 6   A     I don't remember giving any orders at that meeting.
 7   Q     Did the Sheriff give any orders to anybody at that
 8   meeting?
 9   A     He did.
10   Q     And what orders did he give?
11   A     He ordered Internal Criminal Investigations Bureau Captain
12   Tom Carey to have his unit investigate this particular matter.
13   Q     Did he give any other orders regarding any other aspect of
14   the matter?
15   A     He did.
16   Q     And what was that?
17   A     He said he didn't want the phone and he didn't want the
18   inmate to go anywhere.
19   Q     Did anybody inside that room make any comments to the
20   Sheriff that either one of those orders were unlawful?
21              MR. FOX:  Objection, leading.
22              THE COURT:  Sustained.
23   Q     (BY MR. HAIG)  Did anybody complain about any of those
24   orders?
25              MR. FOX:  Objection, leading.
```

1           THE COURT:  Sustained.

2    Q    (BY MR. HAIG)  Was there any comment from anybody in that

3    meeting about the orders that were given by Sheriff Baca?

4    A    None that I can recall.

5    Q    Did you consider those orders to be lawful or unlawful?

6    A    I thought those orders were -- were lawful.

7    Q    And why is that?

8    A    Because we have an obligation to investigate any

9    allegations of misconduct and, in this case, criminal

10   misconduct.

11   Q    When you say he said that phone and that inmate aren't

12   going anywhere, did he have any more specificity about that,

13   Sheriff Baca?

14   A    He did.

15   Q    And what was that?

16   A    He wanted the inmate to be interviewed because he wanted

17   to get to the bottom of why the inmate had the phone and how he

18   got it, and he also ordered that the content of the phone be

19   analyzed to find out what calls came in, what calls went out,

20   what photos may or may not have been taken, text messages.  He

21   wanted that entire phone analyzed for anything that had

22   occurred with it.

23   Q    And did the Sheriff task you with doing anything in

24   relation to the orders that he had just given about this

25   matter?

```
 1   A     With regards to the investigation -- or, I mean conducting
 2   the investigation or analyzing the phone, no.
 3   Q     In your role as the direct supervisor to Captain Tom
 4   Carey, would there been an expectation from you that you would
 5   be updated about that investigation?
 6   A     Yes.
 7   Q     And were you updated about that investigation by Captain
 8   Carey?
 9   A     During the course of the investigation, I was periodically
10   updated, correct.
11   Q     Were you also updated by anybody else within ICIB?
12   A     Lieutenant Steve Leavins.
13   Q     During that time -- and when I say "during that time,"
14   from late August to, let's say, late September, were you in
15   communication with Captain Carey regarding anything else, other
16   than the issues involving Anthony Brown and the cell phone?
17   A     Oh, yes.
18   Q     What kinds of things?
19   A     Well, the ACLU had somewhat during that same time period
20   filed a declaration that included in excess of 40 or 50
21   affidavits from inmate who claimed they had been abused at the
22   hands of deputy sheriffs in the jails.  So Captain Carey and I
23   had -- we had numerous discussions about the fact that he
24   needed a lot more resources than the 12 investigators he had
25   because the Sheriff had made a promise publicly that the --
```

```
 1              MR. FOX:  Your Honor, I'm going to object to
 2  foundation.
 3              THE COURT:  Sustained.
 4  Q   (BY MR. HAIG)  You've just talked about some of the
 5  communication you had with Captain Carey and the ACLU.
 6        Were you involved in responding to some of the complaints
 7  from the ACLU?
 8  A   Well, technically.
 9  Q   Why do you say "technically"?
10  A   Because I had to provide the additional resources so that
11  the job could get done.
12  Q   Did you ever instruct Captain Carey to not respond to the
13  ACLU's complaints?
14  A   No.
15  Q   Regarding your contact with Steve Leavins from late August
16  to, let's say, late September, did you have contact with him
17  regarding the issue of Anthony Brown, the cell phone and the
18  FBI's involvement in that?
19  A   Yes.
20  Q   Did you have contact with Steve Leavins about any other
21  matters involving ICIB?
22  A   Yes.
23  Q   Do you recall after the August 20th meeting, the Sheriff's
24  involvement in the issue of Anthony Brown, the cell phone and
25  the FBI's involvement?
```

```
 1   A    Yes.

