1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE PERCY ANDERSON, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,    )
                                 )
6                 Plaintiff,     )
                                 )
7        vs.                     )    CASE NO. CR 15-255-PA
                                 )
8   PAUL TANAKA,                 )
                                 )
9                 Defendant.     )
    ─────────────────────────────)

10

11

12

                    REPORTER'S TRANSCRIPT OF
13
                JURY TRIAL PROCEEDINGS - DAY 8
14
                   MONDAY, APRIL 4, 2016
15
                        7:59 A.M.
16
                   LOS ANGELES, CALIFORNIA
17

18

19

20

21

22   ─────────────────────────────────────────────

23        SHAYNA MONTGOMERY, CSR, RPR, CRR
        FORMER FEDERAL OFFICIAL COURT REPORTER
24        312 NORTH SPRING STREET, ROOM 410
          LOS ANGELES, CALIFORNIA 90012
25          SHAYNAMONTGOMERY@YAHOO.COM

1              **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        EILEEN DECKER
         United States Attorney
5        BY:  BRANDON D. FOX
             EDDIE A. JAUREGUI
6            Assistant United States Attorneys
         United States Courthouse
7        312 North Spring Street
         Los Angeles, California 90012
8

9

     **FOR THE DEFENDANT PAUL TANAKA:**
10
         H. DEAN STEWARD, ATTORNEY-PROFESSIONAL CORPORATION
11       BY:  H. DEAN STEWARD
             Attorney at Law
12       107 Avenida Miramar, Suite C
         San Clemente, California 92672
13       (949) 481-4900

14

15   **FOR THE DEFENDANT PAUL TANAKA:**

16       LAW OFFICE OF JEROME J. HAIG
         BY:  JEROME HAIG
17           Attorney at Law
         21143 Hawthorne Boulevard, Suite 454
18       Torrance, California 90503
         (424) 488-0686

19

20   **ALSO PRESENT:**

21       Leah Tanner, FBI Special Agent

22

23

24

25

**UNITED STATES DISTRICT COURT**

**INDEX OF WITNESSES**

**DEFENDANT'S**
**WITNESSES**                                                              **PAGE**

PAUL K. TANAKA

       Cross-Examination (Continued) by Mr. Fox          19
       Redirect Examination by Mr. Haig                 120
       Recross-Examination by Mr. Fox                   128


CHARLOTTE LYNN LYNCH

       Direct Examination by Mr. Steward                129
       Cross-Examination by Mr. Jauregui                131


CHARLES ANTUNA

       Direct Examination by Mr. Haig                   133
       Cross-Examination by Mr. Fox                     142


HELEN MIKIKO HAYASE

       Direct Examination by Mr. Haig                   147
       Cross-Examination by Mr. Jauregui                148


ANDRE BIROTTE, JR.

       Direct Examination by Mr. Steward                150
       Cross-Examination by Mr. Fox                     160


DAVID REAL

       Direct Examination by Mr. Haig                   167
       Cross-Examination by Mr. Jauregui                169


EDWARD MEDRANO

       Direct Examination by Mr. Haig                   171
       Cross-Examination by Mr. Jauregui                175

### INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | FOR IDENTIFICATION | RECEIVED |
|--------|-------------|--------------------|----------|
| 1 | Clark 2006 Memo | 27 | |
| 2 | Sheriff's Headquarters Bureau Diagram | 68 | |
| 7 | Tanaka Testimony Transcript CCJB | 43 | |
| 15 | E-mail Dated 8/18/11 | 67 | |
| 21 | E-mail Chain Ending 8/20/11 | 70 | |
| 22 | E-mail Chain Ending 8/23/11 | 74 | |
| 23 | E-mail Chain Ending 8/23/11 | 75 | |
| 25 | E-mail Chain Ending 8/24/11 | 76 | |
| 38 | E-mail Chain Ending 8/26/11 | 104 | |
| 59 | E-mail Chain Ending 9/12/11 | 60 | |
| 71 | E-mail Chain Ending 9/25/11 | 118 | |
| 74 | McCorkle 9/1/11 E-mail | 111 | |
| 78 | Tanaka-Leavins E-mail 8/29/11 | 107 | 108 |
| 141 | Proposed Order for Investigative Records Dated 9/7/11 | 113 | |
| 172 | Phone Summary Chart | 50 | |
| 187 | Document Regarding LASD's Policies | 115 | |
| 195 | Tanaka Full Grand Jury Transcript | 105 | |
| 196 | Printed Article | 209 | |
| 317 | Photo | 174 | |
| 352 | 9/26/11 Letter Baca to Birotte | 159 | 160 |
| 362 | E-mail, Yoshinaga to Leavins | 204 | |
| 363 | Stip Re: FBI Report | 204 | |

**UNITED STATES DISTRICT COURT**

1         **LOS ANGELES, CALIFORNIA; MONDAY, APRIL 4, 2016**

2                    **7:59 A.M.**

3                   --oOo--

4        THE DEPUTY CLERK:  Calling item number one,

5 CR 15-255, U.S.A. vs. Paul Tanaka.

6           Counsel, state your appearances, please.

7        MR. FOX:  Good morning, Your Honor.  Brandon Fox and

8 Eddie Jauregui on behalf of the United States.  Also sitting at

9 counsel table is Special Agent Leah Tanner with the FBI.

10        THE COURT:  Good morning.

11        MR. STEWARD:  Good morning, Your Honor.  Dean

12 Steward and Jerome Haig for Mr. Tanaka.  He's present.

13        THE COURT:  Good morning.

14        MR. HAIG:  Good morning.

15        THE COURT:  Let me see counsel at sidebar.

16    (Discussion held at sidebar.)

17        THE COURT:  Before I forget, any of you see the lady

18 that was in here?

19        MR. HAIG:  You know, I can kind of give you a

20 rundown, if you want.

21        MR. STEWARD:  The answer's no.

22        MR. HAIG:  Oh, okay.  I don't know who she is.

23        MR. STEWARD:  She's the one that it's her friend.

24        MR. FOX:  So there's a woman in the first row,

25 blonde with a black top.

 1              THE COURT:  Uh-huh.

 2              MR. FOX:  Do you see her next to the man in a

 3 blue --

 4              MR. JAUREGUI:  Closer to the defense side.

 5              MR. FOX:  Yes, middle close to the defense side.

 6              MR. HAIG:  And I think we -- this is Jerome Haig.  I

 7 think we generally know who she is and what group she's

 8 representing.  I believe that's correct based upon --

 9              THE COURT:  Well, what I'm really trying to do is to

10 identify the woman that was taking pictures.

11              MR. HAIG:  Right, that's what I'm talking about.

12              THE COURT:  Okay.  And it's not the blonde.

13              MR. STEWARD:  It is not.

14              MR. HAIG:  That's right, yeah.

15              THE COURT:  But it's somebody who may be affiliated.

16              MR. STEWARD:  Correct.

17              THE COURT:  Okay.  But it was one of the

18 reporters --

19              MR. STEWARD:  As far as we can tell, no.

20              THE COURT:  Okay.  All right.  I'll just remind

21 everybody again.

22       Okay.  Why don't we take up first this issue about the

23 Vikings.  Now, as I understand the defense's position is, is

24 that this is for -- it's not relevant, and even assuming it has

25 some relevance, its relevance is outweighed by its

```
 1   prejudicial -- it's substantially prejudicial.
 2              MR. HAIG:  That's right, Your Honor.
 3              THE COURT:  Okay.
 4              MR. JAUREGUI:  And I believe there was a remoteness
 5   argument made as well.
 6              MR. STEWARD:  "Stale" was, I think, our word.
 7              MR. JAUREGUI:  Okay.
 8              MR. FOX:  I think what you're getting to is to
 9   relevance.
10              MR. HAIG:  And I think I also had objected that it
11   was beyond the scope.  So, I mean, but I think the major
12   argument is the one the Court just mentioned.
13              THE COURT:  Okay.  Ultimately, where are we going
14   with this?
15              MR. FOX:  Your Honor, I think that it's important to
16   show, and I'll explain how far I'm going to go with this, that
17   he was a member then.  He was the sergeant, and he was a member
18   of a deputy clique as sergeant.  He joined them as a sergeant.
19   He maintains his tattoo -- throughout his career at the LASD,
20   he maintained his tattoo even after there was a finding that it
21   was this type of deputy gang.  Now, I'm not going to get into
22   the racial aspects of it.  I will not --
23              THE COURT:  I understand.  Let's assume for the
24   moment you ask him when you were a member of the -- I'm
25   assuming it's going to go something like, You were a member of
```

**UNITED STATES DISTRICT COURT**

1    the Vikings; correct?  You've gotten on the stand.  You've

2    professed to both personal and professional core values of the

3    Sheriff's Department.  You were a member of a clique.  That

4    clique had values that were totally the opposite of these core

5    values.

6              MR. FOX:  I'm not going to argue it that way, Your

7    Honor.  I'm just going to lay out the facts.  So I'll be happy

8    to tell you the questions that I'm asking if that would be

9    easier.

10             THE COURT:  Okay.

11             MR. FOX:  Obviously, it's not going to be

12   word-for-word, but something to this effect:  When you were at

13   the Lynwood station, you learned of a deputy clique named the

14   Vikings, and you were later asked to become part of the

15   Vikings.  You agreed to become part of the Vikings.  In 1991

16   you found out that there was a finding that this was a deputy

17   gang that was involved in civil rights abuses and lawlessness.

18        Even after that finding you kept your tattoo.  You kept

19   your affiliation with the gang -- I'm sorry, with the Vikings,

20   and even as you were undersheriff you kept your tattoo.  And as

21   you testified today, you still have that tattoo on you, because

22   I think it does go to his intent because if he is, as the

23   defense portrayed him, as he portrayed himself, a person who

24   adheres to the core values, he would not -- as soon as there's

25   a finding about this gang, he would have gotten rid of the

1    tattoo.

2            THE COURT:  All right.  Well, let's assume for the

3    moment he says no, I'm not aware of any such finding that they

4    were -- what were your words that they were?

5            MR. FOX:  A deputy -- I'm sorry, the judge's

6    findings, Judge Hatter's findings were that they were -- to

7    remove some of the stuff that I'm not going to get into, that

8    they were engaged in civil rights abuses and that they also

9    committed other acts of lawlessness, is what he said.

10           THE COURT:  Okay.  Well, how are you going to prove

11   that?  Let's say he denies it.

12           MR. FOX:  If he denies it, I'm not going to put him

13   in the opinion.  That's not -- if he denies knowledge then he

14   denies knowledge, although I would have to look back at his

15   previous testimony before the Citizens' Commission on Jail

16   Violence.  I think in the past he has acknowledged that the

17   judge made a ruling, although I'm not positive.  If he denies

18   knowing about the ruling, I'm going to continue to say he's a

19   member of this clique and he still wears the tattoo of that

20   clique.

21           THE COURT:  Okay.  Well, he's a member of the

22   clique, but how it become -- unless you get into that, it's

23   somehow inconsistent with the testimony that he's given, how is

24   it relevant?

25           MR. FOX:  With the findings of the judge, again the

```
 1    fact that -- and I don't have to say the judge --
 2              THE COURT:  But again, if you're not -- unless
 3    you're able to prove that to the jury -- the jury doesn't know
 4    what Hatter said.  The jury doesn't know anything about the
 5    Vikings, presumably.  So how are you going to prove it?  It's
 6    what you tell him --
 7              MR. FOX:  Sure.
 8              THE COURT:  Well, you're a member of this clique.
 9              MR. FOX:  I can -- what I'll probably do is look to
10    see -- because we have, obviously, a lot of his previous
11    statements.  I'll look to see if we have something that shows
12    that he does know about this ruling where he's admitted knowing
13    the ruling.
14              THE COURT:  But don't you have to have a good faith
15    belief in this question before, instead of looking for
16    testimony?
17              MR. FOX:  It became -- no surprise it became
18    incredibly controversial -- the Vikings became controversial
19    and has received a lot of public scrutiny since that ruling.
20    Now, one thing that I can tell you is that, again, he was
21    questioned on this before the Citizens' Commission on Jail
22    Violence, and he still has that tattoo on him today.  So at
23    some point, he did learn about this.
24              THE COURT:  Well, I understand now, but ultimately
25    if you're going to ask him -- if it's going to have some
```

1    meaning at some point and he denies it -- yeah, I was a member

2    of a club or clique.  So what?

3              MR. FOX:  I think that he will admit that he was

4    aware of the judge's ruling, he became aware of the judge's

5    ruling.  I mean, they will know better than I do, but this is

6    something again that was very well known throughout.

7              THE COURT:  Okay.  Well, again you're saying you

8    think he may.  But if he says, No, I wasn't, then the question

9    becomes, okay -- I mean, I still don't understand where we're

10   going with it.  If ultimately you were going to say -- well,

11   you know that this commission -- what you know of this clique

12   was -- everything he stood for was exactly the opposite of what

13   you testified that you believe in, fine.

14       And then you want to -- you've got some evidence, you want

15   to put Lourdes Baird or Rob Bonner or somebody from that

16   sentence that says, Yeah, we had problems with these cliques

17   that eventually became a problem at the Sheriff's Office, and

18   we took him to task because he was a member of one too.

19             MR. FOX:  I'm not going to go there with that, Your

20   Honor.  We're not going to be proving that up.

21             THE COURT:  Okay.  Well, then I have a hard time

22   seeing of how it's of any relevance to this jury.  Because

23   presumably, the theory is ultimately what you -- I assume that

24   what you want to do is to impeach him for getting on the stand

25   and portraying to the jury that, Hey, I believe deputies are

**UNITED STATES DISTRICT COURT**

```
 1    being -- doing the right thing.  I believe in these core
 2    values.  I believe in discipline, and I was -- so unless you're
 3    going to impeach him -- unless it's being offered to impeach
 4    him for that --
 5              MR. FOX:  That's what it's being offered for, Your
 6    Honor, and I think that I do have a good-faith basis to ask him
 7    if he's aware of that ruling.  And I think I have a good-faith
 8    basis to believe that he became aware --
 9              THE COURT:  What is the good-faith basis?
10              MR. FOX:  It was a published opinion in 1991 about a
11    group that he's involved with within the Sheriff's Department
12    that became huge throughout the Department --
13              THE COURT:  What's the evidence that you have that
14    he knew of that ruling?
15              MR. FOX:  I can look back to see what he was
16    questioned about, Your Honor, but again, I think given that
17    he's a member of that group, given that there was a published
18    opinion about that group that had a temporary restraining order
19    at least at one point saying to the group you cannot operate
20    and you have to -- whatever --
21              THE COURT:  It was reversed.
22              MR. FOX:  It was reversed, but for a while there
23    was -- before it was reversed, there, of course, was an order
24    out there to --
25              MR. JAUREGUI:  To the whole Department.
```

```
 1              MR. FOX:  Of course, to the whole Department.  So

 2    it's something, again, as a leader that he was involved in,

 3    there were -- as you know, there were semiannual reports,

 4    annual reports talking about the issues involving the Sheriff's

 5    Department deputy cliques.  He was a member of one, so I --

 6              THE COURT:  Well, there's no question about that,

 7    but ultimately -- so if he says no, I wasn't aware of it --

 8              MR. FOX:  Then we move on.

 9              THE COURT:  I understand that.  You're stuck with

10    that answer, but ultimately, what's the jury going to get out

11    of this case?

12              MR. FOX:  That he actually was a member, or that

13    that -- I think it's two separate issues.  Was he a member or

14    what did it stand for and --

15              THE COURT:  Well, I think there's probably enough on

16    the record that he's going to -- he's probably going to own up

17    to that, but as to whether or not he was aware of Judge

18    Hatter's ruling --

19              MR. FOX:  Obviously, we don't have access to him to

20    find out what he's going to say, and I can --

21              THE COURT:  If he says yes, then it's a problem.  If

22    he says no --

23              MR. FOX:  I think we can front it at that point,

24    Your Honor.  I think that we --

25              THE COURT:  I don't think so.
```

**UNITED STATES DISTRICT COURT**

1      MR. FOX:  -- have a sidebar -- I mean, I'm saying
2   "we" as in the government, we see if we think we should be
3   doing anything else.
4           THE COURT:  If you've got something, you ought to
5   have it now.
6           MR. FOX:  Let me find it, then.  Give me a few
7   minutes to find it.
8           THE COURT:  You've had all weekend.  You've known
9   about this thing all weekend.
10          MR. FOX:  I -- my position, Your Honor, is that to
11  me it's very clear that he would have known about it and --
12          THE COURT:  Being clear and having something is two
13  different things.  If you've got something -- so...
14          MR. FOX:  Okay.
15          THE DEPUTY CLERK:  All the jurors are here.
16          MR. FOX:  And if I find something during his
17  cross-examination or if the agent does, may -- you've got a
18  binder with the CCJV testimony, and if it's in there, can I
19  point that out to you?
20          THE COURT:  Sure.  If you've got something, that's
21  fine.
22          MR. FOX:  That's what I'm saying.  It's probably in
23  our room -- it's probably here with us, is what I'm saying, and
24  we can find it.
25          THE COURT:  That's fine.

1          MR. FOX:  Okay.  Thank you.

2          THE COURT:  Okay.

3          MR. FOX:  So just to make it clear, you don't want

4    me to get into -- or are you saying that I can, but if he

5    denies knowledge then I'm stuck with that answer?

6          THE COURT:  No.  What I'm saying is before you get

7    into this area, you're going to have to show that you've got a

8    good-faith basis, and thinking that there's something there is

9    not enough.  You're going to have to --

10          MR. HAIG:  Your Honor, this is Jerome Haig again.  I

11    would just ask, if it's all right, for the government to ask to

12    approach again if they want to go into this issue again.

13          THE COURT:  Well, I assume they will.

14          MR. FOX:  Yes, I will.

15          THE COURT:  Okay.

16          MR. FOX:  Thank you.

17          THE COURT:  And it's the Court's finding this is

18    relevant because he basically has gotten the -- taken the

19    position he portrayed himself as -- to the jury as following

20    the rules, living by the creed of the Sheriff's Department and

21    the core values, and that being a member of this gang would be

22    inconsistent with the Sheriff's core values; that one of the

23    things I believe he said is that through his testimony in the

24    government's case concerning his efforts and real plans for

25    him, jail commanders to break up cliques of deputies by

```
 1  reassigning and rotating its deputies through different areas.
 2  And in his direct testimony, he testified he disagreed because
 3  he didn't want to disrupt the schedules of the deputies, not
 4  because he was against efforts to contract the cliques, and
 5  evidence of his own membership in the clique is therefore
 6  relevant to impeach that testimony.
 7       It's also relevant to show that his intent and to obstruct
 8  justice including the possible rift to protect deputies or
 9  alleged members of deputy cliques like the Vikings, and
10  furthermore, I don't find that the probative value of his
11  testimony is substantially outweighed by undue prejudice given
12  the fact the way the government has stated in its brief.
13            MR. FOX:  Your Honor, also Paul Yoshinaga, as you
14  know, is one of the defense witnesses.  Brian Hershman, who
15  represents the County and the Sheriff's Department, informed me
16  last night that he believes there's some privilege issues
17  related to him, that they will object to the introduction of
18  certain of his evidence.
19       Based on the history with Mr. Yoshinaga, I also spoke to
20  the defense last night and today about the possibility that we
21  do something outside of the presence of the jury with respect
22  to Mr. Yoshinaga.  My suggestion is that we get through
23  everything else that we can today.  We table him to the end of
24  the day, excuse the jury, if that's okay with Your Honor, and
25  then we hear from Mr. Yoshinaga.
```

1          THE COURT:  Well, first of all, from what I recall

2    of the proffer there's only one element of his testimony that I

3    think is relevant here because Tanaka never consulted with him

4    about anything.  The fact that other people may have consulted

5    I think is irrelevant to any sort of defensive -- well, it's

6    irrelevant to his defense, and moreover, it seems to me that

7    the defense has said that it's abandonment, his -- the defense

8    abandoned the attorney --

9          MR. HAIG:  Advice of counsel.

10          THE COURT:  -- advice of counsel defense.  Now, if

11    he wants to get on the stand as a percipient witness and say,

12    "I was at this meeting at the U.S. Attorney's Office and here's

13    what I saw," that's one thing, but all this -- all the legal

14    stuff about what he told Thompson or told Leavins, how is that

15    relevant to Tanaka?

16          MR. HAIG:  I can -- this is Jerome Haig again.  I

17    can -- the basic proffer -- and we are abandoning the advice of

18    counsel defense because Mr. Yoshinaga, as is clear from

19    Mr. Tanaka's testimony and is clear from the proffer, did not

20    have any consultations with Mr. Tanaka regarding any legal

21    aspect of --

22          THE COURT:  We understand that.  What's he got to

23    say that's relevant?

24          MR. HAIG:  As the Court said, he's going to be

25    testifying as a percipient witness.

```
 1              THE COURT:  About what?
 2              MR. HAIG:  About -- about what he observed at the
 3   meeting at Andre Birotte's office and also what he observed
 4   regarding his communication with Leavins and Carey.  Well, if I
 5   can just give you --
 6              THE COURT:  What Leavins and Carey have to say is
 7   irrelevant.
 8              MR. HAIG:  It's not -- the aspect of it is not what
 9   was said between the two of them, but just the mere fact that
10   he was communicating much more with Leavins and Carey and Baca
11   than Tanaka, and I think that circumstantially proves that
12   Mr. Tanaka is not as involved as the government claims he was
13   involved.  That's the only aspect of it.  So it's that part,
14   and also his status as a percipient witness to some of the
15   things that have already been testified to.  But as far as his
16   role as the legal advisor, that really just puts him at the
17   scene.  His -- the aspects of legal advice really aren't the
18   important thing in this case.
19              THE COURT:  Well, that's fine.  So it seems to me
20   Mr. Hershman is concerned about privileges.  I don't think
21   that's really going to enter into this, but oh well.
22          All right.  Let's go.
23              MR. HAIG:  Do you want Mr. Tanaka up on the stand
24   yet?
25              THE COURT:  Yep.
```

1          MR. HAIG:  Okay.

2      (End of sidebar discussions.)

3          THE COURT:  Let me just caution everybody, all

4  electronic devices must be turned off.  I have received

5  information that somebody here last week was taking pictures

6  with a cell phone in this courtroom, and that's a real problem.

7  So make sure your electronic devices are turned off.  Anybody

8  who is found taking pictures in this courtroom will be referred

9  to the United States Attorney's Office for prosecution.  It's

10 against federal law.

11     Okay.  Let's bring the jury in.

12     (The jury entered the courtroom.)

13          THE DEPUTY CLERK:  Please be seated.

14          THE COURT:  Good morning, ladies and gentlemen.

15          THE JURY PANEL:  Good morning.

16          THE COURT:  All right.  We're going to resume with

17 the cross-examination.

18          MR. FOX:  May I proceed, Your Honor?

19          THE COURT:  Yes, please.

20               CROSS-EXAMINATION (CONTINUED)

21 Q    (BY MR. FOX)  Mr. Tanaka, on Friday you talked about

22 working as a CPA for about 20 years; is that correct?

23 A    I did.

24 Q    During that time, though, you were actually employed

25 full-time as a law enforcement officer as well; correct?

```
 1   A     During most of that period of time, correct.
 2   Q     You worked for two police departments before joining the
 3   Sheriff's Department; correct?
 4   A     I was employed as a -- well, I wasn't really employed.  I
 5   was a reserve police officer for Montebello for about four
 6   months before being hired as a full-time peace officer by the
 7   El Segundo Police Department.
 8   Q     So you worked for two separate police departments before
 9   joining the Sheriff's Department; correct?
10   A     Yes.
11   Q     And you did police work for these two separate police
12   departments; correct?
13   A     I did.
14   Q     You were not doing accounting or budgetary work for them;
15   correct?
16   A     I was not.
17   Q     Then you joined the Sheriff's Department in 1982; is that
18   right?
19   A     Yes.
20   Q     In May of 1982, you worked as a deputy in one of the
21   county's jails; correct?
22   A     Yes.
23   Q     And that county jail was Men's Central Jail; correct?
24   A     Yes.
25   Q     And you were doing the normal deputy functions as you were
```

```
 1   working in the jail; correct?
 2   A     I was a jailer.
 3   Q     And you were not doing budgetary or accounting work when
 4   you were working for the Sheriff's Department in 1982?
 5   A     I was not.
 6   Q     In 1983 you became a patrol deputy; correct?
 7   A     Yes.
 8   Q     And you were doing the standard duties of a patrol deputy
 9   in 1983; correct?
10   A     Yes.
11   Q     And you continued to do that work for a few years before
12   you went to the Lynwood patrol station in 1987; is that
13   correct?
14   A     Between that I was assigned to the training bureau as a
15   recruitment officer for the Sheriff's Department, from 1985 to
16   1987.
17   Q     And in 1987 you began supervising the patrol officers at
18   the Lynwood station; correct?
19   A     Yes.
20   Q     And you supervised investigations when you were a sergeant
21   at Lynwood; correct?
22   A     I was not a detective sergeant.  I was a patrol sergeant
23   for the first, approximately, year and a half, and then I
24   became the traffic supervisor for maybe under a year.  And then
25   after that, I was the -- an adjutant or the operations sergeant
```

1  to the station captain for the last year and a half or so.

2  Q    And when you were a patrol sergeant, you were overseeing

3  investigations done by the patrol deputies; correct?

4  A    Well, the initial fieldwork, yes.

5  Q    And you became a lieutenant at a jail in Lancaster in

6  1991; correct?

7  A    That's correct.

8  Q    You supervised sergeants and deputies at that jail;

9  correct?

10 A    Yes.

11 Q    You reviewed investigations of force at that jail;

12 correct?

13 A    Yes.

14 Q    And part of your job was to make sure that those

15 investigations were lawful and complete; correct?

16 A    Yes.

17 Q    And then you worked as a lieutenant at the Inmate

18 Reception Center in 1991; correct?

19 A    I believe I was assigned to the Inmate Reception Center

20 sometime in 1992.

21 Q    And in 1993 you were lieutenant at another patrol station;

22 correct?

23 A    Yes.

24 Q    And you supervised sergeants and deputies working patrol

25 at that time; correct?

```
 1   A     I did.

 2   Q     Now, you discussed in your testimony on Friday that

 3   promotions within the Sheriff's Department while you were

 4   there, with respect to sergeant, were merit-based; correct?

 5   A     It was based on a compilation of scores, a three-part

 6   examination process.

 7   Q     So merit-based; correct?

 8   A     Well, I don't know if that's merit-based.  I think part of

 9   it -- about a third of it was merit-based.  Your supervisors

10   would judge your performance and give you a grade based on how

11   they thought you would perform at the next level.  The other

12   two portions were based on a written examination of your

13   knowledge and an oral interview.

14   Q     So at least part of it was based on objective criteria;

15   correct?

16   A     Probably the written test would be the most objective.

17   Q     And promotions to the lieutenant were also based, at least

18   in part, on objective criteria; correct?

19   A     A portion, about a third, was -- or I don't remember the

20   percentages, would also be based on a written examination.

21   Q     During approximately your first 17 years at the Sheriff's

22   Department, you were promoted twice -- once to sergeant and

23   once to lieutenant; correct?

24   A     Yes.

25   Q     And those were based, at least in part, on these objective
```

1    criteria; correct?

2    A      That is correct.

3    Q      And you testified in direct that the Sheriff was able to

4    hand-select anyone from the rank of captain or above; correct?

5    A      That was his policy, correct.

6    Q      During the time you were at the Sheriff's Department, that

7    was his policy; correct?

8    A      Yes.

9    Q      So that meant that he was able to hand-select captains,

10   commanders, chiefs, assistant sheriffs and the undersheriff;

11   correct?

12   A      Yes.

13   Q      Mr. Baca was elected Sheriff at the end of 1998; correct?

14   A      Yes.

15   Q      And at that point, he had the authority to promote anybody

16   at those levels, captain and above; correct?

17   A      Once he became the Sheriff, yes.

18   Q      At the end of 1998?

19   A      Yes.

20   Q      And he was able to do that from 1998 until he left office

21   in January, February of 2014; correct?

22   A      That would be correct.

23   Q      There were no written tests to become captain or above;

24   correct?

25   A      There were no written tests for those positions.

```
 1  Q    And during the first four years that Mr. Baca was Sheriff,

 2  he promoted you three times; correct?  Would it be easier if I

 3  broke that down for you?

 4  A    No.  I'm just trying to recall.  '99, '01, '2 -- three

 5  times in -- did you say three times?

 6  Q    Well, let's break it down.  In 1999, months after he took

 7  office, Mr. Baca promoted you to captain; correct?

 8  A    In August of '99.

 9  Q    And just two years later, in 2001, he promoted you to

10  commander; correct?

11  A    Yes.

12  Q    Just one year after that, in 2002, he promoted you to

13  chief; correct?

14  A    It was 18 months later in -- summer of 2002.

15  Q    So you were captain for four or five months before you

16  became commander?

17  A    18 months, sir.

18  Q    From captain to commander it was 18 months?

19  A    From captain to commander, 18 months.  And from commander

20  to chief, 18 months.

21  Q    And then in 2005, Mr. Baca promoted you to assistant

22  sheriff over custody; correct?

23  A    That was one of the divisions that I was responsible for

24  overseeing when I was promoted to assistant sheriff.

25  Q    In 2007 he moved you to become assistant sheriff over
```

1    patrol; correct?

2    A    He did.

3    Q    And in 2011 he promoted you to become undersheriff;

4    correct?

5    A    Yes.

6    Q    Mr. Baca promoted you over the years because you did

7    exactly what you were asked to do; correct?

8    A    I -- you'd have to ask the Sheriff why he promoted me.

9    Q    Well, Mr. Baca --

10   A    It was his prerogative only.

11   Q    Excuse me.  Mr. Baca has told you that in the past;

12   correct?

13   A    I believe he's made a comment, something to -- along the

14   line of that I did what I was told.

15   Q    Mr. Baca told you that he promoted you over the years

16   because you did exactly what you were asked to do; correct?

17   A    Probably something along those lines.

18   Q    Mr. Baca told you that, that he promoted you over the

19   years because you did exactly what you were asked to do;

20   correct?

21          MR. HAIG:  Objection, Your Honor, asked and

22   answered.

23          THE WITNESS:  I -- I don't remember the exact words,

24   but it was something along those lines, sir.