 2   Q    And what do you recall that to be?

 3   A    The Sheriff was -- had a very strong interest in the

 4   investigation, and he would contact me periodically to ask for

 5   updates.

 6   Q    When you say "a very strong interest," can you be more

 7   specific?

 8   A    I'd known the Sheriff -- I'd worked for him for a long

 9   time.  I could tell when he had a particular interest in a

10   matter, and because of the frequency with which he would ask

11   questions, and so I -- you know, in this particular case,

12   almost at every opportunity he came in contact with me, he

13   would say what's going on, and I couldn't answer.

14   Q    Why couldn't you answer?

15   A    Because I wasn't handling the investigation or involved in

16   a way that I could provide him the answers that he needed.

17   Q    Are you an investigator -- or were you in 2011?

18   A    No, I was not an investigator.

19   Q    Did you have any trust in the people that were doing the

20   investigation?

21            MR. FOX:  Objection, leading.

22            THE COURT:  Sustained.

23   Q    (BY MR. HAIG)  What was your feeling about the people in

24   ICIB and their ability to investigate cases?

25   A    Captain Carey had an extensive background in investigative
```

1    experience, as did Lieutenant Leavins and the investigators --

2    some of the investigators that were assigned to ICIB.

3    Q    Did you ever dictate to Captain Carey what he should or

4    shouldn't do?

5    A    No, I didn't have any investigative experience, and I was

6    not in a position to tell an investigator how to do their job.

7    Q    When Captain Carey would communicate with you regarding

8    the issues involving Anthony Brown, would you communicate with

9    him back?

10   A    Sure.

11   Q    Would you ever give him input?

12   A    Give him input?

13   Q    Yes.

14   A    I don't remember giving him any input.

15   Q    What about with Steve Leavins, did you give him input?

16   A    No, and I don't believe they ever asked for any.

17   Q    Was there a time during this investigation where the

18   Sheriff would communicate with you about this?

19   A    Yes.

20   Q    And would you do anything in relation to his communication

21   with you?

22   A    Yes.

23   Q    What would you do?

24   A    I would tell him that I would have the investigator call

25   him.

```
 1   Q     I'd like you to open your book to Exhibit 360, please.
 2   A     I'm sorry, 3-6-0?
 3   Q     Yes.
 4   A     I don't have anything under 360.
 5         (Pause in proceedings.)
 6   Q     (BY MR. HAIG)  Mr. Tanaka, do you see it now?
 7   A     I do.
 8   Q     And what does this appear to be?  Without reading it, what
 9   does this appear to be?
10   A     A series of two e-mails between myself and Stephen
11   Leavins.
12   Q     And is this from an e-mail that you recognize?
13   A     I do.
14   Q     And how do you recognize it?
15   A     Well, I think I've seen it before, and it appears that
16   I've authored it also back in 2011.
17              MR. HAIG:  Move to admit 360, Your Honor.
18              THE COURT:  Any objection?
19              MR. FOX:  No objection, Your Honor.
20              THE COURT:  It will be received.
21         (Exhibit No. 360 received into evidence.)
22              MR. HAIG:  May I publish, please, Your Honor?
23              THE COURT:  Yes.
24   Q     (BY MR. HAIG)  Starting with the e-mail first in time,
25   Mr. Tanaka, could you read that, please, including whether
```

**UNITED STATES DISTRICT COURT**

```
 1    there's a subject line.

 2    A     The one on the bottom?

 3    Q     Yes, sir.

 4    A     From Stephen Leavins to Paul Tanaka.  It's dated Thursday,

 5    August 25th, 2011, 11:45 a.m.  Stephen Leavins writes "Boss, I

 6    did not have much to report last night.  We have an undercover

 7    operation today.  I will call you tonight with an update."

 8    Q     Did Lieutenant Leavins refer to you as "boss" sometimes?

 9    A     Yes.

10    Q     Did you respond to that e-mail?

11    A     I did.

12    Q     And could you read what you responded.

13    A     Sure.  Approximately two minutes later, I responded

14    "Thanks, Steve.  Right after, and I mean right after, I spoke

15    with Tom this morning, the Sheriff popped in looking for an

16    update.  This case is consuming his entire thought process.