25   Q    (BY MR. FOX)  Mr. Tanaka, you testified on Friday about

```
 1    John Clark's rotation plan.
 2          Do you recall that testimony?
 3    A    Yes.
 4    Q    You testified that you did not approve of the plan because
 5    it required a rotation of shifts, not just job assignments;
 6    correct?
 7    A    Yes.
 8    Q    You testified that you did not want deputies to be moving
 9    from day shift to evening shift or afternoon shift and then to
10    graveyard shift; correct?
11    A    That is correct.
12    Q    Showing you now Government Exhibit 1.
13          And, Mr. Tanaka, do you have a binder in front of you?
14    A    I got a lot of binders.
15    Q    Okay.  Do you see Exhibit 1 there?
16          (Pause in proceedings.)
17              THE WITNESS:  I have Exhibit 1 in front of me.
18    Q    (BY MR. FOX)  All right.  Mr. Tanaka, while in this
19    memorandum by Mr. Clark it discusses deputies' use of force --
20    you see that part highlighted on your screen in front of you?
21    A    Yes.
22    Q    Okay.  Nowhere in this memo does it say that deputies
23    would have to change their hours; correct?
24          Take a look at the memo.  Take as long as you want.
25    A    Yes.  I've looked at this memo, and I understand it, but
```

1    this was never shown to me or discussed with me during my

2    discussion with the captain about the rotation plan.

3    Q     Now, you just said it was never shown to you or discussed

4    with you in your discussions with the captain.  You're talking

5    about John Clark?

6    A     At the time the captain and I had the discussion, and my

7    understanding was that the rotation plan was going to include

8    shift changes every couple of months, that's actually what my

9    biggest concern was.

10   Q     Mr. Tanaka, you just said in your discussions with the

11   captain that he never showed you this memo or discussed this

12   plan with you; correct?

13   A     Not in the way that it's written here, that is correct.

14   Q     There's a commander, Commander Conte, who showed you this

15   memo and provided this memo to you at an executive planning

16   committee meeting; correct?

17   A     That's not correct -- I mean, I don't have any recall of

18   ever seeing this memorandum until years later when I believe

19   there was a jail commission hearing.  And until then, I have no

20   recollection of ever being shown this memo or being told that

21   the rotation plan -- it would have been a different discussion

22   if the captain had said, We're just trying to address issues

23   and we're going to move people around.

24        That is not any concern of mine.  Captain has all the

25   prerogative to move people around within a shift.  But my

```
 1   understanding was that the shift rotation was going to involve
 2   just that, shifts.  And it was -- it was -- I just didn't
 3   believe that it was fair to the 600-plus deputies that were
 4   assigned there to have to endure that kind of transfer policy
 5   every two months.
 6   Q    Mr. Tanaka, Mr. Conte provided you John Clark's memo;
 7   correct?
 8   A    I don't recall Mr. Conte ever providing me with this memo
 9   or, in fact, during all the years we worked together, any
10   memorandum.  I had very little contact with Commander Conte.
11   Q    Are you denying you had a conversation with Mr. Conte at
12   an executive planning committee meeting about John Clark's
13   rotation plan?
14   A    I may have, I just -- I don't have a -- I don't recall
15   having any conversation with Commander Conte about this plan.
16   Q    You'll agree with me that this exhibit says that deputies
17   will remain on their assigned shifts; correct?
18   A    Yes.
19   Q    And that scheduling will make every attempt to leave their
20   schedule in place; correct?
21   A    Yes.
22   Q    Now, your testimony on Friday was that you told Mr. Clark
23   to come up with another plan; correct?
24   A    I did.
25   Q    And then you recommended to Mr. Baca that he be
```

1  transferred; correct?

2  A     At some point afterwards, yes.

3  Q     So it's your testimony that even before Mr. Clark came up

4  with this plan that wouldn't cause deputies to change shifts,

5  you decided to transfer him; correct?

6          MR. HAIG:  Objection, argumentative, Your Honor.

7          THE COURT:  Overruled.  You can answer.

8          THE WITNESS:  I don't think it quite happened that

9  way.  I recall that there was still a chain of command.  He had

10  a chief.  I don't have -- and it's been enough -- it's been ten

11  years now, but I have a vague recollection that I would have

12  had a discussion with his chief at the time in expressing that,

13  you know, I expected there to be a different resolution,

14  because Clark said -- Captain Clark had said, I have a handful

15  of problem deputies, and that was what the issue revolved

16  around.  If you have a handful of problem deputies, you deal

17  with them, and you don't go after the masses of 600-plus

18  deputies and disrupt their personal lives.

19          MR. FOX:  Your Honor, I move to strike the answer as

20  nonresponsive to the question.

21          THE COURT:  Sustained.  The answer is stricken.  The

22  jury should disregard it.

23  Q     (BY MR. FOX)  Mr. Tanaka, before -- it is your testimony

24  that before Mr. Clark had the ability to make the deputy plan

25  be so that the deputies would not be rotated amongst their

1    shifts, that you transferred Mr. Clark; is that correct?

2    A     I'm sorry, can you repeat that, please?

3    Q     Sure.  You testified on Friday that you told Mr. Clark to

4    come up with another plan; correct?

5    A     Yes.

6    Q     And it's your testimony that you transferred him before he

7    came up with this plan that we just saw; is that correct?

8              MR. HAIG:  Objection, Your Honor, misstates the

9    testimony.

10             THE COURT:  Overruled.  You can answer.

11             THE WITNESS:  I did not transfer him.  I had a

12   discussion with the Sheriff and offered up my reasons why I

13   thought there needed to be a change in command at Men's Central

14   Jail.

15   Q     (BY MR. FOX)  So it's your testimony that you recommended

16   to the Sheriff that Mr. Clark be transferred before this plan

17   that we just saw was communicated to you; is that correct?

18   A     Before this -- before the rotation plan -- no, the

19   discussion about the rotation plan, as I understood it, where

20   it involved a changing of shifts, that took place before my

21   discussion with the Sheriff.

22             MR. FOX:  Your Honor, I move to strike the answer as

23   nonresponsive.

24             THE COURT:  Sustained.  The answer is stricken.  The

25   jury should disregard it.

```
 1    Q    (BY MR. FOX)  Mr. Tanaka, do you understand my question?

 2    A    I'm sorry, I must not.

 3    Q    You made the recommendation to Mr. Baca that Mr. Clark

 4    should be transferred, it is your testimony, before you read

 5    John Clark's plan in Exhibit 1; correct?

 6    A    Before I read this memo, yes, because I said I didn't

 7    recall seeing this memo until probably four or five years

 8    later.

 9    Q    And you recommended to Mr. Baca that Mr. Clark be

10    transferred, it is your testimony, before you learned that he

11    had a plan to rotate jobs without rotating shifts; correct?

12    A    Okay.  He and I had a discussion in person.  We discussed

13    the shift rotation, and he never said that it didn't involve

14    shift rotation.  So we had -- it wasn't on a memo, but we had a

15    face-to-face discussion about it.

16    Q    And at that face-to-face discussion is when you told

17    Mr. Clark to come up with another plan; correct?

18    A    I did ask him to come up with another plan, yes.

19    Q    And then it's your testimony before you learned of a new

20    plan by him, you went to Mr. Baca and asked Mr. Clark to be

21    transferred; correct?

22    A    I -- I don't remember if he had implemented any new plans

23    prior to my discussion with Sheriff Baca.

24    Q    Well, you do know he didn't implement any rotation plan;

25    correct?
```

```
 1   A     Whether he wrote -- implemented one that involved movement
 2   within the shift, I don't remember, or I don't know.
 3   Q     With respect to Mr. Olmsted, you testified on Friday that
 4   you did not tell him that you would be Sheriff someday;
 5   correct?
 6   A     That is correct.
 7   Q     But you did run for Sheriff in 2014; correct?
 8   A     I did.
 9   Q     Mr. Tanaka, you testified on Friday that you did threaten
10   to investigate those captains who initiated investigations on
11   deputies that you thought were unnecessary or excessive;
12   correct?
13   A     I wouldn't say "threaten."  I made that very clear to all
14   the captains and supervisors that if their way of supervising
15   was to put cases on people rather than to provide the kind of
16   leadership that deputies needed, then I certainly would not
17   hesitate to open up an investigation on their ability to
18   function in the position that they were in.
19   Q     Mr. Tanaka, you said one of the reasons for making this
20   statement is that deputies oftentimes do not know what they're
21   being investigated for; correct?
22   A     I said that I had a disagreement with the process of the
23   Internal Affairs -- the Internal Affairs process because very
24   often the complaint was that they did not communicate very
25   clearly to the person being investigated what they were really
```

**UNITED STATES DISTRICT COURT**

1    being investigated for.

2    Q    Mr. Tanaka, you're aware that, of course, deputies are

3    part of a union; correct?

4    A    Yes.

5    Q    And they have union representatives; correct?

6    A    Yes.

7    Q    And if they have a complaint with the way they're being

8    treated outside of regulations or the law, they have a means to

9    argue for things to be different; correct?

10   A    That's one option for them, correct.

11   Q    And, Mr. Tanaka, the Sheriff's Department policy was to

12   inform the officers subject to the investigation what they were

13   being investigated for; correct?

14   A    I don't remember the Internal Affairs policy on -- on

15   notification.

16   Q    And, Mr. Tanaka, even going outside of the Internal

17   Affairs policy, it's the law, California Government Code

18   3303(c), the Police Officer Bill of Rights.  You're familiar

19   with that; correct?

20   A    Generally familiar with, yeah, the Peace Officer Bill of

21   Rights.

22   Q    Yeah, because you were one for a long time; correct?

23   A    Yes.

24   Q    And according to that, California Government Code 3303(c),

25   an officer under investigation shall be informed of what

```
 1    they're being investigated for; correct?
 2    A     Well, even if it says that, I'm just saying that a
 3    complaint -- a frequent complaint was that officers felt or
 4    deputies felt or those under investigation believed they
 5    weren't always told with any clarity what the nature of the
 6    investigation was, and that's what caused a lot of
 7    consternation.
 8    Q     Okay.  Mr. Tanaka, it's your testimony that, at least it
 9    was on Friday, that Internal Affairs, they investigated policy
10    violations; correct?
11    A     Yeah.  I'd say administrative violations.
12    Q     And you said -- the two examples you gave, one, coming in
13    late to work; correct?
14    A     I believe so.
15    Q     And the second one you gave us on Friday was calling in
16    sick when you're not really sick; correct?
17    A     Yes.
18    Q     But that's not entirely what Internal Affairs
19    investigates; correct?
20    A     No.  I think I mentioned there's an array of -- I mean,
21    the policy is probably about this thick, the manual.
22    Q     And you chose the ones about coming in late to work and
23    calling in sick; correct?
24    A     I wouldn't say I chose them.  I just told you what -- or I
25    mentioned what -- the couple of them that came to the top of my
```

```
 1  head.
 2  Q    While you were in executive management and had some role
 3  in the process, you know that deputies were also investigated
 4  by Internal Affairs for what could be described as criminal
 5  conduct as well; correct?
 6  A    No, not by Internal Affairs.  Allegations of criminal
 7  misconduct by -- members of the Sheriff's Department were
 8  investigated by a separate investigative bureau, which was the
 9  Internal Criminal Investigations Bureau.
10  Q    The Sheriff's Department had discretion of determining
11  whether investigation would be through ICIB, criminal, or
12  whether it be through IA policy; correct?
13  A    I'm not sure there was that discretion.  Any allegations
14  of criminal conduct by members of the Sheriff's Department were
15  necessarily investigated by ICIB first.  If and when there was
16  any determination that that investigation was complete, there
17  would come a point where they would then determine whether or
18  not it was appropriate to go over to the administrative side,
19  because on the administrative side deputies could be compelled
20  to answer.  And, of course, once that occurred, that could
21  completely infringe upon the -- or cause the criminal case to
22  be thrown out.
23  Q    Under the time you were in executive management, you know
24  that deputies were investigated by IA and not ICIB at times for
25  committing DUIs; correct?
```

1  A     Well, I believe that there's -- there was simultaneous

2  investigation and monitoring, and I believe that the -- when

3  the criminal case was going on, if it was not one that was in

4  the jurisdiction of the Sheriff and it was -- for instance, a

5  DUI was being investigated by another agency, that we had what

6  was called a criminal monitor.  It was up to Internal Criminal

7  Investigations Bureau to monitor the outcome of that

8  investigation.  And then at the appropriate time, when there

9  was no longer any concerns for the criminal case, then the

10 matter would be handled by Internal Affairs.

11 Q    Mr. Tanaka, you're saying that any time there was a DUI,

12 even on the Sheriff's Department property, Sheriff's

13 Department's jurisdiction, that would always be an ICIB

14 investigation?  Is that your testimony?

15         MR. HAIG:  Objection, Your Honor.  That misstates

16 his testimony.

17         THE COURT:  Overruled.  You can answer.

18         THE WITNESS:  I don't believe I said that, Mr. Fox.

19 What I said was if it was a DUI that was investigated, for

20 instance, or occurred in a jurisdiction of another police

21 agency, that agency was responsible for the investigation.  The

22 Sheriff's Department's ICIB did not conduct the investigation.

23 They just monitored the investigation of the handling agency.

24     And I believe, I'm not 100 percent sure, that when the

25 investigation was -- the criminal investigation was concluded,

1    that ICIB would then confer with IAB and recommend at what

2    point it would be okay for them to begin their administrative

3    investigation.

4    Q    (BY MR. FOX)  Mr. Tanaka, it sounds like we should

5    probably get into specifics here rather than go in

6    generalities.

7         You're aware also that IA and not ICIB has been assigned

8    to investigate serious crimes like a sergeant pulling a weapon

9    and threatening to shoot another sergeant; correct?  You know

10   which instance I'm referring to; correct?

11   A    I do, but I believe --

12   Q    And that was an IA investigation; correct?

13   A    Well, if there was any allegation of criminal conduct to

14   begin with, then that would have certainly been handled by ICIB

15   first.

16   Q    So you're saying that an allegation that a sergeant pulled

17   a weapon and threatened to shoot another sergeant is not a

18   criminal allegation?  Is that your testimony?

19   A    No, I didn't say that.  I -- it depends.  I don't -- I

20   don't know all the specifics of that case.  But as you stated,

21   it sure sounds like it's one that may have been referred to

22   ICIB first to see if there was any criminal conduct.  And then

23   if a determination was made that there wasn't, then it could be

24   referred to Internal Affairs at that time.

25   Q    Mr. Tanaka, you were part of a committee that oversaw that

 1    investigation regarding that sergeant; correct?

 2    A     I was part of a committee that made the recommendation --

 3    or had the administrative hearing for discipline on that

 4    particular matter.

 5    Q     And because of the serious allegation, the sergeant was

 6    fired; correct?

 7    A     I don't -- I don't believe the sergeant was fired.

 8    Q     Because of the serious nature of the allegations, the

 9    sergeant must have been demoted, then; correct?

10    A     I don't believe the sergeant was demoted, at least at that

11    particular hearing.

12    Q     The sergeant received a few days off; correct?

13    A     Well, that particular review panel --

14    Q     Do you understand my question?

15    A     Yes.

16    Q     The sergeant received a few days off; correct?

17    A     I don't believe it was a few days, sir.  I think it was in

18    that category that's considered significant discipline, and it

19    was in excess of -- it would have had to have been in excess of

20    15 days or more.

21    Q     Mr. Tanaka, you testified on Friday that the gray area was

22    something that was routine for you to say; correct?

23    A     Yes.

24    Q     You said it hundreds of times when you were the assistant

25    sheriff over patrol; correct?

```
 1   A     Not just when I was the assistant sheriff over patrol.  I
 2   began making -- having those kinds of conversations years
 3   earlier at other ranks also.
 4   Q     So when you were assistant sheriff over custody, you also
 5   made the gray area comment to deputies; correct?
 6   A     I don't have -- I mean, I don't specifically recall
 7   that -- we're talking more than ten years ago -- but I know
 8   that I've had many discussions in that same vein.
 9   Q     And your testimony is that you've made that statement
10   hundreds of times, that speech about the gray area hundreds of
11   times; correct?
12   A     A speech about the area in between the lines and doing the
13   right thing.
14   Q     And you told deputies at every patrol station that you
15   visited that they should be operating in the gray area; that
16   was your testimony from Friday; correct?
17   A     No, that wasn't.  I said that sometimes I described it as
18   a gray area, the area between the line of the law and right or
19   wrong.  Sometimes I described it, I remember using the term a
20   green area or a football field.  And I made it very clear there
21   were boundaries, and if you stepped on the line, it was out of
22   bounds.  And I made it very clear that that was not -- would
23   not be tolerated.
24   Q     Mr. Tanaka, on Friday you testified that you had the
25   discussion about the gray area at every command you visited;
```

1    correct?

2    A    I don't know about every command, but that's likely.

3    Q    So, for example, you must have said it at Century Station

4    with Mr. Roller present in 2007; correct?

5    A    Sir, that was nine years ago.  I'm --

6    Q    It was a command you visited; correct?

7    A    It was a command I visited.

8    Q    In 2007; right?

9    A    Yes.

10   Q    And you remember how you described the gray area to

11   deputies and Pat Maxwell in 2009; correct?

12   A    I don't recall exactly what I said at Norwalk.  And

13   actually it was 2007, in my belief, not 2009.  I couldn't tell

14   you the exact words that I used.

15   Q    And it's your testimony that the reason why you can

16   describe what words you used is because this was part of your

17   routine; correct?

18   A    It was a pretty regular part of the discussions I had with

19   the members of our Department.

20   Q    And it's your testimony that there was nothing improper

21   about your gray area speech; correct?

22   A    No, sir.  I didn't think there was -- if I thought it was

23   improper, I certainly wouldn't have given it and --

24   Q    Well, when you were first publicly questioned about the

25   gray area, you denied that the gray area was a routine part of

**UNITED STATES DISTRICT COURT**

1    your presentations; correct?

2    A    I don't believe so.

3    Q    You answered questions before the Citizens' Commission on

4    Jail Violence on July 27th, 2012; correct?

5    A    I don't remember the date, but I went before that panel.

6    Q    And that commission was set up to try to determine what

7    led to the problems at Men's Central Jail; correct?

8    A    I believe so.

9    Q    And you said before this commission that the gray area was

10   not a routine part of your discussion; correct?

11   A    I don't know if that was in the context of what they were

12   trying to infer, that -- Pat Maxwell's comments that he

13   interpreted, at least he says he interpreted, my comments of

14   the gray area to mean operating outside the lines of the law.

15   Q    Mr. Tanaka --

16   A    And I don't know the context of what that jail

17   commission's questioning was.

18   Q    Mr. Tanaka, you said before the commission that your gray

19   area comment was not a routine part of your discussion;

20   correct?

21   A    You have the transcript.  But I don't remember, because

22   I -- it was a regular part of my discussions for many years.

23   Q    Mr. Tanaka, you actually have the transcript too.

24       Could you please turn to -- there's one that should say

25   "Tanaka Binder" on it.

```
 1   A      I think they all do.
 2          MR. FOX:  Your Honor, this is Exhibit 7.
 3   Q      (BY MR. FOX)  First of all, I'd just like you to look and
 4   see if you recognize this as being the transcript of your
 5   statements before the CCJV.
 6   A      This entire notebook?
 7   Q      Number 7, please.  It's the first one actually in your
 8   binder.
 9          Do you see it?
10   A      I do.
11   Q      Okay.  Do you see that?
12   A      I see it.
13   Q      Do you recognize that as a transcript of your testimony
14   before the Citizens' Commission on Jail Violence?
15   A      I will -- yes, I'm assuming it is the -- that transcript.
16   Q      Well, you recognize your words in there; correct?
17   A      Sir, I -- I don't know if I've ever reviewed this, this
18   testimony, so I --
19   Q      Would it refresh your recollection to review this
20   testimony to determine whether you made the comment that the
21   gray area was not a routine part of your discussions,
22   Mr. Tanaka?
23   A      It might.
24   Q      Okay.  Can I have you turn then to page -- do you see the
25   Bates number -- you know what a Bates number is; right?
```

44

```
 1    A    I do not.
 2    Q    Okay.  See the bottom right-hand corner of the pages where
 3    it has an A number?
 4    A    I do.
 5    Q    I'm asking you to turn to A129845, starting at line 12 and
 6    going to line 24.
 7         Do you see that?  Please close the binder.
 8    A    I do.
 9    Q    Okay.  Please close the binder.
10         Mr. Tanaka, you told the Citizens' Commission on Jail
11    Violence that the gray area was not a routine part of your
12    discussion; correct?
13    A    That's what it says.
14    Q    That's what you said?
15    A    Yes.
16    Q    And you said you only used it on occasion; correct?
17    A    That's what I said to the jail commission, correct.
18    Q    Now, Mr. Tanaka, on Friday you discussed the fact that you
19    were obligated to follow orders of people above you, correct,
20    lawful orders of people above you?
21    A    Yes.
22    Q    And what you mean by an order is a supervisor telling you
23    to do something in the Sheriff's Department.  That's what's
24    referred to as an order; correct?
25    A    Yes.
```

1    Q    And if you told someone below you to do something, that

2    would be an order; correct?

3    A    That would be an order.

4    Q    And it's not that you go over to somebody and necessarily

5    have to say "I order you to do this."  If there's any direction

6    from you, that would be considered an order; correct?

7    A    Yes.

8    Q    And it's something that someone below you would be

9    expected to follow; correct?

10   A    If it's a lawful order, correct.

11   Q    And, Mr. Tanaka, the primary role of a supervisor --

12   actually, before I get into that -- and same thing with the

13   Sheriff; when you were undersheriff, if Mr. Baca gave you a

14   direction without using the word "order," you would still be

15   obligated to follow it if it was a lawful order; correct?

16   A    Yes.

17   Q    And you couldn't do it in any way that would break the

18   law, however; correct?

19   A    Of course.

20   Q    And, Mr. Tanaka, the primary role of a supervisor is to

21   ensure that people that are assigned to you are doing the job

22   they're supposed to be doing; correct?

23   A    Yes.

24   Q    And the primary role is to also ensure that they're doing

25   it in the manner they're supposed to be doing it; correct?

1    A      Supposed to be doing it in a competent fashion and as

2    prescribed by law.

3    Q      And you testified on Friday that you would never tell a

4    supervisor to abdicate their responsibility to supervise the

5    people they were charged with supervising; correct?

6    A      Can you repeat that?

7    Q      Sure.  You testified on Friday that you would never tell a

8    supervisor to abdicate their responsibility to supervise the

9    people they were charged with supervising; correct?

10   A      Yes, that would be correct.

11   Q      But in August and September of 2011, Mr. Baca was asking

12   you questions about the Anthony Brown operation; correct?

13   A      Yes, he did ask questions.

14   Q      In fact, he was asking you for updates on what was going

15   on with the operation with OSJ and ICIB; correct?

16   A      I think there were a few occasions in which he asked for

17   an update on the investigation.

18   Q      You say "a few occasions," but your testimony on Friday

19   was that at every possible chance you saw him and communicated

20   with him, he asked you about the OSJ and ICIB operation;

21   correct?

22   A      Well, but we didn't have interaction on a daily basis.  He

23   was -- you know, he wasn't -- was in the office a lot less than

24   I was, and he had more community responsibilities.  But --

25   Q      It was your testimony on Friday that every time you

1    communicated with him, whether it was in person or on the

2    phone, during this time period he would ask you for updates on

3    what was going on; correct?

4    A    For a period of probably about maybe two weeks.

5    Q    And your testimony on Friday was that even as a supervisor

6    of OSJ and ICIB, you did not have the updates he was looking

7    for; correct?

8    A    I did not always have the information that he was looking

9    for.

10   Q    In August 2011, ICIB was reporting directly to you;

11   correct?

12   A    When was that, sir?

13   Q    When you were undersheriff.

14   A    At the front end of being the undersheriff, correct.

15   Q    In August of 2011 -- let's take that month.

16        In August of 2011, ICIB was reporting directly to you;

17   correct?

18   A    They were reporting directly to myself and also directly

19   to the Sheriff.

20   Q    Mr. Tanaka, the line of report went to you; correct?

21   A    On paper it may have, but the fact of the matter is they

22   were reporting directly both to me and directly to

23   Sheriff Baca.

24   Q    And the paperwork that they would produce in their

25   investigations, ICIB would state Office of the Undersheriff on

1  top; correct?

2  A     That's possible.  I don't remember.

3  Q     And you supervised Tom Carey directly; that was the direct

4  report; correct?

5  A     As I indicated, yes, that he reported directly to me and

6  he reported directly to Sheriff Baca.

7  Q     Mr. Thompson was reporting also directly to you and

8  Mr. Baca with respect to Anthony Brown; correct?

9  A     I -- he may have been reporting to others in his chain of

10 command.  I don't know.  But he and I did have contact, if

11 that's what you're asking.

12 Q     No.  I'm asking you whether Mr. Thompson was reporting

13 directly to you and Mr. Baca with respect to Anthony Brown.

14 A     I don't know if he was reporting anything through his

15 chain of command because he had a separate chain of command.  I

16 know he reported directly to me on Anthony Brown matters, but

17 what I'm saying is I don't know if he also reported to anybody

18 else in his chain of command.

19 Q     Nobody else from his chain of command, of course, was

20 reporting to you on Anthony Brown; correct?

21 A     I don't remember, but I don't think so.

22 Q     Okay.  So Mr. Thompson then was reporting directly to you

23 on the Anthony Brown matter; correct?

24 A     On occasion -- or on certain instances he would.

25 Q     And, Mr. Tanaka, Mr. Carey was reporting information

1   directly to you and Mr. Baca with respect to ICIB's operation

2   in the matter; correct?

3   A     Yes, that's correct.

4   Q     And Mr. Leavins, your former aide, was reporting directly

5   to you and Mr. Baca with respect to ICIB's operation in the

6   matter; correct?

7   A     That is correct, sir.

8   Q     It's your testimony -- it was your testimony on Friday

9   that when Mr. Baca asked about the operation, there were many

10  times that you could not provide him with the answers that he

11  needed; correct?

12  A     You know, I may have used the word "many," but we're

13  talking in a two-week period.  "Many" is a relative term.  But

14  I was not able to provide the Sheriff with the kinds of answers

15  he needed.  So it's -- I always made it -- I mean, in most

16  cases when the Sheriff asked me questions about any matter, I

17  would refer him to the individual that was handling it.

18        So in this case, I would either ask for an update so that

19  I could give it to him, but more often I just had him -- I had

20  the investigators or Steve Leavins or Tom Carey call the

21  Sheriff directly because they had the details that he was

22  looking for.

23  Q     Mr. Tanaka, as you just stated, it's your testimony that

24  you would have the investigator call Mr. Baca with the updates;

25  correct?

1   A    Or go and see him.

2   Q    Well, on Friday it was that you would have the

3   investigator call Mr. Baca; correct?

4   A    I'm sorry.  It -- sometimes if they were in the building

5   and the Sheriff was in the building, I would just let -- ask

6   them to go and see him.

7   Q    All right.  Well, let's look at Government Exhibit 172.

8        Mr. Tanaka, I'm publishing the summary chart of calls

9   involving many of the people that have been discussed in this

10  trial.

11       Do you see that there, for August 18th, the first page of

12  this exhibit?

13  A    I do.

14  Q    Okay.  You testified on Friday that the 5000 number was

15  Mr. Baca's personal number; correct?

16  A    Well, it rang in his office, and it was answered by his

17  secretaries.

18  Q    When you say "it rang in his office," you're not talking

19  about Mr. Baca's desk; you're talking about the office of the

20  Sheriff generally; correct?

21  A    Well, it would ring at his desk, and it would ring, I

22  believe, in the cubicles of his secretaries and his aides.  And

23  there were probably about five or six other desks.

24  Q    So every time somebody would call the general number for

25  the Sheriff's Department, it would ring at his desk; is that

1  correct?

2  A    That's not correct.  That wasn't the general number.  The

3  general number to Sheriff's Headquarters Bureau was a

4  (323) 267-number, and I can't remember it.

5  Q    Have you ever called the 5000 number?

6  A    Have I ever called the 5000 number?

7  Q    That's my question.

8  A    Yes.

9  Q    Did Mr. Baca ever answer the 5000 number?

10 A    Well, he didn't answer his desk line, but it was answered

11 by his -- either his secretary or his aide.

12 Q    And it's a switchboard for the Sheriff's Department;

13 correct?

14 A    No, sir, that's not correct.  It was to his office.  It

15 only rang in his office area.

16 Q    Mr. Tanaka, in 172 I'd like you to look at the first page

17 of this exhibit and identify for me where Tom Carey, Greg

18 Thompson, Steve Leavins, Maricela Long, Scott Craig call

19 Mr. Baca.

20     See anything on the 18th, on this first page?

21 A    No, I do not.

22 Q    It's you and -- the only thing that's reflected on here in

23 terms of calls with Mr. Baca is you and Mr. Baca speaking at

24 5:57 p.m., correct, a nine-minute call?

25 A    Well, there's a call missing then because I didn't

1    initiate the call to him that evening.  He called me on my cell

2    phone, and I don't know whether that was from his desk or

3    whether it was from his cell phone.  And I don't see that

4    listed here.

5    Q    Well, you see that he's calling from his cell phone two

6    minutes beforehand throughout -- actually from 5:40 to 5:55.

7         You see that the chart indicates that he's using his cell

8    phone; correct?

9    A    Yes.

10   Q    Okay.  And now I want you, Mr. Tanaka, to look at page 2

11   of this exhibit, calls on August 18th from 7:42 to 10:15.

12        You don't see any calls between Mr. Baca and any of the

13   OSJ or ICIB people, do you?

14   A    I do not.

15   Q    Showing you August 19th, the first page, from 6:00 a.m. to

16   4:06 p.m., you don't see any calls between Mr. Baca and any of

17   the OSJ or ICIB people, do you?

18   A    I don't -- I don't believe so.

19   Q    Let's go to the next page, August 19th, 4:07 to 7:27.

20        Once again, you don't see any calls between Mr. Baca and

21   any of the OSJ or ICIB people, do you?

22   A    Well, there are some unidentified numbers that -- you

23   know, the cell phones that we had had been set up to where some

24   of the numbers would pop up like "unavailable," like they are

25   here.  And there looks like there's some calls between

1    unavailable and ICIB and unavailable and the OSJ people.  So

2    I --

3    Q    You see on this chart --

4    A    -- those I wouldn't know.

5    Q    You see on this chart, Mr. Tanaka, how Mr. Thompson's

6    county-issued cell shows up and so does Mr. Carey's

7    county-issued cell?

8    A    Is that how it shows up on the phone records, or is this

9    a --

10   Q    Do you see the chart?  I'm asking you to read the chart.

11   A    Right.

12   Q    You see on the chart how it says "Thompson, county-issued

13   cell"?

14   A    Yes.

15   Q    You see on the chart how it says "Carey, county-issued

16   cell"?

17   A    But this is a created document; right?  This isn't the

18   phone records, the actual phone records.

19   Q    Do you think you'd feel better if --

20   A    I don't know --

21   Q    -- you looked at the phone records?

22   A    -- because the -- I'm just saying that like the

23   unavailable calls, I'm just not sure that -- were the -- either

24   are originating from or where they're ending up when it says

25   "unavailable."

54

1  Q    I understand that you're not sure what the underlying

2  phone records might show.  I'm asking you to stick to the

3  chart.

4       Do you understand me?

5  A    I am reading the chart.

6  Q    All right.  And I'm sticking to the identified numbers in

7  the chart.