17    Providing him with updated tidbits helps to ease his mind."

18    Q     Why did you write this back to Lieutenant Leavins?

19    A     Because I wanted to let him know that he needed to keep

20    the Sheriff updated regularly so that the Sheriff wouldn't come

21    looking for answers from me.

22    Q     Why didn't you just update him then?

23    A     Because I couldn't give him the details of the

24    investigation that he was asking for.

25    Q     Did there come a time in late August of 2011 where there
```

1    was an approval process of federal law enforcement interviewing

2    inmates at Men's Central Jail?

3    A    I'm sorry, can you repeat that?

4    Q    In late 2011 -- I'm sorry, late August of 2011, did there

5    come a time where there was instituted an approval process

6    regarding federal law enforcement interviewing inmates at the

7    county jail?

8    A    Yes.

9    Q    And can you tell us --

10    A    I think it applied to all investigators in law

11    enforcement.

12    Q    And if you recall, can you tell us how that order was

13    promulgated.

14    A    At that Saturday meeting, an inquiry was made by the

15    Sheriff, he wanted to see the log of visitors who had come

16    through Men's Central Jail, and embarrassingly enough, there

17    were no records because folks charged with enforcing the

18    visitor log of people who entered into the secure facility at

19    Men's Central Jail had not been doing their job.  So he said

20    that he wanted to make sure that that policy was updated and

21    reinforced -- I mean, and actually enforced.

22    Q    Did there come a time, Mr. Tanaka, where you started

23    receiving communication regarding federal law enforcement

24    wanting to visit with an inmate in county jail -- in one of the

25    county jails?

1  A     Yes.

2  Q     And was there a reason why those communications, if you

3  know, were coming to you and to your office?

4  A     If I recall, I think that the Sheriff had directed that I

5  make the approval for any visits from the FBI to the jails.

6  Q     Professionally, did you have an issue with the FBI coming

7  into the jails at that time?

8  A     No.

9  Q     Do you ever recall whether you -- well, let me back up.

10        Do you recall how many of these inquiries came into your

11  office and specifically to you?

12  A     Maybe two or three.

13  Q     And of those two or three, did you say no to any of them?

14  A     I never denied any visits.

15  Q     Did there come a time when you stopped getting these

16  inquiries coming directly to you?

17  A     Yes.

18  Q     And why did that happen?

19  A     I believe it was Lieutenant Thompson that I told that I --

20  it wasn't something that I felt that the undersheriff needed to

21  do.

22             MR. FOX:  Objection, foundation.

23             THE COURT:  Sustained.

24  Q     (BY MR. HAIG)  Did you have any communications with

25  anybody regarding federal law enforcement coming to the Men's

**UNITED STATES DISTRICT COURT**

 1  Central Jail in the latter part of August 2011?

 2  A    Yes.

 3  Q    And who would that be?

 4  A    I believe it was Lieutenant Thompson.

 5  Q    Did you do anything about that order from Sheriff Baca

 6  after communicating with Lieutenant Thompson?

 7  A    I did.

 8  Q    What did you do, if you recall?

 9  A    I told Lieutenant Thompson just to use his best judgment

10  and to -- as to who should be in and out of the jails.

11  Q    I'd like to direct your attention to Exhibit 361, please.

12       Could you take a moment just to review that document, and

13  let us know when you're finished.

14  A    Okay.

15  Q    What do these appear to be, Mr. Tanaka?

16  A    A series of e-mails between Greg Thompson and myself.

17  Q    And what do they refer to, not specifically, but generally

18  speaking?

19  A    I guess FBI visits into Men's Central Jail.

20            MR. HAIG:  Your Honor, I move to admit 361.

21            MR. FOX:  No objection, Your Honor.

22            THE COURT:  It will be received.

23       (Exhibit No. 361 received into evidence.)

24            MR. HAIG:  If I could publish, please?

25            THE COURT:  Yes.

1  Q    (BY MR. HAIG)  Going with the first page, can you read the

2  subject -- the date and the subject and the body of this

3  e-mail.

4  A    The date was Wednesday, August 24th, 12:53 p.m.  The

5  subject line is "fed complaint."  And the narrative is "FBI

6  Special Agent in Charge Dave Cloney 310/345-8028 called the

7  office at 0922 hours this morning re an FBI who was not allowed

8  to enter MCJ purportedly to interview inmate James Fayed who

9  was arrested by LAPD-Robbery Homicide."

10 Q    As you sit here today, do you recall why you sent that

11 e-mail to Lieutenant Thompson?

12 A    I don't have a recollection of the e-mail.  I can just

13 surmise from what the subject matter is.

14 Q    Going to the second page of this exhibit, can you read the

15 e-mail at the bottom -- the date and time and then the body of

16 the e-mail.

17 A    It's Wednesday, August 24th, 2011 at 1:30 p.m.  No subject

18 on the subject line.  "Sir, I spoke with Special Agent in

19 Charge Dave Cloney.  It was a positive conversation.  With your

20 approval, I request that we allow FBI Agent Maura Kelly to join

21 her DOJ counterparts as they complete their deposition of

22 inmate James Fayed, Number 1524998.  The investigation into

23 Fayed's crimes appear legitimate.  Greg."

24 Q    Did you respond to that e-mail?

25 A    I did.

1    Q    And how did you respond?

2    A    "Ok.  Thanks."

3    Q    And when did you respond?

4    A    Appears to be immediately, Wednesday, August 24th, 2011,

5    and it's time-stamped at 1:30 p.m. also.

6    Q    Now, the third page, could you read the date and then the

7    body of that, please.

8    A    Tuesday, August 30, 2011, 2:34 p.m.  "Sir, LASD/EOB Deputy

9    Mike Young and FBI Agents Rosa Ford and Efrain Rodriguez

10   requested to interview and polygraph inmate Valjan Ognjan,

11   MW/46, Booking Number 2793287 in regards to a Homeland Security

12   investigation.  I advised Deputy Young he must be present

13   during the interview, if granted.  After reviewing all of the

14   available information, I 'would' approve it."

15   Q    And finally, Mr. Tanaka, the last page of this document,

16   could you read both of the e-mails starting with the one on the

17   bottom.

18   A    Okay.  Dated Tuesday, August 30th, 2011, 5:36 p.m.

19   Nothing on the subject line.  "Sir, I handled the FBI request

20   as you suggested.  All future requests will be the same.  I

21   will send out reoccurring e-mails to custody captains reminding

22   them that similar requests by that agency for inmate interviews

23   must be approved by my unit."

24   Q    And how did you respond?

25   A    Tuesday, August 30, 2011 at 6:02 p.m.  "Thanks."