8       Do you understand me?

9  A    I do.

10 Q    Okay.  There are calls between you and Mr. Baca on this

11 date; correct?  See the calls I've highlighted, one at

12 5:09 p.m. and one at 7:22 p.m.?

13 A    Yes.

14 Q    Those are calls between you and Mr. Baca?

15 A    From his phone to mine, yes.

16 Q    Mr. Tanaka, let's move on now to 7:32 p.m. to 9:12 p.m. on

17 August 19th.  There are no calls between Mr. Baca and any

18 member of ICIB or OSJ during this time period; correct?

19 A    Looks that way, yes.

20 Q    There are calls with you and some of these people;

21 correct?  You and Mr. Thompson at 7:39 -- or, excuse me, 7:37?

22 A    Yes.

23 Q    Once again, you and Baca at 8:07; correct?

24 A    Yes.

25 Q    Now let's move on to the 23rd.

1          Once again, please, Mr. Tanaka, identify for me on this

2    chart any calls between you -- I'm sorry, between Mr. Baca and

3    any member of OSJ or ICIB on August 23rd.

4    A    I don't -- on this chart it does not reflect any calls

5    involving Sheriff Baca's telephone line.

6    Q    And on the second page of August 23rd, from 12:22 p.m. to

7    9:11 p.m. does not reflect any calls between Mr. Baca and any

8    member of OSJ or ICIB; correct?

9    A    Not on this chart, correct.

10   Q    However, there are several calls involving you and these

11   people; correct?  One at 12:23 p.m., another one at 12:29 p.m.,

12   another one at 12:32 p.m.

13          See those?

14   A    Yes.  The calls that are going -- yes.

15   Q    And then, Mr. Tanaka, you see that evening calls between

16   you and Mr. Leavins at 9:00 p.m., a little after 9:00 p.m. that

17   day; correct?

18   A    Yes.

19   Q    And there's another one at 9:11 p.m., a six-minute call.

20          Do you see that at the bottom of the page?

21   A    Yes.

22   Q    Let's move on to August 25th.

23          6:30 a.m. to 12:08 p.m., see any calls between Mr. Baca

24   and any member of ICIB or OSJ on August 25th during these

25   times?

1    A    I don't see the Sheriff's phone listed here.

2    Q    There are calls involving you, however.

3         Do you see those?

4    A    I do.

5    Q    10:44 a.m. -- sorry, I missed one.  Yeah, we'll start with

6    the 10:44 a.m. and 10:47 a.m.  You called Mr. Thompson and then

7    Mr. Carey, correct, according to this chart?

8    A    According to this chart, that's correct.

9    Q    And then at 10:55 a.m., Mr. Carey called you, according to

10   this chart; correct?

11   A    Yes.

12   Q    Moving on to the second page of August 25th, this second

13   page reflects only calls between 12:10 p.m. and 2:06 p.m.

14        See any calls involving Mr. Baca and any member of ICIB or

15   OSJ?

16   A    I do not.

17   Q    Again, busy day, so now we're going to talk about the

18   third page on the 25th.

19        See any calls between Mr. Baca and any member of ICIB or

20   OSJ from 2:16 p.m. to 11:51 p.m.?

21   A    I don't see any on this chart.

22   Q    To go over a few of your calls on this chart, Mr. Tanaka,

23   you called Sheriff's Headquarters Bureau at 6:27 p.m.,

24   Mr. Carey at 6:48 p.m. and again at 6:53 p.m.

25        Do you see that on this chart?

1    A    I do.

2    Q    And then Mr. Carey called you at eight o'clock p.m.;

3    correct?

4    A    Yes.

5    Q    According to this chart?

6    A    Yes.

7    Q    And at 9:37 p.m. you received another call from Mr. Carey;

8    correct?

9    A    Yes.

10   Q    Now, the two-week period you're talking about, you've

11   mentioned before that you were only involved in this for a

12   two-week period.

13        Are we talking about August 18th to the end of August?  Is

14   that your testimony?

15        MR. HAIG:  Objection, Your Honor, this misstates his

16   testimony.  And the form of the question as well.

17        THE COURT:  Overruled.  You can answer.

18        THE WITNESS:  I was just thinking that this was

19   about a two-week period.

20   Q    (BY MR. FOX)  I'm sorry, I'm trying to figure out --

21   A    From August 18th until -- it might have been a little bit

22   longer.  I believe it went sometime into September.

23   Q    About September 26th?

24        I mean, you're certainly aware by now, Mr. Tanaka, that

25   Special Agent Marx was approached by sergeants within ICIB on

```
 1    September 26th; correct?

 2    A    Yes.

 3    Q    Okay.  So let's look now at August 26th.

 4         And showing you a chart from 12:20 a.m. to 11:06 a.m., you

 5    don't see any calls between Mr. Baca and any member of ICIB or

 6    OSJ; correct?

 7    A    I don't see the Sheriff's number referenced on this chart.

 8    Q    How about the second page of August 26th, do you see

 9    Mr. Baca's number referenced on this chart?

10    A    Just once.

11    Q    Do you see the one that's down --

12    A    Yeah, just the one that -- from my county-issued cell

13    phone to his.

14    Q    Do you see any other calls between Mr. Baca and any member

15    of OSJ or ICIB on this page?

16    A    I don't see any other reference to the Sheriff's number on

17    this page.

18    Q    Mr. Tanaka, showing you now the next page of August 26th

19    from 4:28 p.m. to 9:33 p.m.

20         There is one call between Mr. Baca and a member of ICIB at

21    5:57 p.m.; correct?

22    A    Yes, there was.

23    Q    That's the only call that you see between a member of OSJ

24    and ICIB on this chart from August 18th to September 26th;

25    correct?
```

```
 1              MR. HAIG:  Objection, Your Honor.  Misstates the

 2   evidence.  It's August 26th.

 3              MR. FOX:  I think I said it correctly, Your Honor.

 4              MR. HAIG:  No, he said September 26th, and this

 5   chart says August 26th.

 6              MR. FOX:  Your Honor, I'll be happy to clarify my

 7   question.

 8              THE COURT:  Let's rephrase the question.

 9              MR. FOX:  Yes.  Thank you.

10   Q    (BY MR. FOX)  Mr. Tanaka, forget about this page right

11   here.  You have the hard copy of the exhibit in front of you,

12   Number 172.  Happy to have you sit there and look at it from

13   August 26th on and tell me if you see any other calls between

14   Mr. Baca and ICIB or OSJ from August 26th to September 26th.

15        You want to do that?

16   A    If you believe that it's -- is that what you want me to

17   do?

18   Q    Do you have any reason to believe that that chart will

19   reflect any additional calls between Mr. Baca and members of

20   OSJ or ICIB from August 26th to September 26th of 2011?

21   A    Well, based on the way you're asking, I'm going to assume

22   that there are none.

23   Q    Now, Mr. Tanaka, you mentioned on Friday that you speak to

24   ICIB -- or at this time you spoke to ICIB about another issue.

25        It wasn't all about this operation; correct?
```

```
 1  A     There were a number of matters that I spoke with ICIB
 2  about.
 3  Q     The one that you mentioned on Friday was the ACLU
 4  declarations; correct?
 5  A     Yes.
 6  Q     And Exhibit 59, which I'm publishing, these are the ACLU
 7  declarations you're talking about, or is it something else?
 8  A     It appears to be similar, but I can't tell anymore.  But
 9  I'm just guessing, it was around somewhere, time-wise, probably
10  in the neighborhood.
11  Q     Okay.  So around September 12th is around the time period
12  you're talking about beginning to speak to ICIB about these
13  ACLU declarations; correct?
14  A     I -- I really don't know when the ACLU declarations were
15  made public and when ICIB began investigating them.
16  Q     Well, any reason to believe that ICIB began investigating
17  the ACLU declarations before Mr. Gennaco forwarded them the
18  list of ACLU declarations?
19  A     I -- you know, in the context of this, sir, I'm not really
20  sure.  There was a press conference that the ACLU had in which
21  they announced their intention to file these complaints, and
22  that would have probably been the origination of ICIB's
23  involvement.
24  Q     That press conference was at the end of September of 2011;
25  isn't that correct, Mr. Tanaka?
```

**UNITED STATES DISTRICT COURT**

```
1   A     I don't know.

2   Q     Now let's look at these declarations just very briefly.

3   This is an attachment to the exhibit.

4        Mr. Tanaka, the majority of these incidents had already

5   been investigated by the Sheriff's Department; correct?

6   A     I really couldn't say.  I just know that a large number of

7   complaints -- I believe it was in excess of 40 that came in,

8   and I don't know whether or not they had been previously

9   investigated or not.

10  Q     Do you see these attachments to the e-mail I just showed

11  you showing in the middle column that the date the review was

12  completed was in 2010?  Do you see that?

13  A     I see that.

14  Q     And you see on the right that for a vast majority or all

15  of them that there was no discipline that any of the deputies

16  received as a result of the Sheriff's Department investigation;

17  is that correct?

18  A     On this chart that you're showing inmate names and the --

19  yeah, the -- where there's a disposition of closed,

20  unfounded -- the terminology used in the Sheriff's Department,

21  "unfounded" meant that there was no finding of wrongdoing.

22  Q     So by 2010 the Sheriff's Department had concluded that in

23  all these instances involving the ACLU declarations that the

24  allegations were unfounded; is that correct?

25  A     Are these the inmates that were part of the ACLU
```

1    declaration?

2    Q    These are the attachments to the e-mail I was just showing

3    you.  Let me show you.  You've got it in front of you again.

4    If you want to look at it in hard copy, if that's easier for

5    you --

6    A    No, no.  I understand what you're saying now; that it

7    was -- it's the attachment for this e-mail.

8    Q    Mr. Tanaka, the goal in having ICIB look at this was not

9    to reopen an IA investigation that was unfounded, but it was

10   trying to find out what would lead the Sheriff's Department to

11   whatever the feds were looking at; correct?

12   A    No.  The ACLU complaints that came out, the Sheriff made a

13   public proclamation that each and every case would be

14   investigated, and I believe that he had actually stated

15   publicly that every single case -- every complaint would be

16   investigated, fully investigated and completed by October.  And

17   that I remember because the ICIB team was very -- they were

18   having difficulties with that, because they didn't think it

19   would be possible with the number of personnel that they had to

20   be able to complete all of these investigations in the manner

21   in which they needed to be done.

22   Q    Mr. Tanaka, please read for the jury Mr. Carey's statement

23   in this e-mail that I've highlighted for you.

24   A    It says "The list of complaints out of CJ probably lead

25   us, in part, to where/what the feds are looking at."

1  Q    Now, Mr. Tanaka, you would agree with me, as we move to

2  Anthony Brown now, that if you were concerned about deputies

3  abusing Mr. Brown, you certainly could have ordered deputies to

4  stay away from Mr. Brown; correct?

5  A    I could have issued that order.

6  Q    You, Mr. Tanaka, could have issued that order.  And if you

7  were concerned about deputies abusing Mr. Brown, you could have

8  placed Mr. Brown in a cell with cameras trained on his cell to

9  see who was approaching him at all times; correct?

10 A    In theory, that is correct.

11 Q    And at the time you were aware that he was in such a cell

12 from August 18th to August 23rd of 2011; correct?

13 A    A lot of what I -- his housing locations I've learned long

14 after the fact.  During that particular time in August of '11,

15 I don't know if I was actually aware specifically of where he

16 was housed.

17 Q    You may have been aware at the time that he was in a cell

18 with a camera trained on him from August 18th to August 23rd of

19 2011; correct?

20 A    That is possible.

21 Q    It's possible that you may have been aware?

22 A    It's possible that I may have been aware of exactly what

23 his housing situation was.

24 Q    Mr. Tanaka, if the goal was to protect Mr. Brown's life

25 from deputies, he certainly could have been transferred to

```
 1  state custody if he was already designated there; correct?
 2  A    He could have been.  If he was a sentenced state prisoner,
 3  then he could have been.
 4  Q    And you're familiar, I'm sure, with -- SP4 means you're a
 5  sentenced state prisoner; correct?
 6  A    I don't remember the exact numbers.  But, yes, if you're a
 7  sentenced state prisoner, then you're eligible to be
 8  transferred to the state when they say there's room.
 9  Q    If the goal was to save Mr. Brown's life, there's no
10  reason why the FBI should be kept from Mr. Brown; correct?
11  A    If the goal was to save his life?
12  Q    Yes.
13  A    Not unless there was a belief that he could be harmed.
14  Q    If the goal was to save Mr. Brown's life, there's no
15  reason why the FBI should have been kept from him; correct?
16  A    I believe at the time that he was kept apart was -- it was
17  in the initial stages of a confusing situation and an
18  investigation, and the Sheriff's orders were just to keep him
19  separate -- or keep him and to keep him safe.
20  Q    Did you understand my question?
21  A    Yes.
22  Q    If the goal was to save his life, there's no reason why
23  the FBI should have been kept from him; correct?
24  A    Again, there was that investigation that the inmate made
25  some allegations, and it was necessary for the Sheriff's
```

1    Department to conduct an investigation to find out exactly what

2    the inmate had to say.

3             MR. FOX:  Your Honor, I'd like to read from

4    Exhibit 186, lines 69 -- I'm sorry, page 69, lines 21 to 23.

5    186 -- it's part of that binder you have there -- 69, lines 21

6    to 23.

7             MR. HAIG:  We have no objection, Your Honor.

8             THE COURT:  All right.  Go ahead.

9             MR. FOX:  And this is from --

10        (Plaintiff's counsel conferred off the record.)

11            MR. FOX:  Your Honor, we may need to remark this

12   exhibit.  We may have a duplicate exhibit.  May I read from

13   this?

14            THE COURT:  That's fine.

15            MR. FOX:  Okay.  And this is, again -- just so it's

16   clear since we've got some confusion, this is from Mr. Tanaka's

17   December 19th, 2012 testimony before the grand jury.

18        "Question:  If the goal was to save his life, there's no

19   reason why the FBI couldn't talk to Anthony Brown; correct?

20        "Answer:  True."

21   Q    (BY MR. FOX)  Mr. Tanaka, if Mr. Brown was afraid for his

22   life, there's no reason why the federal grand jury couldn't

23   hear his testimony; correct?

24   A    That's correct.

25   Q    Now, Mr. Tanaka, you testified on Friday --

1          (Plaintiff's counsel conferred off the record.)

2     Q    (BY MR. FOX)  You testified on Friday that Mr. Baca told

3     you about his phone call with the FBI during the August 20th

4     meeting, correct, the Saturday meeting?

5     A    I believe he said -- you know, again, I don't remember

6     exactly when he told me that he had discussed with Mr. Martinez

7     that the phone belonged to the FBI, but the initial call about

8     the phone came on the 18th.

9     Q    And it was a rather memorable call; correct?

10    A    Memorable in the fact that the Sheriff was not happy.

11    Q    And he was upset because the phone was an FBI phone, he

12    had learned from Mr. Martinez; correct?

13    A    You know, I don't remember exactly.  I just remember him

14    being upset and, you know, very short about did we confiscate a

15    phone in the jails.  And I don't remember if he said at that

16    time anything more, other than he just wanted to know if we had

17    recovered a cell phone in the jails.

18    Q    Mr. Tanaka, in that August 18th call, Mr. Baca told you

19    that he'd received a call from the assistant director of the

20    FBI, Steve Martinez; correct?

21    A    It's possible that he told me that night.  I just -- it

22    was either the 18, 19 or 20, and it's possible that it was on

23    that first call on the 18th.

24    Q    And he was very upset during this call; correct?

25    A    Yes.  He was not happy.

**UNITED STATES DISTRICT COURT**

Q    And according to Mr. Baca, what was so unusual about the

phone being found when he was calling you on the 18th, was that

he had received a call from the FBI assistant director, Steve

Martinez; correct?

A    Again, it's possible he told me that on the 18th.  But at

some point, certainly, in the next day or two, if it wasn't on

the 18th, that is exactly what he said.

Q    As of December of 2012, your recollection was that

Mr. Baca had informed you on August 18th that he had received a

call from the FBI assistant director, Steve Martinez, about

that phone; correct?

A    If that was my testimony in December '12, it's probably

going to be a little better memory than it is four years later.

Q    Showing you now Exhibit 15.

     That night after you received a call from Mr. Baca, your

aide set up a meeting for you the next day at 1:30 with members

of ICIB and OSJ; correct?

A    It's addressed to ICIB captain and IAB lieutenant and the

OSJ lieutenant.

Q    Well, in this -- these were criminal allegations; right?

A    I'm not sure that any determination had been made at that

point.

Q    About a deputy bringing in a cell?  There hadn't been a

determination made that this was going to be criminal?

A    I -- on the 18th, I'm not -- I don't remember anybody

1   talking about that this involved a deputy sheriff.

2   Q    That it involved an employee of the Sheriff's Department?

3   A    I -- I -- I don't know.

4   Q    You don't remember learning that Mr. Brown initially said

5   that a nurse brought him the phone?

6   A    I learned about information obtained during an interview

7   with Mr. Brown sometime after that Saturday meeting, after the

8   20th.

9   Q    You testified -- well, let me show you -- so you had a

10  meeting at 1:30 on the 19th, correct, with IAB, OSJ and ICIB;

11  correct?

12  A    I think we've had this discussion, and I -- it's very

13  possible, but I don't have any recollection of a Friday

14  meeting, and I don't believe I've ever recalled having a Friday

15  meeting.  I know that there's others that said that one

16  occurred, and it's very possible.

17  Q    And this meeting was to be held in your office; correct?

18  A    That's what the memo says, yes, sir.

19  Q    Showing you Exhibit 2.

20       That's this office, correct, where I marked with the red?

21  A    Yes.

22  Q    And later on August 19th, there was a meeting scheduled

23  with the sheriffs in the executive planning room that I'm

24  hitting right there.

25       Do you see that red dot?

1    A     I do.

2    Q     And Mr. Baca's office is right here with this dot;

3    correct?

4    A     Yes.

5    Q     And there's a smaller conference room right there where I

6    hit that dot; correct?

7    A     Yes.

8    Q     These were the four rooms you're aware that were swept to

9    see if there were bugs located in them, listening devices

10   located in them on September 2nd, 2011; correct?

11   A     I did hear that, yes.

12   Q     Mr. Tanaka, you were informed during your initial meetings

13   with OSJ and ICIB what Anthony Brown told the deputies about

14   the federal investigation; correct?

15   A     On the August -- at the August 20th meeting?

16   Q     Well, whether it's the 19th or the 20th, you were informed

17   of what the Sheriff's Department knew at that time from

18   speaking to Mr. Brown; correct?

19   A     My recollection is that a timeline of sorts -- at least it

20   was verbally presented to the Sheriff about when the phone was

21   found and/or how it was found -- I don't remember any

22   discussion of any interview information that had taken place

23   with Anthony Brown at that time.  It's possible it occurred, I

24   just don't remember -- I thought the interviews of Anthony

25   Brown took place after the 20th meeting, because the Sheriff at

1    that meeting ordered Internal Criminal Investigations to

2    interview Anthony Brown.

3            MR. FOX:  Your Honor, I'm going to play a clip from

4    Exhibit 21.  This is the -- and just for the record, this is

5    the August 19th recording between Mr. Smith, Mr. Manzo and

6    Mr. Brown.

7        (Exhibit 21 played in open court.)

8    Q    (BY MR. FOX)  Mr. Tanaka, this was the information that

9    was provided to you in the August 19th and August 20th

10   meetings, correct, about the feds being here setting up

11   transactions?

12   A    That's possible.  I -- I don't -- the only thing I recall

13   about -- again, I don't recall a 19th meeting.  What I recall

14   of the 20th meeting is Sheriff asking for a briefing about

15   everything that was known to date about the phone and about the

16   inmate, ordering Internal Criminal Investigations to interview

17   the inmate to find out anything and everything that he had to

18   offer.  And I don't remember anybody -- the briefing at least,

19   I don't remember them giving any kind of detailed information

20   like this.

21   Q    Mr. Tanaka, the safety of Anthony Brown was not a concern

22   raised at the Saturday, August 20th meeting by Mr. Baca;

23   correct?

24   A    It doesn't mean that it didn't occur.  I don't remember

25   him raising it at that particular meeting.

1  Q    Okay.  And you testified on Friday that you didn't know by

2  the Saturday meeting if the FBI's actions were authorized by

3  the FBI by the Saturday meeting; correct?

4  A    I don't even know if there was any indication that other

5  than the phone -- other than Mr. Martinez telling Baca the

6  phone was theirs, I don't remember there being very much

7  information, because the investigation that was ordered by the

8  Sheriff took place -- the order took place that morning on the

9  20th.

10 Q    Did you understand my question?  I was asking about your

11 testimony on Friday.

12     On Friday you testified that you did not know that the

13 FBI's actions were authorized by the FBI by the Saturday

14 meeting; correct?

15 A    I don't know if that was a discussion, but I -- I don't

16 even know if that was a discussion that took place on Saturday.

17 Q    Sorry, I'm asking about your testimony on Friday.

18     On Friday you testified that you did not know by the

19 Saturday meeting that the FBI's actions were authorized by the

20 FBI; correct?

21 A    I would not have known that on the Saturday meeting, or at

22 least I did not know that at the Saturday meeting.

23 Q    The only thing you knew about the FBI was that the

24 assistant director had called Mr. Baca before the Saturday

25 meeting; correct?

1    A    I believe that would have been the -- at that point the

2    extent of what we knew with regards to the FBI and the phone.

3    Q    And, Mr. Tanaka, at the time of the August 20th meeting,

4    you did not have a concern that the cell phone had been

5    introduced by a rogue FBI agent; correct?

6    A    I don't believe the Sheriff had referenced that word,

7    "rogue" --

8    Q    But I'm talking about you.

9    A    -- at that meeting.

10   Q    Actually, I'm talking about you.  At the time of the

11   Saturday, August 20th meeting, you, Mr. Tanaka, didn't have a

12   concern that the cell phone was introduced by a rogue agent;

13   correct?

14   A    I don't believe there was enough information that was

15   available that I recall on that Saturday meeting to make any

16   determination.

17   Q    But you didn't have a concern at that meeting that there

18   was a rogue FBI agent; correct?

19   A    I did not have a concern at that meeting.

20   Q    You testified on Friday that Gilbert Michel's involvement

21   was raised during the Saturday meeting, and that's who you were

22   upset about.

23        Do you recall that?

24   A    I don't know that Gilbert Michel's involvement was brought

25   up at the August 20th meeting.

```
1    Q     But you testified --

2    A     I -- what I would have testified to or said was when I

3    found out through the interview of the inmate that a deputy had

4    confessed to smuggling in the phone, that is when I remember

5    getting upset because a deputy had done that.

6    Q     That was August 30th that Gilbert Michel confessed;

7    correct?  You heard --

8    A     I don't mean -- oh, I'm sorry.  Then whenever it was

9    presented that there was enough information that he had done

10   it, and it might have been when he confessed.

11   Q     Okay.  But you talked on Friday that you were upset during

12   the Saturday meeting; correct?

13   A     No, I don't believe so.  If I did, I was -- then I --

14   that's not what I meant to say.  I don't remember being upset

15   at the Saturday meeting.  It was just a briefing that was

16   presented to the Sheriff, and there wasn't really anything to

17   be upset about at that particular time.

18   Q     Mr. Tanaka, it was on August 20th that you spoke with OSJ

19   about changing the policy about FBI access to the jails;

20   correct?

21   A     I believe that the Sheriff made an inquiry that morning.

22   Q     Mr. Tanaka, I'm asking about you --

23   A     Okay.

24   Q     -- Mr. Tanaka.

25   A     I don't have --
```

```
 1   Q    On August 20th --
 2   A    -- any -- I do not have any specific recall about ordering
 3   a change in policy.  There was no order to change policy.  The
 4   order was to enforce the visitation policy.
 5   Q    Showing you Exhibit 21, e-mail from Greg Thompson to
 6   Crystal Miranda and also to himself, Greg Thompson.
 7        You know that Crystal Miranda at the time was an assistant
 8   of Mr. Rhambo's; correct?
 9   A    Yes.
10   Q    This is an August 20th at 9:00 p.m. e-mail, Mr. Thompson
11   indicating that he spoke to you that day; correct?
12   A    Yes.
13   Q    And that Mr. Rhambo was supposed to drop the hammer, and
14   they were ready on their end.
15        Do you see that?
16   A    I see that.
17   Q    This related to the -- coming up with a policy to keep the
18   FBI out of the jail; correct?
19   A    I don't know what this refers to.
20   Q    Well, Mr. Tanaka, it's the entry policy that he was
21   referring to, as shown by Exhibit 22.
22        Do you see that?
23   A    I do.
24   Q    And on the 23rd you learned from Mr. Thompson that the FBI
25   had gotten in to MCJ to see Anthony Brown; correct?
```

```
 1   A     I did learn that.
 2   Q     And you learned that in a meeting with Mr. Thompson and
 3   others; correct?
 4   A     I don't know if we had a meeting and I don't -- or I don't
 5   know if it was a phone call from either Mr. Thompson or from
 6   Captain Carey.
 7   Q     Showing you Exhibit 23, August 23rd at 3:57 p.m.
 8         Any reason to believe that when Mr. Thompson indicates
 9   "Delayed re  meeting with PT," that he's referring to anyone
10   but you with the initials PT?
11   A     No.  It's possible, but I'm just saying the initial
12   notification to me was, I believe, made via telephone.
13   Q     Okay.  But then there was a meeting which you've heard
14   referred to as a butt-chewing meeting; correct?
15   A     Yes.
16   Q     Okay.  And this was a meeting with you, Mr. Thompson and
17   others when you told Mr. Thompson, "You failed me"; correct?
18   A     That's not my recollection of what I said, and I -- I'm
19   assuming that, based on this, that we had a meeting.  I think
20   I've said all along I don't remember meeting with him.  I
21   thought it was on the phone, but certainly possible that it was
22   in person.  I don't remember anybody else, but I do remember
23   being upset with him that he had promised the Sheriff that he
24   would take care of the inmate security.  I told him that he
25   failed the Sheriff because he promised the Sheriff that he
```

1    would keep Anthony Brown safe and secure, and I said, "You

2    failed, so you go tell him."

3    Q    Okay.  So you recall that part.

4         You recall that you told Mr. Thompson, "You failed him, so

5    you go tell him"?

6    A    You know, I don't remember the exact words.  The word

7    "failed" has been used so many times, I probably adopted it as

8    my own.  I don't know that I said that, but I do remember

9    telling him, "You're the one that didn't do what you were

10   supposed to or what you promised the Sheriff, so you go tell

11   him yourself."

12   Q    Showing you Exhibit 25, on the first page, a message from

13   Greg Thompson to Cecil Rhambo.

14        When Mr. Thompson is saying "The last thing I want to hear

15   from you" -- meaning Mr. Rhambo, who he's e-mailing -- "him or

16   the Sheriff are the words 'You failed me,'" he's referring to

17   you saying, "You failed me"; correct?

18   A    Most likely.

19             THE COURT:  Is this a good time for our break?

20             MR. FOX:  Yes, Your Honor.

21             THE COURT:  All right.  Ladies and gentlemen, we're

22   going to take our first break of the day.  Again, I want to

23   remind you until this trial is over, you're not to discuss this

24   case with anyone, including your fellow jurors, members of your

25   family, people involved in the trial or anyone else, and do not

1 allow others to discuss the case with you.  This includes

2 discussing the case online, through blogs, bulletin boards, by

3 e-mails or text messages.  If anybody tries to communicate with

4 you about this case, please let me know about it immediately.

5 　　　Do not read, watch or listen to any news reports or other

6 accounts about the trial or anyone associated with it.  Do not

7 do any research such as consulting dictionaries, searching the

8 Internet or using other reference materials, and do not make

9 any investigation about the case on your own.

10 　　　Finally, you're reminded to keep an open mind until all of

11 the evidence has been received, you've heard the arguments of

12 counsel, the instructions of the Court and the views of your

13 fellow jurors.

14 　　　We'll come back at five after the hour.

15 　　　(The jury exited the courtroom.)

16 　　　　　THE DEPUTY CLERK:  Please be seated.

17 　　　　　THE COURT:  Okay.  Is there anything we need to take

18 up?

19 　　　　　MR. FOX:  No, Your Honor.

20 　　　　　MR. STEWARD:  Your Honor, we do have a motion for

21 reconsideration pending.  I wondered if the Court wanted to

22 take that up now or at the end of the day or...

23 　　　　　THE COURT:  I'm happy to take -- is there need to

24 take it up right now?

25 　　　　　MR. STEWARD:  No.

**UNITED STATES DISTRICT COURT**

```
1              THE COURT:  Okay.  I'll be happy to take it up
2    before we leave today.
3         (Off the record at 9:49 a.m.)
4         (On the record at 10:04 a.m.)
5              THE COURT:  Please be seated.
6         May I see counsel at sidebar.
7         (Discussion held at sidebar.)
8              THE COURT:  I believe this is your next issue.
9              MR. FOX:  Thank you, Your Honor.
10        I have laid out for you, and I spoke to the defense about
11   this, page A12995, which is part of Exhibit 7, this is the CCJV
12   testimony of Mr. Tanaka.  And in here, while he does not
13   reference Judge Hatter's ruling, he says that it was since
14   formed into a sinister gang -- or what -- he says something
15   sinister, excuse me, and this is in July of 2012.  He still had
16   this tattoo when he was arrested in 2015.  So his continued
17   membership in this organization that he learned became sinister
18   is relevant and probative to the issues that we've discussed.
19   He -- I'll let you look at that, and then I've got one other...
20        (Counsel conferred off the record.)
21        (Pause in proceedings.)
22             MR. FOX:  Your Honor, the other thing --
23             THE COURT:  Just one second.
24             MR. FOX:  Oh, sure.
25        (Pause in proceedings.)
```

1          (Counsel conferred off the record.)

2          THE COURT:  I think you probably wanted to start

3   over here.

4          Okay.  What else have you got?

5          MR. FOX:  And then this is an article, NPR online

6   during the Sheriff's race in which Mr. Tanaka is quoted, asked

7   about the judge's ruling, Judge Hatter's ruling, and scoffing

8   at the judge's characterization saying "It's no big thing, it

9   was a mascot," again showing he had knowledge of the judge's

10  ruling.  And again, we think that this is probative of the fact

11  that he still maintained this tattoo and still continues to

12  maintain this tattoo after his knowledge of the ruling and his

13  knowledge of its nefarious sinister purposes.

14          THE COURT:  I'm sorry.  What is this?

15          MR. FOX:  It's an article -- an NPR article, KPCC

16  article that was published online while he was running for

17  Sheriff in 2014.  They ask him about Judge Hatter's ruling, and

18  he --

19          THE COURT:  Where does it say that?

20          MR. FOX:  He was not named in the lawsuit, scoffs at

21  the judge's characterizations saying it was no big thing, the

22  Viking was a mascot.

23          THE COURT:  Okay.

24          MR. HAIG:  Again, Your Honor -- this is Jerome

25  Haig -- we don't see the relevance, certainly based upon our

1    limited argument this morning and the arguments set forth in

2    our moving papers.  The issue here is if it's that he didn't

3    get his tattoo removed, we don't see why that is an issue in

4    and of itself because that doesn't convince anything except for

5    the fact that he didn't get his tattoo removed.  There's a

6    sitting L.A. County Superior Court judge, a Latino judge, who

7    still has the tattoo.  There are plenty of other promoted

8    senior management officials in the Sheriff's Department who

9    haven't gotten their tattoo removed.  And if the issue is

10   whether the tattoo has been removed or not, we don't see that

11   as being a legitimate issue.