```
 1   Q    Do you recall having any conversations with Lieutenant
 2   Thompson outside of these e-mails regarding the issue of
 3   federal law enforcement coming to the jails?
 4   A    Vague general recollections.
 5   Q    And what would that be?
 6            MR. FOX:  Objection, foundation.
 7            THE COURT:  Sustained.
 8   Q    (BY MR. HAIG)  After that e-mail that was sent to you by
 9   Lieutenant Thompson on August 30th of 2011, did you -- did you
10   continue to receive requests from anybody at -- in the
11   Sheriff's Department regarding federal interviews of inmates?
12   A    I don't believe so.
13   Q    Do you recall a meeting that occurred in late August of
14   2011 at the U.S. Attorney's Office?
15   A    I do.
16   Q    Were you present at that meeting?
17   A    I was present.
18   Q    Do you recall other people that were at that meeting?
19   A    I do recall.
20   Q    And do you recall who else was at that meeting?
21   A    Yes.
22   Q    And who would that be?
23   A    It was the U.S. Attorney at the time, Mr. Andre Birotte,
24   and there were probably 15 or 20 other people that were dressed
25   up in business attire, sitting flanking him on either side of a
```

1  very long conference table that I don't know any of those

2  folks.  From the Sheriff's Department there was Sheriff Lee

3  Baca, and I believe it was Captain Tom Carey, maybe Lieutenant

4  Steve Leavins.

5  Q    Do you recall whether there were any other employees of

6  the County of Los Angeles that were there?

7  A    Possibly Mike Gennaco from the Office of Independent

8  Review.  He was a County employee.

9  Q    Mike Gennaco was a County employee?

10  A    Yes, he wasn't assigned -- he was not a Sheriff's

11  Department employee.

12  Q    And what was the purpose for this meeting, as far as you

13  knew?

14  A    My recollection is that the Sheriff requested this meeting

15  with the U.S. Attorney because he wanted to express his

16  feelings about the phone.

17  Q    About the phone.  What do you mean "about the phone"?

18  A    That he wasn't happy that -- to learn that the phone had

19  been -- was an FBI phone, and he wanted to let the U.S.

20  Attorney know that he did not want to work with the FBI, but

21  that he wanted to work with Mr. Birotte's office only in

22  pursuing any investigation.

23  Q    Do you recall why -- or what Mr. -- what Sheriff Baca said

24  about why he did not want to work with the FBI?

25  A    I don't recall if he gave a reason, or if he did, I just