12       The government wants to get into an organization that had

13   many antisocial characteristics, none of which have been

14   ascribed to this defendant by way of a lawsuit or by way of him

15   being named in any way.  So -- and as the Court well knows, my

16   client is Japanese/American.  He's married to a Latina.  He has

17   none of the attributes that are set forth in Judge Hatter's

18   ruling being a white supremacist or Neo-Nazi organization.

19       I understand the Court's ruling this morning about why it

20   believes it's relevant.  We still believe it's not relevant at

21   all and certainly not probative of anything.

22           THE COURT:  No, he's left the jury under the

23   impression that he is a firm believer, personally and

24   professionally, in the core values of that Department and that

25   clique, and he's known about the problems at the Los Angeles

```
 1   County Sheriff's Department, has had for years, including when
 2   he was a deputy, about cliques -- deputies forming cliques and
 3   gangs.  He denied -- when asked about that in his direct
 4   testimony about efforts to curtail these cliques and gangs, he
 5   said -- he did not -- he denied that he was against curtailing
 6   that, and a possible explanation for that, which the
 7   government's entitled to go into, is that he himself was a
 8   member of the gang.
 9       I don't -- well, and I guess that the tattoo is evidence
10   that, yeah, he was a member of that gang and that despite all
11   this criticism that he has been party to about these cliques
12   and these gangs, he still has that tattoo, which is relevant
13   for the jury to assess.  The jury may say it doesn't mean
14   anything, and you're certainly free to argue that, but the jury
15   may assess that in assessing his credibility when he says, Hey,
16   look, I believe in these core values of the Sheriff's
17   Department, and if anything -- for example, we heard testimony
18   about the Regulators.  The Vikings are a very similar -- sort
19   of an offshoot of the Vikings, and the jury's going to take all
20   that into account in assessing his credibility.
21           MR. HAIG:  I understand the Court's ruling.
22       Just so we have some sort of understanding of the
23   parameter of that ruling, what's the government allowed to ask?
24           THE COURT:  I'm not --
25           MR. HAIG:  Well, as far as Neo-Nazi and white
```

**UNITED STATES DISTRICT COURT**

1    supremacist and things --

2              MR. FOX:  No --

3              THE COURT:  They've already said they're not doing

4    that.

5              MR. HAIG:  I understand that, but I want to make

6    sure because that -- those are referenced in the appeal letter.

7              THE COURT:  Well, that's up to you.

8              MR. HAIG:  And the word "gang," is that going to be

9    something that the government's going to get --

10             THE COURT:  I don't know what the government's going

11   to ask.  I'm not a mind reader.

12             MR. HAIG:  Well, it would be our objection to the

13   word "gang" or "clique" as being a very charged word, both of

14   those are.

15             THE COURT:  The problem is you put him on the stand.

16   You knew about this from day one that he was subject to all of

17   this.  You took your chances.  You put him on the stand.  The

18   government told you that all this stuff, we weren't going to

19   get into it, they weren't going to go into it in their

20   case-in-chief.  But if he took the stand, all bets were off.

21             MR. HAIG:  So because of something that happened 25

22   years ago, he can't defend himself in this case, Your Honor?

23             THE COURT:  Excuse me.  He can defend himself, of

24   course he can defend himself, but he runs the risk like every

25   other witness who gets on the stand and testifies as to a

**UNITED STATES DISTRICT COURT**

1    certain thing that may be inconsistent with -- in fact, what

2    he's really got up there and said is "I have law-abiding

3    character; I'm a law-abiding citizen."  And if anything, this

4    prior affiliation with the Vikings is inconsistent with that,

5    and so they have a right to go into it.

6        Let's go.

7            MR. HAIG:  Your Honor, just one more question, if I

8    could?

9            THE COURT:  Yeah.

10            MR. HAIG:  As far as the objections on the record,

11   is the Court satisfied that the objection at sidebar is

12   sufficient, or would the Court ask me to object to preserve the

13   record for every single question that's asked?  I don't want to

14   keep popping up and down.  I just want to preserve --

15            THE COURT:  If you have an objection, make it.

16            MR. HAIG:  Very well.  Okay.

17            MR. FOX:  Thank you, Your Honor.

18            THE COURT:  Okay.

19        (End of sidebar discussions.)

20            THE COURT:  Okay.  Let's bring the jury out, and

21   let's have the witness resume the stand.

22        (The jury entered the courtroom.)

23            THE DEPUTY CLERK:  Please be seated.

24            MR. FOX:  May I continue, Your Honor?

25            THE COURT:  Yes, please.

1   Q    (BY MR. FOX)  Mr. Tanaka, I want to go back a little bit

2   before talking any more about August 23rd and something that we

3   were discussing on Friday when we broke.

4        When you were sergeant at the Lynwood station, you learned

5   that there was a deputy clique; correct?

6                MR. HAIG:  Objection, Your Honor, relevance.

7                THE COURT:  Overruled.

8                THE WITNESS:  You know, that term, I know that you

9   used that on Friday.  It was not referred to -- when I was at

10  Lynwood station, there was no references during that period of

11  time, at least in the '80s, that it was a clique.

12  Q    (BY MR. FOX)  But on Friday when I asked you that question

13  and asked you whether you were aware of this deputy clique, you

14  said yes; correct?

15  A    I said yes to your question, but there was no reference at

16  Lynwood station that there were any cliques.

17  Q    And this was a subset of deputies at the Lynwood station

18  that were members of this group; is that correct?

19                MR. HAIG:  Objection, Your Honor, relevance.

20                THE COURT:  Overruled.

21                THE WITNESS:  Sir, there was no group.  What you're

22  referring to, there was no group.  It was a -- there was not a

23  group.

24  Q    (BY MR. FOX)  Not everybody was allowed to be a member of

25  this organization; correct?

**UNITED STATES DISTRICT COURT**

```
 1            MR. HAIG:  Objection, relevance.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  It wasn't that -- there was no -- if

 4   you're talking about -- I mean, were there group requirements

 5   or were there requirements to be a part of the group?  None

 6   that I'm aware of.

 7   Q   (BY MR. FOX)  And, Mr. Tanaka, I wasn't talking about

 8   group requirements.  This was a group that you needed to be

 9   invited into; correct?

10            MR. HAIG:  Objection, relevance.

11            THE COURT:  Overruled.

12            THE WITNESS:  I -- I don't know that to be totally

13   true.

14   Q   (BY MR. FOX)  Well, you were invited into it; correct?

15            MR. HAIG:  Objection, relevance.

16            THE COURT:  Let me see counsel at sidebar.

17       (Discussion held at sidebar.)

18            THE COURT:  I guess you mentioned you were going to

19   pop up for every question.

20            MR. HAIG:  Sorry, Your Honor.

21            THE COURT:  That's all right.  In my view, with

22   respect to these preliminary questions about when he was a

23   member of the group, I think you've stated on the record, you

24   have a motion on file, that you have an objection to this.  As

25   far as I'm concerned, that objection is preserved.  If there's
```

1   something that goes beyond the confines of what we've talked

2   about, you'll need to state your objection.

3            MR. HAIG:  All right.  Just wanted to be careful.

4            THE COURT:  Okay.

5            MR. FOX:  Thank you, Your Honor.

6        (End of sidebar discussions.)

7            MR. FOX:  May I continue, Your Honor?

8            THE COURT:  Yes, please.

9   Q    (BY MR. FOX)  Mr. Tanaka, when you were a sergeant at the

10  Lynwood station, you were invited into this group; correct?

11  A    I wouldn't qualify that as any invitation into any group.

12  Q    You were asked to be a member of the Vikings; correct?

13  A    I was not asked to be -- there was no membership into the

14  Vikings.  The Vikings were the mascot symbol at Lynwood

15  station.  Lynwood station, much like many other sheriffs'

16  stations and facilities, were involved in intramural

17  activities.  There were softball teams.  I myself was a member

18  of the Baker to Las Vegas relay running team.

19        We had a -- I think it was a 6- or 8-foot-by-10-foot

20  banner that hung in the station, and the name of the team was

21  Lynwood Vikings.  There were photographs taken with the

22  previous Sheriff and the team in front of that flag.  Other

23  stations, like Firestone, had -- their symbol was -- or mascot

24  was the Pirates.  Norwalk had the Wolverines.  And there were a

25  number of others that were really referred to as the name of

1    their team in their intramural activities, sporting activities.

2    Q    Mr. Tanaka, you were aware that in 1991 there was a

3    finding that the Vikings were a deputy gang; correct?

4    A    I believe that was in a civil lawsuit that I was not a

5    party to, sir.

6    Q    I'm sorry, did you understand my question?  You're aware

7    that in that civil lawsuit there was a finding that the Vikings

8    were a deputy gang; correct?

9    A    I can't speak to findings of a lawsuit that I was not a

10   part of.

11   Q    I'm asking not if you're a part of it but just whether you

12   were aware of that finding.

13        You, as you sit here today, are aware of that finding that

14   in 1991 the Vikings were a deputy gang; correct?

15   A    I may have been made aware of it at that time.  I don't --

16   I don't have a specific recollection that that was the finding.

17   Q    So you may have been aware in 1991 that that was the

18   finding.  Is that your testimony?

19   A    I may have been aware of when that finding occurred.

20   Q    And certainly over time you've become even more familiar

21   with that finding; correct?

22   A    Not necessarily.  I mean, I've never looked at the

23   lawsuit, and I've never reviewed it.  I wasn't a part of it.

24   Q    You're aware of the finding as you sit here today;

25   correct?

```
1    A    The same question that you just asked?

2    Q    That there was a finding that the Vikings were a deputy

3    gang, you're aware of that finding as you sit here today?

4    A    Well, I was aware of it back in -- whenever it was.  I'm

5    pretty sure I was made aware of it at the time that the finding

6    was made.

7    Q    And you're aware of the finding that the Vikings engaged

8    in civil rights violations; correct?

9    A    I don't know.  I --

10   Q    You're not aware of whether you --

11   A    I don't know of all the findings, Mr. Fox.  I was not a

12   party to the lawsuit, so I -- I'm sorry, but I didn't read it.

13   Q    And as you proceeded up in the ranks of the Sheriff's

14   Department, you learned that the Vikings -- there was a finding

15   that the Vikings engaged in other acts of lawlessness as well;

16   right?

17             MR. HAIG:  Objection, relevance, Your Honor.

18             THE COURT:  Overruled.

19             THE WITNESS:  I believe the findings with that

20   related to conduct of deputies.  I don't know how it related

21   to -- maybe because they worked at Lynwood, so they made the

22   reference to Vikings.  But the fact is it wasn't -- if I

23   recall, the finding was -- it was directed at the conduct of

24   the individuals that were sued.

25   Q    (BY MR. FOX)  The deputies that you supervised as sergeant
```

1  at Lynwood?

2  A     I don't remember them -- any of the deputies that worked

3  for me.  I was on the -- I think at the time I might have been

4  the administrative sergeant.

5  Q     Mr. Tanaka, there's no public list of who the Vikings

6  were, correct, the members of the Vikings?

7  A     Again, there was no membership.  The station was

8  referenced as Lynwood station -- it was Lynwood station in the

9  city of Lynwood.  The mascot for that station, like other

10 stations, this one was named the Vikings.  There was no

11 membership list, at least that I'm aware of.

12 Q     Mr. Tanaka, as we discussed in your testimony earlier

13 today, Lynwood was not the only station that you worked at;

14 correct?

15 A     That's correct.

16 Q     It's the only station that you have a tattoo of, correct,

17 the mascot as you're referring to it?

18            MR. HAIG:  Objection, Your Honor, relevance.

19            THE COURT:  Overruled.

20            THE WITNESS:  It is the only tattoo -- I only have

21 one tattoo.

22 Q     (BY MR. FOX)  And that tattoo is of a Viking; is that

23 correct?

24 A     It is.

25 Q     Mr. Nee, your aide, was also a Viking; correct?

1   A     To the best of my knowledge, I don't believe so.

2   Q     Mr. Thompson, when he was the head of OSJ, had Viking

3   paraphernalia hanging in his office; correct?

4              MR. HAIG:  Objection, relevance, Your Honor.

5              THE COURT:  Overruled.

6              THE WITNESS:  I don't know that I ever visited

7   Mr. Thompson's office.

8   Q     (BY MR. FOX)  You obtained a Viking tattoo at the time

9   that you were a sergeant at Lynwood; is that correct?

10  A     Yes.

11  Q     You remained -- well, you kept that Viking tattoo even

12  after learning about the finding in that civil lawsuit that the

13  Vikings were a gang; correct?

14  A     Sir, at the time that I received the tattoo and the time

15  that I was at Lynwood station, there was nothing sinister about

16  that symbol.  There was Minnesota Vikings.  There was Viking

17  Van Lines, Viking Charities.  Nothing in and of itself of the

18  word "Vikings" was evil.  And it was the symbol of the station.

19  It wasn't one that required any specific membership.  And after

20  the fact for a lawsuit to occur and some deputies engaged in

21  whatever conduct they were found to have engaged in and a judge

22  made a ruling, made that symbol into what it is today.

23        However, in the 1980s, and however long Lynwood existed,

24  there was nothing that was inappropriate about that symbol.  It

25  was sanctioned by the Sheriff's Department.  It was nothing

1    more than the station mascot up until the time that the judge

2    made his ruling.

3    Q    And it's your testimony that at some point the Vikings

4    turned into -- formed something that was sinister; is that

5    correct?

6    A    I don't -- the people, whoever got the tattoos or whoever

7    worked at Lynwood station, I wouldn't say that they were all

8    sinister or turned sinister.  And, again, I don't know what the

9    results were of the civil lawsuit and the findings.  I'm just

10   saying that at some point the media or the public decided to

11   make the Vikings symbol, based on the judge's ruling, into

12   something that was not what it was supposed to have been or

13   what it was intended to be as a mascot from the initial stages.

14   Q    Okay.  So if I understand your testimony, you got a

15   Vikings tattoo somewhere between 1987 and 1991; correct?

16   A    Yes.

17   Q    And sometime around 1991, you learned that a judge found

18   that this group was operating beyond the scope of the law; is

19   that correct?

20   A    My recollection is the judge found specific individuals

21   who were engaged in whatever conduct that they weren't supposed

22   to be engaged in.

23   Q    You're aware that he referred to the Vikings by name and

24   said that the Vikings were engaged in that conduct; correct?

25   A    I believe, though, he was referencing the individuals

1    and -- maybe because the individuals who worked there were

2    referenced as Lynwood Vikings, that's possible, but I don't

3    think he broad-brushed the entire station.

4    Q    No, Mr. Tanaka, I'm talking about the Vikings

5    specifically, and as you were rising through the ranks of the

6    Sheriff's Department, you learned that there were other deputy

7    cliques that also had tattoos for deputies; correct?

8    A    I think the "cliques" word came out later on during the

9    years.  I -- you know, all during the course, at least when I

10   was working, stations, people that worked at different stations

11   and -- their way of exhibiting either their camaraderie or

12   pride, they had their station tattoos.  Other units had their

13   unit tattoos.  It didn't become anything where it created this

14   kind of consternation until later on when somebody applied the

15   term clique to it.  And for years, there was never any

16   reference.  It was -- it was not an issue.

17   Q    Mr. Tanaka, you're aware that the deputies working on

18   3,000, during the time period we've been discussing, refer to

19   themselves as the 3,000 Boys; correct?

20   A    I learned that reference, the 3,000 Boys, in a newspaper

21   article.  I don't think that anybody in the organization had

22   ever discussed it, at least not to me, prior to that time.

23   Q    Mr. Tanaka, let's go back to your tattoo.

24        You kept your Viking tattoo even after you learned of the

25   ruling in that civil case; correct?

```
 1   A    Sir, the organization was well-aware of that tattoo and --
 2   Q    I think you're missing my question.
 3        My question is simply, you kept that tattoo; you didn't
 4   get it removed after you learned of the civil case's finding;
 5   correct?
 6   A    The civil case was not against me.  I was not a Viking in
 7   the sense that you're trying to infer.  I was a member of the
 8   Los Angeles County Sheriff's Department assigned to Lynwood
 9   station, whose mascot was the Viking.  There were numerous
10   people that had the Viking tattoo that worked there.  It was
11   nothing sinister about it at the time that I and others
12   received that tattoo -- or went to get the tattoo.
13   Q    Let's try this a different way.  In 1992 you kept your
14   Vikings tattoo; correct?  You didn't have it removed?
15   A    I did not have it removed.
16   Q    And when Sheriff Baca came up with the core values that
17   you discussed on Friday, you didn't have the tattoo removed,
18   did you?
19             MR. HAIG:  Objection, argumentative.
20             THE COURT:  Sustained.
21   Q    (BY MR. FOX)  Mr. Tanaka, even after you resigned from the
22   Sheriff's Department, you didn't have that tattoo removed, did
23   you?
24             MR. HAIG:  Objection, Your Honor, misstates the
25   evidence.
```

1            THE COURT:  Overruled.

2            THE WITNESS:  I did not resign, Mr. Fox.  I retired

3  in 2013, and I have not had the tattoo removed.

4  Q    (BY MR. FOX)  And you still have your Viking tattoo as you

5  sit there testifying today; correct?

6  A    Because you're trying to make it evil, it doesn't mean

7  that it is evil, sir, and so there is no reason for me to

8  remove it.

9  Q    Mr. Tanaka, you still have that tattoo as you sit there

10 testifying today?  It's on your leg; correct?

11 A    I have the tattoo, sir.

12 Q    Okay.  Let's go back to the butt-chewing meeting from

13 August 23rd of 2011.

14      You're with me on this?

15 A    I'm with you, sir.

16 Q    Because you sent in Mr. Thompson to go brief the Sheriff,

17 you didn't go with him; correct?

18 A    I did not.

19 Q    It was just Mr. Thompson and perhaps one other person who

20 went and briefed the Sheriff; correct?

21 A    I don't know who else went with Mr. Thompson.

22 Q    And it was after your meeting with Mr. Thompson on the

23 23rd that the OSJ deputies moved Anthony Brown to a different

24 floor; correct?

25 A    I'd have to look at when the move was, but it's possible.

Q     Well, you knew he was moved to a medical ward at Men's
Central Jail; correct?

A     I believe that my -- at least my recollection is after he
was moved is when I was notified.

Q     Okay.  And you were notified that he was moved to a
medical floor at Men's Central Jail; correct?

A     Yes.

Q     And it was only at that time that OSJ deputies began
standing guard outside of his cell; correct?

A     I don't know when they began their standing security
outside.  I don't know when that began.

Q     Mr. Tanaka, you are aware that Mr. Thompson assigned his
OSJ deputies to guard Anthony Brown at MCJ; correct?

A     Yes.

Q     In fact, you authorized overtime for hiding Anthony Brown;
correct?

        MR. HAIG:  Objection, Your Honor,
mischaracterization of the question and argumentative of the
word -- term "hiding."  Misstates his testimony.

        MR. FOX:  Your Honor, I'll be happy to rephrase the
question and remove the word hiding.

Q     (BY MR. FOX)  Mr. Tanaka, you authorized overtime for the
OSJ deputies who were standing guard outside of Mr. Brown's
cell; correct?

A     Yes.

1  Q    So you ordered that they be paid overtime to do that;

2  correct?

3  A    They were provided with overtime to provide security for

4  Mr. Brown.

5  Q    I'm sorry, did you miss my question?  I'm just asking

6  whether --

7           MR. HAIG:  Objection, Your Honor, argumentative.

8           THE COURT:  Sustained.

9  Q    (BY MR. FOX)  Did you order the deputies, the OSJ deputies

10  standing guard outside of Anthony Brown's cell to be paid

11  overtime?

12  A    I didn't give any order.  I believe that the order was

13  just given to ensure Mr. Brown's security, and I may have

14  authorized the overtime in order to accomplish that task.

15  Q    Mr. Tanaka, you testified on Friday that with respect to

16  the policy change that required approval before the FBI could

17  interview inmates within Men's Central Jail, you told

18  Mr. Thompson to use his discretion; correct?

19  A    I believe at some point that occurred.

20  Q    But you were the one who was approving or denying FBI

21  requests for interviews subsequent to this policy change;

22  correct?

23  A    I never denied any FBI request for an interview.  In fact,

24  the two or three that I received were approved.

25  Q    Mr. Tanaka, you were the one who was approving or denying

1    FBI requests for interviews subsequent to this policy change;

2    correct?

3    A    I didn't deny any FBI requests to interview inmates in the

4    county jail system.

5    Q    Mr. Tanaka, you've stated you were pretty far removed from

6    the events that we've been talking about.  You were just sort

7    of a conduit of information.  That's basically your testimony;

8    correct?

9    A    Basically.

10   Q    Okay.  On August 25th you met with a Sheriff's Department

11   undercover officer who was to pose as an inmate in Anthony

12   Brown's cell; correct?

13   A    I did.  I'm not -- I'm not sure who they were.

14   Q    You and Mr. Leavins met with this LASD undercover officer

15   in a parking lot; correct?

16   A    I don't -- it was outside someplace.

17   Q    And you had the officer pose as an inmate who had been

18   beaten up; correct?

19   A    I did not.

20   Q    You were there when Mr. Leavins provided him with this

21   plan; correct?

22   A    I don't believe I was present for any formulation of the

23   plan or implementation.  I believe I was out there to -- I

24   don't even know why I was there, if it was coincidental or if I

25   went there.  I think the only conversation that I would have

1   had would have just been to tell the deputy to be careful.

2   Q    Okay.  I want to make sure I understand that.

3        So you and Mr. Leavins went to go meet with this

4   undercover officer; correct?

5   A    Sir, again, I've read so many documents over the past

6   years.

7   Q    No, no --

8   A    I don't have a specific recollection of having this

9   meeting.  Now, it's possible that it occurred, but I -- it

10  wasn't anything that was done at my direction.

11  Q    Okay.

12  A    It was all part of the investigation that was being

13  conducted by the Internal Criminal Investigations Bureau.

14  Q    And when Mr. Leavins met with this individual, you just

15  told this individual to be careful.  That's your testimony?

16  A    I said that that's something that I likely would have

17  said.  I don't even have a recollection of actually having that

18  meeting, so it's not possible, really, for me to recall what

19  our conversation would have been.

20  Q    Mr. Tanaka, is it fair to say that you don't recall these

21  events as well as you -- well, your recollection is missing on

22  some of these events; is that correct?

23              MR. HAIG:  Objection, Your Honor, argumentative.

24              THE COURT:  Sustained.  You can rephrase it.

25  Q    (BY MR. FOX)  Mr. Tanaka, you've answered a few questions

1   saying that you don't recall the answers to my questions; is

2   that correct?

3   A    I can't tell you what I don't know or I don't recall.

4   Q    Mr. Tanaka, this became a big deal -- this whole Anthony

5   Brown, ICIB, OSJ operation became a big deal in the public at

6   the end of September of 2011; correct?

7   A    Yeah.  At some point it became, I think, more reported on

8   in the media.

9   Q    And at some time, you met with OSJ and ICIB individuals to

10  try to figure out what had happened during that time period;

11  correct?

12  A    I'm not sure what you mean.

13  Q    Mr. Tanaka, it was at the end of September or early

14  October of 2011 that you knew that the public was scrutinizing

15  what the Sheriff's Department had been doing over the past

16  couple of months with respect to Anthony Brown, OSJ and ICIB;

17  correct?

18         MR. HAIG:  Objection, Your Honor.  Beyond the scope,

19  relevance.

20         THE COURT:  Let's go to sidebar.

21      (Discussion held at sidebar.)

22         THE COURT:  Okay.  I'm going to give a limiting

23  instruction now on the jury's -- how they should consider the

24  Vikings-related testimony.  The Court's prepared to instruct

25  the jury that they may consider the Vikings ruling testimony by

1    the defendant only for the purpose of if it has any bearing at

2    all on his intent and credibility and for no other purpose.

3            MR. STEWARD:  We would request that at this time.

4            MR. FOX:  Yeah.  And with respect to this issue -- I

5    don't know if this is why you wanted to see us, but --

6            THE COURT:  Yeah.

7            MR. FOX:  Okay.  I was going to move on.  Thank you,

8    Your Honor.

9            THE COURT:  Okay.

10        (End of sidebar discussions.)

11           THE COURT:  Ladies and gentlemen, the

12   Vikings-related testimony by the defendant may be considered by

13   you for its bearing, if any, on the question of the defendant's

14   intent and credibility and for no other purpose.

15           MR. FOX:  May I continue, Your Honor?

16           THE COURT:  Yes.

17   Q    (BY MR. FOX)  Mr. Tanaka, based on your experience as

18   watch commander of IRC -- because I think you said you were

19   watch commander of IRC; is that right?

20   A    I did say that.

21   Q    Okay.  Based on your experience as watch commander of IRC,

22   you were familiar with all of the activities of IRC.  That was

23   your testimony on Friday; correct?

24   A    I wouldn't have said that.  I was not familiar with all of

25   the activities.  I had a specific duty.  That was to be --

**UNITED STATES DISTRICT COURT**

1   provide leadership for those who worked on my shift and also to

2   ensure that things were being run appropriately.

3   Q    And you were aware that IRC booked inmates; you were aware

4   of that activity; correct?

5   A    Yes.

6   Q    You were aware that IRC found the appropriate housing for

7   those inmates; is that correct?

8   A    Yes.  The initial classification of inmates was conducted

9   by the personnel at Inmate Reception Center.

10  Q    And your duties generally included overseeing all of the

11  activities of IRC; correct?

12  A    Well, the line functions with regards to the processing in

13  of inmates and then -- and ensuring their safety while they

14  were within the confines of the Inmate Reception Center prior

15  to being assigned to a housing facility.

16  Q    You were overseeing the activities of IRC to move the

17  inmates; correct?

18  A    No.  I believe there was a classification lieutenant,

19  because the watch commander -- again, our job was -- as they

20  were -- people were being brought in through the door, the

21  incoming door and being processed or booked, then our job was

22  to just ensure their security.  I believe the classification

23  had a separate unit.

24  Q    You were responsible for overseeing the activity of

25  processing the inmates; is that correct?

```
 1   A     It was mostly just to ensure the process of -- that the
 2   people, the flow kept -- the flow was -- it was kept moving.
 3   Q     Mr. Tanaka, you were overseeing the activities of IRC to
 4   process court orders; correct?  And if you want me to be more
 5   specific, to process court orders for inmates that would be
 6   sent to and from the courts.
 7   A     It may have been, but it never was anything that was
 8   brought to the lieutenant's level as far as processing and
 9   moving inmates.
10          MR. FOX:  Your Honor, I would like to read in -- and
11   I'll show it to the defense.  One second, please.
12          (Counsel conferred off the record.)
13   Q     (BY MR. FOX)  Mr. Tanaka, you also, as watch commander of
14   IRC, also facilitated -- excuse me -- the release of
15   individuals that were in the custody of L.A. County jails;
16   correct?
17   A     Yes.
18   Q     Okay.
19          MR. FOX:  Your Honor, I'd like to read from his
20   testimony on Friday, page 11, lines 11 through 20.  And I
21   understand there's no objection from the defense.
22          MR. HAIG:  There is none, Your Honor.
23          THE COURT:  All right.
24          MR. FOX:  "Question:  What were your duties as a
25   watch commander?
```

1          "Answer:  At Inmate Reception Center, the duties generally

2     just included overseeing all the activities.  It involved

3     inmates that were booked -- or people that were booked into the

4     system; then found appropriate housing; the movement, each and

5     every day, early in the morning and in the afternoons, of

6     sending inmates from our custody into the courts throughout the

7     county and then bringing them back from court; and then also

8     facilitating the release of individuals that were in the

9     custody at L.A. County jails."

10    Q     (BY MR. FOX)  Mr. Tanaka, you were familiar with the watch

11    commander of IRC in August of 2011; correct?

12    A     No, I can't say that, sir.  The facility had since moved,

13    and I really couldn't tell you the details of what the IRC

14    watch commander's duties were in 2011 versus when I was there

15    nearly 20 years earlier.

16    Q     Okay.  Well, let's go above him.  You were at least

17    familiar with the captain of IRC in August of 2011; correct?

18    A     I -- I don't remember who the captain -- who the captain

19    was of IRC in 2011.

20    Q     You knew that Mr. Chuck Antuna worked as captain of IRC in

21    August of 2011; correct?

22    A     I know he was the captain there, and it could have been in

23    August of 2011.

24    Q     And you had worked with Mr. Antuna previously at Lynwood?

25    A     I did.

1   Q    And he's someone that you vacationed with for a very long

2   period of time; correct?

3   A    For about four days a year for about eight years.

4   Q    Mr. Tanaka, you know that Anthony Brown was removed from

5   the computer system at IRC on August 25th of 2011; correct?

6   A    I'm not sure I was aware that he was removed at that time.

7   I learned about it at some point after the fact, and I don't

8   know exactly when.

9   Q    You learned that Mr. Brown's name on August 25th was

10  changed to another name; correct?

11  A    I did learn that after.

12  Q    And you know that as of August 25th, he remained at Men's

13  Central Jail in that medical ward; correct?

14  A    I don't remember the exact dates and sequences.

15           MR. FOX:  Your Honor, I'm going to publish

16  Government Exhibit 38.

17  Q    (BY MR. FOX)  Mr. Tanaka, you're pretty sure you'd have

18  known that Anthony Brown wasn't moved out of Men's Central Jail

19  until August 26th of 2011; correct?

20  A    I'm pretty sure?

21  Q    Well, that's what you said before; correct?

22  A    I don't -- I know he was -- you're talking about moved?

23  Q    Out of Men's Central Jail.

24  A    Out of Men's Central Jail.

25  Q    Yeah.  You're pretty sure you would have known that he

1   wasn't moved out of Men's Central Jail until August 26th of

2   2011; correct?

3   A    I don't remember the date.

4   Q    You may have been informed that Anthony Brown no longer

5   wished to cooperate with the FBI when he was moved back to

6   Men's Central Jail on September 2nd of 2011; correct?

7   A    I may have been informed, that is correct.

8   Q    Now, you discussed the August 29th meeting at the U.S.

9   Attorney's Office on Friday.  I want to talk briefly about

10  that.

11       You testified on direct examination that there were as

12  many as 15 to 20 people flanking the U.S. Attorney Andre

13  Birotte.

14  A    Yeah, there were -- there were a few.  I -- it may have

15  been 15 or 20.

16  Q    But there were really only just a handful of his staff

17  there; isn't that correct?