```
 1  don't remember.
 2  Q    Do you recall Sheriff Baca talking about the investigation
 3  that was undertaken by ICIB?
 4  A    I don't remember if he discussed the ICIB investigation at
 5  that particular time.
 6  Q    Do you recall whether anybody from the federal government
 7  advised that anybody from the Sheriff's Department cease doing
 8  what they were doing as far as any investigation was concerned?
 9           MR. FOX:  Objection, vague.
10           THE COURT:  Sustained.
11  Q    (BY MR. HAIG)  Do you recall any directives coming at all
12  from anybody from the federal government at that meeting?
13  A    I don't.
14  Q    At that meeting, do you recall ever being notified about a
15  writ for Mr. Brown to appear in front of a United States grand
16  jury for testimony?
17  A    No.
18  Q    At that meeting, do you recall anybody from the federal
19  government asking you about the whereabouts of Anthony Brown?
20  A    No.
21  Q    Do you recall any of the case agents being present at that
22  meeting?  The case agents, and I'll be more specific, Leah
23  Marx, Leah Tanner, David Dahle, David Lam, Victor Cockrell?
24  A    I don't know if they were there or not.
25  Q    Did you speak at all at that meeting?
```

1    A      No.

2    Q      Do you recall who spoke on behalf of the Sheriff's

3    Department at that meeting?

4    A      Sheriff Lee Baca.

5    Q      Anybody else?

6    A      I don't believe so.

7    Q      Why did you go to that meeting?

8    A      I was ordered to do so by the Sheriff.

9    Q      Do you recall receiving between August 18th and September

10   12th any specific request to you to allow anybody from the

11   federal government to speak to Anthony Brown?

12   A      No.

13   Q      Did you ever issue any orders that Anthony Brown should be

14   hidden from the FBI?

15   A      No.

16   Q      Did you ever issue any orders that a federal grand jury

17   subpoena should be ignored by the Sheriff's Department?

18   A      No.

19   Q      Did any such orders ever get issued in your presence?

20   A      No.

21   Q      Were you ever made aware of anyone in the Sheriff's

22   Department, whether above you or below you, that issued those

23   orders?

24   A      To ignore --

25   Q      To ignore a federal grand jury subpoena or to hide Anthony

1  Brown from the FBI.

2  A    No.

3  Q    During the month from end of August of 2011 until

4  September 26th of 2011, did you continue to receive updates

5  from people involved in this investigation?

6  A    I'm sorry, can you tell me --

7  Q    From the end of August of 2011 to September 26th of 2011,

8  did you continue to receive updates about the Anthony Brown

9  investigation?

10 A    I did.

11 Q    And who would you receive those updates from?

12 A    Either Captain Carey or Lieutenant Leavins.

13 Q    Is there an attorney that works at the Sheriff's

14 Department Headquarters?

15 A    Yes.

16 Q    How many attorneys work there, do you know?

17 A    I believe there were maybe three assigned to the Sheriff's

18 Department.

19 Q    Do you know an attorney by the name of Paul Yoshinaga?

20 A    I do.

21 Q    And what was his job, if you know, in August of 2011?

22 A    He was the Sheriff's chief legal advisor.

23 Q    And where did he work?

24 A    His office was located on the second floor at Sheriff's

25 Headquarters in Monterey Park.