18  A    I recall maybe six or seven or eight people and actually

19  more behind him, and I'm not sure if anybody was sitting,

20  exactly at -- they might have been sitting alongside him.  It

21  was a -- I recall a fairly large conference room.  I think it

22  was more than a handful.

23            MR. FOX:  Your Honor, for the record, I renumbered

24  what I had said earlier is Exhibit 186.  It is now Government

25  Exhibit 195.

1          (Counsel conferred off the record.)

2          MR. FOX:  Your Honor, I'm going to read from

3    Government Exhibit now 195, Mr. Tanaka's grand jury testimony

4    from December of 2012 on page 86, lines 7 to 13 -- I'm sorry,

5    lines 8 to 13.

6          "Question:  I want to ask you some questions about the

7    meeting" --

8          THE COURT:  Excuse me.

9          MR. FOX:  I'm sorry.

10          THE COURT:  Any objection?

11          MR. HAIG:  No, Your Honor.

12          THE COURT:  All right.  Go ahead.

13          MR. FOX:  Sorry.  I'd already cleared it.  I should

14    have made that clear.

15          "Question:  I want to ask you some questions about that

16    meeting that you've discussed a few times with U.S. Attorney

17    Andre Birotte.  Who was in attendance at that meeting?

18          "Answer:  Mr. Birotte.  I believe there were a handful of

19    U.S. attorneys, assistant United States attorneys."

20    Q    (BY MR. FOX)  Mr. Tanaka, one of the issues that was

21    raised at this meeting was the federal grand jury subpoenas

22    that were seeking records from the Sheriff's Department

23    regarding the use of force; is that correct?

24    A    I don't know.  I don't remember anything that was

25    discussed.  I just remember the conversation was largely being

1  done by -- or being led by Sheriff Baca, and I don't recall

2  exactly -- or I certainly don't remember anything that -- what

3  you just said.

4  Q    Okay.  So I guess your testimony was just that you don't

5  recall anything that happened at that meeting; is that correct?

6  A    No, that's not true.  I remember the Sheriff -- my

7  recollection was that he told that -- the U.S. attorney,

8  Mr. Birotte, that he would work with his office in any joint

9  investigation that the federal government wanted to do, but I

10 believe he also said that he had no intention of or he had no

11 desire to work with the FBI in an investigation.

12 Q    Mr. Tanaka, at least in 2014 you recall that one of the

13 things that was discussed at this meeting was the number of

14 grand jury subpoenas that had been served on the Sheriff's

15 Department and how cumbersome they were; correct?

16 A    That's -- that's possible.  I don't -- I don't remember

17 that now, but it's very possible.

18 Q    You recalled in 2014 that there was a discussion about the

19 subpoenas; correct?

20 A    As I sit here now, no.  But I may have remembered that a

21 couple years ago.

22 Q    Mr. Tanaka, could you please look at Exhibit 78 in the

23 binder that is somewhere around you.

24      (Counsel conferred off the record.)

25           MR. FOX:  Your Honor, I move for the admission of

1    Government Exhibit 78, and it's my understanding that Mr. Haig

2    has no objection to this exhibit coming in.

3              MR. HAIG:  That's correct, Your Honor.

4              THE COURT:  It will be received.

5         (Exhibit No. 78 received into evidence.)

6    Q    (BY MR. FOX)  Mr. Tanaka, before going to that meeting at

7    the U.S. Attorney's Office, Mr. Leavins advised you that they

8    were going to be interviewing Gilbert Michel the very next day;

9    is that correct?

10   A    That's what it says here, yes.

11   Q    And then you went to MCJ the next day when ICIB was going

12   to speak to the deputies; correct?

13   A    I was -- I was at Men's Central Jail when Deputy Michel

14   was interviewed.  I was there that day.

15   Q    You were briefed on the interview of Gilbert Michel after

16   Mr. Leavins, Mr. Craig and Ms. Long conducted it; correct?

17   A    At some point, I was -- my recollection is that Lieutenant

18   Leavins did brief me on what he believed were pertinent bits of

19   information from the interview.

20   Q    And that briefing happened around the time that their

21   interviews of the deputies had ended that day; correct?

22   A    That's possible.

23   Q    And you think that they may have conveyed to you that they

24   had told Mr. Michel that the FBI was manipulating him; correct?

25   A    They may have told me that.  I don't know.

1    Q    And you think it's possible that they may have conveyed to

2    you that they told Mr. Michel the FBI was threatening him in an

3    attempt to convince him to be a witness in the federal

4    investigation; correct?

5    A    I don't -- I don't know if that's what they told me.  They

6    may have.

7    Q    Mr. Tanaka, you mentioned in direct examination your close

8    relationship with Paul Yoshinaga; correct?

9    A    Okay.

10   Q    You referred to him as the chief legal advisor to the

11   Sheriff; correct?

12   A    That was, I believe, in response to a question of what his

13   title was when he was with the Sheriff's Department.

14   Q    He was actually the chief legal advisor to the Sheriff's

15   Department, not just to the Sheriff; correct?

16   A    Could have been.  It was -- but he was always referred to,

17   at least I remember him being referred to as the Sheriff's

18   chief legal advisor.  I guess you could include the Department.

19   Q    Mr. Tanaka, you would have no problem going to

20   Mr. Yoshinaga for advice if you needed it; correct?

21   A    If I needed work-related legal advice, then I would be

22   able to go to him, yes.

23   Q    And you testified that it was one of your core missions to

24   make sure that deputies knew the law; correct?

25   A    Yes.

```
 1   Q     You didn't raise any concerns at the end of August 2011
 2   that Mr. Leavins, Mr. Craig and Ms. Long had told Gilbert
 3   Michel that the FBI was manipulating him; correct?
 4   A     I didn't have any -- I don't believe I had any discussions
 5   with them about that.
 6   Q     And you didn't have any discussions with Mr. Craig,
 7   Mr. Leavins or Ms. Long about any concerns you might have had
 8   that the FBI -- that they had told him that the FBI was
 9   threatening him in an attempt to convince to not -- excuse me.
10   Let me try that again.
11         You didn't have any conversations with Mr. Leavins,
12   Mr. Craig or Ms. Long about the potential legality of them
13   threatening Mr. Michel in an attempt to convince him not to be
14   a witness in the federal investigation?
15   A     I don't remember any conversations along those lines.
16   Q     And you never went to Mr. Yoshinaga to ask about anything
17   that you observed, learned about, going on in August or
18   September of 2011 with respect to Anthony Brown, OSJ or the
19   ICIB operation; correct?
20   A     I don't remember having any conversations, that's correct,
21   with Mr. Yoshinaga about this particular investigation.
22   Q     In September of 2011, the Sheriff's Department took steps
23   to see which deputies were meeting with the FBI; correct?
24   A     I'm sorry, could you say it one more time?  I'm sorry.
25   Q     Sure.  In September of 2011 -- instead of just saying
```

**UNITED STATES DISTRICT COURT**

1    Sheriff's Department, I'll ask you, Mr. Tanaka.

2         You took steps to see which deputies were meeting with the

3    FBI; correct?

4    A    Did I take steps?

5    Q    Yes.  If you want me to be more specific, I will.

6         On September 1st you ordered that all sworn and custody

7    assistant personnel be told that they needed to report any

8    contact with the FBI to their superiors; correct?

9    A    I don't know if I told them.  I remember, I believe, the

10   captain of that facility re-briefing the policy that if there's

11   any law enforcement-related contact with any outside law

12   enforcement agencies, deputies were reminded that the policy

13   required them to report that to their unit of command -- or

14   their unit commander.

15   Q    But you ordered, not just at MCJ, but all sworn and

16   custody assistant personnel to be told that they needed to

17   report any contact with the FBI to their superiors; correct?

18   A    I may -- I don't know.  I may have given the order.  I

19   don't know.

20   Q    I ask you to see if you can refresh your recollection by

21   looking at Government Exhibit 74, which is just for

22   identification purposes at this point.

23        Mr. Tanaka, does that refresh your recollection about

24   whether you ordered that all sworn and custody assistant

25   personnel be told that they needed to report any contact with

1  the FBI to their superiors?  Close that book if you have a

2  chance --

3  A    I think it says -- it has something to do with not

4  knowingly interfering or -- with investigations.  But I --

5  lieutenant -- I didn't work with Lieutenant McCorkle, so I

6  can't tell you why he put that in his memorandum.

7  Q    Why he put what in his memorandum?

8  A    What I just said.

9  Q    The fact it was coming from you?

10 A    Yeah, "per the undersheriff."

11 Q    Mr. Leavins was briefing you on the surveillance being

12 conducted of FBI agents in September of 2011; correct?

13 A    I did receive a briefing that a surveillance had taken

14 place.

15 Q    Mr. Leavins was the one who was briefing you on the

16 surveillance being conducted of FBI agents; correct?

17 A    It could have been Lieutenant Leavins.

18 Q    Mr. Tanaka, the plan was to have Mr. Leavins, Mr. Craig

19 and Ms. Long tell other deputies who might have been meeting

20 with Special Agent Marx not to cooperate with the FBI; correct?

21 A    I don't know what their investigative plan was, sir.  I

22 wasn't involved in their investigation.

23 Q    Well, you've stated before that it's possible that that

24 was their plan; correct?

25 A    You'd have to ask them, but it is possible.

1    Q      Showing you now Exhibit 141.  This is the denied court

2    order seeking all FBI records.

3           Do you see this?

4    A      I do.

5    Q      You were told the judge denied the order around the time

6    that this occurred; correct?

7    A      I don't know if it was around the time this occurred, but

8    I was told that the judge had indicated he did not have

9    jurisdiction over the request that was made.

10   Q      And you learned that around the time that this occurred;

11   correct?

12   A      I don't know, Mr. Fox.

13   Q      You've testified before that you learned of this around

14   the time that it occurred; correct?

15   A      It's possible.  I mean, you're asking me questions that

16   have taken place over a period of the past five years, and I'm

17   just trying to tell you what I know.

18   Q      Mr. Tanaka, you believe that it's probable that you were

19   told around the time that it occurred that the judge denied

20   this order; correct?

21   A      I probably wouldn't use that word today, but I don't know

22   when I said that.  But it may have been probable at the time

23   that I was asked that question, in whatever year that was.

24   Q      Okay.  You were told that the court did not have

25   jurisdiction in the matter; correct?

1    A      Yes.

2    Q      And, Mr. Tanaka, LASD's policy at the time was that

3    employees should not take any action that could interfere with,

4    delay, obstruct, distort or unduly influence any investigation;

5    is that correct?

6    A      That sounds -- I don't remember the exact policy, but

7    there was a policy that we weren't to interfere or --

8    Q      Or obstruct?

9    A      I don't remember the exact words, sir.

10   Q      And that policy included in federal investigations; that

11   you couldn't interfere with federal investigations; correct?

12   A      That's possible that the policy was that specific.  I'd

13   have to see it, but I don't remember.

14   Q      Mr. Tanaka, the policy also was that employees shall not

15   take any action that could intimidate or unduly influence any

16   participant in an investigation; correct?

17   A      I -- I -- sir, I don't know.  I -- you're asking me about

18   a policy.  There's many policies.  There's -- like I said, the

19   policy book was at least this thick.  And unless I see it, I

20   don't have a specific recollection.  I know just in general

21   that the orders were not to engage in any type of conduct that

22   would interrupt another agency's investigation if it required

23   cooperation.

24   Q      If it required cooperation.

25          There's nothing in the policy that discusses cooperation;

**UNITED STATES DISTRICT COURT**

```
1   correct?

2   A    Again, sir, I'd have to see the policy.  I don't know.

3   Q    Okay.  Well, you've testified to this before, haven't you?

4   A    Sir, I'm sure you're going to show me something I don't

5   remember.

6              MR. FOX:  This is 187, page 907.

7              Your Honor, now going to be looking at -- reading

8   from Exhibit 187, page 907, starting at line 12 -- actually

9   starting at line 2 and going all the way to line 23.

10             MR. HAIG:  Your Honor, may I have one moment with

11  counsel, please?

12             THE COURT:  Yes.

13        (Counsel conferred off the record.)

14  Q    (BY MR. FOX)  Mr. Tanaka, why don't you just, if you

15  would, look at Exhibit 187 which should be in the Tanaka Binder

16  that is around you.  And look at this page, which is 907.

17        It is -- Mr. Tanaka, as undersheriff it was your job to be

18  familiar with all laws and policies that applied to the

19  Department; correct?

20  A    Yes.  Sir, can you tell me the exhibit again?

21  Q    Sure.  It's Exhibit 187.  Do you see that there?  187's

22  missing from yours?

23  A    There's nothing.

24             MR. HAIG:  May I approach the witness, please?

25             THE COURT:  Steve.
```

1        (Pause in proceedings.)

2   Q    (BY MR. FOX)  187, Mr. Tanaka, now you do have that in the

3   binder?

4   A    I do, sir.

5   Q    Okay.  Page 907, why don't you just read pages 907 and --

6   907 from line 2 to 908 to line 3 to see if this refreshes your

7   recollection on LASD's policies.

8   A    "In referring you to page 44 of that exhibit" --

9   Q    No, no, no.  I'm not asking you to read that into the

10  record.  I'm asking you to read it to yourself and seeing if

11  that refreshes your recollection on the Sheriff's Department's

12  policies with respect to what we've just been talking about.

13       (Pause in proceedings.)

14            THE WITNESS:  Okay.

15  Q    (BY MR. FOX)  Okay.  Does that refresh your recollection

16  as to whether the Sheriff's Department policy at the time was

17  that employees shall not take any action that could interfere

18  with, delay, obstruct, distort or unduly influence any

19  investigation?

20  A    Yeah.  I'm sorry, that is what the policy states here.

21  Q    Okay.  And does that policy also include -- does it

22  refresh your recollection as to whether that policy included

23  federal investigations?

24  A    It said all law enforcement agencies I believe.

25  Q    And that policy also applied to whether you could

1   intimidate or unduly influence any participant in an

2   investigation; correct?

3   A     Yes.

4   Q     As undersheriff, Mr. Tanaka, in August, September,

5   October, November of 2011, you oversaw IA and ICIB; correct?

6   A     Internal criminals -- internal criminal -- ICIB, I

7   believe, during that period of time.  Internal Affairs, I

8   believe -- well, actually the undersheriff on the

9   organizational chart shows over the entire organization, so

10  that would be a yes.  But I believe there was a chain of

11  command through a division.

12  Q     There may have been a chain of command with respect to IA,

13  but you oversaw IA at some point; correct?

14  A     As part of that chain, yes.

15  Q     As undersheriff you never opened an internal investigation

16  of Tom Carey for his actions in August or September of 2011;

17  correct?

18  A     I did not.

19  Q     As undersheriff you never opened an internal investigation

20  on Steve Leavins for his actions in August or September of

21  2011, did you?

22  A     I did not.

23  Q     You never opened an investigation into Scott Craig or

24  Maricela Long for their actions in August or September of 2011,

25  did you?

1    A     I didn't.

2    Q     Same thing for Greg Thompson, you didn't do it for him

3    either, did you?

4    A     That's correct.

5    Q     And same thing for the OSJ deputies, Mickey Manzo, Gerard

6    Smith and James Sexton, you didn't open an investigation into

7    them based on their conduct that we've been hearing about in

8    this case; correct?

9    A     You're correct.

10   Q     Publishing now Exhibit 71.  This is your e-mail to Steve

11   Leavins in which you clarified -- or you learned that the

12   orders into investigating local law enforcement agencies were

13   coming from the top; is that correct?

14   A     That's what it says here.  I believe it was just in

15   response to an inquiry as to why the investigation was taking

16   place.

17   Q     I'm going to ask you about a couple things you just said

18   there.  You said that's what it said here.  That's what you

19   wrote here?

20   A     That's what I wrote on my e-mail, correct.

21   Q     And in terms of the inquiry you're talking about, it was

22   your inquiry into what the Justice Department might be doing

23   with respect to policing the police; correct?

24   A     I believe that that inquiry -- I don't remember where it

25   was generated from, but I think I found something on the

1    Internet, and so I passed it on.

2    Q    So that's you passing on to Steve Leavins and Tom Carey

3    your opinion that the orders to investigate the Sheriff's

4    Department were coming from the top; correct?

5    A    I don't know if it's specifically related to just our

6    department.  I think there was a conversation about -- maybe

7    county -- I don't remember if it was just about our department

8    or if it was about county jail facilities in general.

9    Q    So this at least applied to the Sheriff's Department and

10   may have applied more broadly, is what you're saying; correct?

11   A    It's possible.

12   Q    And you're aware that the very next day that ICIB

13   sergeants threatened to arrest a special agent; correct?

14   A    I didn't look at the date of the -- that e-mail just now,

15   but I'm guessing that that's correct, based on your question.

16   Q    Well, I can show it to you again.

17        Mr. Tanaka, both of your e-mails on Exhibit 71 come on

18   September 25th, 2011; correct?

19   A    Yes.

20   Q    Mr. Tanaka, in September of 2011, talking about the

21   threatened arrest of Special Agent Marx, you're aware that

22   Mr. Leavins told you that ICIB had concluded there was no

23   probable cause to arrest Special Agent Marx; correct?

24   A    He did tell me that at some point.

25   Q    And you were also aware, based on your duties as a law

**UNITED STATES DISTRICT COURT**

```
 1   enforcement officer and your role in the Sheriff's Department,
 2   that undercover agents, somebody -- let me strike that -- that
 3   you're aware, based on your experience, that a law enforcement
 4   officer conducting an undercover operation does not break the
 5   law when engaging in authorized criminal conduct; correct?
 6   A     That's correct.
 7   Q     And with respect to ICIB's role, you testified on Friday
 8   that criminal investigations of personnel from other police
 9   departments occurred when they had requested that the Sheriff's
10   Department come in and investigate them; correct?
11   A     Yes.
12   Q     And that's the only time that ICIB comes in to investigate
13   other law enforcement agencies; correct?
14   A     At the request of the agency, correct.
15   Q     The FBI never asked the Sheriff's Department to
16   investigate its agents, did it?
17   A     Not that I'm aware of.
18   Q     You can think of no other time in which ICIB investigated
19   a federal law enforcement officer; correct?
20   A     I'm not aware of any.
21              MR. FOX:  Nothing further, Your Honor.
22              THE COURT:  All right.  Redirect?
23                        REDIRECT EXAMINATION
24   Q     (BY MR. HAIG)  Mr. Tanaka, Mr. Fox asked you about your
25   comments on a conversation that Mr. Olmsted had testified to in
```

1    this trial about whether you had told him that you were going

2    to be Sheriff someday.

3          Remember those questions from this morning?

4    A    Yes.

5    Q    And you had also testified that you ran for Sheriff of

6    Los Angeles County?

7    A    Yes.

8    Q    And when did you do so?

9    A    That was two years ago, in 2014.

10   Q    And were you retired from the Sheriff's Department at the

11   time that you ran for Sheriff?

12   A    I was.

13   Q    And who ran against you?  Anybody who testified at this

14   trial?

15   A    Yes.

16   Q    Who would that be?

17   A    Robert Olmsted.

18   Q    You also were asked some questions about being on a

19   committee that oversaw some punishment for certain deputies

20   that were involved in misconduct?

21   A    Yes.

22   Q    Do you recall hearing about the Christmas fight that has

23   been discussed in this case?

24   A    Yes.

25   Q    Were you involved in any way in that?

```
 1   A     Not in the fight.
 2   Q     Well, not in the fight, but were you involved in the
 3   aftermath?
 4   A     In the disciplinary review process.
 5   Q     And what was your job in the Sheriff's Department at that
 6   time?  What was your rank in the Sheriff's Department at that
 7   time?
 8   A     I believe I was an assistant sheriff at that time.
 9   Q     Were you the sole person who was making decisions as to
10   discipline, or were there others?
11   A     There was a review panel of three, because this was
12   discipline that would be heard at the highest levels of
13   misconduct.
14   Q     Were any deputy sheriffs at that time dismissed?
15         MR. FOX:  Objection, beyond the scope.
16         THE WITNESS:  Yes.
17         THE COURT:  Sustained.  The answer is stricken.  The
18   jury should disregard it.
19   Q     (BY MR. HAIG)  Do you recall the specific discipline that
20   was given to deputy sheriffs as a result of that panel that you
21   were on after the Christmas fight?
22         MR. FOX:  Objection, Your Honor, beyond the scope.
23         THE COURT:  Sustained.
24   Q     (BY MR. HAIG)  The county jail system, specifically Men's
25   Central Jail, do you have any personal knowledge of whether
```

```
 1    cell phones work very well inside that jail?
 2              MR. FOX:  Objection, beyond the scope.
 3              THE COURT:  Sustained.
 4              MR. HAIG:  Your Honor, if I could be heard on that,
 5    please.
 6              THE COURT:  Okay.
 7              MR. HAIG:  Thank you.
 8         (Discussion held at sidebar.)
 9              MR. HAIG:  Your Honor, the relevance of that is --
10              THE COURT:  It's not the relevance.  His is beyond
11    the scope.
12              MR. HAIG:  Oh, okay.  I apologize.  Why we believe
13    it's not beyond the scope is that it refers directly to that
14    list that was shown to Mr. Tanaka when he first started
15    testifying about the phone calls that were going back and forth
16    between Baca's cell phone and other people's cell phones and
17    Carey's cell phone and various lines.
18         The line of questioning that I'm going to go to, if I can
19    just tell you where I'm going to go so the Court can rule
20    whether it's beyond the scope or not, is that the -- cell
21    phones did not work very well at MCJ.  Therefore, it was often
22    that people would use landlines at MCJ.  That's point number
23    one.
24         And then the second part of that is that Sheriff's Baca's
25    practice was not always to use his cell phone.  He would have
```

```
 1    his aide make phone calls for him all the time, and then the
 2    phone would get handed back and forth.  And so it's to explain
 3    the lack of possibility of certain phone calls that might have
 4    been between Mr. Tanaka's cell line or office line and
 5    Mr. Baca's cell line or office line and why some of these
 6    people who may have been calling Mr. Baca's cell phone or
 7    Mr. Tanaka's cell phone or even somebody else's cell phone or
 8    landline might have been calling from an MCJ phone instead of
 9    calling from their own phone.
10             THE COURT:  But somehow they happened to work when
11    they called him.
12             MR. HAIG:  No, no, no.  I'm not saying that, Your
13    Honor.  I'm saying --
14             THE COURT:  I know you're not but --
15             MR. HAIG:  No, no.  What I'm saying is that there
16    has got to be -- well, what I'm saying is there's a strong
17    potential for phone calls to have originated from MCJ that
18    would not have been noticed in that document because that
19    wasn't one of the trigger lines that they were talking about.
20             MR. FOX:  Your Honor, there's a lot of speculation
21    here because there's -- I don't know if he's going to ask this
22    witness to comment on whether these people were calling Sheriff
23    Baca from the jail.  I mean it sounds like it's an argument
24    that he would like to make.  If he wants to have a very limited
25    amount of this, we will not object to it based on his
```

1    representations, but if there's going to be any question about

2    whether Mr. Tanaka was aware if they were calling Mr. Baca from

3    the jail, I think that that's outside --

4         MR. HAIG:  I'm not asking that, Your Honor, and we

5    do have something from Agent Tanner about her cell phone not

6    working when she was kicked out of the interview room and she

7    had to go outside for it to work.

8         THE COURT:  Okay.  Well, you can rephrase your

9    question.  They told you they, I guess, won't object.  Okay?

10        (End of sidebar discussions.)

11   Q    (BY MR. HAIG)  Mr. Tanaka, do you have any personal

12   experience with cell phones working inside of Men's Central

13   Jail?

14   A    Yes.

15   Q    And what would that be?

16   A    They generally didn't -- at least when I was working, they

17   generally didn't work very well because of the -- the cement

18   walls.

19        MR. FOX:  Objection, Your Honor.  I think we need

20   some clarification on time, please.  I'm not sure if we're

21   talking about 1980 or --

22        MR. HAIG:  I can clarify that.

23   Q    (BY MR. HAIG)  What would your time frame be consisting of

24   when you're talking about the cell phones not working because

25   of the walls?  Would that be when cell phones were first

```
 1   commonplace or at some other time?
 2   A    At least during the period of time that I was working, so
 3   whenever cell phones were first issued.  Maybe in the late
 4   '90s, early 2000s, my experience was that the phones didn't
 5   work very well in the jails, if at all.
 6            MR. FOX:  Your Honor, objection.  And move to strike
 7   as irrelevant at this point.
 8            THE COURT:  Sustained.
 9   Q    (BY MR. HAIG)  Are there --
10            THE COURT:  The answer is stricken.  The jury should
11   disregard the answer.
12   Q    (BY MR. HAIG)  Are there any landlines that are
13   county-owned landlines at Men's Central Jail?
14   A    Yes.
15   Q    Sheriff Baca -- we've seen some testimony about Sheriff
16   Baca's cell phone; right?  You remember hearing that testimony
17   this morning about --
18   A    Yes.
19   Q    -- and about his landline?
20   A    Yes.
21   Q    All right.  Did Sheriff Baca have an aide in 2011?
22   A    Yes.
23   Q    And --
24   A    He had several aides and a driver.
25   Q    Do you have any personal experience of Sheriff Baca's
```

1    habit as to how he would make telephone calls to other people

2    that he wanted to speak to?

3    A    Yes.

4    Q    And what would that be?

5    A    He would ask his aide or his driver to call whomever the

6    Sheriff wished to talk to, and the driver would do that from

7    the driver's phone and then hand the phone over to the Sheriff.

8    Q    Did you have the driver's phone number saved as a contact

9    in your own personal or county-issued cell phone?

10   A    I did.

11   Q    Did you ever get phone calls from Sheriff Baca on the

12   aide's cell phone?

13   A    I did.

14   Q    At some point in time during your time as undersheriff,

15   did the Sheriff give you any directives regarding the gray

16   area?

17   A    Yes, he did.

18   Q    And do you recall what he told you?

19        MR. FOX:  Objection, Your Honor.  May I have one

20   moment?

21        (Counsel conferred off the record.)

22   Q    (BY MR. HAIG)  And what did he tell you to do?

23        MR. FOX:  Objection, Your Honor.  Foundation and

24   hearsay.

25        THE COURT:  Sustained.

```
 1              MR. HAIG:  I have no more questions, Your Honor.

 2              THE COURT:  Anything else?

 3                         RECROSS-EXAMINATION

 4   Q    (BY MR. FOX)  Mr. Tanaka, I just briefly want to ask you

 5   to list all of the aides and drivers that Mr. Baca had in

 6   August and September of 2011 who you might have been

 7   communicating with.

 8   A    I don't remember who his driver was in 2011, and I -- he

 9   went through drivers about every one or two years.

10   Q    So you can't list his driver, you can't name his driver.

11   Can you list his aides that you might have been communicating

12   with in August and September of 2011?

13   A    I don't remember who the aides were in 2011.

14              MR. FOX:  No further questions, Your Honor.

15              MR. HAIG:  No more questions.

16              THE COURT:  All right, sir, you may step down.

17         Call your next witness.

18              MR. STEWARD:  Charlotte Lynch, Your Honor.  May I

19   retrieve her -- or never mind.

20              THE DEPUTY CLERK:  Will you please raise your right

21   hand.

22         (The witness, CHARLOTTE LYNN LYNCH, was sworn.)

23              THE DEPUTY CLERK:  Will you please have a seat.

24         Will you please state your full name and spell your last

25   name for the record.
```

```
 1                THE WITNESS:  Charlotte Lynn Lynch, L-Y-N-C-H.

 2                THE DEPUTY CLERK:  Thank you.

 3                          DIRECT EXAMINATION

 4    Q    (BY MR. STEWARD)  And, Ms. Lynch, what city do you reside

 5    in?

 6    A    Gardena.

 7    Q    And how long have you lived there?

 8    A    Since 1988.

 9    Q    Okay.  What do you do for a living?

10    A    I am a retired public health nurse.

11    Q    Do you know Paul Tanaka?

12    A    Yes, I do.

13    Q    Do you see him sitting here in the courtroom?

14    A    Yes, I do.

15    Q    And can you point him out to us.

16    A    Right over there.

17    Q    Okay.  And describe what he's wearing if you would.

18    A    A black suit with a blue shirt and dark navy blue tie with

19    white.

20    Q    And how is it that you know Mr. Tanaka?  In other words,

21    well, how do you know him?

22    A    I originally met Mr. Tanaka back in 2005 as when he was

23    campaigning to become mayor.

24    Q    And did you support him?

25    A    I absolutely did.
```

```
1    Q    Since 2005 have you encountered Mr. Tanaka again?

2    A    Yes.

3    Q    Multiple times?

4    A    Several times, yes.

5    Q    Okay.  And if you can give us what sort of -- where did

6    you see him again?  What kind of -- was it an event, or what

7    was it?

8    A    I -- since I've lived in the city of Gardena and after I

9    did my volunteer work at Serra Junipero High School in Gardena,

10   I became involved in volunteering with the City.

11   Q    And what kinds of things?

12   A    Okay.  I was a neighborhood watch coordinator for nine

13   years of which Mr. Tanaka would come at least once or twice a

14   year and speak to our residents to keep us updated.  I was on a

15   committee called the Gardena Beautiful Committee of which

16   Mr. Tanaka had nominated me to be on.  I'm -- oh, my gosh, I'm

17   on the chief of police administrative panel, so --

18   Q    And what does that panel do?

19   A    That oversees duties that the police department works on

20   and gets the opinions of the citizens as to whether or not they

21   feel it's a good idea, bad idea.  Not that we are the law or

22   anything, but we are residents and we have to live those.

23   Q    Is -- to your knowledge, is Mr. Tanaka in any way involved

24   in actual law enforcement in Gardena?

25   A    Not to my knowledge.
```

```
1    Q    A member of the police department there or anything like
2    that?
3    A    No.
4    Q    Did he also nominate you for some honor?
5    A    Yes, he did.
6    Q    And what was that?
7    A    It was the distinction -- Woman of Distinction in 2011, I
8    believe, and it was for the 35th District of the State of
9    California.
10   Q    And have you discussed Paul Tanaka with other members of
11   the Gardena community?
12   A    Yes.
13   Q    And based upon your own association with and dealings with
14   Mr. Tanaka, do you have a personal opinion as to whether or not
15   he's a truthful person?
16   A    Absolutely, I believe he's an honest and truthful person.
17   Q    Well, you just answered my next question.
18   A    Oh.
19   Q    Thank you.
20        MR. STEWARD:  Nothing further, Your Honor.
21        THE COURT:  All right.  Cross-examination.
22                    CROSS-EXAMINATION
23   Q    (BY MR. JAUREGUI)  Ms. Lynch, do you know Paul Tanaka
24   mainly as a politician from Gardena?
25   A    No, I would have to say that I know him as a friend.  Not
```

1   a real close friend, but a person that I've worked with in my

2   volunteer work.

3   Q     Okay.  And you said you testified that you encountered him

4   several times; correct?