```
 1  Q     Did -- do you recall having any interaction --
 2            MR. HAIG:  Strike that, Your Honor.
 3  Q     (BY MR. HAIG)  Do you recall seeking any legal guidance
 4  from Mr. Yoshinaga regarding your activity in the Anthony Brown
 5  matter?
 6  A     No.
 7  Q     Do you recall having any conversations with Mr. Yoshinaga
 8  regarding the Anthony Brown matter?
 9  A     I do not.
10  Q     Was Mr. Yoshinaga a person that you spoke to frequently or
11  infrequently?
12  A     Frequently.
13  Q     Over what kinds of issues?
14  A     Virtually any of the legal matters that concerned the
15  Sheriff's Department.
16  Q     And would you seek his counsel, if needed?
17  A     Oh, yes.
18  Q     Was Mr. Yoshinaga also somebody that you were a social
19  friend with?
20  A     Yes.
21  Q     And how long have you known Mr. Yoshinaga?
22  A     Maybe 45 years.
23  Q     Were you ever present in any meeting where Mr. Yoshinaga
24  was dispensing legal advice to anybody else in the Department
25  about this matter?  When I say "this matter," the Anthony Brown
```

 1   matter.

 2   A    I don't recall being present in any meeting where Paul

 3   Yoshinaga was present also regarding this matter.

 4             MR. HAIG:  Could I have one moment, please, Your

 5   Honor?

 6             THE COURT:  Yes.

 7        (Defendant's counsel conferred off the record.)

 8             MR. HAIG:  I have no more questions, Your Honor.

 9   Thank you.

10             THE COURT:  All right.  Cross-examination?

11             MR. FOX:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13   Q    (BY MR. FOX)  Mr. Tanaka, on direct examination, Mr. Haig

14   took you through your career going back to actually your high

15   school education in 1976; is that correct?

16   A    Yes.

17   Q    And then he took you through your experience with a CPA

18   firm for 20 years; correct?

19   A    I said it was approximately 20 years that I had worked in

20   the CPA firm.

21   Q    And Mr. Haig took you through your experience with another

22   department working in El Segundo; correct?

23   A    I don't believe we discussed the experience there.

24   Q    Well, just the fact that you worked there; correct?

25   A    Yes.

```
 1   Q     And then we glossed over a whole bunch of time, and we
 2   went to -- I believe it was -- was it 1991 --
 3              MR. HAIG:  Objection, Your Honor, argumentative to
 4   the form of the question.
 5              MR. FOX:  Your Honor, I'll --
 6              THE COURT:  Sustained.
 7              MR. FOX:  I'll reask the question.
 8   Q     (BY MR. FOX)  Mr. Haig didn't ask you about your
 9   experience as a supervisor at the Lynwood Station; correct?
10   A     He did not.
11   Q     And when you were a sergeant at the Lynwood Station, you
12   learned that there was a deputy clique at the Lynwood Station;
13   correct?
14   A     Yeah.
15   Q     And that deputy clique was known as the Vikings; correct?
16              MR. HAIG:  Objection, Your Honor.
17              THE COURT:  Let's go to sidebar.
18         (Discussion held at sidebar.)
19              MR. HAIG:  Your Honor, the objection is relevance,
20   and it's beyond the scope.  And I did go through many of the
21   things, but when we spoke to Mr. Fox before this trial started,
22   he said he would not bring out the Vikings -- let me finish --
23   in his case-in-chief.  I had hoped that if it was something
24   that he wanted to bring out before asking the question, that he
25   would at least approach and alert us so that I could lodge an
```

1    objection.

2        I didn't get the objection out soon enough, but the fact

3    that he was in the Vikings is not relevant to anything that

4    he's testified to today.  I didn't gloss over it.  I just

5    didn't think it was important because it happened so long ago.

6    I will -- I just -- I'm a bit floored and shocked that he would

7    mention that certainly without approaching the Court and

8    alerting at least me or somebody about that.

9            MR. FOX:  Your Honor, if I may respond, I made it

10   very clear that I would not bring it out in the case-in-chief.

11   I think it was with Mr. Steward, although my memory may be

12   mistaken on who it was with, in which I said if he takes the

13   stand, then all bets are off on this issue.  So it's -- this is

14   not something that he should be floored about or shocked about

15   because this is something that I put him on notice of, that if

16   he took the stand, I was going to go into this area.

17       So it will show a number of things, Your Honor, about how

18   Mr. Tanaka would not stand for certain things, and the

19   Vikings -- there's been a federal judge that has found in 1991

20   that this was a -- they were in gang-like activity.  I'm not

21   going to go into the racial aspects of it, which is something

22   that Judge Hatter found, but I'm going to point out that

23   Mr. Tanaka still has a Vikings tattoo despite that finding that

24   they operated as a gang.  And I think that this is relevant to

25   this whole thing that they put on about Mr. Tanaka being

**UNITED STATES DISTRICT COURT**