5   A     Yes.

6   Q     Okay.  You've never been employed a day in the Los Angeles

7   County Sheriff's Department; correct?

8   A     No.

9   Q     And you never sat in on any meetings with the

10  undersheriff -- well, with Mr. Tanaka pertaining to an inmate

11  named Anthony Brown?

12  A     No.

13  Q     And you haven't been here for the past two weeks observing

14  any of the trial and listening to testimony?

15  A     No.

16  Q     And you were not in the room when Paul Tanaka testified

17  about his role in this case?

18  A     No.

19            MR. JAUREGUI:  No further questions, Your Honor.

20            THE COURT:  All right.

21            MR. STEWARD:  No redirect, Your Honor.

22            THE COURT:  All right.  You may step down.

23        Call your next witness.

24            MR. HAIG:  Your Honor, defense calls Charles Antuna.

25            THE DEPUTY CLERK:  Will you stand there and raise

```
 1   your right hand.
 2          (The witness, CHARLES ANTUNA, was sworn.)
 3              THE DEPUTY CLERK:  Please have a seat up there.
 4       Will you please state your full name and spell your last
 5   name for the record.
 6              THE WITNESS:  My name is Charles Antuna,
 7   A-N-T-U-N-A.
 8              THE DEPUTY CLERK:  Thank you.
 9                        DIRECT EXAMINATION
10   Q    (BY MR. HAIG)  Mr. Antuna, what do you do for a living?
11   A    I'm a deputy sheriff, rank of captain, assigned to Men's
12   Central Jail.
13   Q    And how long have you been a deputy sheriff?
14   A    34 years, nine months.
15   Q    And how long have you been a captain?
16   A    Approximately five years.
17   Q    Were you ever a lieutenant before you were a captain?
18   A    Yes.
19   Q    And how long were you a lieutenant?
20   A    Approximately five years.
21   Q    Do you recall the time frame when you were a lieutenant?
22   A    Yes.
23   Q    And what would that be?
24   A    Approximately 2003 to 2008.
25   Q    As a lieutenant, did you ever work as lieutenant in any
```

```
 1  custodial facility?
 2  A     Yes.
 3  Q     And where would that be?
 4  A     Twin Towers facility.
 5  Q     And do you recall the year or years that you worked at
 6  Twin Towers Correctional Facility?
 7  A     It would be 2006, 2007, 2008.
 8  Q     And what was your job at Twin Towers Correctional
 9  Facility?
10  A     I served there as watch commander for a period of time,
11  and also acting captain.
12  Q     So why were you acting captain?
13  A     In the absence of a captain for sick or leave, I became
14  responsible to run the facility.
15  Q     And how was it, if you know, how you became a lieutenant
16  assigned to Twin Towers Correctional Facility?
17  A     I passed a series, a regimen of tests and -- after
18  applying, and made it to a promulgated list and was selected to
19  the rank of lieutenant.
20  Q     Do you know a gentleman by the name of Paul Tanaka?
21  A     Yes.
22  Q     And do you see him in court?
23  A     Yes.
24          MR. HAIG:  He's identified the defendant, Your
25  Honor.
```

```
 1   Q     (BY MR. HAIG)  In 2006, do you recall what Mr. Tanaka's
 2   rank was in the Sheriff's Department?
 3   A     I believe it was assistant sheriff.
 4   Q     And do you recall whether he was in your chain of command
 5   when you were working at Twin Towers?
 6   A     Yes, for a -- I think a short period of time, yes.
 7   Q     At any time that you were working at Twin Towers
 8   Correctional Facility, did Mr. Tanaka ever give you any
 9   indication that he approved of unlawful deputy force upon an
10   inmate?
11   A     No.
12            MR. FOX:  Objection, Your Honor.  401 and 403.
13            THE COURT:  Let's go to sidebar.
14       (Discussion held at sidebar.)
15            MR. FOX:  Your Honor, I don't understand the
16   relevance of whether Mr. Tanaka approved of force on an inmate,
17   which I think was the question, and it's my understanding that
18   they're going to next go into, based on their proffer, whether
19   he instructed supervisors at the jail to appear to obstruct the
20   ACLU of the FBI in any of their investigations.  And I think
21   that this is going to when he was in Twin Towers from '06 to
22   '08.  None of the allegations in the indictment relate to
23   anything that went on in Twin Towers in '06 to '08.
24            MR. HAIG:  First of all, the indictment does cover
25   that period of time, and it covers many, many allegations of
```

1    the defendant's alleged conduct and looking the other way at

2    inmate abuse at the hands of deputy sheriffs.  Likewise, Your

3    Honor, none of my client's conduct that happened in 1997 or

4    1987 was relevant, and that did come in, but I think the --

5              THE COURT:  It did come in, and you didn't object.

6              MR. HAIG:  Well, Your Honor, I think the point that

7    I'm trying to make here is that this captain has firsthand

8    knowledge that the defendant never would have condoned unlawful

9    conduct by a deputy sheriff, and it corroborates not only what

10   we believe is the true state of the record, but it also

11   conflicts with the government's evidence to the contrary.

12             MR. FOX:  Your Honor, I'll point out that there's

13   been no foundation that there were any instances that he came

14   upon -- Mr. Antuna came upon a situation where there was a

15   lawful use of force and told Mr. Tanaka about it and then had a

16   response.  Right now, we've just jumped to the conclusion

17   without any basis for that, so with him just jumping to that

18   conclusion, again it's 401 and 403 at this point.

19             THE COURT:  Okay.  I believe that the current

20   question before us is you asked him whether or not he was --

21   whether Tanaka never told him to condone the use of --

22             MR. HAIG:  Whether he had condoned to him -- whether

23   he had ever told him that he condoned the unlawful application

24   of force by a deputy upon an inmate.

25             MR. FOX:  He's basically asking in the negative, did

**UNITED STATES DISTRICT COURT**

1    he ever condone it.  There has to be something there for him to

2    condone.  Otherwise, it's an irrelevant question.

3              THE COURT:  Well, at this point, if there's

4    something -- some foundation you want to lay for this, but at

5    this point, I'll sustain that.  Now, what's the foundation?

6              MR. HAIG:  Well, the foundation is that he has

7    personal knowledge that the defendant didn't do that.  I can

8    ask him about whether they had had discussions about that and

9    whether that topic had ever come up.

10              THE COURT:  How is that relevant?

11              MR. HAIG:  Well, Your Honor, we've got testimony

12   from Mr. Gonzales --

13              THE COURT:  Well, what's he going to say next?  Has

14   that topic ever come up?

15              MR. HAIG:  Here's the problem, Your Honor.  We have

16   not been allowed to talk to him by edict of the current Sheriff

17   not allowing them to talk to the defense.  So I don't know --

18              THE COURT:  Why don't you know?  That's --

19              MR. HAIG:  That's not my fault, Your Honor.  We have

20   not been able to talk to --

21              THE COURT:  Yeah, it kind of is.

22              MR. HAIG:  It really isn't, Your Honor.  I mean, we

23   have not -- they've been -- they hold up these witnesses.  We

24   cannot speak to them.

25              MR. FOX:  Your Honor, we're objecting on foundation

1    grounds at this point.  If he believes he has a good faith

2    basis to ask a question if there's unlawful force that

3    Mr. Antuna presented to Mr. Tanaka and Mr. Tanaka responded to

4    it, so long as he establishes a foundation --

5            THE COURT:  But he says he doesn't know at this

6    point because he hasn't talked to the witness.  We're going to

7    take -- we'll take a short recess.

8            MR. HAIG:  I can ask him about that, Your Honor, and

9    report back to you.

10            THE COURT:  You can ask him what?

11            MR. HAIG:  What you just asked me to ask him.

12            THE COURT:  You mean you want to talk to the witness

13    over the recess?

14            MR. HAIG:  If the Court's directing me to do so.

15            THE COURT:  I'm not directing you to do anything.

16            MR. HAIG:  If the Court wants more information as to

17    a foundation, I can do that.  I don't want to, certainly,

18    interfere with the witness's testimony.  I can do it in front

19    of Mr. Fox if you'd like me to do that.

20            THE COURT:  I don't want you to do anything.  All I

21    know is you've got a witness on the stand.  There's been an

22    objection.  There's no foundation to support this question at

23    this point.  So if you want to take a recess now, I'll be happy

24    to do that.  You can do whatever it is you want to do.  I'm not

25    suggesting anything.  So I'm going to sustain the objection and

```
 1   move along.
 2              MR. HAIG:  I'm fine taking a recess.  It's not a bad
 3   idea.
 4              MR. FOX:  I'll talk to Mr. Haig, and we have no
 5   objection of him talking to this witness, of course, while he's
 6   on direct examination.
 7              THE COURT:  All right.
 8         (End of sidebar discussions.)
 9         (Counsel conferred off the record.)
10              THE COURT:  Ladies and gentlemen, we're going to
11   take our final break of the day.  Again, I want to remind you
12   that until this trial is over, you're not to discuss this case
13   with anyone, including your fellow jurors, members of your
14   family, people involved in the trial or anyone else, and do not
15   allow others to communicate with you about this case.
16         Do not read or listen to any news accounts about the
17   trial.  If anybody approaches you and tries to talk with you
18   about this case, please let me know about it immediately.  Do
19   not do your own investigation about the case.  If you need to
20   communicate with me, simply give a note to the clerk.
21         We'll come back at five until the hour.
22         (The jury exited the courtroom.)
23              THE DEPUTY CLERK:  Please be seated.
24              THE COURT:  All right.  Anything else?
25              MR. STEWARD:  Only, Your Honor, that our next
```

1    witness will be Judge Birotte.  I know he had a ten o'clock

2    calendar.  I'm hoping and praying he's done now and can join us

3    for a little while.  I'll check as soon as we break.

4              THE COURT:  Okay.

5         (Off the record at 11:40 a.m.)

6         (On the record at 11:56 a.m.)

7              THE COURT:  Are we ready to resume?

8              MR. STEWARD:  Yes, Your Honor.

9              MR. FOX:  The government is, Your Honor.

10             THE COURT:  Okay.  Let's bring the jury in.

11        (The jury entered the courtroom.)

12             THE DEPUTY CLERK:  Please be seated.

13        (Pause in proceedings.)

14             THE COURT:  All right.  Sir, you're reminded that

15   you're still under oath.

16             THE WITNESS:  Thank you, Your Honor.

17   Q    (BY MR. HAIG)  Mr. Antuna, before you took over your

18   assignment at Twin Towers as the lieutenant, do you recall

19   having any meeting with the defendant?

20   A    Yes.

21   Q    And where was that?

22   A    I believe it was in his office.

23   Q    And where was his office at that time?

24   A    On the fourth floor in Monterey Park.

25   Q    And do you recall what happened at that meeting?

```
 1   A     I was sitting there across from him on his sofa --
 2               MR. FOX:  Objection, Your Honor.  Foundation as to
 3   time, date.
 4   Q     (BY MR. HAIG)  Do you have an approximate year when this
 5   happened?
 6   A     It must have been about April 2006.
 7   Q     All right.  Go on.  So you said you were sitting across on
 8   a sofa?
 9   A     Yes.
10   Q     And what happened?
11   A     He said, Charlie, just remember, I don't tolerate neglect
12   of duty, biasness or apathy.  And then he gave me an anecdote,
13   he said, Charlie, remember management is not just about
14   management; it's also about taking care of the men and women on
15   the front line.
16   Q     Now, he referred to you as Charlie.  Is that a name that
17   he'd used to refer to you as before?
18   A     Yes, sir.
19   Q     And how did you refer to him?  By his name or by his rank?
20   A     It was either "sir" or "Mr. Tanaka."
21   Q     Was this the first time you'd ever been in the private
22   company of Mr. Tanaka?
23   A     Yes.  In his office, yes.
24   Q     In his office.  What about on any social basis?
25   A     I had been with him alone before.
```

```
1   Q     In 2006 would -- did you consider yourself to be a

2   personal friend of Mr. Tanaka?

3   A     Yes.

4   Q     Do you recall when -- what year approximately that you

5   first met Mr. Tanaka?

6   A     It may have been about 1986, '87.

7   Q     And were the two of you working at the same location when

8   you first met?

9   A     Yes.

10  Q     And where was that?

11  A     It was a place called Lynwood station.

12  Q     And was it at Lynwood station where the two of you became

13  friends?

14  A     Well, initially he was my supervisor, and I later called

15  him a friend.

16  Q     And as you sit here today, do you still consider him to be

17  a friend?

18  A     Yes.

19          MR. HAIG:  Thank you.  No more questions, Your

20  Honor.

21          THE COURT:  All right.

22                      CROSS-EXAMINATION

23  Q    (BY MR. FOX)  Mr. Antuna, in terms of the two of you being

24  friends and associates, you went on vacation with Mr. Tanaka

25  quite frequently; correct?
```

1  A     Yes.  In later years we both had a passion for fishing,

2  yes.

3  Q     And so you would go on these fishing trips annually;

4  correct?

5  A     Yes.

6  Q     When was the last time you went on one of these fishing

7  trips?

8  A     2013 I believe.

9  Q     And with these fishing trips you would go on, there would

10  be other people present besides the two of you; correct?

11  A     Yes, sir.

12  Q     One of those would be Paul Yoshinaga?

13  A     Yes, sir.

14  Q     Did Greg Thompson join you on any of these fishing trips?

15  A     No.

16  Q     And when you were captain at IRC, that was in August and

17  September of 2011; correct?

18  A     Yes.

19  Q     And despite being captain of the Inmate Reception in

20  August of 2011, you don't know anything about what happened

21  with Anthony Brown at the time; correct?

22  A     No.  There was a matter that came before me regarding an

23  inmate Brown, yes.

24  Q     Okay.  You don't know anything about anybody coming into

25  the Inmate Reception Center and taking his records jacket;

1  correct?

2  A      That's correct, I do not know that.

3  Q      And you didn't know anything at the time about anyone

4  going into the computer databases and removing him -- his name

5  from the database and showing him released, do you?

6  A      No.

7  Q      And during the time of August and September of 2011, if

8  IRC received a federal writ, there was no need to do anything

9  but process it; correct?

10 A      Yes.

11 Q      And you didn't need a legal advisor to take a look at it

12 in August and September of 2011 before processing it; correct?

13 A      I suppose it would depend on the -- on the document and...

14 Q      What you would do in August and September of 2011 is

15 receive the writ, drop it in the computer database and pull a

16 pass allowing the inmate to be processed; correct?

17         MR. HAIG:  Objection, Your Honor.  Beyond the scope,

18 relevance.

19         THE COURT:  Sustained.

20 Q      (BY MR. FOX)  Mr. Antuna, this conversation with

21 Mr. Tanaka in his office in 2005 -- or, I'm sorry, 2006 I think

22 your testimony was that you were friends at the time; is that

23 correct?

24 A      Yes.

25 Q      And before that, he was your sergeant at Lynwood; correct?

```
 1   A     Yes.

 2   Q     And you have a Viking tattoo; correct?

 3              MR. HAIG:  Objection, Your Honor, relevance.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  Yes.

 6              MR. FOX:  No further questions, Your Honor.

 7              MR. HAIG:  I have no more questions of this witness,

 8   Your Honor.

 9              THE COURT:  All right.  You may step down.

10              THE WITNESS:   Thank you, Your Honor.

11              THE COURT:  Call your next witness.

12              MR. HAIG:  Your Honor, before calling a witness we'd

13   like to read a stipulation, please.

14              THE COURT:  All right.

15              MR. HAIG:  Can I have one moment?

16          (Counsel conferred off the record.)

17              MR. HAIG:  Your Honor, this is the stipulation

18   between the parties regarding an FBI report.  Defendant Paul

19   Tanaka, by and through his counsel, Dean Steward and Jerome

20   Haig, and Plaintiff United States of America, by and through

21   its counsel, Assistant United States Attorneys Brandon Fox and

22   Eddie Jauregui -- I should know this by now.

23              MR. FOX:  Jauregui.

24              MR. HAIG:  Jauregui, yes, thank you -- hereby

25   stipulate as follows -- sorry, Eddie -- a Federal Bureau of
```

```
 1    Investigations report dated August 22nd, 2011 indicates as
 2    follows:  On August 18, 2011, informant Anthony Brown's cover
 3    was revealed to the Los Angeles County Sheriff's Department
 4    (LASD) after LASD deputies discovered a cell phone smuggled
 5    into Men's Central Jail.  Investigations by LASD linked Anthony
 6    Brown to FBI Special Agent Leah Marx.  FBI Assistant Director
 7    in Charge Steven Martinez notified LASD Sheriff Leroy Baca and
 8    requested that informant Anthony Brown be placed in a
 9    protective unit.  Mr. Baca assured the safety of informant
10    Anthony Brown.
11         It is so stipulated and agreed by the parties.
12              THE COURT:  Ladies and gentlemen, the parties have
13    agreed to certain facts that have been stated to you.  You
14    should therefore treat these facts as having been proved.
15              MR. STEWARD:  And, Your Honor, our next witness is
16    Andre Birotte.
17         (Pause in proceedings.)
18              MR. STEWARD:  Apparently we're going to change our
19    order a little bit, Your Honor.
20              THE COURT:  All right.
21              MR. HAIG:  Your Honor, we would call Helen Hayase to
22    the stand, please.
23              THE DEPUTY CLERK:  Please stand here for me, raise
24    your right hand.
25         (The witness, HELEN MIKIKO HAYASE, was sworn.)
```

```
1              THE DEPUTY CLERK:  Please have a seat up there.

2         Will you please state your full name and spell your last

3    name for the record.

4              THE WITNESS:  My name is Helen Mikiko Hayase,

5    H-A-Y-A-S-E.

6              THE DEPUTY CLERK:  Thank you.

7         (Reporter clarification.)

8              THE WITNESS:  M-I-K-I-K-O.

9                        DIRECT EXAMINATION

10   Q    (BY MR. HAIG)  Ms. Hayase, what do you do for a living?

11   A    I'm a judicial research attorney for the California Court

12   of Appeal, Second Appellate District, Los Angeles.

13   Q    And do you know somebody by the name of Paul Tanaka?

14   A    Yes, I do.

15   Q    You see him in court?

16   A    Yes, I do.

17   Q    How long have you known Mr. Tanaka?

18   A    We've known each other since we were in second grade at

19   Gardena Elementary School.  So -- well, I don't know exactly,

20   close to 50 years.

21   Q    Both of you are about the same age though?

22   A    We're about the same age.

23   Q    Sorry.

24        During that -- knowing him since the second grade, have

25   you had much contact and communication with Mr. Tanaka
```

1    throughout the years?

2    A     Yes.  There's a group of us, we've been lifelong friends,

3    and we've just kept in touch over the years.  So yes, I

4    consider Paul a very good friend.

5    Q     How often throughout the years would you say you

6    communicate with him on a yearly basis?

7    A     At least several times a year, sometimes depending on what

8    we're doing.  If it's a reunion year, way more.  Other years,

9    we might be very busy and just once or twice, but we've been in

10   regular communication over all our lives.

11   Q     Do you have any opinion as to whether you believe

12   Mr. Tanaka to be a truthful person?

13   A     I absolutely do.  I believe he's a very honest person,

14   very truthful.

15              MR. HAIG:  Thank you.  I have no more questions.

16              THE COURT:  Cross-examination.

17                     CROSS-EXAMINATION

18   Q     (BY MR. JAUREGUI)  Ms. Hayase, you care very much for Paul

19   Tanaka?

20   A     I do.

21   Q     And you are a friend and supporter of his?

22   A     Yes, I am.

23   Q     And you've given money to his political campaigns?

24   A     Yes, I have.

25   Q     And you've never worked for the Los Angeles County

```
 1   Sheriff's Department, have you?
 2   A     No, I have not.
 3   Q     And you've never been in any meetings at Sheriff's
 4   Headquarters about an inmate named Anthony Brown?
 5   A     No, I have not.
 6   Q     And you've never been in any meetings where there was
 7   discussion about changing that inmate's name or moving him?
 8   A     No.
 9   Q     You haven't been here for the past two plus weeks
10   listening to the testimony in this case, have you?
11   A     No, I've been at work.
12   Q     And you don't know what Paul Tanaka has testified to, if
13   he's even testified at all in this case?
14   A     I read in the paper that he testified --
15              THE COURT:  Excuse me.
16              MR. JAUREGUI:  I'll move on, Your Honor.
17              THE COURT:  All right.
18   Q    (BY MR. JAUREGUI)  And you don't know anything about
19   any -- well, let me rephrase the question.
20        You've never been in any meetings at Sheriff's
21   Headquarters where they discussed surveilling FBI agents?
22   A     No.
23              MR. JAUREGUI:  No further questions, Your Honor.
24              THE COURT:  All right.
25              MR. HAIG:  I have no redirect, Your Honor.  Thank
```

1  you.

2          THE COURT:  All right.  Thank you very much.  You

3  may step down.

4      Call your next witness.

5          MR. STEWARD:  I believe Mr. Birotte has arrived,

6  Your Honor.

7          MR. HAIG:  Your Honor, if I could go outside, I

8  don't know if our witness coordinator knows where he is.

9      May I?

10          THE COURT:  Sure.  The witness might have some

11  difficulty finding his way here.

12          MR. STEWARD:  I was going to ask for a warrant, but

13  maybe not.

14          THE DEPUTY CLERK:  Will you raise your right hand.

15      (The witness, ANDRE BIROTTE, JR., was sworn.)

16          THE DEPUTY CLERK:  Please be seated.

17      Will you please state your full name and spell your last

18  name for the record.

19          THE WITNESS:  My name is Andre Birotte, Jr.  Last

20  name is spelled B, as in boy, I-R-O, double T as in Tom, E.

21          THE DEPUTY CLERK:  Thank you.

22          MR. STEWARD:  May I proceed, Your Honor?

23          THE COURT:  Yes, please.

24                      DIRECT EXAMINATION

25  Q   (BY MR. STEWARD)  Sir, how were you employed in 2011?

1    A     In 2011 I was a United States Attorney for the Central

2    District of California.

3    Q     And can you tell the jury what the duties are of a United

4    States Attorney.

5    A     As U.S. Attorney, I was -- I guess the short answer is I

6    was the head federal law enforcement officer for the Central

7    District of California, which includes seven counties going as

8    far north as San Luis Obispo down to the San Diego border.  We

9    had responsibility over -- in criminal and civil cases on

10   behalf of the United States.

11   Q     And what, if anything, is the relationship between the

12   U.S. Attorney's Office and the FBI?

13   A     Oh, they were one of the main partners of the U.S.

14   Attorney's Office, one of the many investigative agencies that

15   we worked with.

16   Q     Okay.  And in 2011, was that also true then?

17   A     Yes.

18   Q     Do you know a Steve Martinez?

19   A     Yes.

20   Q     In 2011 can you tell us, what position did he hold?

21   A     In 2011 Steve was the assistant director in charge of the

22   L.A. FBI office.  He was the head of the L.A. FBI office.

23   Q     Do you know Leroy Baca?

24   A     Yes.

25   Q     And how is it that you know Mr. Baca?

1    A    Oh, I've known Lee for a number of years.  He was the

2    Sheriff at the time, but I knew him in my prior job before I

3    was U.S. Attorney.

4    Q    Okay.  And so when we say the Sheriff at the time, are we

5    talking 2011 as well?

6    A    Correct.

7    Q    Now, do you recall having a meeting with Mr. Baca and

8    others in late August of 2011?

9    A    Yes.

10   Q    Okay.  I'm not trying to pin you down on a date, but does

11   the 29th of August sound perhaps okay?

12   A    That sounds okay.  I don't know the dates and specifics.

13   Q    Okay.  But you do recall the meeting itself?

14   A    Yes.

15   Q    Do you recall -- how was that set up?  Did you call the

16   meeting?  Did he call the meeting?

17   A    You know, I'll be honest, I don't remember how it was set

18   up.  I honestly don't.  I just know there was a big meeting up

19   on the 12th floor in the conference room.

20   Q    And 12th floor of the conference room of this building?

21   A    Yes, I'm sorry.  This building, which is where the U.S.

22   Attorney's Office is located.

23   Q    Okay.  Did you become aware before the 29th of August of

24   an incident regarding a cell phone and an inmate by the name of

25   Anthony Brown?

1    A    Yes.

2    Q    And before the 28th of August, do you recall how much

3    before that you became aware of a cell phone and Brown?

4    A    I honestly don't.  I mean, certainly days.  Might have

5    been a week before.  I'm not sure.

6    Q    And do you recall how it was you learned of this

7    particular incident?

8    A    Of the incident with Anthony Brown?

9    Q    Yes.

10   A    If my memory serves me correctly, I seem to recall being

11   at a conference -- well, let me step back.  I mean, I was aware

12   of an investigation involving the Los Angeles County Sheriff's

13   Department, and so I knew that was going on.  And then I

14   think -- I seem to recall I was at a conference, and then I got

15   a phone call from Director Martinez indicating that the phone I

16   think had been discovered in the jail.

17   Q    Okay.  And you're not sure whether it was the day before

18   the 29th or a week before the 29th, something like that?

19   A    I don't know.  I'm assuming it was somewhere close in that

20   time period, because things moved quickly -- pretty quickly

21   after that.

22   Q    And so the meeting on the 12th floor in this building, who

23   do you remember attending that meeting besides yourself and

24   Mr. Baca, Sheriff Baca at the time?

25   A    Well, there were a bunch of people there, representatives

1    from the county and representatives from our office and

2    representatives from -- I think, the FBI were there as well.

3    Q    Okay.  And is this a big conference room, large conference

4    room?

5    A    It's a large conference room, yes.

6    Q    Physically, do you recall that, for want of a better word,

7    you feds were on one side, and the county people were on the

8    other side of the table?

9    A    By and large, yes.

10   Q    During that meeting, just generally, what was the topic or

11   topics?

12   A    I mean, this was the -- how could I describe it?  This was

13   the -- as you mentioned, for lack of a better term, federal

14   folks on one side, county on the other side.  I think the

15   county -- or specifically the Sheriff's Department was voicing

16   their displeasure or concerns about the phone, the nature of

17   the investigation, why weren't they in the loop?  They wanted

18   to stop and/or wanted to be part of the investigation going

19   forward.  That's what I remember.

20   Q    Sorry.  Who was it who shared all of this with you?  Who

21   was talking?

22   A    Sheriff Baca.

23   Q    Did anyone else speak at that meeting, if you remember?

24   A    From the county side?

25   Q    Well, let's do both.  First from the county side with the

1    sheriffs.

2    A    I don't recall anyone else speaking.

3    Q    Okay.  Do you know Paul Tanaka?

4    A    I know who he is, yes.

5    Q    Did you know that back in 2011?

6    A    Yes.

7    Q    Okay.  Do you recall him saying anything at all at that

8    meeting?

9    A    Don't recall him saying anything.

10   Q    Okay.  Now, on the other side of the table, was it you

11   doing the talking, others?  If you recall.

12   A    Look, I was the U.S. Attorney at the time, so I know I did

13   some talking.  I can't remember -- I know Mr. Fox was there.

14   For some reason, I thought -- Mr. Middleton might have been

15   there as well, Lawrence Middleton, who I think at the time was

16   the head of the public corruption section, our chief.

17   Q    Just standing back for a moment, Mr. Middleton was at the

18   time an assistant U.S. attorney; correct?

19   A    Correct.

20   Q    And Mr. Fox, also assistant U.S. attorney, was there also?

21   A    Correct.

22   Q    From the -- and again, for want of a better word, the

23   feds' side, I believe you said somebody from the FBI was there?

24   A    I think so, although I cannot recall who.

25   Q    Okay.  Approximately how many people, if you remember,

```
1   were on your side of the table?

2   A    I couldn't tell you.  I mean --

3   Q    10?  5?

4   A    I'd be guessing.  I mean, this was, you know, the feds,

5   county.  I -- just lined up.

6   Q    Okay.  Do you remember on the county side how many folks

7   were over there?

8   A    No.  I do remember that I think they had sheriff, Office

9   of Independent Review, county counsel.  I thought those were

10  the entities that were represented.  And I know, for example,

11  for OIR, I know there's this one person I knew the individual.

12  And there might have been two or three from the county counsel

13  and two or three from the Sheriff's Department.  You know,

14  that's what I recall.

15  Q    Okay.  And you referred to OIR.  Is that Office of

16  Independent Review?

17  A    Yes, the Office of Independent Review.

18  Q    And they would have been on -- that person would have been

19  on the county side?

20  A    Correct.

21  Q    That was Mike Gennaco?

22  A    That's correct.

23  Q    Okay.  A former assistant U.S. attorney?

24  A    Correct.

25  Q    Can you describe the demeanor -- well, let me back up just
```

1    a second.

2        How long did the meeting last, do you recall?  Ballpark?

3    A    Maybe 15, 20 minutes.

4    Q    And can you describe the demeanor of Sheriff Baca during

5    this meeting?

6    A    Boy.  I mean, this was -- this was his opportunity to

7    express his displeasure about what was going on.  I can't

8    recall -- I don't -- there was no yelling or anything like

9    that.  I think he was just laying out, you know, why he thought

10   it was wrong, the claims about, you know, it was illegal

11   conduct and wanted to stop.  But there wasn't -- it wasn't

12   yelling.  But, you know, he was just letting us know he didn't

13   like it.

14   Q    Did he appear angry to you?

15   A    No, not -- not really.

16   Q    Okay.  Now, as a result of that meeting, did you take any

17   action?  And I mean that broadly.

18   A    No.

19   Q    Did you respond to Baca's -- Mr. Baca, Sheriff Baca's

20   complaints?

21   A    You mean at the time of the meeting when he voiced his

22   displeasure?  I may have said, Okay, Lee, thank you for

23   sharing, and that was pretty much it.  I don't know if I said

24   anything like, This is what we're going to do.  We had a

25   follow-up meeting thereafter, but it was -- I viewed it as

1    more, Look, we're going to let these guys say what they need to

2    say.  We're not changing anything, we just move forward.

3    Q    You mentioned a follow-up meeting.  Approximately -- and

4    again, ballpark -- when was that?

5    A    You're going to have to help me.  I honestly don't

6    remember, but there was a follow-up meeting.

7    Q    Sure.  Was it about 30 days later?

8    A    I thought it was sooner, but if you have documentation to

9    suggest otherwise, I'll go with you.

10   Q    And what was the purpose of this follow-up meeting?

11   A    Boy.  The purpose -- well, the meeting was Sheriff Baca,

12   Steve Martinez and myself.  And I think the purpose was really

13   to sort of say, Okay, this is what's going on.  I heard what

14   you had to say when we met earlier.  Here's what's happening.

15   Here's what we're going to do, and that's that.

16   Q    Okay.  So this was you, on the federal side, telling

17   Sheriff Baca what you were going to do?  Or was it the reverse;

18   Baca telling you what they were going to do?  Or both?

19   A    No, it was more, Lee, you raised these concerns.  I want

20   to bring you together.  Let's -- and we're going to talk about

21   it.  Here's our position.  So it was -- I guess it would be

22   more me saying, This is what's happening with the

23   investigation, this is what we're going to do going forward, et

24   cetera.