```
 1   somebody who would never stand for any of this deputy
 2   misconduct, anything like that, and he wasn't aware of these
 3   issues that were going on.  So I think that it's incredibly
 4   relevant to --
 5            MR. HAIG:  Well, Your Honor, he was not part of that
 6   lawsuit.
 7            THE COURT:  Where'd the jury go in that case?
 8        We'll let the jury go and then discuss it.
 9        (End of sidebar discussions.)
10            THE COURT:  All right.  Ladies and gentlemen, I
11   think we've done about as much as we can do today.  So again, I
12   want to remind you until this trial is over, you are not to
13   discuss this case with anyone, including your fellow jurors,
14   members of your family, people involved in the trial or anyone
15   else, and do not allow others to discuss the case with you.
16   This includes discussing the case on the Internet through
17   e-mails or by text messages.  If anyone tries to communicate
18   with you about this case, please let me know about it
19   immediately.
20        Do not read, watch or listen to any news reports or other
21   accounts about the trial or anyone associated with it,
22   including anything online.  There is quite a bit of interest in
23   the trial, so please avoid looking at anything online, reading
24   any newspapers.  Don't do any research such as consulting
25   dictionaries, searching the Internet or using other reference
```

```
 1   materials, and do not make any investigation about the case on
 2   your own.
 3        Finally, you're reminded to keep an open mind until all of
 4   the evidence has been received, you've heard the arguments of
 5   counsel, the instructions of the Court and the views of your
 6   fellow jurors.
 7        All right.  We're going to resume Monday at 8:00 a.m.
 8        All right.  Thank you very much.  Please leave your
 9   notebooks on your chairs and have a nice weekend.
10        (The jury exited the courtroom.)
11             THE DEPUTY CLERK:  Please be seated.
12             THE COURT:  You may step down.
13             THE WITNESS:  Thank you.
14             THE COURT:  As to this issue that was discussed at
15   sidebar, why don't you give me just short briefs by Sunday,
16   say, at three o'clock as to why you believe you're entitled to
17   get into this, and why don't you give me something as to why
18   you think he shouldn't be able to get into it.
19             MR. FOX:  We will, Your Honor.  Thank you.
20             THE COURT:  All right.  The clerk's going to have an
21   order momentarily for both sides.  Why don't you take a look at
22   that, and is there anything else we need to get into?
23             MR. FOX:  Not from the government, Your Honor.
24             MR. HAIG:  No, Your Honor.
25             THE COURT:  All right.
```

```
 1              MR. HAIG:  I do have one question, Your Honor, I'm

 2    sorry.  You talked about something that you wanted us to get

 3    about a proffer on our witnesses.

 4              THE COURT:  That's what the clerk's going to have

 5    for you.

 6              MR. HAIG:  Very well, okay.

 7              THE COURT:  Okay.  Do you think you're going to be

 8    concluding with testimony by Monday?

 9              MR. STEWARD:  I do, Your Honor, probably by the end

10    of the day.