25   Q    Okay.  And here we are, four or five years later.

**UNITED STATES DISTRICT COURT**

1    Do you recall what you told him in terms of what you

2  intended to do?

3         MR. FOX:  Objection, Your Honor, relevance.

4         THE COURT:  Sustained.

5  Q    (BY MR. STEWARD)  Let's take a look at Exhibit 352, if you

6  would.  It's in a white -- yes, right there.

7    Do you have that there?

8  A    I do.

9  Q    And take a look, if you would.  I think it's about an

10  eight-page document.  See if that looks familiar to you.

11  A    The document looks familiar, yes.

12  Q    And just generally, is this a letter addressed to you?

13  A    It is.

14  Q    Dated September 26, 2011?

15  A    Correct.

16  Q    And the subject matter generally is the Brown cell phone

17  and some of the complaints that you've talked about; correct?

18  A    Yes.

19  Q    Signed, page 3, by Lee Baca?

20  A    Correct.

21         MR. STEWARD:  At this time, Your Honor, we'd offer

22  352?

23         THE COURT:  Any objection?

24         MR. FOX:  May I have one moment?

25         THE COURT:  Yes.

**UNITED STATES DISTRICT COURT**

1          (Counsel conferred off the record.)

2          MR. FOX:  Your Honor, counsel and I have talked

3     about a portion of the letter that we will redact.  Other than

4     that, we have no objection, and Mr. Steward said he would not

5     publish that portion.

6          THE COURT:  All right.  It will be received.

7          (Exhibit No. 352 received into evidence.)

8          MR. STEWARD:  And, Your Honor, I'm not going to

9     publish it at this time at all, and I'm finished with

10    questioning.  Thank you.

11         THE COURT:  All right.  Thank you.

12         MR. FOX:  May I proceed, Your Honor?

13         THE COURT:  Yes.

14                        CROSS-EXAMINATION

15    Q    (BY MR. FOX)  I hate to impeach my former boss, but you

16    said that I was at this meeting.

17         Do you remember when I joined the office?

18    A    Oh, goodness.

19    Q    Had I been at a previous U.S. Attorney's Office at that

20    point in time?

21    A    Yes, you were.  You were.  You were in Chicago.

22    Q    Okay.

23    A    Sorry.

24    Q    Thank you.

25         So what did you do before becoming U.S. Attorney?

```
 1   A    Immediately prior to being U.S. Attorney, I was the
 2   Inspector General for the Los Angeles Police Commission for --
 3   from 2000 -- well, I started in 2001, but I became Inspector
 4   General in 2003 to 2010.
 5   Q    Can you please describe those duties to the jury.
 6   A    All right.  The inspector general served as eyes and ears
 7   for the Los Angeles Police Commission.  We reviewed complaints
 8   of misconduct and significant uses of force on behalf of the
 9   Police Commission, and we were responsible for providing
10   reports and insights, specifically as it related to uses of
11   force, so that the Police Commission could make recommendations
12   about whether those uses of force were in or out of policy.
13   Q    Now, you said on direct examination that you were aware of
14   the investigation into the Los Angeles County Sheriff's
15   Department while you were U.S. Attorney; correct?
16   A    Yes.
17   Q    And that included before the meeting with Mr. Baca and
18   Mr. Tanaka; correct?
19   A    Oh, yes.
20   Q    And when I say that, I'm meaning the first meeting in
21   August.
22        Before the first meeting in August with the Sheriff's
23   Department, you were aware of this investigation?
24   A    Oh, absolutely.  Absolutely.
25   Q    And you had been for some time?
```

1    A    Yes.

2    Q    And Mr. Tanaka and Mr. Baca came to that meeting together;

3    is that correct?

4    A    I believe so, yeah.  I mean, they were there.

5    Q    And Mr. Tanaka sat on the same side as Mr. Baca in that

6    room?

7    A    Yes.

8    Q    Is it unusual when you have meetings with heads of

9    agencies and their staff that only the top two people in the

10   group are the ones talking?

11   A    No.  No.

12   Q    Did you give Mr. Baca and Mr. Tanaka any reason to believe

13   that a crime had been committed by the FBI at that August

14   meeting?

15   A    Crime by the FBI?

16   Q    Correct.

17   A    No.  No.

18              MR. FOX:  No other questions, Your Honor.

19              THE COURT:  All right.

20              MR. STEWARD:  No redirect, Your Honor.

21              THE COURT:  All right.  You may step down.

22        Call your next witness.

23              MR. HAIG:  Your Honor, could we approach on one

24   issue, please, regarding the next witness?

25              THE COURT:  Yes.

**UNITED STATES DISTRICT COURT**

1          (Discussion held at sidebar.)

2              MR. HAIG:  Your Honor, our next --

3              THE COURT:  Don't judges make awful witnesses.

4              MR. FOX:  I didn't know how to refer to him.  You

5      said he was a federal judge, so I didn't want to say Your

6      Honor.

7              THE COURT:  Okay.

8              MR. HAIG:  The next witness, Your Honor, is David

9      Real.  He was in the proffer we offered yesterday.  Mr. Real is

10     a current deputy sheriff, and we'd spoken about it last week.

11     Mr. Real is, for lack of a better term, a higher-up witness who

12     knows the defendant and cares deeply about him and will

13     probably be a character witness as well, as long as some other

14     people of course.  But also, we think his testimony is relevant

15     because he was a deputy sheriff in August of 2011 for three

16     years after on the 3,000 floor at Men's Central Jail, and we'd

17     like him to testify about some of the things that the deputies

18     had to deal with on the 3,000 row.

19         We think it's relevant, Your Honor, just to give context

20     to some of the things that have come in earlier in this trial

21     about reports of deputy abuse on the floor 3,000, also on

22     2,000.  We think it's important because it -- the context is

23     something the jury would like to know.  I think it would be

24     important for the jury to know that -- not only the types of

25     inmates that are housed there, but the conditions that deputies

1    would have to undergo as far as getting attacked and abused by

2    some of these inmates.

3         And we think that's important in establishing an

4    understanding of not only what the Sheriff's Department was

5    dealing with, but also what the complainants were dealing with

6    at the same time; also what the ACLU had to deal with.  Because

7    right now, we have lots and lots of reports of deputy abuse

8    without the context as to what was really going on there.

9    That's why we think it's important.

10             MR. JAUREGUI:  Your Honor, if I may, I've discussed

11   this with defense counsel.  I've looked at the proffer.  I

12   think that the testimony is largely irrelevant.  I don't think

13   it goes to the offenses.  I don't think it goes to any

14   defenses.  The proffered testimony about gassing and about the

15   attack on Deputy Real, I think is prejudicial -- unduly

16   prejudicial.  So I've objected to almost all of the fact

17   testimony as irrelevant under 401 and unduly prejudicial under

18   403.

19        There's also the issue of his character testimony.  The

20   proffer doesn't say what pertinent character trait he will

21   testify to.  I understand from Mr. Haig that it would be his

22   personal opinion about Mr. Tanaka's truthfulness, but there's a

23   lot in the proffer that I think is improper character evidence

24   under Rule 405 about how the witness himself was a former

25   Marine suffering from all these things and Mr. Tanaka gave him

```
 1    a shot and gave him a second chance.  I don't think any of that
 2    is -- I think it's improper character evidence under Rule 405.
 3              THE COURT:  Okay.
 4              MR. HAIG:  Again, I wasn't going to go into those
 5    things.  I don't -- maybe it wasn't evident.  I just wanted to
 6    give you all a fuller picture of how he knew him in case you
 7    wanted to cross-examine him on those things, because I think it
 8    might be important for the basis of his opinion.  But, of
 9    course, the truthfulness doesn't have anything to do with
10    his -- his -- many other things that were in the proffer.  I
11    just figured it was something you should know and at least --
12              MR. JAUREGUI:  No, no.  I appreciate that.
13              THE COURT:  Okay.  These instances that Mr. Real is
14    subjected to while on the floor, I have a hard time seeing how
15    that's relevant given these charges.  So to the extent they
16    were objected to, that objection is sustained.
17              MR. JAUREGUI:  And the issue of gassing in
18    particular, Your Honor.
19              THE COURT:  Yes.
20              MR. JAUREGUI:  I think it's inflammatory and --
21              MR. HAIG:  Your Honor, just so I fully understand
22    the Court's ruling, is the Court precluding him from testifying
23    at all about his time on 3,000 as being irrelevant and some of
24    the conditions that they're under?
25              THE COURT:  What's that have to do with -- what's
```

1   that have to do with whether or not this defendant obstructed?

2           MR. HAIG:  It doesn't have anything to do with

3   whether or not this defendant obstructed, but it's our position

4   that because the Court has already allowed testimony in about

5   what's happened on 3,000, so we think the context is important.

6   But I've already made my case, Your Honor.

7           THE COURT:  Okay.  Well, look, what happened on

8   3,000, when that came in, I don't believe you objected to when

9   that -- when the government elicited that testimony.  So the

10  Court didn't allow anything.  You acquiesced in that, and now

11  they don't want to -- you know, it's really not a case that the

12  Court allowed it for them and is not allowing it for you.

13          MR. HAIG:  My objection is admissibility of all that

14  evidence in pretrial motions, Your Honor.  Just so the Court

15  knows, we did not acquiesce any of that.

16          THE COURT:  I don't recall that, but if it is, it

17  is.

18          MR. JAUREGUI:  Your Honor, just for the record if I

19  could say one more thing.  A lot of the evidence that did come

20  in about the 3,000 floor was from earlier time periods, and I

21  think it was provided to show notice to the defendant.  This

22  witness was hired into MCJ in August of 2011 at the time all of

23  this came to light.  So I think there's the timing issue as

24  well that makes it irrelevant.

25          MR. HAIG:  Well, I don't think there was any

```
 1    qualitative difference between when he first got there in
 2    August of 2011 and some of the time frames that we've spoken
 3    about earlier in the trial.
 4             THE COURT:  Okay.  Let's go.
 5             MR. HAIG:  Your Honor, so I just -- I will be
 6    calling him as a character witness.  I'm certainly going to see
 7    what he does from here.
 8             THE COURT:  Okay.
 9         (End of sidebar discussions.)
10             MR. HAIG:  Your Honor, the defense calls David Real
11    to the witness stand.
12         (Pause in proceedings.)
13             THE DEPUTY CLERK:  Just stand here for me, please.
14             THE WITNESS:  Yes, sir.
15             THE DEPUTY CLERK:  And raise your right hand.
16         (The witness, DAVID REAL, was sworn.)
17             THE DEPUTY CLERK:  Please have a seat.
18         Will you please state your full name and spell your last
19    name for the record.
20             THE WITNESS:  David Real.  Last name is R-E-A-L.
21             THE DEPUTY CLERK:  Thank you.
22                          DIRECT EXAMINATION
23    Q    (BY MR. HAIG)  Mr. Real, what do you do for a living?
24    A    I'm a deputy for L.A. County.
25    Q    Deputy?
```

1    A    Deputy sheriff, sorry, sir.

2    Q    And how long have you been employed as a deputy sheriff?

3    A    Since August 14th, 2011, sir.

4    Q    And what's your current assignment?

5    A    I'm currently a custody deputy at Men's Central Jail, but

6    I'm on loan to the Homicide Gang Task Force as a monitor for

7    our Homicide Gang Task Force.

8    Q    What does being on loan mean?

9    A    It means I'm still required to work whatever -- I'm not a

10   patrol deputy.  So until you go to patrol, you can't -- you

11   can't promote from custody.  So being on loan is I'm working

12   under the Homicide Gang Task Force on a temporary basis, but

13   I'm still a body that belongs to Men's Central Jail to a unit.

14   Q    Understood.  All right.

15        Is there anybody in court as you look around that you

16   recognize?

17   A    Yes, sir.

18   Q    And who would that be, sir?

19   A    Paul, Paul Tanaka, sir.

20   Q    And how do you know Paul Tanaka?

21   A    I met Paul on -- I met Paul at Veteran's Day Memorial.  I

22   was a guest speaker because I had a background in the Marine

23   Corps.

24   Q    Do you remember what year?

25   A    That was in -- that was six months after I worked for the

```
 1   Gardena PD for six months, and I got let go regarding -- I
 2   didn't pass training as I didn't pass my field training
 3   program.
 4   Q    Okay.  So you -- was that in 2010?
 5   A    Yes, sir.
 6   Q    And have you known Mr. Tanaka since 2010?
 7   A    Yes, sir.  I went to speak at the Veteran's Day --
 8             THE COURT:  That's fine.  Next question.
 9             THE WITNESS:  Yes, sir.
10   Q    (BY MR. HAIG)  Deputy Real, do you have an opinion as to
11   the honesty of Paul Tanaka based upon the time that you've
12   known him?
13   A    Absolutely, sir.
14   Q    And what would that opinion be, sir?
15   A    Paul's -- in my opinion, Paul is a stand-up person.
16   He's -- he changed my life.  He changed my life.
17             MR. JAUREGUI:  Your Honor, objection, nonresponsive.
18             THE COURT:  Sustained.
19             MR. HAIG:  I have no more questions, Your Honor.
20   Thank you.
21             THE COURT:  All right.
22        (Plaintiff's counsel conferred off the record.)
23                          CROSS-EXAMINATION
24   Q    (BY MR. JAUREGUI)  Sir, you testified that you had been
25   let go from the Gardena Police Department at some point before
```

1    you met Paul Tanaka?

2    A    Yes, I did, sir.

3    Q    And at the time that you met him, you were unemployed?

4    A    Yes, I did, sir.

5    Q    And at that time, you were desperate for a job; right?

6    A    Yeah, I guess you could say that.

7    Q    And when you met Paul Tanaka, he offered to help you out;

8    right?

9    A    Yes, sir.

10   Q    And you feel very grateful to him for that offer; right?

11   A    Absolutely, sir.

12   Q    And you've worked at the Sheriff's Department now for how

13   many years?

14   A    Going on five years, sir.

15   Q    And you were not a member of Internal Criminal

16   Investigations Bureau?

17   A    No, sir.

18   Q    You were not a member of the Internal Affairs Bureau?

19   A    No, sir.

20   Q    And you haven't been here for the past two weeks listening

21   to any witnesses testify?

22   A    No, sir.

23            MR. JAUREGUI:  No further questions, Your Honor.

24            THE COURT:  All right.

25            MR. HAIG:  I have no more questions, Your Honor.

**UNITED STATES DISTRICT COURT**

1    Thank you.

2           THE COURT:  All right.  Sir, you may step down.

3           THE WITNESS:  Yes, sir.

4           THE COURT:  Call your next witness.

5           MR. HAIG:  Your Honor, the defense calls Ed Medrano

6    to the witness stand.

7        (Pause in proceedings.)

8           THE DEPUTY CLERK:  Stand here for me, please.

9        (The witness, EDWARD MEDRANO, was sworn.)

10          THE DEPUTY CLERK:  Please be seated.

11       Will you please state your full name and spell your last

12   name for the record.

13          THE WITNESS:  Edward Medrano, M-E-D-R-A-N-O.

14          THE DEPUTY CLERK:  Thank you.

15          MR. HAIG:  My apologies, Your Honor.

16                       DIRECT EXAMINATION

17   Q    (BY MR. HAIG)  Mr. Medrano, what do you do for a living?

18   A    I'm a police chief for the City of Gardena.

19   Q    And how long have you been a police chief for the City of

20   Gardena?

21   A    Approximately eight years.

22   Q    Eight years?

23   A    Eight.

24   Q    All right.  And what did you do before you were a police

25   chief in the City of Gardena?

```
 1   A     I was a police officer holding various ranks in the City
 2   of Gardena Police Department.
 3   Q     In total, how long have you been a peace officer?
 4   A     27 years.
 5   Q     Is that all with the City of Gardena?
 6   A     Excluding one year where I worked for the City of
 7   Whittier.
 8   Q     Do you know somebody by the name of Paul Tanaka?
 9   A     I do.
10   Q     And how do you know him?
11   A     He's the mayor in our city.
12   Q     Did you know Mr. Tanaka before he became mayor in the
13   city?
14   A     I knew him as a counsel member and briefly when he worked
15   at the Sheriff's Department at a couple different ranks.
16   Q     Did you first meet Mr. Tanaka through your activity as a
17   peace officer in the City of Gardena?
18   A     Yes.
19   Q     And was it through his official capacity as a counselman?
20   A     No, he worked in adjacent station.  I had met him a couple
21   times just briefly.
22   Q     When you say he worked in an adjacent station, can you be
23   more specific?
24   A     He worked at Lennox Station, and I believe we had a couple
25   minor encounters in field activities because their station is
```

1   adjacent to ours.

2   Q    And Lennox Station, would that be an L.A. County Sheriff's

3   Department station?

4   A    Yes.

5   Q    And is it frequent that the Gardena Police Department and

6   Lennox Station would cooperate in certain investigations that

7   would overlap their two areas?

8   A    We share a contiguous border, so sometimes that would

9   occur.

10  Q    What year did you become the chief of police, sir?

11  A    2007.

12  Q    And was Mr. Tanaka in elected office in the City of

13  Gardena at that time?

14  A    He was.

15  Q    What was he at that time?

16  A    I believe he was the mayor.

17  Q    And how were you selected as a chief of police?

18            MR. JAUREGUI:  Objection, Your Honor, relevance.

19            THE COURT:  Sustained.

20  Q    (BY MR. HAIG)  Since you met Mr. Tanaka, have the two of

21  you remained close?

22  A    Yes.

23  Q    And would you consider the two of you to be friends?

24  A    Yes.

25  Q    Do you socialize from time to time?

```
 1   A     From time to time.

 2   Q     All right.  If you can open up the exhibit book to Exhibit

 3   317, the white book in front of you.

 4         Do you see that photo?

 5   A     Yes.

 6   Q     What does it appear to be a photo of?

 7   A     It's a photo of me in my police uniform next to

 8   Mr. Tanaka.

 9   Q     And do you have any idea as to the date that photo was

10   taken or the event that it was taken at?

11   A     I don't.  I know that looks like the backdrop of our

12   community center, but I don't know the date or where that was

13   taken or why.

14         MR. HAIG:  Move to admit 317, Your Honor.

15         MR. JAUREGUI:  Objection, relevance.

16         THE COURT:  We'll take it up at the conclusion of

17   the day.

18   Q     (BY MR. HAIG)  Chief Medrano, did you have any

19   participation in any of the public elections that Mr. Tanaka

20   ran for, including for mayor?

21         MR. JAUREGUI:  Same objection, Your Honor.

22         THE COURT:  Sustained.

23   Q     (BY MR. HAIG)  Mr. Medrano, do you have any opinion as to

24   the honesty of Mr. Tanaka?

25   A     Yes.
```

1    Q    And what would that opinion be?

2    A    I believe him to be generally an honest person.

3    Q    And what is that based upon?

4    A    My years working with him as a city counsel member and a

5    mayor of the City of Gardena.

6    Q    Thank you.

7              MR. HAIG:  No more questions, Your Honor.

8         (Plaintiff's counsel conferred off the record.)

9                    CROSS-EXAMINATION

10   Q    (BY MR. JAUREGUI)  Mr. Medrano, you testified that Paul

11   Tanaka is your friend; right?

12   A    Yes, we've become friends over the years.

13   Q    And you're a big supporter of Paul Tanaka's?

14   A    Yes.

15   Q    And you've supported his political campaigns?

16   A    Yes.

17   Q    And you've given him, at least on one occasion, over

18   $1,000; right?

19   A    Yes.

20   Q    Have you ever -- you've never been employed by the

21   Los Angeles County Sheriff's Department in your career?

22   A    No.

23   Q    And so you've never been in any meetings at all at the

24   Sheriff's Department pertaining to Anthony Brown; correct?

25   A    No.

        1           MR. JAUREGUI:  Nothing further, Your Honor.

        2           THE COURT:  All right.  Anything else?

        3           MR. HAIG:  No, thank you.

        4           THE COURT:  All right.  Sir, you may step down.

        5      Call your next witness.

        6           MR. HAIG:  Your Honor, the defense calls Paul

        7   Yoshinaga.

        8      Your Honor, may I approach the clerk?

        9           THE COURT:  Yes.  Let's go to sidebar.

       10      (Discussion held at sidebar.)

       11      (Counsel conferred off the record.)

       12           THE COURT:  Okay.  Is his lawyer here?

       13           MR. FOX:  Is his lawyer Mr. Hershman?

       14           MR. JAUREGUI:  He is here.

       15           MR. FOX:  Do you mean his attorney from two years

       16   ago, Mr. Nessim, or do you mean the County's lawyer?

       17           THE COURT:  Whoever is representing him.

       18           MR. FOX:  The county.

       19           MR. HAIG:  Would you like him to come up here?

       20           THE COURT:  Well, it depends on what you're getting

       21   into.  If he's going to be a character witness, the answer is

       22   probably no.  If you're going to get into -- if you're going to

       23   attempt to get into it with him about advice that he may have

       24   given Mr. Leavins or some of these other alleged

       25   coconspirators, then maybe he needs to be up here.

1          MR. HAIG:  I think that we probably won't be asking

2     questions about that.

3               THE COURT:  Okay.  Well --

4          MR. HAIG:  Well, can I preface that?

5               THE COURT:  Uh-huh.

6          MR. HAIG:  I don't think I'll be asking questions

7     about what his advice was, but I will be asking questions that

8     he did render -- or did give legal advice, just not what it

9     was.

10              MR. FOX:  Your Honor, communications to the attorney

11    themselves may be privileged.  I'm not saying that's what

12    happened here, but they have the right to be able to object to

13    that.

14              MR. HAIG:  And it's our belief that the County --

15    the attorney for the County --

16         (Reporter admonition.)

17              MR. HAIG:  It's our belief that the County had

18    already waived the attorney-client privilege at the initial

19    meeting that he had with the FBI, but again, I wasn't his

20    lawyer there, so I don't know.

21              MR. FOX:  And we can't take a position for the

22    County on that.

23              THE COURT:  Well, that's fine.

24         Do you have a position as to whether or not you're going

25    to raise any objections to him getting into this area?

1          MR. FOX:  You're saying I'm not.  Obviously I'm not

2     going to object based on attorney-client privilege issues.  I

3     don't know exactly where he's going to be going with this.  If

4     he's trying to have an advice of counsel defense, of course we

5     have an objection.

6          THE COURT:  He's saying that he's abandoned his

7     advice of counsel.

8          MR. FOX:  If it's simply to say, Your client was not

9     involved in these issues, then I don't know why we need the

10    substance of this.  Otherwise, it's going to confuse the jury.

11    That's my concern, is it's going to be a 403 issue especially

12    with the advice of counsel instruction.

13         THE COURT:  Yeah, if your point is Paul Tanaka never

14    sought you out -- you were advising others, but Paul Tanaka

15    never sought you out, can't you just ask him, Paul Tanaka never

16    sought you out concerning any of these --

17         MR. HAIG:  I can, but I'd like this document too.

18    I'm being honest with you.

19         THE COURT:  It's fine.  It's okay.  I'd like a lot

20    of things too.

21         MR. HAIG:  I think --

22         THE COURT:  Mainly for this to go away.

23         MR. FOX:  It will soon.

24         MR. HAIG:  We tried.

25         THE COURT:  Do you have any objection to this

1   document?

2          MR. FOX:  It is -- may I see it, Your Honor, because

3   I -- thank you.

4      I may ask -- Your Honor, I'm not sure what the relevance

5   of this is.  This is the substance of his advice, from what I

6   can tell, so I don't know what the --

7          MR. HAIG:  I think it's relevant in that the

8   Sheriff's legal advisor ratified at least some of the conduct

9   that the defendant is now being accused of doing that's

10  misconduct.

11         MR. FOX:  So now we're getting into the issues that

12  are 403 and advice of counsel.  And, Your Honor, what I suggest

13  is that we send the jury home.  I believe this is their last

14  witness.  We do this in what has to be an in camera proceeding,

15  so this is never publicly aired -- if we're getting into

16  attorney-client privilege it's not publicly aired, and that

17  this either -- I think, again, this is their last witness.

18         MR. HAIG:  Well, there's a witness, Commander

19  Hebert, that couldn't be here today because of a death in the

20  family, and he can be here tomorrow morning.

21         THE COURT:  What's he got to offer?

22         MR. HAIG:  He was also -- he was a -- he's now a

23  commander, and he was a supervisor at Men's Central Jail,

24  similar in testimony to Mr. Antuna, so pretty short.

25         MR. FOX:  And I think we can -- if he can testify,

1    and we can address that later, I think it would be very short

2    testimony.  So I suggest we send -- if it's okay with Your

3    Honor, send the jury home and deal with these issues and wrap

4    up tomorrow very quickly and then go to argument.

5              THE COURT:  Where is Mr. Yoshinaga?

6              MR. JAUREGUI:  He's on the far right in the red tie.

7              THE COURT:  Oh, yes.  Okay.  That's fine.

8         (End of sidebar discussions.)

9              THE COURT:  All right.  Ladies and gentlemen, we're

10   going to conclude for the day.  I anticipate that there will be

11   a short presentation of evidence tomorrow, but counsel will

12   make their closing arguments tomorrow to you.  And then the

13   Court will have some final instructions for you, and then the

14   case will be submitted to you for your deliberations.

15        So again, I want to remind you until this trial is over,

16   you're not to discuss this case with anyone, including your

17   fellow jurors, members of your family, people involved in the

18   trial or anyone else, and do not allow others to discuss the

19   case with you.  This includes discussing the case online,

20   through blogs, bulletin boards, by e-mails or text messages.

21   If anyone tries to communicate with you about this case, please

22   let me know about it immediately.

23        Do not watch, read or listen to a news reports or other

24   accounts about the trial or anyone associated with it,

25   including looking up anything online.  Do not do any research

1  such as consulting dictionaries, searching the Internet or

2  using other reference materials, and do not make any

3  investigation about the case on your own.

4      Finally, you're reminded to keep an open mind until all of

5  the evidence has been received, you've heard the arguments of

6  counsel, the instructions of the Court and the views of your

7  fellow jurors.  If you need to speak with me, simply give a

8  note to the clerk.

9      All right.  We'll see everybody tomorrow morning at eight

10  o'clock.  Please leave your notebooks on your chairs.

11      (The jury exited the courtroom.)

12          THE DEPUTY CLERK:  Please be seated.

13      (Pause in proceedings.)

14          THE COURT:  All right.  I believe Mr. Hershman is

15  here.

16      Mr. Hershman, if you could join us over here at sidebar,

17  please.

18      (Discussion held at sidebar.)

19          THE COURT:  All right.  I understand that they want

20  to call Mr. Yoshinaga, and one of the documents they want to

21  put in front of you is this one.

22          MR. HERSHMAN:  Who authored it, do we know?

23          MR. FOX:  Your Honor, I believe based on previous

24  testimony in other trials, Mr. Leavins may have authorized --

25  or authored this first and then it went to Mr. Yoshinaga.

1          May I go grab a document from a binder?

2               THE COURT:  That's fine.

3          (Reporter clarification.)

4               MR. HERSHMAN:  H-E-R-S-H-M-A-N.

5               MR. FOX:  And, Your Honor, for the record, it says

6     that Young Su Kim acknowledged that he was willing to waive any

7     privilege concerns for certain e-mails of Yoshinaga's with the

8     Los Angeles Sheriff's Department personnel.

9               MR. HERSHMAN:  Here's what happened, and I explained

10    that to him, is in previous trials, it's my understanding there

11    was an issue about advice of counsel that was being raised.  So

12    the scope of the waiver in the context of advice of counsel

13    being raised was something to do with privilege.

14         My understanding is that --

15         (Reporter admonition.)

16              MR. HERSHMAN:  My understanding is that in this

17    trial there is no advice of counsel being waived, and I do not

18    have the authority nor have I raised with County counsel the

19    waiver of privilege in this context.  And my understanding is

20    that I'm to assert the privilege in this context on behalf of

21    the County.

22              THE COURT:  Okay.

23              MR. HERSHMAN:  If advice of counsel is being raised

24    and there were discussion among the parties, then I would go

25    back to County counsel and we'd have a discussion with the

1  board about waiver, but that's not the context I understand
2  we're in.
3           THE COURT:  Okay.  As I understand it, the defense
4  has abandoned any advice of counsel defense, and Mr. Tanaka had
5  indicated, I believe, that he never sought any legal advice
6  from Mr. Yoshinaga.  And I think that's sort of where we are.
7  And what I need -- what I need to know, at least from you, is
8  whether or not the County is asserting privilege.  And if you
9  are, that's fine.  If you're not, that's fine.  If you want
10 to --
11          MR. HERSHMAN:  My understanding is, in this context,
12 the County is continuing to assert the attorney-client
13 privilege.  I understand there may be an issue -- because of
14 prior communications that there could have been a waiver of
15 that, and I would say that that I haven't analyzed sufficiently
16 to determine whether or not the scope of any discussions or
17 waiver in the previous incident when advice of counsel was at
18 least on the table constituted that here such that I have -- I
19 can't continue to assert it.
20      As far as whether I would like to continue to assert it, I
21 can answer affirmatively yes, I would like to assert the
22 privilege absent a finding that it has been waived, which we
23 have not yet fully briefed or litigated.
24      Does that make sense?
25          THE COURT:  Yes.  Okay.

1          MR. HERSHMAN:  And I've explained that, that

2     Mr. Yoshinaga is not prepared to testify about the content of

3     any discussions because we view that as privilege.  The fact

4     that he may have been present at meetings...

5          MR. FOX:  And, Your Honor, the content of any

6     discussions really is irrelevant to this trial because there's

7     been no evidence and Mr. Tanaka didn't say that he was exposed

8     to any of those communications.  So again, I don't think that

9     he can testify to these things, and I don't think it would be

10    admissible at trial.

11         THE COURT:  If you want to talk to Mr. Hershman

12    after we leave, that's fine.  We are where we are.

13         MR. HAIG:  Your Honor, this is Jerome Haig.  From my

14    discussions with Mr. Yoshinaga in preparation for trial -- and

15    I've sent my report over to the government on that so they know

16    what we've talked about -- he said that when he first met,

17    meaning Yoshinaga first met with the government and was

18    asked -- and he had representation at that time.  I think it

19    was Ron Nessim who was his lawyer that he had actually paid

20    for, and there was a government lawyer there as well, I think

21    Mr. Kim, I think was his name.

22         MR. FOX:  County counsel.

23         MR. HAIG:  County counsel, right.

24         The representation that Mr. Yoshinaga made to me was that

25    he was prepared to -- because he's a lawyer, to assert the

privilege, but that he was instructed that the County was

waiving that privilege, and that's why he continued to ask

questions.  And I think, quite frankly, that's probably why he

was able to answer my questions as well because he figured that

the County had not asserted the privilege, and it was actually

against his view of what they should have done that that really

wasn't the issue, I guess.  But the issue, we think, is that

there is a waiver now because of what had transpired earlier in

his interview with the FBI.