11              THE COURT:  Okay.  And who are you calling on

12    Monday?

13              MR. STEWARD:  Your Honor, which is a good point,

14    Judge Birotte for one, and I've talked to him last night.  He

15    has his regular calendar on Monday, but he said he would take a

16    break whenever we needed him and would come by.  A current

17    Sheriff's Department employee named Charles Antuna.  Cecil

18    Rhambo.  We'll finish with Mr. Tanaka.  Paul Yoshinaga.

19    Character witnesses are Rod Lyons, Carlos Lifosjoe, David Real,

20    Charlotte Lynch and Ed Medrano and Helen Hayase.

21              MR. HAIG:  And, Your Honor --

22              THE COURT:  Excuse me.  The last two are character

23    witnesses?

24              MR. STEWARD:  The last -- the last five -- David

25    Real is a hybrid.  He's both character and is a veteran of the
```

```
 1    3,000 floor of the jail.
 2              THE COURT:  Do you have -- do you have a spelling on
 3    the last witness's name, Helen?
 4              MR. HAIG:  H-A-Y-A-S-E.
 5              THE COURT:  And, I'm sorry, the next to the last
 6    person was who?
 7              MR. STEWARD:  Charlotte Lynch, Your Honor, L-Y-N --
 8              THE COURT:  Right after that.
 9              MR. STEWARD:  Ed Medrano, Your Honor.
10              MR. FOX:  Your Honor, it's our understanding from
11    talking to the defense that the character witnesses will solely
12    be about the defendant's character for truthfulness, just so
13    Your Honor's aware.
14              THE COURT:  Okay.
15              MR. FOX:  And at some point, this might -- I mean,
16    six witnesses on this one issue seems like a lot, but it's also
17    my understanding that Mr. Yoshinaga and Mr. Rhambo may also
18    testify about his character according to the defense.  So
19    again, this seems like a lot of witnesses for that one
20    particular issue.
21              MR. HAIG:  As far as Mr. Rhambo and Mr. Yoshinaga,
22    clearly they have a personal relationship with Mr. Tanaka, but
23    the reason they're being called is not because of that, but I
24    do think it's certainly fair for the government to inquire in
25    that way.  In other words, they may have a bias as to why
```

1    they're testifying, but they're not going to be called for

2    specific character purposes.  I think we've got enough other

3    witnesses that would testify to that.

4         THE COURT:  Okay.  Well, you might want to sever

5    these character witnesses.  You may want to put whoever you

6    really care about at the beginning because at some point they

7    may be a little cumulative because that's a lot of character

8    witnesses.  Okay.

9         MR. FOX:  We don't have anything else, Your Honor.

10        THE COURT:  Okay.  And the character witnesses go to

11   truthfulness, correct?

12        MR. STEWARD:  Correct, Your Honor.

13        THE COURT:  Okay.  All right.  Have a nice weekend.

14      Do you have copies of this order --

15        MR. FOX:  Yes.

16        THE COURT:  -- at this point?  If you're going to --

17   if you're going to -- since we're doing this on a Sunday, if

18   it's going to be in camera and under seal, if you feel that's

19   necessary, you can e-mail it to the chamber's inbox.

20        MR. FOX:  And, Your Honor, I will -- I do want to

21   raise one thing.  Given the defendant's testimony about Paul

22   Yoshinaga, I have no idea how they could raise a defense with

23   respect to Mr. Yoshinaga, and I don't see what relevance he

24   will add to this proceeding.  So I would appreciate if it's an

25   in camera filing with respect to Mr. Yoshinaga that we have the

1    ability to see that because, again, I don't know how we can

2    contest what he has to say unless we see the filing.

3            MR. HAIG:  I've got no problem letting him know,

4    Your Honor, no problem at all.

5            MR. FOX:  Okay, thank you.

6            THE COURT:  That's fine.  Okay.

7            MR. HAIG:  If I file it in camera, I'll just e-mail

8    them a copy too.

9            MR. FOX:  Thank you.

10           THE COURT:  Okay.  If you're going to give them a

11   copy, there's no reason to make it in camera.

12           MR. FOX:  Thank you.

13           MR. HAIG:  Okay.

14        (The proceedings adjourned at 1:34 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

      I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  *August 24, 2016*

              /s/ SHAYNA MONTGOMERY
            _____
            SHAYNA MONTGOMERY, CSR, RPR, CRR
            Former Federal Official Court Reporter

**UNITED STATES DISTRICT COURT**