MR. FOX:  Your Honor, you've seen that 302, and if

you recall -- I'm using the word recall -- Mr. Yoshinaga

couldn't recall anything that he had given to anybody besides

case -- or not even case citations, statutory citations.  I can

show you 302, once again we can make it part of the record, but

to the extent that he was able to testify about things and it

wouldn't constitute a waiver, he didn't testify about those

things, so it doesn't constitute waiver.

MR. HERSHMAN:  From the County's perspective -- and

I said it's a different context where my understanding was

advice of counsel was on the table for certain defendants and

the scope of the discussion, and I think I've been candid that

I would need to research and determine whether or not that

constituted a waiver in this context if somebody's going to

assert that.  But whether we are asserting the privilege, we

are asserting the privilege.

1          THE COURT:  Okay.  That's all I need to know.  I'll

2     take a look at the 302.  If you want to get here tomorrow

3     morning at a quarter to 8:00, that's fine.  I'll have a chance

4     to look at the 302, and you can have discussions with

5     Mr. Hershman, and we'll resolve it.

6          MR. HAIG:  And it may turn out that my examination

7     is truncated a bit based upon what Mr. Yoshinaga even recalls

8     about the document that we're going to be showing him,

9     certainly based upon what Mr. Fox is saying.

10        So you want Mr. Yoshinaga here at 7:45 in the morning?

11         THE COURT:  I want you here at 7:45.

12         MR. HAIG:  Right.  Well, I'm going to be here.  I

13    just didn't know if you want him here too.

14         THE COURT:  No, I don't think he needs to be here.

15         MR. FOX:  What were your plans for our jury

16    instruction conference?

17         THE COURT:  I was hoping that would go away.

18    Apparently it won't.  What time is it now?  1:00?

19         MR. FOX:  Yes.

20         MR. JAUREGUI:  Yes, just after 1:05.

21         THE COURT:  We'll have to give the reporter a break,

22    even though she's young enough to continue on without any

23    breaks.

24         MR. FOX:  She's not smiling.

25         MR. JAUREGUI:  Oh, she is now.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  I don't know, two o'clock?

 2              MR. FOX:  That's fine.

 3              MR. HAIG:  Two o'clock then?

 4              THE COURT:  Uh-huh.

 5          And now what else do we have?  We have your motion to

 6    reconsider.

 7              MR. FOX:  We have an exhibit that there was an

 8    objection to that was Mr. Tanaka shaking hands and smiling with

 9    Mr. Medrano.

10              MR. HAIG:  And as I said at the previous sidebar --

11    this is Jerome Haig -- Commander Kevin Hebert will be here in

12    the morning, and then the government and the Court can, you

13    know, address that issue tomorrow as to whether he's going to

14    testify.

15              THE COURT:  Well, no, how about the photo.

16              MR. HAIG:  Oh, the photo.  It's just relevant to

17    show context again.  It's a nice picture.

18              THE COURT:  It is a nice picture, and I wish I had

19    taken it.  But it's out.  The objection is sustained.

20          Okay.  So I will see everybody at two o'clock.

21              MR. FOX:  Okay.

22              MR. JAUREGUI:  Thank you.

23              THE COURT:  And I'll rule on that motion to

24    reconsider the time.

25          (End of sidebar discussions.)
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  All right.  We will get together at two

2    o'clock to talk about jury instructions.

3          MR. FOX:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5       (Off the record at 1:06 p.m.)

6       (On the record at 2:07 p.m.)

7          THE DEPUTY CLERK:  Recalling item number one,

8    CR 15-255, U.S.A. vs. Paul Tanaka.

9       Counsel, state your appearances, please.

10          MR. FOX:  Good afternoon, Your Honor.  Brandon Fox

11   and Eddie Jauregui on behalf of the United States.

12          THE COURT:  Good afternoon.

13          MR. STEWARD:  And, Your Honor, Dean Steward and

14   Jerome Haig for Mr. Tanaka.  He's present.

15          THE COURT:  Good afternoon.

16          MR. HAIG:  Good afternoon.

17          THE COURT:  All right.  Let's talk about jury

18   instructions.

19       You want to start with the disputed instructions?

20          MR. FOX:  Yes, Your Honor.  I think that the defense

21   has withdrawn three of them:  Numbers 3, 5 and 6.  So we don't

22   have very many to discuss.  The first one that's disputed is

23   the multiple purposes instruction, Instruction Number 1.  As

24   you know, we've litigated this quite a bit in the past, and we

25   think it's an appropriate instruction.

1        THE COURT:  I suspect you'd have the same view or

2   position as the defendants had in the prior trial.  Gave it the

3   last time, inclined to -- looked at the case law then, looked

4   at the case law now.  I think the government probably prevails

5   on this one, but if you have something -- if you want to be

6   heard or if you have something different to add, I'll be happy

7   to hear it.

8        MR. HAIG:  Thank you, Your Honor.

9     I don't want to be specifically heard other than what I've

10  set forth in the moving papers.  I think the argument that --

11  from us is a little bit different than in the Thompson trial.

12  We don't think it's an appropriate instruction, and we object

13  to the Court giving it.

14        THE COURT:  Okay.

15     All right.  I'm going to give disputed Instruction Number

16  1, and that, I believe, takes us to disputed Instruction Number

17  2.

18        MR. HAIG:  Your Honor, the reason we think Number 2

19  is appropriate is also set forth in our argument.  Also, in

20  light of Special Agent Tanner testifying about certain things,

21  we think that this is a -- she was asked some questions about

22  this being an authorized investigation.  She couldn't be

23  arrested or anything like that, and I think that this is a

24  proper statement of the law that the jury I think may have

25  questions about, and certainly this would educate them on that.

1    And it does nothing to confuse the jury.  It just, I think,

2    does something to educate the jury and have them understand

3    really what's going on in this case a little bit better.

4         MR. FOX:  Your Honor, I do think that it confuses

5    the issues, because especially in this trial there's been -- I

6    want to say almost zero testimony that they thought she was a

7    rogue agent.  So what we have is an undercover operation, and

8    this -- this suggests, based on this instruction, that an

9    undercover operation might fall under this where an agent could

10   be arrested and then would have an affirmative defense.

11        As you know, Your Honor, we had some concerns about this

12   anyway, whether it was accurate with respect to the law anyway,

13   but this -- again, with the evidence that we have at trial,

14   it's not appropriate.  And the statute itself, the California

15   code talks about this not being a crime if it's an authorized

16   investigation anyway, and I think the testimony about whether

17   this was authorized went more to that than the Supremacy

18   Clause.  I think the Supremacy Clause is really readherent for

19   what's going on here.

20        THE COURT:  There's no evidence in the record at

21   this point that the defendant was actually out conducting his

22   own investigation.

23        MR. HAIG:  That's absolutely true, Your Honor, but

24   there is certainly a lot of evidence in the record, and I think

25   the government's going to certainly talk about the fact that

 1    there were coconspirators out there going to Ms. Marx's home

 2    and threatening to arrest her, right?  I mean, that's a big

 3    part of the government's case.

 4        It's our view that --

 5            THE COURT:  Your client has said that -- what's he

 6    said about that?

 7            MR. HAIG:  Well, he said that he didn't know about

 8    it and he wasn't involved in it, right?

 9            THE COURT:  That's right.

10            MR. HAIG:  If the jury believes that, that's fine.

11    If the jury doesn't believe that, then they're still left with

12    the impression that if the sheriff's deputies that went out to

13    Leah Marx's house didn't know that it was an authorized

14    investigation -- and I think that that's important -- if they

15    didn't know that it was an authorized investigation, then this

16    instruction basically sets up an affirmative defense for

17    Ms. Marx's prosecution, which would bar her from being

18    prosecuted, but would not stop the deputies from actually

19    arresting her.

20        And so I think that that's the difference.  It's the

21    knowledge element, not actually whether she can be prosecuted

22    or not, and I think that's what this instruction assists the

23    jury in finding out, and if they had a question like that.

24            MR. FOX:  And, Your Honor, there are really three

25    issues there, and they're just trying to point out one which is

1 the Supremacy Clause.  There's the Supremacy Clause.  There's

2 the California Penal Code.  There's an undercover person that

3 has -- someone has not committed a crime if they're engaged in

4 an undercover operation.

5  I suggested an instruction that covers some of what

6 Mr. Haig's looking for in our dispute -- in our statement of

7 objections to the disputed Instruction Number 2.  And it's a

8 block quote, and I think that it would be appropriate here and

9 would cover some of what Mr. Haig's looking for because we

10 would get into they have the authority to investigate potential

11 violations of the law.

12  "They can't use that authority to obstruct justice, and

13 it's a matter of law when an undercover investigation involves

14 the use of informants and undercover agents.  Neither the law

15 enforcement officers conducting the operation nor the

16 informants assisting in the investigation become coconspirators

17 with the target of the undercover activity."

18  So I think that that is a very clear statement of the law,

19 and I think it helps out both sides.

20   MR. HAIG:  I do agree with what the government says,

21 and if the Court is disinclined to give our instruction, I

22 think a close runner-up would be the one that the government

23 proposes in its -- in that block quote that it just read.

24   THE COURT:  Do you have any objection to the

25 government's proposed instruction?

```
 1              MR. HAIG:  The one that's contained in the body of
 2   disputed Instruction Number 2 and the government's objections,
 3   we do not --
 4              THE COURT:  I think it's on page 9.
 5              MR. HAIG:  Yes.
 6              THE COURT:  It's in a block quote.
 7              MR. HAIG:  I've got it right here.
 8              THE COURT:  Okay.  Do you have any objection to it?
 9              MR. HAIG:  Dean?
10              MR. STEWARD:  No.
11              MR. HAIG:  We don't, Your Honor, and that would be
12   in place of the disputed Instruction Number 2.
13              THE COURT:  That's correct.
14              MR. HAIG:  All right.  Okay.
15              THE COURT:  I think the only -- I think we gave this
16   instruction the last -- during the Thompson trial.  I think we
17   had something at the end where we identified Marx and CJ and --
18              MR. FOX:  It was Anthony Brown, actually, that we
19   identified, and the reason why we're not asking you to do that
20   here is --
21              THE COURT:  That's fine.
22              MR. FOX:  -- Mr. Craig on the stand before said she
23   had still committed a crime.  So I thought we needed to
24   actually apply the facts.
25              THE COURT:  That's fine.  So we'll give this block
```

 1    quoted instructions instead of disputed Instruction Number 2.

 2        Okay.  3, you've withdrawn.

 3            MR. HAIG:  Yes.

 4            THE COURT:  And what's the next disputed

 5    instruction?

 6            MR. FOX:  Number 4, Your Honor.

 7            THE COURT:  Okay.

 8            MR. FOX:  And, Your Honor, it's the government's

 9    position that the elements instructions cover what Mr. Haig is

10    concerned about here, and that's that the obstruction needs to

11    be of a grand jury investigation, not of an FBI -- not simply

12    of an FBI or U.S. Attorney's Office investigation.  The

13    elements make clear that that's the case.

14        So we don't think that this is something that is

15    necessary, and also, I spoke about this with counsel, I don't

16    think this is their defense either.  So I don't think that this

17    is something that is a theory of the case instruction based on

18    my conversations with defense counsel.

19            MR. HAIG:  Your Honor, we still think it's

20    appropriate because it answers a potential question the jury

21    might have as opposed to whether the statute covers an FBI

22    investigation versus a grand jury proceeding, and certainly

23    there is evidence as to when one of those began and whether one

24    was actually in place at the time that the phone was

25    discovered.  I don't think this is an improper statement of the

 1   law, and I think it compliments the other instructions that are

 2   in the joint set.

 3              THE COURT:  I think the instructions that we're

 4   going to give concerning the elements of obstruction are

 5   sufficient.  I'm not inclined to give disputed Instruction

 6   Number 4.

 7       What's the next disputed instruction?

 8              MR. FOX:  I think it's 7, Your Honor, the public

 9   authority instruction that the defendant has proposed.  And as

10   we've litigated in the past, they're trying to argue that

11   Mr. Baca could have provided Mr. Tanaka with public authority,

12   and a local law enforcement officer cannot give anyone the

13   authority to break federal law.  So we don't think this is an

14   appropriate instruction.

15              MR. HAIG:  Your Honor, the facts of the case aren't

16   that Mr. Baca gave the defendant authority to break federal

17   law.  It's that he gave the defendant an order and other people

18   orders that they thought were not in violation of their own

19   laws, and because the -- the powers that be in the Sheriff's

20   Department might not have known everything that the federal

21   government knew, they were acting under the impression where

22   they were justified in doing the two things that Mr. Tanaka

23   says that they did do.

24       There was one person up in the chain of command that

25   actually gave that order.  We have a separate fact here that

1    probably wasn't available in the first trial of the Thompson

2    defendants, and that's that we have a stipulation that the FBI

3    director in Los Angeles, Steven Martinez, actually gave a -- or

4    made a request to protect the inmate, and that request was sent

5    down the chain of command.

6         So to the extent that the government's position is adopted

7    by the Court, we don't think that's a proper position.  But to

8    the extent that it is, there is a federal law enforcement

9    officer that, in our view, gave a blanket "okay" to having the

10   inmate Anthony Brown protected.

11            MR. FOX:  Your Honor, to the point about the Steve

12   Martinez -- the evidence related to Steve Martinez, I think

13   that that misrepresents what actually the facts are, because

14   while that is stipulated in -- between the parties that

15   Mr. Martinez asked for Mr. Brown to be kept in protective

16   custody, that was on August 18th and Mr. Brown was moved to

17   protective custody on August 18th.

18        So the movement of Anthony Brown on August 18th is not

19   part of the obstruction charges.  It's the movement of him from

20   protective custody to other areas that is the subject of the

21   indictment.  So, you know, this again misstates the law for

22   several reasons as I've outlined in our objections to the

23   disputed instructions.  It's not a correct statement of the

24   law, and the facts don't apply as Mr. Haig has said they do.

25            THE COURT:  I'm not going to give 7.  I don't think

**UNITED STATES DISTRICT COURT**

1    it applies in this case.

2         Okay.  Let's turn to the agreed-upon instructions.  I see

3    here you have an Instruction 4.1.  I don't think 4.1 applies in

4    this case.  I believe 4.1 goes to when there is a confession

5    and the jury has to determine the voluntariness of the

6    defendant's statement.  When you're testifying in front of a

7    grand jury or at a trial, that's not the issue.  That's not

8    what 4.1 was intended to address.

9              MR. HAIG:  Which number was that again, Your Honor?

10   I'm sorry.

11             THE COURT:  It is your -- let's see.

12             MR. FOX:  It's on page 33 of the joint instructions.

13             THE COURT:  It's entitled "Statement by Defendant."

14             MR. HAIG:  I see it, yes.  So is the Court not going

15   to give that?

16             THE COURT:  I don't think it applies.  I mean, if

17   you look at the Ninth Circuit instructions, you look at the

18   comment to the Ninth Circuit instructions, it's clear that what

19   that instruction is intended to address is when there is a

20   confession and the jury has to determine the voluntariness of

21   the confession.

22        And I quote, "When voluntariness of a confession is an

23   issue, the instruction is required by 18 United States Code

24   Section 3501(a), providing that after a trial judge has

25   determined that a confession to be admissible, the judge shall

```
 1   permit the jury to hear evidence on the issue of the

 2   voluntariness."

 3        So that's what that instruction goes to, not -- not the

 4   defendant's statement in this case.  So unless you both want to

 5   give it...

 6             MR. HAIG:  That's fine, Your Honor.  We agree.

 7             THE COURT:  Okay.

 8        (Discussion held off the record.)

 9             THE COURT:  Okay.  Instruction -- Ninth Circuit

10   Instruction 2.10.  I also gave the jury an instruction that was

11   geared to the Viking testimony, and I think we probably ought

12   to give that.  I think I ought to also give that same

13   instruction again with regard to the Viking testimony.

14             MR. FOX:  No objection, Your Honor.

15             MR. HAIG:  That's fine, yes.

16             THE COURT:  Okay.  And we don't need 20, so we'll

17   give two versions of 4.3.

18        Now, there used to be an instruction 4.4, which I don't

19   know that -- that used to be the character evidence

20   instruction.  The Ninth Circuit has now held that they don't

21   think that that's -- you don't need to give that, and I'm happy

22   to do it either way.

23             MR. FOX:  Whatever the defense wants, Your Honor.

24   We -- either way for us.

25             MR. HAIG:  We didn't include it because of what
```

1    the -- what you just said, but we'd like to have it read to the

2    jury.

3              THE COURT:  Okay.  So that instruction reads:  "You

4    have heard evidence of the defendant's character for

5    truthfulness.  In deciding this case, you should consider the

6    evidence together within the same manner as all other evidence

7    in the case."  Okay.

8              MR. HAIG:  Yes.  Yes, Your Honor.

9         Your Honor, may I ask a question?

10             THE COURT:  Yes.

11             MR. HAIG:  When the jury gets these instructions

12   back in the room, do they get the titles or just the actual

13   body of the instruction?

14             THE COURT:  They get a -- basically, they just get

15   the instructions.

16             MR. HAIG:  All right.  Okay.

17        (Pause in proceedings.)

18             THE COURT:  Okay.  We heard Joint Jury Instruction

19   32.  I believe we heard from Mr. Manzo.  I don't think we've

20   heard from Mr. Carey as yet.

21             MR. FOX:  We're not planning on calling him in our

22   rebuttal case, Your Honor.

23             THE COURT:  Do you expect to have a rebuttal case?

24             MR. FOX:  Yes, Your Honor.  Someone who is actually

25   here today prepared to testify, Dennis Conte, he is going to

1   very briefly say, in direct contradiction to what Mr. Tanaka

2   said, that he gave Mr. Tanaka John Clark's memo and Mr. Tanaka

3   disparaged John Clark at the time and said, "We're not doing

4   this," basically.  So it's going to directly contradict his

5   testimony.

6        And then I expect Special Agent Tanner to explain the

7   phone records a little bit better.  I think that our testimony

8   will be a total of probably about 45 minutes.

9            THE COURT:  Okay.

10           MR. FOX:  And if Mr. Yoshinaga says anything that's

11  inconsistent with his -- the 302 that we showed you, then she's

12  also prepared to testify as to that.

13           THE COURT:  Okay.  So Carey comes out.  Michel will

14  be in.  Anybody else that we need to account for?

15           MR. FOX:  No, Your Honor.  And, of course, there's a

16  bracket that is just a placeholder that says "Name of Witness,"

17  so that obviously needs to be stricken as well.

18           THE COURT:  Right.

19       33.

20           MR. FOX:  There was some cross-examination of

21  Special Agent Tanner about her decision to use Anthony Brown,

22  so we think this is an appropriate instruction.

23           THE COURT:  Oh, I don't -- I don't doubt that.  I

24  guess, is there going to be any argument that...

25           MR. FOX:  And this instruction obviously is not

1    written correctly because it says "You heard testimony from an

2    informant."  So it probably should read "You've heard that the

3    government used an undercover agent and an informant in its

4    investigation."

5            THE COURT:  "You've heard evidence about a federal

6    informant who was involved in the government's investigation in

7    this case.  You've also heard that the federal government used

8    an undercover FBI agent in its investigation.  Law enforcement

9    officials may use informants and undercover agents in order to

10   investigate criminal activities."

11           MR. FOX:  Thank you, Your Honor.

12           MR. HAIG:  That's fine.

13           THE COURT:  There isn't going to be any argument

14   that the agent -- or Marx became some sort of coconspirator?

15           MR. STEWARD:  As much as I like that argument, no, I

16   won't make that.

17           MR. FOX:  We won't either, Your Honor.

18           THE COURT:  Just going to leave that alone.

19       Were there any experts used in this case?

20           MR. FOX:  I don't think so.

21           THE COURT:  So we can take out 34?

22           MR. FOX:  Yes, Your Honor.

23           THE COURT:  Summaries not received in evidence.

24           MR. FOX:  I think everything's in that was a

25   summary.  We will have new summary exhibits based on Special

1    Agent Tanner's testimony that we're going to prepare tonight.

2    In fact, I could probably -- if I can find it, I might be able

3    to pass it out today.  Assuming that those are received into

4    evidence, then we will not need Number 35.

5         (Pause in proceedings.)

6              THE COURT:  And everybody's happy with 40?

7              MR. FOX:  The government is, Your Honor.

8              MR. HAIG:  Yes, we are.

9              THE COURT:  Okay.  You have an instruction here

10   "Rereading of Testimony."  If there is a request for rereading

11   of testimony, I will give it, however, but I -- I'm not

12   inclined to give it before there is a request for a rereading

13   of testimony.

14             MR. FOX:  We only included it because it's part of

15   your standing order, so that's why we put it in here.

16             THE COURT:  Okay.  That's fine.

17        And I'd like to avoid having anybody tell the jury to go

18   look -- if there's some doubt, you know, you don't remember

19   something, go look at the transcript or ask for it a transcript

20   or ask for it to be reread.  They've watched enough Perry

21   Mason, they know how to do that.  And, I take it, nobody --

22   you've agreed upon the verdict form?

23             MR. FOX:  I don't think there's an objection to the

24   verdict form.  I think we've got a joint verdict form that's on

25   page 56.

```
 1              THE COURT:  Yes.

 2              MR. HAIG:  It's fine, Your Honor, yes.

 3          (Pause in proceedings.)

 4              THE COURT:  I think we've -- I think we've given the

 5   jury instructions on stipulation of fact.  You have a

 6   stipulation of testimony instruction.  I don't think there was

 7   any stipulated testimony in this case.

 8              MR. FOX:  That's right, Your Honor.

 9          Your Honor, let me check our phone record stipulation

10   because that may be basically business records stipulation if

11   called to testify, so let me check that one out.

12              THE COURT:  Okay.

13              MR. FOX:  But regardless, we don't care if you --

14   for that one, I don't think it's necessary still to read that

15   instruction unless the defense requests it.  That is -- it's

16   not a stipulation as to testimony, Your Honor, so we don't need

17   that stipulation.

18              THE COURT:  Okay.  How long do you anticipate that

19   you're going to be with Mr. Yoshinaga?

20              MR. HAIG:  Well, Your Honor, I wanted to bring that

21   up, so thank you.

22          I spoke to Mr. Hershman after we took our recess, and I

23   think the questioning will be pretty brief, and according to my

24   questioning -- or my comment with Mr. Hershman, we're not going

25   to go into any protected communication.  So I think -- I really
```

```
 1    think ten minutes.
 2              THE COURT:  Okay.  And how long are you going to be
 3    with your -- you have one other witness after that?
 4              MR. HAIG:  Mr. Hebert, and I think he's very short
 5    as well, and I think we have to -- we'll probably discuss, us,
 6    about what he's going to be testifying to.  You've got the
 7    proffer, but it's going to be fairly short.  Again, I'm a bit
 8    hamstrung, I apologize, because I haven't been able to talk to
 9    him, although I have a good idea of what he's going to say, not
10    a specific idea of what he's going to say.
11         And in relation to that, Your Honor, there are two things
12    I would ask the Court to do.  We had an exhibit, which is 362,
13    that the Court was discussing with us in relation to
14    Mr. Yoshinaga's testimony and in relation to Mr. Hershman's
15    advice to Mr. Yoshinaga.  I just need that to be marked for
16    identification on the record.
17              THE COURT:  That's fine.
18              MR. HAIG:  And also Exhibit 363, which is a copy of
19    the stipulation that I read into the record, I'd move that into
20    evidence, ask that it be admitted.
21              THE COURT:  Well, it certainly could be marked for
22    identification, but it seems to me you've -- they've read their
23    stipulations, you've read yours.  The Court has told the jury
24    to accept those facts as true.  I'm not sure it needs to go
25    back.
```

1          MR. HAIG:  Well, that's fine.  I -- maybe I assumed

2    mistakenly that all the government's stipulations were going

3    back as exhibits too.

4          MR. FOX:  We did not ask for these stipulations

5    themselves to be sent back.  We did not introduce the stips --

6          THE COURT:  I don't think they introduced them.

7          MR. HAIG:  Okay, then that's fine.  I just wanted it

8    marked for identification.

9          THE COURT:  That's fine.

10         MR. HAIG:  Okay.

11         THE COURT:  Okay.  And you've got a rebuttal case

12   that's going to last maybe as long as 45 minutes?

13         MR. FOX:  I think that's fair, Your Honor.

14         THE COURT:  So we should be done with your case by

15   8:30, 8:40?

16         MR. HAIG:  Yes.

17         THE COURT:  And then you'll be done at probably by

18   9:30.

19      Okay.  And how long do you want for your closing argument?

20         MR. FOX:  I think for the summation, there's a lot

21   to go through, but I will try to do it in an hour, Your Honor.

22         THE COURT:  Okay.  And that's the opening part of

23   your summation?

24         MR. FOX:  Yes, Your Honor.

25         THE COURT:  Okay.

 1          MR. STEWARD:  I anticipate an hour as well, Your

 2   Honor.

 3          THE COURT:  Okay.

 4          MR. FOX:  And if that's the case, then I will limit

 5   myself to 30 -- sorry, to 20 minutes in the rebuttal, Your

 6   Honor.

 7          THE COURT:  Okay.  So what I can do is let you know

 8   when your -- you got about three minutes left or I can tell

 9   you, "Time's up."

10          MR. STEWARD:  That's fine, Your Honor.

11          THE COURT:  Which would you prefer?

12          MR. STEWARD:  Probably the three-minute thing.

13          THE COURT:  Okay.

14          MR. FOX:  That's fine, Your Honor.

15          THE COURT:  Okay.  I'm trying to get these people to

16   give me a light like they do at the Supreme Court.  A light

17   comes on, you got to sit down.

18      Now let's see.  What else?

19      Okay.  I think we have a motion for reconsideration.

20          MR. STEWARD:  Yes, Your Honor, briefly.

21      My thinking on this was almost like it was a severance

22   motion in the sense that I would think anyone looking at this

23   record later would ask me, Did you give the trial judge an

24   opportunity to reevaluate your motions in light of the

25   testimony?  And so to answer that question, I prepared this

1    motion for reconsideration.

2         I also included, as you can see, the government's

3    position, and beyond that, Your Honor, we would submit based

4    largely on the arguments and law that we made on both of the

5    original arg -- or motions.

6              THE COURT:  Okay.  Does the government wish to be

7    heard?

8              MR. JAUREGUI:  Yes, very briefly, Your Honor.

9         Your Honor, I don't think any of the factual developments

10   in the trial have changed.  The legal analysis that applies

11   here, and I would submit that as far as the immunity motion,

12   the defense still has not met its burden under Straub.  And as

13   far as the out-of-court statements by Mr. Baca, they still are

14   not statements against penal interest and do not have any

15   indicia of reliability, and I would submit on our papers which

16   are at Docket 83 and 108, unless the Court has any questions.

17             THE COURT:  Okay.  I don't believe that this --

18   excuse me.  I don't believe this motion qualifies for a motion

19   for reconsideration.  I don't believe that the trial testimony

20   has essentially changed the facts or law that were presented to

21   the Court in the original motion.  I believe everything that

22   has come -- that has come during the trial was reasonably

23   available to the moving party.

24        In the exercise of reasonable diligence, I don't think

25   there's been any change in the law or the facts, and even if I

1   were to consider it on the merits, I don't believe that at

2   least with respect to the statements by Mr. Baca, that any of

3   those statements were against his penal interest, nor were the

4   circumstances under which they were given -- there was no

5   trustworthiness such that they should be admitted at trial.

6   There's nothing in the facts or circumstances surrounding which

7   of those statements were made that would indicate some

8   independent trustworthiness, and those statements are plainly

9   hearsay.

10        With respect to immunity for Mr. Baca, there was no

11   evidence that the government intentionally caused the defense

12   witness to invoke his Fifth Amendment right against

13   incrimination with the purpose of distorting the fact-finding

14   process.  I don't think there's any evidence the government or

15   its agents took any affirmative actions to prevent a defense

16   witness from testifying, in this case, Mr. Baca; nor is there

17   any showing that denying Mr. Baca use of immunity would distort

18   the fact-finding process at the trial.

19        Moreover, there's been no showing that the testimony that

20   Mr. Baca would give directly contradicted the testimony of

21   Mr. Manzo, who I believe was the only immunized witness called

22   by the government.  In other words, there is no evidence of a

23   selective denial of immunity by the government.

24        So that motion for reconsideration is denied.

25             MR. FOX:  Your Honor, the only other issue that the

```
 1    government has -- we showed you an article -- a printed article
 2    at sidebar on the Vikings issue.
 3         How would you like us to make this part of the record?
 4              THE COURT:  I'd like to have that marked for
 5    identification.
 6              MR. FOX:  We will mark it -- I believe 196 is
 7    available, so we'll mark it for identification as Exhibit 196.
 8              THE COURT:  All right.
 9              MR. FOX:  And we'll make copies for everybody next
10    time we're here.
11              THE COURT:  Okay.  And so I assume the jury will get
12    this case right around noon or thereabouts.  We'll have lunch
13    brought in for the jury.  They will probably go until 3:30
14    tomorrow.  Make sure the clerk has a phone number where he can
15    reach you, preferably a cell phone, and hopefully you will be
16    in the building.
17         Anything else?
18              MR. FOX:  Nothing from the government, Your Honor.
19              MR. STEWARD:  Nothing from the defense, Your Honor.
20              THE COURT:  And you've agreed upon a redacted
21    indictment?
22              MR. FOX:  Yes, Your Honor.  That was attached to the
23    trial memo.  We refiled it because the first time we filed it,
24    we mistakenly did not attach the redacted indictment.  But we
25    now have -- we filed again an amended version that contained
```

1    the redacted indictment.  It is -- so you can easily find it.

2    I believe that it is Document 136.

3            THE COURT:  That's fine.  It's my practice to send

4    back multiple copies of the jury instructions as well as the

5    indictment to the jury, and I'd like counsel to meet once the

6    closing arguments have concluded to confirm with the clerk

7    what's to go back to the jury.  Again, the recordings will not

8    go back, nor will the transcripts.

9        Okay.  All right.  We'll see everybody tomorrow morning at

10   eight o'clock.

11           MR. FOX:  Thank you, Your Honor.

12           MR. JAUREGUI:  Your Honor, 7:45 tomorrow?

13           THE COURT:  Well, I guess -- I thought that we sort

14   of resolved those issues but --

15           MR. JAUREGUI:  Okay.

16           MR. HAIG:  I think we have, Your Honor.

17           MR. FOX:  And I've talked to the defense -- one last

18   thing on Yoshinaga.  I've talked to the defense.  I will

19   probably go into the absence of communications, which I don't

20   think are attorney-client privilege.  Just so we're aware, I'll

21   talk to Mr. Hershman to make sure that's not going to be an

22   area of objection, but that's going to be one of my areas of

23   cross.  We'll see.

24           THE COURT:  Okay.

25       (The proceedings adjourned at 2:49 p.m.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

      I, SHAYNA MONTGOMERY, Former Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  *August 24, 2016*

         /s/ SHAYNA MONTGOMERY
        _____
        SHAYNA MONTGOMERY, CSR, RPR, CRR
        Former Federal Official Court Reporter

**UNITED STATES DISTRICT COURT**